# Defendant's Appendix To Its Motion To Dismiss Or, In The Alternative, Motion For Summary Judgment[1]

## Table of Contents

|  | Date | Description | DA |
|---|---|---|---|
| 1 | Dec. 6, 2017 | Claimant's Application Package (Application and Supplemental Documents) | 1-164 |
| 2 | Dec. 28, 2017 | Eligibility Letter | 165-166 |
| 3 | Dec. 13, 2018 | Payment Letter | 167 |
| 4 | June 6, 2019 | Claimant's counsel email to DOJ Fund Attorney | 168-169 |
| 5 | June 7, 2019, June 18, 2019, June 18, 2019, and June 20, 2019 | Email communications between claimant's counsel and DOJ Fund Attorney | 170-173 |
| 6 | June 20, 2019 | Counsel Letter to Interim Special Master | 174-178 |
| 7 | July 16, 2019 | Counsel Letter to AAG Benczkowski | 179-185 |
| 8 | July 30, 2019 | Interim Special Master Letter to Counsel | 186 |
| 9 | Oct. 11, 2019 | Counsel Letter to Interim Special Master | 187 |
| 10 | Oct. 24, 2019 | Interim Special Master Letter to Counsel | 188 |
| 11 | Jan. 15, 2020 | Reconsideration Decision Letter and Exhibits:  Record for Special Master and FBI FD-302s (Feb 2, 2016 and May 9, 2016) | 189-207 |
| 12 | Feb. 12, 2020 | Counsel Letter to Special Master | 208-209 |
| 13 | March 19, 2020 | Special Master's Letter re: Testimony Date and Claimant's Submission by March 23, 2020 | 210-211 |
| 14 | March 23, 2020 | Claimant's Submission and Supporting Materials Exhibits 1, 1, 2, 2 through 13; A-W) | 212-506 |
| 15 | April 7, 2020 | Testimony Transcript (Redacted) | 507-610 |
| 16 | April 24, 2020 | Special Master's Email and Hearing Continuation Procedures | 611-612 |
| 17 | June 26, 2020 | Department Submission and B. Kramarsic Declaration with Exhibits 1, 2 [Supplemental Record] | 613-754 |
| 18 | July 27, 2020 | Claimant's Reply to the Department's June 26, 2020 submission and Declaration of Counsel re G. Serrano | 755-777 |
| 19 | July 28, 2020 | Special Master's Email to Counsel Confirming Receipt of Claimant's Response | 778-779 |

[1] Defendant notes that redactions to the appendix marked in black reflect either redactions of classified information that was also redacted from the record provided to the Special Master or redactions of personally identifiable information.  This public filing also contains additional redactions (marked with the word "REDACTED") that, consistent with the Court's March 4, 2021 Order, reflect portions of the appendix that plaintiff and defendant have jointly identified as containing information that is sensitive and has previously been submitted to a court or administrative tribunal under seal.

| 20 | Sept. 15, 2020 | Special Master's Letter Requesting Additional Information from Counsel | 780-781 |
|----|----------------|-----------------------------------------------------------------------|---------|
| 21 | Oct. 13, 2020  | Special Master's Email Granting Claimant Extension                     | 782-783 |
| 22 | Nov. 20, 2020  | Counsel Response to Special Master's Sept. 15, 2020 Letter             | 784-797 |
| 23 | Dec. 7, 2020   | Final Decision Letter                                                 | 798-800 |



# U.S. Victims of State Sponsored Terrorism Fund

## Application Form



OMB No. 1123-0013
Expires 12/31/2019

## Instructions:

Please complete the questions included in this Application Form (the "Application Form") as your submission for compensation from the U.S. Victims of State Sponsored Terrorism Fund (the "Fund"). If you wish to submit a claim to the Fund, you must either complete this Application Form or submit an Application Form electronically by visiting **www.usvsst.com**. Only one application may be submitted for each claim and only the Personal Representative may submit a claim for a deceased Victim.

## When completing this Application Form, you must:

- Print your answers using black or blue ink.
- Submit your answers in English.
- Submit the signed Signature Page with your completed Application Form.
- Submit required documentation with your completed Application Form.

**The Fund keeps all documents you submit with your Application Form. Please make copies for your records of any documents you submit, including a copy of your completed Application Form.**

## Filing Deadline:

**A claim based on a final judgment obtained on or after July 14, 2016 must be submitted no later than 90 days after the date of obtaining the final judgment.**

## Required Documentation Checklist:

A document checklist is provided with this form (Part VI of the Application Form) to assist you in gathering and submitting the document(s) needed to process your claim.

## Submitting Your Application Form:

Your completed Application Form may be mailed to the Claims Administrator via first-class or overnight mail, postage prepaid, addressed as follows:

**By regular mail:**
U.S. Victims of State Sponsored Terrorism Fund
c/o GCG
PO Box 10299
Dublin, OH 43017-5899

**By overnight mail:**
U.S. Victims of State Sponsored Terrorism Fund
c/o GCG
5151 Blazer Parkway, Ste A
Dublin, OH 43017

An Application Form may also be submitted as an email attachment to info@usvsst.com or faxed toll free to (855) 409-7130. If you are outside the United States, the toll fax number is (614) 553-1426.

It is very important that you keep the Fund informed of any changes in your mailing address, telephone number, or email address because this is the information that the Fund will use to contact you about your claim.

If you need assistance completing this Application Form, or have any questions, please call our toll-free helpline at (855) 720-6966. If you are calling from outside the United States, please call collect at (614) 553-1013.



October 2016 Version 2.0
DA1



# U.S. Victims of State Sponsored Terrorism Fund

## Application Form

OMB No. 1123-0013
Expires 12/31/2019

**Privacy Act Notice:**

By submitting this form, you are authorizing the U.S. Department of Justice to collect this information as allowed by the Justice for United States Victims of State Sponsored Terrorism Act (the "Act"), codified at 42 U.S.C. § 10609 (2015). The information you submit in your claim, including but not limited to your Social Security Number, is for official use by the U.S. Department of Justice for the purposes of determining your eligibility for, and the amount of, compensation you may receive under your claim to the Fund. In addition, Executive Order 9397 (November 22, 1943) authorizes federal agencies to use Social Security numbers as individual identifiers to distinguish between people with the same or similar names, and 5 U.S.C. § 5514, 26 U.S.C. §§ 6402, 6331, 31 U.S.C. §§ 3711–20E, 42 U.S.C. § 664, and other applicable legal authorities, authorize the Department of the Treasury and other officials disbursing federal payments to use individual Social Security numbers to identify federal payment recipients who owe a delinquent debt. Providing this information is voluntary; however, failure to provide complete information may result in a delay in processing or a denial of your claim. Information you submit regarding your claim may be disclosed by the U.S. Department of Justice only in accordance with the provisions of the Privacy Act, including the routine uses indicated below:

(a)  To the Department of the Treasury to ensure that any recipients of federal payments who also owe delinquent federal debts have their payment offset or withheld or reduced to satisfy the debt.

(b)  Where a record, either alone or in conjunction with other information, indicates a violation or potential violation of law – criminal, civil, or regulatory in nature – the relevant records may be referred to the appropriate federal, state, local, territorial, tribal, or foreign law enforcement authority or other appropriate entity charged with the responsibility for investigating or prosecuting such violation or charged with enforcing or implementing such law.

(c)  In an appropriate proceeding before a court, grand jury, or administrative or adjudicative body, when the U.S. Department of Justice determines that the records are arguably relevant to the proceeding; or in an appropriate proceeding before an administrative or adjudicative body when the adjudicator determines the records to be relevant to the proceeding.

(d)  To an actual or potential party to litigation or the party's authorized representative for the purpose of negotiation or discussion of such matters as settlement, plea bargaining, or in informal discovery proceedings.

(e)  To the news media and the public, including disclosures pursuant to 28 C.F.R. § 50.2, unless it is determined that release of the specific information in the context of a particular case would constitute an unwarranted invasion of personal privacy.

(f)  To contractors, grantees, experts, consultants, students, and others performing or working on a contract, service, grant, cooperative agreement, or other assignment for the federal government, when necessary to accomplish an agency function related to this system of records.

(g)  To a former employee of the U.S. Department of Justice for purposes of: responding to an official inquiry by a federal, state, or local government entity or professional licensing authority, in accordance with applicable U.S. Department of Justice regulations; or facilitating communications with a former employee that may be necessary for personnel-related or other official purposes where the U.S. Department of Justice requires information and/or consultation assistance from the former employee regarding a matter within that person's former area of responsibility.

(h)  To a Member of Congress or staff acting upon the Member's behalf when the Member or staff requests the information on behalf of, and at the request of, the individual who is the subject of the record.





# U.S. Victims of State Sponsored Terrorism Fund

## Application Form

OMB No. 1123-0013
Expires 12/31/2019

(i)  To appropriate agencies, entities, and persons when (1) the U.S. Department of Justice suspects or has confirmed that the security or confidentiality of information in the system of records has been compromised; (2) the U.S. Department of Justice has determined that as a result of the suspected or confirmed compromise there is a risk of harm to economic or property interests, identity theft or fraud, or harm to the security or integrity of this system or other systems or programs (whether maintained by the U.S. Department of Justice or another agency or entity) that rely upon the compromised information; and (3) the disclosure made to such agencies, entities, and persons is reasonably necessary to assist in connection with the U.S. Department of Justice's efforts to respond to the suspected or confirmed compromise and prevent, minimize, or remedy such harm.

(j)  To the National Archives and Records Administration for purposes of records management inspections conducted under the authority of 44 U.S.C. §§ 2904 and 2906.

**Paperwork Reduction Act Notice:**

This request is in accordance with the Paperwork Reduction Act of 1995.  An agency may not conduct or sponsor an information collection and a person is not required to respond to a collection of information unless it contains a currently valid Office of Management and Budget ("OMB") approval number.  We try to create forms and instructions that are accurate, can be easily understood, and that impose the least possible burden on you.  The information collected in this Application Form is for the purpose of assessing the eligibility of your claim for compensation from the Fund, and for the purpose of determining the appropriate amount of compensation.  It is estimated that applicants will complete the Application Form in an average of 2 hours.

Comments concerning the accuracy of this burden estimate and suggestions for reducing this burden should be directed to the Office of the Special Master, U.S. Victims of State Sponsored Terrorism Fund, U.S. Department of Justice, 950 Pennsylvania Ave, NW, Washington, DC 20530; OMB control number 1123-0013.



DA3



# U.S. Victims of State Sponsored Terrorism Fund

### Application Form
OMB No. 1123-0013
Expires 12/31/2019

## PART I – VICTIM AND APPLICANT INFORMATION

The term "Victim" refers to a U.S. person who (1) has secured a final judgment in a U.S. district court under state or federal law against a state sponsor of terrorism and arising from an act of international terrorism, for which the foreign state was found not immune under section 1605A, or section 1605(a)(7), of title 28, United States Code ("FSIA"), or (2) was held hostage at the United States Embassy in Tehran, Iran during the period beginning November 4, 1979, and ending January 20, 1981, or the spouse or child of a former hostage as described in this paragraph, if such person is identified as a member of the proposed class in case number 1:00-CV-03110 (EGS) of the United States District Court for the District of Columbia. The term "Applicant" refers to the individual who is filing the claim to seek compensation for the Victim. Individuals who are filing a claim on their own behalf are both the Applicant and the Victim.

### INFORMATION ABOUT THE VICTIM

1. **Complete the information below.** *Please Note: If you are a Personal Representative who is filing on behalf of a deceased Victim, please complete the below information to the extent possible for the deceased Victim.*

| Last Name | First Name | Middle Name |
|---|---|---|
| Hekmati | Amir | Mirza |

| Mailing Address | | | |
|---|---|---|---|
| | | | |

| City | State | Zip/Postal Code | Country (if not in U.S.) |
|---|---|---|---|
| | | | |

| Home Phone | Cell Phone | Facsimile |
|---|---|---|
| | | |

| Email Address | Date of Birth |
|---|---|
| | |

Is or was the Victim a U.S. citizen? ▮

Provide the Victim's Social Security Number (SSN) or Taxpayer ID Number (TIN), if any: ▮

If the Victim does or did not have a SSN or TIN, or is or was not a U.S. citizen, provide the following:

| National Identification Number | Country of Citizenship | Passport Number | Passport Country |
|---|---|---|---|
| | | | |

Did or has the Victim ever gone by any other names (*e.g.*, maiden name)? ▮

If **Yes,** provide the following:

| Last Name | First Name | Middle Name |
|---|---|---|
| | | |



4

DA4



# U.S. Victims of State Sponsored Terrorism Fund

## Application Form
OMB No. 1123-0013
Expires 12/31/2019

---

### INFORMATION ABOUT THE APPLICANT

2. **In what capacity are you filing the claim? Select _one_ from the list below:**

☒ **Self** – I am the Victim. You do not need to complete the remaining information in this section – *skip to Question 6.*

**For Applicants who are _not_ the Victim: (You must also complete Question 3)**
**Select _one_ from the list below:**

☒ **Personal Representative for the deceased Victim.** In addition to completing the applicable sections below, *you must complete Part V of the Application Form.*

☒ **Parent or guardian of a Victim who is a minor.** Please provide additional information below:

    ☐ I have sole legal custody of the minor.

    ☐ I share or have joint legal custody of the minor. **(You must also complete Question 4)**

☒ **Guardian of a non-minor.**

☒ **Other (please specify):** _____

**For Attorneys:**

☐ If your client is an Applicant other than the Victim (such as a Personal Representative), please complete Questions 3 and 6.

☑ If your client is the Victim, *you may skip Questions 3 and 4 and provide your information in Question 6.*

> *If there is a co-Personal Representative or if you share joint custody of a minor, you also must provide that individual's information in Question 4.*

3. **Complete the following information for the Applicant:**

| Last Name | First Name | Middle Name |
|---|---|---|
| | | |

| Mailing Address | | | |
|---|---|---|---|
| | | | |

| City | State | Zip/Postal Code | Country (if not in U.S.) |
|---|---|---|---|
| | | | |

| Home Phone | Cell Phone | Facsimile |
|---|---|---|
| | | |

| Email Address |
|---|
| |

Is the Applicant a U.S. citizen? ☒ Yes ☒ No

    Provide the Applicant's Social Security Number (SSN) or Taxpayer ID Number (TIN), if any: _____

    If the Applicant does not have an SSN or TIN, or is not a U.S. citizen, provide the following:

| National Identification Number | Country of Citizenship | Passport Number | Passport Country |
|---|---|---|---|
| | | | |





# U.S. Victims of State Sponsored Terrorism Fund

## Application Form

OMB No. 1123-0013
Expires 12/31/2019

---

4. **If applicable, complete the following information about the person with whom you share joint representation or custody of the Victim.** *Please Note: Both signatures are required wherever the Fund asks for a signature.*

☐ Not Applicable

| Last Name | First Name | Middle Name |
|---|---|---|
| | | |

| Mailing Address |
|---|
| |

| City | State | Zip/Postal Code | Country (if not in U.S.) |
|---|---|---|---|
| | | | |

| Home Phone | Cell Phone | Facsimile |
|---|---|---|
| | | |

| Email Address |
|---|
| |

Is the person a U.S. citizen?  ☒ Yes  ☒ No

Provide the person's Social Security Number (SSN) or Taxpayer ID Number (TIN), if any: _____

If the person does not have an SSN or TIN, or is not a U.S. citizen, provide the following:

| National Identification Number | Country of Citizenship | Passport Number | Passport Country |
|---|---|---|---|
| | | | |

**INFORMATION ABOUT ALTERNATIVE CONTACT (IF APPLICABLE)**

5. **If there is someone with whom you would like to authorize the Fund to communicate regarding the claim, (*e.g.*, a spouse or a child), list his or her contact information below.**

☐ Not Applicable

| Last Name | First Name | Middle Name |
|---|---|---|
| | | |

| Mailing Address |
|---|
| |

| City | State | Zip/Postal Code | Country (if not in U.S.) |
|---|---|---|---|
| | | | |

| Email Address |
|---|
| |

| Telephone | Relationship to the Victim |
|---|---|
| | |



6

DA6



# U.S. Victims of State Sponsored Terrorism Fund

## Application Form
OMB No. 1123-0013
Expires 12/31/2019

---

**INFORMATION ABOUT THE APPLICANT'S ATTORNEY (IF APPLICABLE)**

6. **If an attorney is representing the Applicant with this claim, fill out the information below:**

   *Please Note: All communications from the Fund will be with the attorney you identify unless your attorney instructs the Fund otherwise in writing. In addition, you must provide documentation (signed by you and your attorney) of your counsel's authority to represent you, and you and your attorney must complete the certification in Part IV acknowledging that attorneys may not charge, receive, or collect any payment of fees and costs that in the aggregate exceed 25% of any payments. A separate Application Form must be completed and filed on behalf of each represented individual.*

   ☐ Not Applicable

| Last Name<br>Grim | | First Name<br>Emily | Middle Name<br>Pearson |
|---|---|---|---|
| Law Firm Name<br>Gilbert LLP | | | |
| Mailing Address<br>1100 New York Ave. NW, Suite 700 | | | |
| City<br>Washington | State<br>DC | Zip/Postal Code<br>20005 | Country (if not in U.S.) |
| Email Address<br>grime@gotofirm.com | | Telephone<br>(202) 772-3926 | Facsimile |



DA7



# U.S. Victims of State Sponsored Terrorism Fund

## Application Form
OMB No. 1123-0013
Expires 12/31/2019

---

## PART II – ELIGIBILITY FOR COMPENSATION

In order for the Victim to receive compensation from the Fund, the Applicant must complete either Part II.A or Part II.B below and provide the appropriate supporting documents, as applicable. Part VI lists the required supporting documents you must submit to support each claim type.

**A. VICTIM WHO IS A HOLDER OF A FINAL JUDGMENT**

**Check the box below and answer each question if the Victim is the holder of a final judgment issued by a U.S. district court under state or federal law, awarding the Victim compensatory damages on a claim(s) brought by the Victim arising from acts of international terrorism for which the foreign state was found not immune from the jurisdiction of the courts of the United States under the FSIA.**

> *Please Note:* Judgment creditors in *Peterson v. Islamic Republic of Iran*, No. 10 Civ. 4518 (S.D.N.Y.), and Settling Judgment Creditors in *In re 650 Fifth Avenue & Related Properties*, No. 08 Civ. 10934 (S.D.N.Y. filed Dec. 17, 2008), must read Part VI of the Fund's Notice published in the Federal Register and available on the Fund's website www.usvsst.com. In addition, a Victim seeking a conditional payment must sign the certification in Part IV of the Application Form.

☑ **HOLDER OF A FINAL JUDGMENT**

7. **Please provide the name of the case, the U.S. district court in which the judgment was entered, the case number, and the amount of compensatory damages awarded.**

| Case Name | U.S. District Court |
|---|---|
| Hekmati v. Government of the Islamic Republic of Iran | U.S. District Court for the District of Columbia |
| **Case Number**<br>16-0875 (ESH) | **Compensatory Damages Award Amount**<br>$31,748,179 |

8. **Were any immediate family member(s) of the Victim identified in the final judgment?** ☐ Yes ☑ No
   If **No**, proceed to Question 10.



DA8



# U.S. Victims of State Sponsored Terrorism Fund

## Application Form

OMB No. 1123-0013
Expires 12/31/2019

9. List any immediate family member(s) who also were identified in the final judgment.  Immediate family members are a spouse, domestic partner, child, stepchild, parent, stepparent, brother, sister, half-brother, and half-sister of the Victim.  If more than two immediate family members were identified in the final judgment, identify each family member by copying this page, completing this section for each one, and submitting the additional page(s) with the Application Form.

| Last Name | First Name | Middle Name |
|---|---|---|
| Mailing Address | | |

| City | State | Zip/Postal Code | Country (if not in U.S.) |
|---|---|---|---|
| Telephone | | | Relationship to the Victim |

| Last Name | First Name | Middle Name |
|---|---|---|
| Mailing Address | | |

| City | State | Zip/Postal Code | Country (if not in U.S.) |
|---|---|---|---|
| Telephone | | | Relationship to the Victim |



DA9



# U.S. Victims of State Sponsored Terrorism Fund

## Application Form

OMB No. 1123-0013
Expires 12/31/2019

10. **Did any immediate family member(s) obtain any separate final judgment(s) based on the same act of international terrorism?** ☒ Yes ☑ No

> Answer the questions below only if you answered yes to Question 10. **If more than one immediate family member was identified in the(se) final judgment(s), identify each family member by copying this page, completing this section for each one, and submitting the additional page(s) with the Application Form.**

> a) If **Yes**, please list the immediate family member(s) who obtained the separate final judgment(s).

| Last Name | First Name | Middle Name |
|---|---|---|
| Mailing Address | | |

| City | State | Zip/Postal Code | Country (if not in U.S.) |
|---|---|---|---|
| Telephone | | | Relationship to the Victim |

> b) Please provide the name of the case, the U.S. district court in which the separate final judgment was entered, the case number, and the amount of compensatory damages awarded.

| Case Name | U.S. District Court |
|---|---|
| Case Number | Compensatory Damages Award Amount |



10

DA10



# U.S. Victims of State Sponsored Terrorism Fund

## Application Form

OMB No. 1123-0013
Expires 12/31/2019

11. **Is the Victim a judgment creditor in *Peterson v. Islamic Republic of Iran* or Settling Judgment Creditor *In re 650 Fifth Avenue & Related Properties*?**  ☒Yes ☐No

**Answer the questions below only if you answered yes to Question 11.**

a)  Please indicate whether the Victim is a judgment creditor, Settling Judgment Creditor, or both.

☐ Judgment creditor in *Peterson v. Islamic Republic of Iran*
☐ Settling Judgment Creditor in *In re 650 Fifth Avenue & Related Properties*
☒ <u>Both</u> a judgment creditor in *Peterson v. Islamic Republic of Iran* and a Settling Judgment Creditor in *In re 650 Fifth Avenue & Related Properties*

b)  Is the Victim electing to participate in the Fund? ☒Yes ☐No

**Answer the questions below only if you answered yes to Question 11b.**

i)  Did the Victim separately notify the Attorney General in writing? ☐Yes ☒No
Date the Attorney General was notified: _____

ii)  Did the Victim separately notify the chief judge of the United States District Court for the Southern District of New York? ☐Yes ☒No
Date the chief judge was notified: _____

iii)  Did the Victim separately notify the Special Master in writing? ☐Yes ☒No
Date the Special Master was notified: _____

**Answer the question below only if you answered no to Question 11b.**

iv)  Is the Victim seeking a Conditional Payment? ☒Yes ☐No



11

DA11



# U.S. Victims of State Sponsored Terrorism Fund

## Application Form
OMB No. 1123-0013
Expires 12/31/2019

---

12. **Did the Victim or the Victim's Personal Representative file a claim with the September 11th Victim Compensation Fund of 2001?** ☒Yes ☑No

**Answer the questions below only if you answered yes to Question 12.**

a) Did the Victim receive an award or an award determination (including a determination that denied an award)? ☒Yes ☒No

b) Did the Victim's heirs and beneficiaries receive an award or an award determination? ☒Yes ☒No

**Answer the question below only if you answered yes to Question 12(b).**

Please identify the heirs and beneficiaries who received an award or an award determination from the September 11th Victim Compensation Fund of 2001. If more than two heirs and beneficiaries received an award or an award determination, identify each heir and beneficiary by copying this page, completing this section for each one, and submitting the additional page(s) with the Application Form.

| Last Name | First Name | | Middle Name |
|---|---|---|---|
| Mailing Address | | | |
| City | State | Zip/Postal Code | Country (if not in U.S.) |
| Telephone | | | Relationship to the Victim |

| Last Name | First Name | | Middle Name |
|---|---|---|---|
| Mailing Address | | | |
| City | State | Zip/Postal Code | Country (if not in U.S.) |
| Telephone | | | Relationship to the Victim |



12

DA12



# U.S. Victims of State Sponsored Terrorism Fund

## Application Form
OMB No. 1123-0013
Expires 12/31/2019

### B. VICTIM WHO WAS HELD HOSTAGE OR SPOUSE OR CHILD OF PERSON HELD HOSTAGE

Check one of the boxes below and answer each question if the Victim was taken and held hostage from the U.S. Embassy in Tehran, Iran, during the period beginning November 4, 1979, and ending January 20, 1981, or is the spouse or child of a former hostage as described in this paragraph, if such person is also identified as a member of the proposed class in case number 1:00-CV-03110 (EGS) of the United States District Court for the District of Columbia.

☒ **HELD HOSTAGE**

13. Date the Victim was taken hostage: _____

14. Date the Victim was released: _____

15. Is the Victim a member of the proposed class in case number 1:00-CV-03110 (EGS) of the United States District Court for the District of Columbia?   ☒ Yes ☒ No

☒ **SPOUSE OF PERSON HELD HOSTAGE**

16. Name of hostage: _____

17. Date the spouse was married to the former hostage: _____

18. Did the marriage continue through January 20, 1981?   ☒ Yes ☒ No

19. Is the spouse a member of the proposed class in case number 1:00-CV-03110 (EGS) of the United States District Court for the District of Columbia?   ☒ Yes ☒ No

☒ **CHILD OF PERSON HELD HOSTAGE**

20. Name of hostage: _____

21. Date of birth: _____

22. Was the child adopted by the former hostage?   ☒ Yes ☒ No

    If **Yes**, date of adoption: _____

23. Is the child a member of the proposed class in case number 1:00-CV-03110 (EGS) of the United States District Court for the District of Columbia?   ☒ Yes ☒ No





# U.S. Victims of State Sponsored Terrorism Fund

## Application Form
OMB No. 1123-0013
Expires 12/31/2019

---

## PART III – OTHER INFORMATION IN SUPPORT OF APPLICATION

### COMPENSATION SOURCES OTHER THAN THIS FUND

**All Applicants (except those applying as Iran hostages, or spouses or children thereof) must complete this section. Please identify compensation from any source other than this Fund that the Victim, or the Victim's beneficiaries, received or is entitled to receive as a result of the act of international terrorism that gave rise to his or her final judgment. Sources other than this Fund include, but are not limited to, life insurance; pension funds; death benefit programs; payments by federal, state, or local governments (including payment from the September 11th Victim Compensation Fund of 2001); and court awarded compensation related to the act that gave rise to the judgment.**

24. Indicate below whether the Victim or the Victim's beneficiaries received or is entitled to receive any of the following:

| Program/Benefits | Y/N | Amount | Source(s) |
|---|---|---|---|
| Life insurance | ☒ Yes ☒ No | | |
| Pension funds | ☒ Yes ☒ No | | |
| Death benefit programs | ☒ Yes ☒ No | | |
| Payments by federal, state, or local governments (including payment from September 11th Victim Compensation Fund of 2001) | ☒ Yes ☒ No | | |
| Court awarded compensation related to the act which gave rise to the judgment | ☒ Yes ☒ No | | |
| Any other source(s) of compensation not already listed (If any, please provide the type and source in the "Source(s)" column) | ☒ Yes ☒ No | | |

If more space is required for other sources of compensation, identify each source by copying this page and submitting the additional page(s) with the Application Form.

**Please Note: It is the Applicant's obligation to keep the Fund informed of any compensation that the Victim, or the Victim's beneficiaries, received or is entitled to receive from sources other than this Fund throughout the life of the Fund.**





# U.S. Victims of State Sponsored Terrorism Fund

## Application Form

OMB No. 1123-0013
Expires 12/31/2019

---

## INFORMER INFORMATION (IF APPLICABLE)

Complete this section only if you are seeking additional compensation as an informer. A Victim who meets the eligibility requirements of Part II above and identifies and notifies the Attorney General in writing of funds or property of a state sponsor of terrorism, or held by a third party on behalf of or subject to the control of that state sponsor of terrorism, may be eligible to receive an award of 10% of the related funds deposited in the Fund if the other conditions in 42 U.S.C. § 10609(g) are met.

☑ Not Applicable

25. Has the Victim or Applicant notified the Attorney General?   ☒ Yes ☒ No

    a)  If **Yes**, please provide the date of the communication and identify the person notified:

_____

_____

---

## ADDITIONAL INFORMATION (Optional)

Use the area below (and any additional pages) to provide any other information that may be relevant to the individual circumstances of this claim. Please also identify and submit any additional documents not already requested that may be relevant.



DA15



# U.S. Victims of State Sponsored Terrorism Fund

## Application Form
OMB No. 1123-0013
Expires 12/31/2019

## PART IV – SIGNATURES AND CERTIFICATIONS

By submitting this Application Form, you are agreeing that you understand the notices below (continued on the following page), including the Privacy Act (as referenced fully in the instructions), authorization to communicate with your attorney or other representative, and the limitation on attorneys' fees.

<u>Instructions</u>: Please review the following statements and initial where indicated.  Sign, date, and print your name at the end of the Application Form.

*For all Applicants, please initial in acknowledgement of the following:*

**AH**
_____
Applicant
Initials

I **certify**, under oath, subject to penalty of perjury or in a manner that meets the requirements of title 28 U.S.C. § 1746, that the information provided in the Application Form and any documents submitted in support of the claim are true and accurate to the best of my knowledge, and I agree that any payment made by the Fund is expressly conditioned upon the truthfulness and accuracy of the information and documentation submitted in support of the claim.  When a Victim is represented by a third party, such as a Victim's legal guardian, the Personal Representative of the decedent Victim's estate, or other person legally authorized to act for the Victim, these persons must have authority to certify on behalf of the Victim.

**AH**
_____
Applicant
Initials

I **understand** that false statements or claims made in connection with the claim may result in fines, imprisonment, and/or any other remedy available by law to the federal government, including as provided in title 18 U.S.C. § 1001, and that claims that appear to be potentially fraudulent or to contain false information will be forwarded to federal, state, and local law enforcement authorities for possible investigation and prosecution.

**AH**
_____
Applicant
Initials

I **authorize** the U.S. Department of Justice to disclose any records or information relating to my claim in accordance with the Privacy Act Notice, including the routine uses, identified above.  This includes, but is not limited to, the disclosure of any records or information relating to my claim for the purpose of determining qualification and/or compensation of my claim specifically to: agency contractors performing or working on a contract, service, grant, cooperative agreement, or other assignment for the federal government when necessary for administration of the Fund; and the Department of the Treasury to ensure that any recipients of federal payments who also owe delinquent debts have their payment offset or withheld or reduced to satisfy the debt.

**AH**
_____
Applicant
Initials

If I receive payment under the Act, I **agree** and **accept** that the United States shall be subrogated to the rights of the Victim (and any of his or her heirs, successors, or assignees) to the extent and in the amount of such payment, but that, to the extent amounts of damages remain unpaid and outstanding to the Victim following any payments made under this Act, each Victim shall retain creditor rights in any unpaid or outstanding amounts of the judgment, including any prejudgment or post-judgment interest, or punitive damages, awarded by a U.S. district court pursuant to a judgment.



DA16



## U.S. Victims of State Sponsored Terrorism Fund

### Application Form
OMB No. 1123-0013
Expires 12/31/2019

---

*For Applicants who are represented by an attorney, __you and your attorney__ must initial the following:*

**AH**
_____
Applicant
Initials

**EG**
_____
Attorney
Initials

Notwithstanding any contract for legal services or retainer agreement, an attorney representing a Victim may not charge, receive, or collect, and the Special Master will not approve, any payment of fees and costs that in the aggregate exceeds 25 percent of any payment made under this title on such claim. The attorney shall certify his or her compliance with this section and shall provide such information as the Special Master requires ensuring such compliance. An attorney who violates this limitation on fees shall be fined under title 18, United States Code, imprisoned for not more than 1 year, or both.

*For Applicants, if the Victim is a judgment creditor in __Peterson v. Islamic Republic of Iran__ or a Settling Judgment Creditor in __In re 650 Fifth Avenue & Related Properties__ seeking conditional payment, please initial the following:*

_____
Applicant
Initials

I **understand** that, notwithstanding my eligibility for payment and the deadline for initial payments set forth in the Act, the Special Master shall allocate but withhold payment until such time as an adverse final judgment is entered in *Peterson v. Islamic Republic of Iran*, No. 10 Civ. 4518 (S.D.N.Y.), and in *In re 650 Fifth Avenue & Related Properties*, No. 08 Civ. 10934 (S.D.N.Y. filed Dec. 17, 2008).

*For Applicants with an attorney or other authorized representative or alternative contact, please initial in acknowledgment of the following:*

**AH**
_____
Applicant
Initials

I **authorize** the Special Master, the Special Master's designees, the U.S. Department of Justice, or agency contractors assisting in the administration of the Fund to contact my attorney or other persons authorized to act on my behalf.

*For Applicants filing on behalf of a deceased Victim, please initial in acknowledgment of the following:*

_____
Applicant
Initials

I **certify** that I have provided the required Notice of Filing Claim to all of the decedent's living relatives and potentially interested parties by either personal delivery or certified mail, return receipt requested, and that I am not aware of anyone else to whom such notice should be provided.

---

**AMIR HEKMATI** Digitally signed by AMIR HEKMATI
Date: 2017.12.01 01:06:47 -06'00'
_____
**Signature of Applicant**

**AMIR HEKMATI**
_____
**Print Name**

**Emily Grim** Digitally signed by Emily Grim
DN: cn=Emily Grim, o, ou, email=grimma@gotofirm.com, c=US
Date: 2017.12.05 17 01 06 -05'00'
_____
**Signature of Authorized Representative (if applicable)**

**Emily Grim**
_____
**Print Name**

**12/01/2017**
_____
**Date of Signature (mm/dd/yyyy)**

**12/05/2017**
_____
**Date of Signature (mm/dd/yyyy)**



DA17



# U.S. Victims of State Sponsored Terrorism Fund

## Application Form
OMB No. 1123-0013
Expires 12/31/2019

## PART V - ADDITIONAL INFORMATION FOR CLAIM FILED FOR DECEASED VICTIMS

This part is for Applicants who are filing a claim on behalf of a deceased Victim.

1. **Have you been appointed by a court as the Personal Representative for the deceased Victim?**

   ☒Yes ☒No

   If **No**, have you attempted to be appointed the Personal Representative by a court?

   ☒Yes ☒No

   If **Yes,** explain below why you were not appointed as the Personal Representative by a court or attach a statement to your Application Form with the explanation.

   _____

   _____

   _____

2. **Did the decedent Victim leave a will?**

   ☒Yes ☒No ☒Do Not Know

### NOTICE TO INDIVIDUALS OF FILING OF CLAIM

You are required to notify the following people that you are filing a claim on behalf of the decedent Victim:

- ✓ The immediate family of the decedent (the spouse, former spouse(s), children, other dependents, siblings, and parents);
- ✓ The executor/administrator and beneficiaries of the decedent's will;
- ✓ The beneficiaries of the decedent's life insurance policies; and
- ✓ Any other person who may reasonably be expected to assert an interest in an award or to have a cause of action to recover damages relating to the wrongful death of the decedent.

*The "Additional Forms" page of the Fund's website contains a sample Notice of Filing Claim that you may provide to the required individuals. You are required to provide notice to everyone in the four categories above, even if they are not included in the decedent Victim's will, in accordance with Port VII of the Fund's Notice published in the Federal Register and available on the Fund's website at www.usvsst.com.*



18

DA18



# U.S. Victims of State Sponsored Terrorism Fund

## Application Form
OMB No. 1123-0013
Expires 12/31/2019

Please complete the information in the following sections:

**A. Decedent's mother – this individual is:**

☐ Deceased (*only name required*) ☐ Living but address unknown ☐ Living and information below:

| Last Name | First Name | Middle Name |
|---|---|---|
| | | |

| Mailing Address | | | |
|---|---|---|---|
| City | State | Zip/Postal Code | Country (if not in U.S.) |

| Email Address | Telephone |
|---|---|
| | |

| Method of Delivery: |
|---|
| ☐ Hand Delivered  ☐ Certified Mail, Return Receipt Requested  ☐ Other (Describe) _____ |
| Date of Delivery: |

| Please provide a short explanation if service could not be completed: |
|---|
| |

**B. Decedent's father – this individual is:**

☐ Deceased (*only name required*) ☐ Living but address unknown ☐ Living and information below:

| Last Name | First Name | Middle Name |
|---|---|---|
| | | |

| Mailing Address | | | |
|---|---|---|---|
| City | State | Zip/Postal Code | Country (if not in U.S.) |

| Email Address | Telephone |
|---|---|
| | |

| Method of Delivery: |
|---|
| ☐ Hand Delivered  ☐ Certified Mail, Return Receipt Requested  ☐ Other (Describe) _____ |
| Date of Delivery: |

| Please provide a short explanation if service could not be completed: |
|---|
| |



DA19



# U.S. Victims of State Sponsored Terrorism Fund

## Application Form

OMB No. 1123-0013
Expires 12/31/2019

---

**C.  Did decedent have a spouse or partner?**

☒ Yes - spouse   ☐ Yes – partner   ☐ No

If **Yes – this individual is:**

☐ Deceased (*only name required*)   ☐ Living but address unknown   ☐ Living and information below:

| Last Name | First Name | Middle Name |
|---|---|---|
|  |  |  |

| Mailing Address |
|---|
|  |

| City | State | Zip/Postal Code | Country (if not in U.S.) |
|---|---|---|---|
|  |  |  |  |

| Email Address | Telephone |
|---|---|
|  |  |

| Method of Delivery: |
|---|
| ☐ Hand Delivered   ☐ Certified Mail, Return Receipt Requested   ☐ Other (Describe) _____ |
| Date of Delivery: |
| Please provide a short explanation if service could not be completed: |

**D.  Did decedent have a former spouse or partner?**

☐ Yes – former spouse   ☐ Yes – former partner   ☐ No

If **Yes – this individual is:**

☐ Deceased (*only name required*)   ☐ Living but address unknown   ☐ Living and information below:

If the decedent Victim had more than one former spouse, identify each by copying this page, completing a section for each spouse, and submitting the additional page(s) with the Application Form.

| Last Name | First Name | Middle Name |
|---|---|---|
|  |  |  |

| Mailing Address |
|---|
|  |

| City | State | Zip/Postal Code | Country (if not in U.S.) |
|---|---|---|---|
|  |  |  |  |

| Email Address | Telephone |
|---|---|
|  |  |

| Method of Delivery: |
|---|
| ☐ Hand Delivered   ☐ Certified Mail, Return Receipt Requested   ☐ Other (Describe) _____ |
| Date of Delivery: |
| Please provide a short explanation if service could not be completed: |



DA20



# U.S. Victims of State Sponsored Terrorism Fund

## Application Form
OMB No. 1123-0013
Expires 12/31/2019

**E. Did decedent have siblings?**

☒ Yes  ☐ No

If **Yes**, indicate how many siblings the decedent Victim had, including siblings who are deceased: _____

Complete the information below for each sibling.

**Sibling 1 – this individual is:**

☒ Deceased (*only name required*)  ☒ Living but address unknown  ☒ Living and information below:

| Last Name | | First Name | Middle Name |
|---|---|---|---|
| Mailing Address | | | |
| City | State | Zip/Postal Code | Country (if not in U.S.) |
| Email Address | | | Telephone |

Method of Delivery:
☒ Hand Delivered  ☒ Certified Mail, Return Receipt Requested  ☒ Other (Describe) _____
Date of Delivery:

Please provide a short explanation if service could not be completed:

If the decedent Victim had more than two siblings, identify each sibling by copying this page, completing a section for each sibling, and submitting the additional page(s) with the Application Form.

**Sibling 2 – this individual is:**

☒ Deceased (*only name required*)  ☒ Living but address unknown  ☒ Living and information below:

| Last Name | | First Name | Middle Name |
|---|---|---|---|
| Mailing Address | | | |
| City | State | Zip/Postal Code | Country (if not in U.S.) |
| Email Address | | | Telephone |

Method of Delivery:
☒ Hand Delivered  ☒ Certified Mail, Return Receipt Requested  ☒ Other (Describe) _____
Date of Delivery:

Please provide a short explanation if service could not be completed:



DA21



# U.S. Victims of State Sponsored Terrorism Fund

## Application Form

OMB No. 1123-0013
Expires 12/31/2019

---

**F.  Did decedent have dependents (including biological or adopted children)?**

☒ Yes ☒ No

If **Yes**, indicate how many dependents the decedent had, including dependents who are deceased:_____

Complete the information below for each dependent.

**Dependent 1 – this individual is:**

☒Deceased (*only name required*) ☒Living but address unknown ☒Living and information below:

| Last Name | | First Name | | Middle Name |
|---|---|---|---|---|
| | | | | |
| Mailing Address | | | | |
| | | | | |
| City | State | Zip/Postal Code | Country (if not in U.S.) | |
| | | | | |
| Email Address | | | Telephone | |
| | | | | |
| Method of Delivery: ☒ Hand Delivered ☒ Certified Mail, Return Receipt Requested ☒ Other (Describe) _____ Date of Delivery: | | | | |
| Please provide a short explanation if service could not be completed: | | | | |

If the decedent Victim had more than two dependents, identify each dependent by copying this page, completing a section for each dependent, and submitting the additional page(s) with the Application Form.

**Dependent 2 – this individual is:**

☒Deceased (*only name required*) ☒Living but address unknown ☒Living and information below:

| Last Name | | First Name | | Middle Name |
|---|---|---|---|---|
| | | | | |
| Mailing Address | | | | |
| | | | | |
| City | State | Zip/Postal Code | Country (if not in U.S.) | |
| | | | | |
| Email Address | | | Telephone | |
| | | | | |
| Method of Delivery: ☒ Hand Delivered ☒ Certified Mail, Return Receipt Requested ☒ Other (Describe) _____ Date of Delivery: | | | | |
| Please provide a short explanation if service could not be completed: | | | | |



DA22



# U.S. Victims of State Sponsored Terrorism Fund

## Application Form

OMB No. 1123-0013
Expires 12/31/2019

**G.  Are there any other potential beneficiaries or persons who may have an interest in the claim?**

☐ Yes  ☐ No

If **Yes**, indicate the number of potential beneficiaries or persons who may have an interest in the claim, including potential beneficiaries who are deceased: _____

**Potential Beneficiary 1 – this individual is:**

☐ Deceased (*only name required*)  ☐ Living but address unknown  ☐ Living and information below:

| Last Name | First Name | Middle Name |
|---|---|---|
| | | |

| Relationship to Victim |
|---|
| |

| Mailing Address |
|---|
| |

| City | State | Zip/Postal Code | Country (if not in U.S.) |
|---|---|---|---|
| | | | |

| Email Address | Telephone |
|---|---|
| | |

| Describe interest in claim |
|---|
| |

| Method of Delivery: |
|---|
| ☐ Hand Delivered  ☐ Certified Mail, Return Receipt Requested  ☐ Other (Describe) _____<br>Date of Delivery: |
| Please provide a short explanation if service could not be completed: |



DA23



## U.S. Victims of State Sponsored Terrorism Fund

### Application Form
OMB No. 1123-0013
Expires 12/31/2019

If the decedent Victim had more than two potential beneficiaries, identify each potential beneficiary by copying this page, completing a section for each potential beneficiary, and submitting the additional page(s) with the Application Form.

**Potential Beneficiary 2 – this individual is:**

☒ Deceased (*only name required*)  ☒ Living but address unknown  ☒ Living and information below:

| Last Name | First Name | Middle Name |
|---|---|---|
| | | |

| Relationship to Victim |
|---|
| |

| Mailing Address |
|---|
| |

| City | State | Zip/Postal Code | Country (if not in U.S.) |
|---|---|---|---|
| | | | |

| Email Address | Telephone |
|---|---|
| | |

| Describe interest in claim |
|---|
| |

Method of Delivery:
☒ Hand Delivered  ☒ Certified Mail, Return Receipt Requested  ☒ Other (Describe) _____
Date of Delivery:

Please provide a short explanation if service could not be completed:



DA24



# U.S. Victims of State Sponsored Terrorism Fund

## Application Form
OMB No. 1123-0013
Expires 12/31/2019

## PART VI – DOCUMENT CHECKLIST

You must provide the documentation described below to establish eligibility for payment under the Act. In certain cases, the Special Master may request additional documentation. Providing thorough documentation is the best way to ensure your Application Form is processed quickly. All documents you submit to establish eligibility will be reviewed and considered by the Special Master.

All documents submitted in languages other than English must be accompanied by a complete translation into English. In addition, you must include a certification from the translator that he or she is a competent translator and that the translation is complete and accurate. The certification must include the date and the translator's name, signature, and address.

Any requests for waiver of a documentation requirement or an extension of time in which to submit a particular document must be submitted to the Special Master in writing at least 20 business days prior to the application deadline. Decisions to waive a documentation requirement or to extend the time to submit a particular document are wholly within the discretion of the Special Master.

You must submit all supporting documentation with your Application Form. Applicants do not need to submit multiple copies of the same document. One document may satisfy several of the below requirements.

### DOCUMENT REQUIREMENTS TO ESTABLISH ELIGIBILITY

An Applicant who seeks to establish eligibility for payment on the basis of a final judgment, as described in Part II.A above, must submit:

|  | Attached? |
|---|---|
| 1. A copy of the final judgment. *Please Note: You should include all court documents demonstrating that the judgment qualifies as an eligible final judgment (e.g., action brought under the FSIA, award for compensatory damages, and the individual award amount).* | ☑ |
| 2. Proof of service of judgment. | ☑ |



DA25



# U.S. Victims of State Sponsored Terrorism Fund

## Application Form
OMB No. 1123-0013
Expires 12/31/2019

An Applicant who seeks to establish eligibility for payment as a U.S. person who was held hostage at the U.S. Embassy in Tehran, Iran, during the period beginning November 4, 1979, and ending January 20, 1981, as described in Part II.B above, must submit:

|  | Attached? |
|---|---|
| 1. Verification of the date on which the Victim was taken hostage from the U.S. Embassy in Tehran, Iran. | ☒ |
| 2. Verification of the date on which the Victim was released from the U.S. Embassy in Tehran, Iran. | ☒ |
| 3. Verification that the Victim is a member of the proposed class in case number 1:00-CV-03110 (EGS) of the United States District Court for the District of Columbia. | ☒ |

An Applicant who seeks to establish eligibility for payment as the spouse of a U.S. person who was held hostage at the U.S. Embassy in Tehran, Iran, during the period beginning November 4, 1979, and ending January 20, 1981, as described in Part II.B above, must submit:

|  | Attached? |
|---|---|
| 1. A copy of a marriage certificate showing the date of marriage. | ☒ |
| 2. An affirmation that the marriage continued through January 20, 1981. | ☒ |
| 3. A copy of the divorce decree, if the Applicant is no longer married to the Victim. | ☒ |
| 4. Verification that the spouse is a member of the proposed class in case number 1:00-CV-03110 (EGS) of the United States District Court for the District of Columbia. | ☒ |

An Applicant who seeks to establish eligibility for payment as the child of a U.S. person who was held hostage at the U.S. Embassy in Tehran, Iran, during the period beginning November 4, 1979, and ending January 20, 1981, as described in Part II.B above, must submit:

|  | Attached? |
|---|---|
| 1. A copy of a birth certificate or adoption decree showing a date of birth or adoption prior to January 20, 1981. | ☒ |
| 2. Verification that the child is a member of the proposed class in case number 1:00-CV-03110 (EGS) of the United States District Court for the District of Columbia. | ☒ |



DA26



# U.S. Victims of State Sponsored Terrorism Fund

## Application Form

OMB No. 1123-0013
Expires 12/31/2019

An Applicant who is electing to participate in the Fund as a judgment creditor in *Peterson v. Islamic Republic of Iran* or a Settling Judgment Creditor in *In re 650 Fifth Avenue & Related Properties,* must submit:

|  | Attached? |
|---|:---:|
| 1. Verification that the judgment holder is a judgment creditor in *Peterson v. Islamic Republic of Iran* or a Settling Judgment Creditor in *In re 650 Fifth Avenue & Related Properties.* | ☒ |
| 2. Proof that the Applicant submitted written notice of his or her election to participate in the Fund by September 12, 2016 to the Attorney General of the United States, the Special Master, and the chief judge of the United States District Court for the Southern District of New York. | ☒ |

## DOCUMENT REQUIREMENTS FOR PERSONAL REPRESENTATIVES

Please Note: In the case of claims brought by a foreign citizen on behalf of a decedent Victim, the Special Master may alter the document requirements.

|  | Attached? |
|---|:---:|
| 1. **Personal Representative of deceased Victim:** Copies of legal documentation showing sufficient evidence of authority to represent the estate of a decedent Victim, such as court orders, letters testamentary or similar documentation, proof of the purported Personal Representative's relationship to the decedent, and copies of wills, trusts, or other testamentary documents. | ☒ |
| 2. **Representative of minor Victim:** A copy of a court order or other document issued by an official showing appointment as the guardian or other authorized representative of the minor Victim. | ☒ |
| 3. **Representative of non-minor Victim:** A copy of a court order or other document issued by an official showing appointment as the guardian or other authorized representative of the incompetent Victim. | ☒ |

## DOCUMENT REQUIREMENT FOR APPLICANTS AND VICTIMS REPRESENTED BY AN ATTORNEY

|  | Attached? |
|---|:---:|
| 1. Documentation of counsel's authority to represent the Applicant, such as a copy of the retainer agreement or contract for legal services signed by both the Applicant and the attorney. | ☑ |



DA27



Amir Hekmati Application

Attachment 1

Order and Default Judgment

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| AMIR HEKMATI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 16-0875 (ESH) |
| | ) | |
| ISLAMIC REPUBLIC OF IRAN, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### ORDER AND DEFAULT JUDGMENT

Pursuant to Rule 55(b) of the Federal Rules of Civil Procedure and 28 U.S.C. § 1608(e), and for the reasons set forth in the accompanying Memorandum Opinion,[1] it is hereby

**ORDERED** that plaintiff's motion for default judgment (ECF No. 12) is **GRANTED**; it is further

**ORDERED** that a **DEFAULT JUDGMENT** in the amount of $63,496,358 is entered for plaintiff Amir Hekmati and against defendant Islamic Republic of Iran, allocated as follows:

(1) $16,020,000 in compensatory damages for pre-release pain and suffering;

(2) $10,000,000 in compensatory damages for post-release pain and suffering;

(3) $5,728,179 in economic damages; and

(4) $31,748,179 in punitive damages.

/s/ *Ellen Segal Huvelle*
ELLEN SEGAL HUVELLE
United States District Judge

Date:  September 29, 2017

---

[1] The Memorandum Opinion will be filed under seal as it references sealed material.  A redacted version, though, will be placed on the public docket at ECF No. 16.

DA29



Amir Hekmati Application

Attachment 2

Memorandum Opinion

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMIR HEKMATI, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  Civil Action No. 16-0875 (ESH) |
| | ) |
| ISLAMIC REPUBLIC OF IRAN, | )  <u>REDACTED</u> |
| | ) |
| Defendant. | ) |
| | ) |

## <u>MEMORANDUM OPINION</u>

Plaintiff Amir Hekmati, a United States citizen, spent four and one-half years in Evin

prison in the Islamic Republic of Iran ("Iran"). He brings this action for compensatory and

punitive damages against Iran under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C.

§§ 1602-1611, alleging that Iran's detention of him and treatment while detained constituted

hostage taking and torture. (Compl., May 9, 2016, ECF No. 1.) Iran failed to respond to the

complaint, the Clerk entered a default, and plaintiff has now moved for a default judgment

pursuant to Federal Rule of Civil Procedure 55(b)(2). (Mot. for Default Judgment, Feb. 6, 2017,

ECF No. 12.) For the reasons set forth herein, the Court will grant the motion for default

judgment.

## BACKGROUND

### I.  FINDINGS OF FACT

The evidence in the record before the Court establishes the following facts.

Amir Hekmati is a dual U.S.-Iranian citizen who was born in the United States in 1983.

(Proposed Findings of Facts and Conclusions of Law in Support of Mot. for Default Judgment

("Mem.") Ex. A (Decl. of Amir Hekmati ("Hekmati Decl.")) ¶¶ 1, 3.)  His parents, Ali and

Behnaz Hekmati, had immigrated to the United States from Iran before he was born.  (*Id.* ¶ 3.)

He has three siblings--an older sister, a twin sister, and a younger brother.  (*Id.* ¶ 4.)  When he

was eight years old, his family moved to Flint, Michigan, and he lived there until he graduated

from high school in 2001.  (*Id.* ¶¶ 7-8.)

From July 2001 until August 2005, Hekmati served in the United States Marine Corps.

(*Id.* ¶ 9, Ex. A.)  While in the Marines, he completed a 63-week course in Arabic at the Defense

Language Institute in Monterey, California, graduating with high honors in May 2003.  (*Id.* ¶ 10,

Ex. C.)  Thereafter, he was deployed to Iraq as an infantry rifleman to support combat

operations; he also served as the personal interpreter for the battalion commander.  (*Id.* ¶ 11, Ex.

D.)  After completing his four-year term of active service, during which he reached the rank of

E-5/SGT, he was honorably discharged in August 2005.  (*Id.* ¶¶ 9, 12, Ex. A.)  After leaving the

military, Hekmati worked as a defense contractor in the areas of language and cultural

instruction, with a focus on new language translation technology.  (*Id.* ¶¶ 14-16, 18.)  He also

went to college online, obtaining a bachelor's degree in International Business Management in

2009 from the University of Phoenix.  (*Id.* ¶ 17.)

In 2009, Hekmati was hired as a research manager for a U.S. defense contractor, which

led to his spending a year in Iraq, providing cultural analysis and advice to U.S. military

commanders.  (*Id.* ¶ 19.)  In May 2011, he started a new job in Afghanistan as an analyst for

another U.S. defense contractor.  (*Id.* ¶ 20.)  Shortly thereafter, though, he was accepted into a

Master's Program in Economics at the University of Michigan, and he decided to enroll.  (*Id.* ¶¶

21-22.)  Before returning to the United States, he decided he would take his first trip to Iran to

visit relatives and see the country of his parents' birth.  (*Id.* ¶ 25.)

DA32

## A.     Iran

Hekmati received authorization to travel to Iran from the Iranian Interests Section of the

Pakistani Embassy in Washington, D.C., and he arrived at the airport in Tehran on August 14,

2011.  (*Id.* ¶¶ 27-28.)  After a brief interview with immigration officials, he was admitted to the

country using his Iranian passport.  (*Id.* ¶ 28.)  On August 29, 2011, two days before his

scheduled departure, two men who represented themselves as being from a passport control

agency appeared and asked him to come with them to answer a few additional questions.  (*Id.* ¶

30.)  They took Hekmati to a small office building nearby, where he was questioned by men

from the Iranian Ministry of Intelligence and Security ("MOIS").  (*Id.* ¶¶ 31-32.)  MOIS is Iran's

primary intelligence organization; in 2012, it was designated by the United States Department of

the Treasury for human right abuses dating back to June 12, 2009.  *See* U.S. Dept. of Treasury,

*Treasury Designates Iran Ministry of Intelligence and Security for Human Rights Abuses and*

*Support for Terrorism*, U.S. Dept. of Treasury Press Center (Feb. 16, 2012) ("Treasury

Designation") ("The U.S. Departments of the Treasury and State also today imposed sanctions

against MOIS pursuant to E.O. 13553 for being responsible for or complicit in the commission

of serious human rights abuses against the Iranian people since June 12, 2009.")

Hekmati was asked why he was in Iran, and he told them he was there "[t]o visit Iran."

(Hekmati Decl. ¶ 31.)  He was also asked to write down the names of his family members, which

he did.  (*Id.*)  Then he was ordered to write down that he was a former member of the U.S.

military.  (*Id.*)  Once he did that, the interrogator asked him to sign the paper, which he did.  (*Id.*

¶ 32.)  After Hekmati signed the paper, the interrogator began to call him a "spy" and threatened

that he would be taken to "a very bad place" if he did not confess.  (*Id.* ¶ 33.)  He told the

interrogator that he had no idea what he was talking about, but ultimately, two guards handcuffed

Hekmati and took him to Evin Prison.  (*Id.* ¶¶ 33-34.)

DA33

### B.   Detention

"Evin Prison in Tehran [is] notorious for cruel and prolonged torture of political opponents of the government." U.S. Dep't of State, Iran 2012 Human Rights Report at 7.  When Hekmati first arrived at Evin, he was strip-searched, given blue prison pajamas, blindfolded, and taken to a small, windowless cell in Ward 209, which was controlled by MOIS. (Hekmati Decl. ¶¶ 34, 36); *see also* Iran 2012 Human Rights Report at 7 ("news organizations and human rights groups reported [that Ward 209] was under the control of the country's intelligence services"); Treasury Designation at 1 ("MOIS agents are responsible for the beatings, sexual abuse, prolonged interrogations, and coerced confessions of prisoners, particularly political prisoners, which occurred in Ward 209 of Evin Prison, which is controlled by MOIS, following the June 2009 elections in Iran.")

Hekmati describes his first few days in Ward 209 as a "blur." (Hekmati Decl. ¶ 35.)  He was "shocked, confused, scared, [and] indignant."  (*Id.*)  He did not know if what had happened was all a "misunderstanding" or if "prison official were about to blow [his] head off." (*Id.* ¶ 35.) As it turned out, Hekmati spent the next four months in his cell in solitary confinement. (*Id.* ¶ 36.)  His cell was so small that he could not fully extend his legs when he was lying down. (*Id.* ¶ 37.)  The walls were curved, making him "feel constantly like the walls were caving in" on him. (*Id.*)  The "floor was cold tile covered with a thin carpet," and that is where Hekmati slept as there was no mattress.  (*Id.*)  Hekmati was given a thin blanket, but it did little to protect him from the cold floor.  (*Id.*)  "There was nothing else in the cell except a small makeshift toilet, which was more like a pail with a hose."  (*Id.* ¶ 38.)  "There was no plumbing and no toilet paper."  (*Id.*)  The prison official kept bright lights on 24 hours a day, making it impossible for Hekmati, in his windowless cell, to tell if it was daytime or nighttime.  (*Id.* ¶ 39.)  "At other times, the power went out, and [he] was left in complete darkness for hours at a time."  (*Id.*)

<center>4</center>

When that happened, Hekmati felt like he was "being buried alive." (*Id.*) He was served very little food—a slice of bread and margarine in the morning, soggy rice and lentils for lunch, and a small cup of soup or lentils in the evening. (*Id.* ¶ 49.) He rapidly lost a significant amount of weight – by his estimate, over 20 pounds. (*Id.*) Hekmati was permitted to leave his cell "only once every few days for 10–15 minutes to take a cold shower." (*Id.* ¶ 40.) Otherwise, he was "taken from [his] cell only for interrogations, which . . . happened every few days." (*Id.*) He was always blindfolded when he was taken out of his cell. (*Id.*)

While Hekmati was in Ward 209, he was frequently subjected to physical and psychological abuse. For example, "[p]rison officials intentionally exacerbated [Hekmati's discomfort] by regularly pouring water on the floor of [his] cell so that it remained cold and damp and grew moldy," a smell he describes as "putrid." (*Id.* ¶ 37.) "At times, the air was so heavy and polluted that [Hekmati] had trouble breathing" and, in fact, "the guards [had to wear] surgical masks." (*Id.* ¶ 38.) In addition, "[p]rison guards beat [him] repeatedly with batons and struck [him] in [his] kidneys with an electric taser." (*Id.* ¶ 41.) On one occasion, an interrogator "chained [him] to a table blindfolded and whipped the bottom of [his] feet with cables as punishment for not giving him the answers he wanted." (*Id.* ¶ 42.) Hekmati describes these "whippings" as "excruciating." (*Id.* ("Because I could not move, I felt the pain not just on my feet, but reverberating through my head, like a screwdriver jammed into my brain.").) Also, because the wounds were on his feet, they were slow to heal; his feet became swollen, and he could not walk properly. (*Id.*) On multiple occasions, he "was handcuffed in stress positions for hours at a time." (*Id.* ¶ 43.) Such as on one occasion, he "was handcuffed with one arm reaching behind [his] shoulder and the other hand meeting it behind [his] back for nearly forty-eight hours," a position that prevented him from sitting the entire time and caused "excruciating" pain

DA35

in his shoulder. (*Id.*) The prison guards also constantly taunted and belittled him, insulting him, his mother, and his country. (*Id.* ¶ 44.) On one occasion, prison officials lied and told him that his sister had been involved in a terrible car accident, but then refused him access to a phone to call his family unless he confessed that he was a spy. (*Id.*) He "worried every day about [his] mother, who [he] knew must be desperate to find [him]." (*Id.* ¶ 45.)

Hekmati's "physical and psychological health deteriorated rapidly," to the point where he thought he "was truly losing [his] mind." (*Id.* ¶ 51.) Initially, he completely lost track of time and just stared at the wall all day. (*Id.* ¶ 46.) Next, he "began talking to the walls, as if they were a family member or friend from home." (*Id.* ¶ 47.) Eventually, he felt that the "walls were caving in on [him] and that [he] couldn't breathe." (*Id.* ¶ 51.) He had "numerous panic attacks," during which he "would start banging and clawing at the door, screaming for the guards. (*Id.*) His distress "was met only with taunts and more beatings." (*Id.*) He often thought about suicide. (*Id.*)

"Roughly three months into [Hekmati's] solitary confinement, the guards started forcing [him] to take sedatives." (*Id.* ¶ 52.) "The sedatives made it even harder to keep track of time." (*Id.*) He "drifted in and out of consciousness," a state he describes as like "a living corpse." (*Id.*) Hekmati resisted the pills initially, but "they quickly became [his] lifeline," as they "allowed [him] to feel numb." (*Id.* ¶ 53.) Once Hekmati was "hooked on the pills . . . [his] interrogator used them as a means of controlling [him]." (*Id.* ¶ 54.) He "would cut off the pills abruptly to attempt [to] coerce [Hekmati] to do things or say things that were untrue." (*Id.*) Hekmati "felt out of control when the pills were taken from [him]"; he "stopped sleeping and started experiencing panic attacks again"; he "felt [he] would do anything to get more pills." (*Id.*)

DA36

Hekmati was "told that all of these abuses would continue for as long as it took [him] to confess to being a spy sent to Iran by the CIA to collect intelligence and spread pro-U.S. propaganda." (*Id.* ¶ 55.) He was also told "on numerous occasions" that "'[his] Government'— meaning the United States—needed to 'cooperate' if [he] was to be released." (*Id.*) In light of these statements, Hekmati concluded "shortly after [his] arrest," "that he was being used as a pawn by the Iranian Government to spread anti-U.S. propaganda and to win concessions from the U.S. Government." (*Id.*)

In December 2011, after four months in solitary confinement, Hekmati was dressed in civilian clothes and transported to a local hotel, where he was given food, cigarettes, and more pills, and "told that [he] would be released immediately if [he] agreed to be interviewed for an internal training video for MOIS" and to "state that [he] had been sent to Iran by the CIA." (*Id.* ¶ 56.) Hekmati initially refused, but after his interrogators "swore on the Koran that the video was only for internal training purposes," he eventually decided "to comply in hopes of being released." (*Id.* ¶ 57.) Hekmati was not released. Rather, he was returned to solitary confinement in Ward 209. (*Id.* ¶ 59.) He later learned that the Iranian Government "broadcast [his] false 'confession' on Iranian state television as 'proof' of [his] crimes." (*Id.*)

In January 2012, Hekmati was tried by Iran's Revolutionary Court. He was not informed of the charges against him, and he only met his court-appointed defense counsel five minutes before the trial began. (*Id.* ¶ 61.) After a 15-minute proceeding behind closed doors, he was convicted of "espionage, waging war against God, and corrupting the earth." (*Id.* ¶ 62.) A month later, he learned from a newspaper article, shown to him by the prison guards, that he had been "sentenced to death, to be executed immediately by hanging." (*Id.* ¶¶ 62-63.)

After receiving his death sentence, Hekmati was kept on Ward 209, but moved to a

"suite"—"two solitary confinement cells with the dividing wall removed." (*Id.* ¶ 64.) Other than

that change, the physical and mental mistreatment continued. (*Id.*) He still had "no phone, no

visits, no lawyer, and no reading material." Added to that was a death sentence that "haunted

[him] day in and day out," such that he woke up every day "wondering if it was [his] execution

day." (*Id.* ¶ 65.) Hekmati lived "in a constant state of fear and anxiety." (*Id.*) He "started

having nightmares and more frequent panic attacks." He heard "other prisoners being dragged

from their cells to be executed" and those screams continue to haunt him. (*Id.*) Hekmati "could

feel whatever mental strength [he] had left begin to crumble." (*Id.* ¶ 66.) He "stopped sleeping";

he "stopped eating"; he "paced [his] cell at all hours"; and he "was hypervigilant, paranoid that

[his] executioners were about to arrive." (*Id.*) He had "constant visions of [his] execution and

death." (*Id.*)

After several months on death row, Hekmati was taken back to the Revolutionary Court

for a new trial – before a different judge – because an Iranian appeals court had "overturned [his]

death sentence based on insufficient evidence." (*Id.* ¶ 67.) The second trial was also held behind

closed doors, and it lasted no more than 10 minutes. (*Id.*) Months later Hekmati learned, again

through a newspaper shown to him by prison guards, that he had been convicted of cooperating

with a hostile government and sentenced to 10 years in Evin Prison.[1] (*Id.* ¶ 68.)

By this time, Hekmati had spent nearly a year in solitary confinement. (*Id.* ¶ 70.)

Although he "felt some relief when [his] death sentence was annulled, . . . [he] knew the courts

could re-instate the sentence at any time." (*Id.*) Thus, his fear of execution "festered, never

really going away," and he "continued to live for [his] daily dose of pills." (*Id.*)

---

[1] Hekmati also learned later that before the trial his mother had secretly wired $20,000 to his
court-appointed attorney in exchange for which the attorney had promised that Hekmati would
receive only a one-year sentence. (Hekmati Decl. ¶ 69; Behnaz-Hekmati Decl. ¶ 6.)

DA38

Hekmati could not bear the thought of spending 10 more years in solitary confinement, and he went on multiple hunger strikes to protest his conditions. (*Id.* ¶ 71.) Eighteen months into his imprisonment, he lost consciousness after a prolonged hunger strike, fell, and suffered a head injury. (*Id.* ¶ 72.) At that point, Iranian officials transferred him out of Ward 209 to a political prison in Ward 350. (*Id.*)

When Hekmati arrived in Ward 350, he saw his reflection for the first time in eighteen months, and he "didn't recognize the face staring back" at him. (*Id.* ¶ 73 ("I was pale and drawn. My eyes were sunken and had dark circles under them. A thick beard covered the hollows of my face.").) Although he was no longer in solitary confinement, conditions in Ward 350 were "terrible": there were "20–30 prisoners . . . packed together in a small cell"; "[e]veryone had physical and psychological problems"; "[t]here were no beds[--]only pieces of wood suspended from the wall"; prisoners "were regularly dragged out of the cell for execution or beatings"; and "[t]he guards indicated that prisoners would be helped if they snitched on other prisoners, so there was a constant atmosphere of fear and distrust among the population." (*Id.* ¶ 74.) "Tensions ran high," so Hekmati tried to keep to [him]self." (*Id.*) Although "Ward 350 had a small courtyard where [prisoners] could see a small patch of sky," it was so small that Hekmati "could do little more than move in tight circles." (*Id.* ¶ 75.) In addition, prison officials stopped giving Hekmati his pills, causing him months of painful withdrawal symptoms. (*Id.* ¶ 74.)

While in Ward 350, Hekmati still was not allowed to use the phone or to speak to a lawyer, diplomatic officials, or his family back home, but he was allowed to meet with his uncle once a month for 20–30 minutes. (*Id.* ¶ 76.) It was then that he learned that his father, after learning about Hekmati's death sentence, had suffered a major stroke, followed by a diagnosis of advanced brain cancer. (*Id.* ¶ 77.) His father at that point had lost his mobility and could no

9

DA39

longer care for himself. (*Id.*) In addition, Hekmati's older sister had quit her job to lobby full-time for his release, despite having two young children at home, and his family was spending tens- of-thousands of dollars on lawyer fees and expenses to lobby for his release. (*Id.*) Hekmati had been in Ward 350 for about a year and a half when there was a "huge riot," and "[a]s punishment," he (and others) "were transferred to the general population prison." (*Id.* ¶ 80.)

In the general prison population, Mr. Hekmati was assigned to Ward 7, where he was housed with drug dealers and other violent criminals. (*Id.*) He describes the conditions there as "some of the most brutal he had faced in his three years at Evin": his "'cell' was actually a basement typically used to quarantine sick prisoners"; there were again 20–30 prisoners packed into a small space; "[t]he cell was infested with rats," which Hekmati and the other prisoners "had to kill [them]selves using broomsticks or other blunt objects"; "[t]here were no beds"; his "skin was eaten by lice and fleas"; he "would wake up with bed bugs all over [him]"; and when prison officials would occasionally spray the room with chemicals to get rid of the bed bugs, the chemicals "made the prisoners sicker than the bug bites did." (*Id.* ¶ 81.) In addition, the ward "had no heat, air conditioning, or ventilation"; "[t]here was no courtyard or outdoor recreational space"; "[t]here were no toilets," just "three holes in the ground with a hose next to them"; "[t]he showers were directly next to the toilet holes" and, "because of the terrible ventilation, the showers became a breeding ground for infection." (*Id.* ¶ 82.) Prisoners were given a surgical mask to wear in the shower, but each only got one mask, so masks quickly became filthy. (*Id.*)

Hekmati was sick the entire time he was in Ward 7 from "recurring lung and sinus infections and constant intestinal problems." (*Id.* ¶ 83.) "Prison officials would ignore [prisoners'] ailments unless they had a high fever, which they would 'treat' by injecting [them] with steroids that actually suppressed the immune system, making the infection worse." (*Id.*)

Hekmati eventually stopped requesting any medical treatment. (*Id.*)

Hekmati "lived in constant fear of [the] other prisoners in Ward 7." (*Id.* ¶ 84.) Prison officials would put violent criminals in the cell to pressure political prisoners like Hekmati to confess or swear allegiance to the Iranian Government. (*Id.*) These prisoners would beat other prisoners; one prisoner's face was torn apart by a razor blade. (*Id.*) Many of the political prisoners who had been transferred to Ward 7 with Hekmati suffered mental breakdowns from the trauma of the surroundings. (*Id.*) Hekmati "tried not to make trouble"; his "only goal was to stay alive." (*Id.*) The only bright spot was that Hekmati finally was permitted to call his family. (*Id.* ¶ 85.) But his phone access was limited to 5–10 minutes per day, and the news from his family was "always disheartening." (*Id.* ¶¶ 85-86.) His father's health was "getting worse," and his mother was "clearly struggling to take care [of him]." (*Id.*)

### C.  Release & Post-Release

In January 2016, Hekmati was taken from his cell in Ward 9 back to Ward 209, where he met with a prosecutor, who told him that he would be released if he "expressed regret over [his] actions." (*Id.* ¶ 87.) Hekmati refused, but nonetheless he was taken to the airport and, on January 16, 2016, put on a plane leaving Iran. (*Id.* ¶¶ 87-88.) As Hekmati later learned, Iran had released him and three other imprisoned Americans in exchange for clemency for seven Iranians indicted or imprisoned in the United States for sanctions violations. (*Id.* ¶ 89); *see also, e.g.,* Michael Pearson and Elise Labott, *Five Americans Released by Iran, Four as Part of Prisoner Swap*, CNN (Jan. 16, 2016), *available at* http://www.cnn.com/2016/01/16/middleeast/iran-jason-rezaian-prisoners-freed/index.html.

After Hekmati returned to the United States, he continued to suffer from his detention. Prior to his imprisonment, Hekmati was an energetic and hardworking young man, with plans to go to graduate school, get married, and start a family. (Hekmati Decl. ¶¶ 91-92; *see also* Mem.

11

Ex. C (Decl. of Behnaz Hekmati ("Behnaz Hekmati Decl.")) ¶¶ 7-30; Mem. Ex. D (Decl. of

Sarah Hekmati ("Sarah Hekmati Decl.")) ¶¶ 2-15.)  After his return, he was ███████████

███████████████████████████████████████████████████████████████████████

███████████████████  (Hekmati Decl. ¶ 91; Behnaz Hekmati Decl. ¶¶ 7-30; Sarah

Hekmati Decl. ¶¶ 2-15.) ████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████  (Hekmati Decl. ¶¶ 94-95.) ██████

███████████████████████████████████████████████████████████

████████████████  (Id. ¶ 95.) ██████████████████

███████████████████████████████████  (Id. ¶¶ 97-99.) █████

█████████████████████████  (Behnaz Hekmati Decl. ¶ 17.) █████████

███████████████████████████████████████████████████████

████████████████  (Hekmati Decl. ¶¶ 100-101; *see also* Behnaz Hekmati Decl. ¶¶

27-30; Sarah Hekmati Decl. ¶¶ 13-14.) ████████████████████████████

████████████████████████████████████  (Hekmati Decl. ¶

102; Behnaz Hekmati Decl. ¶ 19; Sarah Hekmati Decl. ¶ 15.)

 Dr. Stuart Grassian, M.D., who was retained as an expert to evaluate Hekmati "in

relationship to the psychiatric effects of his imprisonment," has diagnosed Hekmati as ██████

████████████████████████████████████  (Mem. Ex. B (Expert Report of

Stuart Grassian, M.D. ("Grassian Rep.")), at 1)[2] ███████████████████████

---

[2] Dr. Grassian is a Board-certified psychiatrist, licensed to practice medicine in the
Commonwealth of Massachusetts, with "extensive experience in evaluating the psychiatric
effects of solitary confinement, of confinement under the sentence of death, and of harsh and
sadistic interrogation practices." (Grassian Rep. at 1-2.)  He prepared his expert report after
interviewing Hekmati for over 8 hours in August 2016, and reviewing relevant documents,

DA42

███████████████████████████████████████████████████

████████; *see also* Hekmati Decl. ¶ Ex. F (Letter from Dr. Katherine Porter, VA Ann Arbor

Healthcare System, Aug. 9, 2016)████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████ (*See* Grassian Rep. at 16-17.)

### D.      Iran's Purpose in Detaining Hekmati

According to Dr. Mehdi Khalaji, Hekmati was detained "at the direction, and with the

active participation, of the Iranian government" and as "part of a policy and practice of the

Iranian government to seek political advantage through the mistreatment of Iranian-American

dual citizens." (Mem. Ex. F (Expert Report of Dr. Mehdi Khalaji ("Khalaji Rep.")), ¶¶ 7, 34-

35)[4]; *see also* Opinions Adopted by the United Nations Working Group on Arbitrary Detention,

No. 28/2013 (Aug. 2013), *available at* http://hrlibrary.umn.edu/wgad/28- 2013.html (finding Mr.

Hekmati's detention arbitrary and in contravention of the Universal Declaration of Human

Rights and the International Covenant on Civil and Political Rights).  Specifically, Iran's

purposes in detaining Hekmati, and other Iranian-Americans detained during the same period,

─────────────────────

which are identified therein. (*Id.* at 4.)

[3] Stupor and delirium is a disorder which is characterized by symptoms of disorientation, hallucinations, severe anxiety, panic attacks, and claustrophobia, and it is typically seen only in prisoners held in solitary confinement. (Grassian Rep. at 5–9.)

[4] Dr. Mehdi Khalaji is a Senior Fellow at the Washington Institute for Near East Policy and the CEO at The Idea Center for Arts and Culture. (Khalaji Rep. ¶¶ 1-3.) He holds a doctoral degree in Shiite theology and exegesis from the University of Sorbonne in Paris, France and a master's degree in Western Philosophy from the University of Tarbiat Modarres in Qom, Iran. (*Id.* ¶4.) His complete curriculum vitae is attached to his expert report. (*See id.*, Ex. A.) He previously testified as an expert in *United States v. Lahiji*, 3:10-cr-00506 (D. Or. 2013). (*Id.* ¶ 5.) In addition to Hekmati, Dr. Khalaji identifies and discusses seven other incidents between 2007 and 2016 where Iranian-American citizens were detained in order "to threaten U.S. interests and to advance the political interests of the Iranian state." (Khalaji Rep. ¶¶ 16-33.)

DA43

and others like him, included "coercing . . . false confessions that they had taken actions against

the Iranian state on behalf of the American government" and to use them "as leverage in the

U.S.-Iranian nuclear negotiations" or to obtain the release of Iranians in prison in the United

States. (Khalaji Rep. ¶ 34; *see also* Behnaz Hekmati Decl. ¶¶ 4-5 ("Iranian Government officials

initially told our family that Amir would be released if we kept quiet.  Judge Salavati, the judge

presiding over Amir's case, later told us to do more to pressure the U.S. Government to

cooperate with the Iranian Government's demands."); *see also* Mem. at 10-11 & nn. 5-6 (citing

news articles reporting on Iran's interest in a possible prisoner swap).[5]

## II.    PROCEDURAL HISTORY

On May 9, 2016, Hekmati filed suit against Iran, claiming that its treatment of him

constituted torture and hostage-taking in violation of the FSIA, 28 U.S.C. § 1605A.  On May 24,

2016, plaintiff's counsel asked the Clerk of Court to effectuate service on Iran, pursuant to the

provisions of 28 U.S.C. § 1608(a)(4), by mailing a copy of the summons, complaint, notice of

suit, and offer to arbitrate, together with a translation of each into Farsi, the official language of

Iran, to the United States Department of State, for it to effect service through diplomatic

channels.  (Aff. Requesting Foreign Mailing, May 24, 2016, ECF No. 5.)  On November 29,

---

[5] *See, e.g.,* Thomas Erdbrink, *Amid Report of Jason Rezaian's Conviction, Iran Hints at Prisoner Exchange*, N.Y. Times (Oct. 12, 2015), *available at*
http://www.nytimes.com/2015/10/13/world/middleeast/jason-rezaian-washington-post-conviction-iran.html; Steve Inskeep & Bill Chappell, *Speaker of Iran's Parliament Suggests Prisoner Swap for Rezaian, Other Americans*, NPR (Sept. 3, 2015), *available at*
http://www.npr.org/sections/thetwo-way/2015/09/03/437322607/speaker-of-iran-s-parliament-suggests-prisoner-swap-for-rezaian-other-americans; Rick Gladstone, *Jason Rezaian Trial In Iran May Be More About Leverage Than Justice*, N.Y. Times (May 27, 2015), *available at*
http://www.nytimes.com/2015/05/28/world/middleeast/jason-rezaian-trial-in-iran-may-be-more-about-leverage-than-justice.html; Indira Lakshmanan, *Fate of Jailed Americans Hangs Over Talks with Iran*, Bloomberg News (May 15, 2015), *available at*
https://www.bloomberg.com/politics/articles/2015-05-15/fate-of-jailed-and-missing-americans-hangs-over-iran-talks.

DA44

2016, the Department of State confirmed that the documents were delivered to the Iranian

Ministry of Foreign Affairs, via the Embassy of Switzerland, under cover of diplomatic note, on

October 18, 2016, and that service was refused that same day (*see* Return of Service/Affidavit,

Dec. 6, 2016, ECF No. 7). Iran's answer was due on December 17, 2016. (*Id.*) No answer or

other response to the complaint was filed by that date; nor has any been filed to date. On

December 20, 2016, plaintiff requested that the Clerk enter a default against Iran pursuant to Fed.

R. Civ. P. 55(a) (Request for Entry of Default, Dec. 20, 2016, ECF No. 8), which the Clerk did

on December 21, 2016 (Clerk's Entry of Default, Dec. 21, 2016, ECF No. 10). Pursuant to

Federal Rule of Civil Procedure 55(b), plaintiff now moves for a default judgment.

## DISCUSSION

### I.   LEGAL STANDARD FOR ENTRY OF A DEFAULT JUDGMENT AGAINST IRAN

Federal Rule of Civil Procedure 55(b)(2) gives a district court the discretion to enter a

default judgment upon a party's motion, but the "entry of a default judgment is not automatic."

*Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005). "[S]trong policies favor resolution of

disputes on their merits," and therefore "[t]he default judgment must normally be viewed as

available only when the adversary process has been halted because of an essentially

unresponsive party." *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir.1980) (internal quotations

omitted)). In addition, "the procedural posture of a default does not relieve a federal court of its

'affirmative obligation'" to determine whether it has subject matter jurisdiction over the action,"

*Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71, 79 (D.D.C. 2017) (quoting *James

Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996)), and "a court should satisfy itself

that it has personal jurisdiction before entering judgment against an absent defendant." *Mwani*,

417 F.3d at 6. The party seeking default judgment has the burden of establishing both subject

DA45

matter and personal jurisdiction. *See Khadr v. United States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008); *FC Inv. Grp. LC v. IFX Mkts., Ltd.*, 529 F.3d 1087, 1091 (D.C. Cir. 2008). Finally, before a court can enter a default judgment under the FSIA, plaintiffs are required to establish their claims "by evidence satisfactory to the court." 28 U.S.C. § 1608(e). Thus, the Court "may not unquestioningly accept a complaint's unsupported allegations as true," *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 211 (D.D.C. 2012), but "[u]ncontroverted factual allegations that are supported by admissible evidence are taken as true." *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 33 (D.D.C. 2016). In addition, "§ 1608(e) does not require the court to demand more or different evidence than it would ordinarily receive; indeed, the quantum and quality of evidence that might satisfy a court can be less than that normally required." *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017) (internal quotations omitted); *see also Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047 (D.C. Cir. 2014) ("when the defendant State fails to appear and the plaintiff seeks a default judgment, the FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide"). Nor is an evidentiary hearing required; a "plaintiff may establish proof by affidavit." *Reed*, 845 F. Supp. 2d at 211; *see also, e.g., Stansell v. Republic of Cuba*, 217 F. Supp. 3d 320, 336 n.2 (D.D.C. 2016).

As set forth below, plaintiff has demonstrated that he is entitled to a default judgment against Iran and an award of compensatory and punitive damages.

## II.   JURISDICTION

### A.   Subject Matter Jurisdiction

The FSIA provides the sole basis for obtaining jurisdiction over a foreign state in a United States court. *See* 28 U.S.C. § 1604 ("Subject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be

DA46

immune from the jurisdiction of the courts of the United States and of the States except as

provided in sections 1605 to 1607 of this chapter."); 28 U.S.C. § 1330(a)[6]; *Argentine Republic v.*

*Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989). Here, plaintiff asserts jurisdiction

under the "[t]errorism exception to the jurisdictional immunity of a foreign state." 28 U.S.C. §

1605A.[7] Section 1605A(a)(1), entitled "No immunity," provides that a foreign state

> *shall not be immune* from the jurisdiction of courts of the United States . . . *in any*
> *case* not otherwise covered by this chapter *in which money damages are sought*
> *against a foreign state for personal injury* or death that was *caused by an act of*
> *torture*, extrajudicial killing, aircraft sabotage, *hostage taking*, or the provision of
> material support or resources for such an act . . . .

*Id.* § 1605A(a)(1) (emphasis added). Section 1605A(a)(2), entitled "Claims heard," further

provides that a court "shall hear a claim under this section if–

> (i) . . . the foreign state was designated as a state sponsor of terrorism at the time
> the act described in paragraph (1) occurred . . . and . . . remains so designated
> when the claim is filed . . . .

> (ii) the claimant or the victim was, at the time the act described in paragraph (1)
> occurred – (I) a national of the United States; . . . and

> (iii) in a case in which the act occurred in the foreign state against which the claim
> has been brought, the claimant has afforded the foreign state a reasonable
> opportunity to arbitrate the claim in accordance with the accepted international
> rules of arbitration.

---

[6] Section 1330(a) provides that:

> The district courts shall have original jurisdiction without regard to amount in
> controversy of any nonjury civil action against a foreign state as defined in [the
> FSIA, 28 U.S.C. § 1603(a)] as to any claim for relief in personam with respect to
> which the foreign state is not entitled to immunity either under [28 U.S.C. §§
> 1605-1607] or under any applicable international agreement.

28 U.S.C. § 1330(a).

[7] Section 1605A was an amendment to the FSIA added by the National Defense Authorization
Act for Fiscal Year 2008, Pub.L. No. 110-181, § 1083 ("Defense Authorization Act"). It
replaced § 1605(a)(7), the former state-sponsored terrorism exception.

DA47

*Id.* § 1605A(a)(2)(A).

All of the conditions necessary to establish jurisdiction over plaintiff's claims under § 1605A have been satisfied. First, Iran has been continuously designated a state sponsor of terrorism since January 19, 1984. *See* U.S. Dept. of State, State Sponsors of Terrorism, available at http://www.state.gov/j/ct/list/c14151.htm (2017).[8] Thus, it was so-designated during the time Hekmati was detained and remained so at the time this case was filed. Second, Hekmati was a United States citizen at the time he was detained (Hekmati Decl. ¶ 3), and he is thus a United States national. *See* 28 U.S.C. § 1605A(h)(5).[9] Third, an offer of arbitration was included with the documents served on Iran (*see* Return of Service/Affidavit at 3, ECF No. 7), which is sufficient to satisfy the FSIA's requirement. *See Simpson v. Socialist People's Libyan Arab Jamahiriya*, 326 F.3d 230, 233 (D.C. Cir. 2003) ("*Simpson I*") ("a reasonable opportunity to arbitrate" need not precede the filing of the complaint). Fourth, plaintiff is seeking money damages for personal injuries caused by defendant's actions. Finally, as explained below, Iran's actions constituted both torture and hostage taking.

### 1.   Torture

Under § 1605A, the term "torture" is defined to "have the meaning given [it] in section 3 of the Torture Victim Protection Act of 1991 (28 U.S.C. 1350 note)." *Id.* § 1605A(h). As

---

[8] The term "state sponsor of terrorism" means a country the government of which the Secretary of State has determined, for purposes of section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. 2405(j)), section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. 2371), section 40 of the Arms Export Control Act (22 U.S.C. 2780), or any other provision of law, is a government that has repeatedly provided support for acts of international terrorism. 28 U.S.C.A. § 1605A(h)(6).

[9] The term "national of the United States" has the meaning given that term in section 101(a)(22) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(22)), 28 U.S.C. § 1605A(h)(5), which defines a "national of the United States" to mean "(A) a citizen of the United States, or (B) a person who, though not a citizen of the United States, owes permanent allegiance to the United States." 8 U.S.C. § 1101(a)(22).

DA48

defined therein:

> (1) the term "torture" means any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind; and

> (2) mental pain or suffering refers to prolonged mental harm caused by or resulting from—

> (A) the intentional infliction or threatened infliction of severe physical pain or suffering;

> (B) the administration or application, or threatened administration or application, of mind altering substances or other procedures calculated to disrupt profoundly the senses or the personality;

> (C) the threat of imminent death; or

> (D) the threat that another individual will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind altering substances or other procedures calculated to disrupt profoundly the senses or personality.

Torture Victim Protection Act of 1991 ("TVPA"), Pub. L. No. 102-256, 106 Stat. 73 (Mar. 12, 1992), *codified at* 28 U.S.C. § 1350 (note).

In *Price v. Socialist People's Libyan Arab Jamahiriya*, the D.C. Circuit gave extensive consideration to what conduct should be deemed to constitute torture under the FSIA. 294 F.3d 82, 92-93 (D.C. Cir. 2002) ("*Price I*"). It concluded that there were "two ambiguities lurking in the [TVPA's] definition" of torture: "The first concerns the meaning of 'severe': how much actual pain or suffering must defendants inflict before their conduct rises to the level of torture? The second involves the 'for such purposes' language: what must plaintiffs prove about the motivation for the alleged torture if they hope to deprive foreign states of their immunity?" *Id.* at

DA49

92. As to the severity requirement, the Court observed that it "is crucial to ensuring that the

conduct proscribed by the Convention [Against Torture] and the TVPA is sufficiently extreme

and outrageous to warrant the universal condemnation that the term 'torture' both connotes and

invokes." *Id.* Thus, it concluded that:

> [t]he critical issue is the degree of pain and suffering that the alleged torturer
> intended to, and actually did, inflict upon the victim. The more intense, lasting, or
> heinous the agony, the more likely it is to be torture. . . . This understanding thus
> makes clear that torture does not automatically result whenever individuals in
> official custody are subjected even to direct physical assault. Not *all* police
> brutality, not *every* instance of excessive force used against prisoners, is torture
> under the FSIA.

*Id.* at 93. Rather, the Court in *Price I* agreed with the Senate that "torture is a label that is

'usually reserved for extreme, deliberate and unusually cruel practices, for example, sustained

systematic beating, application of electric currents to sensitive parts of the body, and tying up or

hanging in positions that cause extreme pain.'" *Id.* at 92-93. As for the purposes requirement,

the Court held that "it is clear from the text of the TVPA that the list of purposes provided was

not meant to be exhaustive." *Id.* at 93. Rather, "this list was included in order to reinforce that

torture requires acts both intentional and malicious, and to illustrate the common motivations that

cause individuals to engage in torture." *Id.* Thus, the Court concluded that "whatever its

specific goal, torture can occur under the FSIA only when the production of pain is purposive,

and not merely haphazard." *Id.*; *see Han Kim*, 774 F.3d at 1050 ("[S]uffering alone is

insufficient to establish a claim under the FSIA's terrorism exception. To qualify as torture, the

mistreatment must be purposeful—that is, the defendant must have targeted the victim . . . .")

Applying this interpretation of torture  the Court of Appeals in *Price I* held that the

allegations in the complaint were insufficient to allege torture because they "offer[ed] no useful

details about the nature of the kicking, clubbing, and beatings that plaintiffs allegedly suffered,"

and, thus, there was "no way to determine . . . the severity of plaintiffs' alleged beatings –

including their frequency, duration, the parts of the body at which they were aimed, and the

weapons used to carry them out – in order to ensure that they satisfy the TVPA's rigorous

definition of torture." *Price I*, 294 F. 3d at 94 ("In short, there is no way to discern whether

plaintiffs' complaint merely alleges police brutality that falls short of torture."); *see also*

*Simpson*, 326 F.3d at 234 (holding that allegations that plaintiff was "interrogated and then held

incommunicado," "threatened with death ... if [she] moved from the quarters [where she was]

held," and "forcibly separated from her husband ... [and unable] to learn of his welfare or his

whereabouts" "reflected a bent toward cruelty on the part of their perpetrators," but were "not in

themselves so unusually cruel or sufficiently extreme and outrageous as to constitute torture

within the meaning of the Act").)

District courts in this jurisdiction applying the principles set forth in *Price* and *Simpson*

have consistently concluded that victims treated similarly to Hekmati were victims of torture.

For example, in *Moradi*, this Court held that a detainee in Iranian prison experienced torture

when his interrogators subjected him to "severe physical and mental pain, including threatening

him with death and dismemberment, physically beating him, sexually assaulting him, and

keeping him in excruciatingly painful positions for hours at a time during the interrogations."

*Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 68-69 (D.D.C. 2015)  Similarly, in *Price*

itself, after the case was remanded and the complaint amended, the district court held that the

amended complaint stated a claim for "mental torture" by alleging that the victims were "forced

to watch on three separate occasions as fellow prisoners were beaten, one of whom was beaten to

death," were "informed on each occasion that they would suffer the same fate if they refused to

confess that they were guilty of espionage," and were "informed, during an interrogation at

which cabinet-level Libyan officials were present, that they were being afforded one last chance

to confess, or they would be beaten as they had seen their fellow prisoners be beaten." *Price v.*

*Socialist People's Libyan Arab Jamahiriya,* 274 F. Supp. 2d 20, 25 (D.D.C. 2003) (*Price II*),

*aff'd,* 389 F.3d 192, 195-99 (D.C. Cir. 2004); *see also Nikbin v. Islamic Republic of Iran,* 517 F.

Supp. 2d 416, 425 (D.D.C. 2007) ("striking [the plaintiff] repeatedly on the soles of his feet with

an electrical cable, hanging [him] upside down from the ceiling during an interrogation session,

and assaulting [him] with a coke bottle" were "acts of torture"); *Kilburn v. Islamic Republic of*

*Iran,* 699 F. Supp. 2d 136, 152 (D.D.C. 2010) (hostage taken by an Iranian-supported terrorist

group experienced torture in the form of "beatings, unsanitary conditions, inadequate food and

medical care, and mock executions"); *Massie v. Government of the Democratic People's*

*Republic of Korea,* 592 F. Supp. 2d 57, 66, 74 (D.D.C. 2008) (former members of a crew of a

United States Naval vessel captured by the Government of the Democratic People's Republic of

Korea (North Korea) in 1968 were victims of torture where they were "provided inadequate

rations of food and forced to live in unsanitary conditions" and subjected to "individual threats of

death, threats to kill others, [and] severe beatings" in order to coerce them into signing

confessions); *Regier v. Islamic Republic of Iran,* 281 F. Supp. 2d 87, 91, 97 (D.D.C. 2003)

(victim was "tortured'" when his captors regularly beat him, threatened him with death, and

confined him in "deplorable and inhumane conditions"); *Daliberti v. Republic of Iraq,* 146 F.

Supp. 2d 19, 25 (D.D.C. 2001) (victim who was held at gunpoint, threatened with physical injury

if he did not confess to espionage, and incarcerated "in a room with no bed, window, light,

electricity, water, toilet or adequate access to sanitary facilities" experienced torture as defined

by the FSIA); *Sutherland v. Islamic Republic of Iran,* 151 F. Supp. 2d 27, 45 (D.D.C. 2001) ("the

deprivation of adequate food, light, toilet facilities, and medical care for over six years amounts

22

DA52

to torture").

Applying the statute and the relevant caselaw to the facts of this case, this court has no difficulty in concluding that the physical and mental injuries inflicted upon Hekmati by his interrogators in conjunction with the other conditions of his detention constituted torture within the meaning of the FSIA.[10]  His mistreatment clearly goes beyond a mere "instance of excessive force" against a prisoner; rather the infliction of pain was deliberate and malicious and for the purpose of eliciting a false confession.  Accordingly, the Court concludes that Hekmati was the victim of torture.

### 2.   Hostage Taking

Under § 1605A, "the term 'hostage taking' has the meaning given that term in Article 1 of the International Convention Against the Taking of Hostages."  28 U.S.C. § 1605A(h)(2).  As defined therein, hostage taking means:

> Any person who *seizes or detains and threatens to kill, to injure or to continue to detain another person* (hereinafter referred to as the "hostage") *in order to compel a third party,* namely, a State, an international intergovernmental organization, a natural or juridical person, or a group of persons, *to do or abstain from doing any act as an explicit or implicit condition for the release of the hostage* . . . .

*See* 28 U.S.C. § 1605A(h)(2).  "The essential element of [a] hostage-taking claim is that the intended purpose of the detention be to accomplish the sort of third-party compulsion described in the [C]onvention."  *Simpson v. Socialist People's Libyan Arab Jamahiriya,* 470 F.3d 356, 359 (D.C. Cir. 2006) ("*Simpson II*") (quoting *Simpson I,* 326 F.3d at 234–35); *see also Price I,* 294 F.3d at 94.  That is, the defendants must seek "some '*quid pro quo*' arrangement whereby the hostage would be released 'upon performance or non-performance of any action by that third

---

[10] As was the case in *Moradi,* plaintiff suggests that the Court could find that Hekmati was tortured simply by virtue of his extended period of solitary confinement, but the Court need not reach that novel issue given its conclusion that the totality of Hekmati's treatment constituted torture.  *See Moradi,* 77 F. Supp. 3d at 68 n.9.

DA53

party.'" *Simpson II*, 470 F.3d at 359 (quoting *Price I*, 294 F.3d at 94).

As set forth above, Iran detained Hekmati on false espionage charges and, for four- and-
a-half years, continuously threatened to kill, injure, and detain him, in an effort to compel the
United States to release Iranians imprisoned in the United States or make other political or
financial concessions to Iran. Indeed, Iran ultimately released Hekmati as part of a prisoner
exchange when the United States released several Iranian prisoners from U.S. prison. These
facts establish that Iran's conduct constituted hostage taking under the FSIA.

As all of the conditions for subject matter jurisdiction under § 1605A are met, the Court
concludes that it has jurisdiction over plaintiff's stated against Iran.

**B.      Personal Jurisdiction**

Personal jurisdiction over a foreign state exists if there is subject matter jurisdiction under
§ 1330(a) and service is made pursuant to 28 U.S.C. § 1608.   28 U.S.C.A. § 1330(b). Service
may be effectuated under 28 U.S.C. § 1608 in one of four ways: (1) by "special arrangement for
service between the plaintiff and the foreign state," (2) "in accordance with an applicable
international convention on service of judicial documents," and if the first two options were not
applicable, the service may be completed (3) by "sending a copy of the summons and complaint
and a notice of suit, together with a translation of each into the official language of the foreign
state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk
of the court to the head of the ministry of foreign affairs of the foreign state concerned," or (4) by
requesting the clerk of the court to send the aforementioned package to "the Secretary of State in
Washington, District of Columbia, to the attention of the Director of Special Consular
Services—and the Secretary shall transmit one copy of the papers through diplomatic channels to
the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note
indicating when the papers were transmitted." 28 U.S.C. § 1608(a). As set forth above, plaintiff

DA54

properly effectuated service on defendant via the fourth method.  Accordingly, the Court finds

that it has personal jurisdiction over defendant.

## III.   LIABILITY

Section 1605A(c) created a federal "private right of action" for acts of terrorism by

foreign states. 28 U.S.C. § 1605A(c).  Drawing on the jurisdictional requirements set forth in §

1605A(a), it provides that:

> A foreign state that is or was a state sponsor of terrorism as described in
> subsection (a)(2)(A)(i), and any official, employee, or agent of that foreign state
> while acting within the scope of his or her office, employment, or agency shall be
> liable to—
>
> (1) a national of the United States, . . .
>
> for personal injury or death caused by acts described in subsection (a) (1) of that
> foreign state, or of an official, employee, or agent of that foreign state, for which
> the courts of the United States may maintain jurisdiction under this section for
> money damages.  In any such action, damages may include economic damages,
> solatium, pain and suffering, and punitive damages.  In any such action, a foreign
> state shall be vicariously liable for the acts of its officials, employees, or agents.

*Id.* A claim brought under § 1605A(c) must be filed within ten years from the date the action

accrued to initiate an action. *See* 28 U.S.C. § 1605A(b).

In concluding that there is jurisdiction over Hekmati's claims under 1605A(a), the Court

has already determined all of the essential elements for imposing liability under 1605A(c) have

been established because section § 1605A(c) expressly incorporates the elements required to

waive the foreign state's immunity and vest the court with subject matter jurisdiction as the basis

for liability.  Essentially, liability under § 1605A(c) will exist whenever the jurisdictional

requirements of §1605A(a)(1) are met. *See Kilburn*, 699 F. Supp. 2d at 155 ("Although an

analysis of a foreign sovereign's potential immunity and liability should be conducted separately,

the elements of immunity and liability under § 1605A(c) are essentially the same in that §

1605A(a)(1) must be fulfilled to demonstrate that a plaintiff has a cause of action."); *see also*

25

*Gates v. Syrian Arab Republic,* 580 F. Supp. 2d 53, 64–69 (D.D.C. 2008); *Murphy v. Islamic Republic of Iran,* 740 F. Supp. 2d 51, 72 (D.D.C. 2010). In addition, as Hekmati was released from confinement in January 2016, this action was filed within the ten-year statute of limitations. Accordingly, Iran is liable under § 1605A(c) for money damages for the personal injuries it caused Hekmati through its acts of torture and hostage-taking. The only remaining question is the amount of damages to be awarded.

## IV.   DAMAGES

Plaintiffs are seeking two types of compensatory damages – damages for pain and suffering and economic damages – as well as punitive damages.

### 1.   Compensatory Damages

To obtain compensatory damages in a FSIA case, a plaintiff "must prove that the consequences of the defendants' acts were reasonably certain to occur, and they must prove the amount of damages by a reasonable estimate." *Reed,* 845 F. Supp. 2d at 213 (citing *Hill v. Republic of Iraq,* 328 F.3d 680, 681 (D.C. Cir. 2003)).

#### a.   Pain and Suffering Damages

Hekmati seeks damages for pre- and post-release pain and suffering, which are described in great detail in Background Sections I.B & I.C, *supra.* He asks for an award of $16,020,000 for his pre-release pain and suffering and $64,080,000 for his post-release and future pain and suffering.

Pain and suffering, past and future, are obviously a reasonably certain consequence of torture. (*See* Discussion, Section II.A.1, *supra*)); *see Moradi,* 77 F. Supp. 3d at 69-70 (awarding damages for pain and suffering resulting from torture); *see also Stansell,* 217 F. Supp. 3d at 346 (same); *Price v. Socialist People's Libyan Arab Jamahiriya,* 384 F. Supp. 2d 120, 134-36 (D.D.C. 2005) ("*Price III*") (same); *Massie,* 592 F. Supp. 2d at 77 (same). The challenge arises

26

in assigning a dollar value to such pain and suffering. *See, e.g., Stansell*, 217 F. Supp. 3d at 345

("quantifying these types of harms is inherently difficult"); *Moradi*, 77 F. Supp. 3d at 70 (same);

*Price III*, 384 F. Supp. 2d at 134 (same). The primary consideration in these cases is to ensure

that "individuals with similar injuries receive similar awards." *See Moradi*, 77 F. Supp. 2d at 70

(internal quotations omitted); *see also, e.g., Stansell*, 217 F. Supp. 3d at 345 (same)

     For his pain and suffering while imprisoned, Hekmati suggests $16.02 million because he

was detained for 1602 days and "[c]ourts in this district, including this Court, typically set

damages for prolonged and abusive captivity at $10,000 per day for the pain and suffering that

victims experienced while imprisoned." (Mem. at 27); *see, e.g., Moradi*, 77 F. Supp. 3d at 70

($1.68 million for 168 days of imprisonment); *Stansell*, 217 F. Supp. 3d at 346 ($19.67 million

for 1967 days held hostage); *Kilburn*, 699 F. Supp. 2d at 157 ($5.03 million for 503 days as

hostage); *Massie*, 592 F. Supp. 2d at 77 ($3.35 million for 335 days of imprisonment); *Price III*,

384 F. Supp. 2d at 135 ($1.05 million for 105 days of captivity); *Sutherland*, 151 F. Supp. 2d at

51 ($23.54 million for 2,354 days of captivity); *Anderson v. Islamic Republic of Iran*, 90 F.

Supp. 2d 107, 113 (D.D.C. 2000) ($24.54 million for 2,454 days of captivity). The Court sees no

reason to deviate from this approach and therefore will award $16.02 million in pain and

suffering damages for Hekmati's 1602 days (four and one-half years) of imprisonment.

     For his pain and suffering post-imprisonment, Hekmati suggests $64.08 million because

that is 4x the pre-release award amount, which was apparently the formula used by the district

court in *Massie*. The problem with this approach is that it ignores two factors that are directly

relevant to determining the magnitude of a victim's likely post-release pain and suffering: the

victim's age at the time of release (the length of time he will be experiencing pain and suffering)

DA57

and the extent of the victim's long-term injuries (the level of pain and suffering).[11]  At the time

Hekmati was released he was 32 years old, and his life expectancy at that point was over 45

years.  *See, e.g.*, National Vital Statistics Reports, Vol. 64, No. 11 (Sept. 22, 2015).  In addition,

his injuries are severe and likely to persist.  Keeping those considerations in mind, and looking at

the awards in other detention cases, including *Moradi*, *Stansell*, *Price*, *Acree* , *Wyatt*, and

*Massie*, the Court will award Hekmati $10 million for his post-release pain and suffering.

In total, the Court awards Hekmati $26.02 million for his past and future pain and

suffering.

### b.   Economic Damages

Hekmati seeks economic damages in the amount of $5,728,179 million to compensate for

his lost earnings during his detention, since his release, and in the future.  (*See* Mem. at 31.)

"As a general rule, lost earnings – past and future – are compensable economic

damages."  *See Moradi*, 77 F. Supp. 3d at 71 (citing Restatement (Second) of Torts § 906).  In a

FSIA case, "[t]he report of a forensic economist may provide a reasonable basis for determining

the amount of economic damages."  *Reed*, 845 F. Supp. 2d at 214 (awarding economic damages

for lost earnings based on report of forensic economist); *see also Thuneibat*, 167 F. Supp. 3d at

48-50 (same); *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 402 (D.D.C. 2015) (same);

*Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 24 (D.D.C. 2009) (same).  "In considering

---

[11] As an alternative, plaintiff suggests a lump sum award of $25 million because that is the
amount recently awarded by the court in *Stansell*.  217 F. Supp. 3d at 346.  In *Stansell*, though, it
appears that the $25 million was intended to compensate for both post-release pain and suffering
and the fact that, in the court's estimation, $10,000 per day did not adequately compensate the
plaintiffs for their pre-release pain and suffering.  *See id.* (additional lump sum added to per diem
"accounts for the length of time [the plaintiffs] were held hostage—which far exceeds the
periods of captivity of plaintiffs in other FSIA cases decided in this District—the violent
shooting down of their aircraft, the extremity of their treatment in the jungle, and the ongoing
physical, psychological, and emotional effects of their experience").

DA58

an award for lost future earnings, the Court shall take account of the reasonableness and foundation of the assumptions relied upon by the expert." *Roth*, 78 F. Supp. 3d at 402.

To support his claim for economic damages, plaintiff has submitted an earning capacity evaluation from Robert Taylor, the Director of Vocational Diagnostics, Inc. and an expert report from Frank Slesnik, Ph.D., a forensic economic consultant. (*See* Mem. Ex. E (Earning Capacity Evaluation of Robert Taylor ("Taylor Eval.")); *id.* Ex. G (Expert Report of Frank Slesnik, Ph.D ("Slesnik Report")).)   Based on these reports, the Court will award the economic damages sought by Hekmati.

Taylor "evaluate[d] [plaintiff's] ability to work and earn wages but for and considering the injuries he sustained as a result of the subject incident."[12] (Taylor Eval. at 1.)   Taylor first analyzed plaintiff's "earning capacity had the subject incident not occurred." (*Id.* at 10.)[13]   He concludes that Hekmati would likely have worked full time in the competitive labor market after obtaining his Master's degree in December 2012 and that "[h]e then could have chosen to pursue a doctoral degree in economics, which would have expanded the vocational opportunities available to him as well as his probable earnings." (*Id.* at 19.)   He calculates that Hekmati's worklife expectancy after earning a Master's degree would have been another 35.03 years and that if he had continued his education and completed a Ph.D. in 2020, his worklife expectancy at

---

[12] Taylor's evaluation is based upon his review of all of the documents filed in the above-captioned case along with documentation of plaintiff's earnings from 2005 through 2015. (Taylor Eval. at 1-9.)

[13] Taylor's report explains that he uses "the RAPEL methodology," which "considers labor market access, placeability, earnings, labor force participation and worklife expectancy both before and after the subject incident. Post-subject incident, rehabilitation strategies are considered that may enhance one's labor market access, placeability, earnings, labor force participation and worklife expectancy." (Taylor Eval. at 10.)   He describes this methodology as "widely published in the rehabilitation counseling literature and the most widely-used methodology for evaluation of earning capacity by rehabilitation counselors." (*Id.*)

29

DA59

that time would have been another 30.47 years. (*Id.*) As for Hekmati's earning capacity in light of the subject incident, Taylor concludes that he ███████████████████████████████████

████████████████████████████████████████████████████████

(Taylor Eval. at 21.) ███████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ (*Id.*)

Slesnik "calculate[d] [plaintiff's] lost earning due to his incarceration in Iran from August 2011 through January 2016." (Slesnick Report at 2.) In making his calculations, Slesnick also assumed that plaintiff would have completed his Master's program and started work in January 2013. (*Id.* at 5.) To calculate what plaintiff would have earned under those circumstances, Slesnick considered two possible scenarios: (1) he "would have earn[ed] the equivalent of an individual with a [Master's] degree," or (2) "he would have earned the equivalent of an economist." (*Id.* at 4.) Slesnick then looked at the earnings data for each scenario at the 50th and 75th percentile, concluding that "[g]iven [plaintiff's] background, it is reasonable to assume that he might obtain a higher than average income for a particular class of individuals." He then calculated the present value of plaintiff's lost earnings for each set of assumptions, as shown below:

|                  | 50th percentile | 75th percentile |
|------------------|-----------------|-----------------|
| Economist        | $4,631,638      | $6,173,317      |
| Masters' Degree  | $3,404,888      | $4,746,145      |

(*Id.* at 4, 8 & Tables 1-4.) Slesnick next calculated plaintiff's likely post-injury compensation under a couple of scenarios: ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

DA60

██████████████████████████████████ Finally, Slesnick calculated Hekmati's

net economic loss (the difference between what he would have earned had he not been detained

and what he is likely to actually earn) for each scenario, coming up with a range of ████████

████████. However, in his opinion the best estimate, given plaintiff's "past earnings and his

strong personal recommendations from his superiors," would be to assume that Hekmati would

have had a job as an economist earning in the 75th percentile had he not been detained. Under

that scenario, the present value of his lost earnings is $6,173,317, and the net economic loss

would be between ████████████████. (*Id.* at 9-10.) Within this range, Slesnick selects

██████████████████ $5,728,179 as his best estimate of economic loss as it is a

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████ (*Id.* at 9-10.)

The Court has closely reviewed the reports submitted by Taylor and Slesnick. Both are

highly qualified, and their analyses and calculations are thoroughly explained and based on

reasonable assumptions well-grounded in the facts. Accordingly, their reports provide a

reasonable basis for awarding $5,728,179 in economic damages.

### 2. Punitive Damages

Punitive damages are appropriate in cases involving "outrageous conduct." Restatement

(Second) of Torts § 908(1). Their purpose is "to punish and deter the actions for which they are

awarded.'" *Moradi*, 77 F. Supp. 3d at 73 (quoting *Oveissi v. Islamic Republic of Iran*, 879 F.

Supp. 2d 44, 55-56 (D.D.C. 2012)). According to plaintiff, punitive damages are warranted

because he was "held in extreme solitary confinement, beaten, threatened, deprived of adequate

food and sanitary conditions, and psychologically battered by his captors for nearly five years"

(Mem. at 31), and "Iran's conduct is consistent with a pattern and practice of imprisoning U.S.–

DA61

Iranian citizens under false pretenses and subjecting them to extreme physical and psychological abuse during their detention." (*Id.* (citing Khalaji Rep. ¶¶ 18-34).) The evidence supports plaintiff's contention, and the Court has no trouble concluding that Iran's conduct was sufficiently outrageous to warrant the imposition of punitive damages.

As for the amount, courts generally calculate the proper amount of punitive damages by considering "four factors: (1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants." *Moradi*, 77 F. Supp. 3d at 73 (quoting *Oveissi*, 879 F. Supp. 2d at 56). All of these factors suggest that a substantial award of punitive damages is justified in this case. Defendant's conduct was truly horrific and it caused substantial and permanent harm. In addition, defendant's conduct is part of a longstanding pattern and policy, making the need for deterrence clear.[14] Finally, "Iran is a sovereign and has substantial wealth." *Bluth v. Islamic Republic of Iran*, 203 F. Supp. 3d 1, 25 (D.D.C. 2016).

The more difficult question here is what the actual amount of punitive damages should be. *See Anderson*, 90 F. Supp. 2d at 114 ("It is never a simple task to calibrate an award of punitive damages to the gravity of the offense.").

Plaintiff first suggests that $300 million as the appropriate award of punitive damages because "a number of courts have awarded $300 million in punitive damages in cases where plaintiffs suffered harm at the hands of MOIS on the basis that such an award is equal to three times the amount of annual funding provided by Iran to MOIS." (Mem. at 32 (citing *Anderson*,

---

[14] At this time at least four other American citizens are imprisoned in Iran. *See* Carol Morello, *U.S. prisoner in Iran receives pacemaker as Trump calls for Tehran to free him*, Washington Post, Sept. 21, 2017 available at https://www.washingtonpost.com/world/national-security/us-prisoner-in-iran-has-pacemaker-put-in-as-trump-calls-for-tehran-to-free-him/2017/09/19/e295bba3-ae29-44f0-af81-3fe097771485_story.html?utm_term=.08eb5b51e2a9.

DA62

90 F. Supp. 2d at 114).) The Court sees several problems with this approach. First, although the evidence supports plaintiff's contention that MOIS had some involvement in Hekmati's detention and torture, in particular while he was in Ward 209, and in the similar treatment of other United States citizens, there are substantial and material differences between what happened to Hekmati and what happened to Anderson and Sutherland, who were kidnapped by terrorist groups and held for over six years in "dungeons" in various parts of Lebanon. *Anderson*, 90 F. Supp. 2d at 108; *Sutherland*, 151 F. Supp. 2d at 31. In addition, the $300 million figure was based on expert testimony in those cases, *see Anderson*, 90 F. Supp. 2d at 114; *see also Sutherland*, 151 F. Supp. 2d at 52-53, but they were decided over 15 years ago and the record in this case contains no such evidence. *Cf. Roth*, 78 F. Supp. 3d at 406 (awarding punitive damages in the amount of $112.5 million, three times the amount that Iran was providing Hamas annually during the relevant time, as established by evidence in the record before the court). Given the staleness of the evidence and the differences in plaintiffs' experience, the Court cannot simply adopt the punitive damages amount awarded in *Anderson*.

In the alternative, plaintiff asks that the Court award "punitive damages in an amount equal to a plaintiff's total compensatory damages." (Mem. at 33 (citing cases).) Other courts have used this approach when the expenditure times multiplier doesn't work. *See, e.g., Opati v. Republic of Sudan*, 60 F. Supp. 3d 68, 80–82 (D.D.C. 2014). Indeed, this Court used this approach in *Moradi*, which involved a very similar set of facts, *see Moradi*, 77 F. Supp. 3d at 73, and sees no reason not to follow it here. As set forth above, plaintiff's total compensatory damages award in this case is $31,748,179.00 ($26,020,000 for pain and suffering plus $5,728,179 in economic damages). Accordingly, the Court will award punitive damages in the amount of $31,748,179.00.

<div align="center">33</div>

## CONCLUSION

For the reasons stated above, the Court grants plaintiffs' motion for default judgment and enters judgment for plaintiffs in the amounts specified above.  A separate Default Judgment accompanies this Memorandum Opinion.


/s/  *Ellen Segal Huvelle*
ELLEN SEGAL HUVELLE
United States District Judge


Date:   September 29, 2017

DA64



# Amir Hekmati Application

# Attachment 3a

# Plaintiff's Affidavit Requesting Foreign Mailing

CO 226
Rev. 3/2010

# UNITED STATES DISTRICT AND BANKRUPTCY COURTS
## FOR THE DISTRICT OF COLUMBIA

Amir Hekmati

_____
Plaintiff(s)

vs.                                        Civil Action No.: 1:16-cv-875

The Government of the Islamic Republic of Iran

_____
Defendant(s)

## AFFIDAVIT REQUESTING FOREIGN MAILING

I, the undersigned, counsel of record for plaintiff(s), hereby request that the Clerk mail a copy of the default judgment ☑ (and notice of suit, where applicable) to (list name(s) and address(es) of defendants):

The Government of the Islamic Republic of Iran
c/o Ministry of Foreign Affairs
Khomeini Avenue
United Nations Street
Tehran, Iran

by: (check one)      ☑   registered mail, return receipt requested (+ U.S. State Department)
                     ☐   DHL
pursuant to the provisions of: (check one)
                     ☐   FRCP 4(f)(2)(C)(ii)
                     ☐   28 U.S.C. § 1608(a)(3)
                     ☐   28 U.S.C. § 1608(b)(3)(B)
                     ☒   28. U.S.C. § 1608(a)(4)

I certify that this method of service is authorized by the domestic law of (name of country):
the United States of America                                    , and that I obtained this information by
contacting the Overseas Citizens Services, U.S. Department of State.

_____
(Signature)

Emily P. Grim
Gilbert LLP
1100 New York Ave. NW
Suite 700
Washington, DC 20005

(Name and Address)

DA66

 **Gilbert** LLP

1100 New York Avenue, NW
Suite 700
Washington, DC 20005
O 202.772.2200
F 202.772.3333

gotofirm.com

Emily P. Grim
202.772.3926
grime@gotofirm.com

October 18, 2017

**VIA HAND DELIVERY AND ECF**

Office of the Clerk
Attn: Angela D. Caesar
United States District Court for the District of Columbia
United States Courthouse
333 Constitution Avenue, NW
Washington, DC 20001

Re:    Request for Service of Process on Defendant, The Government of the Islamic Republic of Iran,
       in *Hekmati v. The Government of the Islamic Republic of Iran*, Civil Action No. 1:16-cv-875
       (ESH)

Dear Ms. Caesar:

In connection with the above captioned case, we write to request that you take all necessary steps,
pursuant to 28 U.S.C. § 1608(a)(4), to effect service of the Court's opinion and final judgment in this
matter on Defendant, The Government of the Islamic Republic of Iran.

Pursuant to local procedures as outlined in the Manual for Service of Process on a Foreign Defendant,
because the defendant is Iran, plaintiff need not attempt service under other provisions of 28 U.S.C.
§ 1608 prior to requesting service under § 1608(a)(4).

In these circumstances, upon request the Clerk of Court is required to send two copies of the Court's
opinion and final judgment, together with a translation of each (in this case translations are in Farsi, the
official language of Iran), by "any form of mail requiring a signed receipt, to be addressed and
dispatched by the clerk of the court to the Secretary of State" in Washington, D.C., and to the attention
of the Director of Special Consular Services. The Secretary of State shall then take the necessary steps
to effectuate service through diplomatic channels.

In accordance with 28 U.S.C. § 1608(a)(4), I have enclosed:  1) two copies of the Court's opinion;
2) two copies of the Court's final judgment; 3) two copies of each document translated into Farsi, the
official language of the Islamic Republic of Iran; and 4) an affidavit requesting foreign mailing on the
form provided by the Court.

DA67

Office of the Clerk
October 18, 2017
Page 2



Please take the necessary steps to dispatch these materials to effect service on Defendant The Government of the Islamic Republic of Iran pursuant to 28 U.S.C. § 1608(a)(4). The below address should be used for dispatching the above documents to the Director of Special Consular Services:

<div align="center">

U.S. Department of State
Director, Overseas Citizens Services
Office of Legal Affairs (CA/OCS/L)
SA-17, 10th Floor
Washington, DC 20520

</div>

We request that the documents be sent to the above address via Federal Express. We would be happy to handle the actual mailing to the Department of State, along with the payment of expenses after preparation of the appropriate materials. If you contact me at (202) 772-3926 when the materials are ready, I will arrange to have them picked up.

If you have any questions or require anything further, please do not hesitate to contact me. Thank you very much for your assistance in this matter.

Sincerely,

Emily P. Grim

Enclosure

DA68



Amir Hekmati Application

Attachment 3b

D.D.C. Certificate of Mailing

CO 939
Rev. 9/2017

# UNITED STATES DISTRICT AND BANKRUPTCY COURTS
# FOR THE DISTRICT OF COLUMBIA

AMIR HEKMATI
_____
Plaintiff(s)

vs.                                              Civil Action No.: __16cv875-ESH__

ISLAMIC REPUBLIC OF IRAN
_____
Defendant(s)

## CERTIFICATE OF MAILING

I hereby certify under penalty of perjury, that on the __23rd__ day of _____October_____, 20 __17__, I mailed:

1. ☐ One copy of the summons and complaint _____ by registered mail, return receipt requested _____, to the individual of the foreign state, pursuant to the provisions of FRCP 4(f)(2)(C)(ii).

2. ☐ One copy of the summons, complaint and notice of suit _____, together with a translation of each into the official language of the foreign state, by registered mail, return receipt requested _____, to the head of the ministry of foreign affairs, pursuant to the provisions of 28 U.S.C. § 1608(a)(3).

3. ☒ Two copies of the order and Default Judgment _____, together with a translation of each into the official language of the foreign state, by certified mail, return receipt requested _____, to the U.S. Department of State, CA/OSC/L, SA-17, 10th Floor, Washington, DC 20522-1710, ATTN: Director of Overseas Citizens Services, pursuant to the provisions of 28 U.S.C. § 1608(a)(4).

4. ☐ One copy of the summons and complaint _____, together with a translation of each into the official language of the foreign state, by registered mail, return receipt requested _____, to the agency or instrumentality of the foreign state, pursuant to 28 U.S.C. § 1608(b)(3)(B).

ANGELA D. CAESAR, CLERK

By: _____/s/ Regianld D. Johnson_____
Deputy Clerk

DA70

# Amir Hekmati Application

# Attachment 3c

# Ex. 1 to Certificate of Mailing

DA71

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

U.S. DEPARTMENT OF STATE
DIRECTOR - OFFICE OF INFORMATION SERVICES
(CA/OCS)
SA-17, 10th FLOOR
WASHINGTON, DC 20520

16cv875

9590 9402 2738 6351 9643 89

2. Article Number (Transfer from service label)

7012 2920 0001 8840 7113

PS Form 3811, July 2015 PSN 7530-02-000-9053

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X
☐ Agent
☐ Addressee

B. Received by (Printed Name)        C. Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery
   (over $500)
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

Domestic Return Receipt

7012 2920 0001 8840 7113

CERTIFIED MAIL

NEOPOST
10/18/2017
US POSTAGE $012.75⁰
ZIP 20006
041M11272766

DA72



Amir Hekmati Application


Attachment 3d


Supplemental Letter from E. Grim to U.S.
Department of State

 **Gilbert** LLP

1100 New York Avenue, NW
Suite 700
Washington, DC 20005
O 202.772.2200
F 202.772.3333
gotofirm.com

Emily P. Grim
202.772.3926
grime@gotofirm.com

November 3, 2017

**VIA FEDEX**

U.S. Department of State
Director, Overseas Citizens Services
Office of Legal Affairs (CA/OCS/L)
Attn: Jared Hess
SA-17, 10th Floor
Washington, DC 20522

Re:   Request for Service of Process on Defendant, The Government of the Islamic Republic of Iran,
      in *Hekmati v. The Government of the Islamic Republic of Iran*, Civil Action No. 1:16-cv-875
      (ESH)

Dear Mr. Hess:

As a follow-up to my October 18, 2017 letter and our November 2, 2017 telephone conversation, and
pursuant to the requirements of 28 U.S.C. § 1608(a)(4) and 22 C.F.R. §93.2, please find enclosed the
following documents for service on the Defendant in the above-captioned case, The Government of the
Islamic Republic of Iran (the "Defendant"):

   1)   Two copies of a Notice of Default Judgment;

   2)   Two copies of the Notice of Default Judgment translated into Farsi;

   3)   Two copies of the Foreign Sovereign Immunities Act of 1976 ("FSIA"); and

   4)   Two copies of the FSIA translated into Farsi.

These documents were inadvertently omitted from the collection of documents we previously
transmitted to the State Department via the Clerk of Court for service on the Defendant. Those
previously-transmitted documents included: (1) two copies of the Court's final judgment; (2) two copies
of the Court's opinion (3) two copies of each document translated into Farsi; and (4) an affidavit
requesting foreign mailing on the form provided by the Court. (*See* ECF Nos. 18, 19.)

U.S. Department of State
November 3, 2017
Page 2



Pursuant to my November 3, 2017 telephone conversation with Reginald Johnson, Deputy Clerk for the U.S. District Court for the District of Columbia, the Clerk of Court has instructed us to send these additional materials directly to your office.

As requested in our letter of October 18, 2017 (*see id.*), please take all necessary steps, pursuant to 28 U.S.C. § 1608(a)(4), to effect service of the Court's opinion and final judgment and the Notice of Suit in this matter on the Defendant.

If you have any questions or require anything further, please do not hesitate to contact me. Thank you very much for your assistance in this matter.

Sincerely,

Emily P. Grim /cam

Emily P. Grim

Enclosure

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMIR HEKMATI )<br><br>Plaintiff, )<br><br>v. )<br><br>THE GOVERNMENT OF THE )<br>ISLAMIC REPUBLIC OF IRAN, )<br>c/o Ministry of Foreign Affairs )<br>Khomeini Avenue, )<br>United Nations Street )<br>Tehran, Iran )<br><br>Defendant. )<br>_____ ) | Civil Action No. 1:16-cv-875 (ESH) |

## NOTICE OF DEFAULT JUDGMENT

Pursuant to 22 C.F.R. 93.2, Plaintiff Amir Hekmati hereby gives notice to Defendant, the Government of the Islamic Republic of Iran, of the following:

1.       This case is *Hekmati v. The Government of the Islamic Republic of Iran.* The case number is 1:16-cv-875, filed in the U.S. District Court for the District of Columbia.

2.       The Defendant in this case is the Government of the Islamic Republic of Iran ("Defendant").

3.       The Plaintiff is Amir Hekmati.  There are no other parties.

4.       Enclosed herein are copies of the Default Judgment and Opinion Granting Plaintiff's Motion for Default Judgment ("Opinion") in this matter, both issued on September 29, 2017.  The Default Judgment and Opinion explain the law under which this case arises (the Foreign Sovereign Immunities Act), the Court's award of damages, and the facts that support that award.  Also included is a copy of the Foreign Sovereign Immunities Act.

5.      The Defendant was named in the suit because it unlawfully detained Mr. Hekmati

when he traveled to Iran to visit his family, falsely imprisoned him for 4.5 years, and subjected

him to physical and psychological abuse, all of which amounts to torture and hostage-taking.

Mr. Hekmati was seriously harmed as a result of this treatment. Mr. Hekmati alleges that the

Defendant committed all of these acts in an effort to extract concessions from the United States.

The Defendant was properly served with this action pursuant to 28 U.S.C. § 1608(a)(4) of the

Foreign Sovereign Immunities Act and failed to respond or appear.  The Clerk of Court entered

the Defendant's default on December 21, 2016.  Mr. Hekmati filed a Motion for Default

Judgment ("Motion") on February 6, 2017, requesting judgment in the amount of $85,828,179 in

compensatory and economic damages and $300,000,000 in punitive damages.

6.      As noted above, the Court granted the Motion on September 29, 2017, and

entered a Default Judgment against the Defendant in the amount of:

(a) $16,020,000 in compensatory damages for pre-release pain and suffering;

(b) $10,000,000 in compensatory damages for post-release pain and suffering;

(c) $5,728,179 in economic damages; and

(d) $31,748,179 in punitive damages.

7.      Questions relating to state immunities and to the jurisdiction of United States

courts over foreign states are governed by the Foreign Sovereign Immunities Act of 1976, which

appears in sections 1330, 1391(f), 1441(d), and 1602 through 1611 of Title 28, United States

Code (Pub. L. 94-583; 90 Stat. 2891).

- 2 -

DA77

Dated:  November 2, 2017



/s/ Emily P. Grim
Scott D. Gilbert (D.C. Bar # 290932)
Mark A. Packman (D.C. Bar # 336321)
Emily P. Grim (D.C. Bar # 1006597)
Gilbert LLP
1100 New York Avenue, NW
Suite 700
Washington, DC 20005
Tel:  (202) 772-2200
Fax:  (202) 772-3333
gilberts@gotofirm.com
packmanm@gotofirm.com
grime@gotofirm.com

*Attorneys for Plaintiff Amir Hekmati*

DA78

<div dir="rtl">

دادگاه منطقه ای ایالات متحده
در منطقه کلمبیا



|  |  |
|---|---|
| امیر حکمتی | ( |
| خواهان، | ( |
| علیه | ( شماره دعوای مدنی: (ESH) 875-cv-16:1 |
| دولت | ( |
| جمهوری اسلامی ایران، | ( |
| به وسیله وزارت امور خارجه | ( |
| خیابان خمینی، | ( |
| خیابان سازمان ملل | ( |
| تهران، ایران | ( |
| متهم. | ( |

<u>اطلاعیه صدور حکم غیابی</u>

بر اساس 22 C.F.R. 93.2، خواهان، امیر حکمتی، بدین وسیله موارد زیر را به آگاهی خوانده، دولت جمهوری

اسلامی ایران، می‌رساند:

١.    این دعوای حکمتی علیه دولت *جمهوری اسلامی ایران* است. این دعوا با شماره 875-cv-16:1 در

دادگاه منطقه‌ای ایالات متحده در منطقه کلمبیا اقامه شده است.

٢.    خوانده این دعوا دولت جمهوری اسلامی ایران («خوانده») است.

٣.    خواهان امیر حکمتی است. طرف دیگری وجود ندارد.

٤.    رونوشت «حکم غیابی» و دیدگاه کارشناسی برای اقدام «خواهان» برای محاکمه غیابی («دیدگاه») در

این دعوا به این نامه پیوست شده است. هر دو سند در 29 سپتامبر 2017 صادر شده است. «حکم غیابی» و «دیدگاه» قانون

مبنای طرح این دعوا (قانون مصونیت دولت های خارجی)، حکم دادگاه درباره غرامت و واقعیات تاییدکننده این حکم را

شرح می دهند. نسخه‌ای از قانون مصونیت دولت‌های خارجی نیز پیوست شده است.

</div>

5.   نام «خوانده» به این دلیل در این دعوا مطرح شده است که امیر حکمتی را در جریان سفری که برای

دیدار با خانواده‌اش به ایران داشت، به طور غیرقانونی بازداشت کرده است، به اشتباه 4.5 سال در زندان نگه داشته است و

مورد آزار جسمی و روانی قرار داده است که این اعمال مجموعاً شکنجه محسوب می‌شود. آقای حکمتی در نتیجه این رفتار

دچار آسیب جدی شده است. آقای حکمتی مدعی است که «خوانده» همه این اقدامات را برای امتیاز گرفتن از ایالات متحده

انجام داده است. اطلاعیه این دعوا بر اساس (4)(a)1608 § .U.S.C 28 از «قانون مصونیت دولت‌های خارجی» به

«خوانده» ابلاغ شده بود که «خوانده» به آن پاسخ نداده است. منشی دادگاه موضوع غیبت «خوانده» را در 21 دسامبر

2016 ثبت کرده است. آقای حکمتی در 6 فوریه 2017 درخواست صدور حکم غیابی («درخواست») را مطرح کرده بود.

آقای حکمتی درخواست کرده بود که مبلغ $85,828,179 برای غرامت جبرانی و اقتصادی و مبلغ $300,000,000 برای

غرامت تنبیهی تعیین کند.

6.   همان طور که ذکر شد، دادگاه در 29 سپتامبر 2019 «درخواست» را پذیرفت و به شرح زیر «حکم

غیابی» علیه «خوانده» صادر کرد:

(a)   $16,020,000 غرامت جبرانی بابت درد و رنج وارد شده به «خواهان» در دوره پیش از آزادی؛

(b)   $10,000,000 غرامت جبرانی بابت درد و رنج وارد شده به «خواهان» در دوره پس از آزادی؛

(c)   $5,728,179 غرامت اقتصادی؛ و

(d)   $31,748,179 غرامت تنبیهی.

7.   پرسش‌های مربوط به مصونیت دولتی و صلاحیت دادگاه‌های ایالات متحده برای رسیدگی به دعوا علیه

دولت‌های خارجی مشمول قانون 1976 مصونیت دولت‌های خارجی است که در بخش‌های 1330، (f)1391، (d)1441 و

1602 تا 1611 از عنوان 28 قانون ایالات متحده (Pub. L. 94-583; 90 Stat. 2891).

- 2 -

تاریخ: 2 نوامبر 2017

/s/ امیلی گریم (Emily P. Grim)
اسکات گیلبرت(Scott D. Gilbert) (D.C. Bar # 290932)
مارک پکمن (Mark A. Packman) (D.C. Bar # 336321)
امیلی گریم (D.C. Bar # 1006597)
Gilbert LLP
1100 New York Avenue, NW
Suite 700
Washington, DC 20005
تلفن: 772-2200 (202)
نمابر: 772-3333 (202)
gilberts@gotofirm.com
packmanm@gotofirm.com
grime@gotofirm.com

وکلای خواهان امیر حکمتی

- 3 -

DA81



**TRANSPERFECT**

City of New York, State of New York, County of New York

I, Aurora Landman, hereby certify that the document, "2017.11.02 Hekmati Notice of Default Judgment 4848-4003-1571 v.2" is, to the best of my knowledge and belief and within the given parameters, a true and accurate translation from English into Farsi.

_____
Aurora Landman

Sworn to before me this

_____
November 3, 2017

_____
Signature, Notary Public

WENDY POON
NOTARY
NO. 01PO6356754
QUALIFIED IN
QUEENS COUNTY
COMM. EXP.
04-03-2021.
PUBLIC
STATE OF NEW YORK

_____
Stamp, Notary Public

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS
THREE PARK AVENUE, 39TH FLOOR, NEW YORK, NY 10016 I T 212.689.5555 I F 212.689.1059 I WWW.TRANSPERFECT.COM
OFFICES IN 90 CITIES WORLDWIDE

DA82

> United States Code Annotated
>   Title 28. Judiciary and Judicial Procedure (Refs & Annos)
>     Part IV. Jurisdiction and Venue (Refs & Annos)
>       Chapter 85. District Courts; Jurisdiction (Refs & Annos)

28 U.S.C.A. § 1330

§ 1330. Actions against foreign states

Currentness

(a) The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605-1607 of this title or under any applicable international agreement.

(b) Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under subsection (a) where service has been made under section 1608 of this title.

(c) For purposes of subsection (b), an appearance by a foreign state does not confer personal jurisdiction with respect to any claim for relief not arising out of any transaction or occurrence enumerated in sections 1605-1607 of this title.

**CREDIT(S)**
   (Added Pub.L. 94-583, § 2(a), Oct. 21, 1976, 90 Stat. 2891.)

28 U.S.C.A. § 1330, 28 USCA § 1330
Current through P.L. 114-143. Also includes P.L. 114-145, 114-146, 114-148, and 114-151 to 114-154.

**End of Document**                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

---

United States Code Annotated
  Title 28. Judiciary and Judicial Procedure (Refs & Annos)
    Part IV. Jurisdiction and Venue (Refs & Annos)
      Chapter 85. District Courts; Jurisdiction (Refs & Annos)

28 U.S.C.A. § 1332

§ 1332. Diversity of citizenship; amount in controversy; costs

Currentness

<Notes of Decisions for 28 USCA § 1332 are displayed in two separate documents. Notes of Decisions for subdivisions I to X are contained in this document. For Notes of Decisions for subdivisions XI to end, see second document for 28 USCA § 1332.>

(a) The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between--

(1) citizens of different States;

(2) citizens of a State and citizens or subjects of a foreign state, except that the district courts shall not have original jurisdiction under this subsection of an action between citizens of a State and citizens or subjects of a foreign state who are lawfully admitted for permanent residence in the United States and are domiciled in the same State;

(3) citizens of different States and in which citizens or subjects of a foreign state are additional parties; and

(4) a foreign state, defined in section 1603(a) of this title, as plaintiff and citizens of a State or of different States;

(b) Except when express provision therefor is otherwise made in a statute of the United States, where the plaintiff who files the case originally in the Federal courts is finally adjudged to be entitled to recover less than the sum or value of $75,000, computed without regard to any setoff or counterclaim to which the defendant may be adjudged to be entitled, and exclusive of interest and costs, the district court may deny costs to the plaintiff and, in addition, may impose costs on the plaintiff.

(c) For the purposes of this section and section 1441 of this title--

(1) a corporation shall be deemed to be a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business, except that in any direct action against the insurer of a policy or contract of liability insurance, whether incorporated or unincorporated, to which action the insured is not joined as a party-defendant, such insurer shall be deemed a citizen of--

(A) every State and foreign state of which the insured is a citizen;

---

§ 1332. Diversity of citizenship; amount in controversy; costs, 28 USCA § 1332

(B) every State and foreign state by which the insurer has been incorporated; and

(C) the State or foreign state where the insurer has its principal place of business; and

(2) the legal representative of the estate of a decedent shall be deemed to be a citizen only of the same State as the decedent, and the legal representative of an infant or incompetent shall be deemed to be a citizen only of the same State as the infant or incompetent.

(d)(1) In this subsection--

(A) the term "class" means all of the class members in a class action;

(B) the term "class action" means any civil action filed under rule 23 of the Federal Rules of Civil Procedure or similar State statute or rule of judicial procedure authorizing an action to be brought by 1 or more representative persons as a class action;

(C) the term "class certification order" means an order issued by a court approving the treatment of some or all aspects of a civil action as a class action; and

(D) the term "class members" means the persons (named or unnamed) who fall within the definition of the proposed or certified class in a class action.

(2) The district courts shall have original jurisdiction of any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which--

(A) any member of a class of plaintiffs is a citizen of a State different from any defendant;

(B) any member of a class of plaintiffs is a foreign state or a citizen or subject of a foreign state and any defendant is a citizen of a State; or

(C) any member of a class of plaintiffs is a citizen of a State and any defendant is a foreign state or a citizen or subject of a foreign state.

(3) A district court may, in the interests of justice and looking at the totality of the circumstances, decline to exercise jurisdiction under paragraph (2) over a class action in which greater than one-third but less than two-thirds of the members of all proposed plaintiff classes in the aggregate and the primary defendants are citizens of the State in which the action was originally filed based on consideration of--

(A) whether the claims asserted involve matters of national or interstate interest;

DA85

**§ 1332. Diversity of citizenship; amount in controversy; costs, 28 USCA § 1332**

(B) whether the claims asserted will be governed by laws of the State in which the action was originally filed or by the laws of other States;

(C) whether the class action has been pleaded in a manner that seeks to avoid Federal jurisdiction;

(D) whether the action was brought in a forum with a distinct nexus with the class members, the alleged harm, or the defendants;

(E) whether the number of citizens of the State in which the action was originally filed in all proposed plaintiff classes in the aggregate is substantially larger than the number of citizens from any other State, and the citizenship of the other members of the proposed class is dispersed among a substantial number of States; and

(F) whether, during the 3-year period preceding the filing of that class action, 1 or more other class actions asserting the same or similar claims on behalf of the same or other persons have been filed.

(4) A district court shall decline to exercise jurisdiction under paragraph (2)--

(A)(i) over a class action in which--

(I) greater than two-thirds of the members of all proposed plaintiff classes in the aggregate are citizens of the State in which the action was originally filed;

(II) at least 1 defendant is a defendant--

(aa) from whom significant relief is sought by members of the plaintiff class;

(bb) whose alleged conduct forms a significant basis for the claims asserted by the proposed plaintiff class; and

(cc) who is a citizen of the State in which the action was originally filed; and

(III) principal injuries resulting from the alleged conduct or any related conduct of each defendant were incurred in the State in which the action was originally filed; and

(ii) during the 3-year period preceding the filing of that class action, no other class action has been filed asserting the same or similar factual allegations against any of the defendants on behalf of the same or other persons; or

DA86

§ 1332. Diversity of citizenship; amount in controversy; costs, 28 USCA § 1332

(B) two-thirds or more of the members of all proposed plaintiff classes in the aggregate, and the primary defendants, are citizens of the State in which the action was originally filed.

(5) Paragraphs (2) through (4) shall not apply to any class action in which--

(A) the primary defendants are States, State officials, or other governmental entities against whom the district court may be foreclosed from ordering relief; or

(B) the number of members of all proposed plaintiff classes in the aggregate is less than 100.

(6) In any class action, the claims of the individual class members shall be aggregated to determine whether the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs.

(7) Citizenship of the members of the proposed plaintiff classes shall be determined for purposes of paragraphs (2) through (6) as of the date of filing of the complaint or amended complaint, or, if the case stated by the initial pleading is not subject to Federal jurisdiction, as of the date of service by plaintiffs of an amended pleading, motion, or other paper, indicating the existence of Federal jurisdiction.

(8) This subsection shall apply to any class action before or after the entry of a class certification order by the court with respect to that action.

(9) Paragraph (2) shall not apply to any class action that solely involves a claim--

(A) concerning a covered security as defined under 16(f)(3) [1] of the Securities Act of 1933 (15 U.S.C. 78p(f)(3) [2]) and section 28(f)(5)(E) of the Securities Exchange Act of 1934 (15 U.S.C. 78bb(f)(5)(E));

(B) that relates to the internal affairs or governance of a corporation or other form of business enterprise and that arises under or by virtue of the laws of the State in which such corporation or business enterprise is incorporated or organized; or

(C) that relates to the rights, duties (including fiduciary duties), and obligations relating to or created by or pursuant to any security (as defined under section 2(a)(1) of the Securities Act of 1933 (15 U.S.C. 77b(a)(1)) and the regulations issued thereunder).

(10) For purposes of this subsection and section 1453, an unincorporated association shall be deemed to be a citizen of the State where it has its principal place of business and the State under whose laws it is organized.

(11)(A) For purposes of this subsection and section 1453, a mass action shall be deemed to be a class action removable under paragraphs (2) through (10) if it otherwise meets the provisions of those paragraphs.

DA87

§ 1332. Diversity of citizenship; amount in controversy; costs, 28 USCA § 1332

---

**(B)(i)** As used in subparagraph (A), the term "mass action" means any civil action (except a civil action within the scope of section 1711(2)) in which monetary relief claims of 100 or more persons are proposed to be tried jointly on the ground that the plaintiffs' claims involve common questions of law or fact, except that jurisdiction shall exist only over those plaintiffs whose claims in a mass action satisfy the jurisdictional amount requirements under subsection (a).

**(ii)** As used in subparagraph (A), the term "mass action" shall not include any civil action in which--

**(I)** all of the claims in the action arise from an event or occurrence in the State in which the action was filed, and that allegedly resulted in injuries in that State or in States contiguous to that State;

**(II)** the claims are joined upon motion of a defendant;

**(III)** all of the claims in the action are asserted on behalf of the general public (and not on behalf of individual claimants or members of a purported class) pursuant to a State statute specifically authorizing such action; or

**(IV)** the claims have been consolidated or coordinated solely for pretrial proceedings.

**(C)(i)** Any action(s) removed to Federal court pursuant to this subsection shall not thereafter be transferred to any other court pursuant to section 1407, or the rules promulgated thereunder, unless a majority of the plaintiffs in the action request transfer pursuant to section 1407.

**(ii)** This subparagraph will not apply--

**(I)** to cases certified pursuant to rule 23 of the Federal Rules of Civil Procedure; or

**(II)** if plaintiffs propose that the action proceed as a class action pursuant to rule 23 of the Federal Rules of Civil Procedure.

**(D)** The limitations periods on any claims asserted in a mass action that is removed to Federal court pursuant to this subsection shall be deemed tolled during the period that the action is pending in Federal court.

**(e)** The word "States", as used in this section, includes the Territories, the District of Columbia, and the Commonwealth of Puerto Rico.

**CREDIT(S)**

(June 25, 1948, c. 646, 62 Stat. 930; July 26, 1956, c. 740, 70 Stat. 658; July 25, 1958, Pub.L. 85-554, § 2, 72 Stat. 415; Aug. 14, 1964, Pub.L. 88-439, § 1, 78 Stat. 445; Oct. 21, 1976, Pub.L. 94-583, § 3, 90 Stat. 2891; Nov. 19, 1988, Pub.L. 100-702, Title II, §§ 201(a), 202(a), 203(a), 102 Stat. 4646; Oct. 19, 1996, Pub.L. 104-317, Title II, § 205(a), 110 Stat. 3850; Feb. 18, 2005, Pub.L. 109-2, § 4(a), 119 Stat. 9; Pub.L. 112-63, Title I, §§ 101, 102, Dec. 7, 2011, 125 Stat. 758.)

DA88

§ 1332. Diversity of citizenship; amount in controversy; costs, 28 USCA § 1332

Footnotes

1    So in original. Reference to "16(f)(3)" probably should be preceded by "section".
2    So in original. Probably should be "77p(f)(3)".

28 U.S.C.A. § 1332, 28 USCA § 1332

Current through P.L. 114-143. Also includes P.L. 114-145, 114-146, 114-148, and 114-151 to 114-154.

**End of Document**                                      © 2016 Thomson Reuters. No claim to original U.S. Government Works.

DA89

§ 1391. Venue generally, 28 USCA § 1391

> United States Code Annotated
>   Title 28. Judiciary and Judicial Procedure (Refs & Annos)
>     Part IV. Jurisdiction and Venue (Refs & Annos)
>       Chapter 87. District Courts; Venue (Refs & Annos)

28 U.S.C.A. § 1391

§ 1391. Venue generally

Currentness

(a) **Applicability of section.**--Except as otherwise provided by law--

(1) this section shall govern the venue of all civil actions brought in district courts of the United States; and

(2) the proper venue for a civil action shall be determined without regard to whether the action is local or transitory in nature.

(b) **Venue in general.**--A civil action may be brought in--

(1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;

(2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or

(3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

(c) **Residency.**--For all venue purposes--

(1) a natural person, including an alien lawfully admitted for permanent residence in the United States, shall be deemed to reside in the judicial district in which that person is domiciled;

(2) an entity with the capacity to sue and be sued in its common name under applicable law, whether or not incorporated, shall be deemed to reside, if a defendant, in any judicial district in which such defendant is subject to the court's personal jurisdiction with respect to the civil action in question and, if a plaintiff, only in the judicial district in which it maintains its principal place of business; and

(3) a defendant not resident in the United States may be sued in any judicial district, and the joinder of such a defendant shall be disregarded in determining where the action may be brought with respect to other defendants.

§ 1391. Venue generally, 28 USCA § 1391

(d) Residency of corporations in States with multiple districts.--For purposes of venue under this chapter, in a State which has more than one judicial district and in which a defendant that is a corporation is subject to personal jurisdiction at the time an action is commenced, such corporation shall be deemed to reside in any district in that State within which its contacts would be sufficient to subject it to personal jurisdiction if that district were a separate State, and, if there is no such district, the corporation shall be deemed to reside in the district within which it has the most significant contacts.

(e) Actions where defendant is officer or employee of the United States--

(1) In general.--A civil action in which a defendant is an officer or employee of the United States or any agency thereof acting in his official capacity or under color of legal authority, or an agency of the United States, or the United States, may, except as otherwise provided by law, be brought in any judicial district in which (A) a defendant in the action resides, (B) a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (C) the plaintiff resides if no real property is involved in the action. Additional persons may be joined as parties to any such action in accordance with the Federal Rules of Civil Procedure and with such other venue requirements as would be applicable if the United States or one of its officers, employees, or agencies were not a party.

(2) Service.--The summons and complaint in such an action shall be served as provided by the Federal Rules of Civil Procedure except that the delivery of the summons and complaint to the officer or agency as required by the rules may be made by certified mail beyond the territorial limits of the district in which the action is brought.

(f) Civil actions against a foreign state--A civil action against a foreign state as defined in section 1603(a) of this title may be brought--

(1) in any judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated;

(2) in any judicial district in which the vessel or cargo of a foreign state is situated, if the claim is asserted under section 1605(b) of this title;

(3) in any judicial district in which the agency or instrumentality is licensed to do business or is doing business, if the action is brought against an agency or instrumentality of a foreign state as defined in section 1603(b) of this title; or

(4) in the United States District Court for the District of Columbia if the action is brought against a foreign state or political subdivision thereof.

(g) Multiparty, multiforum litigation--A civil action in which jurisdiction of the district court is based upon section 1369 of this title may be brought in any district in which any defendant resides or in which a substantial part of the accident giving rise to the action took place.

CREDIT(S)

(June 25, 1948, c. 646, 62 Stat. 935; Oct. 5, 1962, Pub.L. 87-748, § 2, 76 Stat. 744; Dec. 23, 1963, Pub.L. 88-234, 77 Stat. 473; Nov. 2, 1966, Pub.L. 89-714, §§ 1, 2, 80 Stat. 1111; Oct. 21, 1976, Pub.L. 94-574, § 3, 90 Stat. 2721; Oct. 21, 1976, Pub.L.

§ 1391. Venue generally, 28 USCA § 1391

94:583, § 5, 90 Stat. 2897; Nov. 19, 1988, Pub.L. 100-702, Title X, § 1013(a), 102 Stat. 4669; Dec. 1, 1990, Pub.L. 101-650, Title III, § 311, 104 Stat. 5114; Dec. 9, 1991, Pub.L. 102-198, § 3, 105 Stat. 1623; Oct. 29, 1992, Pub.L. 102-572, Title V, § 504, 106 Stat. 4513; Oct. 3, 1995, Pub.L. 104-34, § 1, 109 Stat. 293; Nov. 2, 2002, Pub.L. 107-273, Div. C, Title I, § 11020(b) (2), 116 Stat. 1827; Pub.L. 112-63, Title II, § 202, Dec. 7, 2011, 125 Stat. 763.)

28 U.S.C.A. § 1391, 28 USCA § 1391
Current through P.L. 114-143. Also includes P.L. 114-145, 114-146, 114-148, and 114-151 to 114-154.

**End of Document** © 2016 Thomson Reuters. No claim to original U.S. Government Works.

DA92

---

United States Code Annotated
  Title 28. Judiciary and Judicial Procedure (Refs & Annos)
    Part IV. Jurisdiction and Venue (Refs & Annos)
      Chapter 89. District Courts; Removal of Cases from State Courts (Refs & Annos)

28 U.S.C.A. § 1441

§ 1441. Removal of civil actions

Currentness

**(a) Generally.**--Except as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending.

**(b) Removal based on diversity of citizenship.--(1)** In determining whether a civil action is removable on the basis of the jurisdiction under section 1332(a) of this title, the citizenship of defendants sued under fictitious names shall be disregarded.

**(2)** A civil action otherwise removable solely on the basis of the jurisdiction under section 1332(a) of this title may not be removed if any of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought.

**(c) Joinder of Federal law claims and State law claims.--(1)** If a civil action includes--

**(A)** a claim arising under the Constitution, laws, or treaties of the United States (within the meaning of section 1331 of this title), and

**(B)** a claim not within the original or supplemental jurisdiction of the district court or a claim that has been made nonremovable by statute, the entire action may be removed if the action would be removable without the inclusion of the claim described in subparagraph (B).

**(2)** Upon removal of an action described in paragraph (1), the district court shall sever from the action all claims described in paragraph (1)(B) and shall remand the severed claims to the State court from which the action was removed. Only defendants against whom a claim described in paragraph (1)(A) has been asserted are required to join in or consent to the removal under paragraph (1).

**(d) Actions against foreign States.**--Any civil action brought in a State court against a foreign state as defined in section 1603(a) of this title may be removed by the foreign state to the district court of the United States for the district and division embracing the place where such action is pending. Upon removal the action shall be tried by the court without jury. Where removal is based upon this subsection, the time limitations of section 1446(b) of this chapter may be enlarged at any time for cause shown.

---

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.   1

§ 1441. Removal of civil actions, 28 USCA § 1441

(e) **Multiparty, multiforum jurisdiction.**--(1) Notwithstanding the provisions of subsection (b) of this section, a defendant in a civil action in a State court may remove the action to the district court of the United States for the district and division embracing the place where the action is pending if--

(A) the action could have been brought in a United States district court under section 1369 of this title; or

(B) the defendant is a party to an action which is or could have been brought, in whole or in part, under section 1369 in a United States district court and arises from the same accident as the action in State court, even if the action to be removed could not have been brought in a district court as an original matter.

The removal of an action under this subsection shall be made in accordance with section 1446 of this title, except that a notice of removal may also be filed before trial of the action in State court within 30 days after the date on which the defendant first becomes a party to an action under section 1369 in a United States district court that arises from the same accident as the action in State court, or at a later time with leave of the district court.

(2) Whenever an action is removed under this subsection and the district court to which it is removed or transferred under section 1407(j) has made a liability determination requiring further proceedings as to damages, the district court shall remand the action to the State court from which it had been removed for the determination of damages, unless the court finds that, for the convenience of parties and witnesses and in the interest of justice, the action should be retained for the determination of damages.

(3) Any remand under paragraph (2) shall not be effective until 60 days after the district court has issued an order determining liability and has certified its intention to remand the removed action for the determination of damages. An appeal with respect to the liability determination of the district court may be taken during that 60-day period to the court of appeals with appellate jurisdiction over the district court. In the event a party files such an appeal, the remand shall not be effective until the appeal has been finally disposed of. Once the remand has become effective, the liability determination shall not be subject to further review by appeal or otherwise.

(4) Any decision under this subsection concerning remand for the determination of damages shall not be reviewable by appeal or otherwise.

(5) An action removed under this subsection shall be deemed to be an action under section 1369 and an action in which jurisdiction is based on section 1369 of this title for purposes of this section and sections 1407, 1697, and 1785 of this title.

(6) Nothing in this subsection shall restrict the authority of the district court to transfer or dismiss an action on the ground of inconvenient forum.

(f) **Derivative removal jurisdiction.**--The court to which a civil action is removed under this section is not precluded from hearing and determining any claim in such civil action because the State court from which such civil action is removed did not have jurisdiction over that claim.

**CREDIT(S)**
  (June 25, 1948, c. 646, 62 Stat. 937; Oct. 21, 1976, Pub.L. 94-583, § 6, 90 Stat. 2898; June 19, 1986, Pub.L. 99-336, § 3(a), 100 Stat. 637; Nov. 19, 1988, Pub.L. 100-702, Title X, § 1016(a), 102 Stat. 4669; Dec. 1, 1990, Pub.L. 101-650, Title III, § 312,

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

DA94

§ 1441. Removal of civil actions, 28 USCA § 1441

104 Stat. 5114; Dec. 9, 1991, Pub.L. 102-198, § 4, 105 Stat. 1623; Nov. 2, 2002, Pub.L. 107-273, Div. C, Title I, § 11020(b)(3), 116 Stat. 1827; Pub.L. 112-63, Title I, § 103(a), Dec. 7, 2011, 125 Stat. 759.)

28 U.S.C.A. § 1441, 28 USCA § 1441
Current through P.L. 114-143. Also includes P.L. 114-145, 114-146, 114-148, and 114-151 to 114-154.

End of Document © 2016 Thomson Reuters. No claim to original U.S. Government Works.

DA95

United States Code Annotated
    Title 28. Judiciary and Judicial Procedure (Refs & Annos)
        Part IV. Jurisdiction and Venue (Refs & Annos)
            Chapter 97. Jurisdictional Immunities of Foreign States

28 U.S.C.A. § 1602

§ 1602. Findings and declaration of purpose

Currentness

The Congress finds that the determination by United States courts of the claims of foreign states to immunity from the jurisdiction of such courts would serve the interests of justice and would protect the rights of both foreign states and litigants in United States courts. Under international law, states are not immune from the jurisdiction of foreign courts insofar as their commercial activities are concerned, and their commercial property may be levied upon for the satisfaction of judgments rendered against them in connection with their commercial activities. Claims of foreign states to immunity should henceforth be decided by courts of the United States and of the States in conformity with the principles set forth in this chapter.

**CREDIT(S)**
    (Added Pub.L. 94-583, § 4(a), Oct. 21, 1976, 90 Stat. 2892.)

28 U.S.C.A. § 1602, 28 USCA § 1602
Current through P.L. 114-143. Also includes P.L. 114-145, 114-146, 114-148, and 114-151 to 114-154.

End of Document                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

§ 1603. Definitions, 28 USCA § 1603

United States Code Annotated
  Title 28. Judiciary and Judicial Procedure (Refs & Annos)
    Part IV. Jurisdiction and Venue (Refs & Annos)
      Chapter 97. Jurisdictional Immunities of Foreign States

28 U.S.C.A. § 1603

§ 1603. Definitions

Effective: February 18, 2005
Currentness

For purposes of this chapter--

(a) A "foreign state", except as used in section 1608 of this title, includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b).

(b) An "agency or instrumentality of a foreign state" means any entity--

(1) which is a separate legal person, corporate or otherwise, and

(2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

(3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (e) of this title, nor created under the laws of any third country.

(c) The "United States" includes all territory and waters, continental or insular, subject to the jurisdiction of the United States.

(d) A "commercial activity" means either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.

(e) A "commercial activity carried on in the United States by a foreign state" means commercial activity carried on by such state and having substantial contact with the United States.

CREDIT(S)
  (Added Pub.L. 94-583, § 4(a), Oct. 21, 1976, 90 Stat. 2892; amended Pub.L. 109-2, § 4(b)(2), Feb. 18, 2005, 119 Stat. 12.)

28 U.S.C.A. § 1603, 28 USCA § 1603
Current through P.L. 114-143. Also includes P.L. 114-145, 114-146, 114-148, and 114-151 to 114-154.

DA97

§ 1604. Immunity of a foreign state from jurisdiction, 28 USCA § 1604

> United States Code Annotated
>   Title 28. Judiciary and Judicial Procedure (Refs & Annos)
>     Part IV. Jurisdiction and Venue (Refs & Annos)
>       Chapter 97. Jurisdictional Immunities of Foreign States

28 U.S.C.A. § 1604

§ 1604. Immunity of a foreign state from jurisdiction

Currentness

Subject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter.

**CREDIT(S)**

(Added Pub.L. 94-583, § 4(a), Oct. 21, 1976, 90 Stat. 2892.)

28 U.S.C.A. § 1604, 28 USCA § 1604
Current through P.L. 114-143. Also includes P.L. 114-145, 114-146, 114-148, and 114-151 to 114-154.

**End of Document**      © 2016 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

DA98

United States Code Annotated
  Title 28. Judiciary and Judicial Procedure (Refs & Annos)
    Part IV. Jurisdiction and Venue (Refs & Annos)
      Chapter 97. Jurisdictional Immunities of Foreign States

28 U.S.C.A. § 1605

§ 1605. General exceptions to the jurisdictional immunity of a foreign state

Effective: January 28, 2008
Currentness

(a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case--

(1) in which the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver;

(2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere: or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States;

(3) in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States;

(4) in which rights in property in the United States acquired by succession or gift or rights in immovable property situated in the United States are in issue;

(5) not otherwise encompassed in paragraph (2) above, in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment; except this paragraph shall not apply to--

(A) any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused, or

(B) any claim arising out of malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights; or

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

§ 1605. General exceptions to the jurisdictional immunity of a..., 28 USCA § 1605

(6) in which the action is brought, either to enforce an agreement made by the foreign state with or for the benefit of a private party to submit to arbitration all or any differences which have arisen or which may arise between the parties with respect to a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration under the laws of the United States, or to confirm an award made pursuant to such an agreement to arbitrate, if (A) the arbitration takes place or is intended to take place in the United States, (B) the agreement or award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards, (C) the underlying claim, save for the agreement to arbitrate, could have been brought in a United States court under this section or section 1607, or (D) paragraph (1) of this subsection is otherwise applicable.

(7) Repealed. Pub.L. 110-181, Div. A, § 1083(b)(1)(A)(iii), Jan. 28, 2008, 122 Stat. 341

(b) A foreign state shall not be immune from the jurisdiction of the courts of the United States in any case in which a suit in admiralty is brought to enforce a maritime lien against a vessel or cargo of the foreign state, which maritime lien is based upon a commercial activity of the foreign state: *Provided*, That--

(1) notice of the suit is given by delivery of a copy of the summons and of the complaint to the person, or his agent, having possession of the vessel or cargo against which the maritime lien is asserted; and if the vessel or cargo is arrested pursuant to process obtained on behalf of the party bringing the suit, the service of process of arrest shall be deemed to constitute valid delivery of such notice, but the party bringing the suit shall be liable for any damages sustained by the foreign state as a result of the arrest if the party bringing the suit had actual or constructive knowledge that the vessel or cargo of a foreign state was involved; and

(2) notice to the foreign state of the commencement of suit as provided in section 1608 of this title is initiated within ten days either of the delivery of notice as provided in paragraph (1) of this subsection or, in the case of a party who was unaware that the vessel or cargo of a foreign state was involved, of the date such party determined the existence of the foreign state's interest.

(c) Whenever notice is delivered under subsection (b)(1), the suit to enforce a maritime lien shall thereafter proceed and shall be heard and determined according to the principles of law and rules of practice of suits in rem whenever it appears that, had the vessel been privately owned and possessed, a suit in rem might have been maintained. A decree against the foreign state may include costs of the suit and, if the decree is for a money judgment, interest as ordered by the court, except that the court may not award judgment against the foreign state in an amount greater than the value of the vessel or cargo upon which the maritime lien arose. Such value shall be determined as of the time notice is served under subsection (b)(1). Decrees shall be subject to appeal and revision as provided in other cases of admiralty and maritime jurisdiction. Nothing shall preclude the plaintiff in any proper case from seeking relief in personam in the same action brought to enforce a maritime lien as provided in this section.

(d) A foreign state shall not be immune from the jurisdiction of the courts of the United States in any action brought to foreclose a preferred mortgage, as defined in section 31301 of title 46. Such action shall be brought, heard, and determined in accordance with the provisions of chapter 313 of title 46 and in accordance with the principles of law and rules of practice of suits in rem, whenever it appears that had the vessel been privately owned and possessed a suit in rem might have been maintained.

(e), (f) Repealed Pub.L. 110-181, Div. A, Title X, § 1083(b)(1)(B), Jan. 28, 2008, 122 Stat. 341

(g) Limitation on discovery.--

DA100

§ 1605. General exceptions to the jurisdictional immunity of a..., 28 USCA § 1605

**(1) In general.**--(A) Subject to paragraph (2), if an action is filed that would otherwise be barred by section 1604, but for section 1605A, the court, upon request of the Attorney General, shall stay any request, demand, or order for discovery on the United States that the Attorney General certifies would significantly interfere with a criminal investigation or prosecution, or a national security operation, related to the incident that gave rise to the cause of action, until such time as the Attorney General advises the court that such request, demand, or order will no longer so interfere.

(B) A stay under this paragraph shall be in effect during the 12-month period beginning on the date on which the court issues the order to stay discovery. The court shall renew the order to stay discovery for additional 12-month periods upon motion by the United States if the Attorney General certifies that discovery would significantly interfere with a criminal investigation or prosecution, or a national security operation, related to the incident that gave rise to the cause of action.

**(2) Sunset.**--(A) Subject to subparagraph (B), no stay shall be granted or continued in effect under paragraph (1) after the date that is 10 years after the date on which the incident that gave rise to the cause of action occurred.

(B) After the period referred to in subparagraph (A), the court, upon request of the Attorney General, may stay any request, demand, or order for discovery on the United States that the court finds a substantial likelihood would--

(i) create a serious threat of death or serious bodily injury to any person;

(ii) adversely affect the ability of the United States to work in cooperation with foreign and international law enforcement agencies in investigating violations of United States law; or

(iii) obstruct the criminal case related to the incident that gave rise to the cause of action or undermine the potential for a conviction in such case.

**(3) Evaluation of evidence.**--The court's evaluation of any request for a stay under this subsection filed by the Attorney General shall be conducted ex parte and in camera.

**(4) Bar on motions to dismiss.**--A stay of discovery under this subsection shall constitute a bar to the granting of a motion to dismiss under rules 12(b)(6) and 56 of the Federal Rules of Civil Procedure.

**(5) Construction.**--Nothing in this subsection shall prevent the United States from seeking protective orders or asserting privileges ordinarily available to the United States.

**CREDIT(S)**

(Added Pub.L. 94-583, § 4(a), Oct. 21, 1976, 90 Stat. 2892; amended Pub.L. 100-640, § 1, Nov. 9, 1988, 102 Stat. 3333; Pub.L. 100-669, § 2, Nov. 16, 1988, 102 Stat. 3969; Pub.L. 101-650, Title III, § 325(b)(8), Dec. 1, 1990, 104 Stat. 5121; Pub.L. 104-132, Title II, § 221(a), Apr. 24, 1996, 110 Stat. 1241; Pub.L. 105-11, Apr. 25, 1997, 111 Stat. 22; Pub.L. 107-77, Title VI, § 626(c), Nov. 28, 2001, 115 Stat. 803; Pub.L. 107-117, Div. B, Ch. 2, § 208, Jan. 10, 2002, 115 Stat. 2299; Pub.L. 109-304, § 17(f)(2), Oct. 6, 2006, 120 Stat. 1708; Pub.L. 110-181, Title X, § 1083(b)(1), Jan. 28, 2008, 122 Stat. 341.)

DA101

§ 1605. General exceptions to the jurisdictional immunity of a..., 28 USCA § 1605

28 U.S.C.A. § 1605, 28 USCA § 1605
Current through P.L. 114-143. Also includes P.L. 114-145, 114-146, 114-148, and 114-151 to 114-154.

End of Document

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

DA102

United States Code Annotated
    Title 28. Judiciary and Judicial Procedure (Refs & Annos)
        Part IV. Jurisdiction and Venue (Refs & Annos)
            Chapter 97. Jurisdictional Immunities of Foreign States

28 U.S.C.A. § 1605A

§ 1605A. Terrorism exception to the jurisdictional immunity of a foreign state

Effective: January 28, 2008 --
Currentness

**(a) In general.--**

**(1) No immunity.--**A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case not otherwise covered by this chapter in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

**(2) Claim heard.--**The court shall hear a claim under this section if--

**(A)(i)(I)** the foreign state was designated as a state sponsor of terrorism at the time the act described in paragraph (1) occurred, or was so designated as a result of such act, and, subject to subclause (II), either remains so designated when the claim is filed under this section or was so designated within the 6-month period before the claim is filed under this section; or

**(II)** in the case of an action that is refiled under this section by reason of section 1083(c)(2)(A) of the National Defense Authorization Act for Fiscal Year 2008 or is filed under this section by reason of section 1083(c)(3) of that Act, the foreign state was designated as a state sponsor of terrorism when the original action or the related action under section 1605(a)(7) (as in effect before the enactment of this section) or section 589 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1997 (as contained in section 101(c) of division A of Public Law 104-208) was filed;

**(ii)** the claimant or the victim was, at the time the act described in paragraph (1) occurred--

**(I)** a national of the United States;

**(II)** a member of the armed forces; or

**(III)** otherwise an employee of the Government of the United States, or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment; and

---

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.         1

**(iii)** in a case in which the act occurred in the foreign state against which the claim has been brought, the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim in accordance with the accepted international rules of arbitration; or

**(B)** the act described in paragraph (1) is related to Case Number 1:00CV03110 (EGS) in the United States District Court for the District of Columbia.

**(b) Limitations.**--An action may be brought or maintained under this section if the action is commenced, or a related action was commenced under section 1605(a)(7) (before the date of the enactment of this section) or section 589 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1997 (as contained in section 101(c) of division A of Public Law 104-208) not later than the latter of--

**(1)** 10 years after April 24, 1996; or

**(2)** 10 years after the date on which the cause of action arose.

**(c) Private right of action.**--A foreign state that is or was a state sponsor of terrorism as described in subsection (a)(2)(A)(i), and any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency, shall be liable to--

**(1)** a national of the United States,

**(2)** a member of the armed forces,

**(3)** an employee of the Government of the United States, or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment, or

**(4)** the legal representative of a person described in paragraph (1), (2), or (3),

for personal injury or death caused by acts described in subsection (a) (1) of that foreign state, or of an official, employee, or agent of that foreign state, for which the courts of the United States may maintain jurisdiction under this section for money damages. In any such action, damages may include economic damages, solatium, pain and suffering, and punitive damages. In any such action, a foreign state shall be vicariously liable for the acts of its officials, employees, or agents.

**(d) Additional damages.**--After an action has been brought under subsection (c), actions may also be brought for reasonably foreseeable property loss, whether insured or uninsured, third party liability, and loss claims under life and property insurance policies, by reason of the same acts on which the action under subsection (c) is based.

**(e) Special masters.**--

DA104

(1) **In general.**--The courts of the United States may appoint special masters to hear damage claims brought under this section.

(2) **Transfer of funds.**--The Attorney General shall transfer, from funds available for the program under section 1404C of the Victims of Crime Act of 1984 (42 U.S.C. 10603c), to the Administrator of the United States district court in which any case is pending which has been brought or maintained under this section such funds as may be required to cover the costs of special masters appointed under paragraph (1). Any amount paid in compensation to any such special master shall constitute an item of court costs.

**(f) Appeal.**--In an action brought under this section, appeals from orders not conclusively ending the litigation may only be taken pursuant to section 1292(b) of this title.

**(g) Property disposition.**--

(1) **In general.**--In every action filed in a United States district court in which jurisdiction is alleged under this section, the filing of a notice of pending action pursuant to this section, to which is attached a copy of the complaint filed in the action, shall have the effect of establishing a lien of lis pendens upon any real property or tangible personal property that is--

(A) subject to attachment in aid of execution, or execution, under section 1610;

(B) located within that judicial district; and

(C) titled in the name of any defendant, or titled in the name of any entity controlled by any defendant if such notice contains a statement listing such controlled entity.

(2) **Notice.**--A notice of pending action pursuant to this section shall be filed by the clerk of the district court in the same manner as any pending action and shall be indexed by listing as defendants all named defendants and all entities listed as controlled by any defendant.

(3) **Enforceability.**--Liens established by reason of this subsection shall be enforceable as provided in chapter 111 of this title.

**(h) Definitions.**--For purposes of this section--

(1) the term "aircraft sabotage" has the meaning given that term in Article 1 of the Convention for the Suppression of Unlawful Acts Against the Safety of Civil Aviation;

(2) the term "hostage taking" has the meaning given that term in Article 1 of the International Convention Against the Taking of Hostages;

(3) the term "material support or resources" has the meaning given that term in section 2339A of title 18;

DA105

(4) the term "armed forces" has the meaning given that term in section 101 of title 10;

(5) the term "national of the United States" has the meaning given that term in section 101(a)(22) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(22));

(6) the term "state sponsor of terrorism" means a country the government of which the Secretary of State has determined, for purposes of section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. 2405(j)), section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. 2371), section 40 of the Arms Export Control Act (22 U.S.C. 2780), or any other provision of law, is a government that has repeatedly provided support for acts of international terrorism; and

(7) the terms "torture" and "extrajudicial killing" have the meaning given those terms in section 3 of the Torture Victim Protection Act of 1991 (28 U.S.C. 1350 note).

**CREDIT(S)**

(Added Pub.L. 110-181, Div. A, Title X, § 1083(a)(1), Jan. 28, 2008. 122 Stat. 338.)

28 U.S.C.A. § 1605A, 28 USCA § 1605A
Current through P.L. 114-143. Also includes P.L. 114-145, 114-146, 114-148. and 114-151 to 114-154.

**End of Document**  © 2016 Thomson Reuters. No claim to original U.S. Government Works.

§ 1606. Extent of liability, 28 USCA § 1606

---

United States Code Annotated
  Title 28. Judiciary and Judicial Procedure (Refs & Annos)
    Part IV. Jurisdiction and Venue (Refs & Annos)
      Chapter 97. Jurisdictional Immunities of Foreign States

28 U.S.C.A. § 1606

§ 1606. Extent of liability

Effective: November 26, 2002
Currentness

As to any claim for relief with respect to which a foreign state is not entitled to immunity under section 1605 or 1607 of this chapter, the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances; but a foreign state except for an agency or instrumentality thereof shall not be liable for punitive damages; if, however, in any case wherein death was caused, the law of the place where the action or omission occurred provides, or has been construed to provide, for damages only punitive in nature, the foreign state shall be liable for actual or compensatory damages measured by the pecuniary injuries resulting from such death which were incurred by the persons for whose benefit the action was brought.

**CREDIT(S)**

  (Added Pub.L. 94-583, § 4(a), Oct. 21, 1976, 90 Stat. 2894; amended Pub.L. 105-277, Div. A, § 101(h) [Title I, § 117(b)], Oct. 21, 1998, 112 Stat. 2681-491; Pub.L. 106-386, Div. C, § 2002(f)(2), Oct. 28, 2000, 114 Stat. 1543; Pub.L. 107-297, Title II, § 201(c)(3), Nov. 26, 2002, 116 Stat. 2337.)

28 U.S.C.A. § 1606, 28 USCA § 1606
Current through P.L. 114-143. Also includes P.L. 114-145, 114-146, 114-148, and 114-151 to 114-154.

---

End of Document                                              © 2016 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
    Title 28. Judiciary and Judicial Procedure (Refs & Annos)
        Part IV. Jurisdiction and Venue (Refs & Annos)
            Chapter 97. Jurisdictional Immunities of Foreign States

28 U.S.C.A. § 1607

§ 1607. Counterclaims

Effective: January 28, 2008
Currentness

In any action brought by a foreign state, or in which a foreign state intervenes, in a court of the United States or of a State, the foreign state shall not be accorded immunity with respect to any counterclaim--

(a) for which a foreign state would not be entitled to immunity under section 1605 or 1605A of this chapter had such claim been brought in a separate action against the foreign state; or

(b) arising out of the transaction or occurrence that is the subject matter of the claim of the foreign state; or

(c) to the extent that the counterclaim does not seek relief exceeding in amount or differing in kind from that sought by the foreign state.

**CREDIT(S)**
    (Added Pub.L. 94-583, § 4(a), Oct. 21, 1976, 90 Stat. 2894; amended Pub.L. 110-181, Div. A, Title X, § 1083(b)(2), Jan. 28, 2008, 122 Stat. 341.)

28 U.S.C.A. § 1607, 28 USCA § 1607
Current through P.L. 114-143. Also includes P.L. 114-145, 114-146, 114-148, and 114-151 to 114-154.

End of Document                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

§ 1608. Service; time to answer; default, 28 USCA § 1608

United States Code Annotated
  Title 28. Judiciary and Judicial Procedure (Refs & Annos)
    Part IV. Jurisdiction and Venue (Refs & Annos)
      Chapter 97. Jurisdictional Immunities of Foreign States

28 U.S.C.A. § 1608

§ 1608. Service; time to answer; default

Currentness

(a) Service in the courts of the United States and of the States shall be made upon a foreign state or political subdivision of a foreign state:

(1) by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision; or

(2) if no special arrangement exists, by delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents; or

(3) if service cannot be made under paragraphs (1) or (2), by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned, or

(4) if service cannot be made within 30 days under paragraph (3), by sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services—and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted.

As used in this subsection, a "notice of suit" shall mean a notice addressed to a foreign state and in a form prescribed by the Secretary of State by regulation.

(b) Service in the courts of the United States and of the States shall be made upon an agency or instrumentality of a foreign state:

(1) by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the agency or instrumentality; or

(2) if no special arrangement exists, by delivery of a copy of the summons and complaint either to an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process in the United States; or in accordance with an applicable international convention on service of judicial documents; or

DA109

§ 1608. Service; time to answer; default, 28 USCA § 1608

(3) if service cannot be made under paragraphs (1) or (2), and if reasonably calculated to give actual notice, by delivery of a copy of the summons and complaint, together with a translation of each into the official language of the foreign state--

(A) as directed by an authority of the foreign state or political subdivision in response to a letter rogatory or request or

(B) by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the agency or instrumentality to be served, or

(C) as directed by order of the court consistent with the law of the place where service is to be made.

(c) Service shall be deemed to have been made--

(1) in the case of service under subsection (a)(4), as of the date of transmittal indicated in the certified copy of the diplomatic note; and

(2) in any other case under this section, as of the date of receipt indicated in the certification, signed and returned postal receipt, or other proof of service applicable to the method of service employed.

(d) In any action brought in a court of the United States or of a State, a foreign state, a political subdivision thereof, or an agency or instrumentality of a foreign state shall serve an answer or other responsive pleading to the complaint within sixty days after service has been made under this section.

(e) No judgment by default shall be entered by a court of the United States or of a State against a foreign state, a political subdivision thereof, or an agency or instrumentality of a foreign state, unless the claimant establishes his claim or right to relief by evidence satisfactory to the court. A copy of any such default judgment shall be sent to the foreign state or political subdivision in the manner prescribed for service in this section.

**CREDIT(S)**
(Added Pub.L. 94-583, § 4(a), Oct. 21, 1976, 90 Stat. 2894.)

28 U.S.C.A. § 1608, 28 USCA § 1608
Current through P.L. 114-143. Also includes P.L. 114-145, 114-146, 114-148, and 114-151 to 114-154.

End of Document    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

DA110

United States Code Annotated
   Title 28. Judiciary and Judicial Procedure (Refs & Annos)
      Part IV. Jurisdiction and Venue (Refs & Annos)
         Chapter 97. Jurisdictional Immunities of Foreign States

28 U.S.C.A. § 1609

§ 1609. Immunity from attachment and execution of property of a foreign state

Currentness

Subject to existing international agreements to which the United States is a party at the time of enactment of this Act the property in the United States of a foreign state shall be immune from attachment arrest and execution except as provided in sections 1610 and 1611 of this chapter.

**CREDIT(S)**

(Added Pub.L. 94-583, § 4(a), Oct. 21, 1976, 90 Stat. 2895.)

28 U.S.C.A. § 1609, 28 USCA § 1609
Current through P.L. 114-143. Also includes P.L. 114-145, 114-146, 114-148, and 114-151 to 114-154.

End of Document                                               © 2016 Thomson Reuters. No claim to original U.S. Government Works.

DA111

§ 1610. Exceptions to the immunity from attachment or execution, 28 USCA § 1610

United States Code Annotated
   Title 28. Judiciary and Judicial Procedure (Refs & Annos)
     Part IV. Jurisdiction and Venue (Refs & Annos)
       Chapter 97. Jurisdictional Immunities of Foreign States

28 U.S.C.A. § 1610

§ 1610. Exceptions to the immunity from attachment or execution

Effective: August 10, 2012
Currentness

(a) The property in the United States of a foreign state, as defined in section 1603(a) of this chapter, used for a commercial activity in the United States, shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States or of a State after the effective date of this Act, if--

(1) the foreign state has waived its immunity from attachment in aid of execution or from execution either explicitly or by implication, notwithstanding any withdrawal of the waiver the foreign state may purport to effect except in accordance with the terms of the waiver, or

(2) the property is or was used for the commercial activity upon which the claim is based, or

(3) the execution relates to a judgment establishing rights in property which has been taken in violation of international law or which has been exchanged for property taken in violation of international law, or

(4) the execution relates to a judgment establishing rights in property--

(A) which is acquired by succession or gift, or

(B) which is immovable and situated in the United States: *Provided*, That such property is not used for purposes of maintaining a diplomatic or consular mission or the residence of the Chief of such mission, or

(5) the property consists of any contractual obligation or any proceeds from such a contractual obligation to indemnify or hold harmless the foreign state or its employees under a policy of automobile or other liability or casualty insurance covering the claim which merged into the judgment, or

(6) the judgment is based on an order confirming an arbitral award rendered against the foreign state, provided that attachment in aid of execution, or execution, would not be inconsistent with any provision in the arbitral agreement, or

§ 1610. Exceptions to the immunity from attachment or execution, 28 USCA § 1610

(7) the judgment relates to a claim for which the foreign state is not immune under section 1605A or section 1605(a)(7) (as such section was in effect on January 27, 2008), regardless of whether the property is or was involved with the act upon which the claim is based.

(b) In addition to subsection (a), any property in the United States of an agency or instrumentality of a foreign state engaged in commercial activity in the United States shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States or of a State after the effective date of this Act, if--

(1) the agency or instrumentality has waived its immunity from attachment in aid of execution or from execution either explicitly or implicitly, notwithstanding any withdrawal of the waiver the agency or instrumentality may purport to effect except in accordance with the terms of the waiver, or

(2) the judgment relates to a claim for which the agency or instrumentality is not immune by virtue of section 1605(a) (2), (3), or (5) 1605(b) of this chapter, regardless of whether the property is or was involved in the act upon which the claim is based, or

(3) the judgment relates to a claim for which the agency or instrumentality is not immune by virtue of section 1605A of this chapter or section 1605(a)(7) of this chapter (as such section was in effect on January 27, 2008), regardless of whether the property is or was involved in the act upon which the claim is based.

(c) No attachment or execution referred to in subsections (a) and (b) of this section shall be permitted until the court has ordered such attachment and execution after having determined that a reasonable period of time has elapsed following the entry of judgment and the giving of any notice required under section 1608(e) of this chapter.

(d) The property of a foreign state, as defined in section 1603(a) of this chapter, used for a commercial activity in the United States, shall not be immune from attachment prior to the entry of judgment in any action brought in a court of the United States or of a State, or prior to the elapse of the period of time provided in subsection (c) of this section, if--

(1) the foreign state has explicitly waived its immunity from attachment prior to judgment, notwithstanding any withdrawal of the waiver the foreign state may purport to effect except in accordance with the terms of the waiver, and

(2) the purpose of the attachment is to secure satisfaction of a judgment that has been or may ultimately be entered against the foreign state, and not to obtain jurisdiction.

(e) The vessels of a foreign state shall not be immune from arrest in rem, interlocutory sale, and execution in actions brought to foreclose a preferred mortgage as provided in section 1605(d).

(f)(1)(A) Notwithstanding any other provision of law, including but not limited to section 208(f) of the Foreign Missions Act (22 U.S.C. 4308(f)), and except as provided in subparagraph (B), any property with respect to which financial transactions are prohibited or regulated pursuant to section 5(b) of the Trading with the Enemy Act (50 U.S.C. App. 5(b)), section 620(a) of the Foreign Assistance Act of 1961 (22 U.S.C. 2370(a)), sections 202 and 203 of the International Emergency Economic Powers

§ 1610. Exceptions to the immunity from attachment or execution, 28 USCA § 1610

Act (50 U.S.C. 1701-1702), or any other proclamation, order, regulation, or license issued pursuant thereto, shall be subject to execution or attachment in aid of execution of any judgment relating to a claim for which a foreign state (including any agency or instrumentality or such state) claiming such property is not immune under section 1605(a)(7) (as in effect before the enactment of section 1605A) or section 1605A.

(B) Subparagraph (A) shall not apply if, at the time the property is expropriated or seized by the foreign state, the property has been held in title by a natural person or, if held in trust, has been held for the benefit of a natural person or persons.

(2)(A) At the request of any party in whose favor a judgment has been issued with respect to a claim for which the foreign state is not immune under section 1605(a)(7) (as in effect before the enactment of section 1605A) or section 1605A, the Secretary of the Treasury and the Secretary of State should make every effort to fully, promptly, and effectively assist any judgment creditor or any court that has issued any such judgment in identifying, locating, and executing against the property of that foreign state or any agency or instrumentality of such state.

(B) In providing such assistance, the Secretaries--

(i) may provide such information to the court under seal; and

(ii) should make every effort to provide the information in a manner sufficient to allow the court to direct the United States Marshall's office to promptly and effectively execute against that property.

(3) Waiver.--The President may waive any provision of paragraph (1) in the interest of national security.

(g) Property in certain actions.--

(1) In general.--Subject to paragraph (3), the property of a foreign state against which a judgment is entered under section 1605A, and the property of an agency or instrumentality of such a state, including property that is a separate juridical entity or is an interest held directly or indirectly in a separate juridical entity, is subject to attachment in aid of execution, and execution, upon that judgment as provided in this section, regardless of--

(A) the level of economic control over the property by the government of the foreign state;

(B) whether the profits of the property go to that government;

(C) the degree to which officials of that government manage the property or otherwise control its daily affairs;

(D) whether that government is the sole beneficiary in interest of the property; or

(E) whether establishing the property as a separate entity would entitle the foreign state to benefits in United States courts while avoiding its obligations.

DA114

§ 1610. Exceptions to the immunity from attachment or execution, 28 USCA § 1610

(2) **United States sovereign immunity inapplicable.**--Any property of a foreign state, or agency or instrumentality of a foreign state, to which paragraph (1) applies shall not be immune from attachment in aid of execution, or execution, upon a judgment entered under section 1605A because the property is regulated by the United States Government by reason of action taken against that foreign state under the Trading With the Enemy Act or the International Emergency Economic Powers Act.

(3) **Third-party joint property holders.**--Nothing in this subsection shall be construed to supersede the authority of a court to prevent appropriately the impairment of an interest held by a person who is not liable in the action giving rise to a judgment in property subject to attachment in aid of execution, or execution, upon such judgment.

**CREDIT(S)**

(Added Pub.L. 94-583, § 4(a), Oct. 21, 1976, 90 Stat. 2896; amended Pub.L. 100-640, § 2, Nov. 9, 1988, 102 Stat. 3333; Pub.L. 100-669, § 3, Nov. 16, 1988, 102 Stat. 3969; Pub.L. 101-650, Title III, § 325(b)(9), Dec. 1, 1990, 104 Stat. 5121; Pub.L. 104-132, Title II, § 221(b), Apr. 24, 1996, 110 Stat. 1243; Pub.L. 105-277, Div. A, § 101(h) [Title I, § 117(a)], Oct. 21, 1998, 112 Stat. 2681-491; Pub.L. 106-386, Div. C, § 2002(g)(1), Oct. 28, 2000, 114 Stat. 1543; Pub.L. 107-297, Title II, § 201(c)(3), Nov. 26, 2002, 116 Stat. 2337; Pub.L. 110-181, Div. A, Title X, § 1083(b)(3), Jan. 28, 2008, 122 Stat. 341; Pub.L. 112-158, Title V, § 502(e)(1), Aug. 10, 2012, 126 Stat. 1260.)

28 U.S.C.A. § 1610, 28 USCA § 1610
Current through P.L. 114-143. Also includes P.L. 114-145, 114-146, 114-148, and 114-151 to 114-154.

**End of Document** © 2016 Thomson Reuters. No claim to original U.S. Government Works.

DA115

§ 1611. Certain types of property immune from execution, 28 USCA § 1611

---

> United States Code Annotated
>   Title 28. Judiciary and Judicial Procedure (Refs & Annos)
>     Part IV. Jurisdiction and Venue (Refs & Annos)
>       Chapter 97. Jurisdictional Immunities of Foreign States

28 U.S.C.A. § 1611

§ 1611. Certain types of property immune from execution

Effective: August 1, 1996
Currentness

(a) Notwithstanding the provisions of section 1610 of this chapter, the property of those organizations designated by the President as being entitled to enjoy the privileges, exemptions, and immunities provided by the International Organizations Immunities Act shall not be subject to attachment or any other judicial process impeding the disbursement of funds to, or on the order of, a foreign state as the result of an action brought in the courts of the United States or of the States.

(b) Notwithstanding the provisions of section 1610 of this chapter, the property of a foreign state shall be immune from attachment and from execution, if--

  (1) the property is that of a foreign central bank or monetary authority held for its own account, unless such bank or authority, or its parent foreign government, has explicitly waived its immunity from attachment in aid of execution, or from execution, notwithstanding any withdrawal of the waiver which the bank, authority or government may purport to effect except in accordance with the terms of the waiver; or

  (2) the property is, or is intended to be, used in connection with a military activity and

    (A) is of a military character, or

    (B) is under the control of a military authority or defense agency.

(c) Notwithstanding the provisions of section 1610 of this chapter, the property of a foreign state shall be immune from attachment and from execution in an action brought under section 302 of the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996 to the extent that the property is a facility or installation used by an accredited diplomatic mission for official purposes.

**CREDIT(S)**

  (Added Pub.L. 94-583, § 4(a), Oct. 21, 1976, 90 Stat. 2897; amended Pub.L. 104-114, Title III, § 302(e), Mar. 12, 1996, 110 Stat. 818.)

28 U.S.C.A. § 1611, 28 USCA § 1611
Current through P.L. 114-143. Also includes P.L. 114-145, 114-146, 114-148, and 114-151 to 114-154.

---

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.                                                                     1

```
کد تفسیر شده ایالات متحده
تیتر 28 . آئین دادرسی قضائی (مراجع و تفسیر ها )
بخش 4 قلمرو قدرت و محل برگزاری ( مراجع و تفسیر ها )
فصل 85  دادگاه های منطقه ای ؛ قلمرو قدرت ( مراجع و تفسیر ها )
```

28 U S C A § 1330

§ 1330 عملیات بر علیه دولت های خارجی

متداول بودن

(a)  دادگاه های منطقه ای قلمرو قدرت اصلی خود را بدون توجه به مقدار در مشاجره هر نوع حرکت مدنی بدون هیئت منصفه بر علیه یک دولت خارجی خواهند داشت و این در بخش 1603(a) این سند در مورد هر ادعا برای چاره جویی بر علیه شخص با در نظر گرفتن آن که دولت خارجی محق مصونیت ، چه مطابق بخشهای 1605-1607 این سند یا هر موافقتنامه بین المللی ، نمیباشد.

(b)  قلمرو قدرت شخصی روی یک دولت خارجی در مورد هر ادعا برای چاره جویی که دادگاه های منطقه ای مطابق بخش (a) روی آن قدرت دارند و در آن محل تحویل  اعلامیه  مطابق بخش  1608 این سند ارائه شده است، خواهند داشت.

(c)  برای اینکه بخش (b) مورد نظر قرار بگیرد، حضور یک دولت خارجی،  قلمرو قدرت شخصی به آن در مورد هر ادعا برای چاره جویی که نتیجه هر معامله یا اتفاقی  که در بخشهای 1605-1607 این سند آمده است را نمیدهد.

(اعتبار ها )
(Added Pub.L. 94-583, § 2(a), Oct. 21, 1976, 90 Stat. 2891.)

28 U.S.C.A. § 1330, 28 USCA § 1330
جاری الی P.L. 114-143 همچنین شامل 114-148 , 114-146، 114-145, P.L. و 114-151 الی 114-154 نیز میشود.

پایان مدرک                        © 2016 Thomson Reuters. هیچ نوع ادعای نسبت به اعمال دولت ایالات متحده .

کد تفسیر شده ایالات متحده
تیتر 28 . آئین دادرسی قضایی (مراجع و تفسیر ها)
بخش 4 قلمرو قدرت و محل برگزاری ( مراجع و تفسیر ها)
فصل 85 دادگاه های منطقه ای ؛ قلمرو قدرت ( مزایجن و تفسیر ها):

28 U S C A § 1332

§ 1332 تنوع تبعیت ؛ مقدار مشاجره ؛ هزینه ها

متداول بودن

> یاد داشت های تصمیمات برای 1332 § USCA 28 در دو مدرک جداگانه نشان داده شدند. یاد داشت های تصمیمات برای بخشهای 1 الی 10 در این مدرک موجود میباشند. برای یاد داشتهای بخشهای 11 الی آخر، به مدرک دوم مربوط به 28 § USCA < 1332 رجوع کنید.

(a) دادگاه های منطقه ای قلمرو قدرت اصلی را در موارد مدنی که مقدار مشاجره بیش از مجموع یا ارزش 75,000$ باشد خواهد داشت ، که این شامل بهره و هزینه ها نمیشود ، و بین ... است

(1) طبعه های ایالات مختلف ؛

(2) طبعه های یک ایالت و شهروندان یا افراد یک دولت خارجی،اما دادگاههای منطقه ای قلمرو قدرت اصلی را بر اساس بخشی که مربوط میشود به عملی بین شهروندان یک ایالت و شهروندان یا افراد یک دولت خارجی که به طور قانونی اجازه اقامت دائم در ایالات متحده گرفتند و در همان کشور زندگی میکنند را نخواهد داشت؛

(3) شهروندان ایالات مختلف و آنهایی که در آن شهروندان یا افراد یک دولت خارجی طرفین اضافه هستند ؛ و

(4) یک دولت خارجی ، که در بخش (a)1603 این سند به عنوان شاکی و شهروندان یک ایالت یا ایالات مختلف مشخص شده باشند.

(b) به غیر از وقتی که تدارکات دیگری در قانون ایالات متحده ایجاد شده است، که در آن شاکی که پرونده را اول در دادگاه های فدرال به جریان گذاشته است، نهایتاً محق بازیابی مقداری که کمتر از مجموع یا ارزش 75,000$ باشد ، که بدون توجه به مبادله یا دعوای متقابل که در آن حکمی در حق متهم صادر خواهد شد، و بدون در نظر گرفتن بهره و هزینه ها ، دادگاه منطقه ای میتواند هزینه ها را برای شاکی رد کرده، و علاوه بر آن ، برای شاکی هزینه تعیین کند.

(c) برای اهداف این بخش و بخش 1441 این سند --

(1) یک شرکت به عنوان شهروند هر ایالت و دولت خارجی که توسط آن به ثبت رسیده است تلقی خواهد شد و همچنان به عنوان شهروند آن ایالت یا دولت خارجی که در آن مکان اصلی تجارت خود را دارد، به جز در هر عمل مستقیم بر علیه صاحب بیمه نامه یا قرارداد بیمه مسئولیت ، چه ثبت شده باشد یا خیر ، که به آن صاحب بیمه نامه به عنوان طرف مدافع متصل نباشد، و این صاحب بیمه به عنوان شهروند -تلقی خواهد شد

(8) هر ایالت و دولت خارجی که صاحب بیمه نامه شهروند آن میباشد ؛

DA118

**(B)** هر ایالت و دولت خارجی که صاحب بیمه نامه را ثبت کرده است ؛

**(C)** آن ایالت یا دولت خارجی که در آن صاحب بیمه نامه محل اصلی تجارت خود را دارد؛ و

**(2)** نماینده قانونی اموال متوفی تنها در ایالتی که متوفی در آن بوده است به عنوان شهروند قبول خواهد شد، و نماینده قانونی یک نوزاد یا شخص بیکفایت فقط در ایالتی که نوزاد یا شخص بیکفایت در آن میباشد به عنوان شهروند مورد قبول خواهد بود.

**(d)(1)** در این بخش --

**(A)** لفظ "رتبه" به معنی کلیه اعضای یک پرونده قانونی عمده است؛

**(B)** لفظ "پرونده قانونی عمده" به معنی هر پرونده مدنی است که مطابق قانون 23 قوانین فدرال روش مدنی یا قانون ایالتی مشابه آن یا قانون روش قضاییه که اجازه میدهد یک پرونده قانونی توسط اشخص نماینده یا تعداد بیشتری به عنوان پرونده قانونی عمده به اجرا گذاشته بشود؛

**(C)** لفظ "حکم پرونده قانونی عمده" به معنی حکمی است که توسط دادگاه صادر شده و در یک یا چند جنبه یک پرونده مدنی به عنوان یک پرونده قانونی عمده تلقی شده است؛ و

**(D)** لفظ "اعضای پرونده عمده" به معنی اشخاصی است( چه نامشان برده شده باشد و چه نبرده شده باشد )که در رده معنی پرونده پیشنهاد شده یا تصدیق شده در یک پرونده قانونی عمده قرار میگیرند.

**(2)** دادگاه های منطقه ای قلمرو قدرت اصلی را در هر پرونده مدنی که مشاجره بیشتر ان مجموع یا ارزش $5,000,000 را داشته باشد خواهند داشت، که این شامل بهره و هزینه ها نمیشود، و یک پرونده قانونی عمده است که در آن۔۔

**(A)** هر یک از اعضای یک رتبه از شاکیان شهروند ایالتی است که متفاوت از هر مدافعی است؛

**(B)** هر یک از اعضای یک رتبه از شاکیان یک دولت خارجی یا شهروند یا شخص در دولت خارجی است و هر مدافع شهروند یک ایالت است؛ یا

**(C)** هر یک از اعضای یک رتبه از شاکیان شهروند یک ایالت است و هر مدافع یک دولت خارجی یا شهروند یا شخصی در یک دولت خارجی است.

**(3)** یک دادگاه منطقه ای میتواند، برای منافع اجرا عدالت و برای در نظر گرفتن مجموعه شرایط ، از به اجرا گذاشتن قلمرو قدرت خود در یک پرونده قانونی عمده ، مطابق بند **(2)** که در آن بیشتر از یک سوم ، ولی کمتر از دو سوم اعضای کلیه رتبه های شاکیان پیشنهاد شده در مجموع و همچنین مدافعان اصلی ، شهروندان ایالتی هستند که پرونده در آن در وحله اول به اجرا گذاشته شده بود، خود داری کند ، بر اساس ملاحظات ۔۔

**(A)** چنانکه ادعا ها شامل مسائل داخلی یا منافع میان کشوری باشد؛۔

© 2016 Thomson Reuters . هیچ نوع ادعایی نسبت به اعمال دولت آمریکا

WESTLAW

DA119

(B)  چنانکه ادعا ها توسط قوانین ایالتی که در آن پرونده اصلی به اجرا گذاشته شده بود یا توسط قوانین ایالات دیگر؛

(C)  چنانکه پرونده قانونی عمده به نحوی پاسخ به اتهام بدهد که بخواهد از قلمرو قدرت فدرال ممانعت کند؛

(D)  چنانکه پرونده قانونی عمده در انجمنی آورده شده باشد که رابطه مشخصی با اعضای پرونده ، اتهام صدمه ، یا مدافعین داشته باشد؛

(E)  چنانکه تعداد شهروندان ایالتی که پرونده اول در آن برای کلیه رتبه های شاکیان پیشنهادی در مجموع به اجرا گذاشته شده بود به طرز قابل توجهی از تعداد شهروندانی که از ایالات دیگر هستند بیشتر باشد، و تبعیت بقیه اعضای پرونده پیشنهاد شده بین تعداد قابل توجهی از ایالات پخش شده باشد؛ و

(F)  چنانکه، در مدت زمان 3 سال قبل از به اجرا گذاشتن پرونده قانونی عمده ،  1 پرونده قانونی عمده ، یا بیشتر، که ادعا های مشابه از طرف همان شخص یا اشخاص دیگر به اجرا گذاشته شده باشد.

(4)  یک دادگاه منطقه ای میتواند از به اجرا گذاشتن قلمرو قدرت ، مطابق بند (2) ممانعت کند--

(A)(i)  در مورد یک پرونده قانونی عمده که در آن--

(I)  بیشتر از دو سوم اعضای کلیه رتبه های شاکیان پیشنهاد شده در مجموع، شهروندان ایالتی هستند که پرونده اول در آن به اجرا گذاشته شده بود؛

(II)  حداقل یکی از مدافعین یک مدافع است--

(aa)  که اعضای رتبه شاکیان از او چاره جویی درخواست دارند؛

(bb)  که اتهامات رفتاری آنها پایه قابل توجهی برای ادعا هایی که رتبه شاکیان پیشنهادی ارائه دادند را تشکیل میدهد؛ و

(cc)  که شهروند ایالتی است که پرونده اول در آن در جریان گذاشته شده است؛ و

(III)  صدمات عمده ای که در اثر اتهمات رفتاری زده شده ، یا هر رفتار مربوط به آن از طرف هر یک از مدافعین ، در ایالتی که پرونده اول در آن به اجرا گذاشته شده بود اتفاق افتاده است؛ و

(ii)  در مدت زمان 3 سال قبل از به اجرا گذاشتن پرونده قانونی عمده ، هیچ پرونده قانونی عمده دیگری که ادعا اتهامات حقیقی یکسان یا مشابهی را بر علیه هر یک از مدافعین ، از طرف همان شخص یا اشخاص دیگری به اجرا گذاشته باشد؛ یا

© 2016 Thomson Reuters  هیچ نوع ادعایی  نسبت به اعمال دولت آمریکا  WESTLAW

(B) دو سوم یا بیشتر ، از اعضای کلیه رتبه های شاکیان پیشنهاد شده در مجموع، و مدافعین اولیه ، شهروندان ایالتی هستند که در آن پرونده اول به اجرا گذاشته شد..

(5) بند های (2) الی (4) مربوط به هیچ پرونده قانونی عمده که در آن --

(A) مدافعین اصلی دولتها، سران دولت ، یا نهادهای ایالتی دیگری هستند که دادگاه منطقه ای میتواند در صادر کردن حکم برای چاره جویی بر علیه آنها محروم بشود؛ یا

(B) تعداد اعضای کلبه رتبه های شاکیان پیشنهادی در مجموع کمتر از 100 میباشد.

(6) ادعا های اعضای رتبه های شخصی در هر پرونده قانونی عمده جمع زده خواهد شد تا بتوان دید آیا مجموع یا ارزش مسئله مورد مشاجره از $5,000,000 بیشتر است یا خیر ، که این شامل بهره و هزینه ها نمیشود.

(7) تبعیت اعضای رتبه های شاکیان پیشنهادی برای اهداف بندهای (2) الی (6) تایین خواهد شد و از تاریخ به اجرا گذاشتن شکایت ، یا شکایت اصلاح شده ، یا اگر پرونده ای که پاسخ به اتهام اولیه را میدهد شامل قلمرو قدرت فدرال نمیشود، از تاریخی که به شاکیان در مورد پاسخ به اتهام اصلاح شده ، پیشنهاد ، یا مدرک دیگری، اطلاع داده شد که نشانگر حضور قلمرو قدرت فدرال میباشد.

(8) این بخش مربوط به هر پرونده قانونی عمده ای که قبل یا بعد از صدور حکم تصدیق شده پرونده توسط دادگاه به اجرا گذاشته شد است ، با در نظر گرفتن آن پرونده.

(9) بند (2) به هیچ پرونده قانونی عمده ای که به طور انحصاری مربوط به ادعا ای میشود نخواهد بود--

(A) در مورد یک ضمانت تحت پوشش همانطور که در بخش 16(f)(3)[1] قانون اوراق بهادار سال 1933 (15 U.S.C. 78p(f)(3))[2] و بخش (28(f)(5)(E) قانون بورس اوراق بهادار سال 1934 (15 U.S.C. 78bb(f)(5)(E));

(B) که مربوط به مسائل داخلی یک گرداندن یک شرکت یا هر نوع شرکت تجاری بشود و از طریق یا توسط قوانین ایالتی که آن شرکت یا شرکت تجاری ثبت یا تنظیم شده است ایجاد شده باشد؛ یا

(C) که مربوط به حقوق ، وظایف (که شامل وظایف امانتی نیز میشود) ، و تعهداتی که مربوط به یا توسط و به دنبال هر نوع اوراقی (همانطور که در بخش 2(a)(1) قانون اوراق بهادار سال 1933 آمده است (15 U.S.C. 77b(a)(1)) و قوانینی که توسط آن صادر شده است .

(10) به منظور اهداف این بخش و بخش 1453 ، یک انجمن ثبت نشده به عنوان شهروند ایالتی که در آن محل اصلی کسب خود را دارد و ایالتی که مطابق قوانین آن تنظیم شده است شمرده خواهد شد.

(11)(A) به منظور اهداف این بخش و بخش 1453 ، یک پرونده حجیم به عنوان یک پرونده عمده که میتوان آن را مطابق شرایط بندهای (2) الی (10) برچید در نظر گرفته خواهد شد ، مگر اینکه شرایط این بندها را برآورده کند.

(B)(i)  همانطور که در زیربخش (A) آمده است، لفظ "پرونده حجیم" به معنی هر پرونده مدنی (به غیر از یک پرونده مدنی که در محدوده بخش   ( 1711  2) است که در آن ادعا های چاره جویی مالی 100 نفر ، یا بیشتر ، پیشنهاد میشود که به طور مشترک به محاکمه برود بخاطر اینکه ادعا های شاکیان شامل سئوالات متداول  قانونی یا حقیقت میباشد، ولی قلمرو قدرت فقط شامل شاکیانی خواهد بود که ادعاهایشان در یک پرونده حجیم ارقام الزامات قلمرو قدرت را مطابق زیربخش (a) برآورده کند.

(ii)  همانطور که در زیربخش (A) آمده است، لفظ "پرونده حجیم" شامل هیچ نوع پرونده مدنی که در آن--

(I)  کلیه ادعاها از یک واقعه یا اتفاق در دولتی که پرونده در آن به جریان گذاشته شده است بر میخیزد ، و گفته میشود که منجر به صدماتی در آن ایالت یا ایالات که پیوسته به آن ایالت هستند؛

(II)  ادعا ها پس از پیشنهاد یک مدافع پیوسته خواهند شد؛

(III)  کلیه ادعا ها در پرونده از طرف جمعیت عمومی اظهار خواهند شد ( نه از طرف  مدعیان شخصی یا اعضای یک رتبه ظاهری )و به دنبال قانون ایالتی خواهد بود که به طور مشخص چنین پرونده ای را تصویب کرده است؛ یا

(IV)  ادعا ها به طور انحصاری برای جریاناتِ پیش از محاکمه تلفیق یا تنظیم شده اند.

(C)(i)  هر نوع پرونده( جویی )هایی )که به دنبال این زیربخش به دادگاه فدرال انتقال داده شده است پس از آن، مطابق بخش 1407 ، یا قوانینی که توسط آن اعلام شده است، به دادگاه دیگری منتقل نخواهد شد، مگر اینکه اکثریت شاکیان در پرونده در خواست انتقال را بر اساس بخش 1407 بکنند.

(ii)  این بند مورد استفاده--

(I)  پرونده هایی که به مطابق قانون 23 قوانین فدرال روشهای مدنی تصدیق شدند قرار نمیگیرد؛ یا

(II)  اگر شاکیان پیشنهاد کنند که پرونده به عنوان پرونده قانونی عمده ، مطابق قانون  23 قوانین فدرال روشهای مدنی ، پیش برود.

(D)  زمان محدودیتها روی هر ادعا که در یک پرونده قانونی عمده اظهار  شده است و به دنبال این بخش به دادگاه فدرال منتقل شده است، در زمانی که پرونده دردست دادگاه فدرال است، مورد عوارض قرار خواهد گرفت.

(e)  لفظ "ایالات"، به نحوی که در این بخش از آن استفاده شده، شامل سرزمینها ، ناحیه کولومبیا ، و مشترک المنافع پورتو ریکو میباشد.

اعتبار (ها )

(June 25, 1948, c. 646, 62 Stat. 930; July 26, 1956, c. 740, 70 Stat. 658; July 25, 1958, Pub.L. 85-554, § 2, 72 Stat. 415; Aug. 14, 1964, Pub.L. 88-439, § 1, 78 Stat. 445; Oct. 21, 1976, Pub.L. 94-583, § 3, 90 Stat. 2891; Nov. 19, 1988, Pub.L. 100-702, Title II, §§ 201(a), 202(a), 203(a), 102 Stat. 4646; Oct. 19, 1996, Pub.L. 104-317, Title II, § 205(a), 110 Stat. 3850; Feb. 18, 2005, Pub.L. 109-2, § 4(a), 119 Stat. 9; Pub.L. 112-63, Title I, §§ 101, 102, Dec. 7, 2011, 125 Stat. 758.)

پانوسیها

1 همانگونه در اصل. رجوع به ''16(f)(3)'' بهتر است پیشینه ''بخش'' را داشته باشد.

2 همانگونه در اصل. بهتر است  ''77p(f)(3)'' باشد.

28 U.S.C.A. § 1332, 28 USCA § 1332

جاری الی P.L. 114-143 همچنین شامل 114-148 ,114-146, P.L. 114-145 و 114-151الی 114-154 نیز میشود.

پایان مدرک ، © 2016 Thomson Reuters؛ هیچ نوع ادعا ای نسبت به اعمال دولت ایالات متحده ،

© 2016 Thomson Reuters، هیچ نوع ادعایی نسبت به اعمال دولت آمریکا    WESTLAW

DA123

کد تفسیر شده ایالات متحده
تیتر 28 . آیین دادرسی قضایی (مراجع و تفسیر ها )
بخش 4 قلمرو قدرت و محل برگزاری ( مراجع و تفسیر ها)
فصل 87 دادگاه های منطقه ای ، محل برگزاری ( مراجع و تفسیر ها)

28 U S C A § 1391

§ 1391 محل برگزاری به طور کلی

متداول بودن

(a) کاربرد بخش . -- به غیر از آنکه در قانون گفته شده است--

(1) این بخش محل برگزاری کلیه پرونده های مدنی که به دادگاه های منطقه ای ایالات متحده آورده میشوند را تحت فرمان خواهد داشت؛ و

(2) محل برگزاری مناسب برای پرونده مدنی بدون توجه به اینکه پرونده ماهیت محلی دارد یا در حالت گذرا است، تایین خواهد شد.

(b) محل برگزاری به طور کلی. -- یک پرونده مدنی میتواند به --

(1) منطقه قضایی که هر مدافعی در آن سکونت دارد آورده بشود، مشروط بر اینکه کلیه مدافعین ساکین ایالتی هستند که منطقه در آن قرار گرفته است؛

(2) منطقه قضایی که قسمت قابل توجهی از وقایع یا حذفیاتی که باعث ادعای آورده شده بود ، یا قسمت قابل توجهی از اموال که موضوع پرونده است، قرار گرفته باشد؛ یا

(3) اگر منطقه ای وجود نداشته باشد که در آن پرونده میتواند به اجرا گذاشته بشود ، همانطور که در این بخش گفته شده است، هر منطقه قضایی شامل قلمرو قدرت شخصی دادگاه ، با توجه به این پرونده، میباشد.

(c) سکونت، -- برای اهداف کلیه محل های برگزاری

(1) یک شخص طبیعی ، که شامل یک خارجی که به طور قانونی برای اقامت دائم وارد ایالات متحده شده باشد، به عنوان شخصی که در آن منطقه قضایی سکونت دارد تلقی خواهد شد؛

(2) نهادی که قابلیت تعقیب قانونی در مورد خود و دیگران تحت نام متداول خود و مطابق قانون قابل اجرا، صرفنظر از اینکه ثبت شده باشد یا خیر، اگر که یکی از مدافعین باشد، پنداشته خواهد شد که در هر منطقه قضایی که آن مدافع زیر قلمرو قدرت شخصی دادگاه است و مربوط به این پرونده مدنی است سکونت دارد ، و اگر شاکی ، فقط در منطقه قضایی که کسب و کار خود را دارد ؛ و

(3) یک مدافع که ساکن ایالات متحده نیست میتواند در هر منطقه قضایی در معرض پیگرد قانونی قرار بگیرد ، و الحاق آن مدافع در تعیین محل اجرا پرونده، با در نظر گرفتن مدافعین دیگر، نادیده گرفته خواهد شد.

© 2016 Thomson Reuters هیچ نوع ادعایی نسبت به اعمال دولت آمریکا؛ WESTLAW
DA124

(d) سکونت شرکتهای ثبت شده در ایالاتی با مناطق متعدد.  --برای اهداف محل برگزاری مطابق این فصل ، در ایالتی که بیشتر از یک منطقه قضایی دارد، که در آن مدافعی به صورت شرکت ثبت شده است و  واجد شرایط برای قلمرو قدرت شخصی در زمانی که پرونده ای شروع شده است سکونت چنین شرکت ثبت شده ای در هر منطقه ای داخل آن ایالتی که تماسهایش کافی  خواهد بود که آن را واجد شرایط قلمرو قدرت شخصی بکند تلقی خواهد شد ، اگر که آن منطقه یک ایالت جداگانه بود. همچنین ، اگر چنین منطقه ای وجود ندارد ،سکونت  شرکت ثبت شده در آن منطقه ای تلقی خواهد شد که در آن بیشترین تماس ها را دارد.

(e) پرونده هایی که در آن مدافع مامور یا کارمند ایالات  متحده است.۔۔

(1) به طورکلی.  --یک پرونده مدنی که در آن مدافع مامور یا کارمند ایالات متحده  یا نمایندگی  آن است و تحت  مقام رسمی خود عمل می‌کند یا تحت هر اختیار قانونی ، یا نمایندگی ایالات متحد ، یا ایالات متحده ، به غیر از آنچه در قانون آمده است، به جز در منطقه قضایی  که در آن (A) مدافع در آن پرونده سکونت دارد، (B) بخش قابل توجهی از وقایع یا حذفیات باعث ادعا شده است، یا مقدار قابل توجهی از ملکی که  موضوع پرونده است در آن قرار گرفته باشد، یا (C) در محلی که شاکی سکونت دارد ، اگر که هیچ نوع ملکی در پرونده درگیر نیست. افراد فرعی میتوانند به  عنوان طرفین در این پرونده ، مطابق قوانین فدرال روش های مدنی و با الزامات دیگر محل برگزاری ، با یکدیگر بپیوندند اگر که ایالات متحده یا یکی از مامورین ، کارمندان ، یا نمایندگیهایش یکی از طرفین نباشند.

(2) تحویل اعلامیه--  احضاریه و  شکایت در چنین پرونده ای مطابق قوانین فدرال روش های مدنی تحویل داده خواهد شد. ولی تحویل احضاریه و شکایت به مامور یا نمایندگی ، آنطور که مطابق قوانین است، میتواند توسط پست سفارشی،  و فراتر از محدوده سرزمینی منطقه ای که پرونده ای که در آن اجرأ گذاشته شده است انجام بگیرد.

(f) پرونده های مدنی بر علیه یک دولت خارجی  --پرونده مدنی بر علیه یک دولت خارجی ، آنطور که در بخش (a)1603 این سند آمده است.۔۔

(1)  میتواند در هر منطقه قضایی که در آن بخش قابل توجهی از وقایع یا حذفیات باعث ادعا شده است باشد ، یا بخش قابل توجهی از ملکی که موضوع پرونده است؛

(2)  در هر منطقه قضایی که در آن کشتی یا بار دولت خارجی قرار گرفته است، اگر که ادعا مطابق بخش (b)1605 این سند اظهار شده باشد؛

(3)  در هر منطقه قضایی که در آن نمایندگی یا ابزار آن اجازه کسب دارند یا مشغول به کسب میباشند ، اگر که پرونده مطابق بخش (b)1603  بر علیه نمایندگی یا ابزار یک دولت خارجی  باشد؛  یا

(4)  در دادگاه منطقه ای ایالات متحده در منطقه کولومبیا ، اگر که پرونده بر  علیه یک دولت خارجی یا زیربخش سیاسی آن باشد.

(g) دعوی قضایی با طرفین و انجمنهای متعدد   --پرونده مدنی که در آن قلمرو قدرت دادگاه منطقه ای بر اساس بخش 1369 این سند باشد، میتواند در هر منطقه ای که مدافع در آن زندگی میکند یا بخش قابل توجهی از حادثه در آن اتفاق افتاده است که باعث به اجرأ گذاشتن پرونده شده ، باشد.

اعتبار (ها)

(June 25, 1948, c. 646, 62 Stat. 935; Oct. 5, 1962, Pub.L. 87-748, § 2, 76 Stat. 744; Dec. 23, 1963, Pub.L. 88-234, 77 Stat 473; Nov. 2, 1966, Pub.L. 89-714, §§ 1, 2, 80 Stat. 1111; Oct. 21, 1976, Pub.L. 94-574, § 3, 90 Stat. 2721; Oct. 21, 1976, Pub.L.

© 2016 Thomson Reuters. هیچ نوع ادعایی  نسبت به اعمال دولت آمریکا.  WESTLAW

DA125

§ 1391. محل برگزاری به طور کلی 28 USCA § 1391

94-583, § 5, 90 Stat. 2897; Nov. 19, 1988, Pub.L. 100-702, Title X, § 1013(a), 102 Stat. 4669; Dec. 1, 1990, Pub.L. 101-650, Title III, § 311, 104 Stat. 5114; Dec. 9, 1991, Pub.L. 102-198, § 3, 105 Stat. 1623; Oct. 29, 1992, Pub.L. 102-572, Title V, §504, 106 Stat. 4513; Oct. 3, 1995, Pub.L. 104-34, § 1, 109 Stat. 293; Nov. 2, 2002, Pub.L. 107-273, Div. C, Title I, § 11020(b) (2), 116 Stat. 1827; Pub.L. 112-63, Title II, § 202, Dec. 7, 2011, 125 Stat. 763.)

28 U.S.C.A. § 1391, 28 USCA § 1391

جاری الی 114-143 .P.L همچنین شامل 114-148، 114-146، 114-145، 151-114 و 114-151الی 114-154 نیز میشود.

پایان سند   2016 Thomson Reuters © t. هیچ نوع ادعا ای نسبت به اعمال دولت ایالات متحده،.

کد تفسیر شده ایالات متحده

تیتر 28. آیین دادرسی قضایی (مراجع و تفسیر ها)

بخش 4. قلمرو قدرت و محل برگزاری (مراجع و تفسیر ها)

فصل 89. دادگاه های منطقه ای؛ عزل پرونده ها از دادگاه های ایالتی (مراجع و تفسیر ها)

28 U S C A § 1441

§ 1441 عزل پرونده های مدنی

متداول بودن

به طور کلی.  --هر پرونده مدنی که به دادگاه ایالتی رجوع شود که در وهله اول دادگاه های منطقه ای ایالات متحده بر آن قلمرو قدرت داشتند، میتواند توسط مدافع یا مدافعین عزل شده و به دادگاه منطقه ای ایالات متحده که مربوط به منطقه و بخشی است که آن پرونده در آن به اجراً گذاشته شده است برده بشود، مگر اینکه کنگره به طور مخصوص اضهارات دیگری کرده باشد.

(b)  عزل بر اساس تنوع شهروندی. (1).--  برای تشخیص دادن اینکه آیا یک پرونده مدنی، بر اساس قلمرو قدرت، مطابق بخش (a)1332 این سند، قابل عزل است، شهروندی مدافعینی که نام ساختگی دارد نادیده گرفته خواهد شد.

(2) اگر هر یک از طرفین ذینفع به طور صحیح به دیگران پیوست می شده و به عنوان مدافع حاضر شد و شهروند ایالتی بود که به پرونده در آن جریان است، آن پرونده مدنی که منحصراً بر اساس قلمرو قدرت ، مطابق بخش (a)1332 این سند، قابل عزل است، نمی تواند عزل بشود.

(c)  ادعا های قانون پیوستن فدرال و ادعا های قانون ایالتی.  (1).--اگر یک پرونده مدنی شامل--

(A) ادعا ای باشد که در اثر قانون اساسی ، قوانین ، یا قراردادهای ایالات متحده (که در بخش 1331 این سند تعریف شده است)، و

(B)  ادعا ای که در قلمرو قدرت اصلی یا مکمل دادگاه منطقه ای یا ادعا ای که توسط قانون غیر قابل عزل شده است. کلیه پرونده را میتوان در صورت اینکه آن پرونده بدون شمول ادعا که در زیربخش (B) تعریف شده است، عزل کرد.

(2)  در صورت عزل پرونده ای که در بند (1) تعریف شده است، دادگاه منطقه ای کلیه ادعا هایی که در بند (B)(1) تعریف شده است را از پرونده خارج خواهد کرد و ادعا های خارج شده را به دادگاه ایالتی که پرونده از آن عزل شده بود رجوع خواهد کرد.  تنها مدافعینی که ادعا ای بر علیه آنها اظهار شده است، همانطور در بند (A)(1) تعریف شده است، الزام به پیوستن یا قبول عزل را مطابق بند (1) دارند.

(d)  پرونده هایی بر علیه دولتهای خارجی. هر پرونده مدنی که بر علیه یک دولت خارجی در دادگاه ایالتی در جریان میافتد ، آنطور که در بخش (a)1603 این سند آمده است، میتواند توسط دولت خارجی عزل شده و به دادگاه منطقه ای ایالات متحده که آن منطقه و بخشی که آن پرونده در جریان است برده بشود. پرونده پس از عزل در دادگاه ، و بدون هیئت منصفه ، به محاکمه خواهد رفت. وقتی عزل بر اساس این زیربخش باشد، محدودیت زمانی بخش (b)1446 این فصل میتواند هر زمان برای هدف نشان داده شده افزایش پیدا کند.

هیچ نوع ادعایی نسبت به اعمال دولت امریکا   © 2016 Thomson Routers   WESTLAW

(e)   **قلمرو قدرت یا طرفین و انجمنهای متعدد.**   (1)   .-- بدون در نظر گرفتن شرایط زیربخش (b) این بخش، مدافعی در یک پرونده مدنی در یک دادگاه ایالتی میتواند پرونده را عزل کرده و آن را به دادگاه منطقه ای ایالات متحد که در منطقه و بخشی است که پرونده در آن در جریان است ببرد، اگر که --

(A)   پرونده میتوانست به یکی از دادگاه های منطقه ای ایالات متحد ، مطابق بخش 1369 این سند، آورده بشود ؛ یا

(B)   مدافع یکی از طرفین پرونده ای است که میتواند یا میتوانست ، به طور کامل یا بخشی از ان، مطابق بخش 1369 ، به دادگاه منطقه ای ایالات متحد آورده بشود و از همان اتفاقی سرچشمه میگیرد که پرونده اش در دادگاه ایالتی است، حتی اگر پرونده قابل عزل را نمیشد به عنوان یک موضوع اولیه به دادگاه منطقه ای آورد.

عزل پرونده این مطابق این زیربخش با توجه به بخش 1446 این سند انجام خواهد شد، با فرق اینکه اعلامیه عزل میتواند همچنین قبل از محاکمه پرونده در دادگاه ایالتی و در ظرف 30 روز پس ان روزی که مدافع برای اولین بار یکی از طرفین پرونده، مطابق بخش 1369 در دادگاه منطقه ای ایالات متحد میشود، انجام بگیرد، و این باید از همان واقعه که پرونده به آن ربط دارد سرچشمه بگیرد، یا در زمان دیگری با اجازه دادگاه منطقه ای .

(2)   هر زمان پرونده ای مطابق این زیربخش عزل میشود و دادگاه منطقه ای که به آن عزل یا منتقل شده است ، مطابق بخش(j)1407 ، تابین مسئولیت با الزامات جریانات بیشتر برای خسارات کرده است، دادگاه منطقه ای پرونده را به همان دادگاه ایالتی که در پرونده برای تعیین خسارات از آن عزل شده بود باز خواهد گرداند، مگر اینکه دادگاه متوجه بشود که این پرونده باید برای آسودگی طرفین و شاهدان و به خاطر رعایت عدالت ، برای تعیین خسارات اعاده بشود.

(3)   هر نوع اعاده ای که مطابق بند (2) میباشد، تا مدت 60روز پس ان صدور حکم دادگاه منطقه ای برای تعیین مسئولیت و تصدیق غرض خود برای اعاده پرونده عزل شده برای تعیین خسارات به اجرا گذاشته نخواهد شد. استثنائی در مورد تعیین مسئولیت که در دادگاه ایالتی که در ان پرونده از آن مدت 60 روز به دادگاه استیبنائی که قلمرو قدرت روی دادگاه منطقه ای دارد برده بشود.   چنانچه یکی از طرفین چنین استیبنائی بکند، اعاده تا زمانی که استیبناف به طور کامل از بین نرفته است قابل اجرا نخواهد بود.   زمانی که اعاده به اجرا در بیاید، تعیین مسئولیت قابل پیگیری بیشتر از طریق استیبناف یا عمل دیگری نخواهد بود.

(4)   هر تصمیمی که مطابق این زیربخش در مورد اعاده برای تعیین خسارات گرفته بشود قابل مرور از طریق استیبناف یا عمل دیگری نخواهد بود.

(5)   پرونده ای که مطابق این زیربخش عزل بشود به عنوان پرونده مطابق با بخش 1369 تلقی خواهد شد و پرونده ای که قلمرو قدرت آن بر اساس بخش 1369 این سند است، به منظور این بخش و بخشهای 1407, 1697, 1785 این سند خواهد بود.

(6)   هیچ چیز در این زیربخش اختیارات دادگاه منطقه ای را برای انتقال یا عزل پرونده بر اساس انجمن ناخوشایند را محدود نخواهد کرد.

(f)   **قلمرو قدرت حذف مشتق.**   دادگاهی که یک پرونده مدنی به آن عزل شده است، مطابق این بخش، از شنیدن و تعیین هر ادعایی در این پرونده مدنی منع نخواهد شد چون دادگاه ایالتی که پرونده به آن عزل شده است روی آن ادعا قلمرو قدرت نداشته است.

اعتبار (ها )
(June 25, 1948, c. 646, 62 Stat. 937; Oct. 21, 1976, Pub.L. 94-583, § 6, 90 Stat. 2898; June 19, 1986, Pub.L. 99-336, § 3(a), 100 Stat. 637; Nov. 19, 1988, Pub.L. 100-702, Title X, § 1016(a), 102 Stat. 4669; Dec. 1, 1990, Pub L. 101-650, Title III, § 312,

104 Stat. 5114; Dec. 9, 1991, Pub.L. 102-198, § 4, 105 Stat. 1623; Nov. 2, 2002, Pub.L. 107-273, Div. C, Title I, § 11020(b)(3), 116 Stat. 1827; Pub.L. 112-63, Title I, § 103(a), Dec. 7, 2011, 125 Stat. 759.)

28 U.S.C.A. § 1441, 28 USCA § 1441
جاری الی 143-114 .P.L همچنین شامل 114-145، 114-146، 114-148 و 151-114الی 154-114 نیز میشود.

پایان منرک 2016 Thomson Reuters © . هیچ نوع ادعای نسبت به اعمال دولت ایالات متحده.

 2016 Thomson Reuters © . هیچ نوع ادعایی نسبت به اعمال دولت آمریکا WESTLAW

DA129

```
کد تفسیر شده ایالات متحده
تیتر 28 . آیین دادرسی قضائی (مراجع و تفسیر ها )
بخش 4 قلمرو قدرت و محل برگزاری ( مراجع و تفسیر ها )
فصل 97. مصونیتهای قلمرو قدرت دولتهای خارجی
```

28 U S C A § 1602

§ 1602 کشفیات و اظهاریه هدف

متداول بودن

کنگره متوجه شده است که تعیین ادعا در مورد دولتهای خارجی توسط دادگاه های ایالات متحده برای مصونیت از قلمرو قدرت چنین دادگاه هایی در جهت منافع عدالت میباشد و حقوق دولت های خارجی و طرفین دعوی قضایی را حفظ خواهد کرد. قوانین بین‌المللی حکم میکند که ایالت ها از قلمرو قدرت دادگاه های خارجی در مورد فعالیت های تجاری خود مصون نمیباشند ، و املاک تجاری آنها میتواند برای اجرا احکامی صادر شده بر علیه آنها که در رابطه با فعالیت های تجاری آنها میباشد مشمول مالیات بشوند. ادعا های دولتهای خارجی در مورد مصونیت باید از این پس توسط دادگاه های ایالات متحده تصمیم‌گیری بشوند و همچنین در دادگاه هایی که در انطباق با اصولی که در این فصل آمده است میباشند.

اعتبار (ها )
(Added Pub.L. 94-583, § 4(a), Oct. 21, 1976, 90 Stat. 2892.)

28 U.S.C.A. § 1602, 28 USCA § 1602
جاری الی 114-143 .P.L همچنین شامل 114-148، 114-146، 114-145, و 151-114الی 154-114 نیز میشود.

پایان مدرک          © 2016 Thomson Reuters: هیچ نوع ادعا ایی نسبت به اعمال دولت ایالات متحده

          هیچ نوع ا دعا یی  نسبت به اعمال دولت آمریکا © 2016 Thomson Reuters .          WESTLAW

کد تفسیر شده ایالات متحده
تیتر 28 . آیین دادرسی قضایی (مراجع و تفسیر ها )
بخش 4 قلمرو قدرت و محل برگزاری ( مراجع و تفسیر ها )
فصل 97 . مصونیتهای قلمرو قدرت دولتهای خارجی

28 U S C A § 1603

§ 1603 تعریف

قابل اجرا از : ۳۰ بهمن ۱۳۸۳
[ February 18, 2005 ]
متداول بودن

برای اهداف این فصل --

(a) یک "دولت خارجی" ، بغیر از آنکه در بخشها 1608 این سند استفاده شده، شامل بخشی از یک دولت یا نمایندگی یا ابزار خارجی است که انطور که در زیربخش (b) آمده است، متعلق به دولت خارجی است.

(b) نمایندگی یا ابزار یک دولت خارجی" به معنی هر نهادی است که –

(1) شخص، شرکت ثبت شده یا غیره جداگانه قانونی، و

(2) آن که جزو یک دولت خارجی یا بخش سیاسی آن است، یا ان که اکثریت سهامش یا مالکیتش متعلق به دولت خارجی یا بخش سیاسی باشد، و

(3) آن که شهروند یکی از ایالتهای ایالات متحده، همانطور که در بخش( c) 1332 و (e) این سند آمده است، نباشد و همچنین زایده قوانین کشور سوم هم نباشد.

(c) "ایالات متحده" شامل کلیه سرزمینها و آبها ، قاره ای یا جزیره ای ، که در قلمرو قدرت ایالات متحده قرار دارد.

(d) فعالیت تجاری" به معنی نحوه معمولی رفتار تجاری یا یک معامله بخصوص یا حرکت تجاری میباشد. شخصیت تجاری یک فعالیت توسط رجوع به ماهیت نحوه رفتار یا معامله یا حرکت بخصوص قابل تعیین میباشد ، و نه با رجوع به هدف آن.

(e) " فعالیت تجاری که توسط دولت خارجی در ایالات متحده انجام میشود" به معنی فعالیت تجاری است که آن ایالت انجام میدهد و با ایالات متحده تماس قابل توجهی دارد.

اعتبار (ها )
(Added Pub.L. 94-583, § 4(a), Oct. 21, 1976, 90 Stat. 2892; amended Pub.L. 109-2, § 4(b)(2), Feb. 18, 2005, 119 Stat. 12.)

28 U.S.C.A. § 1603, 28 USCA § 1603
جاری الی P.L. 114-143 همچنین شامل 114-148 ,114-146 ,114-145 .P.L و 114-151الی 114-154 نیز میشود.

کد تفسیر شده ایالات متحده

تیتر 28 . آیین دادرسی قضائی (مراجع و تفسیر ها )

بخش 4. قلمرو قدرت و محل برگزاری ( مراجع و تفسیر ها )

فصل 97. مصونیتهای قلمرو قدرت دولتهای خارجی

28 U S C A § 1604

§ 1604 مصونیت دولت خارجی از قلمرو قدرت

متداول بودن

یک دولت خارجی از قلمرو قدرت دادگاه های ایالات متحده و ایالتها که شامل قراردادهای بین‌المللی که در حال حاضر وجود دارند ، که ایالات متحده در زمان اجرأ این قانون یکی از طرفین آن است، مصون خواهد بود مگر از انهایی که در بخشهای 1605 الی 1607 این فصل امده است.

اعتبار (ها )

(Added Pub.L. 94-583, § 4(a), Oct. 21, 1976, 90 Stat. 2892.)

28 U.S.C.A. § 1604, 28 USCA § 1604

جاری الی 114-143 .P.L همچنین شامل 114-148 ,114-146 ,114-145 .P.L و 151-114الی 114-154 نیز میشود..

پایان مدرک          © 2016 Thomson Reuters. هیچ نوع ادعا ای نسبت به اعمال دولت ایالات متحده .

© 2016 Thomson Reuters. هیچ نوع ادعایی نسبت به اعمال دولت آمریکا؛          WESTLAW

DA132

§ 1605 . استثناعات کلی در مورد مصونیت به قلمرو قدرت 1605 § 28 U S C A

کد تفسیر شده ایالات متحده
تیتر28 .  آیین دادرسی قضائی (مراجع و تفسیر ها )
بخش 4  قلمرو قدرت و محل برگزاری ( مراجع و تفسیر ها )
فصل .97  مصونیتهای قلمرو قدرت دولتهای خارجی

28 U S C A § 1605

§ 1605 استثناعات کلی در مورد مصونیت به قلمرو قدرت یک دولت خارجی

قابل اجرا از :  ۸ بهمن ۱۳۸۶
[January 28, 2008]

متداول بودن

(a)    یک دولت خارجی در هیچ موردی نسبت به قلمرو قدرت دادگاه های ایالات متحده یا ایالتها مصون نخواهد بود--

(1)    که در آن دولت خارجی از مصونیت خود صرفنظر کرده باشد، چه به طور وضوح یا چه با مفهوم،  و صرفنظر از هر گونه بازگیری صرفنظری که دولت خارجی ادعا به اجرا آن دارد، بغیر از آن که به آن که در تطابق با شرایط آن صرفنظر باشد؛

(2)    که عمل انجام شده بر اساس یک فعالیت تجاری باشد که توسط دولت خارجی در ایالات متحده اجرا میشود؛ یا بر اساس عملی که در رابطه با فعالیت تجاری دولت خارجی در محل دیگری، در ایالات متحده انجام میشود؛ یا بر اساس عملی که خارج از سرزمینهای ایالات متحده ولی در رابطه با یک فعالیت تجاری دولت خارجی در محل دیگری ، که اثر مستقیمی داخل ایالات متحده بگذارد ؛

(3)    که در آن حقوق املاکی که در نقض قانون بین‌المللی مورد مسئله باشد وتبادلی بین آن ملک یا هر ملکی برای آن ملکی که در ایالات متحده واقع شده است، و در رابطه با فعالیت تجاری که در ایالات متحده توسط دولت خارجی انجام میشود، داشته باشد؛ یا تبادله آن ملک یا هر ملکی که برای آن ملک مورد تبادل قرار گرفته باشد متعلق به نمایندگی یا ابزار دولت خارجی باشد یا آن را بگرداند، و آن نمایندگی یا ابزار سرگرم فعالیت تجاری در ایالات متحده باشد؛

(4)    که در آن حقوق ملکی که در ایالات متحده است و از طریق وراثت یا هدیه بدست آمده است ، یا حقوق ملک غیر منقول که در ایالات متحده قرار دارد ، مورد بحث باشد؛

(5)    که به صورت دیگری در بند (2) فوق مطرح نشده باشد، که در آن خسارات مالی بر علیه یک دولت خارجی برای صدمه شخصی یا فوت ، یا خسارت به مال یا از دست دادن مال که در ایالات متحده اتفاق افتاده است و در اثر عمل مضر  یا حذف آن دولت خارجی یا مامور یا کارمند آن دولت خارجی که در حال کار در محدوده مقام یا کار خود بوده است ، درخواست شده باشد ؛ این بند شامل موارد ذیل نخواهد بود--

(A)    هر نوع ادعا که بر اساس اجرا یا عمل یا عدم اجرا یا عمل یک عملکرد احتیاطی ، صرفنظر از اینکه از آن احتیاط سؤاستفاده شده باشد یا خیر ؛

(B)    هر نوع ادعا که زانیه پیگرد قانونی مخرب ، سؤاستفاده از روند، افترا ، تهمت ، ارائه اطلاعات نادرست ، فریب ، یا دخالت در حقوق قرارداد باشد؛ یا

(6)   در آنجا که پرونده برای اجرا توافقی که توسط دولت خارجی که اجرا شده است باز شده است به همراه یا برای نفع یک شخص خصوصی برای تحویل دادن کلیه اختلافات به داوری ، که این اختلافات بین طرفین ایجاد شده است یا ایجاد خواهد شد، در رابطه یا یک رابطه مشخص قانونی، قراردادی باشد یا خیر، در مورد موضوعی که میتواند مطابق قوانین ایالات متحده توسط داوری به نتیجه برسد، یا برای تائید رای ی که به دنبال توافق برای داوری انجام شده باشد، اگر که (A) داوری در ایالات متحده انجام بشود یا قرار باشد که در ایالات متحده که در ایالات متحده انجام بشود، (B) توافق یا برای است که تحت کنترل معاهده یا یک توافق بین‌المللی دیگر است یا میتواند باشد ، که ایالات متحده به آن متعهد است و شناسائی و اجرای رای داوری را در بر‌میگیرد، (C) ادعا اصلی ، بغیر از توافق برای داوری،که میتوانست مطابق این بخش یا بخش 1607 ، یا (D) ، بند (1) این زیربخش به دادگاه ایالات متحده آورده بشود در غیر اینصورت قابل اجرا است.

(7)   لغو شد.  341. A, § 1083(b)(1)(A)(iii), Jan. 28, 2008. 122 Stat .Pub.L. 110-181, Div

(b)   یک دولت خارجی نسبت به قلمرو قدرت دادگاه های ایالات متحده در مورد هر پرونده دریاسالاری که برای حق رهن دریایی بر علیه یک کشتی یا بار دولت خارجی به اجرا گذاشته شده است ، و آن حق رهن دریایی بر اساس فعالیت تجاری دولت خارجی است، مصونیت نخواهد داشت:  به شرط اینکه.

(1)   اعلامیه پرونده تحویل دادن یک نسخه از اظهاریه و شکایت به شخص ، یانماینده  وی ، که کشتی یا باری که حق رهن دریایی بر علیه آن به اجرا گذاشته شده است و از آن پس به دنبال جریانات از سوی طرفی که پرونده را به اجرا گذاشته است دستگیر بشود، تحویل  اعلامیه جریان دستگیری به عنوان تحویل معتبر آن اعلامیه تلقی خواهد شد، ولی طرفی که پرونده را به اجرا گذاشته است مسئول در نوع خسارتی است که به دولت خارجی در اثر دستگیری، وارد شده است ، چنانچه طرفی که پرونده را به اجرا گذاشته دانش واقعی یا سازنده در مورد درگیری کشتی یا باری که متعلق به دولت خارجی بوده داشته است؛ و

(2)   اعلامیه به دولت خارجی در مورد شروع پرونده ، همانطور که در بخش 1608 این سند آمده است، در مدت ده روز از تحویل اعلامیه که در بند (1) این زیربخش آمده است ، انجام خواهد شد ، یا اگر طرفی در درگیری کشتی یا بار دولت خارجی اطلاع نداشته است، از تاریخی که آن طرف وجود منافع دولت خارجی را تعیین کرد.

(c)   هر زمانی که اعلامیه مطابق زیربخش (1)(b) تحویل داده میشود، پرونده برای به اجرا گذاشتن حق رهن دریایی پس از آن پیش خواهد رفت و به دادرسی خواهد رسید و مطابق اصول قانون و قوانین اجرای پرونده بر علیه شئ ، تعیین خواهد شد و اگر بنظر برسد که کشتی متعلق به بخش خصوصی میتوانست باشد، پرونده بر علیه شئ میتوانست در نظر گرفته بشود.  فرمانی بر علیه دولت خارجی شامل میتواند هزینه های پرونده باشد و اگر این فرمان برای تعیین حکم مالی است، بهره هم مطابق دستور دادگاه به آن تعلق میگیرد. ولی دادگاه نمیتواند بر علیه دولت خارجی حکمی صادر کند که مقدار آن بیشتر از ارزش کشتی یا باری که بر علیه حق رهن دریایی از آن سرچشمه گرفته بود. این ارزش از زمانی که اعلامیه که مطابق زیربخش (1)(b) تحویل داده شد تعیین خواهد گردید.  فرمانها، همانطور که در بقیه پرونده های قلمرو قدرت های دادگاه برای دریاسالاری و دریایی آمده است، منظور خواهند شد.  هیچ چیز مانع آن نمیشود که شاکی، در هر پرونده درستی، به دنبال چاره جوئی بر علیه شخص در همان پرونده که حق رهن دریایی را به اجرا گذاشته است، و در این قسمت آمده است، نرود.

(d)   یک دولت خارجی از قلمرو قدرت دادگاه های ایالات متحده در مورد هر پرونده ای که راجع به سلب وام مسکن ترجیحی باشد، همانطور که در بخش 31301 سند شماره 46 آمده است، مصون نخواهد بود.  چنین پرونده ای، وقتی که بنظر بیاید که کشتی متعلق به و در اختیار بخش خصوصی بوده است که میتوان پرونده قانونی بر علیه شئ را حفظ کرد ، مطابق شرایط فصل 313 سند 46 و مطابق اصول قانون و اجرای پرونده های قانونی بر علیه شئ ، باز و دادرسی خواهد شد.

(f) (e)   لغو شد.  341. A, Title X, § 1083(b)(1)(B), Jan. 28, 2008. 122 Stat .Pub.L. 110-181, Div

(g)محدودیت روی کشف مدارک.--.

© 2016 Thomson Reuters. هیچ نوع ادعایی نسبت به اعمال دولت آمریکا   WESTLAW

**(1)** **به طور کلی.** (A) -- بنابر بند (2) ، اگر پرونده ای به اجرا گذاشته شود که در حالت دیگر توسط بخش 1604 مسدود میباشد ، ولی نه برای بخش 1605A درخواست ، دادگاه درخواست ، مطالبه یا حکم برای کشف مدارک درباره ایالات متحده را که دادستان کل تصدیق کند که به طور چشمگیر با تحقیقات و پیگرد قانونی جنایی، یا یک عملکرد امنیت ملی که به مربوط به واقعه ای که باعث به اجرا گذاشتن این پرونده شده است، دخالت میکند ، را به درخواست دادستان کل کشور متوقف خواهد کرد تا زمانی که دادستان کل کشور به آن دادگاه بگوید که آن درخواست ، مطالبه یا حکم دیگر دخالتی نخواهد داشت.

**(B)** **توقف،** مطابق این بند، در مدت زمان 12 ماهی که دادگاه حکم توقف کشف مدارک را صادر میکند شروع خواهد شد: دادگاه حکم توقف کشف مدارک را مکرراً هر 12 ماه یک بار به دنبال درخواست از سوی ایالات متحده تجدید خواهد کرد و این در صورتی انجام خواهد شد که دادستان کل کشور تصدیق کند که کشف مدارک به طور چشمگیر با تحقیقات و پیگرد قانونی جنایی، یا یک عملکرد امنیت ملی که مربوط به واقعه ای است که باعث به اجرا گذاشتن این پرونده شده است، دخالت میکند.

**(2)** **غروب** (A) --بنابر بند (B) ، هیچ نوع توقفی مطابق بند (1) پس از تاریخی که 10 سال پس از تاریخی که مربوط به واقعه ای است که باعث به اجرا گذاشتن این پرونده شده است، داده نخواهد شد و تمدید نخواهد شد.

**(B)** پس از آن مدت زمانی که در بند (A) به آن اشاره شده است، دادگاه میتواند، به درخواست دادستان کل کشور، هر گونه درخواست ، مطالبه ، یا حکم برای کشف مدارک در مورد ایالات متحده را که دادگاه تشخیص دهد به طور چشمگیری میتواند--

**(i)** برای هر شخصی خطر مرگ جدی یا صدمه بدنی جدی ایجاد کند؛

**(ii)** به طور منفی در توانایی ایالات متحده برای همکاری با سازمانهای اجرا قانون خارجی و بین‌المللی در مورد نقض قوانین ایالات متحده اثر بگذارد ؛ یا

**(iii)** پرونده جنایی که مربوط به واقعه ای که باعث به اجرا گذاشتن پرونده شده است را مسدود کند یا عامل بالقوه برای محکومیت در چنین پرونده ای را تخریب کند.

**(3)** **ارزیابی مدارک.** -- ارزیابی دادگاه برای هر درخواستی برای توقف که مطابق بخشی است که توسط دادستان کل کشور به اجرا گذاشته شده است، به نحوه درخواست از یک طرف و به طور خصوصی خواهد بود .

**(4)** **منع درخواست برای منفصل کردن.** توقف کشف مدارک مطابق این بخش متشکل از منعی از منفصل کردن درخواست بر منفصل کردن طبق قوانین 12(b)(6) و 56 قوانین فدرال روشهای مدنی خواهد بود.

**(5)** **ساختن.** --هیچ چیز در این زیربخش ایالات متحده را از درخواست برای حکم محافظتی یا اعمال امتیازاتی که به طور معمول در اختیار ایالات متحده است منع نمیکند.

اعتبار (ها )

(Added Pub.L. 94-583, § 4(a), Oct. 21, 1976, 90 Stat. 2892; amended Pub.L. 100-640, § 1, Nov. 9, 1988, 102 Stat. 3333; Pub.L. 100-669, § 2, Nov. 16, 1988, 102 Stat. 3969; Pub.L. 101-650, Title III, § 325(b)(8), Dec. 1, 1990, 104 Stat. 5121; Pub.L. 104-132, Title II, § 221(a), Apr. 24, 1996, 110 Stat. 1241; Pub.L. 105-11, Apr. 25, 1997, 111 Stat. 22; Pub.L. 107-77, Title VI, § 626(c), Nov. 28, 2001, 115 Stat. 803; Pub.L. 107-117, Div. B, Ch. 2, § 208, Jan. 10, 2002, 115 Stat. 2299; Pub.L. 109-304, §17(f)(2), Oct. 6, 2006, 120 Stat. 1708; Pub.L. 110-181, Title X, § 1083(b)(1), Jan. 28, 2008, 122 Stat. 341.)

© 2016 Thomson Reuters, هیچ نوع ادعایی نسبت به اعمال دولت آمریکا  WESTLAW

DA135

28 U.S.C.A. § 1605, 28 USCA § 1605

جاری الی 114-143 .P.L همچنین شامل 148-114 ,146-114 ,145-114, و 151-114 الی 154-114 نیز میشود.

پایان مدرک

© 2016 Thomson Reuters. هیچ نوع ادعا ای نسبت به اعمال دولت ایالات متحده.

WESTLAW © 2016 Thomson Reuters. هیچ نوع ادعایی نسبت به اعمال دولت آمریکا

DA136

کد تفسیر شده ایالات متحده
تیتر 28 . آئین دادرسی قضایی (مراجع و تفسیر ها )
بخش 4  قلمرو قدرت و محل برگزاری ( مراجع و تفسیر ها )
فصل 97  مصونیتهای قلمرو قدرت دولتهای خارجی

28 U S C A § 1605A

§ 1605A استثنا تروریسم در مورد مصونیت نسبت به قلمرو قدرت دولت خارجی

قبل اجرا از : 8 بهمن 1386
[January 28, 2008]

متداول بودن (a)  به طور کلی. --

(1) بدون مصونیت.  یک دولت خارجی از قلمرو قدرت دادگاه های ایالات متحده یا ایالتها در هیچ پرونده ای که در این فصل پوشش نگرفته است ، که در آن خسارات مالی بر علیه یک دولت خارجی برای صدمه شخصی یا مرگی که در اثر یک عمل شکنجه ، قتل فراقضایی، گروگانگیری ، یا شرایطی که اجناس یا منابع برای چنین عملی یا فراهم میکند ، اگر که این عمل یا فراهم کردن اجناس یا منابع توسط مامور ، کارمند، یا نماینده آن دولت خارجی در زمانی که در قلمرو سمت ، کار یا نمایندگی خود عمل میکرده مصون نخواهد بود.

(2) دادرسی ادعا،  --دادگاه به دلائل ذیل ادعا ای که مطابق این بخش شده باشد را دادرسی خواهد کرد --

(A)(i)(I) دولت خارجی در زمانی که عملی که در بند (1) تعریف شده است رخ داد ، به عنوان حامی تروریسم شناخته شده بود، یا در اثر چنین عملی به آن عنوان شناخته شده بود، و بر اساس زیربخش (II) ، در زمانی که این ادعا مطابق این بخش به اجرا گذاشته میشود به همان نحو شناخته میشود،  یا در مدت 6  ماه قبل از به اجرا گذاشتن ادعا مطابق این بخش به این عنوان شناخته شده بود؛ یا

(II)  در صورتی که عملی که مطابق این بخش دوباره به علت بخش (c)(2)(A)1083 قانون اختیارات دفاع ملی سال 2008  به اجرا گذاشته بشود یا بخاطر بخش (c)(3)1083 آن قانون ، دولت خارجی به عنوان حامی تروریسم، در زمانی که عمل اولیه یا عمل مربوط به آن ، مطابق بخش (a)(7)1605 آنطور که قبل از اجرای این بخش در جریان بوده(یا بخش 589 قانون اعمال خارجی،  تامین مالی صادرات ، وتخصیص برنامه های مربوطه سال 1997 (همانطور که در بخش (c)101 قسمت A قانون عمومی 104-208) به اجرا گذاشته شده بود ؛

(ii)  شاکی یا قربانی، در زمانی که عملی که در بند (1) تعریف شده است اتفاق افتاد--

(I)   شهروند ایالات متحده بوده؛

(II)   عضو گروه های مسلح بوده ؛ یا

(III)   به نحو دیگری ، کارمند دولت ایالات متحده ، یا کارمند شخصی که به طور قراردادی با دولت ایالات متحده کار میکرده ، و در محدوده کار کارمند عمل میکرده است؛ و

© 2016 Thomson Reuters.  هیچ نوع ادعایی  نسبت به اعمال دولت آمریکا    WESTLAW

(iii) در موردی که عملی که در دولت خارجی بر علیه ادعا ای که انجام شده است که شاکی به دولت خارجی فرصت معقولی برای به داوری بردن ادعا ، مطابق قوانین مورد قبول بین‌المللی ، داده است؛ یا

(B) عملی که در بند (1) تعریف شده است، مربوط به پرونده شماره (1:00CV03110 EGS) در دادگاه منطقه ای ایالات متحده در منطقه کولومبیا باشد.

(b) محدودیت ها. پرونده ای را می‌توان مطابق این بخش به اجرا گذاشت یا آن را نگه داشت ، اگر عمل یا عملی مربوط به آن مطابق بخش 1605(a)(7) به اجرا گذاشته شده باشد قبل از تاریخ اجرای این بخش(یا بخش 589 قانون اعمال خارجی، تامین مالی صادرات ، و تخصیص برنامه های مربوط به سال 1997 )همانطور که در بخش101(c) قسمت A قانون عمومی 104-208 تعریف شده است )و نه دیرتر از تاریخ دومی.--

(1) 10 سال پس از : 5 اردیبهشت 1375 [ April 24, 1996] ؛ یا

(2) 10 سال پس از تاریخی که علت عمل ایجاد شد.

(c) حقوق خصوصی پرونده. یک دولت خارجی که در حال حاضر یا در گذشته حامی تروریسم بوده، آنطور که در زیربخش (a)(2)(A)(i) آمده ، و هر مامور ، کارمند، یا نماینده آن دولت خارجی که در محدوده سمت ، کار ، یا نمایندگی خود مشغول به کار است، نسبت به موارد ذیل مسئولیت خواهد داشت--

(1) شهروند ایالات متحده ،

(2) عضو گروه های مسلح ،

(3) کارمند دولت ایالات متحده ، یا کارمند شخصی که به طور قراردادی با دولت ایالات متحده کار میکرده ، و در محدوده کار کارمند عمل می‌کرده است؛ یا

(4) نماینده قانونی شخصی که در بندهای ( 1، 2 )، یا (3) تعریف شده باشد،

برای صدمه شخصی یا مرگی که در اثر اعمالی که در زیربخش (a)(1) آن دولت خارجی تعریف شده باشد اتفاق افتاده باشد، یا مامور ، کارمند، یا نماینده آن دولت خارجی که دادگاه های ایالات متحده روی آنها، مطابق این بخش ، برای خسارات مالی قلمرو قدرت دارند. خسارات در چنین پرونده ای میتواند شامل خسارات اقتصادی ، جبران خسارت، درد و رنج، و خسارات تنبیهی باشد. دولت خارجی در چنین پرونده ای نیابتاً مسئول اعمال مامورین ، کارمندان یا نمایندگان خود خواهد بود.

(d) خسارات فرعی -- پس از اینکه پرونده ای مطابق زیربخش (c) به اجرا گذاشته شده است ، به اجرا گذاشته شده است، پرونده های دیگری را مانند زیان ملکی قابل پیش‌بینی معقول ، چه آنها بیمه شده باشند یا خیر، مسئولیت شخص ثالث ، و ادعای ضرر مطابق بیمه نامه های عمر و املاک ، می‌توان به دلیل همان اعمالی که پرونده ای که در زیربخش (c) بر آن پایه‌گذاری شده است به اجرا گذاشت.

(e) متخصصین مخصوص. --

(1) به طور کلی -- دادگاه های ایالات متحده میتوانند متخصصین مخصوصی را برای دادرسی ادعا های خسارت که مطابق این بخش به اجرا گذاشته شده را منصوب کنند.

(2) انتقال سرمایه. -- دادستان کل کشور سرمایه هایی که برای این برنامه در دست است را میتواند مطابق بخش 1404C قانون قربانیان اعمال جنایی سال 1984 (42 U.S.C. 10603c) به سرپرست دادگاه منطقه ای ایالات متحده که هرپرونده ای که مطابق این بخش به اجرا گذاشته شده است یا نگهداری میشود را منتقل کند که این سرمایه ها الزامات پوشش هزینه های متخصصین مخصوص منصوب شده را که مطابق بند (1) تعریف شده است، فراهم کند. هر مقداری که به صورت مزد به متخصص مخصوص داده میشود به عنوان هزینه دادگاه تلقی خواهد شد.

(f) استیناف. استینافهایی که مربوط به حکم هایی هستند که دعوی قضایی را قطعا خاتمه میدهند، که پرونده ای است که مطابق این بخش به اجرا گذاشته میشود، میتوانند فقط به دنبال بخش( b) 1292 این سند ارائه بشوند.

(g) وضع اموال. --

(1) به طور کلی. هر پرونده ای که در دادگاه منطقه ای ایالات متحده به اجرا گذاشته میشود که، مطابق این بخش، قلمرو قدرت ادعا شده است، به اجرا گذاشتن اعلامیه پرونده در حال جریان به دنبال این بخش ، که یک نسخه از پرونده شکایت ضمیمه شده است، قدرت اجرای حق رهن در مورد اعلامیه برای پیگرد قانونی برای اموال واقعی یا اموال قابل لمس شخصی را در نظر بگیرد ، دارد.--

(A) شامل اتصال در کمک به اجرا، یا اجرا، مطابق بخش 1610 ؛

(B) در همان منطقه قضایی واقع شده باشد؛ و

(C) به نام هر مدافع ، یا به نام هر نهادی که تحت کنترل هر مدافعی باشد، چنانکه این اعلامیه حاوی اظهاریه ای باشد که آن نهاد کنترل شده را نام میبرد.

(2) اعلامیه. اعلامیه پرونده در حال جریان، به دنبال این بخش، توسط منشی دادگاه منطقه ای به همان ترتیبی که هر پرونده دیگری که در جریان است به اجرا گذاشته خواهد شده و با نوشتن نام کلیه مدافعین به عنوان مدافع و کلیه نهاد هایی که تحت کنترل هر مدافع است، آن را فهرست خواهد کرد.

(3) قابلیت اجرا. --حق رهن که توسط این زیربخش مستقر شده است، مطابق فصل 111 این سند قابل اجرا خواهد بود.

(h) تعاریف. برای اهداف این بخش--

(1) معنی لفظ "خرابکاری هواپیما "در ماده 1 قانون کنوانسیون جلوگیری از اعمال غیر قانونی علیه امنیت هواپیمایی کشور آمده است ؛

(2) معنی لفظ "گروگانگیری "در ماده 1 قانون کنوانسیون بین‌المللی علیه گروگانگیری آمده است؛

(3) معنی لفظ "حمایت مالی یا منابع" در بخش 2339A سند 18 آمده است؛

© 2016 Thomson Reuters. هیچ نوع ادعایی نسبت به اعمال دولت امریکا WESTLAW

DA139

§ 1605A. استثنا تروریسم در مورد مصونیت نسبت به قلمرو قدرت ... 28 USCA § 1605A

(4)   معنی لفظ "گروه های مسلح" در بخش 101 سند 10 آمده است؛

(5)   معنی لفظ "شهروند ایالات متحده" در بخش (22)(a)101 قانون مهاجرت و تبعیت (22)(a)1101 U.S.C. 8) آمده است؛

(6)   لفظ "حامی تروریسم" به معنی کشوری است که دولت آن، مطابق تشخیص وزیر امور خارجه ، و برای اهداف بخش (j)6) قانون مدیریت صادرات سال 1979 (App. 2405(j)), 50 U.S.C) قانون کمک های خارجی سال 1961 (22 U.S.C. 2371) بخش 620A  بخش 40 قانون کنترل صادرات اسلحه (22 U.S.C. 2780) یا هر شرط قانونی دیگر، مکرراً از اعمال بین‌المللی تروریسم حمایت کرده است؛ و

(7)   معنی الفاظ "شکنجه" و "کشتار فرا قضایی"در بخش  3 قانون حفاظت از شکنجه قربانی سال 1991 آمده است (28 U.S.C. 1350 note).

اعتبار (ها)
(Added Pub.L. 110-181, Div. A, Title X, § 1083(a)(1), Jan. 28, 2008, 122 Stat. 338.)

28 U.S.C.A. § 1605A, 28 USCA § 1605A
جاری الی 114-143 P.L. همچنین شامل 114-148، 114-146، 114-145، P.L. 114-145 و 114-151الی 114-154 نیز میشود.

پایان فرمز

© 2016 Thomson Reuters. هیچ نوع ادعا ای نسبت به اعمال دولت ایالات متحده.

هیچ نوع ادعایی  نسبت به اعمال دولت آمریکا © 2016 Thomson Reuters

قd§ 1606. ميزان مسئوليت28 USCA § 1606

كد تفسير شده ايالات متحده
تيتر 28. آئين دادرسى قضائى (مراجع و تفسير ها )
بخش 4. قلمرو قدرت و محل برگزارى ( مراجع و تفسير ها )
فصل .97 مصونيتهاى قلمرو قدرت دولتهاى خارجى

28 U S C A § 1606

§ 1606 ميزان مسئوليت

قابل اجرا از: ۵ آذر ۱۳۸۱
[November 26, 2002]

متداول بودن

هر نوع چاره جويى در رابطه با يک دولت خارجى که طبق بخش 1605 يا 1607 اين فصل مصونيتى ندارد، آن دولت خارجى به همان ترتيب مسئول و به همان اندازه مسئول خواهد بود که با يک شخص خصوصى در شرايط مشابه، ولى دولت خارجى ، بغير از نمايندگى يا ابزار آن، مسئول خسارات تنبيهى نخواهد بود؛ ولى اگر موردى پيش بيايد که فوت صورت گرفته بود، قانون محلى که در آن عمل يا حذف آن فقط خسارات تنبيهى را فراهم ميکند ، با استنباط ميشود که فراهم کند، آن دولت خارجى مسئول خسارات واقعى يا جبرانى که توسط صدمات مالى که در اثر آن فوت اندازه گيرى شده، که اين صدمات به اشخاصى وارد شده بود که پرونده براى منافع آنها به اجرا گذاشته شده بود.

اعتبار (ها )
(Added Pub.L. 94-583, § 4(a), Oct. 21, 1976, 90 Stat. 2894; amended Pub.L. 105-277, Div. A, § 101(h) [Title I, § 117(b)], Oct. 21, 1998, 112 Stat. 2681-491; Pub.L. 106-386, Div. C, § 2002(f)(2), Oct. 28, 2000, 114 Stat. 1543; Pub.L. 107-297, Title II, § 201(c)(3), Nov. 26, 2002, 116 Stat. 2337.)

28 U.S.C.A. § 1606, 28 USCA § 1606
جارى الى 114-143 P.L. همچنين شامل 114-148, 114-146, 114-145 و 114-151الى 114-154 نيز ميشود.

پايان مدرک © 2016 Thomson Reuters. هيچ نوع ادعا اى نسبت به اعمال دولت ايالات متحده.

کد تفسیر شده ایالات متحده
تیتر 28 . آئین دادرسی قضائی (مراجع و تفسیر ها )
بخش 4 قلمرو قدرت و محل برگزاری ( مراجع و تفسیر ها )
فصل 97 . مصونیتهای قلمرو قدرت دولتهای خارجی

28 U S C A § 1607

§ 1607 ادعا های متقابل

قابل اجرا از : 8 بهمن 1386
[ January 28, 2008 ]

متداول بودن

هر پرونده ای که توسط یک دولت خارجی به اجرأ گذاشته میشود، یا پرونده ای که دولت خارجی دردادگاه ایالات متحده یا ایالتی در آن دخالت دارد ، برای دولت خارجی در مورد ادعا متقابل در موارد ذیل مصونیت نخواهد داشت --

(a)   در زمانی که دولت خارجی مطابق بخش 1605 یا 1605A این فصل محق مصونیت نبوده ، اگر که این ادعا در یک پرونده جداگانه بر علیه دولت خارجی به اجرأ گذاشته شده بود؛ یا

(b)   از معامله یا اتفاقی که موضوع ادعا دولت خارجی است سرچشمه گرفته باشد؛ یا

(c)   تا آنجایی که ادعا متقابل به دنبال چاره جویی به مقداری که بیش از ، یا متفاوت از ، نوعی باشد که دولت خارجی آن را طلب میکند،نباشد.

اعتبار ( ها )

(Added Pub.L. 94-583, § 4(a), Oct. 21, 1976, 90 Stat. 2894; amended Pub.L. 110-181, Div. A, Title X, § 1083(b)(2), Jan. 28, 2008, 122 Stat. 341.)

28 U.S.C.A. § 1607, 28 USCA § 1607
جاری الی P.L. 114-143 همچنین شامل 148-114, 114-146, 145-114 .P.L و 151-114الی 154-114 نیز میشود.

پایان مدرک        هیچ نوع ادعا ای نسبت به اعمال دولت ایالات متحده . © 2016 Thomson Reuters

§ 1608 تحویل اعلامیه؛ زمان برای پاسخ؛ پیش فرض 1608 USCA § 28

کد تفسیر شده ایالات متحده
تیتر 28 . آئین دادرسی قضائی (مراجع و تفسیر ها ()
بخش 4 قلمرو قدرت و محل برگزاری (مراجع و تفسیر ها )
فصل 97. مصونیتهای قلمرو قدرت دولتهای خارجی

28 U S C A § 1608

§ 1608 تحویل اعلامیه؛ زمان برای پاسخ؛ پیش فرض

متداول بودن

(a)   تحویل اعلامیه در دادگاه های ایالات متحده و ایالتها به ترتیب زیر به دولت خارجی یا زیربخش سیاسی آن دولت خارجی انجام خواهد شد:

(1)   تحویل یک نسخه از احضاریه و شکایت مطابق هر قرار ویژه ای که برای تحویل اعلامیه بین شاکی و دولت خارجی یا زیربخش سیاسی آن گذاشته شده است؛ یا

(2)   اگر قرار ویژه ای وجود ندارد، با تحویل دادن یک نسخه از احضاریه و شکایت مطابق یکی از کنوانسیون های مورد استفاده بین‌المللی در مورد تحویل مدارک قضایی؛ یا

(3)   اگر تحویل اعلامیه نمیتواند مطابق بندهای (1) یا (2) انجام بشود، باید با فرستادن یک نسخه از احضاریه و شکایت و اعلامیه پرونده قانونی ، همراه با ترجمه هر کدام به زبان رسمی دولت خارجی، از طریق هر نوع سرویس پستی که احتیاج به رسید امضا شده داشته باشد ، که توسط منشی دادگاه به رئیس وزارت امور خارجی دولت خارجی مربوطه خطاب و فرستاده بشود، این کار انجام شود، یا

(4)   اگر تحویل اعلامیه نمیتواند در مدت 30 روز، مطابق بند (3) انجام بشود، باید از طریق فرستادن دو نسخه از احضاریه و شکایت و پرونده قانونی ، همراه با ترجمه هر کدام به زبان رسمی دولت خارجی، از طریق هر نوع سرویس پستی که احتیاج به امضا داشته باشد ، توسط منشی دادگاه به وزیر امور خارجه ، منطقه کولومبیا ، به حضور رئیس خدمات منصوص کنسولی انجام شود ـ و وزیر یک نسخه از مدارک را از طریق کانالهای دیپلماتیک به دولت خارجی خواهد فرستاد و همچنین یک نسخه تصدیق شده یادداشت دیپلماتیکی را که نشانگر محلی که مدارک به آن فرستاده شده را برای منشی دادگاه خواهد فرستاد.

همانطور که در این زیربخش آمده است، "اعلامیه پرونده قانونی" به معنی اعلامیه ای است که خطاب به یک دولت خارجی میباشد و به صورتی است که توسط وزیر امور خارجه مطابق قوانین دستور داده شده است.

(b)   تحویل اعلامیه در دادگاه های ایالات متحده و ایالتها به نمایندگی یا ابزار یک دولت خارجی به ترتیب زیر انجام خواهد شد:

(1)   تحویل یک نسخه از احضاریه و شکایت مطابق هر قرار ویژه ای که بین شاکی و نمایندگی یا ابزار آن گذاشته شده است؛ یا

(2)   اگر قرار ویژه ای وجود ندارد، با تحویل دادن یک نسخه از احضاریه و شکایت به یکی از مامورین ، یا یک نماینده کلی یا نماینده ای که در مقام مدیریت باشد، یا به هر نماینده ای که به طور انتصابی یا قانونی اختیار دارد که اعلامیه را در روند ایالات متحده تحویل بگیرد ؛ یا مطابق یکی از کنوانسیون های مورد استفاده بین‌المللی در مورد تحویل مدارک قضایی؛ یا

   هیچ نوع ادعایی نسبت به اصل دولت آمریکا © 2016 Thomson Reuters   WESTLAW

(3)  اگر تحویل اعلامیه نمیتواند مطابق بندهای  (1) یا  (2) انجام بشود، و اگر محاسبات معقول برای تحویل اعلامیه به عمل آمده است، از طریق تحویل یک نسخه از احضاریه و شکایت ، همراه با ترجمه هر یک به زبان رسمی آن دولت خارجی--

(A)  مطابق دستور اختیاردار دولت خارجی یا زیربخش سیاسی آن در جواب به نامه درخواست از یک دادگاه به دادگاه دیگر برای گرفتن شهادت و فرستادن آن شهادت به دادگاه اولی ، یا درخواست ، یا

(B)  از طریق هر نوع سرویس پستی که احتیاج به رسید امضا شده داشته باشد ، که توسط منشی دادگاه به نمایندگی یا ابزار آن دولتی که باید اعلامیه را تحویل بگیرد خطاب و فرستاده بشود، یا

(C)  مطابق قانون محلی که اعلامیه باید تحویل بشود، آنطور که دادگاه دستور داده است.

(c)  تحویل اعلامیه در موارد زیر به انجام خواهد رسید

(1)  که مطابق تحویل اعلامیه بخش (4)(a) ، و از تاریخ فرستادن که در نسخه تصدیق شده یادداشت دیپلماتیک آمده است؛ و

(2)  اگر پرونده دیگری در این بخش باشد، از تاریخی که رسید پستی تصدیق و امضا شده در مورد دریافت نشان بدهد، یا هر تحویل اعلامیه دیگری که مربوط به روش تحویل باشد.

(d)  هر پرونده ای که در دادگاه ایالات متحده یا ایالتی به اجرا گذاشته بشود، یک دولت خارجی، زیربخش سیاسی ان، یا نمایندگی یا ابزار آن دولت خارجی در مدت زمان شصت روز پس از اینکه اعلامیه مطابق این بخش تحویل داده شد، پاسخ یا پاسخ به اتهام شکایت خواهد داد.

(e)  هیچ حکم پیش فرض شده فرض شده توسط دادگاه ای توسط دادگاه ایالات متحده یا یک ایالت بر علیه یک دولت خارجی، زیربخش سیاسی آن ، یا نمایندگی یا ابزار آن دولت خارجی، صادر نخواهد شد مگر اینکه شاکی ادعا یا حق چاره جویی خود را توسط مدارکی که برای دادگاه قابل قبول است ارائه بدهد.  نسخه حکم پیش فرض شده از طریق روشی که برای تحویل در این بخش دستور داده شده به دولت خارجی یا زیربخش سیاسی آن فرستاده خواهد شد.

اعتبار (ها).
(Added Pub.L. 94-583, § 4(a), Oct. 21, 1976, 90 Stat. 2894.)

28 U.S.C.A. § 1608, 28 USCA § 1608
جاری الی 114-143 P.L. همچنین شامل 114-148, 114-146, 114-145 و 151-114الی 154-114 نیز میشود.

پایان مشرف &copy; 2016 Thomson Reuters. هیچ نوع ادعا ای نسبت به اعمال دولت ایالات متحده

هیچ نوع ادعایی  نسبت به اعمال دولت آمریکا؛    &copy; 2016 Thomson Reuters.   WESTLAW

DA144

§ 1609. مصونیت از اتصال و به اجرأ گذاشتن اموال 1609 § 28 USCA ...

کد تفسیر شده ایالات متحده
تیتر 28 .  آئین دادرسی قضای (مراجع و تفسیر ها )
بخش 4  قلمرو قدرت و محل برگزاری ( مراجع و تفسیر ها )
فصل 97.  مصونیتهای قلمرو قدرت دولتهای خارجی

28 U S C A § 1609

§ 1609ممصونیت از اتصال و به اجرأ گذاشتن اموال یک دولت خارجی

متداول بودن

اموال یک دولت خارجی در ایالات متحده از بازداشت پیوستی و به اجرأ گذاشتن،  مطابق موافقتنامه های بین‌المللی که ایالات متحده در زمان اجرا این قانون یکی از طرفین بوده، ولی بغیر از آنچه در بخشهای 1610 و 1611 این فصل گفته شده است، مصون خواهد بود.

اعتبار (ها )
(Added Pub.L. 94-583, § 4(a), Oct. 21, 1976, 90 Stat. 2895.)

28 U.S.C.A. § 1609, 28 USCA § 1609
جاری الی 114-143 .P.L همچنین شامل 114-148, 114-146, 114-145 و 114-151الی 114-154 نیز میشود.

پایان مترک
© 2016 Thomson Reuters. هیچ نوع ادعا ای نسبت به اعمال دولت ایالات متحده .

هیچ نوع ادعایی نسبت به اعمال دولت آمریکا © 2016 Thomson Reuters   WESTLAW

DA145

کد تفسیر شده ایالات متحده
تیتر 28 . آیین دادرسی قضایی (مراجع و تفسیر ها )
بخش 4 قلمرو قدرت و محل برگزاری ( مراجع و تفسیر ها )
فصل 97 . مصونیتهای قلمرو قدرت دولتهای خارجی

28 U S C A § 1610

§ 1610 استثناعات در مورد مصونیت از بازداشت پیوستی یا به اجرا گذاشتن

قابل اجرا از :  ۲۰ مرداد ۱۳۹۱
[August 10, 2012 ]
متداول بودن

(a)   اموال یک دولت خارجی در ایالات متحده ، آنطور که در بخش (a)1603 این فصل گفته شده است، که برای فعالیتهای تجاری در ایالات متحده استفاده میشود، از پیوستی که در کمک به اجرا است، یا از به اجرا گذاشتن ، و به دنبال حکم دادگاه ایالات متحده یا ایالتی پس از تاریخ اجرا این قانون، مصون نخواهد بود، به شرط اینکه-

(1)   دولت خارجی از مصونیت خود در مورد پیوستی که در کمک به اجرا است، یا از به اجرا گذاشتن به طور اشکار یا مفهوم صرفنظر کرده است ، علیرغم هر بازگیری که صرفنظر ان صرفنظر ممکن است دولت خارجی اعلام کند ، بغیر از ان که با موارد صرفنظر مطابقت داشته باشد، یا

(2)   ملک برای فعالیتهای تجاری ، بر اساس آنچه ادعا میشود یا میشود، استفاده میشود، یا

(3)   اجراگزاری مربوط به حکمی است که حقوقی برای ملک قائل میشود که در نقض قانون بین‌المللی است یا برای ملکی که در نقض قانون بین‌المللی تبادل شده است ، یا

(4)   اجراگزاری مربوط به حکمی است که برای ملک حقوق تعیین میکند--

(A)   که از طریق وراثت یا هدیه بدست آمده است، یا

(B)   غیرمنقول است و در ایالات متحده قرار گرفته است: به شرط اینکه   آن ملک برای مصارف برقراری ماموریت دیپلماتیک یا کنسولی یا برای محل سکونت رئیس آن ماموریت نباشد،  یا

(5)   ملک شامل تعهدات قراردادی یا درآمد هایی از آن تعهدات قراردادی برای غرامت دادن ، یا برای حفظ دولت خارجی و کارمنداش از صدمه، مطابق بیمه نامه اتومبیل یا هر بیمه مسئولیت یا تلفات که ادعا ای که وارد حکم شده است را تحت پوشش قرار بدهد، یا

(6)   حکم بر اساس دستوری است که جایزه داوری را بر  علیه دولت خارجی تصدیق میکند، به شرط اینکه پیوست در کمک به اجرا ، یا اجرا ، با شرایطی که در موافقتنامه داوری عنوان شده است متناقض نباشد، یا

2016 Thomson Reuters © .  هیچ نوع ادعایی  نسبت به اعمال دولت امریکا     WESTLAW

DA146

§ 1610 استثنائات در مورد مصونیت از بازداشت پیوستی یا به اجراگذاشتن، 1610 § USCA 28

(7) حکم مربوط به ادعا ای است که دولت خارجی ، مطابق بخش 1605A یا بخش 1605(a)(7) (به علت اینکه این بخش از تاریخ January 27, 2008 قابل اجرا بوده است ) ، و صرفنظر از اینکه ملک با عملی که ادعا بر آن پایه‌گذاری شده است درگیر بوده یا خیر، نسبت به آن مصونیت ندارد.

(b) علاوه برزیربخش (a) هر ملکی که در ایالات متحده متعلق به نمایندگی یا ابزار یک دولت خارجی است و سرگرم فعالیتهای تجاری در ایالات متحده است، از پیوست در کمک به اجرا ، یا اجرا ، بر اساس حکمی که از طرف دادگاه ایالات متحده یا ایالتی ، پس از اجرا این قانون صادر شده باشد، مصون است، اگر که..

(1) نمایندگی یا ابزار آن از مصونیت خود در مورد پیوست در کمک به اجرا ، یا اجرا ، به طور آشکار یا مفهوم، علیرغم هر بازگیری آن صرفنظر که دولت خارجی ممکن است اعلام کند، بغیر از آن که با موارد صرفنظر مطابقت داشته باشد ، یا

(2) حکم مربوط به ادعا یا شود که نمایندگی یا ابزار آن به علت بخش (3) ,(a)(2)1605، یا (5) یا 1605(b) این فصل ، علیرغم اینکه ملک در عملی که این ادعا بر آن پایه‌گذاری شده است درگیری داشته باشد یا خیر، مصونیت داشته باشد ، یا

(3) حکم مربوط به ادعا است که نمایندگی یا ابزار آن ، مطابق بخش (A)1605 این فصل یا بخش 1605(a)(7) این فصل (به علت اینکه این بخش از تاریخ ۲۷ ژانویه ۲۰۰۸ قابل اجرا بوده است ) ، و علیرغم اینکه ملک در عملی که این ادعا بر آن پایه‌گذاری شده است درگیری داشته باشد یا خیر، مصونیت ندارد.

(c) اجازه هیچ پیوستی یا اجرایی که درزیربخشهای (a) و (b) این بخش به آن اشاره شده است ، تا زمانی که دادگاه دستور چنین پیوست و اجرایی را صادر کند، و پس از اینکه تشخیص داده شد که مدت زمان معقولی پس از صدور حکم و دادن ان اعلامیه الزامی مطابق بخش 1608(e) این فصل گذشته است، داده نخواهد شد.

(d) ملک دولت خارجی، آنطور که در بخش(a)1603 این فصل تعریف شده است، که برای فعالیت تجاری در ایالات متحده استفاده شده است، از پیوست قبل از صدور حکم در هر پرونده ای که در دادگاه ایالات متحده یا ایالتی در حال اجرا است، یا قبل از گذشت مدت زمانی که در زیربخش (c) این بخش آمده است، مصون نخواهد بود، اگر که..

(1) دولت خارجی به طور آشکار از مصونیت خود صرفنظر کرده باشد، علیرغم هر بازگیری آن که دولت خارجی ممکن است اعلام کند، بغیر از آن که با موارد صرفنظر مطابقت داشته باشد، و

(2) هدف پیوست اطمینان حاصل کردن از اجرا حکمی است که بر علیه دولت خارجی صادر شده است، یا ممکن است نهایتاً صادر بشود، و نه برای دستیابی به قلمرو قدرت.

(e) کشتیهای دولت خارجی از دستگیری بر علیه شئ ، فروش موقت ، و اجرا در اعمالی که باعث مسدود شدن وام ترجیحی ، آنطور که در بخش 1605(d) آمده است مصون نخواهد بود.

(f)(1)(A) علیرغم هر شرط قانونی دیگریکه شامل، ولی نه محدود به، بخش (f) 208 قانون ماموریتهای خارجی ((22 U.S.C. 4308(f)) میشود، و بغیر از آنکه در بند (B) گفته شده است، هر ملکی در رابطه با معاملات مالی منع شده یا تنظیم شده مطابق بخش (b) 5 قانون مبادلات با دشمن ( 50 U.S.C. App. 5(b))، بخش 620a قانون کمک های خارجی سال ۱۹۶۱ (22 U.S.C. 2370(a) ) ، بخشهای 202 و 203 قانون قدرتهای اقتصادی اورژانس بین‌المللی (1702-1701 50 U.S.C.) ، یا ها اظهاریه ، دستور، قانون و مجوزی که پس از آن صادر شده باشد، شامل اجرا یا پیوست در کمک به اجرا حکمی که مربوط به ادعا یا باشد که برای آن یک دولت خارجی (که شامل هر نمایندگی یا ابزار ان یا ان دولت است (ادعا در مورد آن ملک میکند، طبق بخش( 7)1605(a) ( که قبل از اجرا بخش 1605A قابل اجرا است )یا بخش 1605A مصون نمیباشد.

(B) بند (A) در صورتی که در زمانی که ملک مصادره یا توسط دولت خارجی تصاحب بشود، و سند ملک در اختیار یک شخص طبیعی است، یا در امانت است، یا برای منافع شخص یا اشخاص طبیعی نگه داشته شده است، قابل اجرا نیست.

© 2016 Thomson Reuters. هیچ نوع ادعایی نسبت به اعمال دولت آمریکا

DA147

§ 1610. استثناعات در مورد مصونیت از بازداشت پیوستی یا به اجرا گذاشتن ، 1610 § USCA 28

(2)(A)   بنابه درخواست هر طرفی که حکمی به نفع او صادر شده است، با در نظر گرفتن ادعا ای که دولت خارجی‌طبق بخش( 7)(a)1605 (که قبل از اجرا بخش 1605A قبل اجرا است ) از آن مصونیت ندارد، با بخش 1605A وزیر دارایی و وزیر امور خارجه باید تمام سعی خود را برای کمک کامل، سریع ، و موثر به طلبکاران یا هر دادگاهی که حکمی برای شناسایی ، تایین محل ، و اجرا بر علیه ملک آن دولت خارجی یا نمایندگی یا ابزار آن دولت صادر کرده است، انجام بدهند.

(B)   در فراهم کردن این کمک ها ، وزرا میبایست

(i)   اطلاعات مهر و موم شده را تحویل دادگاه بدهند؛ و

(ii)   کلیه اقدامات را برای فراهم کردن اطلاعات،  به نحوی که به دادگاه اجازه بدهد که به دفتر مارشال ایالات متحده دستور اجرا سریع و موثر بر  علیه آن ملک را بدهد ، انجام بدهند.

(3)   صرفنظر. رئیس جمهور میتواند از هر شرطی در بند (1)  که به نفع امنیت ملی است چشمپوشی کند.

(g)   ملکی که در بعضی پرونده ها آمده است. --

(1)   به طور کلی. بر اساس بند (3) ، ملک یک دولت خارجی که حکمی بر اساس بخش 1605A بر علیه آن صادر شده است، و ملک نمایندگی یا ابزار آن دولت، که شامل ملکی است که یک نهاد جداگانه قضایی است یا سهمی است که به طور مستقیم یا غیر مستقیم در یک نهاد جداگانه قضایی نگهداری شده است، شامل پیوست در کمک به اجرا، و اجرا ، بر اساس آن حکمی که در این بخش آمده است میشود، علیرغم--

(A)   میزان کنترل اقتصادی روی ملک توسط دولت آن کشور خارجی؛

(B)   اینکه سود ملک به آن دولت داده میشود؛

(C)   درجه ای که سران آن دولت ملک را مدیریت میکنند یا مسائل روزمره آن را کنترل میکنند؛

(D)   اینکه آن دولت ذینفع منحصر به فرد در سهم ملک است؛ یا

(E)   اینکه استقرار ملک به عنوان یک نهاد جداگانه دولت خارجی را محق بر منافع در دادگاه های ایالات متحده ، در حالی که نسبت به آن تعهدی ندارد، میکند.

هیچ نوع ادعایی  نسبت به اعمال دولت آمریکا   © 2016 Thomson Reuters   WESTLAW

§ 1610. استثناعات در مورد مصونیت از بازداشت پیوستی یا به اجراً گذاشتن ،1610 § 28 USCA

(2)   مصونیت فرمانروایی ایالات متحده قابل استفاده نیست.   هر ملک یک دولت خارجی، یا نمایندگی یا ابزار دولت خارجی، که بند (1) شامل آن میشود، از پیوست در کمک به اجراً ، یا اجراً ، بر اساس حکمی که طبق بخش 1605A صادر شده باشد، مصون نخواهد بود چون آن ملک مطابق قوانین دولت ایالات متحده،  و به دلیل پرونده ای که بر  علیه آن دولت خارجی مطابق با قانون مبادلات با دشمن یا قانون قدرتهای اقتصادی اورژانس بین‌المللی به اجراً گذاشته شده است، تنظیم شده است.

(3)   مالکان مشترک ملک شخص ثالث. هیچ چیز در این زیربخش نباید به عنوان جایگزینی اختیارات دادگاه برای منع صحیح تخریب سهمی که توسط شخصی که در پرونده ای که باعث صدور حکم در مورد ملکی که منوط به پیوست در کمک به اجراً ، یا اجراً ، بر اساس آن حکم است، تلقی بشود.

اعتبار (ها )

(Added Pub.L. 94-583, § 4(a), Oct. 21, 1976, 90 Stat. 2896; amended Pub.L. 100-640, § 2, Nov. 9, 1988, 102 Stat. 3333; Pub.L. 100-669, § 3, Nov. 16, 1988, 102 Stat. 3969; Pub.L. 101-650, Title III, § 325(b)(9), Dec. 1, 1990, 104 Stat. 5121; Pub.L. 104-132, Title II, § 221(b), Apr. 24, 1996, 110 Stat. 1243; Pub.L. 105-277, Div. A, § 101(h) [Title I, § 117(a)], Oct. 21, 1998, 112 Stat. 2681-491; Pub.L. 106-386, Div. C, § 2002(g)(1), Oct. 28, 2000, 114 Stat. 1543; Pub.L. 107-297, Title II, § 201(c)(3), Nov. 26, 2002, 116 Stat. 2337; Pub.L. 110-181, Div. A, Title X, § 1083(b)(3), Jan. 28, 2008, 122 Stat. 341; Pub.L. 112-158, Title V, § 502(e)(1), Aug. 10, 2012, 126 Stat. 1260.)

28 U.S.C.A. § 1610, 28 USCA § 1610
جاری الی 114-143 P.L. همچنین شامل 114-148, 114-146, 114-145, P.L. و 114-151الی 114-154 نیز میشود.

پایان مدرک          2016 Thomson Reuters © هیچ نوع ادعا ای نسبت به اعمال دولت ایالات متحده

§ 1611 . املاک بخصوصی که از اجرأ مصون میباشند 28 USCA § 1611

كد تفسير شده ايالات مَتحده
تيتر 28 . آئين دادرسی قضائ (مراجع و تفسیر ها )
بخش 4  قلمرو قدرت و محل برگزاری ( مراجع و تفسیر ها )
فصل  97 . مصونيتهای قلمرو قدرت دولتهای خارجی

28 U S C A § 1611

املاک بخصوصی که از اجرأ مصون میباشند § 1611

قابل اجراء از :  ١١ مرداد ١٣٧٥
[August 1, 1996]
متداول بودن

(a)   علیرغم شرایط بخش 1610 این فصل ، املاک آن سازمان هایی که از طرف رئیس جمهور محق استفاده از امتیازات ، معافیت ها ، و مصونیت هایی هستند که قانون مصونیت سازمانهای بین‌المللی به آنها عطا کرده است، منوط به پیوست یا هر روند قضائی دیگری که توزیع سرمایه به دولت خارجی ، را به دستور آن ، را در اثر پرونده ای که در دادگاه های ایالات متحده یا ایالتی به اجرأ گذاشته شده ، مشكل میکند نخواهد  بود.

(b)   علیرغم شرایط بخش 1610 این فصل ، ملک یک دولت خارجی از پیوست و اجرأ ، در صورت موارد ذیل ، مصون خواهد بود،

(1)   اگر آن ملک متعلق به یک بانک مرکزی خارجی یا اختیاردار مالی باشد که برای حساب خود نگه داشته شده است ، مگر اینکه آن بانک یا اختیاردار ، یا دولت اصلی خارجی به طور آشکار از مصونیت خود در مورد پیوست در مورد پیوست در کمک برای اجرأ ، یا از اجرأ چشمپوشی کرده باشد، علیرغم هر بازگیری آن صرفنظر که بانک ، اختیاردار ، یا دولت ممکن است اعلام کند ، بغیر از آن که با موارد صرفنظر مطابقت داشته باشد؛  یا

(2)   ملک در رابطه با فعالیت نظامی استفاده میشود یا خواهد شد و

(A)   از نوع نظامی است، یا

(B)   تحت کنترل اختیاردار نظامی یا سازمان دفاع است.

(c)   علیرغم شرایط بخش 1610 این فصل ، ملک یک دولت خارجی از پیوست و اجرأ اجرأگزاری در پرونده ای که طبق بخش 302 قانون آزادی و همبستگی دمکراتیک کوبا   (LIBERTAD)  سال 1996  به اجرأ گذاشته شده است،    تا آنجایی که آن ملک تسهیلات یا تاسیساتی است که توسط یک ماموریت دیپلماتیک معتبر برای اهداف رسمی استفاده میشود، مصون خواهد بود.

اعتبار (ها )

(Added Pub.L. 94-583, § 4(a), Oct. 21, 1976, 90 Stat. 2897; amended Pub.L. 104-114, Title III, § 302(e), Mar. 12, 1996, 110 Stat. 818.)

28 U.S.C.A. § 1611, 28 USCA § 1611
جاری الی P.L. 114-143 همچنین شامل P.L. 114-145, 114-146, 114-148 و 114-151 الی 114-154 نیز میشود.

   هیچ نوع ادعایی نسبت به اعمال دولت آمریکا   © 2016 Thomson Reuters   WESTLAW

**DA150**

Amir Hekmati Application

Attachment 3e

FedEx Tracking for Supplemental State Department
of Submission

05751036    fedex.com 1.800.GoFedEx 1.800.463.3339    17838

00100
00076)

**FedEx Express** Package US Airbill

Tracking Number 8092 5644 3825

**1 From** Please print and press hard.

Date 11.3.17

Sender's Name Emily Grim

Company GILBERT LLP

Address 1100 NEW YORK AVE NW STE. 700

City WASHINGTON   State DC   ZIP 20005-6133

Phone 202 772-2200

Sender's FedEx Account Number 2290-0774-5

**2 Your Internal Billing Reference** 14.57.001

**3 To**

Recipient's Name Jared Hess, Director, OCS

Company U.S. DEPT. OF STATE (CA/OCS/L)

Address SA-17 10TH FLOOR

City WASHINGTON   State DC   ZIP 20522

0121062967

**4 Express Package Service** Form ID 0215

**5 Packaging**

☒ FedEx Envelope    ☒ FedEx Pak

**6 Special Handling and Delivery Signature Options**

**7 Payment** Bill to:

☐ Sender   ☐ Recipient   ☐ Third Party   ☐ Credit Card   ☐ Cash/Check

Total Packages   Total Weight   Total Declared Value

MUR3

DA152

# Amir Hekmati Application

# Attachment 3f

# FedEx Confirmation of Delivery of Supplemental State Department Submission



November 13,2017

Dear Customer:

The following is the proof-of-delivery for tracking number **809256443825**.

## Delivery Information:

| | | | |
|---|---|---|---|
| Status: | Delivered | Delivered to: | Shipping/Receiving |
| Signed for by: | L.HARRISON | Delivery location: | DC |
| Service type: | FedEx Priority Overnight | Delivery date: | Nov 6, 2017 09:30 |
| Special Handling: | Deliver Weekday | | |
| | Direct Signature Required | | |

Signature image is available. In order to view image and detailed information, the shipper or payor account number of the shipment must be provided.

## Shipping Information:

| | | | |
|---|---|---|---|
| Tracking number: | 809256443825 | Ship date: | Nov 3, 2017 |

| | |
|---|---|
| **Recipient:** | **Shipper:** |
| DC US | WASHINGTON, DC US |
| **Reference** | 1457001 |

Thank you for choosing FedEx.

DA154

...ckage or shipment with FedEx Tracking                                          Page 1 of 2

**FEX**          Shipping    Tracking    Printing Services    Locations    Support              Sign In

FedEx® Tracking

---

**809256443825**

Ship date:                                              Actual delivery:
Fri 11/03/2017                                           Mon 11/06/2017 9:30 am

WASHINGTON, DC US              **Delivered**             DC US
                          Signed for by: L.HARRISON

---

### Travel History

| Date/Time | Activity | Location |
|---|---|---|
| − 11/06/2017 - Monday | | |
| 9:30 am | Delivered | DC |
| 5:13 am | On FedEx vehicle for delivery | HERNDON, VA |
| 6:25 am | At local FedEx facility | HERNDON, VA |
| − 11/04/2017 - Saturday | | |
| 3:28 pm | At local FedEx facility | HERNDON, VA |
| − 11/03/2017 - Friday | | |
| 10:09 pm | At destination sort facility | DULLES, VA |
| 9:09 pm | Left FedEx origin facility | WASHINGTON, DC |
| 5:23 pm | Picked up | WASHINGTON, DC |

### Shipment Facts

| | | | |
|---|---|---|---|
| Tracking Number | 809256443825 | Service | FedEx Priority Overnight |
| Signature services | Direct signature required | Delivered To | Shipping/Receiving |
| Terms | Shipper | Shipper reference | 1457001 |
| Packaging | FedEx Small Box | Special handling section | Deliver Weekday, Direct Signature Required |
| Standard transit | 11/06/2017 by 10:30 am | | |

---

OUR COMPANY                    MORE FROM FEDEX                       LANGUAGE

About FedEx        FedEx Blog          FedEx Compatible               Change Country
Our Portfolio      Corporate Responsibility   Developer Resource Center
Investor Relations  Newsroom            FedEx Cross Border                 English
Careers            Contact Us

FOLLOW FEDEX

© FedEx 1995-2017          Feedback    |    Site Map    |    Terms of Use    |    Security & Privacy

Amir Hekmati Application

Attachment 4

Engagement Letter Between A. Hekmati and Gilbert LLP

 **Gilbert** LLP

1100 New York Avenue, NW
Suite 700
Washington, DC 20005

O 202.772.2200
F 202.772.3333

gotofirm.com

Scott D. Gilbert
O 202.772.2277
C 202.669.2966
gilberts@gotofirm.com

April 19, 2016

## ELECTRONIC MAIL AND OVERNIGHT DELIVERY

Mr. Amir Hekmati

▮▮▮▮▮▮▮▮▮▮

Re:     Engagement of Gilbert LLP

Dear Amir:

<div align="center">REDACTED</div>

DA157

Mr. Amir Hekmati
April 19, 2016
Page 2



REDACTED

Mr. Amir Hekmati
April 19, 2016
Page 3



REDACTED



Mr. Amir Hekmati
April 19, 2016
Page 4

REDACTED

Mr. Amir Hekmati
April 19, 2016
Page 5

**Gilbert** LLP

REDACTED

Sincerely,

Scott D. Gilbert

Agreed to and Accepted by:

Amir Hekmati                                    04 / 20 / 2016
                                                Date

Amir Hekmati Application

Attachment 5

Supplemental Engagement Letter Between A.
Hekmati and Gilbert LLP



1100 New York Avenue, NW
Suite 700
Washington, DC 20005
O 202.772.2200
F 202.772.3333
gotofirm.com

Scott D. Gilbert
O 202.772.2277
C 202.669.2966
gilberts@gotofirm.com

November 21, 2017

**ELECTRONIC MAIL AND OVERNIGHT DELIVERY**

Mr. Amir Hekmati

███████████████

Re:     Supplement to April 19, 2016 Engagement Letter

Dear Amir:

This letter supplements our April 19, 2016 engagement letter ("April Engagement Letter"), which is incorporated by reference herein unless otherwise noted. Specifically, this letter confirms that the scope of our retention includes the Firm's representation of you in your efforts to recover compensation from the U.S. Victims of State Sponsored Terrorism Fund (the "Fund") under 34 U.S.C. § 20144. Consistent with 34 U.S.C. § 20144(f)(1), the Firm shall not receive payment for costs, expenses, and attorneys' fees that exceeds in the aggregate 25% (twenty-five percent) of any payment made to you from the Fund. This letter does not alter the terms and conditions of the April Engagement Letter with respect to any other activities the Firm may undertake in connection with your claims against Iran.

If you have any questions regarding the terms of this letter, please call me. If this arrangement is satisfactory to you, please sign in the space below and return an executed original to me by mail. We look forward to continuing to work with you.

Sincerely,

Scott D. Gilbert

Agreed to and Accepted by:

_____
Amir Hekmati

_11 - 24 - 2017_
Date

DA163

**Lucas Mason**

| | |
|---|---|
| **From:** | Grim, Emily P. <grime@gotofirm.com> |
| **Sent:** | Wednesday, December 06, 2017 3:17 PM |
| **To:** | info@usvsst.com |
| **Subject:** | Amir Hekmati Application |
| **Attachments:** | Mimecast Large File Send Instructions |

I'm using Mimecast to share large files with you. Please see the attached instructions.

To Whom It May Concern:

I write on behalf of my client, Amir Hekmati, who recently obtained a default judgment against the Government of Iran for damages arising from his hostage-taking and torture.  Please find attached Mr. Hekmati's completed application for submission to the U.S. Victims of State Sponsored Terrorism Fund.  The application includes the following supporting documentation:

(1)  The U.S. District Court for the District of Columbia's final Order and Default Judgment Against the Government of the Islamic Republic of Iran, issued on September 29, 2017

(2)  The Court's corresponding opinion in support of its Order and Default Judgment (public redacted version)

(3)  Proof of service of the Court's Order and Default Judgment on Iran pursuant to 28 U.S.C. § 1608(a)(4), including:

    3a       Plaintiff's Affidavit Requesting Foreign Mailing

    3b-c    Certificate of Mailing by the U.S. District Court for the District of Columbia to the U.S. Department of State

    3d-f    Plaintiff's supplemental submission to the U.S. Department of State and proof of receipt thereof

(4)  Engagement letter between Gilbert LLP and Mr. Hekmati

(5)  Supplemental engagement letter confirming that Gilbert LLP will not receive payment of fees and costs that in the aggregate exceeds 25% of any payment made under the Fund on Mr. Hekmati's claim.

Please let me know if you have any trouble opening the attached documents or if the Special Master requires additional information or documentation.  In particular, please let me know if the Special Master requires the unredacted, sealed version of the Court's opinion (as opposed to the redacted, public version of the Court's opinion provided above).  If so, we will look into the feasibility of providing that document.

For security purposes, please note that the access link will expire after 21 days.

Thank you,
Emily

1

DA164

 **U.S. Department of Justice**
**U.S. Victims of State Sponsored Terrorism Fund**

P.O. Box 10299
Dublin, OH 43017-5899



December 28, 2017

VIA FIRST CLASS MAIL
VTF0201118928



AMIR M HEKMATI
C/O EMILY PEARSON GRIM
GILBERT LLP
1100 NEW YORK AVE. NW SUITE 700
WASHINGTON, DC 20005

Claim No: 1226

Dear Applicant:

You submitted an Application Form to the U.S. Victims of State Sponsored Terrorism Fund ("USVSST Fund"). Based on all the information submitted for your claim, the USVSST Fund has determined your claim to be eligible in the following amount:

- Eligible Compensatory Damages: $31,748,179.00
- Less Offset for Sources Other Than This Fund: $0.00
- **TOTAL ELIGIBLE CLAIM AMOUNT: $31,748,179.00**[1]

The USVSST Fund determined your total eligible claim amount in accordance with the requirements of the Justice for U.S. Victims of State Sponsored Terrorism Act.

**Although the USVSST Fund has determined that your claim is eligible, please note that there is no guarantee that you will receive the total eligible claim amount. Rather, the amount of your first payment will be calculated <u>after</u> the USVSST Fund determines the amount of funds available from which to pay claims and <u>after</u> any statutory limitations are applied to the total eligible claim amount shown above. You will be notified about the exact amount of your first payment after the Special Master authorizes the next distribution in January 2019.**

Please note that in accordance with the requirements of the USVSST Fund and the Justice for U.S. Victims of State Sponsored Terrorism Act, you must inform the USVSST Fund of any new compensation from any source other than this Fund that you receive, or are scheduled or entitled to receive.

If you believe your total eligible claim amount was not properly decided or contains an error, you may submit a detailed explanation to the USVSST Fund in writing within 3 days of receipt of this letter, referencing your Claim Number, in one of the following ways:

- As an email attachment to info@usvsst.com
- By facsimile to (614) 553-1426
- By overnight courier to U.S. Victims of State Sponsored Terrorism Fund, c/o GCG,
  5151 Blazer Parkway, Dublin, OH 43017-5899

---

[1] The total eligible claim amount represents the amount outstanding and unpaid on your eligible claim amount.

U.S. Victims of State Sponsored Terrorism Fund
Claim No: 1226

2

Please visit the USVSST Fund's website at www.usvsst.com for additional detailed information.  If you have any questions, please feel free to call the U.S. Victims of State Sponsored Terrorism Fund's toll-free helpline at (855) 720-6966.  If you are calling from outside of the United States, please call (614) 553-1013. Every effort will be made to respond to your inquiries as soon as possible.

Sincerely,

Kenneth R. Feinberg
Special Master
U.S. Victims of State Sponsored Terrorism Fund

DA166



# U.S. Department of Justice
## U.S. Victims of State Sponsored Terrorism Fund

P.O. Box 10299
Dublin, OH 43017-5899



December 13, 2018

VIA ELECTRONIC MAIL



AMIR M HEKMATI
C/O EMILY PEARSON GRIM
GILBERT LLP
1100 NEW YORK AVE. NW SUITE 700
WASHINGTON, DC 20005

Claim No: 1226

Dear Applicant:

The Special Master has reviewed and approved your claim for compensation from the U.S. Victims of State Sponsored Terrorism Fund (the "USVSST Fund"). The allocated payment amount for this distribution is $839,100.85. Additional information about how the USVSST Fund calculated eligible claimants' award amounts can be found in the "USVSST Fund Payment Calculation Explanation" and the frequently asked questions ("FAQs"), available on the USVSST Fund's website at www.usvsst.com.

In order to receive your payment, you must complete the "Direct Deposit - ACH Payment Form" available on the USVSST Fund's website at the Payment Information tab, if you have not already done so. For more information, see the direct deposit FAQs, also available on the Payment Information tab.

Please note that in accordance with the requirements of the USVSST Fund and the Justice for U.S. Victims of State Sponsored Terrorism Act, you must inform the USVSST Fund of any compensation from any source other than this Fund not previously disclosed.

If you have questions, you may contact the USVSST Fund, referencing your Claim Number shown above, in one of the following ways:

- By telephone to the USVSST Fund's toll-free helpline at (855) 720-6966. If you are calling from outside of the United States, please call (614) 553-1013.
- By email to info@usvsst.com
- By facsimile to (614) 553-1426
- By U.S. mail to U.S. Victims of State Sponsored Terrorism Fund, c/o GCG, P.O. Box 10299, Dublin, OH 43017-5899
- By overnight courier to U.S. Victims of State Sponsored Terrorism Fund, c/o GCG, 5151 Blazer Parkway, Dublin, OH 43017-5899

Every effort will be made to respond to your inquiries as soon as possible.

Sincerely,

Kenneth R. Feinberg

Kenneth R. Feinberg
Special Master
U.S. Victims of State Sponsored Terrorism Fund

DA167

| From: | Gilbert, Scott D |
|---|---|
| To: | Ken Feinberg |
| Cc: | Lee, Jane (CRM) |
| Subject: | Re: Amir Hekmati -- USVSST Fund |
| Date: | Thursday, June 6, 2019 9:33:21 PM |
| Attachments: | image002.png |
| | image204319.png |

Thanks, Ken.  Nice to meet you, Jane; we will contact you and perhaps you can point us in the right direction.

sdg

# GILBERT LLP

**Scott D. Gilbert**
gilberts@gilbertlegal.com
O 202.772.2277
C 202.669.2966

1100 New York Ave, NW
Suite 700
Washington, DC 20005
**GilbertLegal.com**

This email and any attachments may contain confidential information that is privileged at law. If you are not a named recipient or have received this communication by error, please notify the sender immediately and destroy this email and its attachments, and all copies thereof, without further distributing or copying them.

**From:** Kenneth Feinberg <KFeinberg@feinberglawoffices.com>
**Date:** Thursday, June 6, 2019 at 6:02 PM
**To:** Scott Gilbert <gilberts@gilbertlegal.com>
**Cc:** "Jane K Lee (jane.lee3@usdoj.gov)" <jane.lee3@usdoj.gov>
**Subject:** RE: Amir Hekmati -- USVSST Fund

Scott,

My friend, check with Jane Lee. Her contact info:



She has replaced me on at least an interim basis and I am including her as well on this email response.

I hope all is well. As you may be aware, Peter Angelos is not doing well and is quite frail. Time waits for no man.

DA168

Ken

---

**From:** Gilbert, Scott D [mailto:gilberts@gilbertlegal.com]
**Sent:** Thursday, June 06, 2019 5:54 PM
**To:** Ken Feinberg
**Subject:** Amir Hekmati -- USVSST Fund

Ken,

I hope all is well.  I am writing to ask if you can direct us to the appropriate person at the USVSST Fund to obtain some explanation of the status of the processing of Amir Hekmati's 2019  payment. We know many other claimants who have received their payments, and we have called the Fund numerous times, simply to be told that Amir's payment is being processed.  Given Amir's issues and current status, this payment, although a fraction of his allowed claim, is material to his well-being and recovery.  I appreciate it.

sdg

**GILBERT** LLP

**Scott D. Gilbert**
gilberts@gilbertlegal.com
O 202.772.2277
C 202.669.2966

1100 New York Ave, NW
Suite 700
Washington, DC 20005
**GilbertLegal.com**

This email and any attachments may contain confidential information that is privileged at law. If you are not a named recipient or have received this communication by error, please notify the sender immediately and destroy this email and its attachments, and all copies thereof, without further distributing or copying them.

| | |
|---|---|
| **From:** | Abrishami, Monique |
| **To:** | Lee, Jane (CRM) |
| **Subject:** | RE: Amir Hekmati - USVSST Fund - follow up to email between Scott Gilbert and Kenneth Feinberg |
| **Date:** | Thursday, June 20, 2019 11:51:05 AM |
| **Attachments:** | image001.png |
| | image064357.png |

Thank you, Jane.

# GILBERT LLP

**Monique Abrishami**

abrishamim@gilbertlegal.com

O 202.772.2255

1100 New York Ave, NW
Suite 700
Washington, DC 20005

**GilbertLegal.com**

This email and any attachments may contain confidential information that is privileged at law. If you are not a named recipient or have received this communication by error, please notify the sender immediately and destroy this email and its attachments, and all copies thereof, without further distributing or copying them.

**From:** Lee, Jane (CRM) <Jane.Lee3@usdoj.gov>
**Sent:** Thursday, June 20, 2019 9:25 AM
**To:** Abrishami, Monique <abrishamim@gilbertlegal.com>
**Subject:** RE: Amir Hekmati - USVSST Fund - follow up to email between Scott Gilbert and Kenneth Feinberg

Hi Monique,

The Acting Special Master, Deb Connor, is also the Chief of MLARS.

Thank you,

Jane

**From:** Abrishami, Monique [mailto:abrishamim@gilbertlegal.com]
**Sent:** Wednesday, June 19, 2019 2:05 PM
**To:** Lee, Jane (CRM) <Jane.Lee@CRM.USDOJ.GOV>
**Subject:** RE: Amir Hekmati - USVSST Fund - follow up to email between Scott Gilbert and Kenneth Feinberg

Apologies, I meant to say MLARS!

# GILBERT LLP

## Monique Abrishami

abrishamim@gilbertlegal.com
O 202.772.2255

1100 New York Ave, NW
Suite 700
Washington, DC 20005
**GilbertLegal.com**

This email and any attachments may contain confidential information that is privileged at law. If you are not a named recipient or have received this communication by error, please notify the sender immediately and destroy this email and its attachments, and all copies thereof, without further distributing or copying them.

**From:** Abrishami, Monique
**Sent:** Wednesday, June 19, 2019 12:14 PM
**To:** Lee, Jane (CRM) <Jane.Lee3@usdoj.gov>; Gilbert, Scott D <gilberts@gilbertlegal.com>
**Subject:** RE: Amir Hekmati - USVSST Fund - follow up to email between Scott Gilbert and Kenneth Feinberg

Thank you, Jane – much appreciated.  May I ask which Fraud Section supervisors are overseeing the USVSST claims?

**From:** Lee, Jane (CRM) <Jane.Lee3@usdoj.gov>
**Sent:** Wednesday, June 19, 2019 11:08 AM
**To:** Abrishami, Monique <abrishamim@gilbertlegal.com>; Gilbert, Scott D <gilberts@gilbertlegal.com>
**Subject:** RE: Amir Hekmati - USVSST Fund - follow up to email between Scott Gilbert and Kenneth Feinberg

Hi Monique,

I have relayed your inquiry to my supervisors.  I do not have any updates to share with you regarding the status of your client's claim.  When there is more information, we will let you know.

Thank you,
Jane

**From:** Abrishami, Monique [mailto:abrishamim@gilbertlegal.com]
**Sent:** Tuesday, June 18, 2019 3:44 PM
**To:** Lee, Jane (CRM) <Jane.Lee@CRM.USDOJ.GOV>; Gilbert, Scott D <gilberts@gilbertlegal.com>
**Subject:** RE: Amir Hekmati - USVSST Fund - follow up to email between Scott Gilbert and Kenneth Feinberg

Jane,

DA171

I hope you had a great trip!  Just wanted to circle back on this when you have a moment—do you have any time for a call tomorrow, or is there someone else we could speak to about Amir's award? Thanks!

Thanks,
Monique


**GILBERT** LLP

**Monique Abrishami**
abrishamim@gilbertlegal.com
O 202.772.2255

1100 New York Ave, NW
Suite 700
Washington, DC 20005
**GilbertLegal.com**

This email and any attachments may contain confidential information that is privileged at law. If you are not a named recipient or have received this communication by error, please notify the sender immediately and destroy this email and its attachments, and all copies thereof, without further distributing or copying them.

**From:** Abrishami, Monique
**Sent:** Friday, June 7, 2019 1:32 PM
**To:** Lee, Jane (CRM) <Jane.Lee3@usdoj.gov>; Gilbert, Scott D <gilberts@gilbertlegal.com>
**Subject:** RE: Amir Hekmati - USVSST Fund - follow up to email between Scott Gilbert and Kenneth Feinberg

Thank you so much, Jane.  Safe travels.

**From:** Lee, Jane (CRM) <Jane.Lee3@usdoj.gov>
**Sent:** Friday, June 7, 2019 1:17 PM
**To:** Abrishami, Monique <abrishamim@gilbertlegal.com>; Gilbert, Scott D <gilberts@gilbertlegal.com>
**Subject:** Re: Amir Hekmati - USVSST Fund - follow up to email between Scott Gilbert and Kenneth Feinberg

Monique and Scott:

I am in receipt of your emails.  I am currently on travel (on my way to the airport) and will not have any access.  I will circle back after I return on June 18, but one of my DOJ colleagues may be reaching out in the interim.

Thank you,
Jane

On Jun 7, 2019, at 9:58 AM, Abrishami, Monique <abrishamim@gilbertlegal.com> wrote:

Ms. Lee,

I write to follow up on a June 6 communication between Scott Gilbert and Kenneth Feinberg regarding our client, Amir Hekmati (Claim No. 1226). Amir was awarded $839,100.85 from the Fund on December 13, 2008, and he hasn't been paid yet. He's suffering a great deal from the after-effects of his years of captivity and torture, and the payment is necessary to his recovery efforts. We know that others have been paid, and we have called and emailed the Fund hotline several times, but all we're hearing is the general statement that payments are being processed. Could you please direct me to someone who can explain the status of the processing of his payment? Thank you so much.

Best,
Monique Abrishami

**GILBERT** LLP

**Monique Abrishami**
abrishamim@gilbertlegal.com
O 202.772.2255

1100 New York Ave, NW
Suite 700
Washington, DC 20005
**GilbertLegal.com**

This email and any attachments may contain confidential information that is privileged at law. If you are not a named recipient or have received this communication by error, please notify the sender immediately and destroy this email and its attachments, and all copies thereof, without further distributing or copying them.

<Claim No. 1226.pdf>



1100 New York Avenue, NW
Suite 700
Washington, DC 20005
O 202.772.2200
F 202.772.3333

GilbertLegal.com

Scott D. Gilbert
202.772.2277
gilberts@gilbertlegal.com

June 20, 2019

**VIA ELECTRONIC MAIL**

Deborah L. Connor
Acting Special Master
U.S. Victims of State Sponsored Terrorism Fund
1400 New York Avenue NW
Washington, DC 20005

**Re:    Amir Hekmati, Claim No. 1226**

Dear Ms. Connor:

We write on behalf of our client, Amir Hekmati, with respect to U.S. Victims of State Sponsored
Terrorism Fund ("USVSST Fund") Claim No. 1226.  After U.S. District Court Judge Huvelle ordered
Iran to pay Mr. Hekmati $63.5 million, Mr. Hekmati applied to the USVSST Fund for compensation.
On December 28, 2017, the USVSST Fund notified Mr. Hekmati that his eligible claim was
$31,748,179, subject to the $20 million statutory cap.  Subsequently, on December 13, 2018, the
USVSST Fund awarded Mr. Hekmati a distribution of $839,100.85.  It has been over six months since
then, and he has not received his distribution—a distribution that represents a fraction of his allowed
claim—despite others having received millions of dollars in payments.  Every request to the USVSST
Fund for information about the timing for payment of his claim has met with a polite refusal to provide
any update other than a general confirmation that payments are being issued.  A request to your office
for additional information was similarly rebuffed.

Mr. Hekmati, a U.S. veteran who survived a horrific trauma, should not be struggling in this
bureaucratic morass to receive a payment that Congress determined he is owed.  This USVSST Fund
award represents an opportunity for Mr. Hekmati to begin rebuilding his life after an ordeal that left
lasting damage—and its delay in payment has a direct, negative effect on his ability to do so.  In brief,
after completing two lengthy tours of duty in Iraq as a member of the U.S. Marine Corps, Mr. Hekmati
went to Iran to visit his grandmother, where he was arrested and falsely imprisoned.  He survived four
and a half years of captivity and torture in a brutal Iranian prison.  He was finally released on
January 17, 2016, but he continues to experience debilitating post-traumatic stress disorder and other
lasting psychological damage to this day.  He needs the payment from the USVSST to support himself
in his recovery.

Deborah L. Connor
June 20, 2019
Page 2



This letter represents our final attempt to resolve this issue before we escalate the matter. Please advise as to when Mr. Hekmati may expect to receive the USVSST Fund distribution he was awarded in December 2018.

Sincerely,

Scott D. Gilbert

Enclosures:   USVSST Fund letter to A. Hekmati dated December 28, 2017
              USVSST Fund letter to A. Hekmati dated December 13, 2018

DA175

**U.S. Department of Justice**
**U.S. Victims of State Sponsored Terrorism Fund**

P.O. Box 10299
Dublin, OH 43017-5899



December 28, 2017

VIA FIRST CLASS MAIL
VTF0201118928

AMIR M HEKMATI
C/O EMILY PEARSON GRIM
GILBERT LLP
1100 NEW YORK AVE. NW SUITE 700
WASHINGTON, DC 20005

Claim No: 1226

Dear Applicant:

You submitted an Application Form to the U.S. Victims of State Sponsored Terrorism Fund ("USVSST Fund"). Based on all the information submitted for your claim, the USVSST Fund has determined your claim to be eligible in the following amount:

- Eligible Compensatory Damages: $31,748,179.00
- Less Offset for Sources Other Than This Fund: $0.00
- **TOTAL ELIGIBLE CLAIM AMOUNT: $31,748,179.00**[1]

The USVSST Fund determined your total eligible claim amount in accordance with the requirements of the Justice for U.S. Victims of State Sponsored Terrorism Act.

**Although the USVSST Fund has determined that your claim is eligible, please note that there is no guarantee that you will receive the total eligible claim amount. Rather, the amount of your first payment will be calculated <u>after</u> the USVSST Fund determines the amount of funds available from which to pay claims and <u>after</u> any statutory limitations are applied to the total eligible claim amount shown above. You will be notified about the exact amount of your first payment after the Special Master authorizes the next distribution in January 2019.**

Please note that in accordance with the requirements of the USVSST Fund and the Justice for U.S. Victims of State Sponsored Terrorism Act, you must inform the USVSST Fund of any new compensation from any source other than this Fund that you receive, or are scheduled or entitled to receive.

If you believe your total eligible claim amount was not properly decided or contains an error, you may submit a detailed explanation to the USVSST Fund in writing within 3 days of receipt of this letter, referencing your Claim Number, in one of the following ways:

- As an email attachment to info@usvsst.com
- By facsimile to (614) 553-1426
- By overnight courier to U.S. Victims of State Sponsored Terrorism Fund, c/o GCG, 5151 Blazer Parkway, Dublin, OH 43017-5899

---

[1] The total eligible claim amount represents the amount outstanding and unpaid on your eligible claim amount.

U.S. Victims of State Sponsored Terrorism Fund                    2
Claim No: 1226

Please visit the USVSST Fund's website at www.usvsst.com for additional detailed information.  If you have any questions, please feel free to call the U.S. Victims of State Sponsored Terrorism Fund's toll-free helpline at (855) 720-6966.  If you are calling from outside of the United States, please call (614) 553-1013. Every effort will be made to respond to your inquiries as soon as possible.

Sincerely,

Kenneth R. Feinberg
Special Master
U.S. Victims of State Sponsored Terrorism Fund



# U.S. Department of Justice
## U.S. Victims of State Sponsored Terrorism Fund

P.O. Box 10299
Dublin, OH 43017-5899



December 13, 2018

VIA ELECTRONIC MAIL



VTF0201580551

AMIR M HEKMATI
C/O EMILY PEARSON GRIM
GILBERT LLP
1100 NEW YORK AVE. NW SUITE 700
WASHINGTON, DC 20005

Claim No: 1226

Dear Applicant:

The Special Master has reviewed and approved your claim for compensation from the U.S. Victims of State Sponsored Terrorism Fund (the "USVSST Fund"). The allocated payment amount for this distribution is $839,100.85. Additional information about how the USVSST Fund calculated eligible claimants' award amounts can be found in the "USVSST Fund Payment Calculation Explanation" and the frequently asked questions ("FAQs"), available on the USVSST Fund's website at www.usvsst.com.

In order to receive your payment, you must complete the "Direct Deposit - ACH Payment Form" available on the USVSST Fund's website at the Payment Information tab, if you have not already done so. For more information, see the direct deposit FAQs, also available on the Payment Information tab.

Please note that in accordance with the requirements of the USVSST Fund and the Justice for U.S. Victims of State Sponsored Terrorism Act, you must inform the USVSST Fund of any compensation from any source other than this Fund not previously disclosed.

If you have questions, you may contact the USVSST Fund, referencing your Claim Number shown above, in one of the following ways:

- By telephone to the USVSST Fund's toll-free helpline at (855) 720-6966. If you are calling from outside of the United States, please call (614) 553-1013.
- By email to info@usvsst.com
- By facsimile to (614) 553-1426
- By U.S. mail to U.S. Victims of State Sponsored Terrorism Fund, c/o GCG, P.O. Box 10299, Dublin, OH 43017-5899
- By overnight courier to U.S. Victims of State Sponsored Terrorism Fund, c/o GCG, 5151 Blazer Parkway, Dublin, OH 43017-5899

Every effort will be made to respond to your inquiries as soon as possible.

Sincerely,

Kenneth R. Feinberg
Special Master
U.S. Victims of State Sponsored Terrorism Fund

DA178



1100 New York Avenue, NW
Suite 700
Washington, DC 20005
O 202.772.2200
F 202.772.3333

GilbertLegal.com

**Scott D. Gilbert**
202.772.2277
gilberts@gilbertlegal.com

July 16, 2019

## VIA ELECTRONIC MAIL

Brian A. Benczkowski
Assistant Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530-0001

> **Re:   Amir Hekmati, U.S. Victims of State Sponsored Terrorism Fund ("USVSST Fund") Claim
> No. 1226**

Dear Mr. Benczkowski:

We write on behalf of our client, Amir Hekmati, a man who survived years of torture in an Iranian
prison and who is now lost in a bureaucratic morass in his own government. In brief, after completing
two lengthy tours of duty in Iraq as a member of the U.S. Marine Corps, Mr. Hekmati went to Iran to
visit his grandmother, where he was arrested and falsely imprisoned. He lived through four and a half
years of captivity and torture in a brutal Iranian prison. He was finally released on January 17, 2016,
and when he returned to the United States, he filed suit against his former captors. After U.S. District
Court Judge Huvelle ordered Iran to pay Mr. Hekmati $63.5 million, Mr. Hekmati applied to the
USVSST Fund for compensation. On December 28, 2017, the USVSST Fund notified Mr. Hekmati that
his eligible claim was $31,748,179, subject to the $20 million statutory cap. Subsequently, on
December 13, 2018, the USVSST Fund awarded Mr. Hekmati an initial distribution of $839,100.85.
Our understanding was that payments of all such distributions would be made in early 2019.

It has been seven months since then, and Mr. Hekmati has not received his distribution—a distribution
that represents a fraction of his allowed claim—despite numerous other claimants having received
collectively hundreds of millions of dollars in payments. Every request to the USVSST Fund for
information about the timing for payment of his claim has been met with a polite refusal to provide any
update other than a general confirmation that payments are being issued. A June 20, 2019 letter to
Deborah Connor, Acting Special Master of the USVSST Fund, was similarly rebuffed.

Mr. Hekmati, a U.S. veteran who survived a horrific trauma, should not be struggling in red tape to
receive a payment that Congress—and the USVSST Fund—unambiguously determined he is owed.
Although Mr. Hekmati was released from the Iranian prison years ago, he continues to experience

Brian A. Benczkowski
July 16, 2019
Page 2



debilitating post-traumatic stress disorder to this day. This USVSST Fund award represents an opportunity for Mr. Hekmati to support himself in his recovery and begin rebuilding his life after an ordeal that left lasting damage—and its delay in payment has a direct, negative effect on his ability to do so.

We elevate this to your office in the hopes that Mr. Hekmati's situation will finally receive the attention it is due. Please advise as to when Mr. Hekmati may expect to receive the USVSST Fund distribution he was awarded in December 2018.

Sincerely,

Scott D. Gilbert
Monique T. Abrishami

Enclosures: USVSST Fund letter to A. Hekmati dated December 28, 2017
USVSST Fund letter to A. Hekmati dated December 13, 2018
S. Gilbert letter to D. Connor dated June 20, 2019

**U.S. Department of Justice**
**U.S. Victims of State Sponsored Terrorism Fund**

P.O. Box 10299
Dublin, OH 43017-5899



December 28, 2017

VIA FIRST CLASS MAIL
VTF0201118928

AMIR M HEKMATI
C/O EMILY PEARSON GRIM
GILBERT LLP
1100 NEW YORK AVE. NW SUITE 700
WASHINGTON, DC 20005

Claim No: 1226

Dear Applicant:

You submitted an Application Form to the U.S. Victims of State Sponsored Terrorism Fund ("USVSST Fund"). Based on all the information submitted for your claim, the USVSST Fund has determined your claim to be eligible in the following amount:

- Eligible Compensatory Damages: $31,748,179.00
- Less Offset for Sources Other Than This Fund: $0.00
- **TOTAL ELIGIBLE CLAIM AMOUNT: $31,748,179.00**[1]

The USVSST Fund determined your total eligible claim amount in accordance with the requirements of the Justice for U.S. Victims of State Sponsored Terrorism Act.

**Although the USVSST Fund has determined that your claim is eligible, please note that there is no guarantee that you will receive the total eligible claim amount. Rather, the amount of your first payment will be calculated <u>after</u> the USVSST Fund determines the amount of funds available from which to pay claims and <u>after</u> any statutory limitations are applied to the total eligible claim amount shown above. You will be notified about the exact amount of your first payment after the Special Master authorizes the next distribution in January 2019.**

Please note that in accordance with the requirements of the USVSST Fund and the Justice for U.S. Victims of State Sponsored Terrorism Act, you must inform the USVSST Fund of any new compensation from any source other than this Fund that you receive, or are scheduled or entitled to receive.

If you believe your total eligible claim amount was not properly decided or contains an error, you may submit a detailed explanation to the USVSST Fund in writing within 3 days of receipt of this letter, referencing your Claim Number, in one of the following ways:

- As an email attachment to info@usvsst.com
- By facsimile to (614) 553-1426
- By overnight courier to U.S. Victims of State Sponsored Terrorism Fund, c/o GCG, 5151 Blazer Parkway, Dublin, OH 43017-5899

---

[1] The total eligible claim amount represents the amount outstanding and unpaid on your eligible claim amount.

U.S. Victims of State Sponsored Terrorism Fund                                    2
Claim No: 1226

Please visit the USVSST Fund's website at www.usvsst.com for additional detailed information.  If you have any questions, please feel free to call the U.S. Victims of State Sponsored Terrorism Fund's toll-free helpline at (855) 720-6966.  If you are calling from outside of the United States, please call (614) 553-1013. Every effort will be made to respond to your inquiries as soon as possible.

Sincerely,

Kenneth R. Feinberg
Special Master
U.S. Victims of State Sponsored Terrorism Fund

 **U.S. Department of Justice**
**U.S. Victims of State Sponsored Terrorism Fund**

P.O. Box 10299
Dublin, OH 43017-5899



December 13, 2018

VIA ELECTRONIC MAIL
VTF0201580551



AMIR M HEKMATI
C/O EMILY PEARSON GRIM
GILBERT LLP
1100 NEW YORK AVE. NW SUITE 700
WASHINGTON, DC 20005

Claim No: 1226

Dear Applicant:

The Special Master has reviewed and approved your claim for compensation from the U.S. Victims of State Sponsored Terrorism Fund (the "USVSST Fund"). The allocated payment amount for this distribution is $839,100.85. Additional information about how the USVSST Fund calculated eligible claimants' award amounts can be found in the "USVSST Fund Payment Calculation Explanation" and the frequently asked questions ("FAQs"), available on the USVSST Fund's website at www.usvsst.com.

In order to receive your payment, you must complete the "Direct Deposit - ACH Payment Form" available on the USVSST Fund's website at the Payment Information tab, if you have not already done so. For more information, see the direct deposit FAQs, also available on the Payment Information tab.

Please note that in accordance with the requirements of the USVSST Fund and the Justice for U.S. Victims of State Sponsored Terrorism Act, you must inform the USVSST Fund of any compensation from any source other than this Fund not previously disclosed.

If you have questions, you may contact the USVSST Fund, referencing your Claim Number shown above, in one of the following ways:

- By telephone to the USVSST Fund's toll-free helpline at (855) 720-6966. If you are calling from outside of the United States, please call (614) 553-1013.
- By email to info@usvsst.com
- By facsimile to (614) 553-1426
- By U.S. mail to U.S. Victims of State Sponsored Terrorism Fund, c/o GCG, P.O. Box 10299, Dublin, OH 43017-5899
- By overnight courier to U.S. Victims of State Sponsored Terrorism Fund, c/o GCG, 5151 Blazer Parkway, Dublin, OH 43017-5899

Every effort will be made to respond to your inquiries as soon as possible.

Sincerely,

Kenneth R. Feinberg

Kenneth R. Feinberg
Special Master
U.S. Victims of State Sponsored Terrorism Fund

DA183



1100 New York Avenue, NW
Suite 700
Washington, DC 20005
O 202.772.2200
F 202.772.3333

GilbertLegal.com

Scott D. Gilbert
202.772.2277
gilberts@gilbertlegal.com

June 20, 2019

**VIA ELECTRONIC MAIL**

Deborah L. Connor
Acting Special Master
U.S. Victims of State Sponsored Terrorism Fund
1400 New York Avenue NW
Washington, DC 20005

**Re:    Amir Hekmati, Claim No. 1226**

Dear Ms. Connor:

We write on behalf of our client, Amir Hekmati, with respect to U.S. Victims of State Sponsored
Terrorism Fund ("USVSST Fund") Claim No. 1226. After U.S. District Court Judge Huvelle ordered
Iran to pay Mr. Hekmati $63.5 million, Mr. Hekmati applied to the USVSST Fund for compensation.
On December 28, 2017, the USVSST Fund notified Mr. Hekmati that his eligible claim was
$31,748,179, subject to the $20 million statutory cap. Subsequently, on December 13, 2018, the
USVSST Fund awarded Mr. Hekmati a distribution of $839,100.85. It has been over six months since
then, and he has not received his distribution—a distribution that represents a fraction of his allowed
claim—despite others having received millions of dollars in payments. Every request to the USVSST
Fund for information about the timing for payment of his claim has met with a polite refusal to provide
any update other than a general confirmation that payments are being issued. A request to your office
for additional information was similarly rebuffed.

Mr. Hekmati, a U.S. veteran who survived a horrific trauma, should not be struggling in this
bureaucratic morass to receive a payment that Congress determined he is owed. This USVSST Fund
award represents an opportunity for Mr. Hekmati to begin rebuilding his life after an ordeal that left
lasting damage—and its delay in payment has a direct, negative effect on his ability to do so. In brief,
after completing two lengthy tours of duty in Iraq as a member of the U.S. Marine Corps, Mr. Hekmati
went to Iran to visit his grandmother, where he was arrested and falsely imprisoned. He survived four
and a half years of captivity and torture in a brutal Iranian prison. He was finally released on
January 17, 2016, but he continues to experience debilitating post-traumatic stress disorder and other
lasting psychological damage to this day. He needs the payment from the USVSST to support himself
in his recovery.

Deborah L. Connor
June 20, 2019
Page 2



This letter represents our final attempt to resolve this issue before we escalate the matter.  Please advise as to when Mr. Hekmati may expect to receive the USVSST Fund distribution he was awarded in December 2018.

Sincerely,

Scott D. Gilbert

Enclosures:    USVSST Fund letter to A. Hekmati dated December 28, 2017
               USVSST Fund letter to A. Hekmati dated December 13, 2018

DA185



**U.S. Department of Justice**
**U.S. Victims of State Sponsored Terrorism Fund**

P.O. Box 10299
Dublin, OH 43017-5899

July 30, 2019

VIA ELECTRONIC MAIL

AMIR M HEKMATI
C/O MONIQUE ABRISHAMI
GILBERT LLP
1100 NEW YORK AVE. NW SUITE 700
WASHINGTON, DC 20005

Claim No:  1226

Dear Ms. Abrishami:

The U.S. Victims of State Sponsored Terrorism Fund ("USVSST Fund") and the Department of Justice ("Department") have received your letters to Interim Special Master Deborah L. Connor and Assistant Attorney General Brian A. Benczkowski, dated June 20, 2019 and July 16, 2019, respectively, regarding the payment status of the above-referenced claim.  The USVSST Fund and the Department also acknowledge your June 20, 2019 voicemail to Interim Special Master Connor as well as your emails to the claims administrator on July 11, 2019 and July 19, 2019, inquiring whether the USVSST Fund is still issuing payments.

The USVSST Fund has previously responded to your earlier inquiries, including your June 2019 communications with USVSST Fund attorney Jane Lee and emails with the claims administrator.

No further information regarding the claim is available to provide to you at this time.  The USVSST Fund will contact you if this changes.

Sincerely,

Deborah L. Connor
Interim Special Master
U.S. Victims of State Sponsored Terrorism Fund

DA186



1100 New York Avenue, NW
Suite 700
Washington, DC 20005
O 202.772.2200
F 202.772.3333

GilbertLegal.com

**Scott D. Gilbert**
202.772.2277
gilberts@gilbertlegal.com

October 11, 2019

**BY ELECTRONIC MAIL**

Deborah L. Connor
Acting Special Master
U.S. Victims of State Sponsored Terrorism Fund
1400 New York Avenue, NW
Washington, DC 20005

**Re:   Amir Hekmati, Claim No. 1226**

Dear Ms. Connor:

We write on behalf of our client, Amir Hekmati, with respect to U.S. Victims of State Sponsored
Terrorism Fund ("USVSST Fund") Claim No. 1226.  As you know, nearly ten months have passed since
the USVSST Fund awarded Mr. Hekmati a distribution of $839,100.85 as the 2019 partial payment of a
$63.5 million judgment against the Government of Iran for his wrongful detention and brutal torture.
Despite other claimants having received millions of dollars in payments, Mr. Hekmati has yet to receive
a penny of his distribution.

As noted in our June 20, 2019 and July 16, 2019 letters to you and Acting Attorney General Brian
Benczkowski, respectively, the USVSST Fund has refused to provide any information whatsoever
regarding its failure to make the required payment of Mr. Hekmati's claim, despite months of repeated
requests.  Your July 30, 2019 letter "acknowledged" these requests but again declined to address them.

We now are well into the fourth quarter of 2019, and Mr. Hekmati has not received either the payment
due from the USVSST Fund or even the courtesy of an adequate explanation.  This letter serves to notify
you that if Mr. Hekmati does not receive payment from the USVSST Fund in the next fifteen (15) days,
our firm will file suit against both you and the Department of Justice.

Sincerely,

Scott D. Gilbert

October 24, 2019

VIA ELECTRONIC and FIRST CLASS MAIL

AMIR M HEKMATI
C/O SCOTT D. GILBERT
GILBERT LLP
1100 NEW YORK AVE. NW SUITE 700
WASHINGTON, DC 20005

Claim No: 1226

Dear Mr. Gilbert:

        The U.S. Department of Justice ("Department") is in receipt of your letter dated October 11, 2019.  This letter serves to inform you and your client, Amir Hekmati, that the Department intends to seek reconsideration of the prior eligibility determination and approval of Mr. Hekmati's claim dated December 13, 2018, and therefore has suspended any further action on the payment to Mr. Hekmati from the United States Victims of State Sponsored Terrorism Fund.  The matter will be referred for reconsideration to Mr. Kenneth R. Feinberg, who made the original determination on your claim.  Mr. Feinberg will examine whether the conditions for compensation and payment under the applicable statute and procedures have been satisfied.  The Department is in the process of retaining Mr. Feinberg, on a limited basis, for this purpose.  Once he is again in place as Special Master, the Department expects to proceed with reconsideration as expeditiously as possible.  You will receive notice of any further decision once the review process has been completed and, if the claim is not approved, will have an opportunity to request a hearing.  *See* 34 U.S.C. § 20144(b)(4).  We appreciate your patience and hope to resolve this matter as soon as possible.

Sincerely,

Deborah L. Connor
Interim Special Master
U.S. Victims of State Sponsored Terrorism Fund

DA188



**U.S. Department of Justice**
**U.S. Victims of State Sponsored Terrorism Fund**

P.O. Box 10299
Dublin, OH 43017-5899

January 15, 2020

VIA U.S. MAIL & ELECTRONIC MAIL

Scott Gilbert, Esq.
Gilbert LLP
1100 New York Avenue NW Suite 700
Washington, DC 20005

Re:     Amir Hekmati, Claim No: 1226

Dear Mr. Gilbert:

The Department of Justice ("Department") requested that I reconsider the claim referenced above to examine whether the requirements for compensation and payment under the U.S. Victims of State Sponsored Terrorism Fund's ("USVSST Fund") governing statute and procedures have been satisfied. The Department provided me with information (attached) that was not before me at the time of my earlier eligibility and payment determinations. I have reviewed the materials submitted by the Department and have completed this reconsideration.

Based on all of the information Mr. Hekmati submitted in his application to the USVSST Fund, and the attached materials the Department provided to me for reconsideration, I have determined that Mr. Hekmati is not eligible for compensation from the USVSST Fund.

As you know, "any payment made by the [USVSST] Fund is expressly conditioned upon the truthfulness and accuracy of the information and documentation submitted in support of the claim." *Justice for United States Victims of State Sponsored Terrorism,* 81 Fed. Reg. 45,535, 45,539 (July 14, 2016). The USVSST Fund's procedures and the Application Form require every claimant to certify, under oath and subject to penalty of perjury, the truth and accuracy of the application.

Mr. Hekmati certified that his application, including the accompanying documents such as the judgment he obtained in *Hekmati v. Islamic Republic of Iran,* Case No. 1:16-cv-00875-ESH (D.D.C.), were true and accurate to the best of his knowledge. I am persuaded that the attached materials demonstrate that Mr. Hekmati's application and accompanying documents contained material omissions and false statements; in particular, the attached materials support the conclusion that the primary purpose of Mr. Hekmati's trip to Iran was to sell classified U.S. national security information to the government in Iran. This conflicts with Mr. Hekmati's declaration filed in connection with the judgment he obtained in the U.S. District Court for the District of Columbia that the primary purpose of his trip to Iran was to visit family for personal reasons. Therefore, I have determined that Mr. Hekmati has violated the USVSST Fund's processes and procedures, which are required to establish eligibility for payment, and as a result, is not eligible for payment from the USVSST Fund.

U.S. Victims of State Sponsored Terrorism Fund
Amir Hekmati, Claim No: 1226

Under 34 U.S.C. § 20144(b)(4), Mr. Hekmati may request a hearing within 30 days after receipt of this decision.  To request a hearing, please notify the USVSST Fund and me in writing of your hearing request by emailing the USVSST Fund at usvsst.doj@usdoj.gov and me at KFeinberg@feinberglawoffices.com.

Sincerely,

Kenneth R. Feinberg
Special Master
U.S. Victims of State Sponsored Terrorism Fund

Attachments:

Record for Special Master
Fed. Bureau of Investigation Forms FD-302 (Feb. 2, 2016 and May 9, 2016)

DA190

FD-302 (Rev. 5-8-10)



UNCLASSIFIED//FOUO

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry          02/02/2016

(U//FOUO) On Tuesday, 01/19/2016, AMIR NEMA HEKMATI, date of birth (DOB) ████████ was interviewed by Special Agent (SA) Brett Kramarsic and SA Richard A. Anderson at the Landstuhl Regional Medical Center (LRMC) in Landstuhl, Germany. Major Neysa M. Etienne, SERE [Survival, Evasion, Resistance and Escape] Psychologist, telephone number +████████ official e-mail address ████████, personal e-mail address ████████, and Master Sergeant (MSgt) Toby A. Stolz, US Air Force SERE Specialist, telephone number +████████, official e-mail address ████████, personal e-mail address ████████ also participated in the interview. This interview, which took place at approximately 2:30 PM local time, was the second FBI interview of HEKMATI conducted on 01/19/2016 at the LRMC. The FBI SAs identified themselves to HEKMATI during the previous 01/19/2016 interview, which will be documented separately. After SA Anderson thanked HEKMATI for agreeing to speak with the FBI again, HEKMATI provided the following information, some of which was requested by SERE personnel to clarify or expand upon matters discussed during the previous interview:

(U//FOUO) HEKMATI indicated that he was initially arrested in Iran by two (2) older males in their 40s or 50s who identified themselves as being from the Office of Passport Control or the Passport Authority. The arrest took place at approximately 2:00 PM local time. The men effecting the arrest searched HEKMATI's luggage and instructed HEKMATI to come with them for questioning about matters related to his passport. HEKMATI was transported in a vehicle to an office, where he was instructed to list out his family members and write a resume for himself. HEKMATI's electronics, including a laptop computer and a cellphone, as well as his books, were seized by the Iranian officials. HEKMATI's clothes were not seized at that time. HEKMATI stated that his cellphone, but not his laptop, was ultimately returned to him upon his 2016 release from Iranian prison.

(U//FOUO) HEKMATI indicated that the arresting officials conducted a casual search but did not pat down HEKMATI. Once HEKMATI was transported to Evin Prison, he was subjected to a full search, including a pat down when he changed clothes and was stripped down to his underwear.

(U//FOUO) Regarding the Iranian's use of physical restraints, HEKMATI

UNCLASSIFIED//FOUO

Investigation on   01/19/2016   at   Landstuhl, Germany (In Person)

File #   ████  WF-244323                                        Date drafted   01/20/2016

by   ANDERSON RICHARD A, Brett M. Kramarsic

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

DA191

 WF-244323

01/19/2016 Interview of AMIR HEKMATI
(Interview #2)

Continuation of FD-302 of _____ , On  01/19/2016 , Page  2 of 5

stated that during his initial arrest, there were two men on either side of
him in the vehicle used to transport him, plus a driver. He noted that they
did not restrain HEKMATI with handcuffs during the initial transport.
HEKMATI also noted that later during his imprisonment, Iranian officials
used set of cuffs that only attached to two fingers, one on each hand.

(U//FOUO) Regarding whether or not he had ever contemplated escape, HEKMATI
indicated that he thought about it all the time, but that it was more of a
dream than a realistic proposition, as he believed that no one had ever
escaped from Evin Prison. HEKMATI stated that Evin Prison was bounded by
mountains on one side, with a highway on the other side. Evin Prison was
surrounded by a twenty (20) meter tall wall that had a ten (10) meter
trench surrounding it, requiring one to climb 20 meters over the wall and
then descend 30 meters. At some point during his captivity, HEKMATI
reported that he was taken to a hospital [in context, understood to mean a
hospital in Tehran]. He indicated that Tehran was so saturated with cameras
and security that even if he managed to briefly escape, there would be
nowhere to go. During his trip to the hospital, HEKMATI purchased snacks
for Iranian soldiers he interacted with, who reportedly are not paid and
have little food. He indicated that the soldiers were extremely grateful
for this.

(U//FOUO) HEKMATI indicated that there was a ward of Evin Prison dedicated
to Al Qaeda prisoners. He stated that three (3) prisoners from this ward
were brought to Ward 350. These individuals were all Kurds.

(U//FOUO) According to HEKMATI, Evin Prison was mostly run by the prisoners
themselves. He stated that there were only about twenty (20) actual staff
members at Evin Prison, with fellow prisoners doing most of the work. He
stated that there were about 8000 prisoners in Evin Prison.

(U//FOUO) HEKMATI stated that prisoners had access to prison phones, which
were believed to be monitored. Some prisoners had cell phones smuggled in
to the prison, sometimes by individuals coming to the prison for conjugal
visits. HEKMATI indicated that many or all prisoners could have conjugal
visits, and that additional conjugal visits could be earned by working jobs
within the prison.

(U//FOUO) Regarding interrogations, HEKMATI estimated that he was
interrogated approximately twenty (20) times during his imprisonment. He
did not know if the interrogations were recorded, as he was blind folded
and/or facing a wall when the interrogations were conducted. The
interrogations took place in a sound proof room that HEKMATI compared to a
recording room about the size of the room in which the instant interview

FD-302a (Rev. 05-08-10)

**UNCLASSIFIED//FOUO**

WF-244323

01/19/2016 Interview of AMIR HEKMATI
Continuation of FD-302 of (Interview #2) , On 01/19/2016 , Page 3 of 5

was being conducted. [AGENT NOTE: The instant interview was conducted in a
room roughly estimated to be 14' x 10'.] As part of the interrogation
process, HEKMATI was forced to write out his biography two separate times.

(U//FOUO) At approximately 2:50 PM during the instant interview, HEKMATI
was offered and accepted a bottle of water.

(U//FOUO) HEKMATI described one of his cells at Evin Prison as having very
thick walls, a low roof, no window, and a little opening covered by a
perforated metal cover to allow for ventilation. The door to the cell was
very heavy with a tiny latch. The door only had a mechanical handle on the
outside, which was operated by turning counter clockwise. The door
reportedly opened outwards from the cell.

(U//FOUO) HEKMATI relayed information he had acquired alleging that a
sandwich seller who worked outside of the Israeli Embassy in Turkey was
actually a spotter for the IRGC [Islamic Revolutionary Guard Corps]. He
also indicated that of about 100 prisoners in Ward 350 who were imprisoned
for working for a foreign government [in context, understood to mean as a
spy], 30 were accused of working for the United States, and 70 were accused
of working for Israel. Some of these prisoners told HEKMATI that they had
contacted the CIA through the CIA website. The CIA would then arrange for
them to travel to a third country in the Middle East or elsewhere,
presumably for a meeting. HEKMATI indicated that the prisoners told him
that when they were arrested by Iranian officials, they were confronted
with the names of their CIA handling officers and with e-mails between
themselves and the handling officers. Some of these prisoners indicated
that three years had passed between when they had last contacted the CIA
and when they were arrested.

(U//FOUO) Regarding the time period when HEKMATI worked as an intelligence
analyst for the US Government in Afghanistan, HEKMATI was asked if he ever
accessed classified reporting regarding Iran. HEKMATI refused to answer
this question; instead, HEKMATI indicated that the FBI could find out that
information for itself by pulling the log information. When asked if he had
ever read paper copies of classified reporting on Iran, HEKMATI avoided the
question, instead saying that he had a "TS" [Top Secret] clearance
including SI, TK, and Gamma accesses. He stated that he had been tasked as
an intelligence analyst to study "messaging." HEKMATI indicated that his
superiors did not know what he was actually supposed to do and that it felt
like they were wasting his time, which was part of why he quit the job
after just a few months. He indicated that he had worked on one or more
projects related to cell towers in Afghanistan and Taliban targeting. He

**UNCLASSIFIED//FOUO**

FD-302a (Rev. 05-08-10)

UNCLASSIFIED//FOUO



WF-244323

Continuation of FD-302 of  01/19/2016 Interview of AMIR HEKMATI
(Interview #2) _____ , On  01/19/2016 , Page  4 of 5

stated that there was no oversight over what he was supposed to do and that
he did not understand what the mission was.

(U//FOUO) HEKMATI rejected the proposition that he might have been targeted
because he had access to classified information on Iran. He stated that he
had been targeted because he was a Marine. He believed that his arrest was
connected to or in response to the US arrest of an Iranian who had
attempted to assassinate a Saudi Arabian ambassador.

(U//FOUO) Regarding whether or not HEKMATI's Iranian interrogators had
attempted to extract classified information from him, HEKMATI indicated
that although the interrogators knew what his job was in Afghanistan, they
did not spend much time exploring that topic. He indicated that he would
have thought they would have asked for more information. He stated that the
interrogators spent as much time talking about his time in high school as
they did on his time as an intelligence analyst in Afghanistan.

(U//FOUO) Regarding how widely it was known that HEKMATI had a Top Secret
security clearance, HEKMATI stated that his family in Iran did not know
that he had held a TS clearance. He stated that only his co-workers knew
about the TS clearance, as he only had it for about two months. However,
HEKMATI indicated that internet searches on his name would reveal that he
had worked for DARPA. He also referenced his Linked In account. HEKMATI
noted that he had previously only held a Secret security clearance.

(U//FOUO) HEKMATI stated that he was not aware of anything that would make
him suspicious that he had been under surveillance while in Afghanistan,
nor did he recall any suspicious individuals contacting him. He indicated
that he had worked long hours for the brief two months he was there, and
spent all his time on the compound [other than work time] either at the
mess hall, the gym, or his lodging.

(U//FOUO) HEKMATI similarly denied any suspicious events such as
surveillance or unusual contact by individuals after he left Afghanistan
and traveled to Dubai. He stated that he was in Dubai only for about 48
hours and that he spoke to no one while he was there. He did make two calls
back to the US, one of which was a call to the company he had just resigned
from to discuss issues related to his resignation.

(U//FOUO) Once HEKMATI arrived in Iran, his only contact with Iranian
government officials prior to his arrest was an interview that was
conducted immediately upon his arrival in Tehran. He denied any other
contact with Iranian government officials after this interview until he was
arrested several weeks later.

DA194

FD-302a (Rev. 05-08-10)

**UNCLASSIFIED//FOUO**

 WF-244323

01/19/2016 Interview of AMIR HEKMATI

Continuation of FD-302 of (Interview #2) _____ , On 01/19/2016 , Page 5 of 5

(U//FOUO) HEKMATI was shown a series of photographs and asked if he
recognized any of the individuals from his time in Iran or in Evin Prison.
HEKMATI correctly identified several photographs of ROBERT LEVINSON, but
explained that this was only because LEVINSON's likeness was publicly
known. He indicated that he had not seen LEVINSON at any time while in
Iran. For all other photographs shown during the interview, HEKMATI
indicated that he did not recognize the individuals and had not seen them
while in Iran. For one photograph, HEKMATI did indicate that the man in the
photograph looked similar to many Iranian men, but ultimately answered that
he could not identify or recognize the individual.

(U//FOUO) With regards to ROBERT LEVINSON, HEKMATI discussed another
individual who had been a part of the prisoner release that freed HEKMATI.
This individual, named Fred [in context, understood to be a reference to
NOSRATOLLAH KHOSRAVI], claimed that the reason he had been arrested by the
Iranians was that he had sent a text message to LEVINSON. Fred/KHOSRAVI
reportedly elected not to leave Iran with HEKMATI and the other freed
individuals because there were pending charges against him in the US and
because he claimed to have a girlfriend in northern Iran.

(U//FOUO) The instant interview of HEKMATI ended at approximately 3:30 PM,
local time. HEKMATI was offered and accepted a cup of coffee during the
last approximately 30 minutes of the interview.

FD-302 (Rev. 5-8-10)



███████████████████████

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry   05/09/2016

**DOCUMENT RESTRICTED TO CASE PARTICIPANTS**

This document contains information that is restricted to case participants.

████████   AMIR NEMA HEKMATI, date of birth ██████████ social security account number ████████████, home address ████████████████, ████████, was interviewed at the Detroit Field Office – Flint Resident Agency (RA), on 4/7/2016 by Special Agents (SA) William R. Theroux and Melinda B. Capitano. Interviewing agents approached HEKMATI's residence at approximately 0945 hours, at which time they identified themselves and advised HEKMATI of the purpose of the interview. HEKMATI voluntarily agreed to go to the Flint RA to speak with the agents. Due to the fact HEKMATI had no vehicle available to him, HEKMATI requested the agents drive him to his mother's work location at H&R Block to get his vehicle. SA Ian G. Riddle drove the interviewing agents and HEKMATI to H&R Block. While at H&R Block, HEKMATI asked interviewing agents if they would speak to his attorney. SA Capitano stated she would speak to his attorney at a later time from a landline. HEKMATI provided his attorney's name as Scott Gilbert, telephone number ████████. HEKMATI subsequently followed the interviewing agents in his own vehicle to the Flint RA, where HEKMATI was again informed the interview was voluntary and he could leave at any time. Interviewing agents offered HEKMATI a bottle of water, which he accepted and drank throughout the interview. Also, at this point, HEKMATI knew interviewing agents had not yet spoken with his attorney and continued to speak with interviewing agents. HEKMATI provided the following information:

████████   SA Theroux provided HEKMATI a detailed summary of the FBI's investigation into him and his activities beginning in January 2011 in Iraq, continuing through his deployment to Afghanistan and on through his arrest and detainment in Iran. HEKMATI sat still through the presentation, appeared to have listened attentively and at no time interrupted SA Theroux. During this presentation, SA Theroux confronted HEKMATI by telling him the FBI knew HEKMATI went to Afghanistan to gain access to classified



| Investigation on | 04/07/2016 | at | Flint, Michigan, United States (In Person) |
|---|---|---|---|

File # ████ WF-244323-302

Date drafted   04/11/2016

by   CAPITANO MELINDA B, Theroux William R

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

DA196

FD-302a (Rev. 05-08-10)

WF-244323-302

7 April 2016 interview of Amir

Continuation of FD-302 of ~~information in order to travel to Iran and sell this~~ On 04/07/2016 , Page 2 of 7

information in order to travel to Iran and sell this information to the
Iranian government. In response, HEKMATI inquired whether SA Theroux was
asking a question.

**Reason for leaving Afghanistan / returning home early**

HEKMATI stated he resigned from his position as an Intelligence
Analyst (IA) with Six3 Systems at Bagram Air Force Base (BAFB) in
Afghanistan in 2011 to return to Michigan to pursue his Master's degree.
HEKMATI was shown by interviewing agents an email he sent to the University
of Michigan (UM) – Flint Admission on 6/2/2011, before he deployed to
Afghanistan, indicating he needed to defer his admission to January of 2012
because he was leaving for a military deployment overseas. When
interviewing agents asked HEKMATI why everyone to include his colleagues
and employer all thought HEKMATI was traveling directly from Afghanistan to
the U.S. to pursue his graduate degree, HEKMATI indicated he was returning
to the U.S. to attend UM – Dearborn, not UM - Flint.

In August 2011, after HEKMATI resigned from Six3 Systems at BAFB,
HEKMATI traveled to Iran to visit his grandmother, who he had never
visited. HEKMATI only told his mother of his plan to travel to Iran.
HEKMATI did not tell any of his associates or colleagues in Afghanistan
about his intentions to travel to Iran. HEKMATI did not understand why he
would tell anyone he was going to Iran. Interviewing agents brought up
ROLAND TISO and GABRIEL SERRANO and HEKMATI responded they are merely
associates he met in Afghanistan and nothing more.

**Dubai**

HEKMATI advised he took a commercial flight from BAFB to Dubai,
United Arab Emirates. After he landed in Dubai, HEKMATI purchased an
airline ticket to Tehran, Iran. Interviewing agents reminded HEKMATI he
previously informed FBI agents in Germany, he only spent one night in Dubai
and flew out the next day and that he did not have time to do anything else
before departing. HEKMATI stated it was true he did not have time to do
anything else. When challenged by the interviewing agents that records
indicated HEKMATI arrived in Dubai in the evening around 5:00 pm local
time, spent the next day there and then flew to Iran the following day,
HEKMATI did not deny the timeline and commented he never met with anyone.

**Iran**

HEKMATI advised he was incarcerated in Iran because he was a U.S.
Marine. Interviewing agents proposed to HEKMATI he only had contact with
Iranian officials because he approached them and made them aware he had
access to classified information. HEKMATI reiterated his interaction with

DA197

FD-302a (Rev. 05-08-10)

WF-244323-302

7 April 2016 interview of Amir

Continuation of FD-302 of ~~the Iranian government was solely because he was a U.S. Marine.~~   On   04/07/2016, Page   3 of 7

the Iranian government was solely because he was a U.S. Marine. HEKMATI opined Iranian officials learned he was a U.S. Marine when they "Googled" him and looked at his Facebook page which showed HEKMATI's affiliation as a U.S. Marine. HEKMATI did not provide any classified information to Iranian officials.

**Iranian Passport**

Interviewing agents showed HEKMATI a copy of his expired Iranian passport. HEKMATI was not aware he had an Iranian passport until his mother provided it to HEKMATI for the purpose of providing it to Legal Persian. HEKMATI stated he was about 14 years old in the photo. HEKMATI's mother still maintains HEKMATI's Iranian passport. HEKMATI has never indicated on any U.S. government forms or applications that he had the Iranian passport because he was not aware of it when he completed those forms.

**Common Access Card (CAC)**

Interviewing agents showed HEKMATI a photo copy of his Department of Defense (DoD) civilian employee Common Access Card (CAC) [Agent's note: The picture of the CAC shown to HEKMATI was pulled from an online Internet video which appeared to have been produced in concert with the Iranian government. In the video, HEKMATI confessed to being a CIA spy. It appeared from the video the Iranian government was in possession of HEKMATI's actual CAC, or a picture of it.] HEKMATI admitted he took a picture of his CAC with his cell phone. HEKMATI pointed to the thumb and fingers in the photo and stated he was holding the CAC when the photo was taken. HEKMATI explained he took a photo of his CAC, so he would have a photo of it in the event he lost the actual card. HEKMATI stated he turned in his CAC to BAFB before departing for Dubai. When interviewing agents reminded HEKMATI that Six3 Systems instructed him to turn his CAC to a U.S. base upon his return to the U.S. and then mail Six3 Systems a receipt of the return, HEKMATI remained silent. Interviewing agents also reminded HEKMATI he had told FBI agents in Germany he destroyed his CAC before traveling to Iran. In response, HEKMATI indicated he could not remember, and that "maybe" this occurred. HEKMATI denied using his CAC as "bona fides" in any approach to the Iranians.

Interviewing agents showed HEKMATI a copy of his Armed Forces U.S. military identification card. HEKMATI stated this card was currently at his home in Flint and he did not take it with him when he went to Afghanistan and Iran. HEKMATI pointed to the expiration date on the card, which was shown as 2009, and stated it was expired. [Agent's note:  The picture of the Armed Forces U.S. military identification card shown to HEKMATI was pulled from an online Internet video which appeared to have

FD-302a (Rev. 05-08-10)



WF-244323-302

7 April 2016 interview of Amir

Continuation of FD-302 of                                                On 04/07/2016   Page  4 of 7

been produced in concert with the Iranian government. In the video, HEKMATI
confessed to being a CIA spy.]

WF-244323-302

Continuation of FD-302 of          7 April 2016 interview of Amir          , On 04/07/2016    , Page 5 of 7



**BAFB – Analyst experience**

HEKMATI's Secret level clearance was upgraded to TS/SCI when he was still in Iraq working for Human Terrain Systems (HTS). HEKMATI used the TS/SCI clearance to obtain the IA position at BAFB for Six3 Systems. Interviewing agents confronted HEKMATI with reporting that when he arrived in Kabul, Six3 Systems management attempted to move him to another position other than the IA position, which he refused to accept because he came to Afghanistan to work with TS information. HEKMATI denied he took the IA position to gain access to classified information.

HEKMATI accepted the IA position because he wanted to develop IA experience to be more competitive in obtaining a full-time U.S. government job. When interviewing agents discussed with HEKMATI what a reasonable period of time would be for him to gain that experience, HEKMATI acknowledged at least one year. HEKMATI further stated he was willing to

FD-302a (Rev. 05-08-10)

WF-244323-302

Continuation of FD-302 of     7 April 2016 interview of Amir     On 04/07/2016, Page 6 of 7

stay in Afghanistan one, two, or even three years if he was receiving good
job experience as an analyst. Since the IA position was not what HEKMATI
thought it would be and he was not getting good experience, HEKMATI left
the position after a short period of time.

Interviewing agents showed HEKMATI emails between him using email
address                           , and Hessam Mirzaei using email address
                        . Specifically, HEKMATI was shown an email dated
6/6/2011, in which HEKMATI wrote, "So I plan on going in October and just
want to be sure that my Visa is good for 1 year and that I can stay for up
to 3 months without having any problems." Interviewing agents informed
HEKMATI this email indicated he had no intention to stay in Afghanistan
beyond four months, not to mention one, two, or three years as he
previously stated to interviewing agents. HEKMATI stated since the email
indicated he planned to go in October and he actually went in August, the
email meant nothing. Interviewing agents pointed out to HEKMATI his email
showed clear intent by him to spend a very limited period of time in
Afghanistan before he even arrived there and realized the IA position was
not what he thought it would be. HEKMATI denied this was his intent.

HEKMATI acknowledged he could potentially lose his clearance if
he traveled to Iran. HEKMATI could not reconcile the discrepancy between
his previous statement of wanting to acquire experience as an analyst to
obtain a full-time U.S. government job and a pre-planned willingness to
jeopardize his security clearance by traveling to Iran.

**Bonuses / Financial situation**

Interviewing agents showed HEKMATI an email he sent Gretchen
Klugh at Six3 Systems on 6/28/2011. In this email, HEKMATI indicated he
did not want to receive his six or twelve month bonuses up front because he
did not want to pay them back or have a tax liability if he did not stay in
Afghanistan for those periods of time. Interviewing agents pointed out to
HEKMATI the email was sent before he entered Afghanistan, before he would
have realized the analyst position did not meet his expectations; further,
it showed HEKMATI did not intend to stay in Afghanistan even six months.
HEKMATI denied this being the case.

HEKMATI indicated he did not need to "sell" information to the
Iranians because he did not need money. When the interviewing agents
suggested HEKMATI wanted money and referenced $500,000, HEKMATI stated he
had $500,000. HEKMATI did not need money and the FBI should know that. When
interviewing agents indicated the FBI did know and HEKMATI did not have
$500,000 in the bank, HEKMATI stated he had it but it was not "liquid."
When interviewing agents opined that HEKMATI took advantage of the

FD-302a (Rev. 05-08-10)

WF-244323-302

Continuation of FD-302 of ~~7 April 2016 interview of Amir~~ On 04/07/2016 , Page 7 of 7

~~opportunity to make a quick buck regardless of his net worth at the time,~~
HEKMATI queried as to why he would do that when he had all of these bonuses
coming in. When interviewing agents responded that HEKMATI did not have any
bonuses coming in because of the aforementioned email where HEKMATI
specifically asked not to receive them up front with the knowledge he was
not going to stay in Afghanistan for six months, HEKMATI provided no
response.

**Polygraph**

HEKMATI has taken a polygraph before and passed it. When
interviewing agents explained to HEKMATI he took the aforementioned
polygraph prior to his activities in Afghanistan and Iran, and inquired as
to whether or not he would take a polygraph now, HEKMATI agreed to take an
FBI polygraph. At the end of the interview, HEKMATI stated he would only
take an FBI polygraph if he was charged, went to court and then was made to
take a polygraph. HEKMATI asked if he was being charged with a crime.
Interviewing agents informed HEKMATI he was not charged, but they would
present the findings of the investigation to the United States Attorney's
Office.

HEKMATI did not know if his attorney possessed a U.S. government
security clearance. HEKMATI was informed by interviewing Agents that if his
attorney did not have a clearance, the interviewing agents would not be
able to provide him/her any of the information they provided to HEKMATI.

The interview of HEKMATI ended at approximately 1330 hours.

<u>RECORD FOR SPECIAL MASTER</u>

1.  The FBI opened an espionage investigation on AMIR NEMA HEKMATI on September 21, 2011. The FBI investigation has concluded that HEKMATI attempted to pass U.S. classified information to the Government of Iran, and this conclusion is corroborated by multiple reliable sources.  HEKMATI was an Intelligence Analyst contractor for the Department of Defense (DOD) in Afghanistan from June 2011 to August 2011.  In this position, HEKMATI held a security clearance that granted him access to intelligence reports classified at the highest level - Top Secret/Sensitive Compartmented Information (TS/SCI).

2.  When HEKMATI arrived in Afghanistan, he was told he was reassigned as a Human Terrain Systems (religious advisor) member instead of an Intelligence Analyst.  HEKMATI became upset and indicated that, if he was not given the Intelligence Analyst position, he would immediately resign and go home.  HEKMATI argued he was hired as an Intelligence Analyst, which would require routine access to TS/SCI information, while as a religious advisor he would not.

3.  While deployed to Bagram Air Force Base in Afghanistan, HEKMATI was assigned to work on projects related to the Afghan Taliban and the Haqqani network.  However, forensic analysis of his classified information computer system audit revealed that he accessed hundreds of highly classified documents pertaining to Iran, which were all well outside the scope of his assigned duties.  FBI analysis determined that, during the period from early July 2011 to early August 2011, over 90% of the classified products he accessed were related to Iranian topics/issues.  The topics related to Iran included discussion of Iranian military issues, the Iranian nuclear program, Hezbollah, and Iranian support to terrorism.  The products were classified up to and including the TS/SCI level.

4.  In late July 2011, HEKMATI unexpectedly provided two weeks' notice that he intended to terminate his employment.  Although his original employment agreement was for six to twelve months, HEKMATI resigned from his Defense Intelligence Agency contract position within two months of his arrival in Afghanistan.  During his final two weeks, HEKMATI began working the night shift at his request / decision.  In those two weeks, FBI analysis indicates that, once again, approximately 90% of the products HEKMATI viewed appeared to be outside the scope of his assigned duties and an unusually high percentage were highly classified products.

5.  In August 2011, HEKMATI took a military charter flight from Bagram Air Force Base in Afghanistan to a third country.  After he landed in the third country, he purchased an airline ticket to Tehran, Iran.  HEKMATI did not tell any of his colleagues or associates in Afghanistan about his intentions to travel to Iran.  HEKMATI later stated to the FBI that he had only told his mother about his plan to travel to Iran to visit his grandmother.  Records indicate that HEKMATI arrived in the third country in the evening around 5 p.m. local time, spent the next day there, and flew to Iran the following day.

6. Throughout the investigation the FBI has received information from four reliable sources. Those sources confirm that HEKMATI voluntarily traveled to Iran and approached Iranian government officials offering U.S. classified information in exchange for payment.

7. In December 2011, the Iranian government publically released information indicating HEKMATI was arrested as a CIA spy for engaging in espionage against Iran. HEKMATI was sentenced to death, but open sources reported that HEKMATI had been retried in December 2013 and sentenced to ten years in prison. The FBI has confirmed that HEKMATI was never employed or tasked by the CIA.

8. On January 19, 2016, HEKMATI was released from Iranian custody. Following his release, the FBI interviewed HEKMATI at Landstuhl Regional Medical Center near Frankfurt, Germany. HEKMATI stated that he had always wanted to travel to Iran to visit his grandmother and other relatives. Regarding the time period when HEKMATI worked as an Intelligence Analyst for the U.S. government in Afghanistan, HEKMATI was asked if he ever accessed classified reporting regarding Iran. HEKMATI refused to answer this question; instead, HEKMATI indicated that the FBI could find out that information for itself by pulling the log information. When asked if he had ever read paper copies of classified reporting regarding Iran, HEKMATI avoided the question, instead saying that he had a "TS" clearance including SI, TK, and Gamma accesses [references to SCI programs].

9. Several months later, on April 7, 2016, the FBI interviewed HEKMATI in Flint, Michigan. In this interview, the FBI directly confronted HEKMATI, alleging that he went to Afghanistan to gain access to classified information in order to travel to Iran and sell it to the Government of Iran. In response, HEKMATI only inquired whether the FBI agent was asking a question. Interviewing agents showed HEKMATI a "search log" that detailed HEKMATI'S search activity on U.S. classified computer systems. The agents also explained to HEKMATI that approximately 90% of the searches he conducted were about Iran or issues of interest to Iran, unrelated to his assigned work. HEKMATI looked at the search log and denied this was a log of his search activity. When it was explained again this was a detailed search log of his searches, HEKMATI stated he did not have time to access classified reporting about Iran because he had too much work and was already working 12 to 13 hour days.

10. HEKMATI indicated his contractor and the military provided him access to U.S. classified systems and the interviewing agents should ask them why HEKMATI searched those topics on Iran. Interviewing agents explained that line of logic did not make sense and there was an expectation by the granting agency of his security clearance, in this case the U.S. military, he should only access information needed for his assignment. HEKMATI reiterated to ask his contractor or the military. HEKMATI further stated that his contractor and the military gave him access to U.S. classified computer network systems at large and did not restrict his access so he should be allowed to view whatever he viewed.

11. HEKMATI remembered being briefed into the TS/SCI clearance level.  When interviewing agents asked HEKMATI if he understood he did not have a "need to know" pertaining to classified reporting on Iran, HEKMATI deflected and reiterated his contractor and the military gave him "no direction."  HEKMATI indicated that his superiors did not know what he was actually supposed to do and because of this HEKMATI had to find things to do to fill his day.  As a result, HEKMATI felt that his Intelligence Analyst position was a waste of time.  When interviewing agents pointed out the contradiction between HEKMATI having to find things to do to fill his day with HEKMATI'S earlier claim he was too busy working 12 to 13 hours a day to search for information on Iran, HEMATI did not provide a response.

12. After alternating between not responding and deflecting when interviewing agents asked HEKMATI why he accessed classified reporting on Iran, HEKMATI finally responded he accessed classified information regarding Iran to become a subject matter expert on Iran.  HEKMATI stated he is of Iranian descent, was curious, and compared his searches on U.S. classified information systems to a "Google" search.

13. When the interviewing agents explained to HEKMATI that he accessed a certain classified document regarding the Iranian government's presence in a certain country twice in August 2011, just before he left for the same third party country to continue onward to Iran, HEKMATI did not acknowledge accessing the document or doing anything in the third party country other than transiting to Iran.  HEKMATI said he never purposely met with the Iranian government prior to his imprisonment in Iran.

14. HEKMATI said he accepted the Intelligence Analyst position because he wanted to develop intelligence analysis experience to be more competitive in obtaining a full-time U.S. government job.  HEKMATI acknowledged to the interviewing agents that he could potentially lose his clearance if he travelled to Iran.  HEKMATI could not reconcile the discrepancy between his previous statement of wanting to acquire experience as an analyst to obtain a full-time U.S. government job and his pre-planned willingness to jeopardize his security clearance by travelling to Iran.

15. On May 9, 2016, HEKMATI filed a civil action against Iran in the United States District Court for the District of Columbia (USDC).  HEKMATI claimed that his treatment while in custody in Iran constituted torture and hostage taking in violation of the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. §§ 1602-1611, and he sought compensatory and punitive damages.

16. In support of his civil claim, HEKMATI signed a "Declaration of Amir Hekmati" on September 27, 2016.  At the conclusion of the 23-page document, HEMATI attested "Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct."  The declaration was filed with the USDC on February 10, 2017.

17. In his declaration to the USDC, HEKMATI asserted that "Before returning home from Afghanistan to Michigan to start school, I decided to take the opportunity to travel for a few

weeks . . . my mother had been encouraging me in particular over the last few months to visit my grandmother in Iran . . . ." (¶¶ 24, 25)  In fact, this was a false and misleading statement. The primary purpose of his trip to Iran was not to visit his grandmother - it was to approach Iranian Intelligence officials with an offer to sell U.S. classified information to the Iranian government.

18. In his declaration to the USDC, HEKMATI claimed that "Those first few days in Evin [prison] are a blur. I was shocked, confused, scared, indignant." (¶ 35)  HEKMATI asserted that, after his arrest by the Iranian government, "I had no contact with the outside world.  I was not permitted to speak to my family" (¶ 45) and that, after a period of months, "I hadn't spoken to my family since my arrest." (¶ 57).  In fact, this was another series of false statements.  HEKMATI's mother in interviews with the FBI indicated that HEKMATI made several calls to his uncle from his cellular phone over a period of seven to ten days indicating "he was bored ... had nothing to do, but read."

19. In assessing all the facts and circumstances presented above, the FBI has concluded that the purpose of HEKMATI's trip to Iran was to sell classified U.S. intelligence information to Iran and that, in fact, HEKMATI attempted to sell classified information to the Government of Iran when he travelled to Tehran in August 2011.  The forensic examination of his computer system log clearly demonstrates that HEKMATI accessed hundreds of highly classified documents pertaining to Iran that were wholly unrelated to his area of responsibility.  HEKMATI'S assignment in Afghanistan was to analyze the Taliban and Haqqani network - and he had no "need to know" regarding sensitive classified reporting on Iranian matters.  The suspicious nature of this unauthorized conduct is further underscored by HEKMATI'S unexpected two weeks' notice that he was terminating his employment months earlier than the terms of his contract.  Then HEKMATI informed only his mother that he was taking a trip to Iran.  Subsequent reporting provide from multiple sources corroborate that HEKMATI travelled to Iran to sell U.S. classified information to the Iranians in exchange for payment.

20. In addition, HEKMATI's own statements during interviews with FBI agents reveal dissembling behavior that reflects a consciousness of guilt.  In his initial interview after his release from Iran, when the FBI asked him if he had ever accessed classified documents as an Intelligence Analyst in Afghanistan, HEKMATI did not answer the question, instead he said the FBI could find out itself by pulling the log information.  In another interview months later, when the FBI directly confronted him alleging he went to Iran to sell classified U.S. intelligence information, HEKMATI again did not respond- instead replying only to ask if that was a question.

21. Moreover, in his statements to the interviewing agents, HEKMATI provided significantly inconsistent answers that show his effort to deflect and evade the FBI's questions.  When the FBI showed him the computer search log listing his accessing of numerous classified documents regarding Iran, HEKMATI initially denied that it was his log.  He further claimed he had so much work to do over his 12 to 13 hour shifts that he did not have any time to search classified documents on Iran.  However, later in the same interview, HEKMATI admitted

accessing the classified reports on Iran because he had to find things to do to fill his day.  Still later in the course of the interview, HEKMATI once again changed his answer - discarding his previous assertion that he accessed the documents because he had to fill the time, HEKMATI stated that he accessed the classified documents on Iran because he wanted  to become a subject matter expert on Iran.  Finally, when the FBI focused on the fundamental principle of "need to know" in accessing intelligence reports, HEKMATI simply remarked that his contractor and the military had given him access to the classified computer network and did not restrict his access, so he should be allowed to view whatever he viewed.

22. In reviewing the classified intelligence reports on Iran that HEKMATI accessed, the FBI found numerous reports on the Iranian government.  The Iranian government has a long established history of conducting and supporting terrorist operations around the world.

23. The Iranian Revolutionary Guard Corps (IRGC), with the support of the Iranian government, has engaged in terrorist activity since its inception 40 years ago.  The IRGC - most prominently through its Qods Force - has the greatest role among Iran's actors in directing and carrying out a global terrorist campaign.

- In recent years, IRGC Qods Force terrorist planning has been uncovered and disrupted in many countries, including Germany, Bosnia, Bulgaria, Kenya, Bahrain, and Turkey.

- The IRGC Qods Force in 2011 plotted a brazen terrorist attack against the Saudi Ambassador to the U.S. on American soil.  Fortunately, this plot was foiled.

- In 2012, IRGC Qods Force operatives were arrested in Turkey for plotting an attack and in Kenya for planning a bombing.

- In January 2018, Germany uncovered ten IRGC operatives involved in a terrorist plot in Germany, and convicted another IRGC operative for surveilling a German-Israeli group.

- In September 2018, a U.S. federal court found Iran and the IRGC liable for the 1996 Khobar towers bombing, which killed 19 Americans.

24. The IRGC continues to provide financial and other material support, training, technology transfer, advanced conventional weapons, guidance, or direction to a broad range of terrorist organizations, including Hizballah, Palestinian terrorist groups like Hamas and Palestinian Islamic Jihad, Kata'ib Hizballah in Iraq, al-Ashtar Brigades in Bahrain, and other terrorist groups in Syria and around the Gulf.

25. The FBI assesses that the sensitive intelligence reporting accessed by HEKMATI could be exploited by the Iranian government in support of terrorist operations.

| | |
|---|---|
| **From:** | Grim, Emily P. |
| **To:** | Ken Feinberg |
| **Cc:** | doj, usvsst (CRM); Lee, Jane (CRM); Gilbert, Scott D |
| **Subject:** | RE: USVSST Fund Claim No. 1226 |
| **Date:** | Wednesday, February 12, 2020 11:55:22 AM |
| **Attachments:** | image083522.png |
| | 2020.02.12 - Letter to Special Master Ken Feinberg re Reconsideration.pdf |

Special Master Feinberg:

On behalf of Scott Gilbert, please see the attached correspondence.

Thank you,
Emily

---

# GILBERT LLP

**Emily P. Grim**
grime@gilbertlegal.com
O 202.772.3926
C 610.737.3191

1100 New York Ave, NW
Suite 700
Washington, DC 20005
**GilbertLegal.com**

This email and any attachments may contain confidential information that is privileged at law. If you are not a named recipient or have received this communication by error, please notify the sender immediately and destroy this email and its attachments, and all copies thereof, without further distributing or copying them.

**From:** Lee, Jane (CRM) <Jane.Lee3@usdoj.gov>
**Sent:** Wednesday, January 15, 2020 11:05:07 AM
**To:** Gilbert, Scott D <gilberts@gilbertlegal.com>
**Cc:** Ken Feinberg <KFeinberg@feinberglawoffices.com>; doj, usvsst (CRM) <usvsst.doj@usdoj.gov>
**Subject:** USVSST Fund Claim No. 1226


Mr. Gilbert:

On behalf of Mr. Kenneth R. Feinberg, please find attached correspondence dated January 15, 2020 with referenced enclosures.

Regards,

U.S. Victims of State Sponsored Terrorism Fund



1100 New York Avenue, NW
Suite 700
Washington, DC 20005
O 202.772.2200
F 202.772.3333

GilbertLegal.com

Scott D. Gilbert
202.772.2277
gilberts@gilbertlegal.com

February 12, 2020

**VIA ELECTRONIC MAIL**

Kenneth R. Feinberg
Special Master
U.S. Victims of State Sponsored Terrorism Fund
P.O. Box 10299
Dublin, OH 43017
kfeinberg@feinberglawoffices.com

**Re:    Amir Hekmati, Claim No. 1226**

Dear Special Master Feinberg:

We are in receipt of your January 15, 2020 decision regarding the reconsideration of Mr. Hekmati's eligibility for compensation from the U.S. Victims of State Sponsored Terrorism Fund (the "Fund"). We disagree with the decision on both legal and factual grounds. Neither the Fund's authorizing statute nor any other law permits reconsideration of a claimant's eligibility. Even if such reconsideration were appropriate, the decision itself is at odds with the material facts in this case.

We would like to provide you with our views on this matter, including a fuller explication of the facts, and thus request an opportunity to be heard consistent with 34 U.S.C. § 20144(b)(4). Of course, we will provide you with appropriate supporting materials beforehand. Please contact me to arrange a mutually convenient date, preferably in the second half of March or first half of April.

Please note that our participation in this process is not an acknowledgement that the Fund's reconsideration of Mr. Hekmati's eligibility is authorized by law, nor is it a waiver of any rights or arguments with respect to this issue. We continue to reserve all rights regarding this matter.

We understand that the Fund intends to authorize third-round distributions to eligible claimants by May 19, 2020. We expect that if Mr. Hekmati's initial eligibility determination is reinstated, he will receive payment not only of his second-round distribution from the Fund, but also his allocable share of any third-round distributions as well as subsequent distributions by the Fund.

Thank you for your consideration.

Sincerely,

Scott D. Gilbert

DA209

March 19, 2020


VIA ELECTRONIC MAIL


Scott Gilbert, Esq.
Gilbert LLP
1100 New York Avenue NW Suite 700
Washington, DC 20005


      Re:   <u>Amir Hekmati, Claim No: 1226</u>


Dear Mr. Gilbert:

      I am writing to respond to your letter dated February 12, 2020. As we discussed, a hearing in the above-referenced matter may be required.  A hearing date of April 7, 2020 has been reserved.

      You indicated that you will submit written materials to me and the U.S. Victims of State Sponsored Terrorism Fund (USVSST Fund) by March 23, 2020.  The submitted materials should identify all legal and factual arguments upon which you rely, and include any documents or other materials supporting them.  As we discussed, your written submission may be sufficient without the necessity of an in-person or telephonic hearing. However, upon review of your written materials, I may request that we proceed in-person or by telephone.  The in-person hearing would be held at a conference room in my office building, located at 1455 Pennsylvania Avenue NW, Washington, D.C. 20004.  However, given the coronavirus situation, the hearing may likely be telephonic.  In any event, a court reporter will transcribe the hearing.

      If there is a telephonic or in-person hearing, you will have the opportunity to present your legal and factual arguments.  I may ask you or Mr. Hekmati questions at the hearing. If Mr. Hekmati offers additional information orally or responds to questions, he will be required to do so under oath and affirmation under penalty of perjury.  No other witnesses may appear at the hearing; however, you may submit statements from Mr. Hekmati and other witnesses in writing, executed under penalty of perjury, as part of the materials you submit before the hearing.

      I will issue a final written decision within 90 days of the hearing as required by the statute.

Please submit your materials by March 23, 2020 electronically to the USVSST Fund at usvsst.doj@usdoj.gov and to me at KFeinberg@feinberglawoffices.com.

Sincerely,

Kenneth R. Feinberg
Special Master
U.S. Victims of State Sponsored Terrorism Fund

| From: | Grim, Emily P. |
|-------|----------------|
| To: | Ken Feinberg |
| Cc: | doj, usvsst (CRM); Lee, Jane (CRM); Gilbert, Scott D |
| Subject: | RE: USVSST Fund Claim No. 1226 |
| Date: | Monday, March 23, 2020 11:59:57 PM |
| Attachments: | image526118.png |
| | 2020.03.23 Special Master Brief.pdf |

Special Master Feinberg,

On behalf of Scott Gilbert, please see the attached brief regarding Amir Hekmati's claim to the USVSST Fund (No. 1226).  Please note that the brief and supporting materials contain sensitive medical information that Mr. Hekmati has not disclosed publicly.  We are providing the brief and supporting materials on a confidential basis, subject to all applicable procedures and protections.

Supporting materials will follow under separate cover.

Thank you,
Emily

# GILBERT LLP

**Emily P. Grim**
grime@gilbertlegal.com
O 202.772.3926
C 610.737.3191

1100 New York Ave, NW
Suite 700
Washington, DC 20005
**GilbertLegal.com**

This email and any attachments may contain confidential information that is privileged at law. If you are not a named recipient or have received this communication by error, please notify the sender immediately and destroy this email and its attachments, and all copies thereof, without further distributing or copying them.

**From:** Grim, Emily P.
**Sent:** Wednesday, February 12, 2020 11:54 AM
**To:** Ken Feinberg <KFeinberg@feinberglawoffices.com>
**Cc:** usvsst.doj@usdoj.gov; Jane.Lee3@usdoj.gov; Gilbert, Scott D <gilberts@gilbertlegal.com>
**Subject:** RE: USVSST Fund Claim No. 1226

Special Master Feinberg:

On behalf of Scott Gilbert, please see the attached correspondence.

Thank you,
Emily

**From:** Lee, Jane (CRM) <Jane.Lee3@usdoj.gov>
**Sent:** Wednesday, January 15, 2020 11:05:07 AM
**To:** Gilbert, Scott D <gilberts@gilbertlegal.com>
**Cc:** Ken Feinberg <KFeinberg@feinberglawoffices.com>; doj, usvsst (CRM) <usvsst.doj@usdoj.gov>
**Subject:** USVSST Fund Claim No. 1226

Mr. Gilbert:

On behalf of Mr. Kenneth R. Feinberg, please find attached correspondence dated January 15, 2020 with referenced enclosures.

Regards,

U.S. Victims of State Sponsored Terrorism Fund

## INTRODUCTION

Nine years ago, Amir Hekmati, a decorated veteran of the U.S. Marines, traveled to Iran at his mother's urging to see his grandmother. While there, he was wrongfully arrested and imprisoned at the age of 28. After nearly five years of physical and psychological torture, Mr. Hekmati was released as part of the 2016 Iran hostage deal. Since his release, Mr. Hekmati has sought to rebuild his life and find peace. Instead, Mr. Hekmati's own government has harassed and bullied him, taken advantage of him at his most vulnerable, and now has unlawfully denied him the right to at least partial compensation for the harms he has suffered.

Mr. Hekmati appeals from a decision of the U.S. Victims of State Sponsored Terrorism Fund (the "USVSST Fund" or the "Fund") made pursuant to a request for reconsideration of his eligibility by the U.S. Department of Justice ("DOJ" or the "Government").[1] That decision concluded that Mr. Hekmati made material falsehoods in his application to the Fund by stating in a declaration to the U.S. District Court of the District of Columbia (the "District Court") as part of his suit against the Iranian government that he went to Iran to visit his grandmother, when in fact the primary purpose of his trip was to sell information to the Iranian government. The decision rests on summaries of two FBI interviews with Mr. Hekmati and a "Record for Special Master," which appears to set forth findings made by certain law enforcement officials with respect to Mr. Hekmati's alleged wrongdoing. In a nutshell, the key accusations in the interview summaries and Record for Special Master are as follows:

- In the months leading up to his trip to Iran, Mr. Hekmati sought a job as an intelligence analyst in Afghanistan solely to access classified information, and

---

[1] Mr. Hekmati's exercise of his right to be heard with respect to the decision and apparent accusations against him is not an acknowledgement that the Fund's reconsideration of Mr. Hekmati's eligibility is authorized by law, nor is it a waiver of any rights or arguments with respect to this issue or any other legal or factual issues addressed herein. Mr. Hekmati continues to reserve all rights regarding this matter.

became upset when, upon arrival, he instead was assigned a role of a religious advisor, which did not permit him to access classified information.

- After being re-assigned to a position as an intelligence analyst, Mr. Hekmati accessed classified materials regarding Iran that purportedly were outside the scope of his job.

- Mr. Hekmati terminated his employment early, chose to work the night shift during his last two weeks in his position, and failed to inform his former employers about his plans to travel to Iran.

- Mr. Hekmati accessed an article about Iran's presence in Dubai, then stopped in Dubai en route to Iran.

- "Four reliable sources" confirm that Mr. Hekmati approached Iranian government officials offering classified information in exchange for payment.

- Mr. Hekmati's declaration to the District Court stated that he was not permitted to speak with his family for months, but his mother, in interviews with the FBI, allegedly indicated that Amir "made several calls to his uncle from his cellular phone over a period of seven to ten days indicating 'he was bored . . . had nothing to do, but read.'"

- Mr. Hekmati demonstrated a "consciousness of guilt" while being interviewed by FBI agents after his release.

As set forth below, the decision to reconsider and subsequently rescind Mr. Hekmati's eligibility for compensation based upon his purported omissions or misrepresentations to the District Court is both unlawful and factually deficient on a multitude of grounds:

First, the decision contradicts the material facts of this case. Mr. Hekmati has provided substantial evidence demonstrating that he certainly did not travel to Iran with the primary purpose of selling information to the Iranian government.

Second, even if one were to disregard Mr. Hekmati's evidence, the Government has proffered no evidence supporting the determination that Mr. Hekmati traveled to Iran to sell information to the Iranian government. The purported evidentiary record contains only conclusions. Even if such conclusions alone could constitute credible evidence of Mr. Hekmati's

conduct in the months leading up to his trip to Iran, the record does not support a logical leap that

Mr. Hekmati intended to sell classified information to the Iranian government—indeed, the

record includes no constitutionally permissible evidence regarding Mr. Hekmati's activities in

Iran whatsoever.

Third, the Fund had no legal authority to reconsider Mr. Hekmati's eligibility for

payment in the first place.  Such "reconsideration" is expressly prohibited by the authorizing

statute for the USVSST Fund.

Fourth, the Fund cannot legally terminate Mr. Hekmati's right to payment without

articulating the specific factual basis for its decision or disclosing all evidence purportedly

supporting the decision against him, neither of which the Fund has done.  Such conduct violates

Mr. Hekmati's administrative due process rights.

Fifth, Mr. Hekmati made no statements regarding the purpose of his trip to Iran in his

application or supporting materials.  The Special Master's decision relied on statements made by

Mr. Hekmati solely in a declaration submitted to the District Court as part of his lawsuit against

the government of Iran.  Neither the Special Master nor the DOJ writ large has legal or

constitutional authority to rescind Mr. Hekmati's payment rights based on statements made

outside the context of his application to the Fund.

Sixth, under federal law, willful omissions of material facts are not actionable as long as

the declarant's statement is literally true.  Mr. Hekmati's statement to the District Court

regarding the circumstances of his trip to Iran are literally true—neither the Government nor the

Special Master has contended otherwise.  Thus, even if the primary purpose of Mr. Hekmati's

trip to Iran was to sell information (it was not), his statement regarding his intent to visit family

cannot serve as a basis to terminate his payment rights.

## FACTUAL BACKGROUND

I.    **Mr. Hekmati's Background**

Mr. Hekmati was born in ▮▮▮▮▮▮▮▮, in ▮▮. Declaration of Amir Hekmati ¶ 1 ("A. Hekmati Decl.") (attached as Ex. A). His parents are naturalized U.S. citizens who emigrated from Iran to the United States in 1979. His father has a Ph.D. in Microbiology and was a college professor until his retirement. *Id.* ¶ 2. His mother is an accountant. *Id.*

Mr. Hekmati and his three siblings grew up in Flint, Michigan. He graduated with honors from Monterey Peninsula College as an Arabic Linguist, received a bachelor's degree in International Business Management from the University of Phoenix in 2009, and recently completed a Bachelor of Science in Economics from the University of Michigan.

In 2001, Mr. Hekmati's senior year of high school, he decided to join the U.S. Marine Corps after recruiters put on a presentation at his school. His family expressed some reservations—his mother was concerned for his safety, and his father wanted him to go straight to college to study medicine—but in the end, they respected his decision. He entered the Marines in July 2001, immediately after graduating from high school, and served as an infantry rifleman and translator until his honorable discharge in August of 2005. *Id.* ¶ 6.

Sergeant Hekmati completed two lengthy tours of duty in Iraq in the 2nd Battalion, 4th Marine Regiment, a unit that suffered one of the highest casualty rates in the Marines. He left the Marines a decorated combat veteran, having received the Good Conduct Medal, Global War on Terror Service Medal, Sea Service Deployment Ribbon, GWOT Expeditionary Medal, National Defense Service Medal, and a Combat Action Ribbon. *Id.* ¶ 7; Certificate of Release or Discharge from Active Duty (attached as Ex. 1 to A. Hekmati Decl.).

## II.   Mr. Hekmati's Activities Leading Up to His Trip to Iran

After Mr. Hekmati completed his service in the Marines, he went on to serve his country as a military contractor from 2005 to 2011, focusing on translation and cultural education.  A. Hekmati Decl. ¶ 12.  Mr. Hekmati did well as a contractor, finding regular work and patenting his own instructional methodology for languages that later was purchased by Vcom3D, a defense contractor in Orlando, Florida, for $300,000.  *Id.* ¶¶ 13–14.

In 2009, Mr. Hekmati became a research manager for defense contractor BAE Systems. As part of this position, he worked for one year in Tikrit, Iraq for the U.S. Army's Human Terrain Analysis Program, primarily providing cultural analysis and advice to U.S. military commanders.  His research topics included, among others, Iranian influence in Iraq and Iranian infiltration of Iraqi militias in Southern Iraq.[2]  At the request of his supervisors, Mr. Hekmati applied for and was granted a top-secret-level security clearance.  A. Hekmati Decl. ¶ 17.

In 2009 and 2010, Mr. Hekmati took, and passed, two intensive polygraphs as part of background checks for two intelligence-related positions with the U.S. government.  The first was in connection with a potential position at the Defense Intelligence Agency ("DIA").  *Id.* ¶ 18.  The second was in connection with a potential position with the National Clandestine Service at the Central Intelligence Agency ("CIA").[3]  *Id.*

Despite his success as a contractor, by 2011, Mr. Hekmati was at a personal and professional crossroads.  His contract with BAE was set to expire.  He loved intelligence work, but his sense was that active intelligence roles in Iraq requiring his specific expertise in Farsi and

---

[2] *See* Christopher S. Brace Recommendation Letter (Ex. 6 to A. Hekmati Decl.).
[3] Mr. Hekmati ultimately turned down a position with DIA to take the job with BAE Systems.  The CIA made an offer of conditional employment to Mr. Hekmati, but an available role for him did not materialize in the immediate training cycle.  Mr. Hekmati had steady work as a contractor at the time and had mixed feelings about taking a position that would require him to conceal a large part of his life from family and friends, so he did not push the issue.

cultural education were starting to dry up as the war in Iraq was winding down.  Mr. Hekmati was beginning to tire of the frequent travel that contract work required.  He was in a serious relationship with a woman from Michigan and was ready to settle down and start a family.  Mr. Hekmati decided to apply to a number of master's programs in economics in order to diversify his resume and open up future job opportunities while staying closer to home.  *Id.* ¶ 19.  Around the same time, Mr. Hekmati's mother was encouraging him and his siblings to travel to Iran to visit their grandmother, who was suffering from health problems.  Mr. Hekmati was close with his grandmother, who had visited his family many times during his youth.[4]  *Id.* ¶ 20.  He exchanged e-mails with his mother in December 2010 and January 2011 regarding his plans to travel to Iran that summer after he returned home from Iraq.  He also corresponded with Legal Persian, a service specializing in Iranian-American travel to Iran, during the same period about getting all necessary visas and travel documents in order to make the trip.[5]

In the spring of 2011, as Mr. Hekmati's contract with BAE was winding down, a co-worker informed Mr. Hekmati that he had recently obtained a position with Six3 Systems, another government contractor, for active intelligence work in Afghanistan.  He recommended that Mr. Hekmati consider applying for the same position and put him in touch with a recruiter from Six3.  The recruiter provided a description of the position and told Mr. Hekmati she "would love to get [him] on the team."[6]  Mr. Hekmati recalls that the recruiter was particularly keen on his Farsi language skills and previous work experience as an analyst on a broad range of issues. A. Hekmati Decl. ¶ 21.

---

[4] Family Photos (attached as Exs. 7–8 to A. Hekmati Decl.).

[5] *See* E-mail from Amir Hekmati to Behnaz Hekmati (Dec. 29, 2010, 11:31 AM) (Ex. 9 to A. Hekmati Decl.); E-mail from Legal Persian to Amir Hekmati (Jan. 3, 2011, 8:58 AM) (Ex. 10 to A. Hekmati Decl.).

[6] E-mail from Gretchen Klugh to Amir Hekmati, May 19, 2011 (attached as Ex. 11 to A. Hekmati Decl.) ("Six3 Recruiting E-mail").

On its face, the job appeared to be an incredible opportunity.  Mr. Hekmati viewed Afghanistan as the epicenter of active intelligence work at the time; positions there were coveted. The role, as described in the recruiter's e-mail, was for an "Intelligence Analyst" providing support on a broad range of topics in connection with "Afghanistan measures of stability," including "security, governance/development, Human Terrain, provincial and district assessments, High Value Targeting products, Extremist and Regional Threat Network Nodal Analysis and preparation of Intelligence Surveillance and reconnaissance Assessment Metrics." Analysts were expected "to present an all source product on military activity, insurgent actions, economic/political activities, threats to regional stability, and trend analysis."[7]  Such a role could provide Mr. Hekmati with another opportunity to use his skillset to serve his country, and also could allow him to gain valuable work experience, learn from more senior analysts, and make professional connections.  The offer was hard to refuse.  A. Hekmati Decl. ¶ 22.

Mr. Hekmati knew, however, that the job would come at a cost.  The position would take him far away from his family and his girlfriend.  It could delay his plans to go to school.  Mr. Hekmati did not know where in Afghanistan he would be placed or precisely the type of projects he would be working on, but he knew from experience that the days would be long, and that many such jobs were in remote areas and could feel very isolating.  After much discussion with his family and girlfriend, he decided to give the position a try.  If it was not everything it had been marketed to be, he would leave.  *Id.* ¶ 23.  His contract was at-will, and he declined any signing bonus, which he would have had to pay back, with taxes, if he did not stay in the position for six months.[8]

---

[7] Ex. 11 to A. Hekmati Decl.

[8] Six3 Systems Employment Agreement at 2 (attached as Ex. 12 to A. Hekmati Decl.) (noting position was for "intelligence analyst").

### III.    Mr. Hekmati's Work for Six3 Systems

Soon after arriving in Kabul, Afghanistan, Mr. Hekmati knew the job was not what he had hoped it would be.  Instead of being placed in a position as an intelligence analyst, as the job description had indicated, he was asked to be a religious advisor.  The position, as he understood it, would require him to patrol alongside U.S. military troops in Taliban-controlled areas discussing sensitive religious topics (in which he had no training) with potentially hostile villagers.  A wrong move on his part could lead to danger for the unit.  He was not prepared to put others at risk by taking a role in which he had no experience.  Moreover, this was not the position for which he had decided to delay his school plans and leave his family and girlfriend. It would not provide any of the professional experience he had been seeking.  He told his supervisor at Six3, Angela Layman, that he would resign if he was not placed in the role for which he had applied and, he believed, had been hired —intelligence analyst.  Mr. Hekmati was assigned promptly to a role as an all-source intelligence analyst at an office at Bagram Airfield. A. Hekmati Decl. ¶ 24.

Upon Mr. Hekmati's arrival in Bagram, Mr. Hekmati's Special Security Officer provided him with access to a wide range of intelligence programs in order to view data to support the unit, including Intelink (akin to Google with respect to classified information) and other Sensitive Compartmentalized Information ("SCI") (SI, TK, HCS, and Gamma special access).  Mr. Hekmati did not request access to these programs.  Mr. Hekmati did not know before taking the position that he would be granted access to these specific programs.  Mr. Hekmati's access rights had no subject-matter-based restrictions.  Indeed, Mr. Hekmati, and all others in the unit with similar clearance, received unsolicited daily reports that were not necessarily directly relevant to whatever projects they were working on at the time, including information related to China and other countries.  *Id.* ¶ 25.

Mr. Hekmati was pleased that he ultimately had been placed in the position for which he had been hired, but he struggled to find his role in the unit.  He recalls being given only one official assignment, which was to monitor and interpret anti-U.S. propaganda by the Taliban, Haqqani network, and Al-Qaeda, and to devise strategies for countering those propaganda efforts.  To do so, he was expected to monitor different media outlets used by the Taliban, deliver a weekly report, and make recommendations to U.S. Army commanders in east Afghanistan.  Beyond that, he recalls receiving little guidance on how to fill the 12-hour shifts that were required by his contract.  He sat elbow-to-elbow with other analysis all day and night but largely was on his own.  He had no project team or mentor.  *Id.* ¶ 26.  He felt pressure from his superiors to be proactive, not reactive.  Nearly every morning, his supervisor would prompt him and others in the office with, "What do you got?"  He felt he needed to have material ready to prove his value.  A single weekly report clearly was not sufficient in the eyes of his supervisors.  *Id.* ¶ 27.

It appeared to Mr. Hekmati that each analyst had built a specialty in a few specific areas.  Separate from his weekly reports on cultural messaging, Mr. Hekmati sought to identify and build an area of expertise where he could add value.  Unprompted by his supervisors, he generated a report on the benefits and feasibility of using local Afghani residents to form a protective force for multinational corporations building cellphone towers throughout dangerous areas of Afghanistan.  Supervisors praised his work.  Mr. Hekmati determined that, given his Iranian background, knowledge of cultural issues, work experience at BAE in Iranian influence in Iraq, and fluency in Farsi, he could establish a role for himself as an expert in Iranian influence in Afghanistan, particularly focused on the threat posed to U.S. troops.  He recalls asking other analysts if this focus seemed useful, and that they agreed.  He searched the

intelligence platforms for data relating to Iran to further educate himself on these issues and identify any potentially useful leads that might be valuable to his unit.  Because of his access to various SCI programs, his search results included a mix of both classified and unclassified information.  *Id.* ¶ 28.

Mr. Hekmati's activities were by no means covert.  He sat in a room crowded with other analysts, and his superiors often circulated around the room, checking in on various analysts' activities.  Mr. Hekmati recalls discussing his Iran focus openly with colleagues and superiors. Not once was Mr. Hekmati cautioned, reprimanded or asked to stop his research.  *Id.* ¶ 29

Mr. Hekmati's contract required that he work 12 hours per day, but his unit did not require him to work during set hours.  He, along with many of his colleagues, split up the 12 hours differently each day so that he could take a break from sitting in front of a computer all day to exercise, have a meal and relax.  Given that so many others split up their hours each day, his office was not significantly less crowded or unsupervised at night.  *Id.* ¶ 30.

Mr. Hekmati never scanned, downloaded, or printed any of the articles or information that he accessed, nor did he attempt to do so.  *Id.* ¶ 31.

Despite positive feedback on his work product and his efforts to build a specialty in Iran-related issues, Mr. Hekmati was unhappy in the job.  He had expected structure, direction, collaboration, and support, but he received none.  He had given the position a chance, but it was not worth delaying his other life plans or being away from his family and loved ones for yet another extended period.  He gave his two weeks' notice only a month or two after arriving.  *Id.* ¶ 32.

IV.    **Mr. Hekmati's Trip to Iran**

While Mr. Hekmati was in Afghanistan, his mother, sister, and brother had been visiting family in Iran.[9]  They encountered no issues during their visit.  Mr. Hekmati knew he would have little time to make a trip after starting school.  He already was in Afghanistan, which borders Iran.  At his mother's urging, he decided to make the trip before returning home to Michigan.  A. Hekmati Decl. ¶ 33; B. Hekmati Decl. ¶ 13.

On August 14, 2011, Mr. Hekmati flew from Bagram Air Base to Dubai.  There were no direct flights to Iran from Bagram Air Base, and options for civilian contractor flights out of Bagram were limited.  Mr. Hekmati's understanding was that the charter airline that provided flights in and out of Bagram for Six3 contractors only went through Dubai.  In any event, flying to Iran by way of Dubai made sense because it was a massive international air hub with multiple daily flights to Iran that were relatively inexpensive.  Mr. Hekmati recalls this being important because it was difficult to predict his exact departure date from Bagram—he had given the standard two weeks' notice but was permitted to leave whatever day he finished tying up any loose ends at work.  Regardless of when he would arrive in Dubai, he knew he could easily buy a ticket to Iran departing within the next day or two.  A. Hekmati Decl. ¶ 34.

Once in Dubai, Mr. Hekmati purchased a ticket to Tehran.  He planned to stay in Iran for a few weeks before returning home to Michigan.  *Id.* ¶ 35.

This was Mr. Hekmati's first trip to Iran.  He was looking forward to reuniting with his grandmother and meeting relatives who until that point had only been able to speak with him over the phone.  He had no safety concerns.  His immediate family had just taken a trip there

---

[9] E-mails Between Behnaz Hekmati and Amir Hekmati (July 13-15, 2011) (attached as Ex. 13 to A. Hekmati Decl.); Declaration of Behnaz Hekmati ¶ 11 ("B. Hekmati Decl.") (attached as Ex. B).

without incident, and he would be staying with relatives the entire time.  No one ever offered any reason why he should not go to Iran.  *Id.* ¶ 36.

When Mr. Hekmati arrived at the airport in Tehran, officials pulled him aside to review his passport.  To Mr. Hekmati's knowledge, this was the only time he had interaction with Iranian government officials before his arrest.  *Id.* ¶ 37.

Mr. Hekmati was with family members during the entirety of his visit to Iran, staying at a family-owned apartment down the street from many relatives.  They took him to explore the sights of Tehran and the surrounding area, including the mountains east of Tehran.  He also went to many sights inside of Tehran, including parks, museums, and restaurants.[10]  Mr. Hekmati enjoyed himself immensely.  He loved connecting with his large, close-knit, and vibrant extended family.  He found the city chaotic, but rich with culture.  A. Hekmati Decl. ¶ 38.

V.     **Imprisonment and Torture of Mr. Hekmati in Iran**

On August 29, 2011, two days before he was scheduled to return home to Michigan, Mr. Hekmati was preparing to attend a family holiday celebration when two older men in suits came to the apartment where he was staying.  The men said they were from a passport control agency and that they had a few more questions to ask about his passport.  Mr. Hekmati was hesitant to go with them but didn't want to cause any trouble.  He was shuttled to a nearby office building, where the men immediately begin accusing Mr. Hekmati of working for the CIA, interrogating him about his activities in Iran, and threatening to take him to "a very bad place" if he did not confess.  *Id.* ¶ 39.

When Mr. Hekmati insisted that he had come to Iran only to visit family, he was handcuffed and taken to Evin Prison—Iran's most notoriously brutal prison.  Upon his arrival, he

---

[10] Declaration of Mohamed Reza Maleki ¶ 3 ("M. Maleki Decl.") (attached as Ex. C)

was strip-searched, given blue prison pajamas, blindfolded, and taken to a small, windowless cell.  Mr. Hekmati did not know at the time that he was to spend the next four-and-a-half years in Evin Prison.  *Id.* ¶ 40.

For the first 18 months of his imprisonment, Mr. Hekmati was held in solitary confinement in Ward 209, which is used by the Iranian Ministry of Intelligence & Security ("MOIS") to torture prisoners into confessing to alleged "crimes."[11]  *Id.* ¶ 41.  His cell was so small that he could not stretch his legs when he laid down.  *Id.* ¶ 42.  The concrete walls of the cell were curved, which threw off his depth perception and made him feel constantly like the walls were caving in on him.  *Id.*  The floor consisted of cold tile covered with a thin carpet.  *Id.*  Mr. Hekmati had no mattress; only a thin blanket that did nothing to insulate him from the cold tile.  *Id.*  Prison officials continually prevented Mr. Hekmati from sleeping by pouring water on the floor of his cell so that it remained cold and damp, quickly growing moldy.  *Id.*  There was nothing else in the cell except a Koran and a small makeshift "toilet," which was akin to a pail with a hose.  *Id.*  There was no plumbing and no toilet paper.  *Id.*  The air was so heavy and polluted that Mr. Hekmati had trouble breathing.  *Id.*  Even the guards wore surgical masks.  *Id.*

Because Mr. Hekmati had no window, he had no concept of whether it was day or night. *Id.* ¶ 43.  Prison officials kept bright lights on in his cell 24 hours a day.  *Id.*  At times, the power went out, and Mr. Hekmati was left in complete darkness for hours at a time, unable to see even

---

[11] *See* Press Release, U.S. Dept. of Treasury, *Treasury Designates Iran Ministry of Intelligence and Security for Human Rights Abuses and Support for Terrorism*, U.S. Dept. of Treasury Press Center (Feb. 16, 2012), *available at* https://www.treasury.gov/press-center/press-releases/Pages/tg1424.aspx; U.S. Dept. of State, *Country Reports on Human Rights Practices for 2012: Iran 2012 Human Rights Report* (2012), https://2009-2017.state.gov/documents/organization/204571.pdf (noting that Ward 209 is outside the control of prison authorities and controlled by MOIS); *see also* Perry Chiaramonte, *Hell on Earth: Inside Iran's brutal Evin prison*, Fox News (Jan. 28, 2013), http://www.foxnews.com/world/2013/01/28/inside-evin-look-at-world-most-notorious-political-prison.html.

his own hands in front of his face.  *Id.*  He described the blackouts as making him feel like he was "buried alive."  *Id.*

Mr. Hekmati was permitted to leave his cell only once every few days for 10–15 minutes to take a cold shower.  *Id.* ¶ 44.  Otherwise, he was taken from his cell only for interrogations, which also occurred every few days.  *Id.*  He was always blindfolded before leaving his cell.  *Id.*

Mr. Hekmati was tortured continuously over the first four months of his imprisonment. *Id.* ¶ 45.  Prison guards regularly beat him with batons and struck him in his kidneys with electric tasers to intimidate and punish him for his alleged "crimes."  *Id.*  His interrogator chained him to a table blindfolded and whipped the bottom of his feet with cables as punishment for not giving him the answers he wanted.  *Id.*  Mr. Hekmati described the whipping as "excruciating."  *Id.* Because Mr. Hekmati could not move, he felt the pain not just on his feet, but reverberating through his head, "like a screwdriver jammed into my brain."  *Id.*  Apart from the physical pain, the whipping was intended to humiliate Mr. Hekmati.  *Id.*  Because the wounds were on his feet, they were slow to heal; his feet became swollen, and he could not walk properly.  *Id.*

On multiple occasions, Mr. Hekmati was handcuffed in stress positions for hours at a time.  *Id.* ¶ 46.  During one such episode, he was handcuffed with one arm reaching behind his shoulder and the other hand behind his back for nearly 48 hours.  *Id.*  The position prevented Mr. Hekmati from sitting the entire time and caused excruciating pain in his shoulder.  *Id.*

Mr. Hekmati also suffered constant psychological abuse.  *Id.* ¶ 47.  Prison guards mercilessly taunted and belittled him, insulting Mr. Hekmati, his mother, and his country.  *Id.* Prison officials lied that Mr. Hekmati's sister had been involved in a terrible car accident, then refused him access to a phone to call his family unless he confessed that he was a spy.  *Id.*

Mr. Hekmati had virtually no contact with the outside world for months, other than a brief call to his relatives in Iran to tell them he was in prison (he couldn't even tell them where, because he didn't know at the time).  *Id.* ¶ 48; M. Maleki Decl. ¶ 5.  Indeed, Mr. Hekmati had almost no physical contact with anyone, apart from the taunts and beatings by the guards and his interrogator.  A. Hekmati Decl. ¶ 48.  He could tell there were other prisoners in the ward, but he could not communicate with them; he only knew they were there because he could hear them screaming when they were tortured or taken from their cells for execution.  *Id.*

Mr. Hekmati lost 20 pounds during his first few months at Evin.  *Id.* ¶ 52.  He was served very little food—a slice of bread and margarine in the morning, soggy rice and lentils for lunch, and a small cup of soup or lentils in the evening.  *Id.*

Mr. Hekmati's physical and psychological health deteriorated rapidly, to the point where he thought he was losing his mind.  *Id.* ¶ 54.  He lost track of time and stared at the wall all day.  *Id.* ¶ 49.  He began talking to the walls, as if they were a family member or friend from home.  *Id.* ¶ 50.  Often, Mr. Hekmati would feel that the walls were caving in on him and that he could not breathe.  *Id.* ¶ 54.  He had numerous panic attacks, during which he would start banging and clawing at the door, screaming for the guards.  *Id.*  He was met only with taunts and more beatings.  *Id.*  He thought about suicide often.  *Id.*

Roughly three months into Mr. Hekmati's solitary confinement, the guards started forcing him to take sedatives.  *Id.* ¶ 55.  The sedatives made it even harder for him to keep track of time.  *Id.*  Mr. Hekmati drifted in and out of consciousness.  *Id.*  He described himself as "a living corpse."  *Id.*

Although Mr. Hekmati resisted the pills initially, they quickly became his lifeline, as they allowed him to feel numb.  *Id.* ¶ 56.  Once he was hooked on the pills, however, his interrogator

used them as a means of controlling him.  *Id.* ¶ 57.  The interrogator would cut off the pills

abruptly to attempt to coerce Mr. Hekmati to do things or say things that were untrue.  *Id.*

Mr. Hekmati felt out of control when he was not given his pills.  *Id.*  He stopped sleeping and

started experiencing panic attacks again.  *Id.*  He felt he would do anything to get more pills.  *Id.*

Mr. Hekmati was told that all of these abuses would continue for as long as it took unless

and until he confessed to being a spy.  *Id.* ¶ 58.  After months of trauma, in December 2011,

Mr. Hekmati's abusers shifted their tactics.  They transported Mr. Hekmati from Evin Prison to

Esteghlal Hotel, dressed him in civilian clothes, gave him food and cigarettes, and told him he

would be released immediately if he agreed to be interviewed for an internal training video for

the Iranian Intelligence Ministry.  *Id.*  As part of the interview, Mr. Hekmati's captors demanded

that he state that he worked for the CIA.  Mr. Hekmati initially refused.  His interrogators told

him he would be returned to solitary confinement if he did not comply.  *Id.*  Mr. Hekmati, having

suffered months of physical and psychological abuse, ultimately complied in hopes of being

released and reunited with his family, as his abusers had promised.  *Id.* ¶ 59.  Iran did not release

Mr. Hekmati, but rather broadcast the "confession" on Iranian state television as "proof" of

Mr. Hekmati's crimes and then returned him to solitary confinement.  *Id.* ¶ 61.

In January 2012—five months after Mr. Hekmati's arrest—Iran's Revolutionary Court

held a 15-minute trial behind closed doors on his "crimes."  *Id.* ¶ 63.  Mr. Hekmati knew nothing

of the charges against him or even that a trial was about to occur.  *Id.*  He did not meet his court-

appointed defense attorney until five minutes before trial.  *Id.*  The court convicted Mr. Hekmati

of espionage, waging war against God, and corrupting the earth.  *Id.* ¶ 64.  He was sentenced to

death, to be executed immediately by hanging.  *Id.*  Prison guards informed Mr. Hekmati of his

sentence by showing him the front page of an Iranian state newspaper, which announced his imminent execution with triumph. *Id.* ¶ 65. The beatings and taunts continued.

Mr. Hekmati's death sentence haunted him daily. *Id.* ¶ 66. He regularly could hear other prisoners screaming and crying as they were dragged from their cells to be executed. *Id.* Every day, he awoke wondering if it was his execution day. *Id.* He described himself as being "in a constant state of fear and anxiety." *Id.* He started having nightmares and more frequent panic attacks. *Id.* Mr. Hekmati's remaining mental strength began to crumble. *Id.* ¶ 67. He stopped eating and sleeping. *Id.* He paced his cell anxiously at all hours, terrified that his executioners were about to arrive. *Id.* He had constant visions of his execution.[12] *Id.*

Several months later, Mr. Hekmati was abruptly taken back to court for a new trial in front of a different judge. A. Hekmati Decl. ¶ 68. He learned that an Iranian appeals court had overturned his death sentence months before based on insufficient evidence. *Id.* Like the previous trial, this second trial was held behind closed doors and lasted no more than 10 minutes. *Id.*

The new court convicted Mr. Hekmati of cooperating with a hostile government, presumably due to his U.S. military service. *Id.* ¶ 69. He was sentenced to 10 years in Evin— the maximum sentence for such a crime. *Id.* Mr. Hekmati did not learn of his conviction and the lifting of his death sentence until months later, again through newspapers the guards showed him. *Id.*

---

[12] REDACTED

          *See* Expert Rep. of Dr. Stuart Grassian at 5–9, *Hekmati v. Islamic Republic of Iran*, No. 16-0875 (ESH) (D.D.C. Feb. 6, 2017) (FILED UNDER SEAL) (attached as Ex. D) ("Grassian Rep.").

By this time, Mr. Hekmati had spent nearly a year in solitary confinement. *Id.* ¶ 70.  He felt some relief when his death sentence was annulled, but he knew the courts could re-instate the sentence at any time if it suited Iran's political needs.  *Id.*  His fear of execution festered, never going away.  *Id.*  He continued to live for his daily dose of pills.  *Id.*

Mr. Hekmati could not bear the thought of spending 10 more years in solitary confinement.  *Id.* ¶ 71.  He went on multiple hunger strikes to protest his conditions.  *Id.* Roughly eighteen months into his imprisonment, he became unconscious after a prolonged hunger strike.  *Id.* ¶ 72.  He suffered a head injury when he fell.  *Id.*  Fearing that Mr. Hekmati's death in prison would be bad publicity for the regime, Iranian officials transferred him out of solitary confinement and to a political prison in Ward 350, where he remained for approximately one year-and-a-half.  *Id.*

Mr. Hekmati was relieved to be out of solitary confinement, but Ward 350 brought with it a new set of horrors.  Conditions were terrible; 20–30 prisoners were packed together in a small cell.  *Id.* ¶ 74.  Everyone had physical and psychological problems.  *Id.*  The food was the same as in Ward 209.  *Id.*  There were no beds; only pieces of wood suspended from the wall.  *Id.* Prison officials stopped giving Mr. Hekmati his pills, which caused him painful physical withdrawal.  *Id.*  Prisoners regularly were dragged out of the cell for execution or beatings.  *Id.* The guards indicated that prisoners would be helped if they snitched on other prisoners, so there was a constant atmosphere of fear and distrust among the population.  *Id.*  Ward 350 had a small courtyard where prisoners could see a small patch of sky.  *Id.* ¶ 75.  However, the courtyard was so small that Mr. Hekmati could do little more than move in tight circles.  *Id.*

Mr. Hekmati still was not allowed to use the phone or speak to a lawyer, diplomatic officials, or his family in Michigan.  *Id.* ¶ 76.  He was permitted to meet with his uncle once a

month for 20–30 minutes, but the news of his family was devastating.  *Id.* ¶¶ 76–77; M. Maleki Decl. ¶ 7.  Shortly after learning Mr. Hekmati had been sentenced to death, his father had suffered a major stroke, followed by a diagnosis of advanced brain cancer.  A. Hekmati Decl. ¶ 77.  He had lost his mobility and could no longer care for himself.  *Id.*  In the meantime, Mr. Hekmati's older sister had quit her job to lobby for his release full-time, despite having two young children at home.  *Id.*  His family was spending tens-of-thousands of dollars on lawyer fees and expenses to lobby for his release.  *Id.*

News of his family's suffering intensified Mr. Hekmati's own suffering.  *Id.* ¶ 78.  He thought every day of his mother, who had been left to deal with a son on death row in Iran and a husband in the hospital, but he was powerless to help.  *Id.*  When he ultimately was able to contact his family with more regularity, he tried to downplay his situation as best he could.  It was the only thing in his control.  *Id.*

About one year-and-a-half after Mr. Hekmati arrived in Ward 350, a major riot occurred. *Id.* ¶ 79.  As punishment, Mr. Hekmati and the other prisoners of Ward 350 were transferred to the general population prison.  Mr. Hekmati was transferred to Ward 7, where he was housed with drug dealers and other violent criminals.  *Id.*

Mr. Hekmati's conditions in Ward 7 were some of the most brutal he had faced in his three years at Evin.  *Id.* ¶ 80.  His "cell" was a basement typically used to quarantine sick prisoners.  *Id.*  As in Ward 350, his cell contained 20–30 prisoners packed into a small space.  *Id.* The cell was infested with rats, which Mr. Hekmati and other prisoners had to kill using broomsticks or other blunt objects.  *Id.*  There were no beds.  *Id.*  His skin was eaten by lice and fleas.  *Id.*  He would wake up with bed bugs all over him.  *Id.*  Prison officials would

occasionally spray the room with chemicals to get rid of the bed bugs, which made the prisoners sicker than the bug bites did. *Id.*

The ward had no heat, air conditioning, or ventilation. *Id.* ¶ 81. There was no courtyard or outdoor recreational space. *Id.* The air was heavy, hot, and thick with germs. *Id.* There were no toilets; rather, there were three holes in the ground with a hose next to them. *Id.* The showers were directly next to the toilet holes. *Id.* Because of the terrible ventilation, the showers became a breeding ground for infection. *Id.* Prisoners wore surgical masks in the shower, but, because they each only got one mask, those masks quickly became filthy. *Id.*

Mr. Hekmati was sick the entire year-and-a-half he spent in Ward 7. *Id.* ¶ 82. He suffered from recurring lung and sinus infections and constant intestinal problems due to malnutrition and the poor sanitary conditions of the prison. *Id.* Prison officials would ignore prisoners' ailments unless they had a high fever, which they would "treat" by injecting them with steroids that actually suppressed the immune system, making the infection worse. *Id.* Eventually, Mr. Hekmati stopped requesting treatment altogether. *Id.*

Mr. Hekmati lived in constant fear of the other prisoners in Ward 7. *Id.* ¶ 83. Prison officials put violent criminals in Mr. Hekmati's cell to pressure prisoners like him to confess or swear allegiance to the Iranian government. *Id.* The guards and the violent criminals beat other prisoners often as a threat to the rest of the population. *Id.* One prisoner's face was torn apart by a razor blade. *Id.* Many of the political prisoners who had been transferred with Mr. Hekmati suffered mental breakdowns from the trauma of the surroundings. *Id.* Mr. Hekmati tried not to make trouble; his only goal was to stay alive. *Id.*

## VI.     Mr. Hekmati's Release From Imprisonment

Mr. Hekmati's wrongful detention and torture caused an international uproar.  In August 2013, the United Nation's Working Group on Arbitrary Detention found Mr. Hekmati's deprivation arbitrary and in contravention of the Universal Declaration of Human Rights and the International Covenant on Civil and Political Rights.[13]  Numerous Congressmen and U.S. Secretary of State John Kerry decried Iran's wrongful detention of Mr. Hekmati and made repeated calls for his release.[14]  Academic experts have testified that Mr. Hekmati's imprisonment was akin to hostage-taking and consistent with a pattern and practice of imprisoning Iranian-Americans to use as bargaining chips against the United States.[15]

On January 16, 2016, Mr. Hekmati was released as part of a prisoner trade between Iran and the United States following on the heels of the Iran nuclear deal.[16] A. Hekmati Decl. ¶ 84.

---

[13] *See* U.N. Human Rights Council, *Amir Nema Hekmati v. Islamic Republic of Iran, Opinions Adopted by the United Nations Working Group on Arbitrary Detention*, No. 28/2013, U.N. Doc. A/HRC/WGAD/2013/28 (2014) (Aug. 23, 2013), http://hrlibrary.umn.edu/wgad/28-2013 html (finding Mr. Hekmati's detention arbitrary and in contravention of the Universal Declaration of Human Rights and the International Covenant on Civil and Political Rights).

[14] *See* Letter from Christopher A. Coon et al. to John Kerry, Secretary of State, Dep't. of State (Sept. 19, 2013) (attached as Ex. E); Letter from William S. Cohen, The Cohen Group, to President Barack Obama (Jan. 20, 2014) (attached as Ex. F); Letter from Richard Blumenthal, U.S. Senate, to John Kerry, Secretary, U.S. Dep't. of State (Jan.5, 2015) (attached as Ex. G); Brownie Marie, *Three Americans still held prison in Iran, Rep. Smith calls for justice*, Christian Today (June 20, 2014, 4:00 PM EST),
https://www.christiantoday.com/article/three.americans.prisoner.iran.rep.smith.calls.justice/38293.htm; *see also* Letter from Victoria M. Lopakiewicz, Division Chief, Office of American Citizen Services and Crisis Management, to Consulate of Spain, Chicago (May 23, 2017) (attached as Ex. H) (noting that imprisonment was "unjust").

[15] *See* Expert Rep. of Mehdi Khalaji, *Hekmati v. Islamic Republic of Iran*, No. 16-0875 (ESH) (D.D.C. Feb. 6, 2017), ECF No. 12-7; *see also See, e.g.*, Rick Gladstone, *Jason Rezaian Trial In Iran May Be More About Leverage Than Justice*, N.Y. Times (May 27, 2015), http://www.nytimes.com/2015/05/28/middleeast/jason-rezaian-trial-in-iran-may-be-more-about-leverage-than-justice html (quoting a former diplomat involved in negotiations to free Americans in Iran as saying "it was possible [Iran] did not want to resolve the prisoner issue because it was part of a negotiating strategy."); Indira A.R. Lakshmanan, *Fate of Jailed Americans Hangs Over Talks with Iran*, Bloomberg News (May 15, 2015, 6:19 PM), https://www.bloomberg.com/politics/articles/2015-05-15/fate-of-jailed-and-missing-americans-hangs-over-iran-talks.

[16] Michael Pearson & Elise Labott, *5 americans released by Iran, 4 as part of prisoner swap*, CNN (Jan. 16, 2016, 11:02 PM), http://www.cnn.com/2016/01/16/middleeast/iran-jason-rezaian-prisoners-freed/.

## VII. Mr. Hekmati's Post-Imprisonment Life[17]

Mr. Hekmati suffered REDACTED severe psychological trauma from his time in Iran. Upon his release, he was haunted continuously by images from prison, including the rats that infested his various cells and the constant visions he had of his own execution. *Id.* ¶ 88. He had trouble sleeping and often had nightmares of his time in Evin. *Id.* He suffered from anxiety and panic attacks. *Id.* REDACTED

He got overwhelmed and anxious in crowds, which made it difficult for him to leave the house. *Id.* He spent most of his time in his bedroom at his mother's house with the door locked. *Id.* REDACTED

84; Decl. of Behnaz Hekmati ¶¶ 14–30, *Hekmati v. Islamic Republic of Iran*, No. 16-0875 (ESH) (D.D.C. Feb. 6, 2017) (FILED UNDER SEAL) (attached as Ex. I); Decl. of Sarah Hekmati ¶¶ 7–15, *Hekmati v. Islamic Republic of Iran*, No. 16-0875 (ESH) (D.D.C. Feb. 6, 2017) (FILED UNDER SEAL) (attached as Ex. J). REDACTED

---

[17] We are providing Mr. Hekmati's sensitive medical information to the Special Master as part of these proceedings on a confidential basis, subject to all applicable procedures and protections.

REDACTED                    Dr. Grassian, who evaluated Mr. Hekmati over the course of two days

eight months after his release from Iran, concluded that REDACTED

He concluded, "It is a credit to his

inner emotional strength that he survived the ordeal at all." *Id.* at 16.

## VIII.   FBI Interviews Following Mr. Hekmati's Release

Shortly after Mr. Hekmati's release, in the midst of his ongoing trauma, he was subject to

two unannounced interrogations by the FBI without the assistance of counsel.

The first interview occurred immediately upon Mr. Hekmati's release from prison, after

he was flown from Iran to a U.S. air base in Landstuhl, Germany.  Rather than releasing

Mr. Hekmati promptly to his family, who had flown to Landstuhl to meet him, Mr. Hekmati was

held for a prolonged period—at least a day or two—at a segregated medical facility.  A. Hekmati

Decl. ¶ 7.  Mr. Hekmati and his family were told that this was "routine" and that he was being

given medical exams.  Declaration of Scott Gilbert ¶ 7 ("S. Gilbert Decl.") (attached as Ex. L).

While he was at this facility, two men interviewed Mr. Hekmati.  The questioning initially began

with the agents showing Mr. Hekmati pictures of other Americans missing or imprisoned in Iran

REDACTED

and asking if he had seen or heard anything about these Americans while in prison, then shifted focus to Mr. Hekmati's work in Afghanistan. He does not recall being informed that he was under investigation. Mr. Hekmati was in a severe state of shock and suffering from the effects of his PTSD. He was confused, annoyed, and numb with exhaustion. A. Hekmati Decl. ¶ 95. His family was sick with worry over his unexplained prolonged detention for purportedly routine medical exams. Mr. Hekmati's lawyer, Scott Gilbert, called Secretary of State John Kerry's Chief of Staff, Jonathan Finer, and threatened legal action. Mr. Finer was extremely apologetic. Mr. Hekmati was permitted to leave promptly thereafter. S. Gilbert Decl. ¶ 8.

A second FBI interview occurred shortly after Mr. Hekmati's return to Michigan, in April 2016. Agents came to his parents' home unannounced. Mr. Hekmati recalls being asked to accompany them to an FBI field office to look at more pictures because they "needed more help with an investigation." *Id.* ¶ 11; A. Hekmati Decl. ¶ 97. Despite the FBI agents' assurances to Mr. Hekmati and his family that the FBI simply needed his help, Mr. Hekmati telephoned his legal counsel immediately. *Id.* Mr. Hekmati's lawyer, Scott Gilbert, asked to speak with the agents and told Mr. Hekmati to instruct them not to interview him unless he was present by telephone. The agents refused to speak with him and said they would call him from a landline at the FBI office. S. Gilbert Decl. ¶¶ 12–13; A. Hekmati Decl. ¶ 98. FBI agents ignored these instructions and conducted the interview, after which they permitted Mr. Hekmati to leave and never contacted him again.[19]

---

[19] *See* E-mail from Emily P. Grim to Elidia Mader (April 7, 2016; 12:21 PM); E-mail from Scott D. Gilbert to Tim Rieser and Carolina A. Tess (April 7, 2016; 2:06 PM) (attached as Exs. 1–2 to S. Gilbert Decl.); A. Hekmati Decl. ¶ 100.

### IX.   Mr. Hekmati's Judgment Against the Government of Iran

On May 9, 2016, Mr. Hekmati filed suit against the government of Iran in the U.S.

District Court for the District of Columbia, alleging that his detention and treatment by the

Iranian government constituted torture and hostage-taking under the Foreign Sovereign

Immunities Act.  In support of his motion for default judgment, Mr. Hekmati submitted a

declaration under penalty of perjury pursuant to 28 U.S.C. § 1746, in which he detailed his

background, his experience in Iran, and the physical, psychological, and financial damages he

had suffered as a result of his imprisonment and torture.  He also submitted testimony from

family members, records of his military accolades, letters of recommendations from employers

in the national security realm, public news reports of his imprisonment and death sentence,

public statements of outrage from international human rights organizations and U.S. government

officials regarding his imprisonment, a report from an academic expert regarding Iran's pattern

and practice of imprisoning U.S.-Iranian citizens to use a negotiating leverage, and detailed

expert reports regarding the ongoing psychological trauma he has suffered as a result of his

imprisonment.

As part of his declaration to the District Court, Mr. Hekmati stated:

My parents had been encouraging me for many years to visit my relatives [in Iran]
and to see the country of my parents' birth.  My mother had been encouraging me
in particular over the last few months to visit my grandmother in Iran if I had the
chance, as her health had begun deteriorating.  Given that I would be starting school
and likely would not have time to go to Iran in the foreseeable future, I decided it
was an opportune time to make the trip.  I flew to Iran via Dubai and planned on
staying for a few weeks.

Decl. of Amir Hekmati ¶ 25, *Hekmati v. Islamic Republic of Iran*, No. 16-0875 (ESH)
(D.D.C. Feb. 10, 2017), ECF No. 14-1.

On September 29, 2017, U.S. District Court Judge Ellen Huvelle awarded Mr. Hekmati a

default judgment in the amount of $63,496,358, consisting of "(1) $16,020,000 in compensatory

damages for pre-release pain and suffering; (2) $10,000,000 in compensatory damages for post-release pain and suffering; (3) $5,728,179 in economic damages; and (4) $31,748,179 in punitive damages." Order & Default J., *Hekmati v. Islamic Republic of Iran*, No. 16-0875 (ESH) (D.D.C. Sept. 29, 2017), ECF No. 15.  As part of the District Court's findings of fact, the Court noted that "[b]efore returning to the United States [from Afghanistan], [Mr. Hekmati] decided he would take his first trip to Iran to visit relatives and see the country of his parents' birth." Mem. Op. at 2, *Hekmati v. Islamic Republic of Iran*, No. 16-0875 (ESH) (D.D.C. Sept. 29, 2017), ECF No. 16.

## X.    Submission of Mr. Hekmati's Claim to the USVSST Fund & Eligibility Determination

Mr. Hekmati's counsel filed a claim with the USVSST Fund on his behalf on December 6, 2017.

To qualify for distribution from the USVSST Fund, the USVSST Act requires claimants to provide proof of a final judgment issued by a United States court awarding compensatory damages against a state sponsor of terrorism for actions such as torture or hostage-taking within 90 days of obtaining the judgment.  34 U.S.C. § 20144(c).

The Act states expressly that all award decisions are "final," and, apart from a right of appeal by claimants whose claims have been denied, "not subject to administrative or judicial review."  34 U.S.C. § 20144(b)(3).

The application required Mr. Hekmati to provide his name, contact information, social security number, the case name and number of his suit against Iran, the relevant district court, the amount of his compensatory damages award, a copy of his final judgment against Iran, and documentation of proof of service of that judgment.  *See* Application at Part I, II, & VI. Mr. Hekmati also was required to certify, "under oath, subject to penalty of perjury or in a

manner that meets the requirements of title 28 U.S.C. § 1746, that the information provided in the Application Form and any documents submitted in support of the claim are true and accurate to the best of my knowledge," and to "agree that any payment made by the Fund is expressly conditioned upon the truthfulness and accuracy of the information and documentation submitted in support of the claim." *See id.* at Part IV.

On December 28, 2017, the USVSST Fund notified Mr. Hekmati via letter that his claim was eligible for compensation. The letter valued Mr. Hekmati's total eligible claim amount at $31,748,179, capped at $20,000,000 by the USVSST Act's maximum statutory cap. *See* 34 U.S.C. § 20144(d)(3)(A)(ii). The letter stated that Mr. Hekmati would be "notified about the exact amount of [his] first payment after the Special Master authorizes the next distribution in January 2019."[20]

On December 13, 2018, the USVSST Fund notified Mr. Hekmati that the Special Master had authorized an initial distribution for his claim of $839,100.85.[21]

## XI.   Breaches by The Fund of the USVSST Act

The Fund began issuing payments for which Mr. Hekmati would have been eligible to claimants in early 2019. Without explanation, the Fund failed to issue Mr. Hekmati's distribution. Mr. Hekmati's counsel called the Fund six times; e-mailed the Fund requesting a status update on April 4, April 5, May 21, July 11, and July 19, 2019; e-mailed the DOJ seeking a status update on June 7 and June 18, 2019; and sent letters to the DOJ and Interim Special Master Deborah Connor on June 20, July 16, and October 11, 2019. *See* Exs. O through T. Mr. Hekmati's requests initially were met with responses that payments were still being made.

---

[20] Letter from Kenneth R. Feinberg, Special Master, U.S. Victims of State Sponsored Terrorism Fund, to Amir M. Hekmati (Dec. 28, 2017) (attached as Ex. M).
[21] Letter from Kenneth R. Feinberg to Amir M. Hekmati (Dec. 13, 2018) (attached as Ex. N).

Subsequent requests were met with silence or statements that no information was available.
*See id.*

On October 11, 2019, Mr. Hekmati's counsel made a final good-faith attempt to resolve the Fund's failure to pay Mr. Hekmati. Mr. Gilbert's letter to the Interim Special Master stated that Mr. Hekmati would be forced to file suit against the Fund and the Special Master if they did not fulfill their payment obligations to Mr. Hekmati in 15 days.[22]

On October 24—13 days after Defendant's receipt of Mr. Gilbert's October 11 letter—the Interim Special Master Connor sent a letter to Mr. Gilbert acknowledging receipt of the October 11 letter and informing Mr. Hekmati and his counsel that the DOJ "intends to seek reconsideration of the prior eligibility determination and approval of Mr. Hekmati's claim dated December 13, 2018, and therefore has suspended any further action on the payment to Mr. Hekmati from the United States Victims of State Sponsored Terrorism Fund."[23] The letter further noted that the DOJ would be re-engaging retired Special Master Kenneth Feinberg specifically for the reconsideration process. The letter provided no information regarding either the legal or factual basis for the Fund's "reconsideration" of Mr. Hekmati's award.

## XII. Litigation in the U.S. Court of Federal Claims

On November 18, 2019, Mr. Hekmati initiated litigation in the Court of Federal Claims over the Government's breach of its payment obligations and unlawful "reconsideration" of Mr. Hekmati's award decision. That litigation remains pending, with dispositive briefs due on May 15, 2020. Mr. Hekmati continues to assert that the Fund's reconsideration of his eligibility

---

[22] Letter from Scott Gilbert to Deborah Connor, Interim Special Master, U.S. Victims of State Sponsored Terrorism Fund (Oct. 11, 2019) (attached as Ex. T).
[23] Letter from Deborah Connor to Scott Gilbert (Oct. 24, 2019) (attached as Ex. U).

violates the express terms of the USVSST Act, and he waives no rights or defenses with respect

to that issue by addressing the Special Master's decision here.

## XIII.   The Special Master's Reconsideration Decision

On January 15, 2020, Mr. Hekmati's counsel received a letter from Special Master

Feinberg setting forth the basis for the reconsideration decision.[24]

The letter asserted that a Federal Register Notice setting forth the Fund's application

procedures provided the legal basis for the Fund's reconsideration of Mr. Hekmati's eligibility.

Consistent with the certification required by Mr. Hekmati's application to the Fund, the Notice

states that claimants must agree that "payment made by the [USVSST] Fund is expressly

conditioned upon the truthfulness and accuracy of the information and documentation submitted

in support of the claim."  Ex. V (citation omitted) (alteration in original).  The Special Master

concluded that:

> Mr. Hekmati's application and accompanying documents contained material omissions
> and false statements; in particular, the attached materials [provided to Special Master
> Feinberg by the DOJ] support the conclusion that the primary purpose of Mr. Hekmati's
> trip to Iran was to sell classified U.S. national security information to the government in
> Iran.  This conflicts with Mr. Hekmati's declaration filed in connection with the judgment
> he obtained in the U.S. District Court for the District of Columbia that the primary
> purpose of his trip to Iran was to visit family for personal reasons.  Therefore, I have
> determined that Mr. Hekmati has violated the USVSST Fund's processes and procedures,
> which are required to establish eligibility for payment, and as a result, is not eligible for
> payment from the USVSST Fund.

*Id.*

The "attached materials" referenced by the letter include (1) two partially-redacted FD-

302s, which we understand to be summaries written by FBI agents of the two interviews

referenced in Section VIII, above), and (2) a "Record for [the] Special Master," a 5-page

document of unidentified origin that appears to summarize a number of findings made by certain

---

[24] Letter from Kenneth R. Feinberg to Scott Gilbert (Jan. 15, 2020) (attached as Ex. V).

federal law enforcement officials regarding Mr. Hekmati's activities in the months leading up to his trip to Iran (collectively, the "DOJ Materials", attached as Ex. W).

<div align="center">

## ARGUMENT

</div>

**I.     The Reconsideration Decision is Unsupported by Evidence and Is at Odds with the Material Facts of This Case**

**A.     Mr. Hekmati Has Demonstrated That He Did Not Intend to Travel to Iran to Sell Information to the Government**

Mr. Hekmati has provided evidence refuting all material allegations contained in the DOJ Materials and demonstrated that his representations to the District Court were truthful and accurate.  As detailed above:

- Mr. Hekmati had plans to travel to Iran to visit his grandmother long before he learned of the Six3 opportunity.[25]  His mother had been asking him to visit his grandmother for months.[26]  E-mail correspondence from Mr. Hekmati to his mother and an Iranian travel service corroborates this timeline.

- Mr. Hekmati did not seek out the Six3 position.  It was recommended to him by a co-worker.  E-mail correspondence from Six3 recruiters demonstrate that they affirmatively pursued him for the position based on his previous experience.[27]

- Mr. Hekmati's access to materials regarding Iran was well within the scope of his job as an all-source analyst.  He was open about his research on these issues and was encouraged by his colleagues and supervisors to pursue those topics.  His work at night was typical of contractors looking to split a 12-hour shift into two 6-hour shifts and provided no additional opportunity to access information without supervision.

- Mr. Hekmati took, and passed, two full-scale polygraphs in the years immediately preceding his trip to Iran.  He had a steady income from his contracting work, a loving family and girlfriend, and no motive to put his life at risk by selling secrets to a hostile government.

- Mr. Hekmati had reservations about the Six3 job at the outset for personal reasons.  He was unhappy in the position from the start and left accordingly.  His

---

[25] A. Hekmati Decl. ¶ 14; B. Hekmati Decl.  ¶  10; Ex. 9 to A. Hekmati Decl.

[26] A. Hekmati Decl. ¶ 14; B. Hekmati Decl.  ¶  9.

[27] A. Hekmati Decl. ¶ 15; Ex. 11 to A. Hekmati Decl. (noting that they "would love to get [Mr. Hekmati] on the team").

mother has attested to this under penalty of perjury.

- Mr. Hekmati was no longer employed by Six3 at the time he traveled to Iran. The Government has not asserted otherwise. Because he was not an employee of Six3, Mr. Hekmati was under no duty to inform his former colleagues about his trip to Iran.

- Mr. Hekmati stayed with family during his trip to Iran and did not approach any individuals in the Iranian government about selling information. The DOJ has not provided any evidence whatsoever regarding Mr. Hekmati's activities in Iran demonstrating otherwise.

- Mr. Hekmati was imprisoned, tortured, and sentenced to death by the government to which he allegedly tried to sell information. Academic experts, international human rights organizations, and our own government have confirmed repeatedly that his imprisonment was politically motivated.[28] The Iranian government held Mr. Hekmati for more than four years and released him only as part of a broader hostage deal.

- Mr. Hekmati was not able to contact his family back home for months after he was detained. The Government's attempt to paint a brief call to his uncle in Iran at some unidentified point during his imprisonment, during which Mr. Hekmati sought to downplay his suffering for the benefit of his mother, as "evidence" that Mr. Hekmati lied about the severity of his conditions is deplorable and contravened by the voluminous medical evidence documenting the severe trauma that Mr. Hekmati has suffered        :DACTED        as a result of his imprisonment.

If there are other aspects of the DOJ Materials that are troubling to the Special Master, Mr. Hekmati would be happy to address them.

### B.   The Record Contains No Evidence of Mr. Hekmati's Activities in Iran

Even disregarding the voluminous evidence supporting Mr. Hekmati's innocence, the Government's proffered evidence, such as it is, is insufficient to support a finding that Mr. Hekmati sought to sell information to the Iranian government. At best for the Government, the DOJ Materials indicate that Mr. Hekmati accessed classified information about Iran as an intelligence analyst, quit his job, and traveled to Iran. The decision fails to explain how such

---

[28] See Ex. H (noting injustice of Mr. Hekmati's detention and confirming that Mr. Hekmati's contact with the outside world was "extremely limited").

accusations support a logical leap that Mr. Hekmati intended to sell classified information to the Iranian government.  Indeed, the record includes no evidence regarding Mr. Hekmati's activities in Iran whatsoever, other than reference to unexplained "corroborat[ion]" by unidentified "sources."  *See* DOJ Materials, attached as Ex. W.

### C.    The 302s Are Not Credible Evidence of Mr. Hekmati's Conduct or Intent in Traveling to Iran

Even if the accusations set forth in the DOJ Materials regarding Mr. Hekmati's activities in the months leading up to his trip to Iran, taken as true, could support an inference that Mr. Hekmati intended to travel to Iran to sell information, they are just that—accusations.  The impressions and conclusions of federal agents who were interrogating a man suffering from severe PTSD, without an attorney present, cannot constitute credible evidence of any fact.

A FD-302 is an FBI agent's (usually handwritten) notes of a meeting or interview with a witness.[29]  Unless demonstrated otherwise, a 302 is not presumed to be a verbatim transcript of the questions asked or the answers given.[30]  The witness is not placed under oath, and the purported witness statements are not sworn.[31]  Different agents have different practices regarding how much detail they choose to include in a 302, and whether to include facts learned elsewhere as part of the investigation or editorial content that were not actually stated during the interview.[32]  Agents with less background in an investigation may make errors in their note taking—for instance, by making references unsupported by the facts of the investigation.[33]  Time

---

[29] Hon. Katherine B. Forrest, "Guidelines Regarding Appropriate Use of 302 Forms in Criminal Trials," at 5 (June 11, 2018), *available at* https://blog.federaldefendersny.org/wp-content/uploads/2018/06/Forrest-on-302s.pdf) ("Judicial Guidelines").
[30] *Id.*
[31] *Id.*
[32] *Id.*
[33] *Id.*

lapses between the interview itself and the drafting of the memo also may give rise to

inaccuracies.[34]

For these reasons, it is well-established that statements included in 302s are "classic

hearsay without—in and of themselves—requisite indicia of reliability."[35]  While such

statements can be used to refresh a declarant's recollection, courts agree that they cannot be used

to prove the truth of any matter asserted.[36]  Accordingly, any purported "facts" or descriptions of

Mr. Hekmati's alleged statements in the 302s do not constitute evidence that those facts are true,

or even that Mr. Hekmati made the statements alleged.  They are impressions and conclusions of

the agents who authored the reports, and nothing more.  Such subjective opinions cannot

appropriately serve as the basis to deny an individual a right to payment—particularly in this

case, given the documented bias of the FBI against Muslims at the time of the investigation into

Mr. Hekmati and the inappropriate and unlawful conduct of the FBI agents in question.[37]

### D.   The Timing and Circumstances of the Interviews Further Undermine Their Credibility

The interviews documented in the 302s were coercive, abusive, and violated Mr.

Hekmati's basic constitutional rights.  Both interviews were conducted shortly after Mr. Hekmati

---

[34] *See, e.g.*, Trial Tr. 51-149:16‑19, in *United States v. Tsarnaev*, No. 13-10200-GAO (D. Mass. Apr. 28, 2015) (advising jurors that FBI 302 reports are not "verbatim transcriptions of the conversation, but summaries, and they may be made from the agents' notes and then put together in a report either that day or perhaps the next day"), http://ftpcontent2.worldnow.com/whdh/pdf/150428-tsarnaev-transcript-relatives.pdf.

[35] Judicial Guidelines at 5; *Carpenters Health & Welfare Fund v. Coca-Cola Co.*, No. 1:00-CV-2838-WBH, 2008 WL 11335088, at *2 (N.D. Ga. Apr. 29, 2008) (finding 302s inadmissible because they contain "two levels of hearsay, were prepared in a criminal investigation unrelated to the instant action, and were not signed or otherwise adopted by the witnesses who were the subjects of the report," and because "302 Reports do not contain factual findings—they simply rehash what an interviewee said during an interview").

[36] Judicial Guidelines at 6–7.

[37] *See Unleashed and Unaccountable:  The FBI's Unchecked Abuse of Authority*, ACLU Report at 16 (Sept. 2013), https://www.aclu.org/other/unleashed-and-unaccountable-fbis-unchecked-abuse-authority (detailing documented evidence of bias against Muslims in FBI training materials and investigative practices, including memo from Detroit FBI office with unsubstantiated assertion that "[b]ecause Michigan [Mr. Hekmati's home state and the location of his second FBI interview] has a large Middle-Eastern and Muslim population, it is prime territory for attempted radicalization and recruitment" (citation omitted) (first alteration in original)).

was released from years of torture, interrogations, and solitary confinement in a brutal Iranian

prison.  The fact that he was suffering from severe PTSD at the time has been well-documented.

Both FBI interviews were conducted without Mr. Hekmati's lawyer present.  Given the

circumstances, any purported inconsistencies or defensiveness Mr. Hekmati exhibited during the

interviews can hardly be attributed to a "consciousness of guilt," as alleged in the Record for

Special Master.  Mr. Hekmati was understandably shocked, confused, and upset when agents

began hurling accusations at him.  At the time of the interviews, he was dealing with constant

insomnia, flashbacks, and panic attacks.  He could barely leave his childhood room or keep track

of the days, let alone withstand yet another interrogation.  Even under the best of circumstances,

suggestions that he attempted to sell secrets to a government that had sentenced him to death and

tortured him for four-and-a-half years would be incomprehensible and utterly non-sensical to any

reasonable person, no less a decorated U.S. Marine.

Further, it is well-established that statements made by individuals suffering from PTSD

and other mental illness while under interrogation are inherently unreliable.  Courts have noted

that individuals suffering from mental illnesses are "significantly less likely to understand their

interrogation rights," "more compliant with police requests, more suggestible to police-generated

narratives, and less able to identify and communicate exculpatory evidence."  Such individuals

also may be more susceptible to the ruse of interrogator-as-friend, and be more likely to give the

cues interrogators perceive as indicating guilt or deception.[38]  As a result, they are more likely to

make inaccurate but potentially damaging statements under questioning.[39]  For this reason,

---

[38] Allison D. Redlich, *Mental Illness, Police Interrogations, and the Potential for False Confession*, 55 Psychiatric. Servs. 19, 19-21 (2004).
[39] Saul M. Kassin et al., *Police-Induced Confessions: Risk Factors and Recommendations*, 34 Law Human Behavior  3, 20-22 (2009).

courts generally treat information gleaned from interviews with those suffering from mental illness as suspect.  *See, e.g.*, *United States v. Hallford*, 756 F. App'x 1 (D.C. Cir. 2018).

Mr. Hekmati was suffering from a number of PTSD-related symptoms at the time of the FBI interviews that render any conclusions based on those interviews inherently suspect.  Dr. Stuart Grassian, an expert on the effects of PTSD on prisoners who have suffered protracted trauma, confirmed as part of his report to the District Court that Mr. Hekmati was experiencing, among other symptoms, "physiologic reactions (heart pounding, sweating, dizziness, etc.) to stimuli reminiscent of the event [his time in Evin]; increased arousal (a constant state of vigilance, anxiety and tension, irritability, jumpiness)"; and "difficulty with concentration and memory" after his release from Iran.  Grassian Rep. at 10, 15.

## II.     There Are No Legal Grounds for the Fund's Reconsideration of Mr. Hekmati's Eligibility Determination

Even putting aside the gross factual deficiencies in the Government's case, the reconsideration of Mr. Hekmati's eligibility itself is unlawful.  The USVSST Act provides the legal framework for the Special Master's ability to evaluate and pay claims.  Pursuant to the express terms of the Act, all award decisions are "final and, except as provided in paragraph (4), not subject to administrative or judicial review."  34 U.S.C. 20144(b)(3).  The cited paragraph (4) only concerns individuals filing appeals after their "claim is denied in whole or in part," and thus does not apply here.  34 U.S.C. 20144(b)(4).

The Federal Register Notice cited by the Special Master does not undercut this principle. The purpose of the Notice is to inform the public of the procedures the Special Master has put in place to carry out the mandates of the USVSST Act.  The text of the Notice itself confirms that it is "procedural in nature, specifying how to apply for compensation and merely restating the eligibility requirements in the Act" and that "it does not create new rights or impose obligations

independent of the statute." *See* 81 Fed. Reg. 45,535.  The Notice further confirms that all such procedures for claim evaluation and payment shall be "in accordance with the [USVSST] Act" and that all eligibility determinations are "final and not reviewable by any court." *Id.*

The Federal Register Notice's requirement that claimants certify the accuracy of their application materials and agree that payment is conditioned on such accuracy does not change the legal contours of the Special Master's duties and obligations with respect to evaluating and paying claims.  While the Special Master reasonably could and should review each application for accuracy and truthfulness as part of the eligibility determination process before awarding a right to payment, the Special Master completed the eligibility determination for Mr. Hekmati's application two years ago.  All DOJ Materials were in DOJ's possession at that time.  If DOJ, as the administering body of the Fund, had concerns regarding the veracity or accuracy of Mr. Hekmati's application, the USVSST Act dictates that all such concerns appropriately should have been addressed during the initial eligibility determination, before granting Mr. Hekmati a right to payment.  The certification requirement does not provide a legal basis for a reconsideration process that otherwise is expressly prohibited by the plain language of the Act.

## III.    Even if the Reconsideration Process Was Permissible, The Decision Itself is Legally Unsupportable

Even if the Special Master determined that he had the statutory right to reconsider his earlier eligibility determination, and that the DOJ Materials provided sufficient factual evidence to support a conclusion  that Mr. Hekmati sought to sell information to the Iranian government, and thus that he omitted material information in his declaration to the District Court, the Government cannot legally terminate Mr. Hekmati's payment rights on this basis.  Such termination violates Mr. Hekmati's due process rights, the separation of powers doctrine, and Supreme Court precedent regarding the standards for actionable falsehoods.

## A.     The Government Cannot Deprive Mr. Hekmati of a Right to Payment Without Opportunity to Challenge All Evidence Against Him

In order to conclude that Mr. Hekmati misrepresented the primary purpose of his trip to Iran, the Special Master must, by extension, conclude that the accusations regarding Mr. Hekmati's intent in traveling to Iran are true.  Thus, the reconsideration proceedings, are, in essence, putting Mr. Hekmati on trial for a crime he did not commit and for which he has not been charged, without any of the fundamental due process protections to which he would be entitled as a criminal defendant.

At a minimum, the Government cannot terminate Mr. Hekmati's payment rights without providing him basic administrative due process rights.  When the government seeks to deprive an individual of a right or interest via an administrative proceeding, the individual is entitled to notice and an opportunity to confront evidence against him, including cross-examination of any adverse witnesses.[40]  The Supreme Court has recognized that such rights are of particular importance where, as here, claimants "have challenged proposed terminations [of rights to payment] as resting on incorrect or misleading factual premises or on misapplication of rules or policies to the facts of particular cases."  *Goldberg*, 397 U.S. at 268.

Here, the Government has denied Mr. Hekmati his fundamental right to confront evidence regarding the key allegation against him—that he went to Iran not to visit his

---

[40]*Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 171-72 (1951) (Frankfurter, J., concurring) (prior to depriving someone of a right, he must be given "notice of the case against him and opportunity to meet it"); *Goldberg v. Kelly*, 397 U.S. 254, 267–68 (1970) (noting, in context of welfare benefits termination hearing, that due process required "timely and adequate notice detailing the reasons for a proposed termination, and an effective opportunity to defend by confronting any adverse witnesses and by presenting his own arguments and evidence orally"); *Willner v. Comm. on Character & Fitness*, 373 U.S. 96 (1963) (holding same prior to denial of admission to the bar); *Goss v. Lopez*, 419 U.S. 565 (1975) (finding that substantive hearing was required prior to a ten-day suspension from a public high school and that the possible damage to a student's reputation that could flow from charges of misconduct implicated fourteenth amendment protection of liberty interests); *Greene v. McElroy*, 360 U.S. 474, 496 (1959) ("Certain principles have remained relatively immutable in our jurisprudence.  One of these is that where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue.").

grandmother, but to sell secrets to the Iranians—which is tantamount to a charge of treason.  All evidence the Government has seen fit to provide regarding this allegation is a statement referencing purported corroboration of four unnamed sources.  Mr. Hekmati has had no opportunity to discover the identity of these accusers or to see the basis for their accusation, nor has he had the opportunity to confront them and challenge their credibility.  Although the reconsideration decision states that "the attached materials support the conclusion that the primary purpose of Mr. Hekmati's trip to Iran was to sell classified U.S. national security information to the government in Iran," the letter does not articulate the evidentiary basis for this conclusion.[41]  Apart from reference to the aforementioned anonymous "sources," the "attached materials" cite no evidence whatsoever regarding Mr. Hekmati's activities while in Iran and contain substantial redactions.

The Fund cannot lawfully terminate Mr. Hekmati's payment rights without setting forth the evidentiary basis on which the Special Master reached his decision and providing Mr. Hekmati with an opportunity to review and challenge all such evidence.  This includes, at a minimum, an opportunity to review any redacted portions of the DOJ Materials and to confront and challenge both the credibility of the "sources" referenced in the Materials and any information those sources purportedly have provided.

This is true even if such evidence is classified or confidential.[42]  It is well-established both in the criminal and administrative context that the government cannot rely on the use of classified or confidential information as a basis for depriving a claimant of a right unless the

---

[41] Ex. V.

[42] Mr. Hekmati does not know whether the Special Master may have reviewed such materials based on redactions in the DOJ materials and reference to these anonymous "sources."  Because the Special Master letter does not articulate the evidentiary basis for the decision, Mr. Hekmati has been left to guess whether the Special Master reviewed and relied upon such materials in the decision-making process.

government discloses such evidence to the claimant or produces a substitute of such evidence that "provide[s] the defendant with substantially the same ability to present a defense and do[es] not otherwise violate his constitutional rights," including the right "to be confronted with the witnesses against him."[43]   The Government has provided no such evidence or a remotely permissible substitute here.

### B. The Special Master Has No Legal Authority to Adjudicate the Truthfulness of Statements Not Made in Connection with Mr. Hekmati's Application to the Fund

The Special Master's decision expressly states that it is based solely on purported false statement(s) and omissions in Mr. Hekmati's declaration to the District Court in his suit against Iran.  Mr. Hekmati did not submit that declaration to the Fund as part of his application, nor did the application require him to do so.  Indeed, the application included no questions whatsoever regarding the purpose of Mr. Hekmati's trip to Iran or any other facts regarding the circumstances of his arrest and imprisonment.  The application required Mr. Hekmati to provide only his name and contact information, social security number, a copy of his judgment against Iran, and proof of service of that judgment.

Mr. Hekmati cannot be said to have misrepresented information that he did not submit to the Fund, or to have omitted information that he was not required to provide.  To the extent the Special Master is suggesting that the District Court's ruling was based upon purported misrepresentations in Mr. Hekmati's declaration, it is not within the Special Master's legal authority, or in the purview of the Executive Branch, to second-guess the appropriateness or

---

[43] Edward C. Liu & Todd Garvey, *Protecting Classified Information and the Rights of Criminal Defendants:  The Classified Information Procedures Act*, at Summary, Congressional Research Service (Apr. 2, 2012), https://fas.org/sgp/crs/secrecy/R41742.pdf.  *See also, e.g., Kwong Hai Chew v. Colding*, 344 U.S. 590 (1953) (finding that procedural due process barred the use of undisclosed classified evidence against a resident alien in deportation proceedings); *Joint Anti-Fascist Refugee Comm.*, 341 U.S. at 170 (Frankfurter, J., concurring) ("democracy implies respect for the elementary rights of men ... [and] must therefore practice fairness; and fairness can rarely be obtained by secret, one-sided determination of the facts decisive of rights").

accuracy of any factual findings by the District Court.  Such encroachment is a clear violation of the separation of powers doctrine.[44]  The District Court was the proper body to make credibility determinations as to the evidence regarding the circumstances of Mr. Hekmati's arrest.  The District Court determined that Mr. Hekmati's supporting evidence was sufficiently credible to issue him a $63.5 million judgment.

Moreover, Mr. Hekmati's case was widely publicized, and the evidence referenced in the DOJ Materials already was in the Government's possession at the time Mr. Hekmati commenced his suit against Iran.  If the Government had reasonable grounds to challenge the veracity of Mr. Hekmati's statements, such challenges should have been made during the District Court proceedings—not after the District Court already had issued a ruling and the Fund already had granted Mr. Hekmati a right to payment based on that ruling.  The fact that the Government waited to raise concerns regarding the accuracy of Mr. Hekmati's declaration until Mr. Hekmati informed the Government of his intent to file litigation in order to enforce his payment rights renders the Government's motivations particularly suspect.

### C.    The Government Cannot Deprive Mr. Hekmati of a Right to Payment Based on a Statement That Was Literally True

Even if the Special Master had legal and constitutional authority to evaluate the truthfulness of Mr. Hekmati's statements to the District Court, and even if the primary purpose of Mr. Hekmati's trip to Iran *was*, in fact, to sell information to the Iranian government (it was not), his omission of that information from his declaration would not constitute a falsehood under federal law and thus cannot constitute grounds for rescinding his right to payment.

---

[44] *See, e.g.*, *Stern v. Marshall*, 564 U.S. 462, 483 (2011) (noting that "'the judicial Power of the United States ... can no more be shared' with another branch than 'the Chief Executive, for example, can share with the Judiciary the veto power, or the Congress share with the Judiciary the power to override a Presidential veto.'"(citation omitted)).

In both his application to the Fund and in his declaration to the District Court, Mr. Hekmati certified under penalty of perjury pursuant to 28 U.S.C. § 1746 (the "Unsworn Declaration Statute") that his statements were true.[45]

The perjury statute, 18 U.S.C. § 1621, sets forth the standards for false statements made under the Unsworn Declaration Statute.  The statute provides:

> Whoever . . . in any declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, United States Code, willfully subscribes as true any material matter which he does not believe to be true . . . is guilty of perjury . . . .

18 U.S.C. § 1621.

It is well-established that § 1621's prohibitions do not include willful omissions of material facts, as long as the declarant's statements are literally true.  *Bronston v. U.S.*, 409 U.S. 352, 362 (1973).  In *Bronston*, the owner of an insolvent entity was asked by creditors, as part of a hearing to determine the insolvent entity's available assets, whether he personally had any Swiss bank accounts.  The owner, who did have such accounts, answered only that the insolvent company had such accounts.  The court found that, although the witness's omission was purposefully misleading, it did not constitute a falsehood under § 1621 because the statement was literally true.  *Id.* at 354–58.  The court determined that the onus was on the party seeking the information to pursue any additional information from the declarant that may be necessary for a complete response.  *Id.* at 358-59.[46]

---

[45] *See* 28 U.S.C. § 1746 (providing that "[w]herever, under any law of the United States or under any rule, regulation, order, or requirement made pursuant to law, any matter is required or permitted to be supported, evidenced, established, or proved by the sworn declaration . . . in writing of the person making the same . . . such matter may . . . be supported, evidenced, established, or proved by the unsworn declaration . . . in writing of such person which is subscribed by him, as true under penalty of perjury, and dated, in substantially the following form:

   (1)  If executed without the United States: 'I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on (date). (Signature).'"

[46] Courts also have extended this literal truth defense to violations of 18 U.S.C. § 1001, which sets forth the standard for falsehoods not made under oath in administrative proceedings, due to "the obvious parallel" between 1001 and § 1621.  *United States. v. Rendon-Marquez*, 79 F. Supp. 2d 1361, 1363 (N.D. Ga. 1999), *aff'd*, 228 F.3d 416 (11th

Even treating the evidence in the light most favorable to the Government, Mr. Hekmati's statement in his declaration to the District Court that his mother had encouraged him to travel to Iran to visit his grandmother—even if it omitted his alleged intent to sell secrets—was literally true.  He has provided evidence to support that statement.  Neither the FBI nor the Special Master has asserted that Mr. Hekmati's mother did not tell him to visit his grandmother, or that Mr. Hekmati did not go to Iran with an intent to visit his grandmother.  Therefore, Mr. Hekmati's statements were "truthful and accurate," as required by Fund procedures, and cannot constitute grounds for depriving him of a right to payment.  The onus was on Iran, as defendant in the District Court case, or the District Court, as adjudicator, to seek additional testimony from Mr. Hekmati if they had concerns that he was omitting material information regarding the purpose for his trip.

## CONCLUSION

Mr. Hekmati has been to hell and back since he traveled to Iran in 2011.  The treatment of Mr. Hekmati by the United States government since his release and return is a disgrace.  It is well past time for our government to do the right thing.  To put it simply, Mr. Hekmati wants to move on with his life.  We respectfully ask that the Special Master reinstate the payment rights to

Cir. 2000).  For example, in *United States v. Vesaas*, 586 F.2d 101, 104 (8th Cir. 1978), the Eighth Circuit found that a defendant who represented that he did not own any stocks with his deceased mother in joint tenancy had not made a false statement, despite the fact that he had done so prior to his mother's death.  The court found that, because it is a legal impossibility for an individual to own property in joint tenancy with someone who is deceased, the defendant's answer could not constitute a false statement.  *See also United States v. Moses*, 94 F.3d 182, 188 (5th Cir.1996) (finding that defendant had not made a falsehood on his INS Form N-445 application by answering "no" to a question that asked "After the date you filed your petition: 1. Have you married, or been widowed, separated, or divorced?" because he had already been separated from his wife before the filing of the petition, thus rendering the statement true on its face).

which Mr. Hekmati is entitled so that he can continue his efforts to rebuild the life that was taken

from him nine years ago.

# EXHIBIT 1

**Martinez, Sherley M.**

---

| | |
|---|---|
| **From:** | Grim, Emily P. |
| **Sent:** | Monday, March 23, 2020 10:57 AM |
| **To:** | Martinez, Sherley M. |
| **Subject:** | FW: FW: |



**Emily P. Grim**
grime@gilbertlegal.com
O 202.772.3926
C 610.737.3191

1100 New York Ave, NW
Suite 700
Washington, DC 20005
**GilbertLegal.com**

This email and any attachments may contain confidential information that is privileged at law. If you are not a named recipient or have received this communication by error, please notify the sender immediately and destroy this email and its attachments, and all copies thereof, without further distributing or copying them.

-----Original Message-----
From: Grim, Emily P. <grime@gotofirm.com>
Sent: Thursday, April 7, 2016 12:21 PM
To: madere@gotofirm.com
Subject: FW:

FYI - Amir Hekmati was taken in by the FBI for questioning this morning. It could be nothing, but they were supposed to call us before speaking with him, and they didn't. They may call Scott's line. If Scott isn't available for some reason, you can patch them through to me.


[cid:imageed7b0d.GIF@21374280.4aa9860b]<http://www.gotofirm.com/>

Emily P. Grim
grime@gotofirm.com


O 202.772.3926
C 610.737.3191
1100 New York Avenue, NW
Suite 700
Washington, DC 20005
gotofirm.com<http://www.gotofirm.com/>

Visit our blog, We've Got You Covered, at

DA258

www.wevegotyoucoveredblog.com<http://www.wevegotyoucoveredblog.com/>.

This email and any attachments may contain confidential information that is privileged at law. If you are not a named recipient or have received this communication by error, please notify the sender immediately and destroy this email and its attachments, and all copies thereof, without further distributing or copying them.

From: Grim, Emily P.
Sent: Thursday, April 07, 2016 12:18 PM
To: Gilbert, Scott D
Subject: RE: <no subject>

I spoke to an agent at the Flint office. He had no information regarding Amir, but he is working on tracking down Agent Capitano immediately. They will call us as soon as they have any information. I also left a message on Agent Capitano's cell phone. I left both of our numbers, so you may get a call from Flint soon. I will call the DC office next.

[cid:image001.gif@01D190C7.85DC1620]<http://www.gotofirm.com/>

Emily P. Grim
grime@gotofirm.com<mailto:grime@gotofirm.com>

O 202.772.3926
C 610.737.3191
1100 New York Avenue, NW
Suite 700
Washington, DC 20005
gotofirm.com<http://www.gotofirm.com/>

Visit our blog, We've Got You Covered, at
www.wevegotyoucoveredblog.com<http://www.wevegotyoucoveredblog.com/>.

This email and any attachments may contain confidential information that is privileged at law. If you are not a named recipient or have received this communication by error, please notify the sender immediately and destroy this email and its attachments, and all copies thereof, without further distributing or copying them.

From: Gilbert, Scott D
Sent: Thursday, April 07, 2016 11:42 AM
To: Grim, Emily P.
Subject: RE: <no subject>

Let's meet for a few minutes now if you can.

[cid:image001.gif@01D190C7.85DC1620]<http://www.gotofirm.com/>

Scott D. Gilbert
gilberts@gotofirm.com<mailto:gilberts@gotofirm.com>

O 202.772.2277

DA259

C 202.669.2966
1100 New York Avenue, NW
Suite 700
Washington, DC 20005
gotofirm.com<http://www.gotofirm.com/>

Visit our blog, We've Got You Covered, at
www.wevegotyoucoveredblog.com<http://www.wevegotyoucoveredblog.com/>.

This email and any attachments may contain confidential information that is privileged at law. If you are not a named recipient or have received this communication by error, please notify the sender immediately and destroy this email and its attachments, and all copies thereof, without further distributing or copying them.
From: Grim, Emily P.
Sent: Thursday, April 07, 2016 11:23 AM
To: Gilbert, Scott D
Subject: RE: <no subject>

Sorry to miss this - I was in another meeting. As I mentioned earlier, I'll be around all afternoon if you want to touch base when you hear back from Amir.

[cid:image001.gif@01D190C7.85DC1620]<http://www.gotofirm.com/>

Emily P. Grim
grime@gotofirm.com<mailto:grime@gotofirm.com>

O 202.772.3926
C 610.737.3191
1100 New York Avenue, NW
Suite 700
Washington, DC 20005
gotofirm.com<http://www.gotofirm.com/>

Visit our blog, We've Got You Covered, at
www.wevegotyoucoveredblog.com<http://www.wevegotyoucoveredblog.com/>.

This email and any attachments may contain confidential information that is privileged at law. If you are not a named recipient or have received this communication by error, please notify the sender immediately and destroy this email and its attachments, and all copies thereof, without further distributing or copying them.
From: Gilbert, Scott D
Sent: Thursday, April 07, 2016 10:51 AM
To: Grim, Emily P.
Subject: <no subject>

Pop by for a minute?

[cid:image001.gif@01D190C7.85DC1620]<http://www.gotofirm.com/>

3

DA260

Scott D. Gilbert
gilberts@gotofirm.com<mailto:gilberts@gotofirm.com>


O 202.772.2277
C 202.669.2966
1100 New York Avenue, NW
Suite 700
Washington, DC 20005
gotofirm.com<http://www.gotofirm.com/>

Visit our blog, We've Got You Covered, at
www.wevegotyoucoveredblog.com<http://www.wevegotyoucoveredblog.com/>.

This email and any attachments may contain confidential information that is privileged at law. If you are not a named recipient or have received this communication by error, please notify the sender immediately and destroy this email and its attachments, and all copies thereof, without further distributing or copying them.

DA261

# EXHIBIT 1

Case 1:19-cv-01766-RA Document 36-3 Filed 03/12/21 Page 265

## CERTIFICATE OF RELEASE OR DISCHARGE FROM ACTIVE DUTY

| 1. NAME (Last, First, Middle)<br>HEKMATI Amir Nema | 2. DEPARTMENT, COMPONENT AND BRANCH<br>USMC-11 | 3. SOCIAL SECURITY NUMBER |
|---|---|---|

| 4a. GRADE, RATE OR RANK<br>Cpl | b. PAY GRADE<br>E-4 | 5. DATE OF BIRTH (YYYYMMDD) | 6. RESERVE OBLIGATION TERMINATION DATE (YYYYMMDD) 20090405 |
|---|---|---|---|

| 7a. PLACE OF ENTRY INTO ACTIVE DUTY<br>Lansing MEPS<br>Lansing MI 48910-6647 | b. HOME OF RECORD AT TIME OF ENTRY (City and state, or complete address if known) |
|---|---|

| 8a. LAST DUTY ASSIGNMENT AND MAJOR COMMAND<br>2ndBn 4thMar 1stMarDiv FMF CamPen CA | b. STATION WHERE SEPARATED<br>2ndBn 4thMar CamPen CA RUC 13220 |
|---|---|

| 9. COMMAND TO WHICH TRANSFERRED<br>CG (MCRSC) 15303 Andrews Road Kansas City MO 64147-1207 RUC 36005 | 10. SGLI COVERAGE<br>AMOUNT: $ 250,000 | NONE |
|---|---|---|

| 11. PRIMARY SPECIALTY (List number, title and years and months in specialty. List additional specialty numbers and titles involving periods of one or more years.)<br>0311 Rifleman<br>(1 year, 6 months) | 12. RECORD OF SERVICE | YEAR(S) | MONTH(S) | DAY(S) |
|---|---|---|---|---|
| | a. DATE ENTERED AD THIS PERIOD | 2001 | 08 | 20 |
| | b. SEPARATION DATE THIS PERIOD | 2005 | 08 | 19 |
| | c. NET ACTIVE SERVICE THIS PERIOD | 04 | 00 | 00 |
| | d. TOTAL PRIOR ACTIVE SERVICE | 00 | 00 | 00 |
| | e. TOTAL PRIOR INACTIVE SERVICE | 00 | 04 | 14 |
| | f. FOREIGN SERVICE | 00 | 05 | 28 |
| | g. SEA SERVICE | 00 | 00 | 00 |
| | h. EFFECTIVE DATE OF PAY GRADE | 2003 | 07 | 01 |

| 13. DECORATIONS, MEDALS, BADGES, CITATIONS AND CAMPAIGN RIBBONS AWARDED OR AUTHORIZED (All periods of service)<br>Marine Corps Good Conduct Medal, Global War on Terrorism Service Medal, Sea Service Deployment Ribbon, Global War on Terrorism Expeditionary Medal, National Defense Service Medal, Meritorious Mast, Certificate of Appreciation, Combat Action Ribbon | 14. MILITARY EDUCATION (Course title, number of weeks, and month and year completed)<br>Recruit Training Male (12 Weeks, 11/2001), Marine Combat Training (2 Weeks, 1/2002), School of Infantry (7 Weeks, 2/2004), Driver Improvement Course, Martial Arts Tan Belt Training (10/2001) |
|---|---|

| 15a. MEMBER CONTRIBUTED TO POST-VIETNAM ERA VETERANS' EDUCATIONAL ASSISTANCE PROGRAM | | YES | X | NO |
|---|---|---|---|---|
| b. HIGH SCHOOL GRADUATE OR EQUIVALENT | | X | YES | NO |

| 16. DAYS ACCRUED LEAVE PAID RLB:0.5 | 17. MEMBER WAS PROVIDED COMPLETE DENTAL EXAMINATION AND ALL APPROPRIATE DENTAL SERVICES AND TREATMENT WITHIN 90 DAYS PRIOR TO SEPARATION | YES | NO X |
|---|---|---|---|

### 18. REMARKS
Good Conduct Medal commences: 20040820. Member contributed $1,800.00 to the Montgomery G. I. Bill. Subject to active duty recall/annual screening. While a member of the Marine Corps Reserve, you will keep the Commanding General, MCRSC (1-800-255-5082) informed of changes of address, marital status, number of dependents, civilian employment, or physical standards. SNM Participated in Operation Iraqi Freedom. Block 13 cont: Sharpshooter Rifle Badge.

45505-2005-0568

The information contained herein is subject to computer matching within the Department of Defense or with any other affected Federal or non-Federal agency for verification purposes and to determine eligibility for, and/or continued compliance with, the requirements of a Federal benefit program.

| 19a. MAILING ADDRESS AFTER SEPARATION (Include ZIP Code) | b. NEAREST RELATIVE (Name and address - include ZIP Code) |
|---|---|

| 20. MEMBER REQUESTS COPY 6 BE SENT TO | DIRECTOR OF VETERANS AFFAIRS | YES | X | NO |
|---|---|---|---|---|

| 21. SIGNATURE OF MEMBER BEING SEPARATED | 22. OFFICIAL AUTHORIZED TO SIGN (Typed name, grade, title and signature)<br>M. SANCHEZ, GYSGT, PERSCHF, USMC |
|---|---|

| SPECIAL ADDITIONAL INFORMATION (For use by authorized agencies only) | |
|---|---|
| 23. TYPE OF SEPARATION<br>Released from Active Duty | 24. CHARACTER OF SERVICE (Include upgrades)<br>HONORABLE |
| 25. SEPARATION AUTHORITY<br>MARCORSEPMAN PAR. 1005 | 26. SEPARATION CODE<br>MBK | 27. REENTRY CODE<br>RE-1A |
| 28. NARRATIVE REASON FOR SEPARATION | COMPLETION OR REQUIRED ACTIVE SERVICE |

| 29. DATES OF TIME LOST DURING THIS PERIOD (YYYYMMDD)<br>None | 30. MEMBER REQUESTS COPY 4 (Initials) A. H. |
|---|---|

| DD FORM 214, FEB 2000<br>(PP/FF - WHS/DIOR) | PREVIOUS EDITION IS OBSOLETE. | SERVICE - 2 |
|---|---|---|

M. A. LEWIS
Head, MMSB-13, RecCorrespSect
Headquarters, U.S. M... Ins Corps

CERTIFIED TRUE COPY

# EXHIBIT 2



# United States Marine Corps

LANCE CORPORAL AMIR N. HEKMATI ████████ USMC

*was, on the* _____13TH_____ *day of* _____JUNE_____, 2002,

*the subject of a*

# MERITORIOUS MAST

*conducted by the*

COMMANDING OFFICER
MARINE CORPS DETACHMENT
DEFENSE LANGUAGE INSTITUTE
FOREIGN LANGUAGE CENTER
PRESIDIO OF MONTEREY CALIFORNIA 93944-5018

*for outstanding service as follows:*

WHILE SERVING AS A ARABIC LINGUIST STUDENT, MARINE CORPS DETACHMENT, YOU CONSISTENTLY CONDUCTED AND PERFORMED YOUR DUTIES IN AN EXEMPLARY, EXCEPTIONAL AND PROFESSIONAL MANNER.  YOUR PROFESSIONALISM, INITIATIVE, MATURE JUDGEMENT AND DEMONSTRATED "CAN DO" ATTITUDE WERE CLEARLY NOTEWORTHY AND SET THE EXAMPLE FOR ALL TO EMULATE.  YOUR MOTIVATION AND "CAN DO" SPIRIT HAVE EARNED THE RESPECT AND ADMIRATION OF YOUR PEERS AND SENIORS ALIKE, AND AS A RESULT YOU ARE MAINTAINING A GRADE POINT AVERAGE OF 3.7 IN YOUR CLASS.  YOUR DEVOTION TO DUTY, ESPRIT DE CORPS AND TIRELESS EFFORTS REFLECTED GREAT CREDIT UPON YOURSELF AND WERE IN KEEPING WITH THE HIGHEST TRADITIONS OF THE UNITED STATES MARINE CORPS.

T. A. SPARKS
MAJOR, U. S. MARINE CORPS
COMMANDING

U.S. G.P.O.: 2000 504-598

____ (REV 1.00)  SN: 0109-LF-986-9800

DA265

# EXHIBIT 2

**Martinez, Sherley M.**

| | |
|---|---|
| **From:** | Grim, Emily P. |
| **Sent:** | Sunday, March 22, 2020 10:15 AM |
| **To:** | Martinez, Sherley M. |
| **Subject:** | FW: Amir Hekmati Follow-Up |



**Emily P. Grim**
grime@gilbertlegal.com
O 202.772.3926
C 610.737.3191

1100 New York Ave, NW
Suite 700
Washington, DC 20005
**GilbertLegal.com**

This email and any attachments may contain confidential information that is privileged at law. If you are not a named recipient or have received this communication by error, please notify the sender immediately and destroy this email and its attachments, and all copies thereof, without further distributing or copying them.

**From:** Grim, Emily P.
**Sent:** Saturday, March 21, 2020 12:52 PM
**To:** Grim, Emily P. <grime@gilbertlegal.com>
**Subject:** FW: Amir Hekmati Follow-Up

**From:** Gilbert, Scott D <gilberts@gotofirm.com>
**Sent:** Thursday, April 7, 2016 2:06 PM
**To:** Caroline_A_Tess@nsc.eop.gov; Tim_Rieser@appro.senate.gov
**Cc:** grime@gotofirm.com
**Subject:** Amir Hekmati Follow-Up

Caroline and Tim:

I am writing to express my concern about a very troubling incident today concerning Amir Hekmati.  Two FBI agents showed up at his mother's home and asked him to come with them to the local FBI office in Flint.  Amir immediately contacted me and I asked to speak to one of the agents, which they refused.  Instead they told Amir they had classified information to provide to him and needed to do so at their office.  They indicated to Amir that they would need to speak with me on a land line in their office.  Once at the FBI location, they refused to contact me and Amir's phone was unavailable.  They then questioned Amir for about 30 minutes, and they alleged that he had disclosed classified information, apparently in connection with an internet search that he did in Afghanistan on his way to Iran.  He of course denied this, and they asked him to take a polygraph.  Amir refused without the ability to speak to his lawyer.

Amir just served almost five years in Ervin Prison because he was a US marine.  He is going back to school to get his masters in economics and is making great strides to recapture the normalcy of life.  I continue to worry about PTSD
REDACTED          So today, we have the USG detaining him, denying him counsel, and leveling absurd and unfounded

1

DA267

accusations at him in an interrogation room.  Amir, understandably is quite upset.  I thought I would raise this with you all, so you can inform Ben and others.  I would prefer you heard about it from me before you read about it.

The FBI agent's name is Melinda B. Capitano, a special agent out of the DC Field Office.  Telephone: ███████████;  Cell: ███████████ email: ███████████████████████.  I intend to put a stop to this, one way or the other.  Please let me know if you have any constructive suggestions.  Thanks.

sdg



**Scott D. Gilbert**
gilberts@gotofirm.com


O 202.772.2277
C 202.669.2966
1100 New York Avenue, NW
Suite 700
Washington, DC 20005
gotofirm.com

Visit our blog, We've Got You Covered, at www.wevegotyoucoveredblog.com.

This email and any attachments may contain confidential information that is privileged at law. If you are not a named recipient or have received this communication by error, please notify the sender immediately and destroy this email and its attachments, and all copies thereof, without further distributing or copying them.

DA268

# EXHIBIT 3

**ISMAIL BOLOTOK**
**DEFENSE LANGUAGE INSTITUTE**
**SCHOOL OF MIDDLE EAST "II"**
**DEPARTMENT "B"**

████████████████████

**SUBJECT: LETTER OF RECOMMENDATION**
**FOR AMIR HEKMATI**

Dear Sir, Mme.

I have professionally known Mr. Hekmati for a period of eighteen months while he studied Arabic at the Defense Language Institute; as the team leader and a member of the teaching staff, I had the opportunity to observe Mr. Hekmati in and out of the classroom.

Mr. Hekmati may be described as the epitome of a person who strives for excellence, his motivation and pursuit to see the light at the end of the tunnel never ceased while he was assigned to study an intense 63 weeks of Arabic, his intellect approach and Analysis of the grammar and syntax allowed him to acquire the Language with ease and ahead of his peers.

I am glad that I had the pleasure of having Mr. Hekmati as one of my students, his maturity encouraged his younger classmates to seek his advice on academic and personal issues; I think he humbly enjoyed playing the big brother role, which he deservedly has earned.

Cordially

Ismail Bolotok
Team leader-B4

# Defense Language Institute

## Foreign Language Center

Presidio of Monterey, California

This is to certify that

### AMIR N HEKMATI

has successfully fulfilled the prescribed requirements for the
sixty-three week Basic Program of Instruction in the

### ARABIC LANGUAGE

In testimony whereof, and by authority of the
Department of Defense
we confer this

## Diploma with High Honors

Given this 15th day of May 2003

Fred F. Vaughn
Registrar

KEVIN M RICE
Colonel, United States Army
Commandant
Defense Language Institute
Foreign Language Center

DEFENSE LANGUAGE INSTITUTE

OFFICIAL

DA271

# EXHIBIT 4

JAN-20-2005 19:02 FROM:                18042780535              TO:17607631198              P.2/2



**UNITED STATES MARINE CORPS**
RECRUITING STATION RICHMOND
9210 ARBORETUM PARKWAY
SUITE 220
RICHMOND, VIRGINIA 23236-3427

IN REPLY REFER TO:
1000
CO
13 Jan 05

From:   Commanding Officer
TO:     To whom it may concern

Subj:   LETTER OF RECOMMENDATION IN CASE OF CORPORAL AMIR N.
        HEKMATI

1. Amir Hekmati is one of the most intelligent, well rounded,
and dynamic young leaders I have served with in my career.
During 8 months of intense combat operations in Ar Ramadi, Iraq,
Amir's language ability, leadership, bravery and interpersonal
skills were a cornerstone in the battalion's success.  In his
daily meetings with the governor of Al Anbar Providence, the
Providence Police Chief and the Providence National Guard
Commander, Amir served as an interpreter, cultural advisor, and
sounding board for the battalion staff and mentor to the Iraqi
officials.  His actions helped to stabilize an entire Providence
and a city of over 450,000.  During this time, he coordinated
the forming of a democratic government, the rebuilding of a
police force, the forming of a national guard, infrastructural
rebuilding efforts and the Providence budget.  During combat
operations, Amir performed the duties of translator in an
outstanding manner. His actions within this chaotic environment
saved the lives of his fellow Marines, provided actionable
intelligence and helped bring order to chaos.

2. Whether it was dealing with Governors, Sheiks, insurgents or
everyday citizens, Amir's actions served as a force multiplier
and were nothing less than superb.  He is capable of excelling
in the most demanding environments through remarkable
intelligence and perseverance, and will be a tremendous asset to
any organization or educational institution.

3. Please contact me at ███████████ if you have any
questions.

J.D. HARRILL
MAJ        USMC

1

DA273



**UNITED STATES MARINE CORPS**
2nd Battalion, 4th Marines
P.O. Box 555493
Camp Pendleton, California 92055-5493

1000
JWH
3 Jan 05

From: Captain John W. Hahn IV
To:   Whom it may concern

Subj: LETTER OF RECOMMENDATION FOR CORPORAL AMIR HEKMATI

1. I was the officer in charge of Corporal Amir Hekmati during combat operations in Ar Ramadi, Iraq from April 2004 until September 2004. I worked directly with him seven days per week, sixteen hours per day, for six months straight. I observed his actions when he was engaged by rocket-propelled grenades and machine gun fire; and when performing technical skills that required extensive study with very little sleep and/or food.

2. Amir performed so well that he was selected from a pool of twenty other interpreters to be the interpreter for the top three ranking officers in the Battalion. He was the best interpreter we had. His duties brought him under enemy fire numerous times. Each time he proved his courage and effectiveness under stress to be everything that I could have wished for.

3. He demonstrated an amazing ability to learn. Consequently I had him write Battalion operation orders that directed the actions of thousands of Marines. He taught himself the orders writing format, Microsoft PowerPoint, Microsoft Word and other Marine Corps-specific software packages. He learns faster and has better study habits than any other Marine I have served with.

4. Amir will excel in whatever field he chooses to work or study in. I recommend him to you with my highest recommendation. If you have any questions, please contact me at ████████████████ or ███████████

Sincerely,

J. W. HAHN
CAPT USMC

DA274



UNITED STATES MARINE CORPS
2D BATTALION, 4TH MARINES
1ST MARINE DIVISION
BOX 555493
CAMP PENDLETON, CA 92055-5493

5800
S-1
10 Jan 05

FIRST ENDORSEMENT on CPL A N Hekmati ███████

From:  Commanding Officer, 2d Battalion, 4th Marines
To:    Director, Department of the Navy, Central Adjudication Facility

Subj: RESPONSE TO LETTER OF INTENT (LOI)

1.  Forwarded, recommending the performance of SNM during the period of May
2004 to January 2005..

2. CPL A N Hekmati joined my battalion during the spring of 2004 while we
were deployed to Ar Ramadi, Iraq.  Upon realizing his skill and proficiency
in Arabic, I quickly employed his talent in a very demanding environment
that most Marines of his age and experience would have been hard pressed to
undertake.  He routinely accompanied me to the provincial government complex
to translate for the Governor and the Chief of Police.  His translations
and, more importantly, interpretation became a source of confidence for both
sides.  He immediately seized upon the subtlety of interpreting this complex
Sunni culture so that exceptional clarity existed between both parties.   .

3.  In addition to his language skill, he was routinely present during the
numerous and varied combat missions executed by this command.  He was the
man on the spot during hasty interrogations and in acting as a go-between in
many tense situations.  I have personally observed his coolness under enemy
fire, facing multiple attacks from improvised explosive devices and small
arms attacks.  I can think of nothing better to test the loyalty and
conviction of any young person than their willingness to perform their duty
under life threatening conditions.

4.  CPL Hekmati contributed in the final weeks of our deployment by
assisting in the socialization of a troop of Iraqi Special Forces assigned
to joint duty with my battalion.  Once again, he performed this role of
interlocutor with skill and aplomb.  Without the secret weapon of this young
Marine I believe that the battalion would have suffered a higher rate of
casualties and committed any number of cultural gaffes that he neatly
steered us around.  I have no doubt concerning his dedication to the Marine
and sailors of 2nd Battalion, 4th Marines.

P.J. Kennedy
LtCol, USMC

JAN-20-2005 19:02 FROM:                 18042720535            TO:17607631198            P.2/2



**UNITED STATES MARINE CORPS**
RECRUITING STATION RICHMOND
9210 ARBORETUM PARKWAY
SUITE 220
RICHMOND, VIRGINIA 23236-3427

IN REPLY REFER TO:
1000
CO
13 Jan 05

From:   Commanding Officer
TO:     To whom it may concern

Subj:   LETTER OF RECOMMENDATION IN CASE OF CORPORAL AMIR N.
        HEKMATI

1.  Amir Hekmati is one of the most intelligent, well rounded,
and dynamic young leaders I have served with in my career.
During 8 months of intense combat operations in Ar Ramadi, Iraq,
Amir's language ability, leadership, bravery and interpersonal
skills were a cornerstone in the battalion's success.  In his
daily meetings with the governor of Al Anbar Providence, the
Providence Police Chief and the Providence National Guard
Commander, Amir served as an interpreter, cultural advisor, and
sounding board for the battalion staff and mentor to the Iraqi
officials.  His actions helped to stabilize an entire Providence
and a city of over 450,000.  During this time, he coordinated
the forming of a democratic government, the rebuilding of a
police force, the forming of a national guard, infrastructural
rebuilding efforts and the Providence budget.  During combat
operations, Amir performed the duties of translator in an
outstanding manner. His actions within this chaotic environment
saved the lives of his fellow Marines, provided actionable
intelligence and helped bring order to chaos.

2.  Whether it was dealing with Governors, Sheiks, insurgents or
everyday citizens, Amir's actions served as a force multiplier
and were nothing less than superb.  He is capable of excelling
in the most demanding environments through remarkable
intelligence and perseverance, and will be a tremendous asset to
any organization or educational institution.

3.  Please contact me at ██████████ if you have any
questions.

                                    J.D. HARRILL
                                    MAJ      USMC

1

DA276

**UNITED STATES MARINE CORPS**

1ST MARINE DIVISION (REIN), FMF
BOX 555380
CAMP PENDLETON, CALIFORNIA 92055-5380

INREPLY REFER TO

From: SSgt Coleman G-3 Training Chief
To:   Whom it may concern

Subj: Character Reference for Cpl Amir N. Hekmati ███████

    I have known Cpl. Hekmati in a variety of capacities for a period of one year. He has been a part of my battalion for over a year and is now my subordinate at 1st Marine Division G-3 and is a part of our language training program.  Cpl Hekmati is organized, efficient, extremely competent and has an excellent rapport with people of all ages. His communication skills, both written and verbal, are excellent.  He faced a very difficult task as a Arabic translator and put his life on the line many times during Operation Iraqi Freedom II.

    In summary, I highly recommend for any position or endeavor that he may seek to pursue. He will be a valuable asset to any organization.  f you have any questions, please to do hesitate to contact me.

Sincerely,

SSgt Patrick D. Coleman
1MarDiv G-3 Training

███████████████



UNITED STATES MARINE CORPS
1ST MARINE DIVISION (REIN), FMF
BOX 555380
CAMP PENDLETON, CALIFORNIA 92055-5380

INREPLY
REFER TO:
3000
G3T
18 May 05

From:   1st Marine Division Training Officer
To:     Whom it may concern

Subj:   Character Reference for Corporal Amir N Hekmati

1.      I have known Cpl Hekmati for a period of approximately 6 months from January - the present. During this time he has served as the Arabic Culture and Language Training NCO.  His duties and responsibilities have included the following:

- Arabic Language and Cultural Instructor
- Taught Arabic to different battalions prior to their deployments to Operation Iraqi Freedom (OIF)-II.
- Scheduled and coordinated Defense Language Institute (DLI) classes for many 1st Marine Division units.
- One of only a handful of Marines qualified to be given the Military Occupational Specialty of 8611 Interpreter/Translator.  Has performed these functions.
- Played an important role in affording Marines the opportunity to take college-level Arabic courses aboard MCB Camp Pendleton.
- Plays an important role in the introduction and assessment of Tactical Iraqi Video Game, a game that we hope to eventually provide language and culture training to Marines, Marine-Corps wide.
- Assisted the Defense Advanced Research Projects Agency (DARPA) in collecting data for a hand-held translation device named the "Phraselator".  This "electronic translator" is designed to provide on the spot linguistic support to Marines on the battlefield.

2.      Corporal Hekmati's performance as Arabic language and Cultural training NCO has been superb.  He knows both languages well.  He is also a very intelligent Marine and possesses writing skills above that of my average Marine and some officers.  These skills have been put to use to organize and train our Marines.  I have personally worked with him and seen his ability and work ethic.  He will get the job done.

3.      Corporal Hekmati would be a great asset to any organization, within or external to the Marine Corps.  I offer my enthusiastic endorsement for his capabilities and motivation.

J.H. GRIFFIN
LTCOL USMCR

# EXHIBIT 5

MAY-26-2006  12:10       DARPA/ISO                      703 696 2203    P.01/01

# DEFENSE ADVANCED RESEARCH PROJECTS AGENCY
### 3701 NORTH FAIRFAX DRIVE
### ARLINGTON, VA 22203-1714

May 23, 2006

**RE: Amir Hekmati**

To Whom It May Concern:

Amir Hekmati has been an independent consultant for DARPA's TRANSTAC program from June 2005 to the present, and has been paid on an hourly basis in accordance with his skills and experience.

Amir's work has included serving as an Arabic language expert, advising on military and cultural issues, training, and assisting subcontractors. Amir is skilled in Arabic and Persian-Farsi, has military combat experience and is also very reliable, intelligent, and motivated.

I am happy to recommend Amir Hekmati as I consider him to be a valuable member of the team, who has consistently delivered excellent results for our program.

Yours faithfully,

Dr. Mari Maeda
Program Manager

TOTAL P.01

DA280



Thomas J. Watson Research Center
P.O. Box 218
Yorktown Heights, NY 10598

March 12, 2007

To Whom It May Concern

Mr Amir Hekmati has worked with my team at IBM on a number of occasions to provide
both military subject matter expertise and linguistic support and to help to discover areas
to improve the IBM MASTOR (Multilingual Automatic Speech-to-Speech Translator)
system. Mr Hekmati has an excellent linguistic ability and was able to offer many
valuable suggestions to help improve our systems. Mr Hekmati was a former Marine who
served in Iraq as well as a fluent Arabic and Persian-Farsi speaker. I would highly
recommend Mr Hekmati to work in any similar consulting position and would consider
him a valuable asset to any organization.

If you would like to discuss this further, please feel free to contact me via phone or email.

Sincerely,

Yuqing Gao, PhD
Manager and Research Staff Member
Speech Recognition and Understanding
IBM T. J. Watson Research Center
1101 Kitchawan Road
Yorktown Heights, NY 10549

Donovan T. Cantrall
Site Lead, II MEF Transition Training Cell
Camp Lejeune, NC 28542

27 March 2009

To Whom It May Concern

As the Site Lead of the Transition Training Cell, I had the privilege of being Amir Hekmati's supervisor from April 2008 to my departure in April 2009.

As the Culture/Language Lead, Amir's team was responsible for the classroom and field instruction of over 36 Military and Police Transition Teams undergoing pre-deployment training at the Transition Training Cell. Amir's team instructed 458 Marines and Sailors on Iraqi Cultural and Language.

Amir completed the Mounted Operations in Urban Terrain Instructor's Course and assisted in infantry tactics such as Close Quarters Battle, Mounted Combat Patrols, Mounted Operations in Urban Terrain and other infantry tactics classes that were required of the team members prior to deployment to Iraq.

Amir also assisted in the instruction of the small arms weapons and crew served weapons associated with an infantry battalion. In addition to these weapons, he also taught the nomenclature and handling of the optical equipment associated with infantry weapons.

Amir is a no-nonsense individual that leads from the front. He is a perfect example of what an employer expects of their employees and can be counted on at all times. He has instructed expertly and has always been a productive member of the Transition Training Cell Team. Amir's personal pride is demonstrated by his great physical condition and impeccable appearance. He communicates in an outstanding manner with everyone he comes into contact with and is an outstanding instructor.

Amir is enthusiastically recommended for whatever position that he may pursue. If I can be any other assistance, please do not hesitate to contact me anytime at the phone number or e-mail address listed above.

Donovan T. Cantrall

DA282

# EXHIBIT 6

Dr. Christopher Brace

Re: Reference Letter for Amir Hekmati

To Whom It May Concern:

I worked closely with Amir during his tenure as a GS-13 Department of Army Civilian in Fort Leavenworth, KS, and Camp Speicher Tikrit, Iraq from January 2010 to May of 2011 in his role as Research Manager.  Mr. Hekmati was tasked with supporting Social Scientists, Team Leaders, and Analysts to conduct various research projects, studies, and specific inquiries for U.S. Army Leadership, NGOs, State Department representatives and Intelligence collection services.  Studies included internal disputes between Kurdistan Regional Government, and the greater Iraqi Government, Cultural sensitivities when dealing with Iraqi Army personnel, Kurdish Oil pipelines, Iranian influence in Iraq, Iranian infiltration of Iraqi militias in Southern Iraq, corruption in the Iraqi Army, and the dispute between the Iraqi government, and the Kurdish Regional government over the division of oil revenues. Mr. Hekmati was also instrumental in the Tadreeb Al Shammil training programing, providing valuable insights into both the U.S. and Iraqi training paradigms. He was extremely effective in his position as Research Manager, and I would highly recommend him as a capable member of any future team. He has outstanding moral character and is of the most flexible, critical thinking research I have ever had the pleasure of working with.

Regards,

Christopher S. Brace, Ph. D.,
Division 1 Manager
Arkansas Support Network
███████████

DA284

# EXHIBIT 7



# EXHIBIT 8



DA288

# EXHIBIT 9

DA289



Maman jaan

ⓘ   Flag for follow up.

amir hekmati
Wed 12/29/2010 11:51 AM
You

Madar jaan,

I have a friend who has a company called "Legal Persian" his website is www.legalpersian.com and his name is Hessam.  He specializes in getting Visa for Iran and he says he can handle everything for me.  He is asking that I scan whatever documents I have for Iran and scan and e-mail them to him so he will know what I need to visit Iran this summer.  His e-mail is info@legalpersian.com.  Can you scan whatever documents I have from Iran and scan and e-mail them to him?

My trip is going very well maman jaan, I will send you some pictures and call you soon.  I love you.


Amir Hekmati
امیرحکمتي

# EXHIBIT 10

DA291



Search

🗑 Delete    📁 Archive    ◯ Junk ⌄    ✎ Sweep    📨 Move to ⌄    ⬦ Categorize ⌄    🕐 Snooze ⌄    ⋯                    ↑    ↓    ✕

visa

On Mon, Jan 3, 2011 at 8:58 AM, Legal Persian L.L.P <legalpersian@gmail.com> wrote:

Amir joon,

You almost have everything to renew your passport. You need to apply for a national ID card, a new passport and temporary military exemption stamp. There will be $270 filing fees and I will charge you (with Hekmati's special discount $260). Your passport and military thing in about a week and you can travel to Iran immediately.  Your national ID card will be ready in 8-10 months, but you would not need it for traveling purposes. Please let me know. If u want me to take care o it for u.

Happy new year too!!

Sent from my iPhone

On Jan 3, 2011, at 10:12 AM, amir hekmati ⬛⬛⬛⬛⬛⬛ rote:

The rest of the files are attached.

Thanks,

Amir Hekmati
امیرحکمتي

DA292

# EXHIBIT 11

/5/12

Gmail - Jobdescription and benefits

# Gmail

A H <amir.hekmati@gmail.com>

## Jobdescription and benefits
1 message

Klugh, Gretchen <

To: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Thu, May 19, 2011 at 10:12 AM

Thank you

Let's talk tomorrow morning

Harding Security Associates, Inc. (HSA), a Six3 Systems (Six3) company embraces Six3's six core values (Integrity, Ethics, Partnership, Trust, Quality, and Innovation) and providing excellence in serving the missions of our 3 key markets (DoD, Intelligence, and Civilian communities). Six3 is backed by the private equity firm GTCR (www.gtcr.com), and the strategy is to build a highly focused and nationally recognized defense company with specialized capabilities in Biometrically Enabled Intelligence, Cyber Security, and Intelligence Surveillance and Reconnaissance (ISR) The Six3 Systems family is made up of industry-leading companies including Harding Security Associates (HSA) and BIT Systems (BITS). Our teams are highly adept at solving complex problems utilizing the convergence of top-line subject matter expertise and leading-edge technology solutions, empowering decision-makers to make better mission-critical decisions. For more information about Six3, please visit www.six3systems.com We are backed by the private equity firm GTCR (www.gtcr.com), and our strategy is to build a highly focused and nationally recognized defense company with specialized capabilities in Biometrically Enabled Intelligence, Cyber Security, and Intelligence Surveillance and Reconnaissance (ISR). The Six3 Systems family is made up of industry-leading companies including Harding Security Associates (HSA) and BIT Systems (BITS). Our teams are highly adept at solving complex problems utilizing the convergence of top-line subject matter expertise and leading-edge technology solutions, empowering decision-makers to make better mission-critical decisions. For more information about Six3, please visit www.six3systems.com Intelligence Analyst will provide USFOR-A CJ2 analytical support on the following: databasing and dissemination of Afghanistan measures of stability. This includes security, governance/development, Human Terrain, provincial and district assessments, High Value Targeting products, Extremist and Regional Threat Network Nodal Analysis and preparation of Intelligence Surveillance and reconnaissance Assessment Metrics. Must be able to fuse IMINT, SIGINT and HUMINT to present an all source product on military activity, insurgent actions, economic/political activities, threats to regional stability, and trend analysis.

Mid-level analyst with 4 years analytic experience, preferred as general military all-source analyst with operational experience. -Experience in either, CT, SWA regional issues and HUMINT or POL/MIL analysis. - proficient in using basic computer applications and intelligence systems. -Strong research and writing skills to produce intelligence products and assessments. - Military specialty 1N /35F / 350F / 18F, 35D, 34A or civilian/Services equivalents. -At least an Associate's Degree, BA preferred. - TS/SCI

I would love to get you on the team

DA294

# EXHIBIT 12

# HARDING SECURITY ASSOCIATES, INC., A SIX3 SYSTEMS COMPANY
## EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT is made as of this 22 day of JUNE 2011, by and between Harding Security Associates, Inc. (HSA), A Six3 Systems Company, a Virginia corporation ("the Company"), and AMIR HEKMATI ("Employee").

WHEREAS, Employee desires to be employed by the Company and the Company desires to employ the services of Employee as a INTELLIGENCE ANALYST, to perform such services as may be assigned to him by the Company pursuant to the terms, covenants and conditions set forth in this Agreement;

WHEREAS, the Company's employees develop and come in contact with the Company's clients, receive training and instruction that involves learning certain proprietary and confidential information about the Company and its operations, processes and methods, and have regular access to proprietary and confidential information of the Company which has significant economic value and is not readily available to the public, is of great importance to the Company and is carefully protected by the Company as secret and confidential information; and

WHEREAS, Employee will, in his position, act for the Company and will be employed in a position of trust and confidence in which a strict duty of loyalty on the part of the Employee to the Company is created;

NOW, THEREFORE, in consideration of the mutual promises and agreements hereinafter set forth, the parties hereto, intending legally to be bound, hereby agree as follows:

1. _Employment_.  The Company hereby employs Employee as a INTELLIGENCE ANALYST to perform all duties consistent with such position and associated therewith, and more specifically as directed and delegated by Employee's management.  Employee hereby accepts and agrees to such employment, subject to the general supervision and direction of the Company.

2. _Loyalty and Best Efforts_.  Employee hereby acknowledges and undertakes a strict duty of loyalty to the Company and promises to devote his best efforts, experience and talents full time to the performance of duties for the Company and, accordingly, agrees to refrain from taking advantage, for himself or others, of any corporate opportunities of the Company.

3. _Term of Employment_.  The term of this Agreement shall commence as of the date first written above and remain in full force and effect until terminated as set forth herein.

DA296

4. _Termination._  Either party may terminate this Agreement and the employment contemplated herein at any time and without liability for doing so.  Notwithstanding the foregoing, the provisions of this Agreement regarding confidentiality, non-competition, non-piracy of clients and non-solicitation of employees shall survive any termination of Employee's employment, however such termination is effected, unless the parties agree in writing to the contrary.

Failure of the Company at any time to require performance by Employee of any provision expressed herein shall in no way affect the Company's right to thereafter enforce such provision, nor shall the waiver by the Company of any breach of any provision expressed herein be taken or held to be a waiver of any succeeding breach of any such provision or as a waiver of a provision itself.

5. _No Prior Agreements._  Employee will not, during the term hereof, improperly use or disclose any proprietary information or trade secrets of any other employer.  Further (check and initial "a" or "b" as applicable)

a. _Employee represents that he is not a party to, or otherwise subject to or bound by the terms of, any contract, agreement or understanding which in any manner would limit or otherwise affect his ability to perform his obligations hereunder, including, without limitation, any contract, agreement or understanding containing any provision limiting Employee's right to compete with a prior employer._  ___BI H___

b. _Employee is a party to an agreement with a former employer containing post-employment restrictions.  Employee agrees he or she can perform his or her duties for the Company without violating any lawful post-employment restrictions and that he or she will abide by all lawful post-employment restrictions._  _____

6. _Non-Competition._  Employee acknowledges that during the course of his employment, he will acquire proprietary and confidential information about the Company's business and will receive training on such proprietary and confidential information, including, but not limited to, the Company's clients, strategies, research, business plans, business methods, sales and pricing data, processes, technology and other information, some of which may be regarded and treated by the Company as trade secrets and that he will be responsible for contacting and developing relationships with customers on behalf of the Company.  In order to protect the Company's critical interest in these relationships and information, Employee covenants as follows:

a. Employee agrees that for a period of six months following the last day of Employee's employment, Employee will not, directly or indirectly, compete with the Company by providing the same or similar services as those provided by Employee during the course of his employment with the Company.

b. The covenants in this paragraph 6 are severable and separate, and the unenforceability of any specific covenant shall not affect the provisions of any other covenant.

c. If any provision of this paragraph 6 relating to the time period or scope of the restrictive covenant shall be declared by a court of competent jurisdiction to exceed the maximum time period, or scope, as applicable, that such court deems reasonable and enforceable, said time period of scope shall be deemed to be, and thereafter shall become, the maximum time period or greatest scope that such court deems reasonable and enforceable and this Agreement shall automatically be considered to have been amended and revised to reflect such determination.

DA297

# EXHIBIT 13



← [redacted]

🗑 Delete   📥 Archive   🚫 Junk ⌄   📁 Move to ⌄   🏷 Categorize ⌄   ⋯      ↑  ↓  ✕

**Happy Bday**

**behnaz hekmati**
Fri 7/15/2011 4:09 AM
[redacted]

merci amir jaan. ghorbaanet beram. jaat kheily khaalee. delemoon tang shodeh barat. let me know if you need anything from iran.

love you too,
mom

⋯

ⓘ   Flag for follow up.

**A H** < [redacted]
Wed 7/13/2011 7:06 AM
You ⌄

Happy Birthday maman jaan, ishallah hamisheeh saalem bashee madar jaaneh man.  I love you very much and miss you mom.  I hope you are having a great time with Grandma.

Love,
**Amir Hekmati**

# EXHIBIT A

## DECLARATION OF AMIR HEKMATI

I, Amir Hekmati, do hereby state the following facts based on my personal knowledge:

## BACKGROUND

1.      I was born ▇▇▇▇▇ in ▇▇▇▇▇▇▇ to Ali and Behnaz Hekmati.

2.      At the time, my father, Ali, was finishing his Ph. D in Microbiology at Arizona State University, and my mother, Behnaz, was completing a B.S. in Accounting.

3.      My family has always been close.  I have an older sister, Sarah; a twin sister, Leila; and a younger brother, Omeed.

4.      When I was eight years old, my family moved to Flint, Michigan, where my father had been hired as a Professor of Biology at Mott Community College—a position that he kept until his retirement.

5.      I grew up in Flint and graduated from high school there.  Growing up, I was an active athlete and on the high school honor roll.  I played for the high school soccer and ice hockey teams and was an annual participant in the Michigan Science Fair.

6.      In 2001, my senior year of high school, recruiters from the United States Marine Corps came to my school.  I was inspired by their presentation.  I told my family I wanted to join the Marines after graduating high school.  They had some reservations—my mother was concerned for my safety, and my father wanted me to go straight to college to study medicine— but in the end, they respected my decision.  I joined the Marines immediately after graduation in July 2001, and served until my honorable discharge in August of 2005.

7.      I joined the Marines out of a sense of duty to my country.  That sense of duty intensified after 9/11, which happened while I was in bootcamp.  I am proud to say that I served honorably and am a decorated combat veteran.  *See* Certificate of Release or Discharge From

Active Duty, attached hereto as Ex. 1.  I received a Meritorious Mast for superior service and

reached the rank of E-5/SGT in under four years, which I understood to be uncommon for a four-

year enlistment.  *See* Meritorious Mast Award, attached hereto as Ex. 2.

8.    While in the Marines, I studied Arabic for 63 weeks at Monterey Peninsula

College.  I had spoken some Farsi at home growing up, but Arabic was new to me (there is some

overlap in the two alphabets, but the languages are very different).  I worked hard and graduated

with honors.  *See* Letter of Reference from Arabic Professor and Diploma, attached hereto as

Ex. 3.

9.    In 2003, I was given orders to deploy with 2nd BN 4th Marines as an infantry

rifleman to support combat operations in Ar-Ramadi, Iraq.  Due to my Arabic training, I had

additional duties of serving as the personal interpreter of the battalion commander.  I also played

a lead role in the training of Iraqi security forces and acted as translator during the

implementation of millions of dollars in reconstruction projects throughout the city.  *See* Letters

of Recommendation from Military Commanders, attached hereto as Ex. 4.

10.    I completed my service in the Marines in 2005, after about four years of service.

11.    I've always viewed my time in the Marines as a positive experience.  Make no

mistake—my time in Iraq was not easy.  I watched friends die and suffer injuries over nine

months of combat.  But, it motivated me to know that people were relying on me and that I was

serving my country with honor.  I came home feeling that I had grown personally and

professionally, and I felt even more appreciative of the freedoms we have in the United States.

12.    After I left the Marines in 2005, I went on to serve my country as a U.S. military

contractor, focusing on translation and cultural education.  I had seen firsthand during my time in

the Marines how crucial such skills could be in obtaining critical information or diffusing tense

DA302

situations with local civilians on the ground.  I had watched delayed or ineffective communication result in the deaths of many Marines.  I was pleased that I could continue to serve my country in an area that I viewed as essential to the safety of our troops abroad.

13.     In 2005, I started Lucid Linguistics, a consulting company providing language and cultural instruction and technology to the U.S. military.  Soon after, Lucid Linguistics was hired by the Department of Defense ("DOD") to assist the Defense Advanced Research Projects Agency ("DARPA") and other DOD clients in the area of language translation technology.  DARPA is an agency that identifies, develops, and procures technologies for use in the U.S. military.  I had worked with DARPA representatives when they came to Iraq during the last few months of my deployment to test new language translation technology, so the transition was a logical one.  I continued to work for the DOD through Lucid Linguistics until 2007.  My other clients included MITRE, BBN Technologies, and IBM.  *See* Employer Letters of Reference, attached hereto as Ex. 5.

14.     While I was working for the DOD through Lucid Linguistics, I patented an instructional methodology for languages that later was purchased by Vcom3D, a defense contractor in Orlando, Florida, for $300,000.  This technology has helped tens of thousands of service members learn language and culture in preparation for deployment overseas.

15.     While working as a contractor, I also decided to go to college.  I was traveling so much for my job that I decided to seek a bachelor's degree in International Business Management online from the University of Phoenix.  I continued to serve our nation through my contract work while completing my degree from the University of Phoenix, which I obtained in 2009.

DA303

16.     In 2007, I became a geopolitical analyst for Cubic Corporation, another defense contractor.  My role was to provide analysis of security-related issues in the Middle East for Cubic Corporation's DOD clients.  I worked with Cubic Corporation until 2009.

17.     In 2009, I became a research manager for defense contractor BAE Systems.  As part of this position, I worked for one year in Tikrit, Iraq for the U.S. Army's Human Terrain Analysis Program, primarily providing cultural analysis and advice to U.S. military commanders. My research topics included, among others, Iranian influence in Iraq and Iranian infiltration of Iraqi militias in Southern Iraq.  *See* Christopher S. Brace Recommendation Letter, attached hereto as Ex. 6.  At the request of my supervisors, I applied for and was granted a top-secret level security clearance.

18.     In 2009 and 2010, I took, and passed, two intensive polygraphs as part of background checks for two different intelligence-related positions with the U.S. Government. The first was in connection with a potential position at the Defense Intelligence Agency ("DIA"). The second was in connection with a potential position with the National Clandestine Service at the Central Intelligence Agency ("CIA").  In connection with my CIA application (as well as my job with BAE), I also underwent a substantial background investigation dating back ten years.  I ultimately turned down a position with DIA to take the job with BAE Systems.  The CIA made me an offer of conditional employment, but an available role did not materialize in the immediate training cycle.  I had steady work as a contractor at the time and had mixed feelings about taking a position that would require me to conceal a large part of my life from family and friends, so I did not push the issue.

19.     Despite my success as a contractor, by 2011, I was at a personal and professional crossroads.  My contract with BAE was set to expire.  I loved intelligence work, but my sense

DA304

was that active intelligence roles in Iraq requiring my particular expertise in Farsi and cultural education issues were starting to dry up as the war in Iraq was winding down.  I was beginning to tire of the frequent travel contract work required.  I was in a serious relationship with a woman from Michigan and was ready to settle down and start a family.  I decided to apply to a number of master's programs in economics in order to diversify my resume and open up future job opportunities while staying closer to home.

20.     Around the same time, my mother was encouraging my siblings and me to travel to Iran to visit my grandmother, who was suffering from health problems.  I was close with my grandmother, who had visited my family many times during my youth.  *See* Family Photos, attached hereto as Exs. 7–8.  I exchanged emails with my mother in December 2010 and January 2011 regarding my plans to travel to Iran after I returned home from Iraq.  I also corresponded with Legal Persian, a service specializing in Iranian-American travel to Iran, during the same period about getting all necessary visas and travel documents in order to make the trip.  *See* E-mail from Amir Hekmati to Behnaz Hekmati (Dec. 29, 2010, 11:31 AM), attached hereto as Ex. 9; E-mail from Legal Persian to Amir Hekmati (Jan. 3, 2011, 8:58 AM), attached hereto as Ex. 10.

21.     In the spring of 2011, as my contract with BAE was winding down, a co-worker informed me that he had recently obtained a position with Six3 Systems ("Six3"), another government contractor, for active intelligence work in Afghanistan.  He recommended that I consider applying for the same position and put me in touch with a recruiter from Six3.  The recruiter provided a description of the position and told me she "would love to get [me] on the team."  E-mail from Gretchen Klugh to Amir Hekmati (May 19, 2011, 10:12 AM), attached

DA305

hereto as Ex. 11.  I recall the recruiter being particularly keen on my Farsi language skills and previous work experience as an analyst on a broad range of issues.

22.     On its face, the job appeared to be an incredible opportunity.  I viewed Afghanistan as the epicenter of active intelligence work at the time; positions there were coveted. The role, as described in the recruiter's email, was for an "Intelligence Analyst" providing support on a broad range of topics in connection with "Afghanistan measures of stability," including "security, governance/development, Human Terrain, provincial and district assessments, High Value Targeting products, Extremist and Regional Threat Network Nodal Analysis and preparation of Intelligence Surveillance and reconnaissance Assessment Metrics." Analysts were expected "to present an all source product on military activity, insurgent actions, economic/political activities, threats to regional stability, and trend analysis."  *Id.*  Such a role could provide me with another opportunity to use my skillset to serve my country, and also could allow me to gain valuable work experience, learn from more senior analysts, and make professional connections.  The offer was hard to refuse.

23.     I knew, however, that the job would come at a cost.  The position would take me far away from my family and my girlfriend.  It could delay my plans to go to school.  I did not know where in Afghanistan I would be placed or precisely the type of projects I would be working on, but I knew from experience that the days would be long, and that many such jobs were in remote areas and could feel very isolating.  After much discussion with my family and girlfriend, I decided to give the position a try.  If it was not everything it had been marketed to be, I would leave.  My contract was at-will, and I declined any signing bonus, which I would have had to pay back, with taxes, if I did not stay in the position for six months.  *See* Six3 Systems Employment Agreement, attached hereto as Ex. 12.

DA306

**WORK FOR SIX3 SYSTEMS**

24.     Soon after arriving in Kabul, Afghanistan, it became clear to me that the job was
not what I had hoped it would be.  Instead of being placed in a position as an intelligence analyst,
as the job description had indicated, I was asked to be a religious advisor.  The position, as I
understood it, would require me to patrol alongside U.S. military troops in Taliban-controlled
areas, discussing sensitive religious topics (in which I had no training) with potentially hostile
villagers.  A wrong move on my part could lead to danger for the unit.  I was not prepared to put
others at risk by taking a role in which I had no experience.  Moreover, this was not the position
for which I had decided to delay my school plans and leave my family and girlfriend.  It would
not provide any of the professional experience I had been seeking.  I told my supervisor at Six3,
Angela Layman, that I would resign if I was not placed in the role for which I had applied and, I
believed, had been hired—intelligence analyst.  I was assigned promptly to a role as an all-
source intelligence analyst at an office at Bagram Airfield.

25.     Upon my arrival in Bagram, my Special Security Officer ("SSO") provided me
with access to a wide range of intelligence programs in order to view data to support the unit,
including Intelink (akin to Google with respect to classified information) and other Sensitive
Compartmentalized Information ("SCI") (SI, TK, HCS, and Gamma special access).  I did not
request access to these programs.  I did not know before taking the position that I would be
granted access to these specific programs.  My access rights had no subject matter-based
restrictions—if I typed something into a search, all potentially relevant hits from the databases I
had clearance to access would come up.  Indeed, I, and presumably all others in the unit with
similar clearance, received unsolicited daily reports that were not necessarily directly relevant to
whatever projects we were working on at the time, including information related to China and
other countries.

DA307

26.     I was pleased that I ultimately had been placed in the position for which I had been hired, but I struggled to find my role in the unit.  I recall being given only one official assignment, which was to monitor and interpret anti-U.S. propaganda by the Taliban, Haqqani network, and Al-Qaeda, and to devise strategies for countering those propaganda efforts.  To do so, I was expected to monitor different media outlets used by the Taliban, deliver a weekly report, and make recommendations to U.S. Army commanders in east Afghanistan.  Beyond that, I recall receiving little guidance on how to fill the 12-hour shifts that were required by my contract.  I sat elbow-to-elbow with other analysts all day and night but largely was on my own. I had no project team or mentor.

27.     I felt pressure from my superiors to be proactive, not reactive.  Nearly every morning, my supervisor would prompt me and others in the office with, "What do you got?"  I felt I needed to have material ready to prove my value.  A single weekly report clearly was not sufficient in the eyes of my supervisors.

28.     It appeared to me that each analyst had built a specialty in a few specific areas. Separate from my weekly reports on cultural messaging, I sought to identify and build an area of expertise where I could add value.  Unprompted by my supervisors, I generated a report on the benefits and feasibility of using local Afghani residents to form a protective force for multinational corporations building cellphone towers throughout dangerous areas of Afghanistan. Supervisors praised my work.  I decided that, given my Iranian background, knowledge of cultural issues, work experience at BAE in Iranian influence in Iraq, and fluency in Farsi, I could establish a role for myself as an expert in Iranian influence in Afghanistan, particularly focused on the threat posed to U.S. troops.  I recall asking other analysts if this focus seemed useful, and that they agreed.  I searched the intelligence platforms for data relating to Iran to further educate

8

DA308

myself on these issues and identify any potentially useful leads that might be valuable to my unit. Because of my access to various SCI programs, my search results included a mix of both classified and unclassified information.

29.     My activities were by no means covert.  I sat in a room crowded with other analysts, and my superiors often circulated around the room, checking in on various analysts' activities.  I recall discussing my Iran focus openly with colleagues and superiors.  Not once was I cautioned, reprimanded, or asked to stop my research.

30.     My contract required that I log 12 hours of work per day, but the unit did not require me to work during set hours.  I, along with many of my colleagues, split up the 12 hours differently each day so that I could take a break from sitting in front of a computer to exercise, have a meal, and relax.  Because so many other people split up their hours each day, my office was not significantly less crowded or unsupervised at night.

31.     I never scanned, downloaded, or printed any of the articles or information that I accessed, nor did I attempt to do so.

32.     Despite positive feedback on my work product and my efforts to build a specialty in Iran-related issues, I was unhappy in the job.  I had expected structure, direction, collaboration, and support, but there was none.  I had given the position a chance, but it was not worth delaying my other life plans or being away from my family and loved ones for yet another extended period.  I gave my two weeks' notice only a month or two after arriving.

## TRIP TO IRAN

33.     While I was in Afghanistan, my mother, sister, and brother had been visiting family in Iran.  *See* E-mails Between Behnaz Hekmati and Amir Hekmati (July 13–15, 2011), attached hereto as Ex. 13.  They encountered no issues during their visit.  I knew I would have little time to make a trip myself after starting school.  I already was in Afghanistan, which

9

DA309

borders Iran.  At my mother's request, I decided to make the trip before returning home to Michigan.

34.    There were no direct flights to Iran from Bagram Air Base.  Options for civilian contractor flights out of Bagram were limited.  As far as I knew, the charter airline that provided flights in and out of Bagram for Six3 contractors only went through Dubai.  In any event, flying to Iran by way of Dubai made sense because it was a massive international air hub with multiple daily flights to Iran that were relatively inexpensive.  I recall this being important because it was difficult to predict my exact departure date from Bagram—I had given the standard two weeks' notice but was permitted to leave whatever day I finished tying up any loose ends at work.  Regardless of when I would arrive in Dubai, I knew I could easily buy a ticket to Iran departing within the next day or two.

35.    On August 14, 2011, I flew from Bagram Air Base to Dubai.  Once in Dubai, I purchased a ticket to Tehran.  I planned to stay in Iran for a few weeks before returning home.

36.    This was my first trip to Iran.  I was looking forward to reuniting with my grandmother and meeting relatives who until that point I had only been able to speak with over the phone.  I had no safety concerns.  My immediate family had just taken a trip there without incident, and I would be staying with relatives the entire time.  No one ever offered any reason why I should not go to Iran.

37.    When I arrived at the airport in Tehran, officials pulled me aside to review my passport.  To my knowledge, this was the only time I had interaction with Iranian Government officials before my arrest.

38.    I was with family members during the entirety of my visit to Iran, staying at a family-owned apartment down the street from many relatives.  They took me to explore the

sights of Tehran and the surrounding area, including the mountains east of Tehran.  They also

took me to many sights inside of Tehran, including parks, museums, and restaurants.  I enjoyed

my time in Iran immensely.  My extended family was large, close-knit, and vibrant.  I loved

being a part of a big family, especially since we had no close relatives in the U.S.  I found

Tehran to be chaotic, but rich with culture.

## IMPRISONMENT AND TORTURE IN IRAN

39.     On August 29, 2011, two days before I was scheduled to return home to

Michigan, I was preparing to attend a family holiday celebration when two older men in suits

came to the apartment where I was staying.  The men said they were from a passport control

agency and that they had a few more questions to ask about my passport.  I was hesitant to go

with them but didn't want to cause any trouble.  I was shuttled to a nearby office building, where

the men immediately began accusing me of working for the CIA, interrogating me about my

activities in Iran, and threatening to take me to "a very bad place" if I did not confess.

40.     When I insisted that I had come to Iran only to visit family, I was handcuffed and

taken to Evin Prison—Iran's most notoriously brutal prison.  Upon my arrival, I was strip-

searched, given blue prison pajamas, blindfolded, and taken to a small, windowless cell.  I did

not know at the time that I was to spend the next four-and-a-half years in Evin Prison.

41.     For the first 18 months of my imprisonment, I was held in solitary confinement in

what I learned years later from other prisoners was Ward 209, which is known to be used by the

Iranian Ministry of Intelligence & Security ("MOIS") to torture prisoners into confessing to

alleged "crimes."

42.     My cell was so small that I could not stretch my legs when I laid down.  The

concrete walls of the cell were curved, which threw off my depth perception and made me feel

constantly like the walls were caving in on me.  The floor consisted of cold tile covered with a

DA311

thin carpet.  I had no mattress; only a thin blanket that did nothing to insulate me from the cold

tile.  Prison officials continually prevented me from sleeping by pouring water on the floor of my

cell so that it remained cold and damp, quickly growing moldy.  The smell of the mold was

putrid.  There was nothing else in the cell except a Koran and a small makeshift "toilet," which

was akin to a pail with a hose.  There was no plumbing and no toilet paper.  The air was so heavy

and polluted that I had trouble breathing.  Even the guards wore surgical masks.

43.     Because I had no window, I had no concept of whether it was day or night.

Prison officials kept bright lights on in my cell 24 hours a day.  At times, the power went out,

and I was left in complete darkness for hours at a time, unable to see even my own hands in front

of my face.  It felt like being buried alive.

44.     I was permitted to leave my cell only once every few days for 10–15 minutes to

take a cold shower.  Otherwise, I was taken from my cell only for interrogations, which also

occurred every few days.  I was always blindfolded before leaving my cell.

45.     I was tortured continuously over the first four months of my imprisonment.

Prison guards regularly beat me with batons and struck me in my kidneys with electric tasers to

intimidate and punish me for my alleged "crimes."  My interrogator chained me to a table

blindfolded and whipped the bottom of my feet with cables as punishment for not giving him the

answers he wanted.  The pain was excruciating.  Because I could not move, I felt the pain not

just on my feet, but reverberating through my head, like a screwdriver jammed into my brain.

Apart from the physical pain, I knew the whipping was intended to humiliate me.  Because the

wounds were on my feet, they were slow to heal; my feet became swollen, and I could not walk

properly.

DA312

46.     On multiple occasions, I was handcuffed in stress positions for hours at a time. One time, I was handcuffed with one arm reaching behind my shoulder and the other hand behind my back for nearly 48 hours.  The position prevented me from sitting the entire time and caused excruciating pain in my shoulder.

47.     The mental abuse was also constant.  I was taunted and belittled.  Prison guards mercilessly insulted me, my mother, and my country.  At one point, I was told that my sister had been involved in a terrible car accident, but that I could not use the phone to call my family unless I confessed that I was a spy.

48.     I had virtually no contact with the outside world for months, other than a brief call to my relatives in Iran to tell them I was in prison (I couldn't even tell them where, because I didn't know at the time).  Indeed, I had almost no physical contact with anyone, apart from the taunts and beatings by the guards and my interrogator.  I could tell there were other prisoners in the ward, but I could not communicate with them; I only knew they were there because I could hear them screaming when they were tortured or taken from their cells for execution.

49.     There was nothing to do in the cell except read the Koran—the only item in the cell aside from my blanket and the toilet.  At first, I tried to stay sharp and focused by memorizing passages, or by doing squats or push-ups in my cell.  It was difficult.  I did these things less and less, and eventually I lost track of time.  I stared at the wall all day.

50.     I began talking to the walls, as if they were a family or friend from home.  I would conjure up old memories or conversations and reenact them, with the wall as my "friend."

51.     Violent images started filling my head—images of how I would torture and murder the guards and my interrogator.  Those images consumed me, and at times I was unable

13

to think of anything else.  In a way, those images helped me stay alive.  They kept me from breaking down completely.

52.     I must have lost 20 pounds in those first few months.  We were served very little food—a slice of bread and margarine in the morning, soggy rice and lentils for lunch, and a small cup of soup or lentils in the evening.  Much of the time, I didn't even eat what was given to me.  I had no appetite.

53.     The sound of the food cart sticks with me to this day.  The wheels on the cart were not oiled, so they would make a screeching sound as the cart approached my cell.  Even now, I can hear the sound in my head, and it makes my hairs stand on edge.

54.     My physical and psychological health deteriorated rapidly in those first four months.  It got to the point where I truly felt that I was losing my mind.  I would feel that the walls were caving in on me and that I couldn't breathe.  I had numerous panic attacks.  I would start banging and clawing at the door, screaming for the guards.  I was met only with taunts and more beatings.  I thought about suicide often.

55.     Roughly three months into my solitary confinement, the guards started forcing me to take sedatives.  The sedatives made it even harder to keep track of time.  I drifted in and out of consciousness, unable to do much else.  I felt like a living corpse.

56.     Although I resisted the pills initially, they quickly became my lifeline.  They allowed me to feel numb.

57.     Once I was hooked on the pills, however, my interrogator used them as a means of controlling me.  He would cut off the pills abruptly to attempt coerce me to do things or say things that were untrue.  I felt out of control when the pills were taken from me.  I stopped

DA314

sleeping.  I started experiencing the same panic attacks and breakdowns from which I had suffered before taking the pills.  I felt I would do anything to get more pills.

58.     I was told that all of these abuses would continue for as long as it took unless and until I confessed to being a spy.  After months of trauma, in December 2011, my abusers shifted their tactics.  They transported me from Evin Prison to Esteghlal Hotel, dressed me in civilian clothes, gave me food and cigarettes, and told me I would be released immediately if I agreed to be interviewed for an internal training video for the Iranian Intelligence Ministry.  As part of the interview, my captors demanded that I state that I worked for the CIA.  I initially refused.  My interrogators told me I would be returned to solitary confinement if I did not comply.

59.     At that point, I had suffered months of physical and psychological abuse, without even being charged for a crime or given a chance to talk to a lawyer or anyone at the Swiss Embassy (the Swiss Embassy represents U.S. interests in Iran since the U.S. has no diplomatic relations with Iran).  I hadn't spoken to my family back home since my arrest.  I was suffering from chemical withdrawal and desperate to go home to Michigan.  I decided to comply in hopes of being released, as my interrogators had assured me I would be.  They swore on the Koran that the video was only for internal training purposes.

60.     Part of me was suspicious, of course.  But even if they were lying, I figured I had nothing to lose by making the statement.  Even if I "admitted" that the CIA had sent me to Iran, I had done nothing illegal once I got there.  I knew that, and they knew that.  Besides, at that point, I thought life couldn't get any worse.

61.     I was not released that day.  Instead, I was returned to solitary confinement.  I learned later that the Iranian Government broadcast my false "confession" on Iranian state television as "proof" of my crimes.

DA315

62.     I was devastated.  I felt foolish that I had let myself hope I would actually be released.  I went back to staring at the walls.  Life in solitary continued as it had before.

63.     In January 2012—five months after my arrest and imprisonment—Iran's Revolutionary Court held a trial behind closed doors on my "crimes."  I knew nothing of the charges against me and had no idea that the trial was about to occur.  I didn't even meet my court-appointed defense attorney until five minutes before trial.

64.     After 15 minutes, the court convicted me of espionage, waging war against God, and corrupting the earth.  I was sentenced to death, to be executed immediately by hanging.

65.     I did not learn of my sentence until about a month after the trial.  The guards told me by showing me the front page of an Iranian state newspaper, which announced my death sentence with triumph.  Initially, I felt shock and disbelief, then anger, then horror.  I was 28 years old.  I couldn't believe that this was how my life was going to end.

66.     The death sentence haunted me day in and day out.  Every day, I woke up wondering if it was my execution day.  I was in a constant state of fear and anxiety.  I started having nightmares and more frequent panic attacks.  I could hear other prisoners being dragged from their cells to be executed.  I can still hear their screams and cries.

67.     I could feel whatever mental strength I had left begin to crumble.  I stopped sleeping.  I stopped eating.  I paced my cell at all hours.  I was hypervigilant, paranoid that my executioners were about to arrive.  I would have constant visions of my execution and death—of me with a noose around my neck; me at the morgue with a black neck and bulging eyes, with my mother crying over my body; me in a grave, with worms crawling out of my eyes.  I wondered how much hanging would hurt.

DA316

68.     Several months later, I was abruptly taken back to court for a new trial in front of a different judge.  I learned that an Iranian appeals court had overturned my death sentence based on insufficient evidence months before.  Like the previous trial, this second trial was held behind closed doors and lasted no more than 10 minutes.

69.     I did not learn of my conviction and new sentence until months later, again through newspapers the guards showed me.  I learned that I had not been re-sentenced to die.  Instead, I was convicted of cooperating with a hostile government, presumably due to my U.S. military service.  I was sentenced to 10 years in Evin—the maximum sentence you can receive for such a crime.

70.     By this time, I had spent nearly a year in solitary confinement.  I felt some relief when my death sentence was annulled, but I knew the courts could re-instate the sentence at any time if it suited Iran's political needs.  My fear of execution festered, never going away.  I continued to live for my daily dose of pills.

71.     My conditions in solitary did not improve, and now ten more years stretched before me.  I couldn't bear the thought.  I went on multiple hunger strikes to protest my conditions—to feel like I had some control over my situation, no matter how small.

72.     Roughly 18 months into my imprisonment, I became unconscious after a prolonged hunger strike.  I hit my head when I fell.  Presumably fearing that my death in prison would be bad publicity for the regime, Iranian officials transferred me out of solitary confinement and to a political prison in Ward 350, where I remained for about a year-and-a-half.

73.     I saw my reflection in a mirror in Ward 350 for the first time in 18 months.  I didn't recognize the face staring back at me.  I was pale and drawn.  My eyes were sunken and had dark circles under them.  A thick beard covered the hollows of my face.

DA317

74.     I was relieved to be out of solitary confinement, but Ward 350 brought with it a new set of horrors.  Conditions were terrible; 20–30 prisoners were packed together in a small cell.  Everyone had physical and psychological problems.  The food was the same.  There were no beds; only pieces of wood suspended from the wall, on which prisoners would put a blanket to sleep.  Prison officials stopped giving me my pills, so I went through months of painful physical withdrawal.  People were regularly dragged out of the cell for execution or beatings.  The guards indicated that prisoners would be helped if they snitched on other prisoners, so there was a constant atmosphere of fear and distrust among the population.  Tensions ran high.  I tried to keep to myself.

75.     Ward 350 had a small courtyard where you could see a small patch of sky.  I tried to stay active, but I could do little more than move in small circles.  It was very hard to stay motivated.

76.     Finally, I was able to meet with my uncle once a month for 20–30 minutes.  I still was not allowed to use the phone or speak to my family back home.  I still was not allowed to speak to a lawyer or to the Swiss Embassy.

77.     I was relieved to receive news about my family though my uncle, but the news was devastating.  My family had received no information about my whereabouts for the first four months of my imprisonment.  My uncles had searched every prison, hospital, and morgue in Tehran.  My father had suffered a major stroke shortly after learning I had been sentenced to death.  After the stroke, he had been diagnosed with advanced brain cancer.  He had lost his mobility and could no longer care for himself.  In the meantime, my older sister had quit her job to lobby for my release full-time, despite having two young children—my niece and nephew—at home.  My family was spending tens of thousands of dollars on lawyer fees and expenses to

lobby for my release, organize rallies, and travel to the U.N. to meet with U.S. and Iranian Government officials.

78.     This was the first news I'd had of my family in nearly two years.  It ate me alive to know that my family was suffering, and that I was adding to their suffering.  I couldn't bear to think of my mother, who had been left to deal with a son on death row in Iran and a husband in the hospital.  I felt powerless to help.  The thought haunted me every day.  When I ultimately was able to contact my family with more regularity, I tried to downplay my situation as best I could.  I wasn't always great at it, but it was the only thing in my control.

79.     About a year-and-a-half after I arrived in Ward 350, a major riot occurred.  As punishment, we were transferred to the general population prison.  I was transferred to Ward 7, where I was housed with drug dealers and other violent criminals.

80.     My conditions in Ward 7 were some of the most brutal I had faced in my three years at Evin.  My "cell" was actually a basement typically used to quarantine sick prisoners.  As in Ward 350, my cell contained 20–30 prisoners packed into a small space.  The cell was infested with rats, which I and other prisoners had to kill using broomsticks or other blunt objects.  There were no beds.  My skin was eaten by lice and fleas.  I would wake up with bed bugs all over me. Prison officials would occasionally spray the room with chemicals to get rid of the bed bugs. The chemicals made us sicker than the bug bites did.

81.     The ward had no heat, air conditioning, or ventilation.  There was no courtyard or outdoor recreational space.  The air was heavy and hot and thick with germs.  There were no toilets; rather, there were three holes in the ground with a hose next to them.  The showers were directly next to the toilet holes.  Because of the terrible ventilation, the showers became a breeding ground for infection.  People wore surgical masks in the shower, but, because we only

DA319

got one mask, it quickly became filthy.  Soon, the masks themselves became a breeding ground for germs.

82.     I was sick the entire year-and-a-half I spent in Ward 7.  I suffered from recurring lung and sinus infections and constant intestinal problems due to malnutrition and the poor sanitary conditions of the prison.  Prison officials would ignore our ailments unless we had a high fever, which they would "treat" by injecting us with steroids that actually suppressed the immune system, making the infection worse.  Eventually, I stopped requesting treatment altogether.

83.     I lived in constant fear of the other prisoners in Ward 7.  Prison officials put violent criminals—I thought of them as "the muscle"—in our cell to lean on us to confess or swear allegiance to the Iranian Government.  They beat other prisoners often.  One prisoner took a razor blade to the face.  Many of the other political prisoners who had been transferred with me suffered mental breakdowns from the trauma of our surroundings.  I tried not to make trouble. My only goal was to stay alive.

## RELEASE FROM PRISON AND POST-IMPRISONMENT LIFE

84.     On January 16, 2016, I was released as part of a prisoner trade between Iran and the United States.

85.     Although I was overjoyed to be free, and especially to be reunited with my family, I quickly learned that it was impossible for me to just pick up where I left off after five years.  My entire life trajectory had been derailed.  The harm I had suffered did not simply go away once the cell door was opened and I was on the other side.

86.     Prior to my arrest, I was looking forward to a bright future.  I was in a serious relationship and had planned on starting a family while in graduate school.  I was calm, happy, and full of drive.  I had given four years of service to my country and risked my life in combat,

DA320

finished an undergraduate degree, started a company, worked as a consultant, and had been about to start working towards my master's degree. I had the support of a healthy and close-knit family.

87.     I returned from Iran broken, jobless, single, and forever changed by the effects of nearly five years of relentless physical and psychological abuse. I returned home to find that my father was only a shell of his former self and that my mother had aged decades.

88.     As soon as I got home, I was haunted continuously by images from prison, including the rats that infested my various cells and the constant visions I had of my own execution. I had trouble sleeping and often had nightmares of my time in Evin. I suffered from anxiety and panic attacks. REDACTED

. I got overwhelmed and anxious in crowds, which made it difficult for me to leave the house. I spent most of my time in my bedroom at my mother's house with the door locked.

REDACTED

DA321

REDACTED

92.    I'm now 36 years old.  I've come a long way since 2016, but it's been a struggle.

REDACTED

## FBI INTERVIEWS

93.    Shortly after my release, I was subject to two unannounced interrogations by the FBI.

94.    The first interview occurred immediately upon my release from prison, after I was flown from Iran to a U.S. air base in Landstuhl, Germany.  I was so relieved to be free from Evin but also completely overwhelmed.  Looking back on it, I think I was still in shock.

95.    Rather than releasing me promptly to my family, who had flown to Landstuhl to meet me, I was held for a prolonged period—at least a day or two—at a segregated medical facility.  Initially, I was told that this was part of a "routine" medical exam process.  While I was at this facility, two men interviewed me.  The questioning began with the agents showing me pictures of other Americans missing or imprisoned in Iran and asking if I had seen or heard anything about these Americans while in prison, then shifted focus to my work in Afghanistan.  I do not recall being informed that I was under investigation.  I was confused, annoyed, and numb with exhaustion.  Ultimately, the agents concluded their interview.  I was permitted to leave promptly thereafter.

96.    A second FBI interview occurred shortly after my return to Michigan, in April 2016.  I was living at home and still struggling to transition to normal life after years of trauma. The insomnia, nightmares, and panic attacks were at their peak.

DA322

97.     Agents came to my parents' home unannounced.  I recall being asked to accompany them to an FBI field office to look at more pictures because they needed more help with an investigation.  I called my lawyer, Scott Gilbert, who asked to speak to one of the agents and said they should not interview me unless he was present by telephone.

98.     The agents refused and said they would need to call Scott on a landline from their office.  Once we were at the office, instead of calling my lawyer as he had instructed them to do, the agents conducted the interview.  I didn't want to cause any trouble for me or my family, so I answered their questions.

99.     Shortly into the interview, the agents began hurling accusations at me about my research in Bagram and my reasons for going to Iran.  I was dumbfounded.  I had defended my country as a U.S. Marine, served for years as a military contractor, taken two polygraphs in the years immediately preceding my arrest, and had been arrested, tortured, and sentenced to death by the government to which the agents now were suggesting I had sought to sell information. The accusations were ridiculous, offensive, insulting, upsetting, and flat out wrong.

100.    When the interview concluded, the agents permitted me to leave and never contacted me again.  I was shaken, and am still shaken, by the experience.


        Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.


Executed On:  March  03/23 , 2020

_____
Amir Hekmati

# EXHIBIT B

## DECLARATION OF BEHNAZ HEKMATI

I, Behnaz Hekmati, do hereby state the following facts based on my personal knowledge:

1.      I am Amir Hekmati's mother.  Amir's father and I live just outside of ███████ ████, where I work as an accountant.

2.      I was born in Iran in 1956.  In 1979, my husband and I immigrated to the United States on student visas after attending top schools in Tehran, Iran, which then was under the rule of the Shah.  It was a difficult decision to leave our families, but we wanted a better life for ourselves and for our future family in the United States.

3.      I have four children—my eldest daughter, Sarah, Amir, his twin sister Leila, and my youngest son, Omeed.  We were living in Arizona when Amir and his sister were born in 1983.  At the time, my husband, Ali, was finishing his Ph. D in Microbiology at Arizona State University.  I was completing a B.S. in Accounting.  We later moved to Michigan while the children were still very young.

4.      Family is very important to me.  I've tried to instill the importance of family in my own children.  We have no other close relatives in the U.S., so it was important for us to stick together and support each other.

5.      I have stayed close with my family in Iran, despite the distance.  I was particularly close with my mother (Amir's grandmother).  She and I spoke frequently right up until her passing in 2019.

6.      My mother was a crucial part of my children's upbringing.  After Amir was born, she lived with us in the U.S. for a year.  After that, she came back a number of times for extended periods during Amir's childhood, taking care of Amir and his siblings.  She acted as a second mother to Amir, teaching him many things, such as language, during these visits.  It was

Privileged & Confidential

always important to me that she play a role in our children's lives, even though she lived far away.

7.     By the mid-1990s, when Amir was a teenager, my mother began suffering from a number of health problems—thyroid issues, arthritis, morbidity, and, ultimately, stomach cancer—that made it more difficult for her to visit us.  Still, she made an effort to remain an important part of Amir's life, as well as of the lives of the rest of my children, speaking regularly with them on the phone.

8.     I visited my mother and other family in Iran periodically over the years after her health issues began.  My other children sometimes joined me, but Amir was never able to come. Initially, I didn't want him to come because I was concerned that, as a male dual Iranian-American citizen, he could be conscripted into the Iranian military if he entered the country. Rules on military service later were relaxed, so that became less of a concern as Amir got older, but by then he was so busy with work and school, it was difficult for him to take time off.  He was deployed for long periods with the Marines, and even after that, he often traveled for long stretches for his jobs.

9.     By late 2010, my mother's health was steadily declining.  I began making plans to visit Iran again.  I urged my children to do the same.  It was especially important to me that Amir make the trip.  Amir's grandfathers in Iran already had passed away, and I was worried that his grandmother would do the same before Amir had a chance to see her again.

10.    Amir and I talked regularly in late 2010 and early 2011 about his plans to join our next trip.  He told me that he was excited to go to Iran, see his grandmother and other family, experience the place where I was born, and visit the cemetery where his grandfather was buried. We decided that we would go as a family, Amir included, in June or July of 2011, after Amir's

DA326

Privileged & Confidential

job in Iraq was scheduled to end.  Amir told me he was applying to several master's programs in economics.  I was happy to think he would be doing something closer to home, at least for a few years.

11.     Plans changed in May 2011, when Amir told me that he received another job offer that would keep him overseas.  He expressed to me that while he wanted to be closer to us and make the trip with us, this new job presented the possibility of a rewarding step in his career.  I encouraged him to take advantage of the opportunity, as difficult as it was to see him stay abroad longer and miss our family trip.  Amir took the job.  My other children and I traveled to Iran in June to July of 2011, as planned.

12.     Shortly after Amir started his new job, he told me that he was unhappy.  He said that the job was boring and different from what he expected it would be.  He told me that he didn't want to delay university for a job like that, and that he wanted to quit.  It was hard to hear him so unhappy.  I told him to do what he thought was best for him.

13.     When I learned that Amir planned to leave his job, I again brought up the subject of his visiting his grandmother.  I encouraged him again to visit his Iranian family, this time before he came home, since he already was abroad.  He agreed that it would probably be his only opportunity to visit in the short term, given the demands of his upcoming schooling.

14.     Amir went to Iran in August of 2011.  I heard about the details of his trip here and there directly by telephone and email from Amir and from other relatives.  I was grateful to hear that he was enjoying himself and spending time with my mother.

15.     Towards the end of his scheduled trip, I learned from family that Amir had been taken by Iranian officials.  We were told almost nothing about his status and for a long time and

DA327

Privileged & Confidential

had no idea if he was alive or even where he was being held.  I was very afraid for his safety.  It was many months before I could communicate with him at all.

16.     Eventually, when I was able to speak to Amir by phone, the calls were very difficult.  Some days he sounded optimistic and hopeful for his release, but most days, he would be angry and frustrated.  He would complain about his conditions and treatment.  As a mother, those calls were torture.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.


Executed On:  March 23, 2020


_____
Behnaz Hekmati

DA328

# EXHIBIT C

# DECLARATION OF MOHAMED REZA MALEKI

I, Mohamed Reza Maleki, do hereby state the following facts based on my personal knowledge:

1. I am Amir Hekmati's uncle. I live in Tehran, Iran.

2. Amir visited our family in Iran in the late summer of 2011. While he was in Iran, he spent time with his grandmother (my mother), my children (his cousins), as well as many other uncles, aunts, and cousins. My understanding from Amir was that he was going to stay in Iran for several weeks. He stayed in a family-owned apartment down the street from my own home.

3. I, along with Amir's grandmother and cousins, spent every day with Amir. We took him to explore the sights of Tehran and the surrounding area. One trip that I remember well was to the beautiful area surrounding Lavasan, to the east of Tehran. We also went to many sights inside of Tehran, including parks, museums, and restaurants.

4. In all of our time together, I did not see Amir meet with anyone I knew who worked for the Iranian Government. Indeed, I did not see him meet with anyone that wasn't a family member or close friend. I never noticed him disappearing for long stretches of time.

5. One night, several weeks into his trip, Amir did not show up to a family party. For a long time, we did not know where he was. Eventually, he called me. The call was very brief. He said that he was in a detention center and that he would talk with me soon.

6. I didn't hear from Amir for a long time after that phone call—maybe two years. We were very worried during that period.

7. When I finally heard from Amir again, he told me about the conditions that he faced in prison. He told me that prison was very difficult for him. He told me that there was

_malekei_
_m. reza_

March / 23 / 2020

Scanned with CamScanner

little food, and that his health was poor. After this, I spoke and met to Amir about once a month until he was finally released.

8.      I was very glad that he was finally released, and I am glad that he is now back with his family in the United States.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed On:  March 23, 2020

_____
Mr. Mohamed Reza Maleki

2

DA331
Scanned with CamScanner

# EXHIBIT D

**\*\*DOCUMENT UNDER SEAL\*\***

*Hekmati v. The Government of the Islamic Republic of Iran, et al.*

**Case No. 1:16-cv-00875 (ESH)**

# EX. B TO PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF HIS MOTION FOR DEFAULT JUDGMENT

## Expert Report of Dr. Stuart Grassian

DA333

**Stuart Grassian, M.D.**
401 Beacon Street
Chestnut Hill, MA 02467
(617) 244-3315; fax (617) 244-2792
stgrassian@gmail.com

**In re:** *Hekmati v. The Government of the Islamic Republic of Iran*
    U.S. Dist. Court, District of Columbia, No. 1:16-cv-875 (D.D.C.)

## Psychiatric Evaluation of Amir Hekmati

### I.    Introduction:

My name is Stuart Grassian, M.D.  I am a Board-certified psychiatrist, licensed to practice medicine in the Commonwealth of Massachusetts.  I have been actively involved in evaluating and treating patients continuously since 1974.  In addition to my clinical work, I also have extensive experience in evaluating the psychiatric effects of solitary confinement, and in consulting about these issues to various non-profit organizations.  My *curriculum vitae* is attached hereto, as is a list of cases since 2009 in which I have testified in court or by deposition.

At the request of Gilbert LLP, I evaluated Amir Hekmati in relationship to the psychiatric effects of his imprisonment in Iran from August 29, 2011 until January 17, 2016.  As discussed more fully below, it is my opinion that Mr. Hekmati's incarceration in Iran has caused him to suffer severe REDACTED

                                        Posttraumatic Stress Disorder;

REDACTED

1

DA334

II.    **Qualifications**:

I have had extensive experience in evaluating the psychiatric effects of solitary confinement, of confinement under the sentence of death, and of harsh and sadistic interrogation practices.

My observations and conclusions generally regarding the psychiatric effects of solitary confinement have been cited in a number of federal court decisions, including *Davenport v. DeRobertis*, 844 F.2d 1310 (7th Cir. 1988), *Madrid v. Gomez*, 889 F. Supp. 1146 (N.D. Cal. 1995), and *Davis v. Ayala*, 135 S.Ct. 323 (2015), (Kennedy, J. concurring.)

I prepared a written declaration for *Madrid* describing the extensive body of literature, including clinical and experimental literature, regarding the effects of solitary confinement on prisoners, the historical experience concerning the psychiatric effects of such confinement, as well as that seen in other conditions of restricted environmental and social stimulation.  I subsequently converted portions of that declaration not specific to any particular prison or inmate into an article entitled *Psychiatric Effects of Solitary Confinement*, 22 Wash. U. Journal of Law & Policy (2006) ("Wash. U. article").  This article is attached hereto and incorporated herein.

I have given lectures and seminars regarding the effects of restricted environmental stimulation and of solitary confinement, including lectures at Harvard Medical School-Beth Israel Hospital, Boston, and at meetings of the Nova Scotia, Virginia, and New York State Bar Associations, the Office of Military Commissions of the U.S. Department of Defense (*re Guantanamo detainees*), the Federal Capital Defenders Habeas Unit, and the Correctional Association of New York.  I have provided invited testimony before state legislative hearings in New York, Massachusetts, and Maine.  I have been retained as an expert in class-action investigations and lawsuits regarding these issues in Massachusetts (two times), New Jersey,

2

New York (three times), California (two times), Kentucky, Michigan, Ohio (two times), Pennsylvania, Texas, and Florida, as well as in individual cases in those states and others, including Alabama, Arizona, California, Connecticut, the District of Columbia, Florida, Georgia, Idaho, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Mississippi, New Mexico, New York, North Carolina, Oregon, Pennsylvania, Tennessee, Texas, Vermont, Virginia, and the State of Washington.  I have been retained and consulted by a variety of public advocacy groups, including the Legal Aid Society of New York, Prisoners' Legal Services of New York, the Center for Constitutional Rights, the Massachusetts Correctional Legal Services, the Massachusetts Civil Liberties Union, the National Prison Project of the American Civil Liberties Union, the Department of Corrections of the State of Florida, and various religious organizations.

Since the tragic events of September 11, 2001, I have also been consulted regarding the confinement of a number of individuals who were deemed to be "enemy combatants" and/or were either charged with or convicted of conspiring against the United States.  These include individuals who were confined in Guantanamo, in the Navy Brig in Charleston, South Carolina, in the Federal ADX prison in Florence, Colorado, and in the SeaTac facility in Seattle, Washington, as well as in federal detention centers in New York City and Miami.  I have also provided consultation to the Office of Military Commissions of the U.S. Department of Defense regarding difficulties encountered in representing detainees who had been confined in solitary confinement at Guantanamo.

My involvement in death penalty cases has included both psychiatric evaluation of inmates in solitary confinement on death row and evaluation of individuals who, now freed, had been falsely accused and convicted of murder, and had been held in solitary confinement on death row.

3

**III.**   **Involvement in the Present Matter:**

In the present matter, the law firm of Gilbert LLP requested that I evaluate the psychiatric effects of Mr. Hekmati's confinement, including in solitary, by the Government of Iran for approximately four-and-a-half years, from August 29, 2011 until January 17, 2016.  My professional fee for all services—record review, interview, preparation of report, and testimony—is $500 per hour.  My compensation is in no way contingent upon the nature of my findings, the presentation of my findings in testimony, or the outcome of any proceeding.

As part of my evaluation, I interviewed Mr. Hekmati for approximately 8.2 hours on August 13–14, 2016.  I have also reviewed the Complaint in this case, as well as a number of other documents, a list of which is attached hereto.  These documents include, among others, the sworn statements of Mr. Hekmati, as well as of his mother and sister, documents provided to and by the United Nations during Mr. Hekmati's incarceration, and a letter from his current treating psychiatrist.  These documents provide a great deal of information regarding the circumstances of his arrest and incarceration, the various conditions under which he was confined, the death sentence and subsequent ten year prison sentence he received, and so forth.  Since these documents have been provided to the Court, the information contained in these documents will not be repeated here except in brief summary form.  I am not at this point aware of any other relevant documents or sources of information, but if any such emerge, I expect to review them and reserve the right to amend this report accordingly.

**IV.**   **Summary of Psychiatric Diagnoses:**

In my opinion, to a reasonable degree of medical certainty, Mr. Hekmati has suffered severe REDACTED      psychiatric harm directly caused by his incarceration in Iran from August 27, 2011 through January 17, 2016.

4

DA337

REDACTED

---

[1] Wash. U. article; *Psychopathological Effects of Solitary Confinement*; 140–11, American Journal of Psychiatry, 1450–1454 (1983).

�edACTED

REDACTED

_____

REDACTED

As described in the many documents in this case, Mr. Hekmati experienced exceedingly harsh conditions of solitary confinement during the 18 months he was confined in Ward 209.  He was housed in a windowless cell.  There was no view of the outside world, no books except for the Koran, no contact with anyone he knew—nothing at all to distract and occupy his mind; the

_____

R
E
D
A
C

cell was brightly lit 24 hours a day or else it was utterly dark for hours at a time when the power went out.

What "stimulation" there was was almost entirely noxious. The air was fetid, heavy, and damp. He was tortured and in almost constant pain. The voices he heard were of sadistic guards, of his cruel interrogator, and the screams of other inmates being tortured or brought out to their deaths.

In both his interview and his declaration, REDACTED

During his time in solitary confinement, his mind was full of worries that he could not escape. In our interview, he stated that he saw an image of himself as being in that prison forever, until he was "an old man"—a "bag of bones"; he couldn't get the image out of his mind. He felt panic and became claustrophobic.

Mr. Hekmati grew increasingly intolerant of the noxious stimuli in Ward 209, such as the screeching of the wheels of the food cart that the guards pushed by his cell three times a day. He began having intrusive images of violence: "Violent images started filling my head—images of how I would torture and murder the guards and my interrogator." These images became an obsessive preoccupation: "Those images consumed me, and at times I was unable to think of anything else." *See* Declaration of Amir Hekmati ¶ 48.

In our interview, Mr. Hekmati described his struggle to maintain his sanity—a regimen of exercising in his cell and keeping his mind active by reading and rereading the Koran and trying to memorize the passages. But gradually he was overpowered. To make things worse, prison officials began giving him sedatives that even further impaired his ability to maintain an adequate state of alertness. He became confused, lost track of time, stared at the wall all day,

8

and then began talking to the walls: "as if they were a family [member] or friend from home." *Id.* ¶ 47.

He lost his ability to maintain any semblance of structure or purpose; especially after his captors started giving him sedatives. His life broke down into meals and pills and being lost in a continual fog. He could not bear it forever. He went on a hunger strike until finally he lost consciousness and fell, banging his head on the cell floor.

### 3.   Conclusion

Based on the forgoing, it is clear that Mr. Hekmati suffered extreme and long-term deprivation of environmental stimuli during his 18 months in solitary confinement

REDACTED

Mr. Hekmati has suffered from severe PTSD since his return from Iran in January 2016.   REDACTED

### 1.   Posttraumatic Stress Disorder (PTSD)

#### A.   Causes and Symptoms

PTSD is the product of psychological trauma—of an experience so horrifying, so frightening, that it overcomes the individual's capacity to cope, reducing him to absolute terror

9

and horror, and filling him with abject shame at his utter helplessness and inability to cope.  It is characterized by intrusive images and thoughts of the traumatic event (awake, or asleep in the form of nightmares); acute physiologic reactions (heart pounding, sweating, dizziness, etc.) to stimuli reminiscent of the event; increased arousal (a constant state of vigilance, anxiety and tension, irritability, jumpiness); emotional numbing and depression (an inability to find pleasure or passion in anything); and avoidance of stimuli reminiscent of the event.  PTSD is characterized as well by feelings of shame and guilt, and not infrequently, it leaves the person immobilized with depression.  Yet despite their underlying distress, individuals with PTSD may appear to function normally for periods of time, only to become massively symptomatic and dysfunctional when triggered by reminders of the trauma.

    **B.**    **Mr. Hekmati's Experience in Prison Caused Him to Develop PTSD.**

Based upon the information I have reviewed, it is clear that Mr. Hekmati suffered severe trauma that was extreme and continuous, inevitably causing him to suffer from PTSD. Mr. Hekmati's trauma was especially severe during his 18 months in solitary confinement, particularly the three months during which he believed his execution was imminent.  During our interview, he described the devastating impact of learning of his death sentence:  "Disbelief, anger, anxiety.  I started having nightmares, panic attacks.  Every time the door opened I would panic.  I saw others taken out screaming to their death.  Super vigilant.  Every time they asked me to go to see the doctor I was very hesitant to leave my cell.  I'd pace the cell all the time, with horrific thoughts going through my mind.  I imagined going up the stairs to my death, the noose around my neck, my neck black from the rope, worms coming out of my eye sockets, wondering how much this is going to hurt.  I saw myself dead, lying in the morgue.  I paced the cell thousands of times, pounding the walls."

10

These horrors continued even after Mr. Hekmati was moved from Ward 209.  While he was incarcerated in Ward 7, his last placement, he was seriously malnourished.  He lived in filth with 20 to 30 inmates packed in a cell, with vermin, with pigeons defecating everywhere, and with no hot or cold water to clean himself.  Lacking heat, air conditioning or ventilation, the ward was either freezing or oppressively hot.  There were bedbugs; the ward was so thick with them that for amusement the inmates collected the dead ones in a large bottle, and when the infestation became too bad, the guards sprayed toxic chemicals that sickened the prisoners.  Mr. Hekmati was sick constantly.  He suffered recurrent infections and high fevers, but the only "treatment" offered was an injection of steroids, guaranteed to allow the infection to worsen.  There was a constant threat of violence by prisoner "bosses"; Mr. Hekmati watched prisoners beaten or their faces slashed.

He also suffered tremendous psychological anguish upon learning, nearly two years into his imprisonment, that his father had been diagnosed with brain cancer and had suffered the first of many strokes just after Mr. Hekmati received his death sentence.

REDACTED

Given his intense suffering and his utter helplessness in the face of the brutality

11

and helplessness he was experiencing, REDACTED                                                                In

his declaration, he notes that even in the first months of his incarceration, he contemplated

suicide.  His life throughout his years of confinement was a constant struggle to survive.  Even

after he was able to have some limited communication with his family and learned of efforts to

free him, he never was given any real hope that his confinement—his suffering—would one day

be over. REDACTED                                                      he despaired that he

would not survive long enough to ever leave the hell in which he lived.

The news of his father's deteriorating health was particularly devastating; he might never

again see his father alive, and he felt terrible guilt—that his incarceration, and then the death

sentence, had caused his father's sickness and increasing disability.  He was plagued by thoughts

that he had failed his family. REDACTED

### 3. Adjustment Post-Incarceration

Since Mr. Hekmati's January 2016 release and repatriation back to his family, he has

experienced symptoms of PTSD, REDACTED

REDACTED

13

REDACTED

14

REDACTED

15

REDACTED

16

REDACTED

Signed this _6th_ day of December, 2016

Stuart Grassian, M.D.

17

**Stuart Grassian, M.D.**
401 Beacon Street
Chestnut Hill, MA 02467-3976
Phone (617) 244-3315  Fax (617) 244-2792
stgrassian@aol.com

Born:  June 29, 1946

## EDUCATION, TRAINING, FACULTY POSITIONS.

| | |
|---|---|
| 1963-1967 | Harvard Club Scholar, Harvard University, Cambridge, MA |
| 1967 | B.A. Cum Laude, Harvard University, Cambridge, MA |
| 1967-1969 | NIMH Fellow in Sociology, Brandeis University, Waltham, MA |
| 1969 | M.A., Sociology, Brandeis University, Waltham, MA |
| 1970 | NSF Fellow in Psychiatry, Bellevue Hospital, NY |
| 1973 | M.D., New York University School of Medicine, NY |
| 1973-1974 | Intern (Medicine), New York University Medical Center, NY |
| 1974-1977 | Resident in Psychiatry, Beth Israel Hospital, Boston, MA. Teaching Fellow in Psychiatry, Harvard Medical School. |
| 1977-2003 | Clinical Instructor in Psychiatry, Harvard Medical School. |
| 1978-1980 | Assistant Clinical Professor of Psychiatry, Tufts University School of Medicine. |
| 1982-1986 | Suffolk University Law School;  J.D. 1986;  Daniel Fern Award. |
| 1986 | Bar Examination completed;  entry into Massachusetts Bar. (remain on "retired" status through present.) |

## LICENSURE.

| | |
|---|---|
| 1974- | Massachusetts Medical License #37749. |

## BOARD CERTIFICATIONS

| | |
|---|---|
| 1979 | Diplomate, American Board of Psychiatry and Neurology   (ABPN) in Psychiatry. |
| 1994 | Diplomate Certification, ABPN, Added Qualifications in Addiction Psychiatry. |
| 1996 | Diplomate Certification, ABPN, Added Qualifications in Forensic Psychiatry |

## MAJOR PROFESSIONAL ACTIVITIES

| | |
|---|---|
| 1977 - | Private practice in Psychiatry:  Cambridge, MA (1977-1979), Chestnut Hill, MA (1979-   ), Stoneham, MA (1980-2003) |
| 1977-1978 | Clinical Director, Inpatient Service, Dorchester Mental Health Center, Boston, MA |
| 1978-1980 | Director, Inpatient Service, WestRosPark Mental Health Center, |

Boston, MA

| | |
|---|---|
| 1979-1983 | Medical Staff, Lecturer, Glover Memorial Hospital, Needham, MA |
| 1980-1994 | Attending Psychiatrist, Adult & Adolescent Inpatient Services, New England Memorial Hospital, Stoneham, MA |
| 1980-1983 | Director, Adult & Adolescent Inpatient Services, Department of Psychiatry, New England Memorial Hospital, Stoneham, MA |
| 1983-1994 | Attending Psychiatrist, Addictions Treatment Unit, New England Memorial Hospital, Stoneham, MA |
| 1987-1993 | Supervising Psychiatrist, Outpatient Department, New England Memorial Hospital, Stoneham, MA |
| 1992-1994 | Psychiatric Director, Partnership Recovery Center, Melrose-Wakefield Hospital, Melrose, MA (Day treatment program for Addiction rehabilitation) |


## CONSULTATIONS, AFFILIATIONS, BOARD MEMBERSHIPS

| | |
|---|---|
| 1979- | Massachusetts Correctional Legal Services.  (Psychiatric Effects of Solitary Confinement, Psychiatric Effects of Strip Search Procedures) |
| 1980- | Massachusetts Civil Liberties Union.  (Psychiatric Effects of Strip Search Procedures, Psychiatric Effects of Solitary Confinement) |
| 1993-4 | Massachusetts Department of Corrections, Stress Management Unit.  (Occupational Stress among Correctional Staff) |
| 1993-4 | Board of Trustees, New England Memorial Hospital, Stoneham, MA. |
| 1995 | Consultation to Psychiatric Expert/Special Master; Madrid v Gomez Federal District Court, Northern District, CA #C-90-3094TEH. (Psychiatric Effects of Solitary Confinement) |
| 1995- | Consultant to Massachusetts Professional Recovery Committee, and to Substance Abuse Rehabilitation Program of the Massachusetts Board of Registration in Nursing.  (Addictive Disorders, Impaired professionals) |
| 1997 | Botech Corporation, Cambridge, MA.  (Effects of Solitary Confinement) |
| 1998 | Psychiatric Expert in Compliance Monitoring; Eng v Coombe Federal Dist. Ct, W.D.NY,  CIV #80-385-S.  (Effects of Solitary Confinement, mental health care provided) |
| 2000-2 | The Desisto School, Lenox MA |
| 2001- | Consultant, Florida Department of Corrections.  (Solitary Confinement and Mental Health Issues in Florida State Prisons.) |
| 2001- 2 | Board of Advisors, Correctional Association of New York, (Mental Health Issues in New York State Prisons). |
| 2002-4 | Board of Directors, Massachusetts 9/11 Fund. |
| 2002-4 | American Boyschoir School, Princeton, NJ. |
| 2002-3 | Poly Prep School, Brooklyn, NY. |
| 2009. | U.S. Department of Defense, Office of Military Commissions. Effects of Confinement on Guantanamo Detainees,  Arlington, Va,. |
| 2010 | Texas ACLU. Expert in K.C. v. Townsend, challenging conditions in state's adolescent female detention facility. |

DA352

| 2012- | Advisory Committee.  New York State Commission on Quality of Care  and Advocacy for Persons with Disabilities) . (Since renamed as – New York Justice Commission. |
| 2013- | U.S. Dept. of Justice (US DOJ) – Conditions of confinement, mental health care in Pennsylvania's Prison System. |
| 2013- | Kentucky Children's Law Center and U.S. Dept of Justice – Conditions of confinement, mental health care in Ohio's Juvenile Justice System. |
| 2015- | New York ACLU – Solitary Confinement, Mental Health Issues at Rikers. |
| 2015- | Texas ACLU et al. – Solitary Confinement, Mental Health Issues in Texas. |
| 2015- | John Jay College of Criminal; Justice, New York – Administrative Segregation. |
| 2015- | US DOJ – National Institute of Justice – Working Group on Administrative Segregation. |

## PROFESSIONAL SOCIETY/COMMITTEE/STAFF MEMBERSHIPS

| 1974-2003. | Member, American Psychiatric Association & Massachusetts Psychiatric Society |

Committee Memberships.
Inpatient Psychiatry Committee (1981-1984)
Private Practice Committee (1992-1995)
Chair, Presidents Task Force on Managed Care (1993-1994)
Steering Committee, Managed Care Retreat (1993-1994)

| 1974-1977 | Resident in Psychiatry, Beth Israel Hospital, Boston, MA. |

Clinical Fellow in Psychiatry, Harvard Medical School.

| 1977-2003 | Courtesy Staff, Beth Israel Hospital, Boston, MA |

Assistant in Psychiatry (1977-1991)
Associate in Psychiatry (1991-2003)
Clinical Instructor in Psychiatry, Harvard Medical School.

| 1980-1999 | Active Staff, Boston Regional Medical Center, Stoneham, MA |

Committee Memberships
Credentials Committee (1986-1990)
Chair, Bylaws Committee (1987-1990)
Medical Staff Executive Committee (1989-1992)
Chief of Staff (1990-1992)
Board of Trustees (1990-1992)

| 1992-2012 | Active/Courtesy Staff, Melrose-Wakefield Hospital, Melrose, MA |
| 1993-2000 | Psychiatric Network of Massachusetts |

Committee Memberships
Steering Committee (1993-1994)
Chairman, Board of Directors (1994-1995)

## AWARDS

| 2005. | National Alliance for the Mentally Ill (NAMI).  Exemplary Psychiatrist Award, |

Presented at Annual Meeting, American Psychiatric Association, May 2005.

## TEACHING APPOINTMENTS, PRESENTATIONS

| | |
|---|---|
| 1967 | Teaching Fellow, Harvard Graduate School of Education, Cambridge, MA |
| 1967-1969 | Teaching Fellow, Department of Sociology, Brandeis University, Waltham, MA |
| 1973 | Clinical Fellow in Psychiatry, New York University Medical Center, New York, NY |
| 1974-1977 | Clinical Fellow in Psychiatry, Harvard Medical School, Boston, MA |
| 1975-1976 | Consultant and Lecturer, Human Resources Institute, Brookline, MA |
| 1977-2003 | Clinical Instructor, Department of Psychiatry, Harvard Medical School, Boston, MA |
| 1978-80 | Assistant Clinical Professor, Department of Psychiatry, Tufts University Medical Center, Boston, MA |
| 1987 | Faculty, Third International Conference on Restricted Environmental  Stimulation, New York, NY:  "Effect of REST In Solitary Confinement and Psychiatric Seclusion" |
| 1987 | Guest Lecturer, Suffolk University School of Law, Boston, MA: "Commitability and the Right to Refuse Treatment" |
| 1988 | Faculty, 32nd Institute on Hospital and Community Psychiatry,Boston, MA |
| 1990 | Massachusetts Bar Association Symposium, Boston, MA. "Drugs and Alcohol on Campus" |
| 1992 | Faculty, American Academy of Psychiatry and Law, Boston, MA: "Effects of Childhood Sexual Abuse" |
| 1993 | Faculty, Massachusetts Department of Corrections Stress Unit, Statewide Seminar, MA:  "Stress Awareness for Managers" |
| 1993 | Massachusetts Continuing Legal Education Seminar, Boston, MA: "Psychiatric Effects of Physical and Sexual Assault" |
| 1994 | Massachusetts Academy of Trial Attorneys Seminar, Boston, MA:  "Psychiatric Evaluation of Victims of Violent Crime" |
| 1994 | Beth Israel Hospital/Harvard Medical School, Boston, MA: "Psychiatric Consequences of Solitary Confinement; "Effects of Sensory Deprivation and Social Isolation in a Vulnerable Population" |
| 1994 | Massachusetts Medical Society, Committee on Managed Care, Waltham, MA:  "Ethics of Managed Care" |
| 1994 | Prison Psychiatric Group, Albany, NY:  "Criminality and Mental Illness, Revisited:  Disorders of Volition".  (Lecture sponsored by Pfizer Pharmaceuticals) |
| 1995 | Suffolk University Advanced Legal Studies, Boston, MA:  "Sexual Abuse:  Memory, Truth and Proof" |
| 1995 | Massachusetts Association of Trial Attorneys Seminar, Boston, MA: |

|      | "Premises Liability/Negligent Security:  Psychiatric Testimony and the Role of the Psychiatric Expert" |
|------|----|
| 1996 | New England Society for the Study of Dissociation, McLean Hospital, Belmont, MA:  "Impact of Forensic Issues on Treating Victims of Violence" |
| 1996 | Harvard Medical School, Children's Hospital Family Violence Seminar, Boston, MA:  "Trauma and Memory" |
| 1996 | Trauma and Memory:  An International Research Conference, Durham, NH:  "Factors Distinguishing True and False Memory of Childhood Sexual Abuse" |
| 1996 | Trauma and Memory:  An International Research Conference, Durham, NH:  "Memory of Sexual Abuse by a Parish Priest" |
| 1997 | Correctional Association of New York, NY:  "Psychiatric Effects of Solitary Confinement". |
| 1998 | Massachusetts Board of Registration in Medicine and Northeastern University Conference, Substance Abuse and The Licensed Professional, Boston, MA:  "Addictions and Compulsions:  Disorders of Volition" |
| 2000 | Human Rights Watch and American Civil Liberties Union Foundation Conference. Washington. D.C.  "Super-Maximum Security Confinement in the United States." |
| 2003 | Capital Habeus Unit Training Conference of the Defender Services Division of the United States Courts, San Antonio, TX. (death row confinement and its effects on post-conviction appeal process.) |
| 2003 | NAACP Legal Defense Fund Conference, Airlie, VA.  - mental health issues and solitary confinement of prisoners. |
| 2005 | Vera Institute. National Commission on Safety and Abuse in Prisons. Newark, NJ July 2005.  Effects of Isolation. |
| 2005. | NAACP Legal Defense Fund, Airlie Conference,  Va.  July 2005. "'Volunteers' in Death Row". |
| 2006 | University of California at Davis, Symposium -  The Neurobiology of  Torture. "What is Known about the Neurobiological Effects of Solitary Confinement." |
| 2009 | Keynote Address.  Nova Scotia Barristers' Society.  "Psychiatric Effects of Solitary Confinement". |
| 2010 | "Psychiatric Effects of Solitary Confinement".  Presentation at Virginia Bar Association Meeting, Richmond, VA. |
| 2010 | Harvard Prisoners Legal Assistance Project.  Invited lecture regarding psychiatric effects of confinement and impact on advocacy. |
| 2010 | Discussant, Annual Meeting of American Psychological Association, San Diego, CA. The Colorado Study - "One Year Longitudinal Study of the Psychological Effects of Administrative Segregation." |
| 2012 | Civil Rights Committee,  New York State Bar Association.  "Psychiatric Effects of Solitary Confinement". |
| 2012 | Columbia University,  "Incarceration and Isolation: A Workshop".  Joint Meeting with the Liman Public Interest Program at Yale Law School, and the Lowenstein International Human Rights Clinic at Yale Law School |
| 2013- | National Religious Coalition Against Torture, – consultant, panelist, etc. regarding solitary confinement and mental health issues in prison. |
| 2016 | American Correctional Association conference:  "Pathways to Reform". |

**MEDIA, PUBLIC AFFAIRS PRESENTATIONS**

| | |
|---|---|
| 1988 | NBC-TV, Today Show  "Small Group Confinement of Female Political Prisoners at the Federal Penitentiary in Lexington, KY" |
| 1990 | NPR-TV, News Interview Program:  "Psychiatric Effects of Small Group Confinement" |
| 1990 | PBS-TV, Point of View  "Through the Wire", Documentary regarding women confined for politically motivated crimes |
| 1991 | WBZ-TV, Boston, MA:  Channel 4 Nightly News  "Statute of Limitations on Cases of Childhood Sexual Abuse" |
| 1992 | Boston Globe, New York Times, etc.:  "Effects of Childhood Sexual Abuse by a Catholic Priest" |
| 1992 | Boston Globe, New York Times, San Francisco Chronicle, Los Angeles Times, etc.:  "Psychiatric Effects of Solitary Confinement" |
| 1993 | New England Cable News, Newton, MA:  Commentator regarding insanity defense in Kenneth Sequin trial |
| 1993 | Massachusetts House of Representatives, Judiciary Committee testimony: Proposed change in Statute of Limitations in cases of childhood sexual abuse |
| 1993 | CBS-TV, 60 Minutes  "Pelican Bay – Psychiatric Effects of Solitary Confinement in California's High-Tech Maximum Security Prison" |
| 1993 | New England Cable News, Newton, MA:  News Night  "False Memory and Recovered Memory of Childhood Sexual Abuse" |
| 1993 | WCVB-TV, Boston, MA:  Chronicle "Sentencing of Father Porter – The Effect on the Victims" |
| 1994 | WHDH-TV, Boston, MA:  Boston Common "False Memory Syndrome". |
| 1994 | FOX-TV, Boston, MA:  At Issue  "Psychiatric Effects of Solitary  Confinement" |
| 1996 | New England Cable News, Newton, MA:  News Night  "The Insanity Defense" |
| 1998 | ABC-TV, Nightline with Ted Koppel; Primetime Live  "Crime and Punishment" |
| 1998 | WBZ-TV, Boston, MA:  Channel 4 Nightly News  "Perpetrators of Sexual Abuse: Dangers to the Community" |
| 1999 | ABC-TV, 20/20  "Effects of Solitary Confinement" |
| 2003 | Discovery Channel.  "Mohammed Atta: Profile of a Terrorist". |
| 2003 | Invited Testimony, Joint Legislative Hearing, New York State Assembly, New York City, November 2003.  "Disciplinary Confinement and Treatment of Prison Inmates with Serious Mental Illness." |
| 2004 | Invited Testimony, Massachusetts State Legislature. Joint Committee on Public Safety.  "The  Cost of Corrections". |
| 2010 | Invited Testimony, Maine State Legislature:  "Solitary Confinement in Maine." |
| 2010 | National Geographic Television:  Explorer: "Solitary Confinement". |
| 2011 | National Religious Campaign Against Torture.  "Solitary Confinement". |
| 2013 | Rock Center with Brian Williams.  "Juveniles in Adult Prisons" with Ted Koppel. |

(Due to the extensive public interest in the issue of solitary confinement, I have also provided interviews and contributions to a number articles in various newspapers, magazines, and radio and television news reports and documentaries;  I have not been able to keep up a catalogue of

these, though they certainly include The Boston Globe, The New York Times, The Los Angeles Times, The San Francisco Chronicle, The Denver Post, The Christian Science Monitor, New Yorker Magazine, and National Public Radio, as well as others.

## MAJOR INTERESTS IN FORENSIC PSYCHIATRY

### 1. Psychiatric Effects of Solitary Confinement

I have had extensive experience in evaluating the psychiatric effects of stringent conditions of confinement and the mental health care afforded inmates and detained juveniles so confined. I have served as an expert in a number of both individual and class-action lawsuits addressing these issues.  My observations and conclusions regarding the psychiatric effects of such confinement have been cited in a number of federal court decisions, for example: *Davenport v. DeRobertis*, 844 F.2d 1310 (7th Cir. 1988), *Coleman v. Wilson* 912 F.Supp.1282 (E.D.Cal, 1995), affirmed in 2011 by the U.S. Supreme Court *sub. nom. Brown v. Plata,*   and *Madrid v. Gomez*, 889 F. Supp. 1146 (N.D. Cal. 1995)

 I prepared a written declaration for *Madrid* describing the medical literature and historical experience concerning the psychiatric effects of restricted and isolated conditions of confinement as well as of other conditions of restricted environmental and social stimulation, and subsequently prepared the general (non-institution specific) and non-redacted (non-inmate specific) portions of that declaration into a general statement, which I have entitled *Psychiatric Effects of Solitary Confinement*, 22 Wash. University Journal of Law and Policy,  (2006). It describes the extensive body of literature, including clinical and experimental literature, regarding the effects of decreased environmental and social stimulation, and more specifically, observations concerning the effects of segregated confinement on prisoners.

I have given lectures and seminars regarding these issue.  Although I do not have a complete list of those lectures and seminars, they include, but are not limited to, lectures at Harvard Medical School-Beth Israel Hospital, Boston, at meetings of the Nova Scotia, Virginia and New York State Bar Associations, The Office of Military Commissions of the U.S. Department of Defense, The Federal Capital Defenders Habeas Unit and The Correctional Association of New York, as well as invited testimony before state legislative hearings in New York, Massachusetts and Maine.   In addition, I was recently appointed as a consultant to the Psychiatric Correctional Advisory Committee of the New York State Commission on Quality of Care and Advocacy for People with Disabilities (more recently renamed The New York State Justice Commission.)

I have been retained as an expert in class-action lawsuits regarding these issues in Massachusetts (2), New York (3), California (2), Kentucky, Michigan, New Jersey, Ohio (2), Texas and Florida, as well as individual cases in other states, including California, Connecticut, Florida, Georgia, Maine, Massachusetts, New Mexico, New York, Oregon, Pennsylvania, Texas, Virginia and the State of Washington.  I have been retained and consulted by a variety of public advocacy groups, including The United States Department of Justice (DOJ), The Legal Aid Society of New York, Prisoner's Legal Services of New York and of Massachusetts, the Center for Constitutional

Rights, The Massachusetts Civil Liberties Union, the National Prison Project of the American Civil Liberties Union, and the Department of Corrections of the State of Florida.  I was a psychiatric expert for the DOJ in its evaluation of the Pennsylvania prison system, and had a similar role in Ohio regarding juvenile facilities.

Since the tragic events of September 11, 2001, I have also been consulted regarding the confinement of a number of individuals who were deemed to be "enemy combatants" and/or were either charged with or convicted of conspiring against the United States. These include individuals who were confined in Guantánamo, in the Navy Brig in Charleston, S.C., in the Federal ADX prison in Florence, Colorado and in the SeaTac facility in Seattle, Washington, as well as in federal detention centers in New York City and Miami, Florida.  Decisions in some of those cases, and my published findings, have been cited in Federal Appellate decisions, and have also generated significant national media interest.

Issues have included:  mental illness among inmates so confined and psychiatric decompensation as a result of such confinement;   adequacy of mental health evaluation, monitoring and treatment; effect on ability to assist in inmate's own legal defense (both pretrial and postconviction);  "volunteering" for execution;  impact on inmate's ability to cooperate with government in debriefing and testifying.   Additionally, I have been consulted in a number of cases involving detention (at Guantanamo, Charleston S.C. Naval Brig, and various Federal Detention Centers) of accused terrorists.

The 1983 American Journal of Psychiatry article listed below described the paradigmatic neuropsychiatric syndrome associated with solitary confinement.  A more extensive review of the literature, including clinical and experimental literature concerning the effects of decreased environmental and social stimulation, as well as specifically, observations concerning the effects of segregated confinement on prisoners, is contained in he 2006 Washington University article listed below.

 Peer-Reviewed Medical Publications:
"Psychopathological Effects of Solitary Confinement", Am J Psychiatry 140:11, 1983.
"Effects of Sensory Deprivation in Psychiatric Seclusion and Solitary Confinement", Intl J Law & Psychiatry 8:49, 1986.

 Law Journals:
"Psychiatric Effects of Solitary Confinement",  Washington Univ. Journal of Law & Policy Vol 22: pp. 325-383, 2007.

 Book Chapter:
"Neuropsychiatric Effects of Solitary Confinement" in Ojeda, ed.,  The Trauma of
 Psychological Torture, Praeger, Westport Conn., 2008.

 On-Line Publications:
"'Fatal Flaws' in the Colorado Solitary Confinement Study". In Solitary Watch; Posted November 15, 2010

## 2.  **Trauma, Including Strip Search Procedures, Sexual and Physical Assault**

Psychiatric expert in a number of strip search cases in Federal and Massachusetts state courts. Testimony in Boston's Federal District was cited by the Federal Appeals Court in affirming damages verdict in *Cole v Snow*.  Consulted in settlement of three class action suits.

Psychiatric expert in cases of rape, sexual and physical assault.  Substantial experience in evaluating the effects of childhood sexual abuse, and the processing over time of memories of that abuse. Evaluated approximately 100 victims of childhood sexual abuse, including many of the plaintiffs in the clergy sex abuse scandals in Massachusetts.  Consulted to private schools around such issues.

> Research and Presentations:

Principal Investigator, Beth Israel Hospital, Department of Psychiatry, Boston, MA.
"Psychiatric and Addictive Problems in Survivors of Childhood Sexual Abuse Perpetrated by Father Porter."
"Vicissitudes of Memory of Childhood Trauma".

With Joseph De Rivera, Ph.D.:  "Recovery of Memory of Childhood Sexual Abuse and Creation of False Memories; Can These Processes be Distinguished?".

Presented at various for above, including International Conference at University of New Hampshire, and Seminar at Suffolk University Law School.

## 3.  **Addictive Disorders.**

Testimony in a number of criminal and civil cases.  My testimony in a highly publicized Texas Federal Court case, *In re, Cockrum,*  helped to establish that an individual who was otherwise highly competent, was not competent to act in his own behalf in appealing his murder conviction, as a result of an underlying addictive disorder and suicidal compulsion.

## 4.  **Civil Rights Issues**
Expert in a number of cases regarding racial and sexual harassment in employment and housing situations, including cases brought by Civil Rights Division of the United States Department of Justice, and by Greater Boston Legal Services, and in strip search procedures by law enforcement and prison personnel.

**Stuart Grassian, M.D.**
401 Beacon Street
Chestnut Hill, MA 02467
(617) 244-3315; fax (617) 244-2792
stgrassian@gmail.com

## Testimony List 2012-2016

### Testimony in 2012

Slevin v. BOCC for Dona Ana County,  USDistCt, NM, Civ No. 08-01185 MV/DJS,
     Trial testimony,  January 2012.
Cady v. Cumberland County Jail et. al.  US Dist. Ct. Maine, 2:10-cv-00512-GZS.
     Deposition testimony, February, 2012.
Richard v.Hinshaw et al.:  US Dist. Ct., District of Kansas,  09-1278-WEB-KMGH.
     Deposition testimony,  October and December 2012.

### Testimony in 2013

Tate v. Starks, et al., USDistCt. Northern Dist Mississippi,  Greenville Division
          Civil No.  4:08CV73-WAP-DAS. Trial testimony January 2013.
Bar Counsel v. John C. Bartley, Massachusetts Board of Bar Overseers,
     BBO File No. C1-08-0262.  Hearing Testimony, February 2013.
Caine v. Burge.  US Dist. Ct., Northern Dist.0f Illinois,  Case No. 11-8996.  May 2013;
     Deposition Testimony.
Monsalve v. Lappin et. al.  US Dist Ct., SD NY, 1:4-CV-07312  LAK-DCF.  Deposition
     testimony.  October 2013.
Richard v. Hinshaw et al.  US Dist Ct. District of Kansas, 09-1278-WEB-KGMH.
     Daubert Hearing,  December 2013.

### Testimony in 2014

Stiles v. Grady, et al.,  U.S.Dist Ct. Middle Dist Florida, Tampa Division, Case No 8:12 –
     cv-2375-T-27EAJ.  Deposition Testimony,  February 2014.
Mario Aguilar v. Billy Roberts, et al,, Commonwealth of Kentucky, Franklin Circuit
John C. Ruiz-Bueno, III, et al., vs. Franklin County Sheriff Zach Scott, et al.
          U.S. Dist. Ct, Southern Dist.Ohio, Eastern Division,  Case No. 2:12-CV-00809.
          Deposition Testimony, April 2014. (Joseph Russell, Atty.)
State of Washington v. Jimi Hamilton;   Trial Testimony September 2014.
          Sup Ct, Snohomish County, Washington. No. 12-1-01937-6 (Jennifer
          Rancourt, Attorney)

DA361

**Testimony in 2015**

<u>Vasquez v. Vargas, et al.</u>  U.S.Dist.Ct, New Mexico, Civ. No. 14-25JB?GBW.
     Deposition Testimony, April 2015.  (Matthew Coyte, Attorney)
<u>Arizona v. Rushing,</u>  Arizona Superior Court, Maricopa County,
     No. CR-2010-007882-001,  Trial Testimony, July 2015 (Randall Craig, Atty.)
<u>In re. Christopher Berry, Aoolication for Parole;</u>  Hearing Testimony,
     11/2015.  (Melissa Dineen, Attorney)

**Testimony in 2016**

<u>North Carolina v. Anthony,</u> NC.  Sup.Ct., Pitt County,  Nos.12CRS52712,52713,52715.
     (Trial Testimony, April 2016;  Terry Alford, Attorney.)
<u>Arizona v. Vanwinkle,</u> Arizona Sup. Ct., Maricopa County, CR-2008-128068-001DT.
     (Trial Testimony, April 2016, Gil Levy, Attorney.)
<u>Anderson v.Brennan,</u>  US Dist Ct, Massachusetts, Civil No. 14-13380-PBS.
     (Deposition Testimony, April 2016,  James Brady, Attorney.)
<u>Lawson v. FMR LLC, et. al.,</u> US Dist Ct, Massachusetts, Civil No. 1:08-cv-10466 DPW
     (Deposition Testimony,  04/12/206,  Laura Studen, Attorney)
<u>Abila v. Funk, et. al.</u>  US Dist Ct., New Mexico,  CV-2014-2129
     (Deposition Testimony, 06/20/2016.  Matt Coyte, Atty.)

## Washington University Journal of Law & Policy

Volume 22 *Access to Justice: The Social Responsibility of Lawyers | Prison Reform: Commission on Safety and Abuse in America's Prisons*

2006

# Psychiatric Effects of Solitary Confinement

Stuart Grassian

Follow this and additional works at: http://digitalcommons.law.wustl.edu/wujlp

 Part of the Law Enforcement and Corrections Commons

Recommended Citation

Stuart Grass an  *Psychiatric Effects of Solitary Confinement*  22 Wash. U. J. L. & Pol'y 325 (2006)
http://d g talcommons.law.wustl.edu/wujlp/vol22/ ss1/24

Th s wo k s b oug   o you   ee o  c a ge by   e Was  U Law Repos  o y. To expo e   e  epos  o y, c ck   e e
(  ttp://d g a co    o s.aw.wus  .edu/). Fo    o e    o   a o ,co  ac   epos   o y@wu aw.wus  .edu

# Psychiatric Effects of Solitary Confinement[†]

## Stuart Grassian[*]

### TABLE OF CONTENTS

PREFACE .......................................................................................327
I. OVERVIEW ...............................................................................327
II. SOLITARY CONFINEMENT CAN CAUSE SEVERE PSYCHIATRIC
    HARM ....................................................................................333
    *A. Solitary Confinement Can Cause a Specific Psychiatric
        Syndrome*........................................................................ 333
        1.   The Specific Psychiatric Syndrome Associated with
            Solitary Confinement ................................................. 335
        2.   This Syndrome has the Characteristics of an Acute
            Organic Brain Syndrome—A Delirium ..................... 337
    *B. The Historical Experience with Solitary Confinement:
        The Nineteenth Century Experience*................................. 338
        1.   The Origin of the American Penitentiary: The
            Nineteenth Century German Experience .................... 338
        2.   Psychological Effects of Severe Isolation.................. 341
    *C. The Twentieth Century Experience: Prisoners of War,
        "Brain Washing," and Experimental Research*.............. 343
        1.   Prisoners of War and "Brain Washing" ..................... 343
        2.   Experimental Research on Sensory Deprivation........ 345
    *D. Factors Effecting Response to Sensory Restriction and
        Solitary Confinement*....................................................... 346
        1.   Differing Conditions of Isolation............................... 346
        2.   The Perceived Intent of the Isolation Experience ...... 347
        3.   Individual Differences in Response ........................... 347

      † This article was prepared from a statement given to the Commission on Safety and Abuse in America's Prisons. As the article is an overview of the psychiatric effects of confinement throughout history it is not fully footnoted

      * M.D. Phone: (617) 244-3315; Fax: (617) 244-2792; 401 Beacon Street, Chestnut Hill, Mass. 02467-3976; e-mail: stgrassian@aol.com.

Wash U Law Repository

    a. Findings at Pelican Bay State Prison ............... 349
    b. Attention Deficit and Antisocial Personality
      Disorders ......................................................... 350
    c. *Langley v. Coughlin* ........................................ 351
    d. Effects on Psychologically More Resilient
      Inmates: *Baraldini v. Meese* and *Hameed v.*
      *Coughlin* ......................................................... 352
   E. Long Term Effects of Solitary and Small Group
     Confinement .................................................................. 353
III. CONCLUSIONS ..................................................................................354
APPENDIX A: REPORTS OF PSYCHIATRIC DISTURBANCES IN
  OTHER CONDITIONS OF RESTRICTED ENVIRONMENTAL
  STIMULATION ................................................................................356
I. AVIATION  .....................................................................................356
II. SMALL GROUP CONFINEMENT ...........................................................357
III. POLAR HABITATION ..........................................................................358
IV. EXPLORERS: SOLO VOYAGES .............................................................361
V. MEDICAL CONDITIONS .......................................................................362
  *A. Eye Patched Patients* .......................................................... 362
  *B. Poliomyelitis* ...................................................................... 363
  *C. Cardiac Patients* ................................................................ 363
  *D. Hearing-Impaired Individuals* ............................................. 364
  *E. Other Medical Patients* ....................................................... 365
VI. OCCUPATIONAL SITUATIONS ............................................................365
VII. ANIMAL STUDIES .............................................................................365
APPENDIX B: THE NINETEENTH CENTURY GERMAN EXPERIENCE
  WITH SOLITARY CONFINEMENT ..................................................367
APPENDIX C: EXPERIMENTAL RESEARCH ON THE PSYCHIATRIC
  EFFECT OF PROFOUND SENSORY DEPRIVATION: FACTORS
  INFLUENCING VULNERABILITY TO PSYCHIATRIC HARM .............373
I. THE INFLUENCE OF EXPECTATION ........................................................373
II. INDIVIDUAL DIFFERENCES IN RESPONSE .........................................374
  *A. Effects of Sensory Deprivation on Antisocial Personality*
   *Disorder* .......................................................................... 376
   1. Aversive Conditioning ............................................... 376
    a. Ethical Considerations ..................................... 378
    b. SHU Incarceration is not Aversive
      Conditioning ..................................................... 378

DA365

      (i)   The behavior being changed:...........................379
      (ii)  The "punishment":..........................................379
APPENDIX D: REPORTS OF THE LONG-TERM EFFECTS OF
    SOLITARY CONFINEMENT IN FORMER POLITICAL PRISONERS
    AND IN PRISONERS OF WAR: SOLITARY CONFINEMENT AS A
    MEANS OF "BRAIN WASHING" AND "INDOCTRINATING" ...........380

## PREFACE

Dr. Grassian is a Board Certified Psychiatrist who was on the faculty of the Harvard Medical School for over twenty-five years. He has had extensive experience in evaluating the psychiatric effects of solitary confinement, and in the course of his professional involvement, has been involved as an expert regarding the psychiatric impact of federal and state segregation and disciplinary units in many settings. His observations and conclusions regarding this issue have been cited in a number of federal court decisions. The following statement is largely a redacted, non-institution and non-inmate specific, version of a declaration which was submitted in September 1993 in *Madrid v. Gomez*.[1] To enhance the readability of this statement, much of the supporting medical literature is described in the appendices to the statement.

## I. OVERVIEW

Solitary confinement—that is the confinement of a prisoner alone in a cell for all, or nearly all, of the day with minimal environmental stimulation and minimal opportunity for social interaction—can cause severe psychiatric harm. It has indeed long been known that severe restriction of environmental and social stimulation has a profoundly deleterious effect on mental functioning; this issue has been a major concern for many groups of patients including, for example, patients in intensive care units, spinal patients immobilized by the need for prolonged traction, and patients with impairment of

---

[1]    889 F Supp 1146 (N D Cal 1995), *rev'd and remanded*, 150 F 3d 1030 (9th Cir 1998)

DA366

their sensory apparatus (such as eye-patched or hearing-impaired patients). This issue has also been a very significant concern in military situations, polar and submarine expeditions, and in preparations for space travel.

The United States was actually the world leader in introducing prolonged incarceration, and solitary confinement, as a means of dealing with criminal behavior. The "penitentiary system" began in the United States, first in Philadelphia, in the early nineteenth century, a product of a spirit of great social optimism about the possibility of rehabilitation of individuals with socially deviant behavior.[2] The Americans were quite proud of their "penitentiary system" and they invited and encouraged important visitors from abroad to observe them.[3] This system, originally labeled as the "Philadelphia System," involved almost an exclusive reliance upon solitary confinement as a means of incarceration and also became the predominant mode of incarceration, both for post conviction and also for pretrial detainees, in the several European prison systems which emulated the American model.[4]

The results were, in fact, catastrophic. The incidence of mental disturbances among prisoners so detained, and the severity of such disturbances, was so great that the system fell into disfavor and was ultimately abandoned. During this process a major body of clinical literature developed which documented the psychiatric disturbances created by such stringent conditions of confinement.[5]

The paradigmatic psychiatric disturbance was an agitated confusional state which, in more severe cases, had the characteristics of a florid delirium, characterized by severe confusional, paranoid, and hallucinatory features, and also by intense agitation and random, impulsive, often self-directed violence. Such disturbances were often

---

2   An excellent history of the Philadelphia System is found in NORMAN JOHNSTON ET AL , EASTERN STATE PENITENTIARY: CRUCIBLE OF GOOD INTENTIONS (1994)

3   *See* DAVID ROTHMAN, THE DISCOVERY OF THE ASYLUM 81 (1971); *see also* GUSTAVE DE BEAUMONT & ALEXIS DE TOCQUEVILLE, ON THE PENITENTIARY SYSTEM IN THE UNITED STATES AND ITS APPLICATION IN FRANCE, http://www law du edu/sterling/Content/ ALH/Tocqueville_Pen pdf; CHARLES DICKENS, AMERICAN NOTES AND PICTURES FROM ITALY (Leonee Ormond ed , Everymans Library 1997) (1842)

4   ROTHMAN, *supra* note 3, at 96–101

5   *See* Appendix D (describing this literature)

DA367

observed in individuals who had no prior history of any mental illness. In addition, solitary confinement often resulted in severe exacerbation of a previously existing mental condition. Even among inmates who did not develop overt psychiatric illness as a result of solitary confinement, such confinement almost inevitably imposed significant psychological pain during the period of isolated confinement and often significantly impaired the inmate's capacity to adapt successfully to the broader prison environment.

It is both tragic and highly disturbing that the lessons of the nineteenth century experience with solitary confinement are today being so completely ignored by those responsible for addressing the housing and the mental health needs in the prison setting. For, indeed, the psychiatric harm caused by solitary confinement had become exceedingly apparent well over one hundred years ago. Indeed, by 1890, with *In re Medley*,[6] the United States Supreme Court explicitly recognized the massive psychiatric harm caused by solitary confinement:

> This matter of solitary confinement is not . . . a mere unimportant regulation as to the safe-keeping of the prisoner . . . .
>
> . . . [E]xperience [with the penitentiary system of solitary confinement] demonstrated that there were serious objections to it. A considerable number of the prisoners fell, after even a short confinement, into a semi-fatuous condition, from which it was next to impossible to arouse them, and others became violently insane; others, still, committed suicide; while those who stood the ordeal better were not generally reformed, and in most cases did not recover sufficient mental activity to be of any subsequent service to the community.[7]

The consequences of the Supreme Court's holding were quite dramatic for Mr. Medley. Mr. Medley had been convicted of having murdered his wife. Under the Colorado statute in force at the time of the murder he would have been executed after about one additional

---

6   134 U S  160 (1890)
7   *Id*  at 167–68

DA368

month of incarceration in the county jail. But in the interim between Mr. Medley's crime and his trial the Colorado legislature had passed a new statute which called for the convicted murderer to be, instead, incarcerated in solitary confinement in the state prison during the month prior to his execution.[8] Unhappily, when the legislature passed the new law it simultaneously rescinded the older law without allowing for a bridging clause which would have allowed for Mr. Medley's sentencing under the older statute.[9]

Mr. Medley appealed his sentencing under the new statute, arguing that punishment under this new law was so substantially more burdensome than punishment under the old law as to render its application to him *ex post facto*.[10] The Supreme Court agreed with him, even though it simultaneously recognized that if Mr. Medley was not sentenced under the new law, he could not be sentenced at all.[11] Despite this, the Court held that this additional punishment of one month of solitary confinement was simply too egregious to ignore; the Court declared Mr. Medley a free man, and ordered his release from prison.[12]

Dramatic concerns about the profound psychiatric effects of solitary confinement have continued into the twentieth century, both in the medical literature and in the news. The alarm raised about the "brain washing" of political prisoners of the Soviet Union and of Communist China—and especially of American prisoners of war during the Korean War—gave rise to a major body of medical and scientific literature concerning the effects of sensory deprivation and social isolation, including a substantial body of experimental research.[13]

This literature, as well as my own observations, has demonstrated that, deprived of a sufficient level of environmental and social stimulation, individuals will soon become incapable of maintaining an adequate state of alertness and attention to the environment.

---

8   *Id* at 162–63
9   *Id* at 166
10   *Id* at 162
11   *Id* at 166
12   *Id* at 174
13   THE MANIPULATION OF HUMAN BEHAVIOR 2–3, 35 (Albert D  Biderman & Herbert Zimmer eds , 1961)

DA369

Indeed, even a few days of solitary confinement will predictably shift the electroencephalogram (EEG) pattern toward an abnormal pattern characteristic of stupor and delirium.

This fact is not surprising. Most individuals have at one time or another experienced, at least briefly, the effects of intense monotony and inadequate environmental stimulation. After even a relatively brief period of time in such a situation an individual is likely to descend into a mental torpor or "fog," in which alertness, attention, and concentration all become impaired. In such a state, after a time, the individual becomes increasingly incapable of processing external stimuli, and often becomes "hyperresponsive" to such stimulation. For example, a sudden noise or the flashing of a light jars the individual from his stupor and becomes intensely unpleasant. Over time the very absence of stimulation causes whatever stimulation is available to become noxious and irritating. Individuals in such a stupor tend to avoid any stimulation, and withdraw progressively into themselves and their own mental fog.

An adequate state of responsiveness to the environment requires both the ability to achieve and maintain an attentional set and the ability to shift attention. The impairment of alertness and concentration in solitary confinement leads to two related abnormalities: the inability to focus, and the inability to shift attention. The inability to focus (to achieve and maintain attention) is experienced as a kind of dissociative stupor—a mental "fog" in which the individual cannot focus attention, and cannot, for example, grasp or recall when he attempts to read or to think.

The inability to shift attention results in a kind of "tunnel vision" in which the individual's attention becomes stuck, almost always on something intensely unpleasant, and in which he cannot stop thinking about that matter; instead, he becomes obsessively fixated upon it. These obsessional preoccupations are especially troubling. Individuals in solitary confinement easily become preoccupied with some thought, some perceived slight or irritation, some sound or smell coming from a neighboring cell, or, perhaps most commonly, by some bodily sensation. Tortured by it, such individuals are unable to stop dwelling on it. In solitary confinement ordinary stimuli become intensely unpleasant and small irritations become maddening. Individuals in such confinement brood upon normally

DA370

unimportant stimuli and minor irritations become the focus of increasing agitation and paranoia. I have examined countless individuals in solitary confinement who have become obsessively preoccupied with some minor, almost imperceptible bodily sensation, a sensation which grows over time into a worry, and finally into an all-consuming, life-threatening illness.

Individuals experiencing such environmental restriction find it difficult to maintain a normal pattern of daytime alertness and nighttime sleep. They often find themselves incapable of resisting their bed during the day—incapable of resisting the paralyzing effect of their stupor—and yet incapable of any restful sleep at night. The lack of meaningful activity is further compounded by the effect of continual exposure to artificial light and diminished opportunity to experience natural daylight. And the individual's difficulty in maintaining a normal day-night sleep cycle is often far worsened by constant intrusions on nighttime dark and quiet, such as steel doors slamming shut, flashlights shining in their face, and so forth.

There are substantial differences in the effects of solitary confinement upon different individuals. Those most severely affected are often individuals with evidence of subtle neurological or attention deficit disorder, or with some other vulnerability. These individuals suffer from states of florid psychotic delirium, marked by severe hallucinatory confusion, disorientation, and even incoherence, and by intense agitation and paranoia. These psychotic disturbances often have a dissociative character, and individuals so affected often do not recall events which occurred during the course of the confusional psychosis. Generally, individuals with more stable personalities and greater ability to modulate their emotional expression and behavior and individuals with stronger cognitive functioning are less severely affected. However, all of these individuals will still experience a degree of stupor, difficulties with thinking and concentration, obsessional thinking, agitation, irritability, and difficulty tolerating external stimuli (especially noxious stimuli).

Moreover, although many of the acute symptoms suffered by these inmates are likely to subside upon termination of solitary confinement, many—including some who did not become overtly psychiatrically ill during their confinement in solitary—will likely suffer permanent harm as a result of such confinement. This harm is

DA371

most commonly manifested by a continued intolerance of social interaction, a handicap which often prevents the inmate from successfully readjusting to the broader social environment of general population in prison and, perhaps more significantly, often severely impairs the inmate's capacity to reintegrate into the broader community upon release from imprisonment.

Many inmates housed in such stringent conditions are extremely fearful of acknowledging the psychological harm or stress they are experiencing as a result of such confinement. This reluctance of inmates in solitary confinement is a response to the perception that such confinement is an overt attempt by authorities to "break them down" psychologically, and in my experience, tends to be more severe when the inmate experiences the stringencies of his confinement as being the product of an arbitrary exercise of power, rather than the fair result of an inherently reasonable process. Furthermore, in solitary confinement settings, mental health screening interviews are often conducted at the cell front, rather than in a private setting, and inmates are generally quite reluctant to disclose psychological distress in the context of such an interview since such conversation would inevitably be heard by other inmates in adjacent cells, exposing them to possible stigma and humiliation in front of their fellow inmates.

## II. SOLITARY CONFINEMENT CAN CAUSE SEVERE PSYCHIATRIC HARM

### A. Solitary Confinement Can Cause a Specific Psychiatric Syndrome

During the course of my involvement as an expert I have had the opportunity to evaluate the psychiatric effects of solitary confinement in well over two hundred prisoners in various state and federal penitentiaries. I have observed that, for many of the inmates so housed, incarceration in solitary caused either severe exacerbation or recurrence of preexisting illness, or the appearance of an acute mental illness in individuals who had previously been free of any such illness.

I became aware of the particular toxicity of solitary confinement when I first had the opportunity to evaluate prisoners in solitary

Wash U Law Repository

confinement as a result of my involvement in a class action lawsuit in Massachusetts, which challenged conditions in solitary confinement at the maximum security state penitentiary in Walpole, Massachusetts.[14] The clinical observations I made in the course of my involvement in that lawsuit, coupled with my research into the medical literature concerning this issue, have formed the basis of two articles I have since published on this topic in peer-reviewed journals.[15] My subsequent professional experience has included observations of similar phenomena in many other solitary confinement settings.

    When I initially agreed to evaluate the Walpole prisoners I had not yet reviewed the literature on the psychiatric effects of solitary confinement and I was somewhat skeptical; I expected that inmates would feign illness and exaggerate whatever psychiatric symptomatology they suffered. I discovered, however, something very different. Contrary to my expectations, the prisoners appeared to be extremely defensive about the psychiatric problems they were suffering in Special Housing Unit (SHU); they tended to rationalize away their symptoms, avoid talking about them, or deny or distort their existence all in an apparent effort to minimize the significance of their reactions to isolation. Numerous interviews began with statements such as "solitary doesn't bother me" or "some of the guys can't take it—not me," or even with the mention of a symptom and a simultaneous denial of its significance: "As soon as I got in I started cutting my wrists. I figured it was the only way to get out of here."

    As these interviews progressed the facile accounts gave way to descriptions of experiences that were very worrisome. For example, one inmate was unable to describe the events of the several days surrounding his wrist-slashing, nor could he describe his thoughts or feelings at the time. Similarly, the prisoner who said he could "take it" eventually came to describe panic, fears of suffocation, and paranoid distortions which he suffered while in isolation. Moreover,

---

14   Libby v Comm'r of Corr , 432 N E 2d 486 (Mass  1982)
15   *See* Stuart Grassian & Nancy Friedman, *Effects of Sensory Deprivation in Psychiatric Seclusion and Solitary Confinement*, 8 INT'L J L  & PSYCHIATRY 49 (1986); Stuart Grassian, *Psychopathological Effects of Solitary Confinement*, 140 AM  J  PSYCHIATRY 1450 (1983)

DA373

the specific psychiatric symptoms reported were strikingly consistent among the inmates:

1. The Specific Psychiatric Syndrome Associated with Solitary Confinement

a. Hyperresponsivity to External Stimuli: More than half the prisoners reported a progressive inability to tolerate ordinary stimuli. For example, "You get sensitive to noise, the plumbing system. Someone in the tier above me pushes the button on the faucet . . . It's too loud, gets on your nerves. I can't stand it. I start to holler."

b. Perceptual Distortions, Illusions, and Hallucinations: Almost a third of the prisoners described hearing voices, often in whispers and often saying frightening things to them. There were also reports of noises taking on increasing meaning and frightening significance. For example, "I hear noises, can't identify them—starts to sound like sticks beating men, but I'm pretty sure no one is being beaten . . . I'm not sure." These perceptual changes at times became more complex and personalized:

> They come by with four trays; the first has big pancakes. I think I am going to get them. Then someone comes up and gives me tiny ones—they get real small, like silver dollars. I seem to see movements, real fast motions in front of me. Then seems like they are doing things behind your back, can't quite see them. Did someone just hit me? I dwell on it for hours.

c. Panic Attacks: Well over half the inmates interviewed described severe panic attacks while in SHU.

d. Difficulties with Thinking, Concentration, and Memory: Many reported symptoms of difficulty in concentration and memory. One prisoner described his experience, "I can't concentrate, can't read . . . Your mind's narcotized. Sometimes I can't grasp words in my mind that I know. Get stuck, have to think of another word. Memory's going. You feel like you are losing something you might not get back." In some cases this problem was far more severe, leading to acute psychotic, confusional states. One prisoner had slashed his wrists during such a state and his confusion and disorientation had actually been noted in his medical record.

DA374

e. Intrusive Obsessional Thoughts: Emergence of Primitive Aggressive Ruminations: Almost half the prisoners reported the emergence of primitive aggressive fantasies of revenge, torture, and mutilation of the prison guards. In each case the fantasies were described as entirely unwelcome, frightening, and uncontrollable. For example, one prisoner recounted

> I try to sleep sixteen hours a day, block out my thoughts; muscles tense, think of torturing and killing the guards; lasts a couple of hours. I can't stop it. Bothers me. Have to keep control. This makes me think I'm flipping my mind . . . I get panicky, thoughts come back—pictured throwing a guard in lime—eats away at his skin, his flesh—torture him—try to block it out, but I can't.

f. Overt Paranoia: Almost half the prisoners interviewed reported paranoid and persecutory fears. Some of these persecutory fears were short of overt psychotic disorganization. For example, one prisoner recalled "sometimes I get paranoid—think they meant something else. Like a remark about Italians. Dwell on it for hours. Get frantic. Like when they push buttons on the sink. Think they did it just to annoy me." In other cases this paranoia deteriorated into overt psychosis:

> Spaced out. Hear singing, people's voices, 'Cut your wrists and go to Bridgewater and the Celtics are playing tonight.' I doubt myself. Is it real? . . . I suspect they are putting drugs in my food, they are putting drugs in my cell . . . The Reverend, the priest, even you, you're all in cahoots in the Scared Straight Program.

g. Problems with Impulse Control: Slightly less than half of the prisoners reported episodes of loss of impulse control with random violence: "I snap off the handle over absolutely nothing. Have torn up mail and pictures, throw things around. Try to control it. Know it only hurts myself." Several of these prisoners reported impulsive self-mutilation; "I cut my wrists many times in isolation. Now it seems crazy. But every time I did it, I wasn't thinking—lost control—cut myself without knowing what I was doing."

DA375

### 2. This Syndrome has the Characteristics of an Acute Organic Brain Syndrome—A Delirium

Clearly, these symptoms were very dramatic. Moreover, they appeared to form a discreet syndrome—that is, a constellation of symptoms occurring together and with a characteristic course over time, thus suggestive of a discreet illness. Moreover, this syndrome was strikingly unique; some of the symptoms described above are found in virtually no other psychiatric illness. The characteristic acute dissociative, confusional psychoses are a rare phenomenon in psychiatry. Similarly, cases of random, impulsive violence in the context of such confusional state is exceedingly rare. But the most unique symptoms in this cluster are the striking and dramatically extensive perceptual disturbances experienced by the isolated person. Indeed, these disturbances are almost pathognomonic of the syndrome, meaning they are symptoms virtually found nowhere else. For example, loss of perceptual constancy (objects becoming larger and smaller, seeming to "melt" or change form, sounds becoming louder and softer, etc.) is very rare and, when found, is far more commonly associated with neurological illness (especially seizure disorders and brain tumors affecting sensory integration areas of the brain) than with primary psychiatric illness.[16]

In addition, functional psychiatric illness very rarely presents with such severe and florid perceptual distortions, illusions, and hallucinations simultaneously affecting multiple perceptual modalities—auditory, visual, olfactory, tactile, and kinesthetic.[17]

Similarly, hyperresponsivity to external stimuli with a dysesthetic (subjectively painful) response to such stimuli, is likewise rare. In fact, it is exceedingly rare; so rare that appearance of this symptom also might suggest an organic brain dysfunction etiology.[18]

---

16   When seen in primary psychiatric illness, it is basically only seen in especially severe, insidious, early onset schizophrenia—the kind of schizophrenic illness which has always been thought to clinically "feel" like a fundamentally biological/neurologic disease

17   In fact, in the more common psychotic illnesses such as schizophrenia and psychotic depression, auditory hallucinations are by far the most common type; visual hallucinations come a distant second; and hallucinations in all other modalities are actually very uncommon Moreover, combined modality hallucinations (other than the combination of auditory with visual) are exceedingly rare

18   This symptom is similar, for example, to the experience many people have during a

DA376

Thus, the fact that all of these quite unusual symptoms ran together in the same syndrome was itself a clear confirmation of the distinct nature of this syndrome. While this syndrome is strikingly atypical for the functional psychiatric illnesses, it is quite characteristic of an acute organic brain syndrome: delirium, a syndrome characterized by a decreased level of alertness and EEG abnormalities; by the same perceptual and cognitive disturbances, fearfulness, paranoia, and agitation; and random, impulsive, and self-destructive behavior which I observed in the Walpole population.

Moreover, delirium is a syndrome which is known to result from the type of conditions, including restricted environmental stimulation, which are characteristic of solitary confinement. Even the EEG abnormalities characteristic of delirium have been observed in individuals exposed to conditions of sensory deprivation. By now the potentially catastrophic effects of restricted environmental stimulation have been the subject of a voluminous medical literature; annual international symposia are being held on the subject, and the issue has even found its way into the popular media. The literature is summarized in the appendices to this statement.

### B. The Historical Experience with Solitary Confinement: The Nineteenth Century Experience

#### 1. The Origin of the American Penitentiary: The Nineteenth Century German Experience

Preindustrial societies had often not made any fundamental distinction between deviant behavior seen as the product of "criminal intent" as opposed to behavior seen as stemming from "mental illness."[19] For such societies, deviant behavior—whatever its origins—was a social evil that was deeply feared and cruelly punished.

---

febrile illness of finding any touching of their body exceedingly unpleasant, or the inability of a patient with a headache to tolerate an even ordinary volume of sound, or the inability of some pregnant women to tolerate even ordinary smells without becoming nauseated

    19   ROTHMAN, *supra* note 3, at 4–5, 62–65

DA377

In Colonial America the Salem witch trials were but one example of a continuing tendency to equate "lunacy" with "demonic possession" and, ultimately, with "evil."[20] Deviant behavior was naturally feared and hated; the instinctive response was to punish it cruelly, lock it away, banish it, or kill its perpetrator. Thus, in Colonial America generally, the social response to deviant behavior was relatively simple: the protection of the larger society was paramount, while the distinction between "illness" and "evil" was far less critical. Indeed, the social response to deviance largely stemmed from the severe puritanical belief in innate human evil that deserved violent retaliation such as whipping, pillories, stockades, brandings, and, ultimately, the gallows. At times, when there was a more "humane" response to persons viewed as suffering from lunacy this response consisted simply of keeping the individual caged under lock and key, often for the rest of his life.

But in the early nineteenth century, a surge of great social optimism swept over America, and along with this grew a belief in the possibility of social reform, perhaps an overly optimistic faith in the possibility of rehabilitation of persons whose behavior was deviant.[21] Not coincidentally, this spirit gave rise virtually simultaneously to two great social reform movements in the United States: the development of large mental hospitals and the construction of the first large penitentiaries.

Both of these institutions were founded upon a similar premise—namely, that psychological and social deviance was largely a result of the evils and stresses of "modern society," and both held a fundamental belief that healing would naturally occur if the deviant individual was removed from the evils of the larger society, and thus enabled to know his own true nature.[22]

In the case of the mental hospital this belief gave rise to the concept of a healing, pastoral, therapeutic community.[23] But, in the case of the penitentiary, an additional safeguard was obviously

---

20  GEORGE IVES, A HISTORY OF PENAL METHODS: CRIMINALS, WITCHES, LUNATICS 58–59, 68–73 (reprint 1970) (1914)

21  ROTHMAN, *supra* note 3, at 57–58, 79

22  *Id* at 82

23  *Id* at 133

Wash U Law Repository

DA378

required: the inmates clearly had to be protected, not only from the evil influences of the broader society, but also from the evil influences of each other.[24] The proper approach thus appeared to be to give each inmate the opportunity to live a life alone, like a penitent monk in his own monastic cell.

Thus, the earliest American penitentiaries were, generally, systems of rigid solitary confinement.[25] Extravagant attention was paid to the design of these institutions, to ensure the absolute and total isolation of the offender from any evil and corrupting influences.[26] The Philadelphia Prison, completed in 1829, was particularly conscientious in this regard:

> The arrangements . . . guaranteed that convicts would avoid all contamination and follow a path to reform. Inmates remained in solitary cells for eating, sleeping, and working . . . . No precaution against contamination was excessive. Officials placed hoods over the head of a new prisoner when marching him to his cell so he would not see or be seen by other inmates.
>
> . . . Thrown upon his own innate sentiments, with no evil example to lead him astray, . . . the criminal would start his rehabilitation. Then, after a period of total isolation, without companions, books, or tools, . . . [h]e would return to the community cured of vice and idleness, to take his place as a responsible citizen.[27]

The American penitentiary, and the Philadelphia System, became world-famous; no important visitor to the United States neglected to tour its penitentiaries and to bring back their principles for emulation in Europe. Some such as Alexis de Tocqueville of France and Nicholas Julius from Prussia came specifically for that purpose.[28] Tocqueville wrote of the utter, "perfect" desolation of the American

---

24   *Id* at 83
25   *Id*
26   *Id* at 82–83
27   *Id* at 85–86
28   *Id* at 81

DA379

penitentiary, of the "profound silence" within its "vast walls," likening it to the silence of death.[29]

### 2. Psychological Effects of Severe Isolation

The openness with which these institutions were held up to public scrutiny led in time to open concern about the psychological effects of such confinement. During a tour of the United States in 1842, Charles Dickens wrote with pathos of the Philadelphia Prison:

> The system here is rigid, strict, and hopeless solitary confinement. . . . Over the head and face of every prisoner who comes into the melancholy house, a black hood is drawn, and in this dark shroud, . . . he is led to the cell from which he never again comes forth, until his whole term of imprisonment has expired. He is a man buried alive . . . . dead to everything but torturing anxieties and horrible despair.
>
> . . . .
>
> The first man I saw . . . answered . . . always with a strange kind of pause . . . . He gazed about him and in the act of doing so fell into a strange stare as if he had forgotten something.
>
> In another cell was a German, . . . a more dejected, broken-hearted, wretched creature, it would be difficult to imagine. . . .
>
> There was a sailor . . . . [w]hy does he stare at his hands and pick the flesh open, upon the fingers, and raise his eyes for an instant . . . to those bare walls . . . ?[30]

American concern about the effects of rigid solitary confinement began as early as the 1830s.[31] Statistical comparisons began to be made between the Philadelphia system and its chief competitor: the Auburn system prevailing in New York State at the Auburn and Sing-Sing penitentiaries.[32] The latter system also utilized solitary

---

29  *Id* at 97
30  P Herbert Liederman, *Man Alone: Sensory Deprivation and Behavioral Change*, 8 Correctional Psychiatry & J Soc Therapy 64, 66 (1962)
31  Rothman, *supra* note 3, at 87–88
32  *Id* at 88

DA380

confinement, but less rigidly; inmates left their cells to work together in workshops and exercise in a common courtyard, although here, too, absolute and strict silence was maintained at all times.[33] Statistical comparisons began to generate evidence that "[i]t was unnatural . . . to leave men in solitary, day after day, year after year; indeed, it was so unnatural that it bred insanity."[34] The Philadelphia Prison system appeared to have a higher incidence not only of insanity but also of physical disease and death than its New York State system counterpart.[35]

Meanwhile, the American system had been emulated in many major European prisons, such as at Halle, Germany.[36] Although the Americans had been the world leaders in instituting rigid solitary confinement in their penitentiary system, German clinicians eventually assumed the task of documenting its demise. Between 1854 and 1909, thirty-seven articles appeared in German scientific journals on the subject of psychotic disturbances among prisoners, summarizing years of work and hundreds of cases. A major review of this literature was published in 1912.[37] A summary and synthesis of this rather large body of work appears as an appendix to this article.[38]

But it should be noted that interest in the problem was not purely academic; psychotic disturbances among prisoners were of such frequency in these prisons that they attracted administrative as well as clinical concern, and great effort was made to explain this disturbing incidence. Thus, the literature covered a variety of issues: speculation, for example, on the "moral degeneracy" of the prison population; comparison of the psychopathology of those who committed "crimes of passion" with those who committed "crimes against property"; or documentation of the incidence of the major diagnostic categories of the time (for example, "circular insanity," "alcoholic psychoses," epilepsy, and general paresis) among the prison population.

---

33  *Id* at 95, 97
34  *Id* at 87
35  *Id* at 87–88
36  *See* Paul Nitsche & Karl Wilmanns, The History of the Prison Psychoses (Francis M Barnes, Jr & Bernard Glueck trans , 1912)
37  *See id*
38  *See* Appendix B

DA381

However, multiple reports based on careful clinical observation suggested that a substantial majority of these prison psychoses were direct reactions to the conditions of imprisonment itself. Gradually, a clinically distinguishable syndrome of acute reactive prison psychoses began to be defined. Different variables were considered in attempting to explain the etiology of these reactive prison psychoses, including long versus short durations of imprisonment, or imprisonment of those already convicted versus imprisonment while awaiting trial. However, the most consistent factor described, reported in over half the total literature, was solitary confinement.

### C. The Twentieth Century Experience: Prisoners of War, "Brain Washing," and Experimental Research

#### 1. Prisoners of War and "Brain Washing"

Unfortunately, other than some anecdotal reports, there was little discussion of the psychological effects of solitary confinement in the medical literature during the first half of the twentieth century. Undoubtedly, this was in part a consequence of the disastrous earlier experience with such confinement. As statistical evidence accumulated during the nineteenth century that solitary confinement produced a very disturbing incidence of insanity, physical disease, and death the system fell into disrepute and, with this, it had changed from an open, optimistic experiment in social reform into a hidden, secretive place of punishment and control.

Its devastating psychological impact, however, did not change, a fact which became suddenly and very painfully evident in the 1950s as the American public began hearing the frightening and dramatic reports of "brain washing" of American prisoners of war in Korea— reports that alterations in the sensory environment were being intentionally imposed upon these prisoners in a seemingly Orwellian attempt to profoundly disrupt their psychological equilibrium.[39]

By the 1950s, reports had already appeared of major psychiatric disturbances among survivors of prolonged solitary confinement in

---

39   Lawrence E  Hinkle, Jr , *The Physiological State of the Interrogation Subject as It Affects Brain Function*, *in* THE MANIPULATION OF HUMAN BEHAVIOR, *supra* note 13, at 35

Wash U Law Repository

war,[40] but during the decade of the Korean War major attention was riveted on the occurrence of these disturbances not only in war but in a variety of other settings as well. In 1956 the Group for the Advancement of Psychiatry (GAP) held a symposium, "Factors Used to Increase the Susceptibility of Individuals to Forceful Indoctrination," to study methods used by the Chinese and Russian Communists to "indoctrinate" and "break the will" of political prisoners and prisoners of war.[41] Dr. Milton Meltzer, former Chief Medical Officer at Alcatraz Federal Penitentiary, contributed his observations of psychiatric disturbances among prisoners exposed to punitive solitary confinement at Alcatraz.[42] These prisoners were rarely confined for periods beyond one week.[43] Despite this, Dr. Meltzer described acute psychotic breakdowns among prisoners so confined; his descriptions closely paralleled the observations at Walpole:

> The motor effects ranged from occasional tense pacing, restlessness and sense of inner tension with noise making, yelling, banging and assaultiveness at one extreme, to a kind of regressed, dissociated, withdrawn, hypnoid and reverie-like state at the other. . . .
>
>     . . . [T]he sense of self, the ego and ego boundary phenomena are profoundly affected by the isolation.[44]

In the same symposium Dr. John Lilly of the National Institute of Mental Health noted that despite the importance of other factors which tended to "weaken personalities and make them more susceptible to [forced indoctrination]"—such as semi-starvation, physical pain and injury, and sleep deprivation—social and sensory isolation was still the central pathogenic factor in such confinement.[45]

---

40    *See, e.g.*, CHRISTOPHER BURNEY, SOLITARY CONFINEMENT (1952)
41    *See* GROUP FOR THE ADVANCEMENT OF PSYCHIATRY, FACTORS USED TO INCREASE THE SUSCEPTIBILITY OF INDIVIDUALS TO FORCEFUL INDOCTRINATION (1956)
42    *Id* at 96–103
43    *Id* at 98
44    *Id*
45    *Id* at 89

DA383

2.  Experimental Research on Sensory Deprivation

An experimental model was therefore designed to study the effect of such sensory deprivation; this research, conducted during the 1950s and early 1960s, primarily at Harvard and McGill University Medical Centers, was in fact funded in large part by the United States government—and especially by the Department of Defense and the Central Intelligence Agency. This research is described in an appendix to this article.[46] Its relevant conclusions can, however, be described relatively briefly:

In these studies subjects were placed in a situation designed for maximum reduction perceptually informative external stimuli (light-proof, sound-proof rooms; cardboard tubes surrounding the arms and hands to reduce proprioceptive and tactile sensation; and so on).[47] The research revealed that characteristic symptoms generally developed in such settings. These symptoms included perceptual distortions and illusions in multiple spheres (visual, auditory, tactile, olfactory); vivid fantasies, often accompanied by strikingly vivid hallucinations in multiple spheres; derealization experiences; and hyperresponsivity to external stimuli. What was also clear, however, was that while some subjects tolerated such experiences well, many did not, and characteristic syndromes were observed, including the above symptoms and cognitive impairment; massive free-floating anxiety; extreme motor restlessness; emergence of primitive aggressive fantasies which were often accompanied by fearful hallucinations; and a decreased capacity to maintain an observing, reality-testing ego function. In some cases an overt psychosis supervened with persecutory delusions and, in other cases, a marked dissociative, catatonic-like stupor (delirium) with mutism developed. EEG recordings confirmed the presence of abnormalities typical of stupor and delirium.

These findings clearly demonstrated that this experimental model did reproduce the findings in the non-experimental situations,

---

46   *See* Appendix C
47   *See, e.g.,* CHARLES A BROWNFIELD, ISOLATION: CLINICAL AND EXPERIMENTAL APPROACHES (1965); SENSORY DEPRIVATION: A SYMPOSIUM HELD AT HARVARD MEDICAL SCHOOL (Philip Solomon et al eds , 1961) [hereinafter SENSORY DEPRIVATION—HARVARD]

DA384

including the findings among prisoners of war held in solitary confinement.

### D. Factors Effecting Response to Sensory Restriction and Solitary Confinement

Much of the subsequent research in this area attempted to delineate variables which might explain these differing outcomes. These variables can be divided into two categories: i) differences among various conditions of perceptual deprivation, and ii) differences in preexisting personality functioning among individuals experiencing such conditions.

#### 1. Differing Conditions of Isolation

One of the factors that was commonly cited in the research was the intensity and duration of the sensory deprivation. More severe sensory restriction, the presence of noxious stimulation, and longer duration of the sensory deprivation experience have all been associated with an increased risk of adverse psychiatric consequences.

In my experience, conditions experienced by inmates in various prison solitary confinement settings generally bear some similarities (a cell of roughly fifty to eighty square feet; approximately twenty-two and one-half hours per day locked in the cell; about one hour per day of yard exercise, five out of the seven days each week), in other respects the conditions are fairly variable. For example, some cells have barred doors, which allow better ventilation, sound transmission, and visual connection with the outside environment than do mesh steel doors; solid steel doors are the most restrictive—especially when they are either hinged or slide shut with almost no air gap from the wall. Moreover, administrative conditions regarding the amount and circumstances of visitation, the availability of reading material and television, and so forth are all factors which vary from institution to institution, and even from time to time within a given institution.

http://digitalcommons.law.wustl.edu/wujlp/vol22/iss1/24

### 2. The Perceived Intent of the Isolation Experience

In addition to the factors described above, another critical factor in determining the effect of isolation appears to be the perceived intent of the isolation. Experimental research has demonstrated that an individual who receives clues which cause him to experience the isolation situation as potentially threatening is far more likely to develop adverse psychiatric reactions to the isolation experience.[48] Conversely, if the subject has reason to believe the situation is likely to be benign he will be far more likely to tolerate or even enjoy it.[49] Among the latter group of subjects who tolerated isolation well, many reported pleasant or at least non-threatening visual imagery, fantasy, and hallucinatory experiences.[50] "His mind may begin to wander, engage in daydreams, slip off into hypnogogic reveries with their attendant vivid pictorial images . . . he may be quietly having sexual or other pleasurable thoughts."[51]

This finding is perhaps not surprising. It appears that sensory restriction produces perceptual disturbances and illusions which are analogous to those produced by hallucinogenic drugs, and clearly, while there are some individuals who could be said to have volunteered to undergo such hallucinatory, psychotic-like experiences it must be almost uniformly terrifying to be forced to undergo an experience similar to that induced by hallucinogenic drugs.

### 3. Individual Differences in Response

Many studies have demonstrated that there is great variability among individuals in regard to their capacity to tolerate a given condition of sensory restriction. This variability helps to provide further insight into the nature of the toxic effect of such isolation conditions, and provides striking corroboration of the fact that such

---

48   *See* Nancy A Wright & David S Abbey, *Perceptual Deprivation Tolerance and Adequacy of Defenses*, 20 PERCEPTUAL & MOTOR SKILLS 35 (1965)
49   Leo Goldberger, *Experimental Isolation: An Overview*, 122 AM J PSYCHIATRY 774, 777 (1966)
50   *Id*
51   *Id*

DA386

deprivation of environmental stimulation, especially when of prolonged duration, is toxic to brain functioning and causes symptoms characteristic of stupor and delirium.

Generally, individuals with mature, healthy personality functioning and of at least average intelligence are most able to tolerate the regressive pull and perceptual intrusions of such isolation situations. On the other hand, individuals with primitive or psychopathic functioning or borderline cognitive capacities, impulse-ridden individuals, and individuals whose internal emotional life is chaotic or fearful are especially at risk for severe psychopathologic reactions to such isolation.[52]

Moreover, there is clear evidence that, in a situation of restricted environmental stimulation, preexisting central nervous system dysfunction is a major predisposing factor to the development of adverse psychiatric reactions and of overt delirium. For example, in one study of patients suffering visual deprivation following eye surgery (eye-patched patients), those patients with preexisting central nervous system dysfunction were found to be at especially high risk to develop symptoms of delirium.[53] Further, the presence of a preexisting personality disorder or impairment of psychosocial functioning was associated with increased risk of incapacitating fearfulness, paranoia, agitation, and irrational aggression toward staff.[54]

In addition, individuals may at times be exposed to situations which cause impairment of central nervous system functioning. Such situations—especially if they impair the individual's state of alertness (for example, sleep deprivation, abnormal sleep-wake cycles, or the use of sedating medication) will substantially increase the individual's vulnerability to the development of delirium. Delirium among post-surgical patients and the so-called "ICU psychoses" are examples of this phenomenon.[55] One of the characteristic difficulties

---

[52]   *See* Appendix C (describing these studies in more detail)
[53]   Eugene Ziskind, *Isolation Stress in Medical and Mental Illness*, 168 J AM MED ASS'N 1427, 1428 (1958)
[54]   Hillel Klein & Rafael Moses, *Psychological Reaction to Sensory Deprivation in Patients with Ablatio Retinae*, 24 PSYCHOTHERAPY & PSYCHOSOMATICS 41, 49–51 (1974) A more extensive review of this literature is contained in Appendix A to this declaration
[55]   Appendix A discusses this issue in more detail

DA387

experienced by inmates in solitary confinement is abnormal sleep-wake cycles and impaired sleep.

###### a.  Findings at Pelican Bay State Prison

These findings received further corroboration in my observations of inmates at Pelican Bay State Prison, California. In 1991–1992, as part of my participation in *Madrid v. Gomez*—a class-action lawsuit challenging conditions at Pelican Bay State Prison, a new "supermax" facility in California[56]—I evaluated forty-nine inmates housed in the SHU at the institution and prepared a lengthy report to the federal court of my findings.[57] Many of the inmates I evaluated there suffered severe psychiatric disturbances while housed in Pelican Bay SHU, either springing up de novo while so incarcerated or representing a recurrence or severe exacerbation of preexisting illness. Of the forty-nine inmates I evaluated, at least seventeen were actively psychotic and/or acutely suicidal and urgently in need of acute hospital treatment, and twenty-three others suffered serious psychopathological reactions to solitary confinement, including (in several cases) periods of psychotic disorganization.

The clinical data at Pelican Bay also added striking corroboration to the conclusion that the severe and prolonged restriction of environmental stimulation in solitary confinement is toxic to brain functioning. The data demonstrated that the most severe, florid psychiatric illnesses resulting from solitary confinement tend to be suffered by those individuals with preexisting brain dysfunction. As noted before, I have observed a high incidence of preexisting central nervous system dysfunction among the inmates I evaluated in solitary confinement settings. This was also the case at Pelican Bay, and statistical analysis of the Pelican Bay data quite dramatically demonstrated that inmates with such preexisting vulnerability were the most likely to develop overt confusional, agitated, hallucinatory psychoses as a result of SHU confinement.

---

56   Madrid v  Gomez, 889 F  Supp  1146 (N D  Cal  1995), *rev'd and remanded*, 150 F 3d 1030 (9th Cir  1998)

57   Much of the literature review and historical material in the present declaration is taken from my *Madrid* declaration

Wash U Law Repository

### b.  Attention Deficit and Antisocial Personality Disorders

In addition, research regarding Attention Deficit Hyperactivity Disorder and Antisocial Personality Disorder demonstrated that these conditions are similarly associated with a particular inability to tolerate restricted environmental stimulation. There is increasing evidence that childhood impulsivity and Attention Deficit Hyperactivity Disorder bear some relationship to Antisocial Personality Disorder, in that both are characterized by impulsivity and stimulation-seeking behavior, and both involve biologically based abnormalities in central nervous system functioning. Moreover, the clinical literature demonstrates that individuals with Antisocial Personality Disorder are especially intolerant of restricted environmental stimulation. For example, the psychopathic individual has been characterized as pathologically "stimulation seeking," "impulsive," and "unable to tolerate routine and boredom."[58]

Given the exigencies of conducting clinical observations of inmates in solitary confinement it is not surprising that little systematic attempt has been made to elucidate the underlying psychological characteristics of those most at risk for developing severe psychopathological reactions to such isolation. However, among the clinical reports on Ganser's Syndrome, a related condition, in non-prison populations are several studies of patients in psychiatric hospitals.[59] These patients were, of course, available for extensive psychological assessment and observation, and these reports described the majority of these patients as suffering long-standing hysterical character disorders, having problems with severe impulsivity, childhood truancy, and antisocial behavior patterns.[60]

Thus, the medical literature demonstrates that individuals whose internal emotional life is chaotic and impulse-ridden and individuals with central nervous system dysfunction may be especially prone to

---

58   Herbert C Quay, *Psychopathic Personality as Pathological Stimulation-Seeking*, 122 AM J PSYCHIATRY 180, 180 (1965)  Appendix B contains a more detailed discussion

59   *See, e.g.*, Merle R Ingraham & David M Moriarty, *A Contribution to the Understanding of the Ganser Syndrome*, 8 COMPREHENSIVE PSYCHIATRY 35 (1967); Rupert H May et al , *The Ganser Syndrome: A Report of Three Cases*, 130 J NERVOUS & MENTAL DISEASES 331 (1960)

60   May et al , *supra* note 59, at 331–36

DA389

psychopathologic reactions to restricted environmental stimulation in a variety of settings. Yet, among the prison population, it is quite likely that these are the very individuals who are especially prone to committing infractions that result in stricter incarceration, including severe isolation and solitary confinement.

### c.  *Langley v. Coughlin*[61]

In the late 1980s I interviewed and reviewed the medical records of several dozen inmates confined in maximum security prisons in New York State, including a large group of women incarcerated at the maximum security women's prison for the state of New York at Bedford Hills. During the process of these evaluations it became clear that a very high percentage of these women had a history of serious emotional or organic mental difficulties. Many had severe cognitive limitations, were highly emotionally labile, impulse ridden, and prone to psychotic disorganization. In many cases the infraction which led to their original incarceration was an act which had been committed impulsively and chaotically. Under the stress of imprisonment these inmates became even more unable to conform their behavior to the requirements of their situation.

Inevitably, this resulted in their being sentenced to terms in the SHU, and once in the SHU their subsequent course was often a nightmare. Many became grossly disorganized and psychotic, smearing themselves with feces, mumbling and screaming incoherently all day and night, some even descending to the horror of eating parts of their own bodies.

The resulting lawsuit was ultimately settled by consent decree. The settlement provided injunctive relief as well as monetary damages both for the mentally ill inmates whose emotional condition had deteriorated during their incarceration in the SHU, and also for the non-mentally ill women who had been subjected to the bedlam of mental illness created in their SHU environment. The injunctive relief required the prison to begin to reframe the meaning it gave to

---

61    There are two companion cases: *Langley v. Coughlin*, 715 F  Supp  522 (S D N Y 1989); and *Langley v. Coughlin*, 709 F  Supp  482 (S D N Y  1989), *aff'd*, 888 F 2d 252 (2d Cir 1989)

DA390

behavioral disturbances which they had previously responded to by further SHU time.[62] Under the settlement the prison began to actively consider whether such disturbances were the result of organic personality disturbances, affective or impulse disorders, or even of schizophreniform illness. The result of these changes was apparently quite dramatic.

Many of the prisoners who had been in SHU began to be treated in a residential psychiatric unit within the prison. This unit had previously refused to treat such inmates, claiming that their security needs were greater than could be handled. When pressed to provide services as a result of the settlement not only did the unit discover that it was able to provide those services, but moreover discovered that the custodial and security needs of these inmates dramatically decreased when their behavioral disturbances were framed as psychiatric problems rather than as a security issue. Thus, as a result of the settlement of the lawsuit, all parties to the suit benefited—prisoners and the officers of the correctional facility alike. I followed the result of the litigation in my capacity as an expert member of the settlement.

>    d. Effects on Psychologically More Resilient Inmates:
>       *Baraldini v. Meese*[63] and *Hameed v. Coughlin*[64]

In 1988 in the course of my involvement in *Baraldini v. Meese*, a class-action challenging the confinement of a small group of women in a subterranean security housing unit at the Federal Penitentiary in Lexington, Kentucky, I had the opportunity to interview several women who were in confinement in this facility. These women had been convicted of having committed politically motivated crimes, were all highly educated, and had a history of relatively strong psychological functioning prior to their confinement. None of these women developed the florid confusional psychosis described earlier in this affidavit, yet each of them demonstrated significant

---

62   *Langley*, 709 F  Supp  482
63   691 F  Supp  432 (D D C  1988), *rev'd sub nom* , Baraldini v  Thornburgh, 884 F 2d 615 (D C  Cir  1989)
64   57 F 3d 217 (2d Cir  1995)

http://digitalcommons.law.wustl.edu/wujlp/vol22/iss1/24

psychopathological reactions to their prolonged confinement in a setting of severe environmental and social isolation. These included perceptual disturbances, free-floating anxiety, and panic attacks. These inmates also uniformly described severe difficulties in thinking, concentration, and memory; for example, one inmate reported that she was able to perform tasks requiring some mental effort—such as reading or writing—only for about the first three hours of the morning after she awoke; by then, her mind had become so slowed down, so much "in a fog," that she was entirely unable to maintain any meaningful attention or expend any meaningful mental effort.

I have since evaluated a number of individuals who evidenced strong psychological adjustment prior to imprisonment. For example, in 1993 I evaluated Bashir Hameed, an inmate who had been incarcerated in the SHU at Shawangunk Correctional Facility and who had brought suit concerning his incarceration there. As I described in my testimony in that case, Mr. Hameed is an individual who evidences strong prior psychological adjustment and no prior psychiatric history, yet became significantly ill as a result of his SHU confinement.

### E. Long Term Effects of Solitary and Small Group Confinement

Long-term studies of veterans of prisoner of war camps, and of kidnapping and hostage situations have demonstrated that while many of the acute symptoms I outlined above tend to subside after release from confinement, there are also long-term effects which may persist for decades.[65] These not only include persistent symptoms of post traumatic stress (such as flashbacks, chronic hypervigilance, and a pervasive sense of hopelessness), but also lasting personality changes—especially including a continuing pattern of intolerance of social interaction, leaving the individual socially impoverished and withdrawn, subtly angry and fearful when forced into social interaction.[66]

---

65   *See* LAWRENCE E HINKLE, JR & HAROLD G WOLFF, COMMUNIST INTERROGATION AND INDOCTRINATION OF "ENEMIES OF THE STATES" (1956)

66   This literature is reviewed in Appendix D to this declaration

Wash U Law Repository

In addition, from time to time I have had the opportunity to evaluate individuals who had been incarcerated in solitary confinement several years previously. I have found the same pattern of personality change described above: these individuals had become strikingly socially impoverished and experienced intense irritation with social interaction, patterns dramatically different from their functioning prior to solitary confinement.

### III. CONCLUSIONS

The restriction of environmental stimulation and social isolation associated with confinement in solitary are strikingly toxic to mental functioning, producing a stuporous condition associated with perceptual and cognitive impairment and affective disturbances. In more severe cases, inmates so confined have developed florid delirium—a confusional psychosis with intense agitation, fearfulness, and disorganization. But even those inmate who are more psychologically resilient inevitably suffer severe psychological pain as a result of such confinement, especially when the confinement is prolonged, and especially when the individual experiences this confinement as being the product of an arbitrary exercise of power and intimidation. Moreover, the harm caused by such confinement may result in prolonged or permanent psychiatric disability, including impairments which may seriously reduce the inmate's capacity to reintegrate into the broader community upon release from prison.

Many of the prisoners who are housed in long-term solitary confinement are undoubtedly a danger to the community and a danger to the corrections officers charged with their custody. But for many they are a danger not because they are coldly ruthless, but because they are volatile, impulse-ridden, and internally disorganized.

As noted earlier in this statement, modern societies made a fundamental moral division between socially deviant behavior that was seen as a product of evil intent, and such behavior that was seen as a product of illness. Yet this bifurcation has never been as simple as might at first glance appear. Socially deviant behavior can in fact be described along a spectrum of intent. At one end are those whose behavior is entirely "instrumental"—ruthless, carefully planned, and

DA393

rational; at the other are individuals whose socially deviant behavior is the product of unchecked emotional impulse, internal chaos, and often of psychiatric or neurological illness.

It is a great irony that as one passes through the levels of incarceration—from the minimum to the moderate to the maximum security institutions, and then to the solitary confinement section of these institutions—one does not pass deeper and deeper into a subpopulation of the most ruthlessly calculating criminals. Instead, ironically and tragically, one comes full circle back to those who are emotionally fragile and, often, severely mentally ill. The laws and practices that have established and perpetuated this tragedy deeply offend any sense of common human decency.

Wash U Law Repository

APPENDIX A:

REPORTS OF PSYCHIATRIC DISTURBANCES IN OTHER CONDITIONS OF
RESTRICTED ENVIRONMENTAL STIMULATION

The psychopathologic syndrome which I have described in the body of this article is found in other settings besides isolation in civil prisons. Some of these settings involve small group, rather than solitary isolation, and the studies have demonstrated that isolated groups comprising two individuals may be the most pathogenic of all. These studies also suggest that those individuals with below average intelligence and poor psychosocial adjustment prior to isolation developed more severe psychiatric difficulties during isolation. In some studies, such disturbances persisted at a one year follow-up after reentry.

I. AVIATION

One particular study, by Bennett, has described psychiatric disturbances among pilots of the British Royal Air Force who had been exposed in-flight to periods of restricted auditory and visual stimulation.[67] All of the groups he described became significantly anxious; many suffered full-blown panic attacks, and many experienced unusual sensations which they were very reluctant to describe. The most severely disturbed groups refused to expose themselves further to the isolation conditions of these flights. At all levels of impairment, however, anxiety was common (both panic and free-floating anxiety). Pilots reported anxiety symptoms such as feeling "hot and tense and powerless" and "nervous and afraid."[68] Feelings of derealization, feelings of detachment from reality, and perceptual distortions were described. Some of these perceptual distortions were dangerous—such as having the impression that the aircraft was turning when it was not—and resulted in serious errors in

---

67   A M Hastin Bennett, *Sensory Deprivation in Aviation*, *in* SENSORY DEPRIVATION—
HARVARD, *supra* note 47, at 161–73
68   *Id* at 164

DA395

judgment like making the aircraft spiral dangerously downward after attempting to "correct" for what was incorrectly perceived as a turning aircraft.

Another study described strikingly similar symptoms among United States Navy pilots exposed to periods of in-flight isolation.[69] Among pilots who flew alone at high altitude (meaning in a situation of monotonous visual and sensory stimulation) and flying with a minimum of pilot activity, over one third experienced frightening feelings of unreality and became severely anxious.[70]

## II. SMALL GROUP CONFINEMENT

Many studies—both anecdotal and experimental—have been made of individuals confined together in small groups. Groups thus described have ranged in size from two to approximately sixty individuals, the larger groups include reports of men isolated on a Pacific island, in submarines, and on Antarctic expeditions.[71] The most consistent finding was of dramatically increased levels of hostility, interpersonal conflict, and paranoia.[72] Individuals exposed to such conditions also tend to become irrationally territorial, staking out "areas of exclusive or special use, [and] acting with hostility to trespasses by others."[73]

Confined groups comprising just two individuals may be the most pathogenic of all, associated with especially high rates of mutual paranoia and violent hostility. Admiral Byrd believed it to be extremely unsafe to staff an Antarctic base unit with just two men:

---

69   Brant Clark & Ashton Graybiel, *The Break-off Phenomenon*, 28 J AVIATION MED 121 (1957)

70   *Id* at 122

71   *See* Seward Smith, *Studies of Small Groups in Confinement*, *in* SENSORY DEPRIVATION: FIFTEEN YEARS OF RESEARCH 374–76 (John Peter Zubek ed , 1969) [hereinafter SENSORY DEPRIVATION: FIFTEEN YEARS]  For articles reporting effects in arctic environments, see Jeanette J Cochrane & S J J Freeman, *Working in Arctic and Sub-Arctic Conditions: Mental Health Issues*, 34 CAN J PSYCHIATRY 884 (1989); Eric Gunderson & Paul D Nelson, *Adaptation of Small Groups to Extreme Environments*, AEROSPACE MED , Dec 1963, at 1111; Charles S Mullin & H J M Connery, *Psychological Study at an Antarctic IGY Station*, 10 U S ARMED FORCES MED J 290 (1959)

72   Smith, *supra* note 71, at 377

73   *Id* at 380

DA396

[I]t doesn't take two men long to find each other out. . . . [T]he time comes . . . when even his [campmate's] unformed thoughts can be anticipated, his pet ideas become a meaningless drool, and the way he blows out a pressure lamp or drops his boots on the floor or eats his food becomes a rasping annoyance. . . . Men who have lived in the Canadian bush know well what happens to trappers paired off this way . . . .

. . . During my first winter at Little America I walked for hours with a man who was on the verge of murder or suicide over imaginary persecutions by another man who had been his devoted friend.[74]

## III. POLAR HABITATION

Psychiatric disturbances have been described in Arctic and Antarctic inhabitants (explorers, researchers, and their support staff), spending varying periods in winter isolation. In these regions, winters last for up to nine months with weather conditions so cold (-100°F) that leaving the confines of the indoors is dangerous.[75] Typically, teams of work groups have fewer than fifty members who spend up to two years working in small quarters.[76] Small group isolation conditions at these stations have been compared to life in prisons by at least one researcher: "[T]he isolation imposed by the harsh environment [of the Antarctic] is rarely experienced outside penal conditions."[77]

A review of the literature on the psychological adjustment to Antarctic living described a staff wintering over at a British Antarctic station; those of the staff who adjusted best tended to be socially mature, intelligent, reserved, and trusting individuals.[78] Similarly,

---

74    *Id* at 381
75    Gunderson & Nelson, *supra* note 71, at 1111
76    *Id*
77    Robert J  Biersner & Robert Hogan, *Personality Correlates of Adjustment in Isolated Work Groups*, 18 J  RESEARCH IN PERSONALITY 491, 491 (1989)
78    *See* Esther D  Rothblum, *Psychological Factors in the Antarctic*, 124 J  PSYCH  253 (1990)

DA397

French, United States, and Australian studies revealed that intelligence and previous social adjustment predicted a decreased risk for psychiatric disturbance among workers at Antarctic stations.[79] On the other hand, lack of respect for authority and aggression were important markers for poor isolation adjustment.[80]

Similarly, another study correlated outcome measures with psychological testing obtained prior to work station assignment.[81] These researchers found specifically that persons with antisocial and psychotic tendencies were poor risks for efficient functioning in conditions of isolation.[82]

As a result of these disturbing findings among Antarctic workers, systematic efforts have been made to provide psychological screening of potential station employees and to ameliorate the isolation conditions prevailing in such stations.[83] Despite these efforts, significant psychiatric disturbances have continued to be observed.[84] The fact that these individuals were confined in small groups rather than alone was not found to prevent these disturbances; indeed, one of the central pathogenic factors cited in this literature has been the interpersonal tension and hostility generated by small group confinement.[85]

Studies have described a "winter-over syndrome" including progressively worsening depression, hostility, sleep disturbance, impaired cognitive functioning, and paranoia during small group winter confinement in the Antarctic.[86] Strikingly similar findings were reported by the United States Navy Medical Neuropsychiatric Research Unit, which found high incidences of sleep disturbance, depression, anxiety, aggression, somatic complaints, and a

---

79   *Id.* at 256; *see also* Smith, *supra* note 71, at 393–95
80   Mullin & Connery, *supra* note 71, at 292
81   *See* Morgan W Wright et al , *Personality Factors in the Selection of Civilians for Isolated Northern Stations*, 8 CAN PSYCHOLOGIST 23 (1967)
82   *Id* at 29
83   Cochrane & Freeman, *supra* note 71, at 889
84   K Natani & J Shurley, *Sociopsychological Aspects of a Winter Vigil at South Pole Station*, *in* HUMAN ADAPTABILITY TO ANTARCTIC CONDITIONS 89–114 (Eugene Gunderson ed , Am Geophysical Union 1974)
85   *See* Biersner & Hogan, *supra* note 77, at 491–96
86   *See, e.g.*, R Strange & W Klein, *Emotional and Social Adjustment of Recent Winter-Over in Isolated Antarctic Stations*, 7 ANTARCTIC BIBLIOGRAPHY 229 (1974)

Wash U Law Repository

progressive impoverishment of social relationships as the winter progressed.[87] Psychiatric problems worsened as the length of time in this confinement increased; in one study of a group of Japanese winter-stationed in the Antarctic, periodic psychological testing revealed increasing levels of anxiety and depression as the winter progressed.[88] Similar findings have been described among a group of Americans stationed in the Antarctic.[89]

A review of the literature on the psychological adjustment to Arctic life described a syndrome which parallels the Antarctic literature: sleep disturbances, apathy, irritability, cognitive dysfunction, hallucinations, depression, and anxiety were widely reported as a result of the small group isolation endured by inhabitants.[90] They also reported "depression, irritability, [and] easily provoked anger which may escalate into dramatic and florid acting out and, not surprisingly, a breakdown in relationships with other members of the group. . . . [I]nsomnia, pallor, loss of appetite, loss of interest, psychomotor retardation, paranoidal ideation, [and] nonspecific hallucinations of light flashes and sudden movements [were also experienced]."[91] Even when Arctic workers were adequately preselected by psychological screening, trained, and supported sleep difficulties, apathy, and irritability persisted.

Studies on reintegration into the home environment after Antarctic living found persisting problems and symptoms including sleep disturbances, cognitive slowing, emotional withdrawal, resentment of authority, indecisiveness, and poor communication even one year after reintegration.[92]

Robert J. Biersner and Robert Hogan summarized the findings related to personality variables in the Arctic and Antarctic workers: "Individuals with high needs for novelty and new sensations, . . . who are emotionally unstable, or who are unconcerned with social

---

87   *See* E K  Eric Gunderson, *Emotional Symptoms in Extremely Isolated Groups*, 9 ARCHIVES GEN  PSYCHIATRY 362 (1963); Gunderson & Nelson, *supra* note 71, at 1111–15

88   Rothblum, *supra* note 78, at 253–73

89   Gunderson & Nelson, *supra* note 71, at 1114

90   *See* Cochrane & Freeman, *supra* note 71, at 889

91   *Id*  at 887

92   Rothblum, *supra* note 78, at 267

DA399

approval seem unsuited for . . . such environments . . . . The opposite [traits are found in] those who adjust well."[93]

## IV. EXPLORERS: SOLO VOYAGES

Anecdotal reports of shipwrecked sailors and individuals accomplishing long solo sea voyages have generally described "disturbances in attention and in organization of thought, labile and extreme affect, hallucinations and delusions."[94] Dramatic anecdotal reports have appeared from time to time. Some of these were summarized in a review article by Dr. Philip Solomon, one of the lead scientists in the Harvard Medical School/Boston City Hospital group:

> Christine Ritter in her very sensitive document *A Woman in the Polar Night*, reported that at times she saw a monster . . . [and] experienced depersonalization to the extent that she thought she and her companions were dissolving in moonlight 'as though it were eating us up' . . . The Spitzbergen hunters use the term ran (strangeness) to describe these experiences . . . .[95]

Tales of the sea have provided many accounts of hallucinatory phenomena. John Slocum sailed alone around the world . . . [In the South Atlantic] he suddenly saw a man, who at first he thought to be a pirate, take over the tiller . . . .

Walter Gibson, a soldier in the British Indian Army, was on a ship torpedoed in the Indian Ocean by the Japanese in World War II . . . . [The shipwrecked survivors] reported that "all of us at various stages in that first week became a prey to hallucinations" . . . [As the weeks passed] the feeling of comradeship disappeared and the men began to find themselves "watching our fellows covertly and suspiciously."[96]

---

93   Biersner & Hogan, *supra* note 77, at 495
94   Peter Suedfeld, *Introduction and Historical Background, in* SENSORY DEPRIVATION: FIFTEEN YEARS, *supra* note 71, at 7
95   Philip Solomon et al , *Sensory Deprivation: A Review*, 114 AM J PSYCHIATRY 357, 357–58 (1957)
96   *Id.*

DA400

Murder, suicide, and cannibalism followed as social controls dissolved.[97]

## V. MEDICAL CONDITIONS

### A. Eye Patched Patients

Restricted environmental stimulation conditions also occur post-operatively and in certain medical conditions. In a study of one hundred American patients with macular degeneration of the retina, a high percentage of such patients experienced disturbing visual hallucinations.[98] Those patients who were relatively cognitively limited, those who were socially isolated, and those with simultaneous sensory impairment in another modality (for example, hearing-impaired patients) fared worst.[99] But other factors, including the presence of concomitant medical illness, did not appear to affect the incidence of hallucinations.[100]

In an especially relevant study of eye patched patients, it was determined that psychologically well-adjusted patients (as assessed prior to surgery) tended not to develop visual hallucinations during the period when their eyes were patched, whereas those suffering preexisting personality disturbances did tend to develop such hallucinations.[101] Among those patients who did develop hallucinations, almost half developed complex hallucinations involving human figures and with content suggesting serious preoccupations with themes of depression and anxiety.[102] Moreover, among those patients who had both preexisting personality disturbances and difficulty with their premorbid psychosocial adjustment, eye patching produced severe psychiatric symptomatology, including: paranoid thoughts about being poisoned, physically harmed or attacked; psychomotor agitation; interpersonal

---

97    *Id.*
98    *See* Suzanne Holroyd et al., *Visual Hallucinations in Patients with Macular Degeneration*, 149 AM. J. PSYCHIATRY 1701, 1703 (1992)
99    *Id.* at 1703–04
100   *Id.*
101   Klein & Moses, *supra* note 54, at 49
102   *Id.*

DA401

aggressiveness; inability to comply with staff directives; fearful visual hallucinations; and incapacitating anxiety.[103] In this most disturbed group, symptoms had not remitted when observed one week after their eye patches were removed.[104]

Other studies have also found patients to suffer from perceptual distortions, thinking disturbances, and mood changes following the visual deprivation that is part of postoperative recovery in eye surgery.[105] Furthermore, it was noted that "[i]n patients with . . . brain damage, there were also delirioid symptoms, *e.g.*, confusion, disorientation, memory impairment, vivid hallucinations [and disorganized] hyperkinetic activity . . . ."[106] Finally, in C. Wesley Jackson's extensive literature review of hospitalized eye patched patients, psychiatric disturbance was commonly found.[107] These patients suffered from unusual emotional, cognitive, and sensory-perceptual disturbances similar to those previously described.

## B. Poliomyelitis

Polio patients confined to tank-type respirators have become psychotic as a direct result of such confinement; moreover, they became more ill, with more florid hallucinations and delusions, at night when sensory input was diminished.[108] The same florid hallucinatory, delusional psychosis has been found in other patients similarly confined in tank respirators.[109]

## C. Cardiac Patients

Patients with decompensated heart disease are at times placed on very strict bed rest; some of these patients have developed acute

---

103    *Id* at 50
104    *Id*
105    *See, e.g.*, Eugene Ziskind et al , *Observations on Mental Symptoms in Eye Patched Patients: Hypnagogic Symptoms in Sensory Deprivation*, 116 AM J PSYCHIATRY 893 (1960); Ziskind, *supra* note 53
106    Ziskind et al , *supra* note 105, at 894
107    *See* C Wesley Jackson, Jr , *Clinical Sensory Deprivation: A Review of Hospitalized Eye-Surgery Patients*, *in* SENSORY DEPRIVATION: FIFTEEN YEARS, *supra* note 71, at 337–43
108    Solomon et al , *supra* note 95, at 361
109    *Id.* at 362

Wash U Law Repository

confusial, paranoid, hallucinatory psychoses, especially at night during periods of decreased sensory input.

Studies of postoperative open heart surgery patients who were bed confined—their visual stimulation restricted to looking up at a white-tiled hospital room ceiling—revealed a high rate of disordered thinking, visual and auditory hallucinations, and disorientation.[110] There is an extremely disturbing incidence of psychosis following open heart surgery, ranging in various studies from 14% to 30%.[111] Upon recovery these patients described their postoperative environment as a major pathogenic factor in producing their psychiatric illness.[112] Perceptual disturbances and emotional liability, as well as paranoia, depression, and obsessive-compulsive reactions to the restrictive postoperative environment have been documented in other studies as well.[113]

### D. Hearing-Impaired Individuals

Another condition of restricted environmental stimulation leading to psychiatric disturbance involves the hearing impaired. Studies of the deaf consistently find significantly higher rates of paranoia in these individuals.[114] High rates of paranoia have been reported in both the developmentally hearing impaired as well as those who

---

110   *See, e.g.*, N Egerton & J H Kay, *Psychological Disturbances Associated with Open Heart Surgery*, 110 BRIT J PSYCHIATRY 433 (1964); Donald S Kornfeld et al , *Psychiatric Complications of Open-Heart Surgery*, 273 NEW ENG J MED 287 (1965); Herbert R Lazarus & Jerome H Hagens, *Prevention of Psychosis Following Open-Heart Surgery*, 124 AM J PSYCHIATRY 1190 (1968); Larkin M Wilson, *Intensive Care Delirium*, 130 ARCHIVES INTERNAL MED 225 (1972)

111   Robert E Lee & Patricia A Ball, *Some Thoughts on the Psychology of the Coronary Care Unit Patient*, 75 AM J NURSING 1498, 1501 (1975)

112   Kornfeld et al , *supra* note 110, at 290

113   *See, e.g.*, Rosemary Ellis, *Unusual Sensory and Thought Disturbances After Cardiac Surgery*, 72 AM J NURSING 2021 (1972); Alvin G Goldstein, *Hallucinatory Experience: A Personal Account*, 85 J ABNORMAL PSYCHOL 423 (1976); Linda Reckhow Thomson, *Sensory Deprivation: A Personal Experience*, 73 AM J NURSING 266 (1973); Lee & Ball, *supra* note 111

114   *See, e.g.*, Kenneth Z Altshuler, *Studies of the Deaf: Relevance to Psychiatric Theory*, 127 AM J PSYCHIATRY 1521 (1971); F Houston & A B Royse, *Relationship Between Deafness and Psychotic Illness*, 100 J MENTAL SCI 990 (1954)

DA403

became deaf in later life. Experimentally induced deafness in psychiatrically unimpaired adults also produced paranoia.[115]

### E. Other Medical Patients

Disorientation and delusional psychoses have also been reported among immobilized orthopedic patients and in patients postsurgically bed-confined. Nursing researchers have studied this phenomenon and have concluded that frightening hallucinatory experiences "are probably far more widespread than has been suspected."[116]

## VI. OCCUPATIONAL SITUATIONS

Researchers reported in the New England Journal of Medicine on a study of fifty long-distance truck drivers; of these, thirty experienced vivid visual hallucinations and some became disoriented as if in a dream.[117]

## VII. ANIMAL STUDIES

As noted in the body of this article, many prisoners confined in solitary become intolerant of normal levels of environmental (especially social) stimulation. These reports receive experimental confirmation in laboratory research on animals. Such research demonstrates that sensory deprivation produces an intolerance to normal levels of environmental stimulation; animals exposed to sensory deprivation conditions became overly aroused— "hyperexcitable"—when exposed to normal levels of environmental stimulation, often resulting in severe behavioral disturbances.[118]

---

115  *See* Phil G Zimbardo et al, *Induced Hearing Deficit Generates Experimental Paranoia*, 212 SCI 1529, 1529–31 (1981)

116  Florence S Downs, *Bed Rest and Sensory Disturbances*, 74 AM J NURSING 434, 438 (1974)

117  Ross A McFarland & Ronald C Moore, *Human Factors in Highway Safety*, 256 NEW ENG J MED 792, 797 (1957)

118  *See* Austin H Riesen, *Excessive Arousal Effects of Stimulation After Early Sensory Deprivation*, *in* SENSORY DEPRIVATION—HARVARD, *supra* note 47, at 35–36

Wash U Law Repository

One study produced agitation in mice and rats after a few days of isolation, a report which corroborated previous studies with rats.[119] Others have also found isolation-induced aggressive behavior in mice (such as biting attacks).[120] Further, social isolation has been demonstrated to produce profound and lasting psychological effects in primates. Researchers have noted that over four hundred published investigations of the effects of social isolation on primates show such deleterious effects as self-mutilation and disturbances in perception and learning.[121] They found that in adult rhesus monkeys even brief periods of social isolation produce compromised cognitive processing.[122] Others have produced symptoms of depression in rhesus monkeys by confining them for thirty days.[123] They concluded that solitary "confinement produced greater destructive behavioral effects in less time and with fewer individual differences among subjects than did total social isolation, previously [demonstrated to be] the most powerful technique for producing psychopathological behavior among monkey subjects."[124] Induced depression through confinement has been reported in both young and mature monkeys.[125] Finally, isolation-produced fear in dogs has been clearly demonstrated.[126]

---

119   *See* T C Barnes, *Isolation Stress in Rats and Mice as a Neuropharmacological Test*, 18 FED'N PROC 365 (1959)

120   Kinzo Matsumoto et al , *Desipramine Enhances Isolation-Induced Aggressive Behavior in Mice*, 39 PHARMACOLOGY BIOCHEMISTRY & BEHAV 167, 168 (1991)

121   *See* David A Washburn & Duane M Rumbaugh, *Impaired Performance from Brief Social Isolation of Rhesus Monkeys*, 105 J COMP PSYCHOL 145 (1991)

122   *Id* at 145

123   William T McKinney et al , *Depression in Primates*, 127 AM J PSYCHIATRY 1313, 1316 (1971)

124   *Id* at 1317

125   *See* Harry F Harlow & Steven J Suomi, *Induced Depression in Monkeys*, 12 BEHAV BIOLOGY 273 (1974)

126   *See* W R Thompson & R Melzack, *Early Environment*, 194 SCI AM 38 (1956)

DA405

APPENDIX B:

THE NINETEENTH CENTURY GERMAN EXPERIENCE WITH SOLITARY
CONFINEMENT

Between 1854 and 1909 thirty-seven articles appeared in the German medical literature on the subject of psychotic disturbances among prisoners, summarizing years of work and many hundreds of cases. A major review of this literature was published in 1912.[127] Solitary confinement was the single most important factor identified in the etiology of these psychotic illnesses.

Indeed, the first report on the subject of prison psychoses was that of Delbruck, chief physician of the prison at Halle, in which the frequency of mental disturbances was at last so great that it attracted the attention of the authorities.[128] Delbruck's report concluded that prolonged absolute isolation has a very injurious effect on the body and mind and that it seems to predispose inmates to hallucinations and advised the immediate termination of solitary confinement.[129]

In 1863 Gutsch reported on eighty-four cases of psychosis stemming from solitary confinement and described vivid hallucinations and persecutory delusions, apprehensiveness, psychomotor excitation, sudden onset of the syndrome, and rapid recovery upon termination of solitary confinement.[130] Many of these individuals developed "suicidal and maniacal outbreaks."[131]

In 1871, in a report on fifteen cases of acute reactive psychoses, some of which apparently occurred within hours of incarceration in solitary, Reich described hallucinosis and persecutory delusions in addition to severe anxiety leading to motor excitement—"[t]he patient becomes noisy, screams, runs aimlessly about, destroys and ruins everything that comes in his way."[132] He also described an acute confusional state accompanying these symptoms, sudden

---

127    *See* NITSCHE & WILMANNS, *supra* note 36
128    *Id* at 1
129    *Id* at 2
130    *Id* at 8
131    *Id*
132    *Id* at 31

DA406

cessation of symptoms, recovery, and subsequent amnesia for the events of the psychosis.[133]

In a statistical summary, Knecht reported in 1891 on the diagnostic assessment of 186 inmates at the "insane department" of the prison at Waldheim and concluded that over half of the total inmates in this department were there due to reactive manifestations to solitary confinement.[134] The majority of these inmates became insane within two years of confinement in solitary.[135]

In 1884 Sommer reported on 111 cases describing an acute, reactive, hallucinatory, anxious, confusional state associated with solitary confinement, emphasizing the "excited outbursts" and "vicious assaults" of these patients.[136] His patients' illness began with difficulty in concentration and hyperresponsivity to minor "inexplicable" external stimuli. These "elementary disturbances of the sensorium (i.e., the five senses)" were seen as leading to "elementary hallucinations" which became more numerous, eventually including auditory, visual, and olfactory hallucinations and eventually becoming incorporated with fearful persecutory delusions.[137]

In 1889 Kirn described 129 cases of psychosis among the inmates at the county jail at Freiburg, concluding that in fifty of those cases, "solitary confinement can be definitely considered as the etiological factor, (and these) show a certain characteristic stamp" including persecutory delusions and hallucinations in multiple spheres (auditory, visual olfactory, tactile).[138] He also noted that these symptoms often precipitated at night:

> [T]he patient is suddenly surprised at night by hallucinatory experiences which bring on an anxious excitement. These manifestations become constant from now on, in many cases occurring only at night, in others also in the daytime. Attentive patients not infrequently hear at first a humming and buzzing

---

133   *Id* at 32–33
134   *Id*
135   *Id* at 17
136   *Id* at 12, 16
137   *Id* at 12–16
138   *Id* at 21

DA407

in their ears, unpleasant noises and inarticulate sounds which they cannot understand until finally they hear well differentiated sounds and distinct words and sentences. . . .

    . . . The visual hallucinations are very vivid.[139]

In 1888 Moeli contributed a description of "vorbereiden"—also known as "the symptom of approximate answers."[140] Ten years later Ganser contributed to the literature the elucidation of a syndrome which included Moeli's symptom.[141] As Arieti points out, Ganser's Syndrome became well known—indeed, almost a codification of the whole body of literature on the prison psychoses.[142] Ganser provided a comprehensive and well-elucidated synthesis of symptoms, most of which had been previously described elsewhere. The syndrome he described included (in addition to vorbereiden) vivid visual and auditory hallucinations, a distinct clouding of consciousness, sudden cessation of symptoms "as from a dream," and "a more or less complete amnesia for the events during the period of clouded consciousness."[143] Ganser's most original description was of "hysterical stigmata" within the syndrome, including conversion symptoms, especially total analgesia.[144]

Some of the German authors failed to note whether the inmates they were describing were housed in solitary confinement and, unfortunately, Ganser was one of these, stating only that his were prisoners awaiting trial. However, Langard, in 1901, also reporting on observations of accused prisoners awaiting trial, described an acute violent hallucinatory confusion with persecutory delusions and

---

139  *Id* at 23–24
140  Vorbereiden is a rather remarkable symptom of deranged and confused thought processes in which the individual's response to a question suggests that he grasped the gist of the question, and his answer is clearly relevant to the question, and related to the obvious correct answer, yet it still oddly manages to be incorrect  An example would be: Q: "How many colors are there in the flag of the United States" A: "Four"  Q: "What are they?" A: "Yellow"
141  Ganser, Ueber Einen Eigenartigen Hysterischen Dämmerzustand, 30 ARCHIV FÜR PSYCHIATRIE UND NERVENKRAN-KHEITEN [ARCH PSYCH  & NERVENK] 633 (1898) (F R G )
142  AMERICAN HANDBOOK OF PSYCHIATRY 710–12 (Gerald Caplan ed , 2d ed  1974)
143  *Id*
144  *Id.*

DA408

specifically stated that this syndrome occurred exclusively among those who awaited trial in solitary confinement.[145]

Also in 1901 Raecke similarly reported on prisoners awaiting trial and described the full syndrome described by Ganser, including vorbereiden; he specifically condemned solitary confinement as responsible for the syndrome.[146] He described his cases as beginning with apathy, progressing to "inability to concentrate, a feeling of incapacity to think," and even catatonic features, including negativism, stupor, and mutism.[147]

In another report, written the same year, Skliar reported on sixty case histories of which he identified twenty-one as acute prison psychoses caused by solitary confinement.[148] While vorbereiden was not noted, most of the other symptoms described by Ganser and Raecke were, including massive anxiety and fearful auditory and visual hallucinations; in severe cases, hallucinations of smell, taste, and "general sensation" as well as persecutory delusions, senseless agitation and violence, confusion, and disorientation.[149] The psychosis developed rapidly, at times within hours of incarceration in solitary confinement.[150] Catatonic symptomatology was also noted.[151]

The German literature reported only on prisoners who suffered gross psychotic symptomatology, some of whom were observed in hospitals or "insane departments" of prisons; thus, these reports generally described only syndromal expressions that rose to the level of overt psychosis. The German reports do, however, powerfully demonstrate the existence of a particular, clinically distinguishable psychiatric syndrome associated with solitary confinement. These multiple reports described a syndrome which included:

1. Massive free-floating anxiety.

2. "Disturbances of the Sensorium," including—

---

145   NITSCHE & WILMANNS, *supra* note 36, at 32
146   *Id* at 34
147   *Id* at 33–35
148   *Id* at 40
149   *Id* at 41
150   *Id*
151   *Id*

DA409

a. hyperresponsivity to external stimuli; and

b. vivid hallucinations in multiple spheres (including auditory, visual, olfactory, gustatory, and tactile modalities); in some reports, these began as simple "elementary" hallucinations and progressed to complex, formed hallucinations.

3. Persecutory delusions, often incorporating coexistent complex hallucinations.

4. Acute confusional states. In some reports these were seen as beginning with simple inattention and difficulty in concentration. In others, the onset was described as sudden. The confusional state and disorientation was in several reports described as resembling a dissociative, dreamlike state, at times involving features of a catatonic stupor, including negativism and mutism; and, upon recovery, leaving a residual amnesia for the events of the confusional state. Ganser and others observed hysterical conversion symptoms during this confusional state.

5. Vorbereiden: This was an infrequent finding, mostly described in conjunction with a confusional, hallucinatory state.

6. Motor excitement, often associated with sudden, violent destructive outbursts.

7. Characteristic course of the illness:

a. onset was described by some authors as sudden, by others as heralded by a progression beginning with sensory disturbances and/or inattention and difficulty in concentration; and

b. in many cases, rapid subsidence of acute symptoms upon termination of solitary confinement.

The German reports were generally based upon prisoners who had been hospitalized because of their psychotic illness. In contrast, the population reported upon in the Walpole study was not preselected by overt psychiatric status. Despite this, all of the major symptoms

DA410

reported by the German clinicians were observed in the Walpole population, except for vorbereiden and hysterical conversion symptoms. In addition, less severe forms of the isolation syndrome were observed in the Walpole population, including:

- Perceptual distortions and loss of perceptual constancy, in some cases without hallucinations.

- Ideas of reference and paranoid ideation short of overt delusions.

- Emergence of primitive aggressive fantasies which remained ego-dystonic and with reality-testing preserved.

- Disturbances of memory and attention short of overt disorientation and confusional state.

- Derealization experiences without massive dissociative regression.

Since Ganser's report has become the twentieth century's clearest memory of a much vaster body of literature, it is also of interest to review the literature describing observations of Ganser's Syndrome in non-prison populations. Several of these reports have been studies of patients in psychiatric hospitals suffering from this syndrome. Since these patients were hospitalized, it was possible to obtain more extensive evaluation and testing of their status. Several reports described a majority of the patients studied as suffering long standing hysterical conversion symptoms; impulsivity, childhood truancy, and antisocial behavior were also commonly described.[152] These findings suggest also that antisocial behavior patterns and psychopathic personality disorder may bear a close relationship to primitive hysterical personality disorder, a relationship which has been described by other authors as well.[153]

---

152    *See, e.g.*, Ingraham & Moriarty, *supra* note 59; May et al , *supra* note 59; Milo Tyndel, *Some Aspects of the Ganser State*, 102 J  MENTAL SCI  324 (1956); Herbert Weiner & Alex Braiman, *The Ganser Syndrome*, 111 AM  J  PSYCHIATRY 767 (1955)

153    *See* ROBERT A  WOODRUFF, JR  ET AL , PSYCHIATRIC DIAGNOSIS (1974)

DA411

APPENDIX C:

EXPERIMENTAL RESEARCH ON THE PSYCHIATRIC EFFECT OF
PROFOUND SENSORY DEPRIVATION: FACTORS INFLUENCING
VULNERABILITY TO PSYCHIATRIC HARM

As noted in the body of this article, laboratory research has demonstrated that experimentally induced sensory deprivation has major psychological effects and can precipitate severe psychiatric illness. Much of the research in this area attempted to delineate factors in addition to the duration and intensity of sensory restriction which might account for these differing outcomes. The factors which have been elucidated include two which are especially relevant to this discussion and may help to explain the particular malignancy of sensory deprivation in solitary confinement: expectation and individual response.

### I. THE INFLUENCE OF EXPECTATION

Research has suggested that a subject's reaction to participation in a sensory deprivation experiment could be profoundly manipulated by external cues imposed by the experimenter:

> [These] dramatic effects could be a function of the demand characteristics of the experimental situation. . . .
>
> There is evidence . . . that preparing a subject for probable hallucinations significantly affects the frequency of hallucinations. . . . [S]uch devices as "panic buttons" in experiments are in a sense eloquent "instructions." The use of such a device increases the subject's expectation that something intolerable may occur, and, with it, the likelihood of a bad experience.[154]

---

154   Martin T  Orne & Karl E  Scheibe, *The Contribution of Nondeprivation Factors in the Production of Sensory Deprivation Effects: The Psychology of the "Panic Button,"* 68 J ABNORMAL & SOC  PSYCHOL  3, 4 (1964) (citations omitted)

DA412

In the experiment, the researchers exposed two groups of subjects to identical conditions of sensory deprivation. The experimental group's introduction to the experiment included the presence of a medical "Emergency Tray," and instructions about a "Panic Button." As predicted, the experimental group became significantly more symptomatic in measures of cognitive impairment and restlessness, and also more symptomatic in every other measure—including perceptual aberrations, anxiety, and spatial disorientation.[155]

In a related manner, prisoners in solitary confinement generally view such confinement as threatening and punitive, and often as a deliberate attempt to make them "crack up" or "break my spirit." In light of this, it is not surprising that the only recent report suggesting no major ill effect of solitary confinement utilized prisoners who volunteered to spend four days in solitary confinement.[156]

## II. INDIVIDUAL DIFFERENCES IN RESPONSE

Several authors have directed attention to the fact that within a given experimental format, massive differences in response can be observed among individual subjects. Often subjects who tolerated the experimental situation well reported pleasant, or at least non-threatening, visual imagery, fantasy, and hallucinatory experiences. The individual's mind may begin to wander, engage in daydreams, slip off into hypnogogic reveries with their attendant vivid pictorial images. The individual may be quietly having sexual and other pleasurable thoughts.[157]

On the other hand,

> Another subject in the same situation may deal with it in quite another manner. He may soon complain of all manner of things: the bed is causing him a backache, his mind is a blank . . . . [He also complains of] intense boredom, tenseness,

---

155  *Id* at 3–12
156  *See* Richard H  Walters et al , *Effects of Solitary Confinement on Prisoners*, 119 AM J PSYCHIATRY 771 (1963)
157  Wright et al , *supra* note 81, at 36

DA413

depressive feelings or of having unpleasant thoughts or picture-like images that disturb him.[158]

In response to these concerns about the incidence of psychopathological reactions to sensory deprivation, an important thrust of the experimentation in this area has been, by prescreening, to select as subjects only those persons demonstrating, by some measure, psychological strength and capacity to tolerate regression. The theoretical premise of such work has been:

> [I]n the sensory deprivation experiments, it is the ego's autonomy from the drives that is predominately involved . . . . Differences in drive-discharge thresholds, phantasy [sic] and daydream capacity, capacity for what [is] . . . termed "regression in the service of the ego" are other theoretically relevant structural dimensions accounting for differences in isolation behavior.[159]

These ideas have been subjected to experimental verification, which has corroborated that some individuals tolerate such isolation better than others. For example, two researchers, using the Rohrshach Test for prescreening, concluded that the Rohrshach manifestations of an individual's defense and control mechanisms appear to be a reliable measure for predicting whether an individual will be effective in controlling the drive-dominated responses that might emerge during the individual's period of reduced sensory stimulation.[160]

Anecdotal reports in a similar vein appear from time to time in the literature. A subject of one study became panicky during sensory deprivation and stated he had been diagnosed "borderline psychotic."[161] Curtis and Zuckerman report on a psychotic paranoid reaction in one subject who suffered delusions for several days afterward, and severe anxiety and depression lasting several weeks;

---

158  Leo Goldberger, *Experimental Isolation: An Overview*, 122 AM J PSYCHIATRY 774, 777 (1966)

159  *Id* at 778 (footnotes omitted)

160  Wright et al , *supra* note 81, at 37

161  Sanford J Freedman & Milton Greenblatt, *Studies in Human Isolation II: Hallucinations and Other Cognitive Findings*, 11 U S ARMED FORCES MED J 1479, 1486 (1960)

DA414

personality test prescreening had suggested poor adjustment, hostility, lack of insight, and insecurity in interpersonal relationships.[162]

Others prescreened forty-three subjects and identified seven as suffering "personality deviations." Two of these subjects, who were diagnosed as borderline, developed frightening, aggressive fantasies, paranoia, and difficulty in reality testing; one of them prematurely terminated the experiment. Two others were diagnosed as psychopathic; both forced the premature termination of the experiment by disruptive behavior.[163]

Others, using interview techniques and formal psychological test data, studied the effects of two to six days of sensory deprivation on hospitalized psychiatric patients. Among the previously non-psychotic patients they studied, two developed overt paranoid psychoses during the experiment, ultimately necessitating electroshock treatment. These particular individuals appeared to have been unable to tolerate the emergence of aggressive fantasies and images during the sensory deprivation experience.[164]

## A. Effects of Sensory Deprivation on Antisocial Personality Disorder

### 1. Aversive Conditioning

Individuals with psychopathic personality disorder are probably among the least tolerant of sensory deprivation. One researcher has described the essential core of psychopathic pathology as a pathological inability to tolerate restricted environmental stimulation:

> The psychopath is almost universally characterized as [pathologically stimulus seeking and] highly impulsive . . . . He is unable to tolerate routine and boredom. . . . [H]is outbursts frequently appear to be motivated by little more than a need for thrills and excitement. . . .

---

162   George C Curtis & Marvin Zuckerman, *A Psychopathological Reaction Precipitated by Sensory Deprivation*, 125 AM J PSYCHIATRY 255, 256 (1968)

163   *See* Henry U Grunebaum et al , *Sensory Deprivation and Personality*, 116 AM J PSYCHIATRY 878 (1960)

164   *See* H Azima & Fern J Cramer, *Effects of Partial Perceptual Isolation in Mentally Disturbed Individuals*, 17 DISEASES NERVOUS SYS 117 (1956)

DA415

It is the impulsivity and lack of even minimal tolerance for sameness which appear to be the primary and distinctive features of the disorder.[165]

He goes on to argue that psychopathic individuals may chronically exist in a state of relative stimulus deprivation: "[H]ighly impulsive, psychopathic behavior [may be seen] in terms of stimulation-seeking pathology. If decreased reactivity and/or rapid adaptation [to environmental stimuli] do produce in these persons an affective state of unpleasantness close to that produced by severe sensory deprivation or monotony in the normal individual . . . ."[166]

He argues that behavioral impulsivity in such individuals may be an effort at coping with this condition of relative sensory deprivation which they experience: "It may be possible . . . to view much of the impulsivity of the psychopath, his need to create excitement and adventure, his thrill-seeking behavior, and his inability to tolerate routine and boredom as a manifestation of an inordinate need for increases or changes in the pattern of stimulation."[167]

A later study, directly comparing psychopathic inmates with non-psychopathic controls, corroborated these findings. The psychopathic inmates scored significantly higher on measures of boredom susceptibility and of impulsivity. The authors concluded that psychopaths are pathologically stimulation seeking and incapable of tolerating isolation conditions.[168]

Others, in a large scale study of criminal offenders suffering from mental illness, noted that the prevalence of severe mental illness is higher among incarcerated offenders than among the general population; and that, compared with non-mentally ill inmates, the mentally ill inmates were more likely to be housed in solitary. Moreover many of these mentally ill inmates suffered from a combination of psychiatric disorders predisposing them to both psychotic breakdown and to extreme impulsivity (often including

---

165    Quay, *supra* note 58, at 80
166    *Id*  at 182
167    *Id*  at 181
168    *See* Timothy D  Emmons & Warren W  Webb, *Subjective Correlates to Emotional Responsivity and Stimulation Seeking in Psychopaths, Normals, and Acting-Out Neurotics*, 42 J  CONSULTING & CLINICAL PSYCHOL  620 (1974)

DA416

substance abuse). Such individuals tended to be highly impulsive, lacking in internal controls, and tended to engage in self-abusive and self-destructive behavior in the prison setting, and especially so when housed in solitary.[169]

Many of the inmates placed in solitary confinement are thus likely to be among the least capable of tolerating the experience, and among the most likely to suffer behavioral deterioration as a consequence of such confinement. Solitary confinement has at times been rationalized as being a form of "aversive conditioning," intended to extinguish negative inmate behaviors. Yet this assertion ignores many of the most basic tenets of any behavior modification treatment, and would in any case clearly violate the ethical guidelines governing the use of aversive conditioning:

### a. Ethical Considerations

First of all, since aversive conditioning—the use of punishment as a means of inducing behavior change—is inherently suspect ethically and creates an inherent risk of harm, very clear outcome variables have to be articulated and systematically measured over time. As a result of these serial measurements, there must be clear evidence that the undesirable behavior is in fact lessening in frequency and intensity. Such measurement will also identify those patients for whom such aversive conditioning is actually harmful, allowing these individuals to be removed from the aversive treatment protocol. Were such measurements done in the prison setting, staff would inevitably be required to acknowledge the behavioral deterioration which many inmates were suffering as a result of placement in solitary, and in such cases, ethical considerations would have required transferring the inmate out of such confinement.

### b. SHU Incarceration is not Aversive Conditioning

SHU incarceration does not meet criteria for aversive conditioning. Indeed, any behavior modification scheme must define and describe very explicitly two variables:

---

169    Curtis & Zuckerman, *supra* note 162, at 271–72

DA417

(i)  The behavior being changed:

Behavior researchers have learned that in order for a subject to benefit from aversive (or any other form of) conditioning, the behavior at issue must be a single, very clearly defined behavior. When multiple behaviors are responded to by the same reinforcer or punishment, learning and behavior change does not occur. Thus, placement in SHU, which is "punishment" for a host of different behaviors, is simply not being used in a manner consistent with an intent of behavior modification; there is inadequate linkage of any specific behavior to this "punishment."

(ii) The "punishment":

Moreover, SHU confinement is quite clearly not "punishment." To be effective, a "punishment" must be very closely linked in time to the targeted behavior, and for learning to occur, there must be repeated opportunities to experience this close link between the target behavior and the punishment. Thus, the "punishment" must be brief and immediate. For example, a mild but painful electric shock or a sudden very loud noise would be ideal punishments in aversive conditioning.

Occasionally "time outs," the brief use of a seclusion room to quickly control disruptive behavior, are used as part of an aversive conditioning program. But when this technique is employed, it is used very quickly and for a very brief period of time—in order for the "time out" to work as a behavior modifier, there must be very clear alternative behaviors which, when manifested, will immediately end the "time out."

For any behavior modification scheme to work then, there must always be an exquisitely close relationship between behavior and response. Indeterminate or prolonged sentencing to solitary simply has nothing to do with aversive conditioning.

Wash U Law Repository

DA418

APPENDIX D:

REPORTS OF THE LONG-TERM EFFECTS OF SOLITARY CONFINEMENT
IN FORMER POLITICAL PRISONERS AND IN PRISONERS OF WAR:
SOLITARY CONFINEMENT AS A MEANS OF "BRAIN WASHING" AND
"INDOCTRINATING"

Although concerns about the psychiatric effects of solitary confinement among prisoners of war were raised in the medical literature at least as early as post-World War II, this issue reached massive public exposure only after the fearful news of "brain washing" among American prisoners of war in Korea. As is well known, the 1950's were an era of tremendous fear of Communism and of the attempts by communist states to "indoctrinate" people into their ideology. As noted in the body of this article, in the 1950s the United States Department of Defense and the Central Intelligence Agency sponsored a great deal of research on these issues. The results of extensive research done for the Department of Defense were subsequently published.[170] The paper documented interrogation techniques of the Soviet KGB in regard to the incarceration of political prisoners, and the Chinese communists' imprisonment of American prisoners of war in Korea.

The report indicated that the KGB operated detention prisons, many of which were "modern . . . well built and spotlessly clean . . . [with] attached medical facilities and rooms for the care of sick detainees. An exercise yard is a standard facility."[171] Incarceration in these prisons is almost universally in solitary confinement, in a cell approximately ten feet by six feet in size.[172] "An almost invariable feature of the management of any important suspect under detention is a period of total isolation in a detention cell."[173]

This isolation was seen as a central feature of the imprisonment: "The effects upon prisoners of the regimen in the isolation cell are

---

170   HINKLE & WOLFF, *supra* note 65
171   *Id* at 125
172   *Id*
173   *Id* at 126

DA419

striking. . . . A major aspect of this prison experience is isolation. . . . [In the cells] [h]is internal as well as external life is disrupted" and "he develops a predictable group of symptoms, which might almost be called 'disease syndrome.'"[174]

This syndrome develops over time:

> He becomes increasingly anxious and restless, and his sleep is disturbed. . . .
>
>     The period of anxiety, hyperactivity, and apparent adjustment to the isolation routine usually continues from one to three weeks. As it continues, the prisoner becomes increasingly dejected and dependent. He gradually gives up all spontaneous activity within his cell and ceases to care about personal appearance and actions. Finally, he sits and stares with a vacant expression, perhaps endlessly twisting a button on his coat. He allows himself to become dirty and disheveled. . . . He goes through the motions of his prison routine automatically, as if he were in a daze. . . . Ultimately he seems to lose many of the restraints of ordinary behavior. He may soil himself. He weeps; he mutters . . . . It usually takes from four to six weeks to produce this phenomenon in a newly imprisoned man.[175]

Addressing the emotional impact on prisoners of such confinement, the report noted that:

> His sleep is disturbed by nightmares. Ultimately he may reach a state of depression in which he ceases to care about his personal appearance and behavior and pays little attention to his surroundings. In this state the prisoner may have illusory experiences. A distant sound in the corridor sounds like someone calling his name. The rattle of a footstep may be interpreted as a key in the lock opening the cell.

---

174   *Id* at 127
175   *Id* at 128

Some prisoners may become delirious and have visual hallucinations.[176]

However, the report also notes that each individual may respond differently: Not all men who first experience total isolation react in precisely this manner. In some, these symptoms are less conspicuous. In others, dejection and utter despondence set in earlier, or later. Still others, and especially those with pre-existing personality disturbances, may become frankly psychotic.[177]

The authors of this report note that the procedures in the Chinese detention camps are somewhat more complex. Prisoners there underwent an initial period of isolation similar to that found in the Soviet prisons.[178] In the second phase, however they were housed in extremely tight quarters within "group cells" comprising approximately eight prisoners.[179] Under the tensions and hostilities created in this environment, brutality of prisoners by other prisoners was almost inevitable and was, according to the authors, apparently an intended result of this "group cell" confinement.[180]

There are many long-term studies of American prisoners of war; unfortunately, the factor of solitary confinement has not generally been separated out in these studies. However, one relatively recent study of Korean prisoners of war described long-term effects including interpersonal withdrawal and suspiciousness, confusion, chronic depression, and apathy toward environmental stimuli. Irritability, restlessness, cognitive impairment, and psychosomatic ailments were extremely common in the group, most of whom had suffered periods of incarceration in solitary confinement at the hands of the Chinese. This report also included a case report of one individual exposed to harsh conditions of solitary confinement for more than sixteen months; thirty years after release, he continued suffering sleep disturbances, nightmares, fearfulness, interpersonal suspicion and withdrawal, severe anxiety, and severe depression. These former prisoners also had psychosomatic ailments including

---

176    *Id*
177    *Id* at 129
178    *Id* at 153
179    *Id* at 156
180    *Id* at 159

DA421

gastrointestinal disturbances, chronic headaches, and obsessive ruminations. They tended to become confused and thus cognitively impaired and were emotionally volatile and explosive.[181]

   In former prisoners of war in the Korean conflict, approximately forty years after their release from confinement, solitary confinement was cited as one of the severe stressors in this group. These former prisoners demonstrated persistent anxiety, psychosomatic ailments, suspiciousness, confusion, and depression. They tended to be estranged and detached from social interaction, suffered from obsessional ruminations, and tended to become confused and cognitively impaired, suffering memory and concentration difficulties which affected their cognitive performance on formal testing.[182]

---

   181   *See* Patricia B  Sutker et al , *Cognitive Deficits and Psychopathology Among Former Prisoners of War and Combat Veterans of the Korean Conflict*, 148 AM  J  PSYCHIATRY 67 (1991)
   182   *Id.* at 68

Wash U Law Repository

DA422

# Psychopathological Effects of Solitary Confinement

## Stuart Grassian, M.D.

*Am J Psychiatry 140:11, November 1983*

©*Copyright 1983 American Psychiatric Association*

DA423

# Psychopathological Effects of Solitary Confinement

Stuart Grassian, M.D.

*Psychopathological reactions to solitary confinement were extensively described by nineteenth-century German clinicians. In the United States there have been several legal challenges to the use of solitary confinement, based on allegations that it may have serious psychiatric consequences. The recent medical literature on this subject has been scarce. The author describes psychiatric symptoms that appeared in 14 inmates exposed to periods of increased social isolation and sensory restriction in solitary confinement and asserts that these symptoms form a major, clinically distinguishable psychiatric syndrome.*

(Am J Psychiatry 140:1450–1454, 1983)

There have been several legal challenges to the use of solitary confinement in the United States penal system based on allegations that such confinement can cause serious psychopathological reactions (1–3). The present article describes clinical observations of 14 prisoner plaintiffs in a lawsuit alleging that the conditions they were exposed to in solitary confinement were violations of Eighth Amendment protection against "cruel and unusual punishment."

## REVIEW OF THE LITERATURE

Despite the obvious legal and humanitarian importance of this issue, there has been a scarcity of recent medical literature on the subject beyond a flurry of theoretical interest generated by concerns about "brainwashing" of American prisoners of war in Korea and the experimentation on profound sensory deprivation precipitated by those concerns (4–8). In the recent literature, reports of clinical observations of prisoners in solitary confinement have been virtually nonexistent. However, with the exception of the only

Received Oct. 24, 1980; revised March 5 and Oct. 20, 1982; accepted Nov. 30, 1982. From the Department of Psychiatry, New England Memorial Hospital, Stoneham, Mass.; Tufts University School of Medicine, Boston, Mass.; and Harvard Medical School, Boston. Address reprint requests to Dr. Grassian, 401 Beacon St., Chestnut Hill, MA 02167.

The author thanks Dr. Dan Buie for his review of the manuscript. Dr. Frank Rundle conducted half of the psychiatric evaluations on which this report is based.

Copyright © 1983 American Psychiatric Association.

*experimental* study in the literature (9), these reports (10–12) have indicated psychopathological effects. One report noted "restlessness, yelling, banging and assaultiveness" in some prisoners and in others "a kind of regressed, dissociated, withdrawn hypnoid state" (10). Another report cited two cases of reactive psychosis marked by initial agitation and behavioral dyscontrol, leading to a hallucinatory, incoherent, confusional state (11).

There was, however, extensive interest in the problem of psychopathological syndromes among prisoners in late nineteenth- and early twentieth-century Europe. During that period, solitary confinement was extensively used in both Europe (13) and the United States (14); in many prisons it was the exclusive mode of incarceration. Indeed, the American penitentiary became world famous; important visitors journeyed to the United States specifically to observe this system and bring it back to Europe for emulation. Perhaps the best known of these visits, that of Alexis de Tocqueville, gave rise to a classic study of American social institutions (15).

This enchantment with solitary confinement was relatively short-lived, however. As early as the 1830s statistical evidence began to indicate an increased incidence of physical morbidity and mortality, as well as of insanity, among prisoners exposed to especially rigid forms of solitary confinement (14, p. 87). The system's openness to public scrutiny brought forth vivid descriptions of the effects of such confinement. Charles Darwin, for example, observed inmates "dead to everything but torturing anxieties and horrible despair. . . . The first man . . . answered . . . with a strange kind of pause . . . [he] fell into a strange stare as if he had forgotten something. . . . [Of another] Why does he stare at his hands and pick the flesh open, . . . and raise his eyes for an instant . . . to those bare walls? (8, p. 66). By 1890, the United States Supreme Court entered an opinion explicitly condemning solitary confinement on psychiatric grounds, indicating that "a considerable number of prisoners . . . fell into a semi-fatuous condition . . . and others became violently insane" (1).

In the United States, unfortunately, these experiences did not give rise to a body of clinical literature. However, in Germany, whose penal system had emulated the American model, major clinical concern developed about the incidence of psychotic disturbances among prisoners. Between 1854 and 1909, 37 articles on this subject appeared in German journals,

DA424

collectively describing hundreds of cases of psychoses that were deemed to be reactive to the conditions of imprisonment. A review of this literature appeared in 1912 (13) and will be only summarized here.

The literature described a hallucinatory, paranoid, confusional psychosis in which characteristic symptoms included 1) extremely vivid hallucinations in multiple sensory modalities, including the visual, auditory, tactile, and olfactory; 2) dissociative features, including sudden recovery "as from a dream," with subsequent amnesia for the events of the psychosis; 3) agitation and "motor excitement" with aimless violence; and 4) delusions, usually described as persecutory. Onset was often described as sudden and, in some reports, as precipitating at night. In other cases, initial manifestations included "humming and buzzing, unpleasant noises and inarticulate sounds [leading to] hallucinations." Rarer, only occasionally noted symptoms included *Vorbereiden* ("the symptom of approximate answers," usually associated with Ganser [16], although described as well by others) and hysterical conversion symptoms.

Of this large body of literature, only Ganser's contribution (16) remains well-known, and Ganser failed to comment on the form of imprisonment to which his prisoner subjects were exposed. However, in more than half the total body of literature, solitary forms of confinement were specifically cited as responsible for precipitating the psychosis, and rapid recovery was often noted when the prisoner's solitary confinement was terminated.

## CIRCUMSTANCES OF THE CLINICAL OBSERVATIONS

The present observations developed as a consequence of a court order mandating psychiatric evaluation of 15 inmates at the Massachusetts Correctional Institution at Walpole, all of whom were plaintiffs in a class action suit against the Department of Corrections that alleged violations of Eighth Amendment protection against "cruel and unusual punishment" because of the conditions to which the prisoners were exposed in solitary confinement.

The correctional institution at Walpole is the maximum security state prison for the Commonwealth of Massachusetts. It is divided into 13 cell blocks. Block 10 is reserved for solitary confinement and is divided into four tiers, each housing 15 cells approximately 1.8 m × 2.7 m in size, each cell containing an open toilet and sink, a steel bed, and a small, fixed steel table and stool. The cells in the lower tiers have double doors. The inner door is barred; the outer door is solid steel except for a small Plexiglas window. There are no other windows in the cells; each cell has one 60-watt light bulb to provide light.

While these structural features have remained constant, administrative decisions have determined other features of the confinement. Until August 20, 1979, the outer steel doors were left open, permitting natural light and air to enter the cell and permitting inmates to speak with other inmates in adjoining cells; on August 20 the steel doors were closed on the cells of all inmates in isolation. At the same time, correctional officers removed personal belongings from these cells, including radios, television sets, and all reading materials except a Bible.

Suit was brought not against the conditions in Block 10 generally but specifically against the conditions prevailing in the lower tiers since August 20, 1979. Of the 15 plaintiffs in the suit, 14 were interviewed; the 15th was no longer in Block 10 at the time of the interviews and was not available. All of the plaintiffs were men, and their mean age was 28 years (range, 22–38 years). Median duration of confinement in isolation was 2 months (range, 11 days to 10 months). Each prisoner was interviewed for approximately one-half hour by one of two psychiatrists, with the exception of one prisoner who, because of concern over his clinical state, was seen twice over a 3-week period. History was obtained of incarcerations, previous experience with solitary confinement, and previous and current psychiatric symptoms and treatment. Due to the pressure of time, we made no active attempt to cover other areas of a full clinical history, e.g., assessment of object relations, defenses, and family history.

In the interviews, conducted in an open-ended manner, careful attention was paid so that suggesting possible symptoms was avoided. The circumstances of the interviews, however, were clearly seen by the prisoners and guards as adversarial. Access to the prisoners for the interviews was obtained only through court order; all prisoners interviewed were informed of the purpose of the interviews and told that data from them might be used in court testimony. In addition, there were several guards stationed just outside the interview room, prompting several prisoners to resort to whispering as a means of avoiding being overheard.

## FINDINGS

It might be expected that the adversarial circumstances of the interviews would have biased the prisoners' reports in the direction of exaggeration of whatever symptoms they might have experienced. Such was not the case. In fact, contrary to expectation, the prisoners appeared to mobilize multiple defensive operations—rationalization, avoidance, denial, distortion, and repression—in an effort to minimize the quality of their reactions to isolation. The interviewer was required, therefore, actively to encourage disclosure of information, to provide reassurance, and persistently to confront and explore gaps in the reported accounts. Numerous interviews began with statements such as "Solitary doesn't bother me" or "Some of the guys can't take it—not me," or even with the mention of a symptom and simultaneous denial of its significance: "As soon as I got in, I started cutting my wrists. I figured it was the only way to get out of here." As the

interviews progressed, these facile, superficial accounts gave way to descriptions of experiences that were troublesome. For example, one inmate was unable to describe the events of the several days surrounding his wrist slashing, nor could he describe his thoughts or feelings at the time. His overt anxiety increased markedly upon questioning, and only after some time was he able to describe an apparent acute confusional state, panic, and subsequent partial amnesia for those events. Similarly, the prisoner who said he could "take it" eventually came to describe panic, fears of suffocation, and paranoid distortions while he had been in isolation.

Indeed, the general pattern was for inmates initially to downplay reactions to the solitary confinement situation, then, after being carefully questioned, to become overtly anxious and, frequently, overtly reluctant to elaborate on significant details. Upon confrontation, several inmates acknowledged the reasons for their reluctance. They feared that the guards would discover their primitive fantasies of revenge or that the guards were waiting to see a weakness that they could exploit to make the inmate "crack up." Furthermore, in extreme cases, the inmate's dread was that he was in fact going insane.

The specific psychiatric symptoms reported were strikingly consistent among the inmates.

### Perceptual Changes

*Generalized hyperresponsivity to external stimuli.* This symptom was most commonly associated with dysesthetic responses to certain stimuli (11 prisoners). Instances of this included "You get sensitive to noise—the plumbing system. Someone in the tier above me pushes the button on the faucet, the water rushes through the pipes—it's too loud, gets on your nerves. I can't stand it—I start to holler. Are they doing it on purpose?" "Everything gets exaggerated. After a while, you can't stand it. Meals—I used to eat everything they served. Now I can't stand the smells—the meat—the only thing I can stand to eat is the bread." "What really freaks me out is when a bee gets into the cell—such a small thing." "Difficult to breathe, stale, awful smell from the toilets—the stench starts to feel unbearable." All 11 inmates denied ever having experienced such symptoms except during confinement in isolation.

*Perceptual distortions, hallucinations, and derealization experiences.* These symptoms were experienced by seven prisoners and are grouped together because under the peculiar circumstances of solitary confinement there were often inadequate means to distinguish them. Thus, experiences described by five of these seven prisoners included hearing voices—often in whispers, often saying frightening things to them—but usually the prisoners had no means by which to corroborate what they thought they heard; for example, "I hear sounds—guards saying, 'They're going to cut it [his nerve-damaged leg] off.' I'm not sure. Did

they say it, or is it my imagination?" If they did say it, the prisoner is suffering from derealization; if they said something else, or something not directed at him, he is suffering a (paranoid) perceptual distortion; if they said nothing, he is having a hallucination. There is no independent corroboration. Another inmate described the dilemma poignantly: "I overhear the guards talking. Did they say that? Yes? No? It gets confusing. I tried to check it out with ___ [the prisoner in the adjoining cell]; sometimes he hears something and I don't. I know one of us is crazy, but which one? Am I losing my mind?"

There were, in addition, two reports of noises taking on increasing meaning and frightening significance; for example, "I hear noises, can't identify them—starts to sound like sticks beating men. But I'm pretty sure no one is being beaten. . . . I'm not sure."

Perceptual illusions with loss of perceptual constancy were more readily identifiable in the visual sphere (three cases), and there were reports such as "The cell walls start wavering," and "Melting, everything in the cell starts moving; everything gets darker, you feel you are losing your vision."

In one of the prisoners the illusions became more complex and personalized: "They come by [for breakfast] with four trays; the first has big pancakes—I think I'm going to get them. Then someone comes up and gives me tiny ones—they get real small, like silver dollars. I seem to see movements—real fast motions in front of me. Then seems like they're doing things behind your back—can't quite see them. Did someone just hit me? I dwell on it for hours." This prisoner also described overt, frightening, visual hallucinations: "There's a guard in my cell; he's holding a noose." He acknowledged having experienced perceptual distortion with psychedelic drug abuse. Otherwise, all seven inmates denied ever experiencing perceptual symptoms like those they described, except during confinement in isolation.

### Affective Disturbances

Ten prisoners described massive free-floating anxiety during their incarceration in solitary, accompanied in eight cases by recurrent acute episodes of tachycardia, diaphoresis, shortness of breath, panic, tremulousness, and dread of impending death. One prisoner reported "shortness of breath a lot. My heart pumps real fast. I feel like I don't get enough oxygen. Get frantic." Another said, "I start to feel dizzy. I can't breathe," and another, "I start to dwell on things—too many roaches—get scared one might get into my ear. Start to feel hot—extreme heat—then I can barely breathe, start sweating, heart races, can't sit still, shaking, get a headache—real bad."

Of these 10 prisoners, three had experienced acute anxiety reactions prior to confinement in isolation, and they reported intensification of symptoms. The other seven denied any previous history of such symptoms.

DA426

### Difficulties With Thinking, Concentration, and Memory

Of the eight inmates who mentioned these symptoms, four reported acute confusional states with subsequent partial amnesia for events during the episode. There was, again, a problem with independent corroboration of these symptoms, especially important because the prisoners were only vaguely aware of what had happened to them. However, one prisoner slashed his wrists during such a state, and thus his confusion and disorientation were noted in the prison medical record.

One prisoner's description particularly suggested dissociative features with mutism: "I went to a standstill psychologically once—lapse of memory. I didn't talk for 15 days. I couldn't hear clearly. You can't see—you're blind—block everything out—disoriented, awareness is very bad. Did someone say he's coming out of it? I think what I'm saying is true—not sure. I think I was drooling—a complete standstill."

Four others reported milder symptoms of difficulty in concentration and memory; for example, "I can't concentrate, can't read. . . . Your mind's narcotized . . . sometimes can't grasp words in my mind that I know. Get stuck, have to think of another word. Memory is going. You feel you are losing something you might not get back."

Several described attempts they made to focus their concentration by self-discipline: "Got to try to concentrate. Remember list of the presidents. Memorize the states, capitals, five boroughs, seven continents, nine planets."

### Disturbances of Thought Content

*Emergence of primitive, ego-dystonic fantasies.* Six prisoners reported the emergence of primitive aggressive fantasies of revenge, torture, and mutilation of the prison guards. In each case, the fantasies were described as ego-dystonic, frightening, and uncontrollable; for example, "I try to sleep 16 hours a day, block out my thoughts—muscles tense—think of torturing and killing the guards—lasts a couple of hours. I can't stop it. Bothers me. Have to keep control. This makes me think I'm slipping my mind. Lay in bed too much—scare yourself with thoughts in bed. I get panicky—thoughts come back—picture throwing a guard in lime—eats away at his skin, his flesh—torture him. Try to block it out, but I can't."

*Ideas of reference, paranoia.* Six prisoners reported ideas of reference associated with persecutory fears; e.g., "Sometimes get paranoid—think they meant something else. Like a remark about Italians. Dwell on it for hours. Get frantic. Like when they push the buttons on the sink. Think they did it just to annoy me." The prisoner's reality testing in this instance was especially shaky: "Spaced out. Hear singing, people's voices—'Cut your wrists and go to Bridgewater and the Celtics are playing tonight.' I doubt myself—is it

real? . . . I suspected they're putting drugs in my cell. . . . the reverend, the priest—even you—you're all in cahoots in the Sacred Straight program. Drive them crazy."

### Problems With Impulse Control

Five prisoners reported episodes of lack of impulse control with random violence. One prisoner said, "I snap off the handle over absolutely nothing. Have torn up mail and pictures, throw things around. Try to control it. Know it only hurts myself." Three of these prisoners reported impulsive self-mutilation; for example, "I cut my wrists—cut myself many times when in isolation. Now, it seems crazy. But every time I did it, I wasn't thinking—lost control—cut myself without knowing what I was doing."

### Rapid Subsidence of Symptoms on Termination of Isolation

The legal statute in Massachusetts requires relief from isolation status with closed solid steel doors for at least 24 hours each 15 days. Certain prisoners had additional periods of relief for medical consultation and, in one case (peroneal nerve injury), hospitalization.

All prisoners interviewed reported a very rapid (usually within the first few hours) diminution of their symptoms during periods of relief. No correlation was apparent between severity of symptoms and the time required for them to subside.

### DISCUSSION

The observations reported here suggest that rigidly imposed solitary confinement may have substantial psychopathological effects and that these effects may form a clinically distinguishable syndrome. The full syndrome described here has not been previously reported in the recent medical literature, although there have been observations consistent with those that I have reported.

The present observations are, however, strikingly consistent with earlier German reports. The German literature reported only on prisoners who suffered gross psychotic symptoms, some of whom were observed in hospitals or "insane departments" of prisons. The Walpole population, on the other hand, was not preselected by overt psychiatric status. Despite this, all of the major symptoms reported by the German clinicians, except *Vorbereiden* and hysterical conversion symptoms, were observed in the Walpole population. In addition, less severe forms of this solitary confinement syndrome were observed in the Walpole population, including 1) sensory disturbances: perceptual distortions and loss of perceptual constancy, in some cases without hallucinations; 2) ideas of reference and paranoid ideation short of overt delusions; 3) emer-

EFFECTS OF SOLITARY CONFINEMENT

gence of primitive aggressive fantasies, which remained ego-dystonic and with reality-testing preserved; 4) disturbances of memory and attention short of overt disorientation and confusional state; and 5) derealization experiences without massive dissociative regression.

The observations at Walpole also suggest that solitary confinement cannot be viewed as a single entity. The effects of solitary confinement situations vary substantially with the rigidity of the sensory and social isolation imposed.

CONCLUSIONS

The present observations, coupled with those in the earlier German literature, suggest strongly that the use of solitary confinement carries major psychiatric risks. I have not attempted in this paper to define or classify this psychopathological syndrome, but, as mentioned earlier, there have been speculations in the literature linking solitary confinement with the formal experiments on profound sensory deprivation. A review of this literature and an elaboration of the variables that may explain the particular pathogenicity of rigidly imposed solitary confinement will be presented in another paper.

REFERENCES

1. In Re Medley, 134 US 160, 167–168 (1890)

2. Bono v Saxbe, 450 F Supp 934–948 (1978)
3. Libby v Hogan, Suffolk Superior Ct, Mass, Civil No 37699 (1979)
4. Brownfield C: Isolation: Clinical and Experimental Approaches. New York, Random House, 1965
5. Biderman A, Zimmer H (eds): The Manipulation of Human Behavior. New York, John Wiley & Sons, 1961
6. Solomon P, Kubzansky P, Liederman P, et al: Sensory Deprivation: A Symposium Held at Harvard Medical School. Cambridge, Mass, Harvard University Press, 1961
7. Scott GD, Gendreau P: Psychiatric implications of sensory deprivation in a maximum security prison. Can Psychiatr Assoc J 14:337–341, 1969
8. Liederman P: Man alone: sensory deprivation and behavior change. Correctional Psychiatry and Journal of Social Therapy 8:64–74, 1962
9. Walters RH, Callagan JE, Newman AF: Effect of solitary confinement on prisoners. Am J Psychiatry 119:771–773, 1963
10. Meltzer M: Solitary confinement, in Group for the Advancement of Psychiatry Symposium Number 3: Factors Used to Increase the Susceptibility of Individuals to Forceful Indoctrination, Observations and Experiments. New York, GAP, 1956
11. Suedfeld P, Roy C: Using social isolation to change the behavior of disruptive inmates. International Journal of Offender Therapy and Comparative Criminology 19:90–99, 1975
12. Kaufman E: The violation of psychiatric standards of care in prisons. Am J Psychiatry 137:566–570, 1980
13. Nitsche P, Williams K: The History of the Prison Psychoses, Nervous and Mental Disease Monograph Series, number 13. New York, Journal of Nervous and Mental Disease Publishing Co, 1913
14. Rothman D: The Discovery of the Asylum. Boston, Little, Brown and Co, 1971
15. de Tocqueville A: Democracy in America. New York, Vintage Books, 1945
16. Ganser J: Uber einen eigenartigen hysterischen dammerzustand. Arch Psychiatr Nervenkr 30:633–640, 1898

DA428

# EXHIBIT E

# United States Senate
WASHINGTON, DC 20510

September 19th, 2013

The Honorable John Kerry
Secretary of State
Department of State
Washington, DC 20520

Dear Mr. Secretary:

We write to you today about the ongoing detention of American citizen and former Marine, Amir Hekmati, in Iran.

Amir traveled to Iran for the first time in August 2011 to visit his ailing grandmother. Two weeks into his visit, he was arrested, interrogated, and imprisoned at the notorious Evin prison under the charge of espionage. He was quickly convicted during a show trial and on January 9, 2012, sentenced to death.

Though his execution order was overturned by the Iranian Supreme Court in March 2012, Amir has remained in custody without charge and was held in solitary confinement for 16 months of his now more than two-year detention. The Hekmati family's efforts to secure Amir's release became even more urgent when Amir's father was diagnosed with terminal brain cancer earlier this year.

While there have been few openings for dialogue with Iran during Amir's detention, we are optimistic that a resolution to this matter is possible. We welcomed the news of the release of several political prisoners on September 18, and were pleased the administration renewed its call for the Iranian regime to release all prisoners of conscience in its custody. Through appropriate channels, we encourage you to raise Amir's case with Iran, including during the United Nations General Assembly next week. We know the magnitude of issues to potentially discuss is great, but we urge you to communicate your concern for Amir and seek his reunification with family at this difficult time.

Thank you for all of your continued efforts on this matter.

Sincerely,

Senator Christopher A. Coons

Senator Mark Kirk

Senator Richard J. Durbin

Senator Carl Levin

Senator Debbie Stabenow

# EXHIBIT F



500 Eighth Street, NW          (202) 863-7200

Suite 200                       (202) 863-7800 Fax

Washington DC

20004                           www.cohengroup.net

January 20, 2014

President Barack Obama
The White House
1600 Pennsylvania Ave, NW
Washington, DC 20500

Dear Mr. President:

We respectfully urge immediate action to facilitate the release of former U.S. Marine, Amir Hekmati. Mr. Hekmati is an American citizen who has been unjustly held in an Iranian prison for more than two years. After being falsely accused of espionage and sentenced to death, his death sentence was overturned by an Iranian court due to a lack of evidence – yet Mr. Hekmati still languishes in Tehran's Evin Prison.

Mr. Hekmati has committed no crime. On the contrary, he has conducted his life with unyielding honor and courage: serving his country; traveling to Iran to visit his ailing grandmother; bravely urging Secretary of State Kerry, from prison, to accept only his unconditional release and full pardon; and apologizing to his family for their hardships during this ordeal. A release now would allow him to see his father, who is dying of brain cancer.

As Iran and the United States attempt a formal accord in the next six months, now is the perfect time for the release of Mr. Hekmati. Freeing him is indeed in both nations' best interests. From a macro perspective, it helps the burgeoning bilateral relationship and signals a greater interest from Iran in rejoining the global community. On a micro level, his release would reunite Amir with his dying father, who desperately wants to embrace his son once more.

A recent report by the United Nations Human Rights Council's Working Group on Arbitrary Detention confirmed that Amir has been deprived of his right to prepare his defense and communicate with counsel. His treatment has not conformed to the standards and principles set forth in the Universal Declaration of Human Rights and the International Covenant on Civil and Political Rights, another reason why Amir should be released immediately.

DA432

Page 2
President Barack Obama
January 20, 2014

Mr. President, the words "gone but not forgotten" are used to honor those who gave their lives for their country. We must likewise remember this brave American and defend him for the honor and courage he has shown in the face of this adversity.

Two years of unjust imprisonment are long enough. Now is the time for action.

Respectfully,

William S. Cohen
U.S. Secretary of Defense (1997-2001)

General Peter Pace
Chairman, Joint Chief of Staff (2005-2007)

General James L. Jones
National Security Advisor to the President (2009-2010)
Supreme Allied Commander, Europe (2003-2006)

General Joseph W. Ralston
Supreme Allied Commander, Europe (2000-2003)
Vice Chairman, Joint Chiefs of Staff (1996-2000)

# EXHIBIT G

RICHARD BLUMENTHAL
CONNECTICUT



UNITED STATES SENATE
WASHINGTON, D.C. 20510

January 5, 2015

The Honorable John Kerry
Secretary
United States Department of State
2201 C Street, NW
Washington, DC 20520

Dear Secretary Kerry:

After speaking with Acting Deputy Secretary of State Wendy Sherman regarding the deeply troubling Iranian detention of Amir Hekmati, I write to urge you to make every possible effort to secure his freedom.

Mr. Hekmati has been held by the Iranian government without a fair trial, at times suffering solitary confinement and deplorable conditions including abuse and torture. His case still languishes in the Iranian judicial system – without conclusion – over 1,170 days after his initial detention. Recent reports by Iranian officials that his case will be revisited do little to assuage my concerns over his unjust imprisonment. Unfortunately, he is one of a number of Americans detained or missing in Iran, along with Saeed Abedini, Jason Rezaian, and Robert Levinson. As you are aware, the Iranian government has a brutal record of abrogating the human rights both of Americans it has illegally detained and of its own people, having conducted over 850 executions in the past year alone.

Amir Hekmati has served our nation honorably as a United States Marine. I ask you to forcefully hold Iran accountable for Mr. Hekmati's welfare while he is in its custody. I also ask you to redouble efforts and aggressively push for the swift release and return home of all Americans illegally detained in Iran. No American citizen should be subjected to the treatment currently being suffered by these individuals and their families.

While I am encouraged by the gravity with which the Department of State appears to be pursuing this concern, I ask that you keep me fully apprised of any developments with regard to Mr. Hekmati's case.

Sincerely,

RICHARD BLUMENTHAL
United States Senate

DA435

# EXHIBIT H

DA436



United States Department of State

Washington, D.C. 20520

Consulate of Spain, Chicago
180 North Michigan Avenue, Suite1500
Chicago, Illinois 60601

May 23, 2017

To Whom It May Concern:

This letter serves as a summary of facts known by the U.S. Department of State in Washington, DC, concerning the detention of U.S. citizen Amir Hekmati. If you have any questions regarding this letter, please contact Jennifer Farrar at the U.S. Department of State's Office of Overseas Citizen Services at (202) 485-6023 or by email at FarrarJ@state.gov.

Dual U.S.-Iranian citizen Amir Hekmati was unjustly detained in Evin Prison, Tehran, Iran, from August 2011 through January 2016. During this time Mr. Hekmati's contact with the outside world was extremely limited as the Swiss Protecting Power in Tehran, which represents U.S. interests in the country, was repeatedly denied consular access to him. Mr. Hekmati was released as a result of diplomatic efforts on January 16, 2016 and subsequently returned to the United States.

Sincerely,

Viktoria M. Loparkiewicz
Division Chief
Office of American Citizen Services and
Crisis Management
Near East and South/Central Asia

# EXHIBIT I

**DOCUMENT UNDER SEAL**

*Hekmati v. The Government of the Islamic Republic of Iran, et al.*

**Case No. 1:16-cv-00875 (ESH)**

# EX. C TO PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF HIS MOTION FOR DEFAULT JUDGMENT

## Declaration of Behnaz Hekmati

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| AMIR HEKMATI, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>THE GOVERNMENT OF THE )<br>ISLAMIC REPUBLIC OF IRAN, )<br>Its Ministries, Agencies, and Instrumentalities, )<br>)<br>Defendants. )<br>) | Case No. 1:16-cv-00875 |

## DECLARATION OF BEHNAZ HEKMATI

I, Behnaz Hekmati, declare under penalty of perjury as follows:

### EFFORTS TO OBTAIN AMIR'S RELEASE

1.     My son, Amir Hekmati, was imprisoned in Iran for four-and-a-half years, from August 2011 to January 2016.

2.     For nearly three months, we knew nothing of Amir's whereabouts or condition. We didn't know who took him, where they took him, or why.  We didn't even know if he was alive.

3.     From the moment we learned Amir had been arrested and taken to Evin Prison, our family worked tirelessly to secure his release.

4.     However, it was clear to us from the start that Amir was being used merely as a bargaining chip by the Iranian Government to extract money or other concessions from the U.S. Government.

5.      Iranian Government officials initially told our family that Amir would be released if we kept quiet.  Judge Salavati, the judge presiding over Amir's case, later told us to do more to pressure the U.S. Government to cooperate with the Iranian Government's demands.

6.      Iranian Government officials used Amir to extort money from our family as well. For example, Amir's court-appointed lawyer for his second "trial" told me that if our family wired $20,000 to him in secret, he could guarantee that Amir would only be sentenced to one year in prison.  I sent the money, and still Amir got the maximum sentence of ten years.

## CHANGES IN AMIR'S BEHAVIOR SINCE HIS IMPRISONMENT

7.      Amir returned home to Michigan in January 2016 and has been living with me since then.  I am so grateful to have him home at last.  REDACTED

### I.      Amir Pre-Imprisonment

8.      Before Amir's imprisonment, he was a very happy person.  He was a free spirit, always smiling, with a sparkle in his eye.  He had a wonderful sense of fun about him.  He was positive and optimistic, always making big plans for the future.

9.      Amir loved to travel and to see new places, but above all, he loved spending time with his family.

10.      Amir and I had always been close.  He was an affectionate son—he hugged me often.  He would call me every day, and we often had long talks.  One of the things I missed most about Amir when he was in prison was our talks.  He was also always very protective of me, asking what I would do after retirement.

2

DA441

11.     Amir was always very social.  He had many friends from school, and later, from work.  Everybody loved him because he was a good and loyal friend.  He was supportive and gave great advice.

12.     Amir is very smart, and he always did well in school.  Really, he did well in everything.  Professional success came as easily to him as school did.  He always received good letters of recommendation.

13.     I did not see any significant change in Amir's personality after his tour of duty in Iraq with the Marines.  He was more mature and often said how much he had appreciated the experience; how he had grown professionally and learned from it.  As far as I could tell, the experience had been a positive one.  He remained happy and outgoing, and he continued to live his life with passion.  To my knowledge, he had no trouble sleeping or concentrating.  He continued to have a great appetite, as he always had, and he continued to take care of himself.  All he ever wanted, he told me many times, was a good, simple, happy life.

**II.     Amir Post-Imprisonment**

14.     REDACTED                                                                                   My first thought when he returned home was that he had lost a tremendous amount of weight.  His face looked completely different—particularly his eyes and mouth.

15.     REDACTED

3

REDACTED

DA443

DA444

REDACTED

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed On:  January __1__, 2017

Behnaz Hekmati

6

DA445

# EXHIBIT J

DA446

**\*\*DOCUMENT UNDER SEAL\*\***

*Hekmati v. The Government of the Islamic Republic of Iran, et al.*

**Case No. 1:16-cv-00875 (ESH)**

# EX. D TO PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF HIS MOTION FOR DEFAULT JUDGMENT

## Declaration of Sarah Hekmati

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AMIR HEKMATI,                                      )
                                                   )
                    Plaintiff,                     )
                                                   )
       v.                                          )       Case No. 1:16-cv-00875
                                                   )
THE GOVERNMENT OF THE                              )
ISLAMIC REPUBLIC OF IRAN,                          )
Its Ministries, Agencies, and Instrumentalities,  )
                                                   )
                    Defendants.                    )
                                                   )

# DECLARATION OF SARAH HEKMATI

I, Sarah Hekmati, declare under penalty of perjury as follows:

1.     I am Amir Hekmati's sister. Amir has lived with our mother since his release in

January 2016. I live nearby and have seen him relatively frequently over the past year. REDACTED
REDACTED

## I.   Amir Pre-Imprisonment

2.     Amir was always a happy person. He certainly had a serious side, but generally

he was funny and easygoing, particularly around family and friends.

3.     Amir and I had a good relationship before his imprisonment. He loved being an

uncle to my young son and daughter. He got along well with my husband, who was more like a

natural brother to him. When he left the Marines in 2005, he lived with us for nine months

without issue. We also traveled with him overseas for three weeks in 2007 without a problem. It

was easy because he was such a "go-with-the-flow" kind of guy.

12/31/16

4.     Amir loved traveling. He always wanted to learn new languages and see the world. His free-spiritedness was one of the things that made it so hard for us to see him in prison for so long.

5.     Amir was always very driven, disciplined, and goal-oriented. He always exercised and ate healthy. He was very ambitious and always did well in school. It was never hard for him to get good grades, as he retained things very easily. He would read a book once and be able to tell you everything about it. He was very successful professionally, even at a young age.

6.     I didn't notice any changes in Amir's personality when he returned from his deployment as a Marine in Iraq. At first, he would be a little jumpy if I disturbed him inadvertently when he was sleeping. Otherwise, he got right back into the swing of things. He invested in property, he traveled, he got into a serious relationship, and he made plans for the future.

**II.     Amir Post-Imprisonment**

REDACTED

2

12/31/16

DA449

REDACTED

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.

Executed On: December 3\, 2016

Sarah Hekmati

3

# EXHIBIT K

REDACTED

# EXHIBIT L

## <u>DECLARATION OF SCOTT D. GILBERT</u>

I, Scott D. Gilbert, do hereby state the following facts based on my personal knowledge:

1.      I am Amir Hekmatis` attorne. .  I practice law in Washington, D.C.  I am a partner and chairman of the law firm Gilbert LLP.  I am a member of the Bars of the District of Columbia, the U.S. Supreme Court, the U.S. Court of Appeals for the District of Columbia, the U.S. District Court for the District of Columbia, the U.S. Court of International Trade, and the Cherokee Nation.

2.      Our firm initially was retained by the Hekmati family in 2015 to assist in negotiations to secure Amir's release from prison in Iran.  The family found our firm through contacts that were familiar with our public-service work in the international-prisoner-release sphere.  Among other clients, our firm previously had represented American contractor Alan Gross and his family in the negotiations leading to Mr. Gross's successful release from unlawful detention in Cuba in 2014.  As of today, our firm has been successful in assisting in the negotiated release of other Americans held unlawfully in Cuba, Iran, Venezuela, and Vietnam.

3.      Following extensive negotiations, Amir was released from Iranian custody in January 2016 as part of a broader hostage exchange between the U.S. and Iran, following on the heels of the U.S.-Iran nuclear deal.

4.      My colleagues and I had been in frequent and substantial personal and telephonic contact with Amir's family during his imprisonment and knew from them, in real time, that he had been experiencing horrific torture and trauma at the hands of his captors.  I developed a close personal relationship with the family during our work together on Amir's case.  I found them to be highly principled and caring people, with strong, shared family values.  They were crushed by what was going on in Iran and their inability ever to reunite their extended family, but they were

so proud of having established successful lives and a cohesive family in the United States.  In many ways, Amir's family reminded me of the family in which I had been raised.

5.      I knew that Amir's imprisonment had irreparably damaged not just his own life, but theirs as well.  His sister had left her job with the support and encouragement of her husband, a full-time doctor, with two young children at home, to lobby full time for Amir's release.  His father had a stroke shortly after learning of Amir's death sentence and never recovered.  As to Amir's mother, I do not know, to this day, how she managed to survive it all, let alone continue as the matriarch of this loving family.

6.      When I learned that Amir was being released, I was very pleased that Amir finally would be reunited with his family.  But I also knew, based on my prior work with others who had undergone such protracted trauma, that Amir would have a long road transitioning back to "normal" life, so to speak.

7.      On January 18, 2016, I received a panicked call from Amir's brother-in-law from Landstuhl, Germany.  He told me that Amir had arrived at the U.S. Air Force Base in Landstuhl but had not yet been permitted to see the family, who had flown there to meet him.  Government officials had told the Hekmati family only that Amir was undergoing "routine" medical exams.  No one could explain to the family why such "routine" exams should take a day or more, or why his family could not see him in the meantime.

8.      I was irate.  I made an emergency call to Jonathan Finer, Chief of Staff for Secretary of State John Kerry, whom I had gotten to know well during the negotiations over Amir's release and in our other U.S. hostage negotiation work.  I threatened to take immediate legal action exposing the shameful behavior of our government towards a decorated Marine who had just been released from nearly five years of traumatic torture and imprisonment.  Mr. Finer

DA455

said he was appalled to hear of Amir's mistreatment and that he would "take care of it."

Mr. Finer told me he would speak immediately with Secretary Kerry, since ironically both of

them were at that time in Switzerland negotiating additional items with Iran.  Shortly after my

call with Mr. Finer, I received another call from Amir's brother-in-law.  He and Amir's sister

were in tears; they were with Amir.  Amir was informed that, as should have been the case from

the outset, he was free to be with his family and return to the United States.  Once Amir returned

home to Michigan, we learned from him about the FBI's first interview of Amir.

9.      Following his return, Amir and I began a professional relationship.  Among other

things, our firm represented him in his lawsuit against the Iranian Government in the U.S.

District Court for the District of Columbia, which was filed in May 2016.

10.      Amir and I developed a close personal relationship as well.  In the months after

his release, we were in regular contact.  I knew Amir was living at home, still struggling to

transition to his normal life, and coping with PTSD REDACTED                                resulting

from his confinement and torture in Iran.

11.      On April 7, 2016, I received a call from Amir informing me that FBI agents had

arrived at his home unannounced and asked him to accompany them to their office because they

"needed more help with an investigation."  He said the agents had told him that they had

classified information that they needed to provide to him, and that they could only do so at their

office.

12.       I told Amir to put me on the phone with the agents and to convey that they were

not to interview him unless I was present by telephone.  The agents refused to speak with me and

told Amir that they would call me from a landline at the FBI office.

DA456

13.      I never heard from anyone.  My colleagues tried repeatedly to contact the agent for whom we'd been given contact information, Special Agent Melinda Capitano, on her cell phone, at the FBI's Flint field office, and through her office in Washington, D.C.  Agent Capitano never called back.  All of this is documented in contemporaneous emails written by my colleagues and me on the date of Amir's interrogation.  *See* E-mail from Emily P. Grim to Eliddia Mader (April 7, 2016, 12:21 PM); E-mail from Scott D. Gilbert to Tim Rieser and Caroline A. Tess (April 7, 2016, 2:06 PM) (attached hereto as Exs. 1–2).

14.      As Amir Hekmati's lawyer and friend, I am sickened and appalled by our government's treatment of him since his release from Iran.  For four years, I have watched Amir work to rebuild his life and his relationships here, only to face constant obstacles and setbacks due to abuse by our own government.  Amir's challenges serve to remind me why I became a lawyer 40 years ago, and my law firm and I are committed to doing everything within our power to remedy this.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed On:  March 23, 2020

_____
Scott D. Gilbert

4

DA457

# EXHIBIT M

**U.S. Department of Justice**
**U.S. Victims of State Sponsored Terrorism Fund**

P.O. Box 10299
Dublin, OH 43017-5899



December 28, 2017

VIA FIRST CLASS MAIL
VTF0201118928



AMIR M HEKMATI
C/O EMILY PEARSON GRIM
GILBERT LLP
1100 NEW YORK AVE. NW SUITE 700
WASHINGTON, DC 20005

Claim No: 1226

Dear Applicant:

You submitted an Application Form to the U.S. Victims of State Sponsored Terrorism Fund ("USVSST Fund"). Based on all the information submitted for your claim, the USVSST Fund has determined your claim to be eligible in the following amount:

- Eligible Compensatory Damages: $31,748,179.00
- Less Offset for Sources Other Than This Fund: $0.00
- **TOTAL ELIGIBLE CLAIM AMOUNT: $31,748,179.00**[1]

The USVSST Fund determined your total eligible claim amount in accordance with the requirements of the Justice for U.S. Victims of State Sponsored Terrorism Act.

**Although the USVSST Fund has determined that your claim is eligible, please note that there is no guarantee that you will receive the total eligible claim amount. Rather, the amount of your first payment will be calculated _after_ the USVSST Fund determines the amount of funds available from which to pay claims and _after_ any statutory limitations are applied to the total eligible claim amount shown above. You will be notified about the exact amount of your first payment after the Special Master authorizes the next distribution in January 2019.**

Please note that in accordance with the requirements of the USVSST Fund and the Justice for U.S. Victims of State Sponsored Terrorism Act, you must inform the USVSST Fund of any new compensation from any source other than this Fund that you receive, or are scheduled or entitled to receive.

If you believe your total eligible claim amount was not properly decided or contains an error, you may submit a detailed explanation to the USVSST Fund in writing within 3 days of receipt of this letter, referencing your Claim Number, in one of the following ways:

- As an email attachment to info@usvsst.com
- By facsimile to (614) 553-1426
- By overnight courier to U.S. Victims of State Sponsored Terrorism Fund, c/o GCG, 5151 Blazer Parkway, Dublin, OH 43017-5899

---

[1] The total eligible claim amount represents the amount outstanding and unpaid on your eligible claim amount.

U.S. Victims of State Sponsored Terrorism Fund                                         2
Claim No: 1226

Please visit the USVSST Fund's website at www.usvsst.com for additional detailed information.  If you have any questions, please feel free to call the U.S. Victims of State Sponsored Terrorism Fund's toll-free helpline at (855) 720-6966.  If you are calling from outside of the United States, please call (614) 553-1013. Every effort will be made to respond to your inquiries as soon as possible.

Sincerely,

Kenneth R. Feinberg
Special Master
U.S. Victims of State Sponsored Terrorism Fund

# EXHIBIT N

DA461



**U.S. Department of Justice**
**U.S. Victims of State Sponsored Terrorism Fund**

P.O. Box 10299
Dublin, OH 43017-5899



December 13, 2018

VIA ELECTRONIC MAIL
VTF0201580551



AMIR M HEKMATI
C/O EMILY PEARSON GRIM
GILBERT LLP
1100 NEW YORK AVE. NW SUITE 700
WASHINGTON, DC 20005

Claim No: 1226

Dear Applicant:

The Special Master has reviewed and approved your claim for compensation from the U.S. Victims of State Sponsored Terrorism Fund (the "USVSST Fund"). The allocated payment amount for this distribution is $839,100.85. Additional information about how the USVSST Fund calculated eligible claimants' award amounts can be found in the "USVSST Fund Payment Calculation Explanation" and the frequently asked questions ("FAQs"), available on the USVSST Fund's website at www.usvsst.com.

In order to receive your payment, you must complete the "Direct Deposit - ACH Payment Form" available on the USVSST Fund's website at the Payment Information tab, if you have not already done so. For more information, see the direct deposit FAQs, also available on the Payment Information tab.

Please note that in accordance with the requirements of the USVSST Fund and the Justice for U.S. Victims of State Sponsored Terrorism Act, you must inform the USVSST Fund of any compensation from any source other than this Fund not previously disclosed.

If you have questions, you may contact the USVSST Fund, referencing your Claim Number shown above, in one of the following ways:

- By telephone to the USVSST Fund's toll-free helpline at (855) 720-6966. If you are calling from outside of the United States, please call (614) 553-1013.
- By email to info@usvsst.com
- By facsimile to (614) 553-1426
- By U.S. mail to U.S. Victims of State Sponsored Terrorism Fund, c/o GCG, P.O. Box 10299, Dublin, OH 43017-5899
- By overnight courier to U.S. Victims of State Sponsored Terrorism Fund, c/o GCG, 5151 Blazer Parkway, Dublin, OH 43017-5899

Every effort will be made to respond to your inquiries as soon as possible.

Sincerely,

Kenneth R. Feinberg

Kenneth R. Feinberg
Special Master
U.S. Victims of State Sponsored Terrorism Fund

DA462

# EXHIBIT O

DA463

| | |
|---|---|
| **From:** | Abrishami, Monique |
| **To:** | info@usvsst.com |
| **Subject:** | RE: Claim No. 1226 |
| **Date:** | Tuesday, May 21, 2019 1:03:44 PM |
| **Attachments:** | image001.png |

Hello,

I just wanted to check in again about Mr. Hekmati's claim. I understand that payments are made on a rolling basis, but it has been over six months since he received his award notification. Has there been any progress on payment?

Thank you,
Monique Abrishami

**From:** info@usvsst.com <info@usvsst.com>
**Sent:** Monday, April 8, 2019 3:36 PM
**To:** Abrishami, Monique <abrishamim@gilbertlegal.com>
**Subject:** RE: Claim No. 1226

There is no particular date. Payments are made on a rolling basis.

Regards,

Claims Administrator
U.S. Victims of State Sponsored Terrorism Fund
www.usvsst.com

**From:** Abrishami, Monique <abrishamim@gilbertlegal.com>
**Sent:** Friday, April 5, 2019 11:08 AM
**To:** info@usvsst.com
**Subject:** RE: Claim No. 1226

Understood, thank you. Is there any sense at all about the timing of these payments? Does the Fund anticipate completing its payment process by a particular date?

# GILBERT LLP

**Monique Abrishami**
abrishamim@gilbertlegal.com
O 202.772.2255

1100 New York Ave, NW
Suite 700
Washington, DC 20005
**GilbertLegal.com**

DA464

**Please note my new email address and firm website!**

*Not admitted in DC. Directly supervised by the principals of the Firm.

This email and any attachments may contain confidential information that is privileged at law. If you are not a named recipient or have received this communication by error, please notify the sender immediately and destroy this email and its attachments, and all copies thereof, without further distributing or copying them.

---

**From:** info@usvsst.com <info@usvsst.com>
**Sent:** Friday, April 5, 2019 10:27 AM
**To:** Abrishami, Monique <abrishamim@gilbertlegal.com>
**Subject:** RE: Claim No. 1226

Hello,

Thank you for contacting us.  The Fund is still issuing payments.

Regards,

Claims Administrator
U.S. Victims of State Sponsored Terrorism Fund
www.usvsst.com

---

**From:** Abrishami, Monique <abrishamim@gilbertlegal.com>
**Sent:** Thursday, April 4, 2019 12:34 PM
**To:** info@usvsst.com
**Subject:** Claim No. 1226

> **CAUTION:** This email originated from outside of Epiq. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hello,

I write on behalf of my client, Amir Hekmati, who received the attached award letter on December 13, 2018.  Could you please advise as to the status of payment on the award?  Many thanks.

Best,
Monique

**GILBERT** LLP

**Monique Abrishami**
abrishamim@gilbertlegal.com
O 202.772.2255

1100 New York Ave, NW
Suite 700
Washington, DC 20005
**GilbertLegal.com**

**Please note my new email address and firm website!**

*Not admitted in DC. Directly supervised by the principals of the Firm.

This email and any attachments may contain confidential information that is privileged at law. If you are not a named recipient or have received this communication by error, please notify the sender immediately and destroy this email and its attachments, and all copies thereof, without further distributing or copying them.

# EXHIBIT P

DA467

| **From:** | Abrishami, Monique |
| **To:** | info@usvsst.com |
| **Subject:** | RE: RE: Claim No. 1226 |
| **Date:** | Friday, July 19, 2019 4:04:01 PM |
| **Attachments:** | image001.png |
| | image002.png |
| | image976325.png |

Checking in again – Could you please advise if the Fund is still issuing payments?  Thank you.

Best,
Monique



### Monique Abrishami
abrishamim@gilbertlegal.com
O 202.772.2255

1100 New York Ave, NW
Suite 700
Washington, DC 20005
**GilbertLegal.com**

This email and any attachments may contain confidential information that is privileged at law. If you are not a named recipient or have received this communication by error, please notify the sender immediately and destroy this email and its attachments, and all copies thereof, without further distributing or copying them.

**From:** Abrishami, Monique
**Sent:** Thursday, July 11, 2019 9:26 AM
**To:** info@usvsst.com
**Subject:** RE: RE: Claim No. 1226

Hello,

Could you please advise whether the Fund is still issuing payments?  Claim No. 1226 remains outstanding.

Thank you,
Monique Abrishami

**From:** info@usvsst.com <info@usvsst.com>
**Sent:** Monday, April 8, 2019 3:36 PM
**To:** abrishamim@gilbertlegal.com

DA468

**Subject:** RE: Claim No. 1226

There is no particular date.  Payments are made on a rolling basis.

Regards,

Claims Administrator
U.S. Victims of State Sponsored Terrorism Fund
www.usvsst.com

**From:** Abrishami, Monique <abrishamim@gilbertlegal.com>
**Sent:** Friday, April 5, 2019 11:08 AM
**To:** info@usvsst.com
**Subject:** RE: Claim No. 1226

Understood, thank you.  Is there any sense at all about the timing of these payments?  Does the Fund anticipate completing its payment process by a particular date?



**Monique Abrishami**
abrishamim@gilbertlegal.com
O 202.772.2255

1100 New York Ave, NW
Suite 700
Washington, DC 20005
**GilbertLegal.com**

**Please note my new email address and firm website!**

*Not admitted in DC. Directly supervised by the principals of the Firm.

This email and any attachments may contain confidential information that is privileged at law. If you are not a named recipient or have received this communication by error, please notify the sender immediately and destroy this email and its attachments, and all copies thereof, without further distributing or copying them.

**From:** info@usvsst.com <info@usvsst.com>
**Sent:** Friday, April 5, 2019 10:27 AM
**To:** Abrishami, Monique <abrishamim@gilbertlegal.com>
**Subject:** RE: Claim No. 1226

Hello,

Thank you for contacting us.  The Fund is still issuing payments.

Regards,

Claims Administrator

U.S. Victims of State Sponsored Terrorism Fund
www.usvsst.com

---

**From:** Abrishami, Monique <abrishamim@gilbertlegal.com>
**Sent:** Thursday, April 4, 2019 12:34 PM
**To:** info@usvsst.com
**Subject:** Claim No. 1226

> **CAUTION:** This email originated from outside of Epiq. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hello,

I write on behalf of my client, Amir Hekmati, who received the attached award letter on December 13, 2018.  Could you please advise as to the status of payment on the award?  Many thanks.

Best,
Monique



**Monique Abrishami**
abrishamim@gilbertlegal.com
O 202.772.2255

1100 New York Ave, NW
Suite 700
Washington, DC 20005
**GilbertLegal.com**

**Please note my new email address and firm website!**

*Not admitted in DC. Directly supervised by the principals of the Firm.

This email and any attachments may contain confidential information that is privileged at law. If you are not a named recipient or have received this communication by error, please notify the sender immediately and destroy this email and its attachments, and all copies thereof, without further distributing or copying them.

# EXHIBIT Q

| | |
|---|---|
| **From:** | Lee, Jane (CRM) |
| **To:** | Abrishami, Monique |
| **Subject:** | RE: Amir Hekmati - USVSST Fund - follow up to email between Scott Gilbert and Kenneth Feinberg |
| **Date:** | Thursday, June 20, 2019 9:25:20 AM |
| **Attachments:** | image002.png |
| | image004.png |

Hi Monique,

The Acting Special Master, Deb Connor, is also the Chief of MLARS.

Thank you,

Jane

---

**From:** Abrishami, Monique [mailto:abrishamim@gilbertlegal.com]
**Sent:** Wednesday, June 19, 2019 2:05 PM
**To:** Lee, Jane (CRM) <Jane.Lee@CRM.USDOJ.GOV>
**Subject:** RE: Amir Hekmati - USVSST Fund - follow up to email between Scott Gilbert and Kenneth Feinberg

Apologies, I meant to say MLARS!

# GILBERT LLP

**Monique Abrishami**
abrishamim@gilbertlegal.com
O 202.772.2255

1100 New York Ave, NW
Suite 700
Washington, DC 20005
**GilbertLegal.com**

This email and any attachments may contain confidential information that is privileged at law. If you are not a named recipient or have received this communication by error, please notify the sender immediately and destroy this email and its attachments, and all copies thereof, without further distributing or copying them.

**From:** Abrishami, Monique
**Sent:** Wednesday, June 19, 2019 12:14 PM
**To:** Lee, Jane (CRM) <Jane.Lee3@usdoj.gov>; Gilbert, Scott D <gilberts@gilbertlegal.com>
**Subject:** RE: Amir Hekmati - USVSST Fund - follow up to email between Scott Gilbert and Kenneth Feinberg

Thank you, Jane – much appreciated.  May I ask which Fraud Section supervisors are overseeing the USVSST claims?

**From:** Lee, Jane (CRM) <Jane.Lee3@usdoj.gov>
**Sent:** Wednesday, June 19, 2019 11:08 AM
**To:** Abrishami, Monique <abrishamim@gilbertlegal.com>; Gilbert, Scott D
<gilberts@gilbertlegal.com>
**Subject:** RE: Amir Hekmati - USVSST Fund - follow up to email between Scott Gilbert and Kenneth
Feinberg

Hi Monique,

I have relayed your inquiry to my supervisors.  I do not have any updates to share with you regarding
the status of your client's claim.  When there is more information, we will let you know.

Thank you,
Jane

---

**From:** Abrishami, Monique [mailto:abrishamim@gilbertlegal.com]
**Sent:** Tuesday, June 18, 2019 3:44 PM
**To:** Lee, Jane (CRM) <Jane.Lee@CRM.USDOJ.GOV>; Gilbert, Scott D <gilberts@gilbertlegal.com>
**Subject:** RE: Amir Hekmati - USVSST Fund - follow up to email between Scott Gilbert and Kenneth
Feinberg

Jane,

I hope you had a great trip!  Just wanted to circle back on this when you have a moment—do you
have any time for a call tomorrow, or is there someone else we could speak to about Amir's award?
Thanks!

Thanks,
Monique

# GILBERT LLP

**Monique Abrishami**
abrishamim@gilbertlegal.com
O 202.772.2255

1100 New York Ave, NW
Suite 700
Washington, DC 20005
GilbertLegal.com

This email and any attachments may contain confidential information that is privileged at law. If you are not a named recipient or have received this communication by error, please notify the sender immediately and destroy this email and its attachments, and all copies thereof, without further distributing or copying them.

**From:** Abrishami, Monique

**Sent:** Friday, June 7, 2019 1:32 PM
**To:** Lee, Jane (CRM) <Jane.Lee3@usdoj.gov>; Gilbert, Scott D <gilberts@gilbertlegal.com>
**Subject:** RE: Amir Hekmati - USVSST Fund - follow up to email between Scott Gilbert and Kenneth Feinberg

Thank you so much, Jane.  Safe travels.

---

**From:** Lee, Jane (CRM) <Jane.Lee3@usdoj.gov>
**Sent:** Friday, June 7, 2019 1:17 PM
**To:** Abrishami, Monique <abrishamim@gilbertlegal.com>; Gilbert, Scott D <gilberts@gilbertlegal.com>
**Subject:** Re: Amir Hekmati - USVSST Fund - follow up to email between Scott Gilbert and Kenneth Feinberg

Monique and Scott:

I am in receipt of your emails.  I am currently on travel (on my way to the airport) and will not have any access.  I will circle back after I return on June 18, but one of my DOJ colleagues may be reaching out in the interim.

Thank you,
Jane

On Jun 7, 2019, at 9:58 AM, Abrishami, Monique <abrishamim@gilbertlegal.com> wrote:

> Ms. Lee,
>
> I write to follow up on a June 6 communication between Scott Gilbert and Kenneth Feinberg regarding our client, Amir Hekmati (Claim No. 1226).  Amir was awarded $839,100.85 from the Fund on December 13, 2008, and he hasn't been paid yet.  He's suffering a great deal from the after-effects of his years of captivity and torture, and the payment is necessary to his recovery efforts.  We know that others have been paid, and we have called and emailed the Fund hotline several times, but all we're hearing is the general statement that payments are being processed.  Could you please direct me to someone who can explain the status of the processing of his payment?  Thank you so much.
>
> Best,
> Monique Abrishami
>
> 
>
> **Monique Abrishami**
> abrishamim@gilbertlegal.com
> O 202.772.2255

DA474

1100 New York Ave, NW
Suite 700
Washington, DC 20005
**GilbertLegal.com**

This email and any attachments may contain confidential information that is privileged at law. If you are not a named recipient or have received this communication by error, please notify the sender immediately and destroy this email and its attachments, and all copies thereof, without further distributing or copying them.

<Claim No. 1226.pdf>

# EXHIBIT R



1100 New York Avenue, NW
Suite 700
Washington, DC 20005
O 202.772.2200
F 202.772.3333

GilbertLegal.com

Scott D. Gilbert
202.772.2277
gilberts@gilbertlegal.com

June 20, 2019

**VIA ELECTRONIC MAIL**

Deborah L. Connor
Acting Special Master
U.S. Victims of State Sponsored Terrorism Fund
1400 New York Avenue NW
Washington, DC 20005

**Re:    Amir Hekmati, Claim No. 1226**

Dear Ms. Connor:

We write on behalf of our client, Amir Hekmati, with respect to U.S. Victims of State Sponsored
Terrorism Fund ("USVSST Fund") Claim No. 1226. After U.S. District Court Judge Huvelle ordered
Iran to pay Mr. Hekmati $63.5 million, Mr. Hekmati applied to the USVSST Fund for compensation.
On December 28, 2017, the USVSST Fund notified Mr. Hekmati that his eligible claim was
$31,748,179, subject to the $20 million statutory cap. Subsequently, on December 13, 2018, the
USVSST Fund awarded Mr. Hekmati a distribution of $839,100.85. It has been over six months since
then, and he has not received his distribution—a distribution that represents a fraction of his allowed
claim—despite others having received millions of dollars in payments. Every request to the USVSST
Fund for information about the timing for payment of his claim has met with a polite refusal to provide
any update other than a general confirmation that payments are being issued. A request to your office
for additional information was similarly rebuffed.

Mr. Hekmati, a U.S. veteran who survived a horrific trauma, should not be struggling in this
bureaucratic morass to receive a payment that Congress determined he is owed. This USVSST Fund
award represents an opportunity for Mr. Hekmati to begin rebuilding his life after an ordeal that left
lasting damage—and its delay in payment has a direct, negative effect on his ability to do so. In brief,
after completing two lengthy tours of duty in Iraq as a member of the U.S. Marine Corps, Mr. Hekmati
went to Iran to visit his grandmother, where he was arrested and falsely imprisoned. He survived four
and a half years of captivity and torture in a brutal Iranian prison. He was finally released on
January 17, 2016, but he continues to experience debilitating post-traumatic stress disorder and other
lasting psychological damage to this day. He needs the payment from the USVSST to support himself
in his recovery.

Deborah L. Connor
June 20, 2019
Page 2



This letter represents our final attempt to resolve this issue before we escalate the matter.  Please advise as to when Mr. Hekmati may expect to receive the USVSST Fund distribution he was awarded in December 2018.

Sincerely,

Scott D. Gilbert

Enclosures:    USVSST Fund letter to A. Hekmati dated December 28, 2017
               USVSST Fund letter to A. Hekmati dated December 13, 2018

# EXHIBIT S



1100 New York Avenue, NW
Suite 700
Washington, DC 20005
O 202.772.2200
F 202.772.3333

**GilbertLegal.com**

**Scott D. Gilbert**
**202.772.2277**
gilberts@gilbertlegal.com

July 16, 2019

**VIA ELECTRONIC MAIL**

Brian A. Benczkowski
Assistant Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530-0001

**Re:** **Amir Hekmati, U.S. Victims of State Sponsored Terrorism Fund ("USVSST Fund") Claim No. 1226**

Dear Mr. Benczkowski:

We write on behalf of our client, Amir Hekmati, a man who survived years of torture in an Iranian prison and who is now lost in a bureaucratic morass in his own government. In brief, after completing two lengthy tours of duty in Iraq as a member of the U.S. Marine Corps, Mr. Hekmati went to Iran to visit his grandmother, where he was arrested and falsely imprisoned. He lived through four and a half years of captivity and torture in a brutal Iranian prison. He was finally released on January 17, 2016, and when he returned to the United States, he filed suit against his former captors. After U.S. District Court Judge Huvelle ordered Iran to pay Mr. Hekmati $63.5 million, Mr. Hekmati applied to the USVSST Fund for compensation. On December 28, 2017, the USVSST Fund notified Mr. Hekmati that his eligible claim was $31,748,179, subject to the $20 million statutory cap. Subsequently, on December 13, 2018, the USVSST Fund awarded Mr. Hekmati an initial distribution of $839,100.85. Our understanding was that payments of all such distributions would be made in early 2019.

It has been seven months since then, and Mr. Hekmati has not received his distribution—a distribution that represents a fraction of his allowed claim—despite numerous other claimants having received collectively hundreds of millions of dollars in payments. Every request to the USVSST Fund for information about the timing for payment of his claim has been met with a polite refusal to provide any update other than a general confirmation that payments are being issued. A June 20, 2019 letter to Deborah Connor, Acting Special Master of the USVSST Fund, was similarly rebuffed.

Mr. Hekmati, a U.S. veteran who survived a horrific trauma, should not be struggling in red tape to receive a payment that Congress—and the USVSST Fund—unambiguously determined he is owed. Although Mr. Hekmati was released from the Iranian prison years ago, he continues to experience

Brian A. Benczkowski
July 16, 2019
Page 2



debilitating post-traumatic stress disorder to this day.  This USVSST Fund award represents an opportunity for Mr. Hekmati to support himself in his recovery and begin rebuilding his life after an ordeal that left lasting damage—and its delay in payment has a direct, negative effect on his ability to do so.

We elevate this to your office in the hopes that Mr. Hekmati's situation will finally receive the attention it is due.  Please advise as to when Mr. Hekmati may expect to receive the USVSST Fund distribution he was awarded in December 2018.

Sincerely,

Scott D. Gilbert
Monique T. Abrishami


Enclosures:     USVSST Fund letter to A. Hekmati dated December 28, 2017
                USVSST Fund letter to A. Hekmati dated December 13, 2018
                S. Gilbert letter to D. Connor dated June 20, 2019

DA481

# EXHIBIT T

 **GILBERT** LLP

1100 New York Avenue, NW
Suite 700
Washington, DC 20005
O 202.772.2200
F 202.772.3333

GilbertLegal.com

**Scott D. Gilbert**
202.772.2277
gilberts@gilbertlegal.com

October 11, 2019

**BY ELECTRONIC MAIL**

Deborah L. Connor
Acting Special Master
U.S. Victims of State Sponsored Terrorism Fund
1400 New York Avenue, NW
Washington, DC 20005

**Re:    Amir Hekmati, Claim No. 1226**

Dear Ms. Connor:

We write on behalf of our client, Amir Hekmati, with respect to U.S. Victims of State Sponsored Terrorism Fund ("USVSST Fund") Claim No. 1226. As you know, nearly ten months have passed since the USVSST Fund awarded Mr. Hekmati a distribution of $839,100.85 as the 2019 partial payment of a $63.5 million judgment against the Government of Iran for his wrongful detention and brutal torture. Despite other claimants having received millions of dollars in payments, Mr. Hekmati has yet to receive a penny of his distribution.

As noted in our June 20, 2019 and July 16, 2019 letters to you and Acting Attorney General Brian Benczkowski, respectively, the USVSST Fund has refused to provide any information whatsoever regarding its failure to make the required payment of Mr. Hekmati's claim, despite months of repeated requests. Your July 30, 2019 letter "acknowledged" these requests but again declined to address them.

We now are well into the fourth quarter of 2019, and Mr. Hekmati has not received either the payment due from the USVSST Fund or even the courtesy of an adequate explanation. This letter serves to notify you that if Mr. Hekmati does not receive payment from the USVSST Fund in the next fifteen (15) days, our firm will file suit against both you and the Department of Justice.

Sincerely,

Scott D. Gilbert

# EXHIBIT U

DA484

October 24, 2019

VIA ELECTRONIC and FIRST CLASS MAIL

AMIR M HEKMATI
C/O SCOTT D. GILBERT
GILBERT LLP
1100 NEW YORK AVE. NW SUITE 700
WASHINGTON, DC 20005

Claim No: 1226

Dear Mr. Gilbert:

      The U.S. Department of Justice ("Department") is in receipt of your letter dated October 11, 2019. This letter serves to inform you and your client, Amir Hekmati, that the Department intends to seek reconsideration of the prior eligibility determination and approval of Mr. Hekmati's claim dated December 13, 2018, and therefore has suspended any further action on the payment to Mr. Hekmati from the United States Victims of State Sponsored Terrorism Fund. The matter will be referred for reconsideration to Mr. Kenneth R. Feinberg, who made the original determination on your claim. Mr. Feinberg will examine whether the conditions for compensation and payment under the applicable statute and procedures have been satisfied. The Department is in the process of retaining Mr. Feinberg, on a limited basis, for this purpose. Once he is again in place as Special Master, the Department expects to proceed with reconsideration as expeditiously as possible. You will receive notice of any further decision once the review process has been completed and, if the claim is not approved, will have an opportunity to request a hearing. *See* 34 U.S.C. § 20144(b)(4). We appreciate your patience and hope to resolve this matter as soon as possible.

Sincerely,

Deborah L. Connor
Interim Special Master
U.S. Victims of State Sponsored Terrorism Fund

# EXHIBIT V



**U.S. Department of Justice**
**U.S. Victims of State Sponsored Terrorism Fund**

P.O. Box 10299
Dublin, OH 43017-5899

January 15, 2020

VIA U.S. MAIL & ELECTRONIC MAIL

Scott Gilbert, Esq.
Gilbert LLP
1100 New York Avenue NW Suite 700
Washington, DC 20005

  Re: <u>Amir Hekmati, Claim No: 1226</u>

Dear Mr. Gilbert:

  The Department of Justice ("Department") requested that I reconsider the claim referenced above to examine whether the requirements for compensation and payment under the U.S. Victims of State Sponsored Terrorism Fund's ("USVSST Fund") governing statute and procedures have been satisfied.  The Department provided me with information (attached) that was not before me at the time of my earlier eligibility and payment determinations.  I have reviewed the materials submitted by the Department and have completed this reconsideration.

  Based on all of the information Mr. Hekmati submitted in his application to the USVSST Fund, and the attached materials the Department provided to me for reconsideration, I have determined that Mr. Hekmati is not eligible for compensation from the USVSST Fund.

  As you know, "any payment made by the [USVSST] Fund is expressly conditioned upon the truthfulness and accuracy of the information and documentation submitted in support of the claim." *Justice for United States Victims of State Sponsored Terrorism,* 81 Fed. Reg. 45,535, 45,539 (July 14, 2016).  The USVSST Fund's procedures and the Application Form require every claimant to certify, under oath and subject to penalty of perjury, the truth and accuracy of the application.

  Mr. Hekmati certified that his application, including the accompanying documents such as the judgment he obtained in *Hekmati v. Islamic Republic of Iran,* Case No. 1:16-cv-00875-ESH (D.D.C.), were true and accurate to the best of his knowledge.  I am persuaded that the attached materials demonstrate that Mr. Hekmati's application and accompanying documents contained material omissions and false statements; in particular, the attached materials support the conclusion that the primary purpose of Mr. Hekmati's trip to Iran was to sell classified U.S. national security information to the government in Iran.  This conflicts with Mr. Hekmati's declaration filed in connection with the judgment he obtained in the U.S. District Court for the District of Columbia that the primary purpose of his trip to Iran was to visit family for personal reasons.  Therefore, I have determined that Mr. Hekmati has violated the USVSST Fund's processes and procedures, which are required to establish eligibility for payment, and as a result, is not eligible for payment from the USVSST Fund.

U.S. Victims of State Sponsored Terrorism Fund
Amir Hekmati, Claim No: 1226

  Under 34 U.S.C. § 20144(b)(4), Mr. Hekmati may request a hearing within 30 days after receipt of this decision.  To request a hearing, please notify the USVSST Fund and me in writing of your hearing request by emailing the USVSST Fund at usvsst.doj@usdoj.gov and me at KFeinberg@feinberglawoffices.com.

     Sincerely,

     Kenneth R. Feinberg
     Special Master
     U.S. Victims of State Sponsored Terrorism Fund

Attachments:

Record for Special Master
Fed. Bureau of Investigation Forms FD-302 (Feb. 2, 2016 and May 9, 2016)

# EXHIBIT W

DA489

FD-302 (Rev. 5-8-10)



UNCLASSIFIED//FOUO

## FEDERAL BUREAU OF INVESTIGATION

Date of entry    02/02/2016

(U//FOUO) On Tuesday, 01/19/2016, AMIR NEMA HEKMATI, date of birth (DOB) ███████, was interviewed by Special Agent (SA) Brett Kramarsic and SA Richard A. Anderson at the Landstuhl Regional Medical Center (LRMC) in Landstuhl, Germany. Major Neysa M. Etienne, SERE [Survival, Evasion, Resistance and Escape] Psychologist, telephone number ████████0, official e-mail address ████████, personal e-mail address ████████, and Master Sergeant (MSgt) Toby A. Stolz, US Air Force SERE Specialist, telephone number ████████, official e-mail address t████████ personal e-mail address ████████ also participated in the interview. This interview, which took place at approximately 2:30 PM local time, was the second FBI interview of HEKMATI conducted on 01/19/2016 at the LRMC. The FBI SAs identified themselves to HEKMATI during the previous 01/19/2016 interview, which will be documented separately. After SA Anderson thanked HEKMATI for agreeing to speak with the FBI again, HEKMATI provided the following information, some of which was requested by SERE personnel to clarify or expand upon matters discussed during the previous interview:

(U//FOUO) HEKMATI indicated that he was initially arrested in Iran by two (2) older males in their 40s or 50s who identified themselves as being from the Office of Passport Control or the Passport Authority. The arrest took place at approximately 2:00 PM local time. The men effecting the arrest searched HEKMATI's luggage and instructed HEKMATI to come with them for questioning about matters related to his passport. HEKMATI was transported in a vehicle to an office, where he was instructed to list out his family members and write a resume for himself. HEKMATI's electronics, including a laptop computer and a cellphone, as well as his books, were seized by the Iranian officials. HEKMATI's clothes were not seized at that time. HEKMATI stated that his cellphone, but not his laptop, was ultimately returned to him upon his 2016 release from Iranian prison.

(U//FOUO) HEKMATI indicated that the arresting officials conducted a casual search but did not pat down HEKMATI. Once HEKMATI was transported to Evin Prison, he was subjected to a full search, including a pat down when he changed clothes and was stripped down to his underwear.

(U//FOUO) Regarding the Iranian's use of physical restraints, HEKMATI

UNCLASSIFIED//FOUO

---

Investigation on   01/19/2016   at   Landstuhl, Germany (In Person)

File #   ███ WF-244323                                         Date drafted   01/20/2016

by   ANDERSON RICHARD A, Brett M. Kramarsic

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

DA490

FD-302a (Rev. 05-08-10)

**UNCLASSIFIED//FOUO**

 WF-244323

01/19/2016 Interview of AMIR HEKMATI
Continuation of FD-302 of  (Interview #2)                        , On  01/19/2016 , Page  2 of 5

stated that during his initial arrest, there were two men on either side of
him in the vehicle used to transport him, plus a driver. He noted that they
did not restrain HEKMATI with handcuffs during the initial transport.
HEKMATI also noted that later during his imprisonment, Iranian officials
used set of cuffs that only attached to two fingers, one on each hand.

(U//FOUO) Regarding whether or not he had ever contemplated escape, HEKMATI
indicated that he thought about it all the time, but that it was more of a
dream than a realistic proposition, as he believed that no one had ever
escaped from Evin Prison. HEKMATI stated that Evin Prison was bounded by
mountains on one side, with a highway on the other side. Evin Prison was
surrounded by a twenty (20) meter tall wall that had a ten (10) meter
trench surrounding it, requiring one to climb 20 meters over the wall and
then descend 30 meters. At some point during his captivity, HEKMATI
reported that he was taken to a hospital [in context, understood to mean a
hospital in Tehran]. He indicated that Tehran was so saturated with cameras
and security that even if he managed to briefly escape, there would be
nowhere to go. During his trip to the hospital, HEKMATI purchased snacks
for Iranian soldiers he interacted with, who reportedly are not paid and
have little food. He indicated that the soldiers were extremely grateful
for this.

(U//FOUO) HEKMATI indicated that there was a ward of Evin Prison dedicated
to Al Qaeda prisoners. He stated that three (3) prisoners from this ward
were brought to Ward 350. These individuals were all Kurds.

(U//FOUO) According to HEKMATI, Evin Prison was mostly run by the prisoners
themselves. He stated that there were only about twenty (20) actual staff
members at Evin Prison, with fellow prisoners doing most of the work. He
stated that there were about 8000 prisoners in Evin Prison.

(U//FOUO) HEKMATI stated that prisoners had access to prison phones, which
were believed to be monitored. Some prisoners had cell phones smuggled in
to the prison, sometimes by individuals coming to the prison for conjugal
visits. HEKMATI indicated that many or all prisoners could have conjugal
visits, and that additional conjugal visits could be earned by working jobs
within the prison.

(U//FOUO) Regarding interrogations, HEKMATI estimated that he was
interrogated approximately twenty (20) times during his imprisonment. He
did not know if the interrogations were recorded, as he was blind folded
and/or facing a wall when the interrogations were conducted. The
interrogations took place in a sound proof room that HEKMATI compared to a
recording room about the size of the room in which the instant interview

UNCLASSIFIED//FOUO

 WF-244323

01/19/2016 Interview of AMIR HEKMATI
Continuation of FD-302 of (Interview #2) , On 01/19/2016 , Page 3 of 5

was being conducted. [AGENT NOTE: The instant interview was conducted in a room roughly estimated to be 14' x 10'.] As part of the interrogation process, HEKMATI was forced to write out his biography two separate times.

(U//FOUO) At approximately 2:50 PM during the instant interview, HEKMATI was offered and accepted a bottle of water.

(U//FOUO) HEKMATI described one of his cells at Evin Prison as having very thick walls, a low roof, no window, and a little opening covered by a perforated metal cover to allow for ventilation. The door to the cell was very heavy with a tiny latch. The door only had a mechanical handle on the outside, which was operated by turning counter clockwise. The door reportedly opened outwards from the cell.

(U//FOUO) HEKMATI relayed information he had acquired alleging that a sandwich seller who worked outside of the Israeli Embassy in Turkey was actually a spotter for the IRGC [Islamic Revolutionary Guard Corps]. He also indicated that of about 100 prisoners in Ward 350 who were imprisoned for working for a foreign government [in context, understood to mean as a spy], 30 were accused of working for the United States, and 70 were accused of working for Israel. Some of these prisoners told HEKMATI that they had contacted the CIA through the CIA website. The CIA would then arrange for them to travel to a third country in the Middle East or elsewhere, presumably for a meeting. HEKMATI indicated that the prisoners told him that when they were arrested by Iranian officials, they were confronted with the names of their CIA handling officers and with e-mails between themselves and the handling officers. Some of these prisoners indicated that three years had passed between when they had last contacted the CIA and when they were arrested.

(U//FOUO) Regarding the time period when HEKMATI worked as an intelligence analyst for the US Government in Afghanistan, HEKMATI was asked if he ever accessed classified reporting regarding Iran. HEKMATI refused to answer this question; instead, HEKMATI indicated that the FBI could find out that information for itself by pulling the log information. When asked if he had ever read paper copies of classified reporting on Iran, HEKMATI avoided the question, instead saying that he had a "TS" [Top Secret] clearance including SI, TK, and Gamma accesses. He stated that he had been tasked as an intelligence analyst to study "messaging." HEKMATI indicated that his superiors did not know what he was actually supposed to do and that it felt like they were wasting his time, which was part of why he quit the job after just a few months. He indicated that he had worked on one or more projects related to cell towers in Afghanistan and Taliban targeting. He

FD-302a (Rev. 05-08-10)

**UNCLASSIFIED//FOUO**

 WF-244323

01/19/2016 Interview of AMIR HEKMATI

Continuation of FD-302 of (Interview #2)  , On  01/19/2016 , Page  4 of 5

stated that there was no oversight over what he was supposed to do and that he did not understand what the mission was.

(U//FOUO) HEKMATI rejected the proposition that he might have been targeted because he had access to classified information on Iran. He stated that he had been targeted because he was a Marine. He believed that his arrest was connected to or in response to the US arrest of an Iranian who had attempted to assassinate a Saudi Arabian ambassador.

(U//FOUO) Regarding whether or not HEKMATI's Iranian interrogators had attempted to extract classified information from him, HEKMATI indicated that although the interrogators knew what his job was in Afghanistan, they did not spend much time exploring that topic. He indicated that he would have thought they would have asked for more information. He stated that the interrogators spent as much time talking about his time in high school as they did on his time as an intelligence analyst in Afghanistan.

(U//FOUO) Regarding how widely it was known that HEKMATI had a Top Secret security clearance, HEKMATI stated that his family in Iran did not know that he had held a TS clearance. He stated that only his co-workers knew about the TS clearance, as he only had it for about two months. However, HEKMATI indicated that internet searches on his name would reveal that he had worked for DARPA. He also referenced his Linked In account. HEKMATI noted that he had previously only held a Secret security clearance.

(U//FOUO) HEKMATI stated that he was not aware of anything that would make him suspicious that he had been under surveillance while in Afghanistan, nor did he recall any suspicious individuals contacting him. He indicated that he had worked long hours for the brief two months he was there, and spent all his time on the compound [other than work time] either at the mess hall, the gym, or his lodging.

(U//FOUO) HEKMATI similarly denied any suspicious events such as surveillance or unusual contact by individuals after he left Afghanistan and traveled to Dubai. He stated that he was in Dubai only for about 48 hours and that he spoke to no one while he was there. He did make two calls back to the US, one of which was a call to the company he had just resigned from to discuss issues related to his resignation.

(U//FOUO) Once HEKMATI arrived in Iran, his only contact with Iranian government officials prior to his arrest was an interview that was conducted immediately upon his arrival in Tehran. He denied any other contact with Iranian government officials after this interview until he was arrested several weeks later.

**UNCLASSIFIED//FOUO**

DA493

FD-302a (Rev. 05-08-10)

**UNCLASSIFIED//FOUO**

 WF-244323

01/19/2016 Interview of AMIR HEKMATI
(Interview #2)

Continuation of FD-302 of _____ , On  01/19/2016 , Page  5 of 5

(U//FOUO) HEKMATI was shown a series of photographs and asked if he
recognized any of the individuals from his time in Iran or in Evin Prison.
HEKMATI correctly identified several photographs of ROBERT LEVINSON, but
explained that this was only because LEVINSON's likeness was publicly
known. He indicated that he had not seen LEVINSON at any time while in
Iran. For all other photographs shown during the interview, HEKMATI
indicated that he did not recognize the individuals and had not seen them
while in Iran. For one photograph, HEKMATI did indicate that the man in the
photograph looked similar to many Iranian men, but ultimately answered that
he could not identify or recognize the individual.

(U//FOUO) With regards to ROBERT LEVINSON, HEKMATI discussed another
individual who had been a part of the prisoner release that freed HEKMATI.
This individual, named Fred [in context, understood to be a reference to
NOSRATOLLAH KHOSRAVI], claimed that the reason he had been arrested by the
Iranians was that he had sent a text message to LEVINSON. Fred/KHOSRAVI
reportedly elected not to leave Iran with HEKMATI and the other freed
individuals because there were pending charges against him in the US and
because he claimed to have a girlfriend in northern Iran.

(U//FOUO) The instant interview of HEKMATI ended at approximately 3:30 PM,
local time. HEKMATI was offered and accepted a cup of coffee during the
last approximately 30 minutes of the interview.

FD-302 (Rev. 5-8-10)

- 1 of 7 -



**FEDERAL BUREAU OF INVESTIGATION**

Date of entry    05/09/2016

**DOCUMENT RESTRICTED TO CASE PARTICIPANTS**
This document contains information that is restricted to case participants.

██████     AMIR NEMA HEKMATI, date of birth ████████████ social security
account number ████████████, home address
████████████ was interviewed at the Detroit Field Office – Flint Resident
Agency (RA), on 4/7/2016 by Special Agents (SA) William R. Theroux and
Melinda B. Capitano. Interviewing agents approached HEKMATI's residence at
approximately 0945 hours, at which time they identified themselves and
advised HEKMATI of the purpose of the interview. HEKMATI voluntarily agreed
to go to the Flint RA to speak with the agents. Due to the fact HEKMATI had
no vehicle available to him, HEKMATI requested the agents drive him to his
mother's work location at H&R Block to get his vehicle. SA Ian G. Riddle
drove the interviewing agents and HEKMATI to H&R Block. While at H&R Block,
HEKMATI asked interviewing agents if they would speak to his attorney. SA
Capitano stated she would speak to his attorney at a later time from a
landline. HEKMATI provided his attorney's name as Scott Gilbert, telephone
number ████████████. HEKMATI subsequently followed the interviewing agents
in his own vehicle to the Flint RA, where HEKMATI was again informed the
interview was voluntary and he could leave at any time. Interviewing agents
offered HEKMATI a bottle of water, which he accepted and drank throughout
the interview. Also, at this point, HEKMATI knew interviewing agents had
not yet spoken with his attorney and continued to speak with interviewing
agents. HEKMATI provided the following information:

██████     SA Theroux provided HEKMATI a detailed summary of the FBI's
investigation into him and his activities beginning in January 2011 in
Iraq, continuing through his deployment to Afghanistan and on through his
arrest and detainment in Iran. HEKMATI sat still through the presentation,
appeared to have listened attentively and at no time interrupted SA
Theroux. During this presentation, SA Theroux confronted HEKMATI by telling
him the FBI knew HEKMATI went to Afghanistan to gain access to classified



Investigation on   04/07/2016   at   Flint, Michigan, United States (In Person)

File #   ██ WF-244323-302                                    Date drafted   04/11/2016

by   CAPITANO MELINDA B, Theroux William R

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

WF-244323-302

Continuation of FD-302 of ▮▮▮▮▮ 7 April 2016 interview of Amir .On 04/07/2016 .Page 2 of 7

information in order to travel to Iran and sell this information to the
Iranian government. In response, HEKMATI inquired whether SA Theroux was
asking a question.

**Reason for leaving Afghanistan / returning home early**

HEKMATI stated he resigned from his position as an Intelligence
Analyst (IA) with Six3 Systems at Bagram Air Force Base (BAFB) in
Afghanistan in 2011 to return to Michigan to pursue his Master's degree.
HEKMATI was shown by interviewing agents an email he sent to the University
of Michigan (UM) - Flint Admission on 6/2/2011, before he deployed to
Afghanistan, indicating he needed to defer his admission to January of 2012
because he was leaving for a military deployment overseas. When
interviewing agents asked HEKMATI why everyone to include his colleagues
and employer all thought HEKMATI was traveling directly from Afghanistan to
the U.S. to pursue his graduate degree, HEKMATI indicated he was returning
to the U.S. to attend UM - Dearborn, not UM - Flint.

In August 2011, after HEKMATI resigned from Six3 Systems at BAFB,
HEKMATI traveled to Iran to visit his grandmother, who he had never
visited. HEKMATI only told his mother of his plan to travel to Iran.
HEKMATI did not tell any of his associates or colleagues in Afghanistan
about his intentions to travel to Iran. HEKMATI did not understand why he
would tell anyone he was going to Iran. Interviewing agents brought up
ROLAND TISO and GABRIEL SERRANO and HEKMATI responded they are merely
associates he met in Afghanistan and nothing more.

**Dubai**

HEKMATI advised he took a commercial flight from BAFB to Dubai,
United Arab Emirates. After he landed in Dubai, HEKMATI purchased an
airline ticket to Tehran, Iran. Interviewing agents reminded HEKMATI he
previously informed FBI agents in Germany, he only spent one night in Dubai
and flew out the next day and that he did not have time to do anything else
before departing. HEKMATI stated it was true he did not have time to do
anything else. When challenged by the interviewing agents that records
indicated HEKMATI arrived in Dubai in the evening around 5:00 pm local
time, spent the next day there and then flew to Iran the following day,
HEKMATI did not deny the timeline and commented he never met with anyone.

**Iran**

HEKMATI advised he was incarcerated in Iran because he was a U.S.
Marine. Interviewing agents proposed to HEKMATI he only had contact with
Iranian officials because he approached them and made them aware he had
access to classified information. HEKMATI reiterated his interaction with

WF-244323-302

Continuation of FD-302 of ~~the Iranian government was solely because he was a U.S. Marine.~~    On    04/07/2016    Page    3 of 7

opined Iranian officials learned he was a U.S. Marine when they "Googled" him and looked at his Facebook page which showed HEKMATI's affiliation as a U.S. Marine. HEKMATI did not provide any classified information to Iranian officials.

**Iranian Passport**

Interviewing agents showed HEKMATI a copy of his expired Iranian passport. HEKMATI was not aware he had an Iranian passport until his mother provided it to HEKMATI for the purpose of providing it to Legal Persian. HEKMATI stated he was about 14 years old in the photo. HEKMATI's mother still maintains HEKMATI's Iranian passport. HEKMATI has never indicated on any U.S. government forms or applications that he had the Iranian passport because he was not aware of it when he completed those forms.

**Common Access Card (CAC)**

Interviewing agents showed HEKMATI a photo copy of his Department of Defense (DoD) civilian employee Common Access Card (CAC) [Agent's note: The picture of the CAC shown to HEKMATI was pulled from an online Internet video which appeared to have been produced in concert with the Iranian government. In the video, HEKMATI confessed to being a CIA spy. It appeared from the video the Iranian government was in possession of HEKMATI's actual CAC, or a picture of it.] HEKMATI admitted he took a picture of his CAC with his cell phone. HEKMATI pointed to the thumb and fingers in the photo and stated he was holding the CAC when the photo was taken. HEKMATI explained he took a photo of his CAC, so he would have a photo of it in the event he lost the actual card. HEKMATI stated he turned in his CAC to BAFB before departing for Dubai. When interviewing agents reminded HEKMATI that Six3 Systems instructed him to turn his CAC to a U.S. base upon his return to the U.S. and then mail Six3 Systems a receipt of the return, HEKMATI remained silent. Interviewing agents also reminded HEKMATI he had told FBI agents in Germany he destroyed his CAC before traveling to Iran. In response, HEKMATI indicated he could not remember, and that "maybe" this occurred. HEKMATI denied using his CAC as "bona fides" in any approach to the Iranians.

Interviewing agents showed HEKMATI a copy of his Armed Forces U.S. military identification card. HEKMATI stated this card was currently at his home in Flint and he did not take it with him when he went to Afghanistan and Iran. HEKMATI pointed to the expiration date on the card, which was shown as 2009, and stated it was expired. [Agent's note:  The picture of the Armed Forces U.S. military identification card shown to HEKMATI was pulled from an online Internet video which appeared to have

FD-302a (Rev. 05-08-10)

WF-244323-302

7 April 2016 interview of Amir

Continuation of FD-302 of ~~been produced in concert with the Iranian government~~  On 04/07/2016 , Page 4 of 7

~~been produced in concert with the Iranian government. In the video, HEKMATI~~
confessed to being a CIA spy.]



WF-244323-302

Continuation ▮▮▮▮▮    7 April 2016 interview of Amir    ▮ 04/07/2016 ▮ 5 of 7



### BAFB – Analyst experience

HEKMATI's Secret level clearance was upgraded to TS/SCI when he was still in Iraq working for Human Terrain Systems (HTS). HEKMATI used the TS/SCI clearance to obtain the IA position at BAFB for Six3 Systems. Interviewing agents confronted HEKMATI with reporting that when he arrived in Kabul, Six3 Systems management attempted to move him to another position other than the IA position, which he refused to accept because he came to Afghanistan to work with TS information. HEKMATI denied he took the IA position to gain access to classified information.

HEKMATI accepted the IA position because he wanted to develop IA experience to be more competitive in obtaining a full-time U.S. government job. When interviewing agents discussed with HEKMATI what a reasonable period of time would be for him to gain that experience, HEKMATI acknowledged at least one year. HEKMATI further stated he was willing to

FD-302a (Rev. 05-08-10)

WF-244323-302

Continuation of FD-302 of ___7 April 2016 interview of Amir___ , On 04/07/2016 , Page 6 of 7

~~stay in Afghanistan one, two, or even three years~~ if ~~he was receiving good~~ job experience as an analyst. Since the IA position was not what HEKMATI thought it would be and he was not getting good experience, HEKMATI left the position after a short period of time.

Interviewing agents showed HEKMATI emails between him using email address _____ and Hessam Mirzaei using email address _____. Specifically, HEKMATI was shown an email dated 6/6/2011, in which HEKMATI wrote, "So I plan on going in October and just want to be sure that my Visa is good for 1 year and that I can stay for up to 3 months without having any problems." Interviewing agents informed HEKMATI this email indicated he had no intention to stay in Afghanistan beyond four months, not to mention one, two, or three years as he previously stated to interviewing agents. HEKMATI stated since the email indicated he planned to go in October and he actually went in August, the email meant nothing. Interviewing agents pointed out to HEKMATI his email showed clear intent by him to spend a very limited period of time in Afghanistan before he even arrived there and realized the IA position was not what he thought it would be. HEKMATI denied this was his intent.

HEKMATI acknowledged he could potentially lose his clearance if he traveled to Iran. HEKMATI could not reconcile the discrepancy between his previous statement of wanting to acquire experience as an analyst to obtain a full-time U.S. government job and a pre-planned willingness to jeopardize his security clearance by traveling to Iran.

**Bonuses / Financial situation**

Interviewing agents showed HEKMATI an email he sent Gretchen Klugh at Six3 Systems on 6/28/2011. In this email, HEKMATI indicated he did not want to receive his six or twelve month bonuses up front because he did not want to pay them back or have a tax liability if he did not stay in Afghanistan for those periods of time. Interviewing agents pointed out to HEKMATI the email was sent before he entered Afghanistan, before he would have realized the analyst position did not meet his expectations; further, it showed HEKMATI did not intend to stay in Afghanistan even six months. HEKMATI denied this being the case.

HEKMATI indicated he did not need to "sell" information to the Iranians because he did not need money. When the interviewing agents suggested HEKMATI wanted money and referenced $500,000, HEKMATI stated he had $500,000. HEKMATI did not need money and the FBI should know that. When interviewing agents indicated the FBI did know and HEKMATI did not have $500,000 in the bank, HEKMATI stated he had it but it was not "liquid." When interviewing agents opined that HEKMATI took advantage of the

WF-244323-302

Continuation of FD-302 of ___ 7 April 2016 interview of Amir ___ , On 04/07/2016 , Page 7 of 7

~~opportunity to make a quick buck regardless of his net worth at the time,~~ HEKMATI queried as to why he would do that when he had all of these bonuses coming in. When interviewing agents responded that HEKMATI did not have any bonuses coming in because of the aforementioned email where HEKMATI specifically asked not to receive them up front with the knowledge he was not going to stay in Afghanistan for six months, HEKMATI provided no response.

**Polygraph**

HEKMATI has taken a polygraph before and passed it. When interviewing agents explained to HEKMATI he took the aforementioned polygraph prior to his activities in Afghanistan and Iran, and inquired as to whether or not he would take a polygraph now, HEKMATI agreed to take an FBI polygraph. At the end of the interview, HEKMATI stated he would only take an FBI polygraph if he was charged, went to court and then was made to take a polygraph. HEKMATI asked if he was being charged with a crime. Interviewing agents informed HEKMATI he was not charged, but they would present the findings of the investigation to the United States Attorney's Office.

HEKMATI did not know if his attorney possessed a U.S. government security clearance. HEKMATI was informed by interviewing Agents that if his attorney did not have a clearance, the interviewing agents would not be able to provide him/her any of the information they provided to HEKMATI.

The interview of HEKMATI ended at approximately 1330 hours.

RECORD FOR SPECIAL MASTER

1.  The FBI opened an espionage investigation on AMIR NEMA HEKMATI on September 21, 2011.
    The FBI investigation has concluded that HEKMATI attempted to pass U.S. classified
    information to the Government of Iran, and this conclusion is corroborated by multiple reliable
    sources.  HEKMATI was an Intelligence Analyst contractor for the Department of Defense
    (DOD) in Afghanistan from June 2011 to August 2011.  In this position, HEKMATI held a
    security clearance that granted him access to intelligence reports classified at the highest level -
    Top Secret/Sensitive Compartmented Information (TS/SCI).

2.  When HEKMATI arrived in Afghanistan, he was told he was reassigned as a Human Terrain
    Systems (religious advisor) member instead of an Intelligence Analyst.  HEKMATI became upset
    and indicated that, if he was not given the Intelligence Analyst position, he would immediately
    resign and go home.  HEKMATI argued he was hired as an Intelligence Analyst, which would
    require routine access to TS/SCI information, while as a religious advisor he would not.

3.  While deployed to Bagram Air Force Base in Afghanistan, HEKMATI was assigned to work on
    projects related to the Afghan Taliban and the Haqqani network.  However, forensic analysis of his
    classified information computer system audit revealed that he accessed hundreds of highly
    classified documents pertaining to Iran, which were all well outside the scope of his assigned
    duties.  FBI analysis determined that, during the period from early July 2011 to early August 2011,
    over 90% of the classified products he accessed were related to Iranian topics/issues.  The topics
    related to Iran included discussion of Iranian military issues, the Iranian nuclear program,
    Hezbollah, and Iranian support to terrorism.  The products were classified up to and including the
    TS/SCI level.

4.  In late July 2011, HEKMATI unexpectedly provided two weeks' notice that he intended to
    terminate his employment.  Although his original employment agreement was for six to twelve
    months, HEKMATI resigned from his Defense Intelligence Agency contract position within two
    months of his arrival in Afghanistan.  During his final two weeks, HEKMATI began working the
    night shift at his request / decision.  In those two weeks, FBI analysis indicates that, once again,
    approximately 90% of the products HEKMATI viewed appeared to be outside the scope of his
    assigned duties and an unusually high percentage were highly classified products.

5.  In August 2011, HEKMATI took a military charter flight from Bagram Air Force Base in
    Afghanistan to a third country.  After he landed in the third country, he purchased an airline
    ticket to Tehran, Iran.  HEKMATI did not tell any of his colleagues or associates in
    Afghanistan about his intentions to travel to Iran.  HEKMATI later stated to the FBI that he
    had only told his mother about his plan to travel to Iran to visit his grandmother.  Records
    indicate that HEKMATI arrived in the third country in the evening around 5 p.m. local time,
    spent the next day there, and flew to Iran the following day.

DA502

6. Throughout the investigation the FBI has received information from four reliable sources. Those sources confirm that HEKMATI voluntarily traveled to Iran and approached Iranian government officials offering U.S. classified information in exchange for payment.

7. In December 2011, the Iranian government publically released information indicating HEKMATI was arrested as a CIA spy for engaging in espionage against Iran. HEKMATI was sentenced to death, but open sources reported that HEKMATI had been retried in December 2013 and sentenced to ten years in prison. The FBI has confirmed that HEKMATI was never employed or tasked by the CIA.

8. On January 19, 2016, HEKMATI was released from Iranian custody. Following his release, the FBI interviewed HEKMATI at Landstuhl Regional Medical Center near Frankfurt, Germany. HEKMATI stated that he had always wanted to travel to Iran to visit his grandmother and other relatives. Regarding the time period when HEKMATI worked as an Intelligence Analyst for the U.S. government in Afghanistan, HEKMATI was asked if he ever accessed classified reporting regarding Iran. HEKMATI refused to answer this question; instead, HEKMATI indicated that the FBI could find out that information for itself by pulling the log information. When asked if he had ever read paper copies of classified reporting regarding Iran, HEKMATI avoided the question, instead saying that he had a "TS" clearance including SI, TK, and Gamma accesses [references to SCI programs].

9. Several months later, on April 7, 2016, the FBI interviewed HEKMATI in Flint, Michigan. In this interview, the FBI directly confronted HEKMATI, alleging that he went to Afghanistan to gain access to classified information in order to travel to Iran and sell it to the Government of Iran. In response, HEKMATI only inquired whether the FBI agent was asking a question. Interviewing agents showed HEKMATI a "search log" that detailed HEKMATI'S search activity on U.S. classified computer systems. The agents also explained to HEKMATI that approximately 90% of the searches he conducted were about Iran or issues of interest to Iran, unrelated to his assigned work. HEKMATI looked at the search log and denied this was a log of his search activity. When it was explained again this was a detailed search log of his searches, HEKMATI stated he did not have time to access classified reporting about Iran because he had too much work and was already working 12 to 13 hour days.

10. HEKMATI indicated his contractor and the military provided him access to U.S. classified systems and the interviewing agents should ask them why HEKMATI searched those topics on Iran. Interviewing agents explained that line of logic did not make sense and there was an expectation by the granting agency of his security clearance, in this case the U.S. military, he should only access information needed for his assignment. HEKMATI reiterated to ask his contractor or the military. HEKMATI further stated that his contractor and the military gave him access to U.S. classified computer network systems at large and did not restrict his access so he should be allowed to view whatever he viewed.

11. HEKMATI remembered being briefed into the TS/SCI clearance level.  When interviewing agents asked HEKMATI if he understood he did not have a "need to know" pertaining to classified reporting on Iran, HEKMATI deflected and reiterated his contractor and the military gave him "no direction."  HEKMATI indicated that his superiors did not know what he was actually supposed to do and because of this HEKMATI had to find things to do to fill his day.  As a result, HEKMATI felt that his Intelligence Analyst position was a waste of time.  When interviewing agents pointed out the contradiction between HEKMATI having to find things to do to fill his day with HEKMATI'S earlier claim he was too busy working 12 to 13 hours a day to search for information on Iran, HEMATI did not provide a response.

12. After alternating between not responding and deflecting when interviewing agents asked HEKMATI why he accessed classified reporting on Iran, HEKMATI finally responded he accessed classified information regarding Iran to become a subject matter expert on Iran. HEKMATI stated he is of Iranian descent, was curious, and compared his searches on U.S. classified information systems to a "Google" search.

13. When the interviewing agents explained to HEKMATI that he accessed a certain classified document regarding the Iranian government's presence in a certain country twice in August 2011, just before he left for the same third party country to continue onward to Iran, HEKMATI did not acknowledge accessing the document or doing anything in the third party country other than transiting to Iran.  HEKMATI said he never purposely met with the Iranian government prior to his imprisonment in Iran.

14. HEKMATI said he accepted the Intelligence Analyst position because he wanted to develop intelligence analysis experience to be more competitive in obtaining a full-time U.S. government job.  HEKMATI acknowledged to the interviewing agents that he could potentially lose his clearance if he travelled to Iran.  HEKMATI could not reconcile the discrepancy between his previous statement of wanting to acquire experience as an analyst to obtain a full-time U.S. government job and his pre-planned willingness to jeopardize his security clearance by travelling to Iran.

15. On May 9, 2016, HEKMATI filed a civil action against Iran in the United States District Court for the District of Columbia (USDC).  HEKMATI claimed that his treatment while in custody in Iran constituted torture and hostage taking in violation of the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. §§ 1602-1611, and he sought compensatory and punitive damages.

16. In support of his civil claim, HEKMATI signed a "Declaration of Amir Hekmati" on September 27, 2016.  At the conclusion of the 23-page document, HEMATI attested "Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct."  The declaration was filed with the USDC on February 10, 2017.

17. In his declaration to the USDC, HEKMATI asserted that "Before returning home from Afghanistan to Michigan to start school, I decided to take the opportunity to travel for a few

DA504

weeks . . . my mother had been encouraging me in particular over the last few months to visit my grandmother in Iran . . . ." (¶¶ 24, 25)  In fact, this was a false and misleading statement. The primary purpose of his trip to Iran was not to visit his grandmother - it was to approach Iranian Intelligence officials with an offer to sell U.S. classified information to the Iranian government.

18. In his declaration to the USDC, HEKMATI claimed that "Those first few days in Evin [prison] are a blur. I was shocked, confused, scared, indignant." (¶ 35)  HEKMATI asserted that, after his arrest by the Iranian government, "I had no contact with the outside world.  I was not permitted to speak to my family" (¶ 45) and that, after a period of months, "I hadn't spoken to my family since my arrest." (¶ 57).  In fact, this was another series of false statements.  HEKMATI's mother in interviews with the FBI indicated that HEKMATI made several calls to his uncle from his cellular phone over a period of seven to ten days indicating "he was bored ... had nothing to do, but read."

19. In assessing all the facts and circumstances presented above, the FBI has concluded that the purpose of HEKMATI's trip to Iran was to sell classified U.S. intelligence information to Iran and that, in fact, HEKMATI attempted to sell classified information to the Government of Iran when he travelled to Tehran in August 2011.  The forensic examination of his computer system log clearly demonstrates that HEKMATI accessed hundreds of highly classified documents pertaining to Iran that were wholly unrelated to his area of responsibility.  HEKMATI'S assignment in Afghanistan was to analyze the Taliban and Haqqani network - and he had no "need to know" regarding sensitive classified reporting on Iranian matters.  The suspicious nature of this unauthorized conduct is further underscored by HEKMATI'S unexpected two weeks' notice that he was terminating his employment months earlier than the terms of his contract.  Then HEKMATI informed only his mother that he was taking a trip to Iran.  Subsequent reporting provide from multiple sources corroborate that HEKMATI travelled to Iran to sell U.S. classified information to the Iranians in exchange for payment.

20. In addition, HEKMATI's own statements during interviews with FBI agents reveal dissembling behavior that reflects a consciousness of guilt.  In his initial interview after his release from Iran, when the FBI asked him if he had ever accessed classified documents as an Intelligence Analyst in Afghanistan, HEKMATI did not answer the question, instead he said the FBI could find out itself by pulling the log information.  In another interview months later, when the FBI directly confronted him alleging he went to Iran to sell classified U.S. intelligence information, HEKMATI again did not respond- instead replying only to ask if that was a question.

21. Moreover, in his statements to the interviewing agents, HEKMATI provided significantly inconsistent answers that show his effort to deflect and evade the FBI's questions.  When the FBI showed him the computer search log listing his accessing of numerous classified documents regarding Iran, HEKMATI initially denied that it was his log.  He further claimed he had so much work to do over his 12 to 13 hour shifts that he did not have any time to search classified documents on Iran.  However, later in the same interview, HEKMATI admitted

accessing the classified reports on Iran because he had to find things to do to fill his day.  Still later in the course of the interview, HEKMATI once again changed his answer - discarding his previous assertion that he accessed the documents because he had to fill the time, HEKMATI stated that he accessed the classified documents on Iran because he wanted  to become a subject matter expert on Iran.  Finally, when the FBI focused on the fundamental principle of "need to know" in accessing intelligence reports, HEKMATI simply remarked that his contractor and the military had given him access to the classified computer network and did not restrict his access, so he should be allowed to view whatever he viewed.

22. In reviewing the classified intelligence reports on Iran that HEKMATI accessed, the FBI found numerous reports on the Iranian government.  The Iranian government has a long established history of conducting and supporting terrorist operations around the world.

23. The Iranian Revolutionary Guard Corps (IRGC), with the support of the Iranian government, has engaged in terrorist activity since its inception 40 years ago.  The IRGC - most prominently through its Qods Force - has the greatest role among Iran's actors in directing and carrying out a global terrorist campaign.

- In recent years, IRGC Qods Force terrorist planning has been uncovered and disrupted in many countries, including Germany, Bosnia, Bulgaria, Kenya, Bahrain, and Turkey.

- The IRGC Qods Force in 2011 plotted a brazen terrorist attack against the Saudi Ambassador to the U.S. on American soil.  Fortunately, this plot was foiled.

- In 2012, IRGC Qods Force operatives were arrested in Turkey for plotting an attack and in Kenya for planning a bombing.

- In January 2018, Germany uncovered ten IRGC operatives involved in a terrorist plot in Germany, and convicted another IRGC operative for surveilling a German-Israeli group.

- In September 2018, a U.S. federal court found Iran and the IRGC liable for the 1996 Khobar towers bombing, which killed 19 Americans.

24. The IRGC continues to provide financial and other material support, training, technology transfer, advanced conventional weapons, guidance, or direction to a broad range of terrorist organizations, including Hizballah, Palestinian terrorist groups like Hamas and Palestinian Islamic Jihad, Kata'ib Hizballah in Iraq, al-Ashtar Brigades in Bahrain, and other terrorist groups in Syria and around the Gulf.

25. The FBI assesses that the sensitive intelligence reporting accessed by HEKMATI could be exploited by the Iranian government in support of terrorist operations.

1

2

3    - - - - - - - - - - - - - -

4    United States Victims of      )

5    State Sponsored Terrorism   )

6    Fund - Hekmati Hearing        )

7    - - - - - - - - - - - - - -

8

9

10

11

12

13

14

15    REPORTER'S TRANSCRIPT OF VIDEOCONFERENCE PROCEEDINGS

16           BEFORE SPECIAL MASTER KENNETH R. FEINBERG

17                  TUESDAY, APRIL 7, 2020

18

19

20

21              BEHMKE REPORTING AND VIDEO SERVICES INC.

22                 BY:  SARAH JEAN SEITZ, RPR, CSR 14175

23                     455 MARKET STREET, SUITE 970

24                   SAN FRANCISCO, CALIFORNIA 94105

25                          (415) 597-5600

DA507

```
 1   APPEARANCES OF COUNSEL:

 2   FOR AMIR HEKMATI:

 3         GILBERT LLP

 4         BY:  SCOTT D. GILBERT, ATTORNEY AT LAW

 5              EMILY P. GRIM, ATTORNEY AT LAW

 6         1100 New York Avenue, NW, Suite 700

 7         Washington, DC 20005

 8         Telephone:  (202) 772-2200

 9         Email:  gilberts@gilbertlegal.com

10                 grime@gilbertlegal.com

11

12   FOR THE U.S. DEPARTMENT OF JUSTICE:

13         U.S. DEPARTMENT OF JUSTICE, CRM DIVISION, MONEY

14         LAUNDERING & ASSET RECOVERY SECTION

15         BY:  JOSHUA SOHN, ATTORNEY AT LAW

16         1400 New York Avenue, NW, Suite 10100

17         Washington, DC 20005

18         Telephone:  (202) 353-1555

19         Email:  joshua.sohn@usdoj.gov

20

21

22

23

24

25
```

DA508

```
 1   APPEARANCES OF COUNSEL - (CONTINUED):

 2   SPECIAL MASTER:

 3        LAW OFFICES OF KENNETH R. FEINBERG, PC

 4        BY:  KENNETH R. FEINBERG, ATTORNEY AT LAW

 5        1455 Pennsylvania Avenue, NW, Suite 390

 6        Washington, DC 20004

 7        Telephone:  (202) 371-1110

 8        Email:  kfeinberg@feinberglawoffices.com

 9

10   ALSO PRESENT:

11        AMIR HEKMATI

12        ROBERT VELASCO, VIDEOGRAPHER

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                          INDEX

 2   TUESDAY, APRIL 7, 2020

 3   AMIR HEKMATI HEARING                        PAGE

 4   PROCEEDINGS                                    5

 5      Examination by MS. GRIM                    11

 6

 7

 8

 9                        ---OOO---

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1              TUESDAY, APRIL 7, 2020; 12:29 P.M.

2                        ---oOo---

3                      PROCEEDINGS

4              THE REPORTER:  Good morning.  My name is Sarah

5    Seitz, California Certified Shorthand Reporter Number

6    14175, and I am here on behalf of Behmke Reporting and

7    Video Services, located in San Francisco, California.

8              SPECIAL MASTER FEINBERG:  Thank you.

9              I am the Special Master of the Federal State

10   Sponsored Terrorism Fund.  I will be hosting this

11   hearing.  I have been appointed Special Master for the

12   second time by the Department of Justice and will

13   currently evaluate and review this application of

14   Mr. Hekmati for review of my previous decision, formal

15   decision, and I will host the hearing.

16             I turn this next to Mr. Gilbert.

17             MR. GILBERT:  Thank you, Special Master

18   Feinberg.

19             Let me say, first of all, that we appreciate

20   everyone taking the time to do this, particularly in a

21   very, very difficult environment for everyone.  Our

22   papers have set forth the facts and the applicable legal

23   standards.  I'm not going to repeat that here.  And,

24   really, from our perspective, the purpose of today's

25   video meeting is to have Special Master Feinberg hear

1    directly from Amir and have an opportunity to ask him

2    questions.  I will be uncharacteristically brief, but I

3    would like to make three points.

4           One, in a perfect world, we would not be having

5    a hearing.  And even in this far less than perfect world

6    replete with a viral pandemic, we should not be having

7    this hearing.  It is necessary to attempt to correct not

8    only a manifest in justice but, frankly, horrific

9    treatment by our government of a decorated U.S. Marine

10   and combat veteran whose only mistakes were traveling to

11   Iran to visit his grandmother, for what turned out to be

12   the last time, and then returning to his country and

13   trusting that our government would do right by him.

14   This entire episode is a disgrace, and it needs to be

15   corrected now.

16          Two, the facts set forth in our papers and

17   affidavits are uncontroverted.  So were the facts set

18   forth in Amir's affidavit in the district court before

19   Judge Huvelle.  I have known her and her husband since

20   he was my partner at Covington decades ago.  And Judge

21   Huvelle is nobody's fool.  She put us to our proof in

22   this proceeding, and the facts upon which she relies in

23   her opinion likewise are uncontroverted.

24          The documents that were provided to us with the

25   Special Master's reconsideration decision and upon which

1   it is based, likewise do not contain any facts, any

2   facts that controvert Amir's testimony here or in the

3   district court.  Instead, they are based on the

4   recollections of FBI agents who interviewed Amir as soon

5   as he was released from nearly five years of prison and

6   torture in Iran and once again when he returned home to

7   stay with his mother.

8            Neither interview involves sworn testimony and

9   neither interview provided Amir with the basic

10  protections required in such interrogations.  But most

11  importantly here, neither interview adduced any facts,

12  any facts that controvert Amir's sworn testimony.

13           Three, we are here because one or more FBI

14  agents had, quote, "suspicions," end quote.  That is

15  all.  Suspicions.  Suspicions that Amir Hekmati

16  committed treason against the United States by trying to

17  sell secrets to Iran; the same Amir Hekmati who served

18  with distinction and combat in the Marines; the same

19  Amir Hekmati who actually did travel to Iran to visit

20  his ailing grandmother; the same Amir Hekmati who, while

21  in Iran, spent all of his time with his family,

22  including his grandmother; the same Amir Hekmati who has

23  been diagnosed with severe PTSD.

24           And the same Iran that arrested Amir Hekmati

25  and held him hostage; the same Iran that sentenced Amir

1  to death; the same Iran that held Amir in solitary

2  confinement for almost one year; the same Iran that

3  tortured Amir continuously.  And here we are because a

4  couple of FBI agents in this era of paranoia about

5  Muslims have, quote, "suspicions," end quote.

6          Really?  Is this how our system, our Department

7  of Justice really works?  I don't believe it.  I know I

8  am partisan.  Amir is my client.  I have gotten to know

9  him and his family, and I hold Amir and his family in

10  high regard.  I've racked my brain.  I've reviewed and

11  re-reviewed every fact.  I've tried to understand on any

12  level what I might be missing, and every time I come up

13  with absolutely nothing.

14          The reason is that there is nothing, nothing

15  but suspicions from a couple of FBI agents whose

16  motivations I can only guess.  Amir made no

17  misrepresentations of any kind in his application to the

18  fund or in the materials supporting his application.

19  All of the facts support this conclusion as does

20  well-established legal precedent.  His eligibility for

21  the fund should be reinstated immediately.

22          My colleague Emily Grim will now examine Amir.

23  We encourage the Special Master to ask questions, and

24  please feel free to do so at any time as we proceed.

25          SPECIAL MASTER FEINBERG:  Before we proceed,

1    Scott, could you give your full name and the name of

2    your law firm and would Emily do likewise.

3              MR. GILBERT:  Yes.

4              Scott D. Gilbert, Gilbert, LLP.

5              SPECIAL MASTER FEINBERG:  Washington, D.C.?

6              MR. GILBERT:  Washington, D.C.

7              SPECIAL MASTER FEINBERG:  Emily, would you

8    also, for the record, give your name and employer.

9              MS. GRIM:  Yes.

10             My name is Emily Grim, and I also work for

11   Gilbert, LLP, in Washington, D.C.

12             SPECIAL MASTER FEINBERG:  Thank you.

13             We also have a distinguished observer from the

14   Department of Justice.

15             Josh, would you give your full name and your

16   role at the Department of Justice for the reporter?

17             MR. SOHN:  Yes.

18             Joshua Sohn from the money laundering and asset

19   recovery section of the US DOJ on behalf of the

20   government.

21             SPECIAL MASTER FEINBERG:  It is my

22   understanding -- and, Josh, you can correct me -- but it

23   is my understanding that you are strictly here at this

24   hearing as an observer and will neither comment nor

25   cross-examine or ask for clarification from Mr. Hekmati;

1  is that correct?

2        MR. SOHN:  That's correct, Mr. Feinberg.

3        SPECIAL MASTER FEINBERG:  Okay.

4        And, Scott, you and Emily understand that as

5  well, that the Department of Justice is listening and

6  observing but not actively participating?

7        MR. GILBERT:  Yes.  We do.  And we have no

8  objection.

9        MS. GRIM:  Yes.

10        SPECIAL MASTER FEINBERG:  And now I would ask

11  the court reporter to swear in Mr. Hekmati officially.

12        And I ask Mr. Hekmati to take the oath and

13  provide his contact information for the reporter.

14                    ---oOo---

15                  AMIR HEKMATI,

16  having been first duly sworn, testified as follows:

17                    ---oOo---

18        SPECIAL MASTER FEINBERG:  Emily, before you

19  begin, let me -- I want to just make one opening

20  statement to Mr. Hekmati and counsel.

21        I am focused in this reconsideration hearing on

22  a very narrow question.  And that is, as I think Scott

23  Gilbert referenced at the end of his statement, did you

24  or -- did Mr. Hekmati or did he not willfully make

25  misrepresentations in his application to the USVSST

 1   fund.  That's my narrow focus.

 2        All of this other information that has been

 3   submitted to me by the department and by Mr. Gilbert and

 4   Emily is all designed to help me focus on the

 5   application that you made.  I take no other issue, pro

 6   or con, on other litigation or other inferences or

 7   accusations.  My sole goal in this hearing is to help

 8   me, through your testimony, Mr. Hekmati, and statements

 9   of counsel, focus on this question of whether or not the

10   application you submitted was truthful.

11        That is my only role in this hearing, and I

12   have an open mind on this, in light of the submissions

13   by both sides.  I am here to listen.  I may have some

14   questions or I may not.  But I'm here to listen, take

15   notes, and render a decision in the next few weeks.

16        So with that, unless there is any further

17   preliminary comment from counsel, I plan to turn this

18   over, I guess, to Emily for examination.

19        Emily, you have the floor.

20        MS. GRIM:  All right.  Thank you, Mr. Feinberg.

21                      ---oOo---

22                      EXAMINATION

23   BY MS. GRIM:

24     Q.  Good afternoon, Mr. Hekmati.  How are you doing

25   today?

1      A.  Good afternoon.  Well, thank you.

2      Q.  I want to ask you a few questions about your

3  background, your career, and your time in Iran.  So

4  let's start at the beginning.

5          When were you born?

6      A. ████████████

7      Q.  Where were you born?

8      A.  ████████████

9      Q.  Where did you grow up?

10     A.  At about three or four years old, we moved to

11  Wayne, Nebraska.  My father was engaged in a

12  Ph.D. program there, he was a junior professor, if you

13  will.

14          We stayed there for a few years.  I think

15  around 12 years old we moved to Flint, Michigan, where

16  he gained a more senior position as a professor of

17  microbiology and biology in Flint, Michigan.  I spent my

18  adolescence there in Flint and left around the age of 18

19  when I joined the Marines.

20     Q.  Do you have any siblings?

21     A.  I have two sisters.  One older, one twin

22  sister, and one younger brother.

23     Q.  Tell me a little bit about your relationship

24  with your family.  Are you close with them?

25     A.  Very close.  You know, that's all I kind of had

1    growing up.  We didn't have any relatives.  It is just

2    my mom, dad, and siblings.  And, generally, Persian

3    families are pretty close and place a high priority on

4    families.  And so I would say that's correct.

5        Q.  Let's talk a little bit about your grandmother

6    on your mom's side.

7            Tell me a little bit about your relationship

8    with her.

9        A.  It was a very special relationship.  As I said,

10   you know, growing up, it was just my mom, dad, and my

11   siblings.  You know, most American families have the

12   luxury of having 20, 30 relatives.  And we never had

13   that growing up.  My only understanding of what it was

14   like to have extended family was just through my one

15   grandmother.  She was the only one in our lives outside

16   of my immediate family.

17           You know, when I was four months old, she was

18   in Iran at the time.  There was a war going on.  And in

19   her old age, she made a significant effort to be there

20   and stayed with me from four months until I was one

21   years old.  She eventually got her green card, and she

22   would -- you know, was deeply involved in my upbringing.

23   You know, aside from my mother, this was, you know, one

24   of the closest people in my life.

25           You know, she was just somebody who we placed a

1    great deal of importance on.  Like I said, when my
2    mom -- she left Iran in '79.  My dad had come a few
3    years before.  They had grown up under the Shah.  It was
4    sort of a European style of living.  And they came here.
5    Shortly after she arrived in the U.S. in '79, there was
6    a revolution.  And then in 1980, there was the Iran-Iraq
7    War that lasted a decade.
8         So visiting her family there was impossible,
9    which really separated and caused a riff in the family,
10   you know, caused separation.  So my grandmother's
11   visiting was really the only window we had into that
12   extended family relationship.
13        Additionally, you know, under the Shah, you
14   know, the Iranian currency had value and you could send
15   your kids to school in the U.S. and afford it.  You
16   could travel freely.  And after the war happened, you
17   know, those financials worsened.  So not only was my mom
18   and dad sort of separated from their family in Iran, but
19   they also struggled financially.  My dad had to go into
20   debt.  He had to basically raise me and my two siblings
21   at the time with loans.
22        So, you know, the living situation was
23   difficult.  We were in a small, you know, college-like
24   apartment, and it was just my dad and his books was
25   basically our ticket to providing for our family.  Our

1   grandma was really the only one relative that would come
2   and visit us, that we had some sort of help.  She helped
3   my mom raise me, and it was very difficult on her.  From
4   the time that, you know, my mom left in '79 to the date
5   that I was born in '83, you know, they hadn't seen each
6   other.
7          And then, when I was born in '83, it was like
8   her daughter had twins, and, you know, it was very
9   important, you know, Persian grandmothers are just
10  really obsessed with their grandkids.  So it was very
11  difficult for her not to be there.
12         And, you know, despite risk to herself and
13  traveling all alone as an old lady, she made the trip.
14  So we really appreciated that growing up.  So we had a
15  really close relationship.  She visited several times,
16  each time six or nine months, extended stays living in
17  our home, in our -- just a very humble living situation
18  and went the extra mile to be there for us and take care
19  of us.
20         So yeah.  I would say I would characterize the
21  relationship as being very special and close.
22     Q.  I understand that it became more difficult for
23  her to visit you in the U.S. as you got older and she
24  faced health problems.
25         Did you still keep in touch with her regularly?

DA521

1      A.  We did.  She was always in touch with my mom.
2   Her health situation deteriorated.  She could no longer
3   visit us, and it made all the more, you know, motivation
4   for us to try and make an effort to see her at some
5   point in the future.
6          But, you know, there was regular calls with my
7   mom, and I would always get on the phone and say, "Hi,
8   Grandma," that sort of thing.
9      Q.  Let's shift back to your background.
10         Where did you go to high school?
11     A.  In Flint, Michigan.
12     Q.  And you joined the Marines shortly after
13   graduating from high school in 2001; is that correct?
14     A.  That's correct.  It wasn't initially planned.
15   It was sort of the last semester of my senior year, and
16   the Marine Corp recruiters had a ritual to come and
17   check on the seniors and tell them about the Marines.
18   They specifically would seek out athletes.  I was the
19   top at sports.  I played ice hockey, I played soccer, I
20   practiced -- mixed martial arts and wrestling.
21         So it appealed to me, and the presentation they
22   gave was very compelling.  It was a call to a higher
23   cause, and, you know, travel the world and serve your
24   country.  So, you know, all those things.  You know, the
25   sense of duty, the competitiveness, the challenge.

1   These are all things that really resinated with me.

2        And I had a couple of discussions with the

3   recruiter, and I was still 17 at the time, so I had to

4   get my parental consent.  And I decided that this was

5   definitely something that I wanted to do.

6        Q.  What did your family think of your decision?

7        A.  My mom was against it for obvious reasons, you

8   know.  She was just worried about my safety.  My father

9   was -- you know, he didn't hate the idea, but his dream

10  for me at a young age was that I would go to medical

11  school.  My father, his goal of coming and studying in

12  the U.S. was, in fact, to become a doctor.

13        But, you know, once money from abroad to help

14  him with those education costs went away and he was in

15  debt with student loans and he had three kids to worry

16  about, he changed course to pursue a shorter route and

17  get his Ph.D. and become a professor.  But, you know, it

18  was always a dream that he had and he sacrificed for us.

19        And he kind of wanted, you know, me to take

20  advantage of that situation.  He would take me to his

21  lab, you know, many times in my youth and teach me about

22  biology.  We did science fair projects together.  And he

23  was a little heartbroken that I didn't want to go that

24  path.

25        I promised him that I would do that after.

DA523

1   Also, you know, my -- professors didn't make much, and,

2   you know, I know how much he sacrificed to raise us.  I

3   didn't want him to be responsible for my education costs

4   as well.  So that was another part of my

5   decision-making.

6           So, you know, with much reluctance, they

7   agreed.  I said four-year enlistment and I'll be back.

8   At that time, it was August 2001, and, you know, we made

9   that decision to move forward.

10   Q.  So you were in basic training on 9/11; is that

11   correct?

12   A.  So I joined on August 15th, and September 11th

13   happened less than a month later.  I immediately saw the

14   threat level was raised at the recruitment facility in

15   San Diego.  And drill instructors were saying, you know,

16   "You guys should really take your training seriously

17   because you might be going off to war soon."

18           And shortly after, drill instructors came and

19   said, "Hey, does anybody here speak foreign languages,

20   and specifically Arabic, Farsi, Dari, Pashto?"  And I

21   grew up speaking, you know, basic Farsi.  I raised my

22   hand.  I had initially enlisted in the Marine Corp after

23   taking the ASVAB and scoring well to become a machine

24   gunner, to become a rifleman.  I wanted the Marine Corp

25   experience, I wanted to do combat arms.

DA524

1          At the time, there wasn't any open slots

2     available in that specialty, so I came in as an open

3     contract, which means after my recruit training, I would

4     then, you know, see what positions were available,

5     hoping that a slot would be available and I could go

6     into combat arms.  I didn't want an office job or a desk

7     job.

8          You know, so they asked me if I spoke a foreign

9     language, and I said Farsi.  They said, "We want you to

10    take a test."  So I took a test.  It is called the DLAB.

11    It is basically an assessment of your ability to learn

12    languages.  I scored well.  And after graduation, I got

13    called into an officer's office and he basically, you

14    know, ordered me -- we say "voluntold" -- me in a nice

15    way that "We want you to do this.  You need to go do

16    this."

17         So being a young recruit at the time, I agreed

18    reluctantly, and I was shipped off to Defense Language

19    Institute in Monterey, California, to attend the 63-week

20    Arabic language course.

21    Q.  And what did you do after completing the

22    course?

23    A.  I completed the course and, you know, it was

24    around 2003, I believe, and the Iraq War effort was

25    really heating up.  And I did some combat training with

DA525

 1   my unit to prepare, and I was shipped off immediately to

 2   Ar Ramadi, Iraq sometime in early 2003, I believe.

 3        Q.  How long were you deployed?

 4        A.  It was a nine-month deployment.  Nine months.

 5        Q.  And when did you leave the Marines?

 6        A.  August 2005.

 7        Q.  Were you discharged honorably?

 8        A.  I was discharged honorably.  If you want, I can

 9   backtrack and talk about my Marine experience in Iraq or

10   if that's something that the Special Master wants some

11   details on or . . .

12             SPECIAL MASTER FEINBERG:  It is up to you and

13   your counsel, entirely up to you and your counsel at

14   this point.

15   BY MS. GRIM:

16        Q.  Why don't we talk about -- let's turn to your

17   professional background, and we can talk about, you

18   know, if anything you did in the Marines informed the

19   decisions you made in terms of the job that you took.

20             SPECIAL MASTER FEINBERG:  Mr. Hekmati, let me

21   just say that, if I desire to have you focus on certain

22   more details in your direct examination, I won't

23   hesitate to inquire.  Other than that --

24             THE WITNESS:  Okay.

25             SPECIAL MASTER FEINBERG:  -- I will allow you

DA526

1   and your counsel to go forward as you wish.

2          THE WITNESS:  Okay.  Got it.

3   BY MS. GRIM:

4      Q.  So, Mr. Hekmati, after you left the Marines in

5   2005, you worked for a number of years as a military

6   contractor; is that correct?

7      A.  That's correct.  So again, this was unplanned.

8   In my last two, three months after I returned from Iraq,

9   I had about two, three months left on my four-year

10  enlistment contract.  And in that two or three months, I

11  was given the role of head language and cultural

12  training NCO.  I was a sergeant at the time.

13         And my job was basically to set up a program

14  from scratch to teach deploying Marines the basics of

15  language and culture before they went to places like

16  Iraq and Afghanistan.  You know, we went into this war

17  effort, and we didn't have anywhere the number of

18  linguists that we needed.  Everything we needed to do

19  out there was -- required language.

20         So this was a big problem, and Marines were

21  going there without even knowing how to say hello in the

22  host country language, basic, you know, greetings and

23  things like that.  So I put together a tactical course

24  and, you know, also engaged with outside contractors and

25  different agencies who had, you know, similar interest.

1    And one of those agencies was DARPA, the Defense

2    Advanced Research Project Agency.

3          The program manager, Dr. Maida, she visited,

4    and she was directed to me because I was basically the

5    head of that department.  And she was working on a

6    program to develop automation technology that would

7    automate the role of the interpreter.  She liked the,

8    you know, comments I had having been in combat and also

9    being a linguist.

10          So as soon as I had gotten out of the Marines a

11    few months later, she contacted me and was very adamant

12    about bringing me on her team at DARPA to be her liaison

13    and basically work with contractors and help them design

14    this tool to make it effective and make it usable by

15    combat forces on the ground.  I had that experience.  I

16    knew language.

17          I didn't plan on going this route.  The promise

18    that I made to my dad was I wanted to serve my country,

19    get this experience, and then go to school.  But, you

20    know, having been in Iraq and having been -- seeing

21    close up basically how important these technologies are

22    and how much lives they can save and how important they

23    are for operational reasons, I was compelled to, you

24    know, put my school off and join DARPA.

25          I joined DARPA, and that just kind of led into

DA528

1  a decade of service, a number of positions in, you know,

2  different government-related roles.

3      Q.  We'll talk a little more specifically in a few

4  minutes about the two jobs you had immediately preceding

5  your trip to Iran.

6          But, overall, tell me, how lucrative was your

7  work in the government contracting sphere?  Were you

8  able to make ends meet?

9      A.  So, you know, I joined -- DARPA was my first

10 job out of the Marines.  The Marines, you know, I didn't

11 make any money, obviously.  It is a very low-paying

12 occupation.  I was just happy to get, you know, free

13 food.

14         Going into DARPA, I believe that first year, at

15 22 years old, I was paid almost $100,000, which, for me,

16 was just a vast amount of money.  And the second year

17 that I worked for DARPA, I was there for two years as a

18 contractor, I again made around $100,000.

19         I left DARPA in 2007.  That program ultimately

20 failed and didn't come to fruition.  But, you know, I

21 did see a need for some sort of technological solution

22 to help military service members and United Nations

23 people be able to learn language and culture on the go.

24 So I incorporated a company called --

25         (Reporter clarification.)

DA529

 1          THE WITNESS:  Lucid Linguistics, LLC.

 2          So seeing that need in DARPA that didn't come

 3   to fruition, I came up with the idea.  I made Lucid

 4   Linguistics.  I devised my own technological solution

 5   that would work on iPhones.  Marines love to have things

 6   on the go.  They understand the iPhone technology.

 7   There's no training needed.  And put this solution

 8   together.

 9          I didn't have the money to bring it to market,

10   so a defense contractor in Florida by the name of

11   VCom3D, V-C-O-M-3-D, they were involved in that space,

12   and they thought it was a great idea.  And, you know,

13   they were ultimately able to bring that to market, and,

14   you know, resulted in thousands of Marines and United

15   Nations personnel adopting this technology.

16          And, you know, I ultimately did it because I

17   wanted to help, I saw a need for it.  I didn't know of

18   any sort of financial outcomes that would happen from

19   that.  But, ultimately, I was paid roughly $300,000.

20   This was the value -- you know, this kind of just showed

21   the value that VCom3D placed on my invention.  I

22   patented it at one point.

23          So, you know, I think in that third year of

24   this contracting career, I made about 350-, $400,000.  I

25   had other contracting, like, translation projects that I

1    worked on.  I was awarded an SBIR grant from the Office

2    of Secretary of Defense.  And, ultimately, I made about

3    $400,000 that year, my third year.  I was 25 years old.

4            And we moved on to Cubic Corporation.  I was

5    supporting mobile training teams, again teaching

6    language and culture, and preparing officers to go

7    overseas and train Iraqi security forces, Afghan

8    security forces.  And then ultimately on to BAE Systems

9    where I joined the Human Terrain Systems program, and

10   then Six3.

11           All throughout these positions I was paid, you

12   know, ranging from 90,000 to $180,000.  I'd say, you

13   know, between 2005 and 2011, close to 8-, $900,000 of

14   earnings from my contracting positions.

15   BY MS. GRIM:

16       Q.  Let's talk about your jobs for BAE and Six3.

17           You worked for BAE as a defense contractor from

18   2009 to 2011; is that correct?

19       A.  That's right.  Towards the end of 2009.

20       Q.  Okay.

21           Were you granted a security clearance as part

22   of that position?

23       A.  I actually had a security clearance before

24   that.  That's all you needed for the position.  So I was

25   good on the clearance front.  And while in Iraq, at the

DA531

1    behest of my supervisors, I was upgrade to a TS/SCI

2    clearance.

3         And, you know, before BAE, I had a few

4    interviews with other agencies and employers, but I

5    ultimately chose BAE for their mission, focusing on, you

6    know, culture and research.

7         Q.  Tell me a little bit more about your role at

8    BAE.

9         A.  So this was for a program that the Department

10   of Army set up.  It is called the Human Terrain System

11   program, and it is basically just adding another

12   component for the commander to visualize the battle

13   space in a sociocultural aspect.  So he was just looking

14   at, you know, targeting and sort of kinetic operations

15   where our role in Iraq and Afghanistan had a lot to do

16   with relationship building and, you know, involving with

17   politicians and that sort of thing.

18        So there was, you know, religious, cultural

19   sensitivity that had to be taken into account.  So this

20   entity was set up to be the advisor to decision-makers,

21   military decision-makers from a cultural, sociocultural

22   standpoint, and I was brought on as research manager.

23        I would basically be the liaison between the

24   commander, the intel -- intelligence teams.  Whatever

25   their requirements were, they would filter through me

DA532

1    and then I would work with a team of social scientists,

2    Ph.Ds, you know, technical people.  And we would come up

3    with our solution, per se, that we would recommend to

4    the commander to take into account in any sort of

5    decision.

6         Q.  Did you work on any issues relating to Iran in

7    that position?

8         A.  So it was a big focus of mine.  There was

9    about -- I'd say about 40 percent of my role there

10   during that year I was in --

11             (Reporter clarification.)

12             THE WITNESS:  Camp Speicher.  Tikrit.  Tikrit,

13   Iraq.  Tikrit is the name of a city in Iraq.

14   T-I-K-R-I-T.

15             So the requirement initially came because, you

16   know, we were giving millions of dollars to the Iraqi

17   military in training and weaponry, equipment.  And a lot

18   of the -- since we had basically wiped out the Ba'ath

19   Party, we were bringing in officers -- the majority of

20   officers in the military, first of all, are from the

21   south of Iraq, which were Shia.  And many of them had

22   sort of cozy relations with Iran.

23             So a big problem that command was facing and

24   they made known to us was that military shipments,

25   training, were -- some of these weapons, equipment they

DA533

1   were giving to the Iraqi military were ending up in the
2   hands of Shia militant groups.  So this was one item
3   they wanted us to kind of look into.
4           Also, you know, influences on politics, you
5   know, are the decision-makers that we are negotiating
6   with to build a future Iraq, are they independent or are
7   they being swayed by foreign advocates.  So this was
8   something that I kind of looked at.
9           I used SIPRNet, which is a secret classified
10  system, and I accessed hundreds of reports on
11  Iran-related topics, I gave my thoughts, and I was sort
12  of, you know, one of the go-tos for Iran-related, you
13  know, issues, having, you know -- speaking Farsi and,
14  you know, Arabic and that sort of thing and having an
15  understanding of, you know, religious dynamics and some
16  of the politics of the region.
17          So I weighed in on that along with another
18  social scientist colleague of mine, Dr. Brace, and a few
19  other analysts that we had.  So, you know, that was a
20  big part of my task there.  It was a huge problem that
21  command was looking at that I focused on.
22          SPECIAL MASTER FEINBERG:  This is the Special
23  Master -- can you hear me?
24          THE WITNESS:  Yes.
25          SPECIAL MASTER FEINBERG:  Mr. Hekmati, let me

1    just ask you, when you accessed these classified

2    systems, did you do this with the -- at the request of

3    your superiors with authority, or was this something you

4    did to advance your objective in terms of learning more?

5    I'm just trying to make sure I understand.

6          When you just testified about accessing

7    classified systems, was this something you did with

8    approval of your superiors?

9          THE WITNESS:  Absolutely.

10         So I had -- you know, we all had these

11   classified systems in front of us at our workstation,

12   and we were freely given access to access the system.

13         The requirement came from not only the

14   reporting that we had in front of us -- so we would get

15   reportings coming in, we would read them, they would

16   say, you know, these sort of items relating to Iranian

17   influence on politics.  And so those items were in front

18   of us.

19         And then as well, the commanders who were

20   dealing with Iraqi military personnel, they were

21   complaining as to why certain weapons they would give to

22   the Iraqi military, uniforms, equipment, would somehow

23   disappear, and it would end up in the hands of the wrong

24   people.

25         So our command wanted us to -- and me

DA535

1   specifically, to research this and weigh in and give

2   our, you know, insight.  So that was a command-directed,

3   you know, tasking, if you will.  And a very important

4   issue in Iraq and still is today, you know, that I'm

5   sure people, like, in my former job are still examining.

6          SPECIAL MASTER FEINBERG:  And when you did

7   this, you did this with the specific knowledge of your

8   superiors?

9          THE WITNESS:  Yes.  Absolutely.  Yes.

10         SPECIAL MASTER FEINBERG:  And I guess your

11  language skills had a fair amount to do with that, I

12  take it?

13         THE WITNESS:  Absolutely.  Because I could look

14  at written documents, I could look at media, I could

15  look at foreign language channels and see what they were

16  saying.  So that definitely was an asset.

17         SPECIAL MASTER FEINBERG:  Just one more

18  question then you can move on.

19         How did you know how to access this classified

20  material?  Were you given a code, or was there some

21  formula or algorithm?  How did you know how best to

22  access this system?

23         THE WITNESS:  So, one, in my previous job at

24  Cubic I had access.  In the Marines, when I was in Iraq,

25  I worked in a SCIF as well.  And then also, when we

1    joined BAE to do the job, we had training.  And they
2    pointed out which platforms did what, which databases
3    would give you what.
4          And a lot of it was self-explanatory.  You
5    would just open up the system and you see different
6    reports.  They would have headlines, they would have
7    titles.  And as they would come in, you could read what
8    they were about.  You would get intelligence summaries.
9          So, you know, that's kind of how I learned and
10   became proficient in these systems.
11         SPECIAL MASTER FEINBERG:  Let me just ask one
12   more question in this area, and then I promise I will
13   let Emily move on with the questions.
14         What is your response when the FBI or others
15   say that you were accessing information far removed from
16   your job description and your qualifications?
17         MS. GRIM:  Let me just jump in and clarify.  We
18   are still talking about his position leading up to his
19   last position before he went to Iran.  He was talking
20   about his position at BAE, just to clarify for the
21   record.
22         SPECIAL MASTER FEINBERG:  Well, then I withdraw
23   the last few questions, perhaps, and you will cover that
24   subsequent testimony.
25         THE WITNESS:  So I went to Afghanistan -- the

1   position in question is 2011.  I was in Iraq from 2010

2   to 2011.  That's the period that I'm referring to.  And

3   that period from 2010 to 2011 when I was in Iraq,

4   there's no contention on that.  I was never asked about

5   that.  It was never an issue.  I just want to clarify.

6            SPECIAL MASTER FEINBERG:  Thank you for that

7   clarification.  I was in error.  Emily corrected me.

8   We'll get to that.

9            MS. GRIM:  We just wanted to give you a context

10  for his professional background.

11  BY MS. GRIM:

12       Q.  Amir, before we do shift to the Six3 job, the

13  job you had right before traveling to Iran, let me just

14  shift gears for a moment and ask have you -- did you

15  ever take a polygraph as part of a background

16  investigation for any of your -- any positions you

17  applied for?

18       A.  So in 2009, late 2009, I believe, early 2010, I

19  applied to two positions.  You know, my Lucid

20  Linguistics was winding down, I was at Cubic for a

21  while, and I was looking for a new position.

22            And I applied to two positions:  One at DIA,

23  the Defense Intelligence Agency, and one at the CIA or

24  the National Clandestine Service.  Both of them

25  responded.  The DIA brought me in for an interview and

1  had me take what is called a counterintelligence

2  polygraph, where they ask questions about foreign

3  allegiances, loyalties, and I won't get into the

4  nuances.

5         But I passed.  I was offered a position at DIA

6  to work in a department called the NMEC, the National

7  Media Exploitation Center, where I would use my language

8  skills and my analytical skills to be a, you know -- a

9  resource for FBI or CIA, NSA, DIA any time -- or the

10  military any time they would see any kind of media

11  document, whatever it was, that was in a foreign

12  language, they would send it to this center.

13         And in this center, people like me would

14  analyze it, translate, interpret, and give our sort of

15  spin on it.  I ultimately didn't accept the position.

16  It had a great pay package, but it just sounded

17  like kind of, you know -- it didn't sound like the right

18  fit for me, just sitting in that station just waiting

19  for, like, you know, documents, to come in to translate

20  them didn't sound like something that appealed to me.

21         The CIA, they responded.  They brought me in

22  for three interviews.  First, they had me take some IQ

23  test online and that sort of thing.  And my

24  understanding was that every interview you came in you

25  had to pass to get to the next interview.  And after the

 1  third interview, you would take a medical exam and a
 2  polygraph.  It is called full-scope polygraph.  And if
 3  you pass that, you know, you were in.
 4        They talked to me -- so I did all those steps.
 5  I took the polygraph.  And so the full-scope polygraph,
 6  it encompasses sort of counterintelligence questions
 7  about loyalty.  It also talks about lifestyle questions.
 8  I passed, and I passed the medical exam and sat down
 9  with HR to talk about compensation packages and
10  availability for reporting to training.
11        They also talked to me about what life is like
12  and that I would be, you know, living this double life.
13  I couldn't tell my family what I did, so to speak.  They
14  called later after I was -- you know, there still wasn't
15  a set date, but they called and said that funding --
16  there was an issue with funding or that the training
17  date had gotten pushed back, and, you know, it didn't
18  materialize.
19        I also was a little bit apprehensive about --
20  you know, I had forgotten the promise I made to my dad.
21  I still hadn't done my university.  And, you know,
22  living a life in a different country every two years or
23  not being able to talk about what I did -- I also was
24  kind of in a serious relationship at the time, so I
25  wasn't -- I ultimately passed on that opportunity and

1   instead chose to join BAE and do what I had before,

2   which is more cultural research working on socioeconomic

3   issues.

4          And I would just point out if I did ever have

5   any intentions to, you know, be somewhere where I could

6   access classified information on Iran, then, you know, I

7   would have -- you know, it would have been to my benefit

8   or anyone's benefit to go and join those agencies where

9   I had an employment offer.  I had an offer to join DIA

10  which is at a much higher level than BAE Systems or the

11  Department of Army.

12         They have much more sensitive information.

13  They have entire desks, entire offices that are

14  dedicated to Iran and Iran-related issues, but I chose

15  not to join those organizations.  I went ahead and

16  joined the Human Terrain Systems because I liked their

17  mission, more focused on socioeconomic and cultural

18  issues, which was something I had a good foundation in

19  and I enjoyed doing.

20         Q.  Let's talk about your job at Six3.  This is the

21  job right before you went on your trip to Iran.

22         You took that job in 2011; is that correct?

23         A.  In June -- May or June of 2011.  That's

24  correct.

25         Q.  And how did you hear about the job?

DA541

1       A.   My colleague in Iraq, where I was working at

2    the time, he had accepted a position with them.  He was

3    actually in Afghanistan at the same time as I was but in

4    a different location.  And he talked highly of the

5    company.  He had -- and additionally, you know, at the

6    time, the mission in Iraq was really dying down to more

7    of a training, support mission where the mission in

8    Afghanistan was at its peak.

9            And, you know, I think having a Farsi language

10   ability and thinking about the high need for someone

11   like me in a place like Afghanistan in a time when

12   operations are sort of at their peak, you know, I was

13   compelled to, you know -- hey, this is something that I

14   can do now and I can do some good and I can, you know,

15   be of service.  I can put school off for one more year.

16           But that's how I found out about it.  I'm

17   starting to get off track.  A colleague at BAE Systems

18   referred me.  He got me in touch with a recruiting team

19   at Six3.  They sent me emails and, you know, we are

20   adamant about bringing me on the team.

21       Q.   How did the recruiter -- or did the recruiter

22   provide a description of the position to you?

23       A.   Intelligence analyst.  She also provided a

24   detailed description, and the detailed description she

25   offered was military all-source analyst and a bunch of

DA542

1    additional details of topics that would be covered
2    where, you know, in the case of all-source, it is pretty
3    wide ranging.  And, you know, you needed to have a
4    bachelor's degree and, you know, she was, you know, very
5    happy about my language skills.  She thought that would
6    be in high demand.
7            And so intelligence analyst.  You had to have a
8    TS/SCI clearance.  You had to have military experience
9    and preferably combat experience, operational
10   experience, and intelligence analysis experience.  It
11   was specifically for, you know, joining as an
12   intelligence analyst to support intelligence analysis.
13       Q.  So we have talked about why the job was
14   appealing.
15           Did you have any reservations about taking the
16   job?
17       A.  So I had been putting off this promise to my
18   dad and to myself since 2005.  None of this was really
19   intentional.  I had just kind of -- this was, you know,
20   the -- the war was going on and I was somebody in high
21   demand.  And it was a great fulfillment to me to be able
22   to be relied on at these levels at that young of an age
23   and make an impact on the level that I did.
24           So I didn't have reservations about, you know,
25   wanting to continue my service.  The reservation that I

1   had was I had been deployed for much of my youth, and I

2   had been in austere environment.  I had not finished my

3   college education.  I had neglected my family.  I had

4   been away from them for quite some time.  And, you know,

5   I had personal commitments that I wanted to fulfill as

6   well, like, you know, the relationship I had with my

7   previous girlfriend.

8           And, you know -- but, again, I just -- my sense

9   of duty and just the thinking that, you know, I'm in a

10  critical need situation, I have skills that are in

11  critical need.  Afghanistan is an opportunity that may

12  not be around in the future, but school will be, so I

13  can do school another year.  And eventually made the

14  decision to join the company under the auspice that it

15  would be a once-in-a-lifetime opportunity and I would be

16  heavily relied upon.

17          But I did have deep reservations mainly for

18  those, you know, personal reasons and the fact that I

19  had put off school for so long.  My parents were on my

20  case saying, "When are you going to get the school done?

21  When are you going to get married?" and, you know, "It

22  is time to come home and be closer to us."

23      Q.  Parents are good at that.

24          So given these concerns you mentioned, did you

25  commit to stay in the position for any set length of

DA544

1   time?

2       A.  So there was no commitments.  This is an

3   at-will agreement, and they could fire me at any time or

4   relieve me at any time without any, you know -- at

5   minimal notice.  And I am also allowed to leave.  I

6   didn't have any touch with the unit, so I didn't know

7   who I would be serving, who the customer is, or what

8   their expectations of me were.  I was -- we are a

9   support entity.  The contract was to provide support and

10  just be there in case there's something that people

11  need, be an extra set of eyes and ears.

12          And so absolutely not.  The only time-related

13  mentions were related to compensation package, meaning

14  that if you -- completion incentives.  Because they bill

15  government, when they hit certain milestones, they make

16  more money.  So they said, "Hey, if you complete six

17  months, you are going to get a bonus.  If you complete

18  12 months, you are going to get another bonus."

19          So the only commitments -- there was never at

20  any point a document I signed or anything anybody said

21  that said, "Hey, if you come aboard, you need to be here

22  for a year otherwise you are basically going to do us an

23  injustice."

24          But no, no commitment.

25      Q.  Let's talk a little bit about your time in

1   Afghanistan.

2           When you arrived in Kabul for the Six3

3   position, you were not initially placed in a role as an

4   intelligence analyst; is that correct?

5       A.  That's right.  I got into Kabul.  And, again,

6   I'm coming in with the mind-set that I'm sacrificing

7   again more time with my family and putting school off

8   for a very critical position.

9           And I got to Kabul.  I met with the Six3

10  manager.  And, you know, the way it works is they don't

11  really know where they are going to send you until you

12  get into country, and I was aware of that.  I had no

13  idea where I was going to go or what I was going to be

14  doing or what I was going to be involved in, but I knew

15  it was going to be an intelligence analyst role, which

16  is what I was hired for and what I was trained for, what

17  I had a proficiency in.

18          When I got there, I was shocked.  She asked me

19  -- she said, "Hey, your job is over here and you are

20  going to be a religious advisor."  I --

21          (Reporter clarification.)

22          THE WITNESS:  No problem.  Okay.

23          So I was shocked.  She said, "You are going to

24  be a religious advisor.  That's what they want you to

25  do."  And I said, "I don't know anything about religion,

1    I haven't trained in theology.  This isn't my job" --

2          SPECIAL MASTER FEINBERG:  Slow down a little

3    bit.  Slow down a little bit.

4          THE WITNESS:  I apologize.

5          So, again, I came in, she said, "You are going

6    to be a religious advisor.  You are going to go out with

7    military patrols.  You are going to engage locals, and

8    you are going to say, 'Hey, we are not that bad.  We

9    don't have a war against Islam, and let's talk about

10   it.'"

11         I didn't feel comfortable with that job

12   description.  I knew nothing about religion.  I didn't

13   study theology.  It wasn't my job.  It is, like, we are

14   going to hire you as an architect and then say, "We want

15   you to be a mechanic."  I didn't know what that was

16   about.  It was a completely different job description,

17   far more dangerous than the job that was, you know,

18   advertised to me.

19         I would have to go out on patrol, and I would

20   basically have to do Iraq all over again, which -- I had

21   already been in combat as a Marine.  So I didn't want to

22   do that again, and I just wasn't trained for that.  I

23   didn't know how to do it.

24         So my obvious response was that "Hey, that's

25   not what I was hired for.  I don't know even know how to

 1  do this job."  And, you know, their thought process was
 2  "Oh, this guy's name is Amir.  He probably knows how to
 3  do this.  He is Muslim so he knows" -- that was faulty
 4  thinking, and I just said politely that "This is not for
 5  me, and I just want the job that you hired me for.  I
 6  want -- that's what you hired me for.  That's what I
 7  came out here for, and that's what I want to do."
 8  BY MS. GRIM:
 9      Q.  So you told your supervisor you would resign if
10  you weren't placed in the position that you had applied
11  for; is that correct?
12      A.  That's correct.  I said, you know, "If you
13  don't have the position that you hired me for, then I'm
14  just going to respectfully resign and go back home."
15      Q.  And did she put you in a new position?
16      A.  She did.  She made calls.  She sent my resume
17  to different places.  And apparently the client at
18  Bagram liked my resume and said, "We'll take him."
19          So I didn't know until I got there, but once
20  they said that, I said okay.  I went out to Bagram and
21  presented myself to the unit there.
22      Q.  Let's talk about your time at Bagram.  I think
23  the Special Master may have some additional follow-up
24  questions here.
25          When you moved to Bagram, what information,

1  programs were you read into or permitted to access?

2      A.  So when I arrived there, I had a meeting with

3  some of the staff, like, you know, the intel chief and

4  different people.  They said, "Okay.  Let's look at his

5  resume."  And then they must have went and talked to the

6  SSO to get their input.  The SSO, the special security

7  officer, he said, "Based on the unit requirements and

8  what I see, I want to read you in to programs called SI,

9  TK, HCS, and Gamma.  These are just -- these are just

10  collections" --

11          (Reporter clarification.)

12  BY MS. GRIM:

13      Q.  I think you need to slow down a little bit.

14  Sorry, Amir.  We are getting into lingo.

15          MR. GILBERT:  Go back to the acronyms.

16          THE WITNESS:  So the unit met with me.  The

17  intelligence chief met with me.  He looked at my resume.

18  He talked to me.  He was sizing up.  He said, "How --

19  what do I want him to do?  How can I use him?"

20          He talked to the SSO who makes that

21  determination.  He is the special security officer, he

22  determines who get access to what.  Just because you

23  have a clearance doesn't mean you get to do whatever you

24  want.  He has to make that determination.

25          And the units' belief, the units' desire and

1   the SSO was I get read into programs called SI, TK, HCS,

2   and Gamma.  These are collection methods.  So imagery,

3   intercept signals, and Gamma is another technical term,

4   and HCS which is sort of sources, reports from fields

5   people.

6           And they read me in to those programs, and they

7   put that into the system so that when I start my job,

8   the system already filters what I have and do not have

9   access to.  That was the decision of the unit.  That's

10  what they wanted me to do, and that's what I ended up

11  having access to.

12  BY MS. GRIM:

13      Q.  So did you ask your supervisor for access to

14  those programs?

15      A.  No.  And it is not in my place to ask anybody.

16  That's not something that I can request.  That's

17  something they have to grant you based on their decision

18  of what they want you to and not have access to.

19      Q.  And did you know you would have access to those

20  specific programs before you arrived?

21      A.  I didn't know anything.  I didn't know what I

22  would be doing, how I would have access.  I never had

23  access to those systems so I didn't even know what their

24  value was or what you could do with it.  I didn't know

25  what location I would be in.  When I signed on, I agreed

DA550

1  to anywhere in Afghanistan.  They could have sent me to
2  some remote village in the boarder of Pakistan and
3  Afghanistan.
4       But they just said, "You would work as an
5  intelligence analyst.  You would use your skills that
6  you had from prior work experience.  You would use your
7  language experience."  And that's something that I was
8  comfortable with.  But I had no prior knowledge of where
9  or what I would be doing or what I would have access to,
10 no.
11      Q.  So when you searched for a particular topic,
12 tell me how that would work?
13      A.  Well, there's -- I didn't really have too much
14 training but the major page, it is called Intelink.  It
15 looks like Google.  It has a search bar, and it just
16 says Intelink.  And if you put a search term in that,
17 like Google, it will return anything that has that
18 keyword in it with all the classifications levels that
19 the SSO gave you permission to access, unsolicited.  It
20 is looking for keywords and access level.
21      If you don't have those access levels, you
22 can't access -- those won't even come up as options to
23 click on.  It is not, you know -- the access levels are
24 not segregated by content, by subject matter.  They
25 don't say, "Oh, you can access things on A, but you

DA551

1    can't" -- it is based on the level and the collection

2    method, those SI, TK, HCS, and Gamma.  There's no

3    restriction based on content or subject matter.

4          But I would just put in a search term and

5    whatever hints would come back, that is where I would

6    look at data and begin to do my research or whatever

7    analytical work I was doing.

8          Q.  Did anyone tell you that you were restricted

9    from viewing anything in the programs to which you had

10   access?

11         A.  Never.  I did, you know, consult with them.

12   The only thing that they said to me was that "You have

13   these accesses and, you know, we are happy to have you

14   on the team and, you know, let's see what you can do."

15         Initially, one suggestion was that I look at

16   propaganda or messaging.  That was the only direct

17   suggestion that was made, that I look at Taliban or

18   Al-Qaeda messaging and propaganda.  So I look at any

19   reports about things that they are telling domestic

20   people, locals, what sort of brainwashing they use to

21   recruit.  If there's anything in their little media

22   channels that they are putting out there that is

23   relevant, I have the language ability.  I can translate,

24   decipher, and write reports on.

25         So that was one item, but I was -- I was

1    mandated to work 12 hours a day.  This is a 24/7

2    operation.  Minimum -- 12 hours was kind of the minimum

3    expected.  And, you know, I'm the support staff.  I'm a

4    military all-source analyst.  He gave me all of these

5    accesses, pretty much wide ranging to everything because

6    I was an all-source analyst and he wanted me to serve as

7    a generalist, fill in the gaps when needed.

8         If there was overflow from the staff, from the

9    corp staff -- which were all in uniform -- military

10   personnel, they had too much on their plate, I was there

11   to say, "Hey, Amir, work on this."

12        In the meantime, however, you had to keep

13   yourself busy, you had to contribute, you had to show

14   value.  You know, I sacrificed, you know, another year

15   of college and that stuff to be there, so I definitely

16   wanted to be of value and contribute.

17        So, you know, initially, that was my focus, was

18   messaging propaganda.  It wasn't -- I was tasked with

19   giving a weekly update.  So once a week we would have an

20   end-of-week huddle.  They would say, "Hey, what do you

21   know about propaganda?  What can you fill in for us,

22   Amir?"

23        But I had 12-hour workdays, and I had a lot of

24   skill and a lot of knowledge, and I have -- you know,

25   they gave me this wide-ranging access because they

1   wanted me to be proactive.  It wasn't a hand-holding

2   situation.

3          And in daily meetings, they would say, you

4   know, "Amir, what do you got?  What do you have to

5   contribute?"  There were many times where I hadn't --

6   and, you know, at the same time, I wish there had been

7   more free -- you know, show my capability and be of use.

8   I was there 12 hours a day whether I liked it or not.

9          And there was some talk about logs that came

10  up, search logs, and I never saw any logs.  No logs were

11  ever shown to me, if they exist --

12          MS. GRIM:  Amir, I'm sorry.

13          Is anyone else seeing him frozen on video?  Is

14  that just my internet connection?

15          (Discussion off the record.)

16  BY MS. GRIM:

17      Q.  I didn't want to interrupt you, Amir.

18          You were talking about -- go ahead.

19      A.  I was referencing logs, that if there are any

20  logs, I never saw any logs in any interviews.  Nobody

21  ever showed me any document.  They said there were logs

22  shown to me, but I was never shown anything.

23          I am just saying if they exist, they would

24  corroborate that in my first week or two, I was looking

25  at messaging and propaganda-type items and then a second

1   project that I worked on involving cell phone towers.

2      Q.  Okay.  So you touched on this, but I just want

3   to confirm.

4          Were you restricted in what topics you could

5   research?

6      A.  I wasn't restricted.  I was an all-source

7   analyst, and my understanding is that you can't even --

8   there are no such subject matter restrictions in

9   intelligence.  You can get access to the level, the

10  system.  I'm an all-source analyst, and I went through

11  two polygraphs and two FSDI investigations, one by the

12  CIA, one by the DIA, one by the -- and I was brought on

13  the team as an all-source analyst.

14          You know, there's -- as far as I know, there's

15  no such thing as subject matter restrictions on access.

16  It is access based on your clearance level and on the

17  programs you were read into, which are collection

18  methods.  There's no such thing as you can access Mexico

19  but you can't access Honduras --

20          SPECIAL MASTER FEINBERG:  Can I ask you one

21  question?  I understand your testimony.

22          How do you gain access to these platforms?  Did

23  you know -- as an analyst, did you already have

24  knowledge of these platforms or were the access points

25  conveyed to you upon your arrival in Afghanistan?

DA555

1          THE WITNESS:  I had access to a lower-level
2    system in Iraq which is pretty much similar in terms of
3    searching and understanding different components.  This
4    was just a higher level in terms of classification.  So
5    the system, the platform, that is pretty similar, and
6    I'm pretty quick at picking things up.
7          So I was sat in a SCIF.  It is an operations
8    center.  We probably have 200 people in there.  There's
9    screens everywhere.  I was given a username and
10   password.  The SSO read me in.  So once I boot up my
11   system, anything that he allowed me access, I was able
12   to access.
13         But it is pretty straightforward.  It was just
14   a Google-type search bar.  And then from there, you can
15   get whatever keywords you get, whatever results you get.
16   You can then do other searches from that, just like
17   Google.  You search a keyword, you get websites, and
18   then you are off --
19         SPECIAL MASTER FEINBERG:  But you need a
20   password; is that right?  And they -- your superiors
21   provided you that password?
22         THE WITNESS:  They provided me that password.
23   And once you put your password in, you are in the
24   system, you can go.  Whatever is in the system -- your
25   accesses, your restrictions are already put into place

1   by the special security officer into the system.  He

2   codes that in there.  So, you know, you wouldn't be able

3   to access it unless he did, he did so.

4          But once you put your password in and you are

5   logged in, anything that you are allowed to see, you can

6   see.  If you are not allowed to see it, you wouldn't

7   even be able to click on it, you wouldn't even be able

8   to access it.

9          SPECIAL MASTER FEINBERG:  Okay.  Thank you.

10         Emily, go ahead.

11  BY MS. GRIM:

12     Q.  So you mentioned that you were looking into

13  topics outside of your original project on

14  propaganda-related issues.

15         What are the sorts of topics that you were

16  looking into?  You mentioned something about a cell

17  phone tower.

18     A.  Right.  So the only direct task -- and this was

19  just a suggestion by the intel officer.  He said, "Hey,

20  you know, why don't you go look at propaganda.  That's

21  one idea that I had for you."

22         But, again, I had to fill 12-hour days.  I was

23  asked daily, "What do you got?"  But my mandate was an

24  all-source analyst.  I was hired on by Six3 for my

25  language skills, for my broad combat experience, my

1  broad, you know, intellect and whatever I could
2  contribute to.  And, you know, the idea is to take the
3  initiative and not just sit there and wait for someone
4  to tell you what to do.
5          So I took it upon myself to look at reporting.
6  In addition to having access to this system, I was added
7  to about 50 different mailing lists.  And in my inbox
8  daily I would get emails that were based on my access
9  levels.  So, you know, because I had all these accesses
10  I would get different products.
11          And in those products was, you know, some
12  reporting about the Taliban blowing up cell phone towers
13  that multinational corporations were installing in -- or
14  if -- you know, because they wanted extortion money.
15  They wanted basically those companies to pay them vast
16  sums of money for the right to have those cell phone
17  towers, you know, and they considered themselves the
18  legitimate government in Afghanistan.
19          So, one, the companies were doing this because
20  they didn't want to lose their infrastructure.  They
21  spent millions on these towers.  They were paying, like,
22  $150,000 to the Taliban, you know, going against
23  international law, essentially, by funding a terrorist
24  organization.
25          So I came up with the idea, you know, my

1    initiative, without being told, without being tasked,

2    without anybody telling me, I went ahead and got into

3    the reporting of these -- of what was going on.  And I

4    studied the situation, the issue.  And I came up with a

5    recommendation, one of which one of the special agents

6    actually read and he commented on that it was a good

7    product.

8           And it was basically my recommendation that we

9    get in touch with the cell phone tower companies, the

10   multinationals, and have them divert these funds to the

11   local population and hire them as sort of a security

12   force for these towers.  And in doing so, we would, you

13   know, curry favor with the locals, we would build

14   relationships, we would put money into a lot of these

15   people who, because of unemployment, were going and

16   working for Taliban, were going and getting recruited by

17   Al-Qaeda, and, you know, build relations.

18          And there might be a chance that the locals

19   share their money with Taliban, but at least we would be

20   showing that being part of the system is better than

21   blowing up towers.  This is their country, this is

22   something that everybody relied upon.  And it was really

23   unpopular with the local population to not be able to

24   send text messages and get in touch with their loved

25   ones.

DA559

1        So, you know, I also recommended it for sort of
2   a propaganda piece that we could put in some media
3   outlets saying, "Hey, like, look at what they are
4   doing."  So I put this project together from scratch and
5   nobody told me to do it.  I sent it over to the
6   intelligence chief, and he thought it was amazing.  He
7   gave me a lot of praise for it, and that was a great
8   feeling.
9        I was emboldened by that to continue on with my
10  initiative and not -- everybody was very busy in there.
11  I couldn't just wait for someone to tell me what to do
12  all the time.  I wanted to be useful, I wanted to
13  contribute.  I did this project from scratch.  Nobody
14  told me -- I never was told that "You can go look cell
15  phone towers," but I did.  I told them that I was going
16  to do it, and they said, "Okay, great."  And I did it,
17  and I, you know, presented that product.  And, you know,
18  I was given praise for that.
19        But, you know, that product came to an end and
20  I -- you know, I had to find another task --
21  BY MS. GRIM:
22    Q.  Let's talk about that -- I understand -- I'm
23  sorry.  Were you finished?
24        I understand from your declaration you started
25  to look into Iran-related issues while at this position.

1   Why did you start to do that?

2         A.  Well, there's a few reasons, and one of them

3   being that I had 12-hour days, I had to fill the time, I

4   had to do something, I had to be of use.  That's one.

5         The second is that everybody in the SCIF kind

6   of worked in their niche.  So the guy that I sat next to

7   was a colonel, Colonel Tiso, he was a Pakistan expert.

8   Anything Pakistan, he was the go-to guy.  Another guy,

9   he worked on identifying weapons; another guy worked on,

10  you know -- everybody kind of had their specialty.  I

11  lacked one.  I had worked on Iran-related issues in

12  Iraq, so I had a foundation to work off of.

13        Third, the intelligence summaries that would

14  come to my inbox unsolicited because of my access always

15  included some reporting about Iran.  It would say Iran

16  reporting that Iran is funding the Taliban, reporting

17  that Iran is buying off politicians.  These are things

18  that I would see and, you know, was made aware of.  I'm

19  also in a Farsi-speaking country, Dari, which I was

20  native, I speak Farsi.

21        So for all of these reasons combined -- again,

22  I just took initiative on the cell phone tower project

23  without being told to.  I was given praise.  So I want

24  to go on that momentum.  I'm sitting next to a Pakistan

25  expert, and having read all this reporting about Iranian

1   influence in Afghanistan, just like they would do in
2   Iraq, it was a big issue.
3         So there was a cross dynamic that I could build
4   off of.  I couldn't just churn out intelligence projects
5   original that I had no grounding in every day when they
6   say "What do you got, Amir?" from scratch.  So I was
7   looking for something that I was versed in, that I had
8   some foundation in.
9         And for all those reasons, looking at these
10  different links, these different reports that would come
11  into my inbox, I started to click on them, I started to
12  say, hey, how about in addition to my weekly propaganda
13  product and these other products -- projects, I would
14  also try to develop expertise in Iranian influence in
15  Afghanistan and other Iranian-related topics and being a
16  so-called Iran expert like I had been in some way in
17  Iraq.
18        So I wanted to build upon that, and that's when
19  I started to, you know, to research these projects.
20        Q.  Did you tell your colleagues about your
21  research on Iran issues?
22        A.  Everyone knew.  The colonel who was on my -- we
23  were elbow to elbow.  This is a SCIF, and we had limited
24  space.  It is packed.  I have analysts on my right; I
25  have analysts on my left.  I have one in front of me,

1    one behind me, elbow to elbow, we can see each other's

2    screen.

3           And, in addition, we had a captain, a major,

4    different uniformed supervisors who would circle the

5    room, stop by, ask you "How you are doing?  What are you

6    working on?  How can I be of help?"  I consulted the

7    colonel next to me.  I said, "Hey, you are the Pakistan

8    expert.  How does that work?  What do you think about me

9    getting -- sort of being like the Iran expert?"

10          "I think that's great."

11          The captain stopped by.  "What are you working

12   on, Amir?"

13          "Hey, I saw these reports about Iranian

14   influence in Afghanistan.  They are, you know, financing

15   Taliban and that sort of thing.  I would like to look on

16   this topic.  I have a background on this.  I worked on

17   similar things in Iraq.  I want to look at this."

18          And like I was saying earlier, if there are

19   some logs that exist, that they would be corroborated to

20   see that, you know, I didn't get there from day one and

21   start looking at Iran topics --

22   Q.  Just to clarify --

23   A.  -- a natural progression, something I can

24   contribute to.

25          Again, I wasn't given specific tasks, I wasn't

1    given a box that I was not allowed to go outside of.  I
2    was an all-source analyst.  This was in a fusion center,
3    and I started to pick that up by first educating myself
4    in the reporting and having -- I was there for 12 hours
5    a day so I did a lot of reading.
6         Q.  So just to confirm, did you tell your
7    supervisors about your research on Iran issues?
8         A.  I told my direct supervisor, he was a captain.
9    I told the analyst next to me, who was a senior advisor.
10   He had the ear of the general, the one star general.
11   You know, and everyone knew.
12            In addition, they didn't want to know
13   minute-by-minute updates on what I was looking at or
14   what I wasn't look at.  They wanted to know -- what they
15   most cared about was "What do you got?  What to you have
16   for us?  What is the product?  What is the solution you
17   have to one of our problems?"
18            So, A, they knew and, B, I had, you know -- I
19   had the permission to do what I felt would be a benefit
20   to the unit, and that's what I felt was a benefit to the
21   unit for the reasons that I just mentioned.
22        Q.  So no one ever told you to stop researching
23   Iran issues; is that right?
24        A.  At no point.
25            And I just want to add that this is a SCIF,

1    this is a sensitive facility, highly secure.  You can't

2    just go in there and do whatever you want.  People know,

3    people are there.  It is a crowded place.

4           So if by somehow telling the captain, telling

5    Colonel Tiso, being given the accesses that I had, being

6    told that I'm an all-source analyst, being recruited

7    because of my Farsi skills, because of my previous

8    skills to do exactly those things, even if all those

9    were not relevant, you still can't just go in there and

10   do whatever you want and not have anybody say anything

11   to you.

12          So, no, at no point did anybody tell me that I

13   can't do what I was doing.  On the contrary, because I

14   did so well at that cell phone tower project, I was

15   encouraged to say "Hey, you know, what else can you do?

16   What other problems can you solve?"

17          So the answer was no.  I was not told I can't

18   access them.

19      Q.  Was there ever a time you were alone in the

20   SCIF?

21      A.  No.  That would be impossible.  No.  There's

22   200 people.  It is a 24/7 operation.  You are 12 hours

23   minimum.  I have seen people pass out in there.  And it

24   is always crowded.  There's always somebody there.  We

25   were supporting all of Eastern Afghanistan, which at

1    that time was the most volatile region in the country.

2           You have to go through three doors just to get

3    into this place, and there's guards that check you in.

4    There's no such thing as alone in that facility.

5    Q.   I understand you worked at night sometimes.

6           Was the room any less crowded when you were

7    there at night?

8    A.   So, you know, I read something about me going

9    to the night shift.

10          First of all, I never went to any night shift.

11   I was -- you know, there's no such thing as a night

12   shift, per se, for analysts because you are expected to

13   get the job done.  So it is a 24/7 operation, and I had

14   to work 12 hours a day.

15          What was common practice -- because 12 hours a

16   day in an austere environment is tough for anyone, it

17   was a common practice is at times guys would split up

18   their day, you know, if they didn't have any pressing

19   requirements, maybe you do four hours in the daytime,

20   you go to lunch, you go to the gym, you work out, you do

21   another four hours, you take a nap, you come back and do

22   another four hours.

23          So there were times maybe when I wasn't feeling

24   good in the daytime so I shifted a few hours to the

25   night.  I was never on any set night shift where I

1   shifted to the night shift.  There was just a few times
2   that I worked at night like everybody else did because
3   it is 12 hours a day and there's burnout.  You know,
4   that's one reason why they kind of entice you with these
5   bonuses, because there's so much burnout.
6          But, you know, I split up a couple days here
7   and there.  You know, I had to do my 12 hours.  So if I
8   was short a few hours, I would make up for it at night.
9   Common practice.  Nobody told me I couldn't do it.  And
10  if I was doing something I shouldn't have been by coming
11  in at night -- which was allowed and it was packed at
12  night -- most of the attacks that happened were at
13  night.
14         So one of the jobs at the intel center was any
15  time there was an attack, alarms would go off and the
16  captain would yell "Hey, guys.  Let's get on this.  I
17  want to know what happened."  A lot of these things
18  would happen at night.  So sometimes it would be more
19  packed at night than at daytime.  It was just depending
20  on the operation, on this operation situation.
21         So to answer your question, no.  Nobody told me
22  I couldn't come in at night.
23     Q.  While you were at the Six3, did you ever
24  download or print anything that you weren't supposed to?
25     A.  No.  This was all -- you know, Iran issues,

1   these were all just reading reports.  I spent very

2   little time on each one.  I was trying to get acquainted

3   with the subject matter, find what was relevant, what

4   wasn't relevant.  If there's any record of the amount of

5   time I spent on these products, it would probably be 20

6   seconds, 15 seconds.  I'm just looking to see what is

7   going on.

8           I never downloaded.  I never scored.  I never

9   printed.  You are not allowed to bring in personal

10  electronics, and I never did.  So no.  I didn't print, I

11  didn't score, I didn't do anything with that information

12  except read it and see what value it had for, you know,

13  the unit.

14      Q.  Did you ever type up any information you viewed

15  by memory on your personal laptop?

16      A.  No.  Absolutely not.

17      Q.  I want to turn now -- and we'll try to keep it

18  brief.  I'm mindful of our time here.

19          Can you tell us the reasons you left the job at

20  Six3?

21      A.  So like I said before, you know, I came in with

22  a bit of reservation that I was again putting off school

23  for another year.  I had been going since 2001.  I had

24  ten years of government service by this time, 2011.  I

25  had been in combat in Iraq.  I had spent another year in

DA568

1   Iraq as a -- with BAE.

2          And I was 27.  I needed -- my mom was on my

3   case about getting married.  I still hadn't finished all

4   my educational goals.  I had only gone because I

5   thought -- Afghanistan was at its peak.  I thought it

6   was a critical need and it was a big demand for me to be

7   there, just like other positions they really needed.

8          When I got there, first of all, they told me to

9   be a religious advisor, then they send me to this unit

10  who didn't really know what to do with me, you know.

11  And they said, "Hey, do you want -- I got a guy over

12  here who speaks Farsi.  Do you want him?"  They were

13  like, "Okay.  We'll take him."

14          But there wasn't any clear goal, there wasn't

15  any clear guidance --

16          (Reporter clarification.)

17          THE WITNESS:  Yeah.  So, you know, I don't

18  think there was a lot of thought that went into my being

19  sent there.  I was sent there.  And then I wasn't relied

20  upon to the degree that I thought.  I thought me, a

21  Farsi speaker, intel experience, combat experience, I'm

22  going to go in there and they are really going to be

23  relying on me.  There's going to be a lot of work for me

24  to do --

25          SPECIAL MASTER FEINBERG:  Mr. Hekmati, I wanted

1   to make -- not only that you speak slower, that seems to

2   be a losing proposition, but that's alright.

3         I also want to reinforce what your counsel just

4   said about responding more succinctly to the question

5   without going on and broadening the scope of what the

6   question is.

7         Your counsel --

8         THE WITNESS:  Okay.

9         SPECIAL MASTER FEINBERG:  Your counsel asked

10  you specifically what she wants to elicit.  And if she

11  wants to elicit more than that, she will ask you another

12  question.  But try and respond to counsel's trying to

13  confine your answers.  Thank you.

14        THE WITNESS:  I understand.

15        MS. GRIM:  How about -- I can reframe my

16  questions in a way that will make it easier to move from

17  point to point and for the court reporter to capture

18  everything, given our time constraints, if you are okay

19  with that, Amir, and Special Master.

20        THE WITNESS:  I'm okay.

21        SPECIAL MASTER FEINBERG:  And believe me, on

22  time constraints, I want to make sure that counsel ask

23  all the questions she deems appropriate and gets

24  responses from her client.  So time constraints are

25  flexible.  I'm more interested in making sure that

1    Mr. Hekmati sticks to the point of the questions that

2    are being asked.

3         THE WITNESS:  Yeah.  I completely understand

4    now.  And I'm just going to -- I'm going to do just

5    that.  If you have any other questions, additional

6    questions, feel free to ask.  I'm just going to be more

7    direct and to the point.

8         So, Emily, if you want to ask your question

9    again, I think I know a better way to respond to it.

10   BY MS. GRIM:

11   Q.  So let's try it this way:  You said earlier and

12   in your declaration to the Special Master that you had

13   some expectations about this position, to get valuable

14   work experience, learn from other analysts.

15        Did you feel you were getting that in the

16   position?

17   A.  No.  I wasn't given direction.  I wasn't relied

18   upon.  I was basically just told to work 12 hours a day

19   and figure out how to be useful.  But --

20   Q.  Were --

21   A.  -- but my thought process was "You hired me,

22   you are paying me this high amount of money, what do you

23   want me to do?  I'm here for you.  So I don't want to

24   create a need for myself.  If you don't need me, I have

25   better places to be.  I have other things that I would

1   like to do.  I'm here to serve this unit.  If you don't
2   need me, then I will respectfully resign."
3       Q.  So it is fair to say -- is it fair to say the
4   job was not as it was marketed to you, not what you had
5   hoped for?
6       A.  Nowhere close, no.  It was not what it was
7   marketed for at all.
8       Q.  Okay.
9           Unless the Special Master has any other
10  questions about your access to information or your
11  activities while working at Six3, I was planning to turn
12  to your trip to Iran.
13          SPECIAL MASTER FEINBERG:  That will be fine.
14  BY MS. GRIM:
15      Q.  Okay.  Mr. Hekmati, after you left your job at
16  Six3, you traveled to Iran; is that right?
17      A.  That's right.
18      Q.  When did you first start planning this trip to
19  Iran?
20      A.  December of 2010.
21          And I just want to add that a trip to Iran had
22  been an aspiration since I was 12 years old when my
23  grandmother could no longer visit us because of her
24  health problems.  For a multitude of reasons, we were
25  always unable to do that, but the plan for this

1  particular trip began in December of 2010.

2      Q.  And why did you start planning a trip there

3  specifically in 2010?  What prompted that?

4      A.  Because my mother had made plans at that time

5  to visit in June of 2011, six months later.  And every

6  time she had been going, my family was like, "Where is

7  my grandson?  Where is our cousin?  Where is our

8  nephew?"  And this is something that -- my mom had never

9  shown her son to her brothers.  This is a big part of

10  her life that was unfulfilled.  So she had always been

11  looking for opportunity to make that happen.

12          So in December of 2010, after other times that

13  she wanted me to go and I couldn't, she again said,

14  "Amir, I'm going in June, July.  Can you come?"  At that

15  time, I said, "There's a good chance that I can" because

16  in May of 2011 I would come home from Iraq, and I was

17  done.  I was already making plans to start school.  I

18  had an acceptance letter at the University of Michigan

19  to start in September.

20          So that time frame worked for me.  I would come

21  home in May, end of May.  We would go in June or July.

22  I would come back in August, have time to prep, and go

23  to school in September.  So, you know, the reason why we

24  made plans was because my mom was going, I had never

25  been, and this is an aspiration of hers.

1            My grandmother made all those trips halfway

2    across the world when I was young.  She was ill, she

3    might die, and it would be a shame if I didn't at least

4    see her before then and make an effort at one point in

5    my life, having never been to Iran, to go and see my

6    grandmother.

7            Q.  Did your family end up taking the trip to Iran

8    that June or July of 2011 that you all had begun

9    planning?

10           A.  Yes.  So in June -- July, if I'm not mistaken,

11   I think it was June, my mom, my sister Leila, my

12   brother, my younger brother Omeed, they all traveled

13   without me and spent their time in Iran.  I think about

14   a month, a little bit longer maybe.

15           And, again, you know, "We wish you were here.

16   Sorry you couldn't come in time.  Grandma is asking

17   about you."  And yeah.  They came back in late July,

18   sometime in July.  I was actually in Afghanistan while

19   they were in Iran and would occasionally had phone calls

20   with my mom or email, you know, saying that "We are

21   here, we are having a good time.  Everything seems okay

22   and everybody is asking about you and they hope to see

23   you someday."

24           Q.  Why did you decide to travel to Iran after you

25   left Six3?

1      A.  Well, you know, once I saw that the job wasn't
2   what I thought it would be and I resigned, it was -- I
3   was only there for a month and a half.  I mean, maybe
4   two months.  I resigned, and I left the company, and I
5   was in Afghanistan.
6          I told my mom about it on the phone, email,
7   said, "Hey, you know, this isn't working out.  It is
8   still August.  I don't start school until September.
9   You know, I'm already in the area.  I have to go through
10  Dubai and maybe we can make this work."
11         So --
12     Q.  Let's talk about that, how you got to Iran.
13         Were there any direct flights to Iran from
14  Bagram?
15     A.  No.  The only flight that I was aware of was to
16  Dubai.  That was the only option.  These are military,
17  like, charter flights.  So they are civilian planes, but
18  they are only for contractors or affiliated personnel.
19  There was one company called DFS that has an office in
20  Dubai, and they ferry Dubai, Bagram.  This is what they
21  do.  And in order to get on that plane, you have to be
22  with Six3 or you have some sort of affiliation.
23         So I flew in from Dubai, and the logical choice
24  was to fly out of Bagram -- it was the only choice I
25  knew of -- and go back to Dubai.

1      Q.  Why didn't you buy a ticket to Iran until you

2  got to Dubai?

3      A.  So a few reasons.  One is that I gave a

4  two-week notice, but I know they didn't need those two

5  weeks.  So I gave them a two-week notice because that's

6  the right thing to do, but I asked the unit, you know,

7  "I'm totally okay with staying two weeks, giving you

8  enough time, but if you don't need me, you know, I

9  just -- I'll go ahead and get out of here."  I don't

10  know what their response would be.  So I had to wait and

11  get an actual release, you know, before I could make

12  solid arrangements, one.

13          The second one, I didn't know about DFS

14  flights.  They were just sort of, as far as I remember,

15  first come, first serve.  You show up the day you wanted

16  to fly.  If there was space, you get on.  So I didn't

17  know when exactly I would get into Dubai.  And then,

18  third, Dubai is a major airport hub, multiple flights to

19  Iran.

20          So worst-case scenario, you know, I would just

21  get one when I got there.  It wasn't going to be an

22  issue.  So for those reasons.

23      Q.  What did you do with your time in Dubai?

24      A.  I got there evening, I went to a hotel, got

25  some rest, went to bed, got up the next day, had some

1   lunch, bought my ticket, and then I believe I spent one

2   more night and then flew out the next morning.

3       Q.  Let's shift now to your time in Iran.

4           Once you arrived there, where did you stay?

5       A.  I met up with my cousin and my uncle.  They,

6   you know, asked -- said that I was fully welcome to stay

7   with them in their residences.  But for my privacy, for

8   my comfort, they had an apartment close to where they

9   lived that, you know, wasn't occupied at the time and

10  owned by my uncle.  I could stay there.  You know, I

11  accepted.

12      Q.  What did you do while you were in Iran?

13      A.  What did I not do?  Every day there was -- I

14  had so many family members.  There was always an event

15  going on, wedding, dinners, meeting with my grandmother,

16  all of my uncles.  I have many uncles.  My aunt -- I

17  mean, people that I had never met before who just heard

18  about me through pictures.

19          It was the first time I had been in the

20  country, museums, monuments, hiking.  We went up to a --

21  a sort of vacation house that they have about an hour

22  outside the city that overlooks the scenic mountain

23  range.  We had a dinner there.  It was just back to back

24  for the entire, you know, three weeks that I was with

25  them.

DA577

1           And I was supposed to show up for another
2    family gathering, I believe it was a wedding.  I didn't
3    make it to that one because I was making plans to head
4    back to the states in a few days because I was getting
5    close to that September time frame.  I had deferred my
6    college, but I was hoping I could go back and get back
7    in there and say, "Hey, I'm here.  Can I undo my
8    deferment and start September as originally planned?"
9           So I wanted to get there before September so I
10   could prep and start my college.
11       Q.  And we'll turn to that in a second.
12           I just want to -- you said you saw your
13   grandmother; is that correct?
14       A.  I saw my grandmother multiple times.
15       Q.  How was she doing?
16       A.  She had the same ailments that she had, her
17   mobility, she had stomach cancer that was in remission.
18   But aside from that, she was ecstatic to see me.
19       Q.  Okay.
20           I'm going to ask you a series of yes-and-no
21   questions here.  Obviously, you can elaborate if you
22   feel appropriate or the Special Master can jump in.
23           Other than when you were pulled aside at the
24   airport upon your arrival in Tehran, which you mentioned
25   in your declaration, did you ever meet with any Iranian

1   government officials before you were arrested?

2       A.  No.

3       Q.  Did you ever sell classified information to

4   anyone while in Iran?

5       A.  No.

6       Q.  Did you ever attempt to sell classified

7   information to anyone while in Iran?

8       A.  No.

9       Q.  Did you ever give classified information to

10  anyone while in Iran?

11      A.  No.  At no point.

12      Q.  Did you ever offer to give classified

13  information to anyone while in Iran?

14      A.  No.

15      Q.  Let's turn now to the circumstances of your

16  arrest while you were in Iran.

17          Can you tell us a little bit about that day?

18      A.  I was at the apartment.  I don't remember what

19  time it was.  I think it was afternoon, and two

20  gentlemen came to the door.  They were wearing, you

21  know, like overcoats, civilian attire.  And, you know, I

22  opened the door.  They kind of helped themselves in.

23          They said, "We are from passport, the passport

24  office.  We need to -- we have an issue with your

25  passport.  You need to come with us, answer a few

DA579

1   questions, and you will come right back."  They didn't
2   let me call anybody.  I wanted to call my uncle.  They
3   went through some of my belongings, looked around, took
4   some of my personal effects.
5          We got in their car.  We drove about, I don't
6   know, about 10, 15 minutes to an administrative
7   building.  It was, you know, like a one, two-story.  It
8   was white.  And we went inside, took a left inside.
9   There's a small room, they sat me in there.  There was a
10  table and a chair.  They said, "Sit in the chair facing
11  the wall, and we will be right back."
12         And then a few minutes later they come back,
13  they said, "Hey, face the wall, don't look back, face
14  the wall."  So I faced the wall.  I'm pretty anxious at
15  this point.  I don't know what is going on.  I'm pretty
16  nervous.  And I'm facing the wall, and I, you know, hear
17  a voice behind me that says, you know, "Why did you come
18  to -- why did you come to Iran?" -- no, no.  I'm sorry.
19         First thing they did was put a paper in front
20  of me and said, "Write your name."  I wrote my name.
21  "And also the names of all your family members."  I
22  wrote the name of my immediate family members, and then
23  he had me thumb print it, and then he took the paper
24  away.
25         He put another paper immediately after and

 1   said, "Did you" -- it already had a question written on
 2   it.  It said "Did you serve in the military?"  You know,
 3   "Write your previous job."  And I wrote that, yeah, I
 4   had served in the military years ago.  And as soon as I
 5   wrote that, he said, "Thumb print it."  I did it, I
 6   thumb printed it.
 7           He grabbed it away from me.  He snatched it
 8   away.  That's when he said -- his tone started to
 9   change, and he said, "Why are you in Iran?"
10           And I said, "I'm here to see my family."
11           And he said, "Again, I'm going to ask you
12   again" -- he said, "I'm going to ask you again.  Why are
13   you in Iran?"
14           And I said, "I just told you.  I'm here to see
15   my family."
16           And he said, "Okay.  I'm going to leave for a
17   few minutes, and I'm going to let you think how you want
18   to answer that question.  I'm going to come back, and
19   I'm going to ask you one last time what are you doing in
20   Iran."
21           And he left, he comes back, he asks me again.
22   I said, "To see my family.  I already told you."
23           And he said, "You messed up."  And he left the
24   room.  And then a few minutes later, those same two guys
25   that picked me up, they come back in, and they are --

1    their tone changed.  They are a little more aggressive.

2         They said, "Get up."  They grab me by the arm,

3    and we go outside the building into their car again.

4    One of them sits in the back with me; one of them is

5    driving.  We drive about, I don't know, about

6    20 minutes, pull up to what looks like a prison, and we

7    go through the checkpoint, the gate.  Somebody shows up,

8    opens the door, we -- the guy hands me a blindfold and

9    said, "Put your blindfold on."

10        And I'm like, "For what?"

11        He just said, "Put it on."

12        And I'm nervous.  I don't know what is going

13   on, and I put the blindfold on.  They walk me into this

14   room and sit me down in the chair and those two guys

15   left.  Another guy comes in, says, "Get up," takes me in

16   a room and says, "Take your clothes off," you know,

17   "Strip, put all your belongings in this bag, and put

18   these blue pajama things on."

19        And I said, "I'm not doing that.  I don't know

20   what this is about, and I want to call my uncle.  You

21   have no right to" -- you know.

22        And he said, "Look, I can tell you again or, if

23   you don't listen, I'm going to tell you another way."

24        And, you know, I'm just -- you know, I'm

25   nervous.  I'm thinking maybe this is some weird process

1    they have that I just have to hurry up and get through

2    so I can go home.  So I comply.  I put the clothes on.

3    I put my clothes in the bag.  They tell me to put my

4    blindfold on.

5           We go -- you know, I don't know where we go,

6    but before I know it, I'm in a solitary confinement

7    cell, and I stay there.  You know, there's a light on,

8    it is a small room.  It is like a small rectangle shape.

9    There's a little hole in the ground where you go to the

10   bathroom and a small sink and that's it.  There's no

11   windows.  There's nothing.

12          And I'm sitting in there.  I'm really, you

13   know, starting to get anxious and, you know, that's when

14   some of the interrogations began.  And the first

15   interrogation was, you know, "I do everything that I say

16   I'm going to do.  I told you you made a mistake, and

17   this is what happened.  Why are you in Iran?"

18          And this just continues, you know.  And

19   sometimes he would ask questions, I would offer

20   justification.  You know, my mom is this person, my

21   grandma is this person, like, you know, I have

22   relatives.  And he said, "I don't care about any of

23   that.  Tell me the real reason that you are in Iran."

24          And it just kept repeating, repeating.  It got

25   more aggressive, more aggressive.  I would have panic

1  attacks.  I would get in altercations with the guards.
2  I was hit with batons.  I would hit the door, you know.
3  They would say stop and I would keep doing it.  They
4  would put me in these cuffs where I had to kind of be in
5  a stress position for a long period.
6          I wasn't let out except for once every three
7  days for ten minutes to just kind of walk around a
8  little bit and take a 30-second, you know, cold shower.
9  It was filthy.  I started getting sick.  I had, like,
10  intestinal problems, the water, the food -- I don't
11  know.
12          You know, a lot of threats, "You are going to
13  stay here until your hair turns as white as your teeth"
14  and just going -- asking questions, leaving, and saying,
15  "That's it.  I'm never coming back.  You are here."
16          At one point I was hit with a Taser in my
17  kidney area.  They -- they took me in a room and they
18  restrained my feet and starting whipping my feet.  And,
19  obviously, that was very painful.  And, you know, they
20  would taunt and say, "Oh, you know, is this the Marine,
21  the U.S. military that we hear so much about, look at
22  you."  They had given me sedatives at one point and then
23  stopped giving them to me.  And I had, you know, some
24  serious withdrawals from that.
25          And, you know, I didn't have any access to a

DA584

1  lawyer.  I couldn't call my embassy even though I asked
2  multiple times.  I wanted to call my family, no one.
3  And this went on for months, and I lost weight, you
4  know, I had constant, you know, panic attacks.  This
5  light is on 24 hours a day, and it was extremely
6  difficult, you know.
7          And it just kept going, going to the point
8  where I realized that there is just -- I have to either,
9  you know, comply -- I can't keep going on this route by
10 saying the same answer even though I told them.  They
11 don't want to accept it.  And, you know, they said --
12 just kept saying, "We know already.  We know already,
13 but we want you to tell us.  Be honest, why you are
14 here, what's your real purpose is here, and we'll help
15 you.  Otherwise, I'm going to leave and come back in six
16 months and just forget about you."
17         And this went on and on and on and on and
18 eventually I just couldn't really deal with that
19 anymore, and I just said, "Whatever it is that you need,
20 maybe I forgot.  Maybe I don't know why I'm here.  I
21 forgot.  You tell me.  Just give me a hint and maybe it
22 will help me understand.  I want your help.  I want to
23 know what it is" -- and he said, "Amir, I know you are
24 CIA.  I know you are a spy.  I know you are CIA.  I know
25 you came here on orders of CIA.  You are CIA."

1          And I said, "I'm a CIA agent.  Now help me."

2          He said -- he put another paper in front of me

3   and said, "Write that you are a CIA agent," and I did.

4   And as soon as he took it, his tone changed.  He put a

5   tea in front of me and said, "You keep asking for a

6   phone call.  Who do you want to call?  I'll give you

7   just a few minutes."

8          And I said, "I want to call my uncle."

9          And he handed me a phone, called my uncle.  You

10  know, very short call.  I said, "I'm in an (foreign

11  language).  I'm in a detention center, but I'm okay.

12  I'm alive."  And, you know, a few other pleasantries,

13  and they took the phone away.  That was it.  So I didn't

14  know anything else.  I didn't know where I was other

15  than that.

16          By this time, you know, my family had been

17  tearing Tehran upside down.  They went to the morgue,

18  they went to hospitals, they went to police stations.

19  They went to Evin several times.  They were told I

20  wasn't there.  They were lied to.

21          And then, you know, I went back to solitary.  I

22  think it was like a day later, like the next day, they

23  came and got me.  They took me to that room.  They said,

24  "Put your clothes back on" -- the clothes that I was

25  wearing when I was arrested -- and put me in a van.

1    They cuffed me, and then we were driving through Tehran.
2            We get to some place, they said, "Put the
3    blindfold on."  I'm walking out, and it looks like kind
4    of like a residence, some sort -- it didn't look like a
5    big administrative building.  We go in.  We go in the
6    basement.  And in the basement, the egress windows are
7    filled with concrete.  There's bars.  And I'm put in --
8    I'm in a cell again, but it's bigger.
9            And then the next day I'm brought up again, you
10   know, blindfolds, sat down, face to the wall, same
11   interrogators behind me.  And he said, "You see, I do
12   everything that I say, you know.  I'm glad that you are
13   being honest, that you are admitting to being a CIA
14   agent, and I want to help you.  You see that you are
15   here now.  I want to help you.  You are going to get
16   free.  But before you do, you need to do what we call a
17   training video.  You are going to do a training video.
18   I want you to help us out.  Do this training video and,
19   after that, you are free to go.  You can go see your are
20   family.  You can get on a plane and go back home."
21           You know, at this point, it didn't matter what
22   he asked me to say or not say.  I was going to say it
23   because I was just in a very difficult position.  I
24   couldn't -- it was obvious that I would just be hurting
25   myself.  This was not America.  There's no law here.  It

1   is what he says it is.

2          So, you know, he starts leading me with these

3   questions:  "Did the CIA sent you here?  Did they want

4   you to infiltrate us -- did they want you to implicate

5   us in terrorist activities?"

6          And I just said okay.  And at one point, I

7   wrote, "Yes.  What you are saying," but I wrote "I'm

8   being forced to say this, and I'm only saying it

9   because" -- he saw this and he flipped out.  He ripped

10  it up, he threw it at my head.  He said, "Take him down

11  to the guard," who was like the muscle.  He said, "Take

12  him back to the basement."

13          He said, "I'm going to send you back to

14  solitary.  You are useless.  And I'm going to forget

15  about you.  You are never going to see" -- the next day,

16  you know, we come back up, and some other guy comes back

17  talking, saying, you know, "Your interrogator wanted to

18  send you back, but I convinced him to give you one more

19  chance.  And -- but this is it.  If you mess this

20  training video up, you know, it is going to be really

21  bad for you."

22          So, you know, we go through this dialogue.  And

23  he said, "Okay.  I'm satisfied, and tomorrow I'll come

24  and see you."  So tomorrow comes, and they put me in the

25  van again and they take me to this hotel.  We go to the

1   top floor, and it is a luxury hotel, and I go in the

2   room, and there's a cameraman and a guy who is going to

3   ask me questions, the same questions that we were asked

4   in the house.

5          And I, again, am hesitant about it, but they

6   threatened me again.  They said, "Look, it's up to you.

7   I don't care.  I'm not going to lose anything.  You can

8   go to solitary and we'll forget about you."  So the same

9   game.

10         So okay.  So we do the questioning, I answer

11   the questions on camera, and the training video is done.

12   And they said, "This is just internal.  It is not going

13   to go anywhere.  You do this, you are free, and it is

14   done."  So it is done, and I said, "Okay.  It is done.

15   I want to go see my family now, like, what next?"

16         "Okay.  Yeah.  We just need -- your

17   interrogator needs to talk to you, so it will just be a

18   little while longer."  They take me back to that house,

19   and I'm there doing nothing for a day or two, and then

20   they say, "Let's go."  And I'm thinking, okay, this is

21   it.  I'm free.

22         And we drive, and before I know it, I'm back in

23   Evin prison.  And same thing.  Blindfolds, strip, put

24   the blue clothes on, go back into solitary.  And I'm

25   yelling, I'm talking to the guards, "What is going on?

1   I was supposed to be freed and I wasn't freed."  And

2   eventually nobody came.

3          I went to court a few months later.  They said

4   "Let's go."  I go to court, no lawyer, no embassy.  And

5   the judge just asked me, he said, "Did you serve in the

6   military?  Did you have a weapon?  And, you know, were

7   you in Iraq, and did you have a weapon from the

8   U.S. military?"

9          And I said, "Yeah, you know.  Everybody knows

10  it.  I was 18.  I joined the military.  I was born in

11  the U.S.  I'm a member of the country."

12         "Okay.  That's it.  Get him out of here."

13         I go back to solitary, and then a few -- I

14  don't know, a month later, I found out I was sentenced

15  to death for a crime called (foreign language), which is

16  waging war against God.  I waged war against God

17  because, as a U.S. Marine, according to them, I took up

18  arms against Muslims.  So that was, you know, a

19  punishable offense by death.  I was supposed to be

20  hanged.

21         So I am in solitary at this point.  It's been

22  six months, maybe, and I have been through hell, and now

23  I keep picturing myself in a morgue with a black neck

24  after being hung and my family crying over me.  Every

25  time the door would open, I would get startled thinking

1  that, you know, this is it.  They are going to take me.

2         And this nightmare just went on for a while.

3  The interrogator eventually came after I got my death

4  sentence and said, "Are you doing good?"

5         And I was like, "No.  I'm not doing good.  What

6  happened?  You lied to me.  Now you want to kill me.

7  This is all a bunch of bullshit.  You made me say these

8  things."

9         He said, "You confessed."

10        And I said, "No.  I didn't.  This was all by

11  force."

12        He said, "Look, don't worry.  If you wage war

13  against God and you are guilty, then you'll get hung and

14  that will absolve you of your sins and you will go to

15  heaven.  And if you are innocent and you didn't, then

16  you would have died a wrongful death and you will also

17  go to heaven.  So what are you worried about?"

18        And he left, and that was it.  I stayed there,

19  you know.

20        Eventually, at my next court date, I saw my

21  mom.  She was told to come.  Months later.  And she

22  looks 20 times thinner.  She looks like she aged

23  50 years.  And, you know, she said, "Your sister is

24  okay, everybody is okay.  The whole world is like -- you

25  are going to get out of this."  And I had another court,

1  and he asked me the same questions, "Did you have arms
2  in the military?  Did you, you know" -- and he reduced
3  my sentence from waging war against God to cooperating
4  with a hostile government, the U.S.A.
5       Q.  Were you present at that sentencing or
6  reduction of sentence?
7       A.  It was just a court.  So I went into a room, I
8  talked to this judge, and I wasn't allowed to talk or
9  say anything.  He just asked me these questions, he
10 wrote them down, and said, "Get him out of here."
11          The sentence was just told to me in prison.
12 Somebody would come and say, "Oh, your sentence has
13 been -- it's execution," and then he says, "Oh, you are
14 ten years."  So I didn't find out until later.
15          So at this point, I'm still in solitary, we are
16 going on 18 months now.  And several months before that,
17 I had a ten-year sentence.  And, you know, this
18 detention center was not meant to house people
19 long-term.  It is meant to kill you, to break you down,
20 get a confession, and then ship you off to a prison.
21 But they didn't want -- I assume they didn't want me to
22 get my word out.  They didn't want me to deny.  I don't
23 know.
24          They wanted to isolate me, and they kept me
25 there for a very long time, and it was extremely

DA592

1   difficult.  And, you know, I would go on hunger strike
2   because other people were having phone calls.  I had
3   nothing, no lawyer, no embassy, no phone calls, no
4   meetings.  They wouldn't even give me a newspaper to
5   read.  I would literally just sit in a room, stare at
6   the wall, and, you know, try to survive.
7           I went on hunger strike multiple times.  And
8   then the last time I went on hunger strike, I collapsed,
9   I hit my head really hard on the ground, I soiled
10  myself.  And the only thing I remember is the guard
11  yelling at me through the door when I eventually came to
12  and yelling at me like, "What the hell are you doing?
13  Get the hell up."
14          And then they saw that there was something
15  wrong with me, so they took me to the infirmary.  And
16  the doctor did a little examination and wrote a report.
17  I assume that, due to health concerns that I would die,
18  they transferred me around 18 months after being in
19  there to a political ward.  So I was housed now with,
20  you know, security people, political oppositioners.
21          And it was better because I could talk to other
22  people.  It had a yard I could make use of, but I still
23  didn't have a phone and, you know, I had had some health
24  problems and, you know -- but I was happy to be there
25  and not be in solitary.

DA593

 1           And that went on for a while.  There was some
 2   riots, political guys who did riots in the prison.  And
 3   as a punishment, they came in and separated -- they took
 4   some of us and moved us into a basement of another
 5   prison that was meant to be a quarantine facility for
 6   incoming prisoners for, like, a day or two.
 7           But they made it a permanent prison for
 8   security people, for traders, for spies and put us in
 9   there.  There's no ventilation.  There's rats.  It is
10   filthy.  We are right on top of the sewage system that
11   the prison -- all their feces would go right underneath
12   us, and it was a punishment for people -- they said, you
13   know -- they would tell us all the time, "We shouldn't
14   even give you this.  The cost of you all is a bullet."
15           So this is -- and then they housed us with drug
16   dealers, with, you know, common criminals and basically
17   made a deal with them that if any of these political
18   guys say anything about the regime, try to get a message
19   out, you know, I want you to lean on them.  And they
20   would beat some of the guys up.  They slashed the guys
21   face with a razor.  They said -- we were being basically
22   -- a prison within a prison.
23           And I still --
24   SPECIAL MASTER FEINBERG:  Excuse me, Counsel.
25   Up to you, of course, you have wide range on this, but I

1   think this testimony concerning his confinement has

2   become cumulative.  But if you feel it is important, by

3   all means, you may proceed.

4           MR. GILBERT:  I kind of just wanted you to get

5   a flavor for this.  I think we can move on.  Because I

6   think it is just very relevant to the allegations that

7   the FBI and others have made against him.  But I think

8   the points have been made, and it is pretty tough

9   testimony for him to go through as well.

10          So, Emily, why don't we move on.

11          MS. GRIM:  Okay.  We do just have a few more

12  questions and we should wrap up soon.

13  BY MS. GRIM:

14      Q.  I do want to ask, Mr. Hekmati, after you were

15  freed, I understand from your declaration that you

16  suffered with PTSD.

REDACTED

REDACTED

13      Q.  I just want to ask a couple questions about

14  your interviews with the FBI.  These will be brief.

15  They are mostly yes-or-no questions, and then we should

16  be done.

17          Mr. Hekmati, I understand the FBI interviewed

18  you when you got to Germany on your way home from Iran;

19  is that right?

20      A.  Well, I didn't know they were FBI.  I landed in

21  Germany.  I'm ready to see my family.  They said, "You

22  have mandatory medical."

23          I said, "I don't care if my limbs are cut off

24  and I'm about to die.  I don't want any medical.  I want

25  to see my family."

 1          And they weren't responsive.  They kept me in
 2   there.  And then they were pretending to -- it was not
 3   all about medical.  I think this was all a deception.
 4   They just put the stethoscope to get my heart rate.
 5   "I'm okay.  I'm alive.  I want to see any family now."
 6          Then, next thing I know, they say, "Hey,
 7   there's some people in the room that want talk to you."
 8          I'm like, "Okay.  About what?"
 9          I go in there, and there's some uniform army
10   people, and there's two men sitting there that never
11   identified themselves.  I didn't know who they were --
12     Q.  Okay.  So you don't remember ever being told,
13   as part of either of those FBI interviews, that you were
14   under investigation, is that right, or as part of this
15   first interview?
16     A.  No.  I didn't know that they were FBI or why
17   they were questioning me let alone that I was under
18   investigation.  I was in a state of shock.  I have just
19   got out of five years of hard prison time.  I want to
20   see my family.  I -- whatever the hell it is you want
21   from me, hurry up and ask and let me the hell out of
22   here.
23          So I go into this room, and there's people
24   sitting there.  They start asking me, "How was it?  How
25   was" -- and I was explaining, yeah, you know, this, they

DA597

1   arrested me --

2       Q.  I'm sorry.  Amir, we did cover this in your

3   declaration, and so I'm trying to be mindful of the

4   Special Master, so --

5       A.  I'm sorry.

6       Q.  -- we need to not have duplicative testimony.

7           Just a couple more questions.  I know you get

8   really emotional when we talk about this.  It is

9   complete understandable.

10          You were interviewed a second time by the FBI a

11  few months after your return home to Michigan; is that

12  right?

13      A.  Yeah.  Shortly after, you know, I'm just still

14  catching my breath from all this.  I just woke up, I get

15  a knock on the door.  It is two people, a man and a

16  woman.  And they say, "We have more photos."  Because,

17  in Germany, they showed me photos of, like, Robert

18  Levinson and a couple of other people.  "Did you see

19  them in Iran?"  And I said no.

20          And they show up to my house.  "We have more

21  photos.  Can you come down and help us out?"

22          "Okay.  Sure.  But" --

23      Q.  So you don't remember being told, as part of

24  that discussion, that you were under investigation

25  either; is that right?

1    A.  No.  I was never told I was under
2  investigation, and I --
3    Q.  Before the --
4    A.  Because they wanted my help, so I was going to
5  help them look at photos.
6    Q.  Before the second interview, did you call your
7  lawyer, Scott Gilbert, with the agents present?
8    A.  So as I hopped in their car, as we were going
9  down, I called Scott.  I had retained Scott by then, and
10  he is my lawyer, so I had to let him know.  That's what
11  he is there for.
12        So I call him.  I say, "Hey, Scott.  I'm with
13  the FBI.  We going down to look at some photos.  No big
14  deal.  They just want me to help out and look at
15  photos."
16        And Scott said, "Let me talk to them."  And I
17  handed the phone to the agent, and she talked to Scott.
18  Scott said, "I don't want you talking to him unless I'm
19  there."
20        And she just said, "I'll call you from a
21  landline.  Bye."  And she hands me the phone --
22    Q.  And did the FBI agents ever call your lawyer
23  from the landline?
24    A.  No.  Not only did they not call my lawyer, but
25  they took my cell phone when we got down to the office.

1   They said, "For security purposes, we are going to need

2   your phone."  And then we get in the room, there was no

3   call to Scott.

4       Q.  Okay.  Did you ever hear from the FBI after

5   that interview?

6       A.  No.  They made -- you know, I sat down and

7   immediately -- the second I sat down, he starts making

8   some accusations.  I have no idea what he is talking

9   about.  I offered some justifications as to why that

10   didn't make any sense.  And then I said, "Look, if you

11   need anything else, call my lawyer," and I left.

12        And he said, "Okay.  We don't need anything

13   else.  Go ahead."

14       Q.  You never heard from them again?

15       A.  Never, ever again, no.

16       MS. GRIM:  Okay.  Thank you.

17       I think those are all of our questions.

18       MR. GILBERT:  Does the Special Master have any

19   additional questions?

20       MS. GRIM:  I think you are on mute.

21       SPECIAL MASTER FEINBERG:  There we go.  I'm

22   sorry.

23       I just have one question here, Amir.  It is a

24   little perplexing.  How does an obviously intelligent

25   guy like you who has accomplished a lot.  You are a CIA

1   intelligence analyst.  What are you doing going to Iran

2   at all?

3          I mean, did you appreciate the risks or the

4   danger or the consequences that would lead you to

5   conclude "I'm done with my work.  I'm about to go to

6   school.  I think I will go see my family in Iran."  And

7   in light of your background in the military and the CIA,

8   I would just like to hear from your own words what

9   prompts you to quite openly get on the plane and go to

10  Iran?

11         THE WITNESS:  Well, I'm a little perplexed by

12  that, but allow me.

13         One, I never worked for the CIA.  Ever.  I

14  wasn't a CIA intelligence analyst.  The majority of my

15  career was language and cultural training.  And the only

16  time that I was ever in any sort of intelligence

17  profession was for the one and a half months that I

18  worked for Six3.

19         And for the reasons that I mentioned before, my

20  grandmother was there when I was four months to

21  one year.  She came multiple times with her old age and

22  her sickness.  I never had any extended family.  This

23  woman braved war --

24         MR. GILBERT:  He is frozen.

25         THE WITNESS:  -- and I resigned from my

1  position, one.

2         Two, it is not illegal for security clearance

3  holders to go to Iran.

4         Three, I didn't have any -- I never worked for

5  the CIA.  So I think that is misinformation.

6         But, again, I resigned from my position.  My

7  grandmother meant a great deal to me, and there's two

8  million Iranian Americans that travel to Iran every

9  year, and many of them have government or

10  government-related position.

11         I had never been to Iran.  My mother was in

12  Iran a month before I was.  We had made plans in

13  December of 2010 to go to Iran.  I have multiple uncles

14  and cousins.  I had never seen any of my family.

15         The threat level, Department of State threat

16  level was a Level 2, which means exercise caution.  I

17  was going there, according to them, as an Iranian

18  citizen with family members to vouch for me, to take

19  care of me.

20         We have eight, nine Americans in Iranian prison

21  right now.  And why did they go?  One of them is an

22  American who served in the Navy.  I -- this is my

23  heritage.  My mom, you know -- I have every right to go.

24  I followed all protocols in leaving my job and resigning

25  and checking the state department and contacting a

1    lawyer for his guidance.

2             My mother was there a month before.  And I was

3    going to go to school and get married and possibly never

4    go to Iran again, never see my grandmother before she

5    died.  And I would be a coward if I didn't go and make

6    at least one attempt to see her on her deathbed.  I lost

7    both my grandfathers without ever meeting them or -- I

8    spoke to one of them on the phone on his deathbed.

9             So, you know, I don't know what else to say.

10   You know, I went there to see my grandmother.  I

11   didn't -- you know, I don't know what other

12   justifications I can provide.  But I hope I have done

13   so.

14            SPECIAL MASTER FEINBERG:  When you were in

15   Afghanistan, who was your -- technically, who was your

16   employer?

17            THE WITNESS:  So I worked for Six3 Systems, but

18   Six3 Systems is an administrative entity that pays me,

19   that liaisons with the unit, and, you know, when you

20   show up, there was no Six3 reps there.  I worked for

21   Six3, but I support -- I'm on loan to the U.S. Army, if

22   that makes sense.

23            I'm paid by Six3, but I work for the U.S. Army

24   in whatever capacity, you know, within my job

25   requirements -- are you there?

DA603

1          SPECIAL MASTER FEINBERG:  I'm listening.

2          THE WITNESS:  So Six3 is the contacting entity

3   that pays me.  They vet my resume, they send my resume

4   over to the Army, and say, "Hey, do you want this guy?

5   We'll hire him."  The U.S. Army doesn't go out and find

6   people.  So Six3 does that part for them.

7          SPECIAL MASTER FEINBERG:  I'm just trying to

8   clarify, really.  This is strictly informational.  I'm

9   not trying to, in any way, be adversarial, please.  I'm

10  just trying --

11         THE WITNESS:  I apologize for cutting you off

12  like that.  I have just been through a lot, and these

13  are topics that I really didn't want to get into, but

14  I'm happy to, you know, go through them with you.

15         SPECIAL MASTER FEINBERG:  You are doing fine.

16  I just have one other question.

17         You testified -- Emily asked you and you

18  testified that you signed a paper when you were in

19  confinement by the Iranians.  You willingly -- not

20  willingly -- you signed a paper saying that you worked

21  for the CIA, and then you testified a few minutes ago,

22  yeah, but then they tried to put another gloss on that

23  and you refused.

24         But you said you did sign that?  What was that

25  about?  Just clarify that for me.

1            THE WITNESS:  So after I had gone through this
2    months of solitary and --
3            SPECIAL MASTER FEINBERG:  Yes.
4            THE WITNESS:  -- the abuse and I was just at a
5    breaking point, I said, "What is it that I need to say?
6    You keep saying that I'm lying, that I didn't come here
7    to see my family.  What is it that I need to say to get
8    out?"
9            He said, "You are a CIA agent.  Tell us the
10   truth and tell us that you are a CIA agent."
11           Out of desperation, I said, "Okay."
12           SPECIAL MASTER FEINBERG:  That's your answer.
13   That's all I care about.  That's exactly the
14   clarification I wanted.  You are telling me you were
15   never really a CIA employee.  You signed that paper in
16   desperation.
17           THE WITNESS:  I signed that paper in
18   desperation.  I even tried to get out of it.  Like I
19   said, later on at the house, I wrote on a separate piece
20   of paper --
21           SPECIAL MASTER FEINBERG:  I understand.
22           THE WITNESS:  -- but it wasn't a situation that
23   I could get out of.  I mean --
24           SPECIAL MASTER FEINBERG:  Mr. Hekmati, I
25   understand --

1          THE WITNESS:  -- I tried to make --

2          SPECIAL MASTER FEINBERG:  Mr. Hekmati, the only

3   reason I referenced the CIA as an employer is because of

4   your testimony.  I misunderstood it, perhaps.  You

5   clarified it.  Out of desperation.  I have no questions.

6          Emily, do you have anything else you would like

7   to add or ask Mr. Hekmati?

8   BY MS. GRIM:

9      Q.  Mr. Hekmati, when your family, your mother, or

10  your siblings had visited Iran numerous times over the

11  years, had they run into any safety issues, security

12  issues?

13     A.  Never.  None.

14     Q.  Did you have any concerns that by going to Iran

15  you would somehow jeopardize future career prospects

16  down the road?

17     A.  No.  Because, one, it is not illegal for

18  security clearance holders to go to Iran --

19         SPECIAL MASTER FEINBERG:  Mr. Hekmati, so the

20  answer is no?

21         THE WITNESS:  The answer is no.

22         MR. GILBERT:  Good.

23         MS. GRIM:  Those are all my questions.

24         SPECIAL MASTER FEINBERG:  Scott Gilbert, do you

25  have anything you would like to close on behalf of your

1   client?

2          MR. GILBERT:  No --

3          SPECIAL MASTER FEINBERG:  And your excellent

4   co-counsel, I may might add.

5          Do you have anything you would like to add?

6          MR. GILBERT:  No.  Nothing to add.  I think

7   that Mr. Hekmati's testimony speaks for itself.

8          SPECIAL MASTER FEINBERG:  Department of

9   Justice, you have observed, as you said you would, Josh.

10  Before I close this hearing officially, do you have

11  anything at all you would like to say?  You have already

12  given us your name and rank, but is there anything you

13  would like to add before we officially close this

14  hearing?

15         MR. SOHN:  No, sir.  I was instructed by my

16  superiors that I should be in listening and observing

17  mode for this hearing, so I'm going to follow those

18  instructions.

19         SPECIAL MASTER FEINBERG:  Thank you very much.

20         And our excellent -- and I do mean excellent --

21  court reporter, under very difficult circumstances, the

22  speed of Mr. Hekmati's answers, and the fact that we are

23  doing this by Zoom technology -- so you get a special

24  vote of thanks from everybody -- do you have anything

25  you want to add?

 1             (Reporter clarification.)

 2             SPECIAL MASTER FEINBERG:  And let me ask you,

 3   will there come a time sooner rather than later that

 4   there will be an official transcript of this hearing

 5   that will be presented to DOJ, Mr. Hekmati's counsel,

 6   and the Special Master?

 7             (Reporter clarification.)

 8             (Discussion off the record.)

 9             SPECIAL MASTER FEINBERG:  As counsel know, both

10   sides or both parties, I have, under the law, 90 days to

11   render a decision.  So if you can get me the transcript

12   in two weeks, that would be fine.  I think that both

13   sides, the Department and Mr. Hekmati and counsel,

14   deserve an official decision by the Special Master way

15   beyond 90 days, after what has transpired over the

16   years, and I will do that.

17             Once I have the transcript, I will immediately

18   turn my attention to the merits.  I have a relatively

19   narrow decision to make, as counsel know, and I will do

20   so.  So if you can get me that transcript with copies to

21   the parties, I will render a decision as soon as

22   practicable under the circumstances after that -- after

23   I receive the transcript.

24             Does anybody have anything else they would like

25   to add before we officially close this hearing?

1          MR. GILBERT:  Just two things.  One is, again,

2   I would like to thank everyone for taking the time to do

3   this, especially Amir for whom I know this is extremely

4   painful.

5          And then, Josh, you don't know me, but I wanted

6   simply to say to you what others do know is that our

7   firm prides itself on constructive consensual resolution

8   of this matter.  If, as you review this with your

9   colleagues, you would find it at all useful to talk over

10  the phone or by video about this, we would be more than

11  happy to take the time to do that, so I make that offer.

12         SPECIAL MASTER FEINBERG:  Thank you.  Thank you

13  all, especially our petitioner, Mr. Hekmati.  Amir, we

14  thank you.

15         THE WITNESS:  Thank you.

16         SPECIAL MASTER FEINBERG:  It is very trying.

17         I wish you all a happy holiday, and thank you

18  again for your participation.  This hearing is

19  officially closed.  Thank you.

20         (Hearing adjourned at 2:50 P.M.)

21                       ---oOo---

22

23

24

25

DA609

1    State of California          )

2                                 ) ss.

3    County of Contra Costa       )

4         I, Sarah Jean Seitz, California Certified

5    Shorthand Reporter No. 14175, do hereby certify:

6         That I was present at the time of the above

7    proceedings;

8         That I took down in machine shorthand notes of

9    all proceedings had and testimony given;

10        That I thereafter transcribed said shorthand

11   notes with the aid of a computer;

12        That the above and foregoing is a full, true,

13   and correct transcription of said shorthand notes, and a

14   full, true, and correct transcript of all proceedings

15   had and testimony taken;

16        That I am not a party to the action or related

17   to a party or counsel;

18        That I have no financial or other interest in

19   the outcome of the action.

20   Dated:  April 9, 2020

21

22                              _____

23                              _____

24                              Sarah Seitz, CSR Number 14175

25

| From: | Ken Feinberg |
|---|---|
| To: | Dorsey, Sarah (CRM) |
| Cc: | Connor, Deborah (CRM); Dery, Alice (CRM); Lee, Jane (CRM); gilberts@gilbertlegal.com |
| Subject: | FW: Hekmati post-hearing procedures |
| Date: | Friday, April 24, 2020 3:30:28 PM |
| Attachments: | Proposed Hearing Continuation Procedures to KF 4-24-20 PDF.pdf |

Sarah,

I thank you for your email and the attached proposed post-hearing procedures. I find the proposed procedures acceptable and am taking the liberty of forwarding the attachment to Scott Gilbert, counsel for Hekmati. These hearing procedures will now be deemed binding on both DOJ and Hekmati,

Ken

---

**From:** Dorsey, Sarah (CRM) <Sarah.Dorsey2@usdoj.gov>
**Sent:** Friday, April 24, 2020 1:28 PM
**To:** Ken Feinberg <KFeinberg@feinberglawoffices.com>
**Cc:** Connor, Deborah (CRM) <Deborah.Connor@usdoj.gov>; Dery, Alice (CRM) <Alice.Dery@usdoj.gov>; Lee, Jane (CRM) <Jane.Lee3@usdoj.gov>
**Subject:** Hekmati post-hearing procedures

Dear Ken,

We hope you remain safe and well on this rainy Friday.  Please see attached proposed post-hearing procedures for your consideration, as a follow-up to your conversation with Deb, Jane, and me.  As always, we are available for questions and discussion.

*Sarah B. Dorsey*

Chief, Policy Unit
Money Laundering and Asset Recovery Section
Criminal Division
U.S. Department of Justice
(she, her, Ms.)
Sarah.Dorsey2@usdoj.gov

DA611

*Money Laundering and Asset Recovery Section*　　　　　　　*Washington, D.C. 20530*

**Proposed Hearing Continuation Procedures for the Special Master**
**USVSST Fund Claimant Amir Hekmati**
April 24, 2020

After the conclusion of the portion of the hearing when you received testimony from the Claimant, you requested that the Department provide a written response to the Claimant's testimony. The Department agrees that such a response may be helpful, and will provide it. The Department proposes that you adopt the following procedures, consistent with the Act, before issuing your final written decision:

- The Department will provide you a written response to the Claimant's testimony, which will include any additional evidence the Department believes is relevant and responsive to the Claimant's testimony. The Department will provide a copy of the response to Claimant's counsel on the same date.
- The Claimant may reply to the Department's submission in a reasonable time. The Claimant's written reply may include any additional evidence the Claimant believes is relevant and responsive to the Department's filing.
- After receiving these additional submissions, you can assess whether you require any additional facts or written submissions from the Department or the Claimant.
- Once you have received all of the submissions, you will declare the hearing complete, and the record will be closed.
- Within 90 days of the conclusion of the hearing, you will render a "final written decision affirming or amending the original decision." 34 U.S.C. § 20144(b)(4). Although not required by law, we recommend that the written decision include an explanation supporting your affirmation or amendment of the original decision.

We propose that you provide the Claimant and the Department with written notice of the procedures you adopt by April 28, 2020.

| | |
|---|---|
| **From:** | Lee, Jane (CRM) |
| **To:** | Ken Feinberg |
| **Cc:** | Connor, Deborah (CRM); Tsao, Leo (CRM); Campbell, Stephen (CRM); Dorsey, Sarah (CRM); Dery, Alice (CRM); Gilbert, Scott D |
| **Subject:** | USVSST Fund Claim No. 1226 |
| **Date:** | Friday, June 26, 2020 11:52:00 AM |
| **Attachments:** | USVSST Memorandum to SM June 26 2020 .pdf |
| | Declaration of Brett M. Kramarsic (e-signed).pdf |
| | Exhibit 1 to Declaration of Brett M. Kramarsic (Record).pdf |
| | Exhibit 2 to Declaration of Brett M. Kramarsic (Supplemental Record).pdf |
| | Exhibits to the Supplemental Record.pdf |

Dear Ken:

Pursuant to your April 24, 2020 Hearing Continuation Procedures, please find attached the Department's written response to Mr. Hekmati's testimony.  Specifically, please find attached: (1) the Department's Memorandum; (2) Declaration of FBI Special Agent Kramarsic, with the original Record and Supplemental Record as Exhibits 1 and 2, respectively; and (3) Exhibits to the Supplemental Record.

Mr. Gilbert is being provided the Department's submission via this email.

Thank you,

*Jane K Lee*
Attorney Advisor
Money Laundering & Asset Recovery Section
U.S. Department of Justice
1400 New York Avenue, NW
Washington, DC 20005
202-305-4232 (Direct)
202-603-9742 (Cell)
jane.lee3@usdoj.gov

*Money Laundering and Asset Recovery Section*            *Washington, D.C.  20530*

June 26, 2020

Kenneth R. Feinberg
Special Master
U.S. Victims of State Sponsored Terrorism Fund

     Re:    <u>Claimant 1226, Amir Hekmati</u>

Dear Special Master Feinberg:

    Pursuant to the process established by the Special Master on April 24, 2020, this memorandum responds to claimant Amir Hekmati's (the "Claimant") appeal of the Special Master's reversal of his initial decision finding that the Claimant was eligible for payment from the United States Victims of State Sponsored Terrorism Fund (the "Fund").  Because the record as a whole demonstrates that the Claimant traveled to Iran to sell U.S. classified information to Iranian government officials, the Special Master should affirm his finding that the Claimant's application to the Fund was not truthful.

    On January 15, 2020, the Special Master granted a request from the United States Department of Justice (the "Department") to reconsider his prior decision finding that the Claimant was eligible for compensation from the Fund.  In reversing the original decision, the Special Master found that the Claimant was ineligible for compensation from the Fund because his application "contained material omissions and false statements."[1]  Specifically, the Special Master determined that "the primary purpose of Mr. Hekmati's trip to Iran was to sell classified U.S. national security information to the government of Iran," which "conflicts with Mr. Hekmati's declaration . . . that the primary purpose of his trip to Iran was to visit family for personal reasons."[2]  The reconsideration decision was based upon a detailed record of evidence submitted by the Department, which included: (1) the reporting of four reliable sources who confirmed to the Federal Bureau of Investigation ("FBI") that the Claimant traveled to Iran and met with government officials to sell classified information; (2) FBI forensic examination of the Complainant's computer search/access logs that revealed over 90% of the hundreds of classified documents accessed by him were on Iran rather than on his assigned responsibility to analyze threats within Afghanistan; (3) the Claimant's highly suspicious actions in abruptly resigning after only serving for two months on a contract for 6-12 months and then traveling to Iran

---

[1] Reconsideration Decision at 1 ("I am persuaded that the attached materials demonstrate that Mr. Hekmati's application and accompanying documents contained material omissions and false statements; in particular, the attached materials support the conclusion that the primary purpose of Mr. Hekmati's trip to Iran was to sell classified U.S. national security information to the government in Iran.").

[2] *Id.* at 1.

without notifying any of his colleagues and friends about his trip; and (4) the evasive, false, and inconsistent statements that the Claimant gave to the FBI when he was subsequently asked about his trip to Iran and the events leading up to that trip.[3]

Following the Special Master's decision, on March 23, 2020, the Claimant submitted a memorandum and supporting factual record appealing the Special Master's reconsideration decision.[4]  The Claimant was also afforded a hearing, as provided by statute.  By agreement of the parties, the hearing took place on April 7, 2020 by video teleconference.  During the hearing, the Claimant provided direct testimony in response to questions from his counsel, and a few questions from the Special Master.  A representative from the Department attended the hearing, but pursuant to the procedures adopted by the Special Master, he did not cross-examine the Claimant or otherwise participate in the hearing.[5]

The Special Master has asked that the Department respond to the Claimant's record, including his hearing testimony.  The record provided by the Claimant, including his testimony at the hearing, is insufficient to rebut the record submitted by the Department.  In his testimony, the Claimant offered blanket denials that he attempted to sell classified information to the Iranian government, but otherwise did not offer evidence or facts to warrant changing the reconsideration decision finding him ineligible for compensation from the Fund.  In direct response to the evidence offered by the Claimant, the Department asserts that it is now providing the Special Master with additional evidence in the record that further undermines the Claimant's denials.  This supplemental record evidence is attached as Exhibit 2 to the sworn declaration of FBI Special Agent Brett M. Kramarsic.[6]

The Claimant has failed to rebut the record evidence that he traveled to Iran to sell U.S. classified information, and the entire record strongly supports the Special Master's reconsideration decision.  The Claimant's appeal should therefore be denied, and the Special Master should issue a final written decision affirming that the Claimant is not eligible for payment from the Fund.

---

[3] This record was not before the Special Master at the time of the initial eligibility and payment determinations in December 2018, nor was it before the district court at the time of the default judgment order.

[4] Claimant's Brief dated March 23, 2020.

[5] Claimant's counsel contends that the facts are "uncontroverted" because the district court made factual findings supporting its order awarding damages to the Claimant.  Counsel further asserts that the Claimant was put "to [his] proof" in that district court.  Hearing Transcript (Apr. 7, 2020) at 6 (hereinafter "Hearing Tr. at __.").  That is incorrect.  As the docket in the proceedings before the district court makes clear, after Iran failed to respond to his complaint, the court entered a default judgment against Iran based simply upon the facts set forth in the Claimant's affidavit.

[6] In the declaration, Special Agent Kramarsic declares under penalty of perjury that the facts contained in the supplemental record and the original record previously submitted to the Special Master are true and correct.

**DISCUSSION**

I.    **Four Reliable Sources Reported to the FBI that the Claimant Traveled to Iran to Sell U.S. Classified Information to Iranian Government Officials and the FBI Investigation Developed Substantial Evidence to Corroborate These Reports**

As the Department explained in its reconsideration request, the record evidence includes reports by four sources – deemed reliable by the FBI – all of whom confirmed to the FBI that the Claimant attempted to sell U.S. classified information to Iranian officials.[7]  This source information is strong evidence of the Claimant's primary reason for traveling to Iran.  The fact that four separate, reliable sources each independently provided the same information to the FBI – each source corroborating the core information provided by the others – is entitled to substantial weight.

Moreover, the source reporting does not stand alone, but is corroborated by the significant circumstantial evidence developed by the FBI on the Claimant's suspicious activities in Afghanistan, *i.e.*, that the Claimant accessed classified reports on Iran to sell this classified information to the Iranian government.  As explained in more detail below, this evidence includes the following key facts:

(1)    the Claimant obtained an Iranian passport relying upon his Iranian citizenship, even though he knew that he could not hold Iranian citizenship at the same time as holding a U.S. security clearance, and that he had previously renounced his Iranian citizenship in order to receive a U.S. security clearance;

(2)    the Claimant failed to disclose to U.S. authorities as required that he obtained the Iranian passport;

(3)    by using an Iranian passport instead of a U.S. passport with an Iranian visa, the Claimant was able to travel to Iran and minimize the risk of alerting U.S. authorities;

(4)    although the Claimant was specifically assigned to analyze threats in Afghanistan, like the Taliban and Haqqani Network, FBI forensic examination of his search/access logs revealed that over 90% of the documents he accessed were on Iran, and not related to his assigned work on Afghanistan;

(5)    the Claimant concealed his work on Iran.  Despite spending the vast majority of his time accessing intelligence documents on Iran, his supervisors were not aware that he was focused on Iranian matters, and he produced no intelligence reports or briefings on Iran;

(6)    the Claimant abruptly resigned by giving two weeks' notice in late July 2011 after less than two months on the job.  He then changed his schedule by

---

[7] Department of Justice Memorandum (Dec. 20, 2019), Exhibit F ¶ 6 (hereinafter "DOJ 12/20/2019 Mem.").

frequently working late at night and doubled the pace by which he accessed classified documents. During his final eleven days in Afghanistan before he left for Iran, the Claimant accessed almost the same number of classified documents on Iran as he had in the previous twenty days, even viewing such information on the day of his departure only hours before he left Afghanistan for his ultimate destination of Iran;

(7)   the Claimant did not disclose his intent to travel to Iran, as required by the security briefing he received just weeks earlier as a Department of Defense contractor, and he traveled to Iran without ever mentioning to any of his colleagues that he was doing so, despite the risks of traveling there;

(8)   during the FBI interviews following his release, the Claimant evaded and essentially refused to answer the FBI's questions related to whether he had accessed classified information regarding Iran; and

(9)   during a later FBI interview, after being told that he was being investigated for espionage and confronted with evidence that he had accessed hundreds of classified documents on Iran, the Claimant provided false denials and inconsistent answers to explain his viewing of these Iran-related documents.

This evidence cannot be reconciled with the Claimant's stated reasons for accessing classified materials on Iran and traveling to Iran, and makes sense only if one accepts the reporting of the four sources: that the Claimant traveled to Iran to sell U.S. classified information to Iranian official.

The foregoing evidence about the Claimant's unusual pattern of conduct exists independent of the source reporting about the Claimant's later activities in Iran. This evidence thus corroborates each of the source reports that the Claimant voluntarily traveled to Iran and approached Iranian government officials offering to sell U.S. classified information. Thus, while the Claimant's counsel repeatedly asserts that this case is based upon the "suspicions" of FBI agents,[8] that claim simply ignores the substantial evidence in the record. The Department addresses this evidence in more detail in the remainder of the memorandum.

## II.   The Claimant's Actions in Securing an Iranian Passport and His Failure to Report His Intent to Travel to Iran Further Corroborate the Source Reporting about the Purpose of His Travel to Iran

In 2011, just months before his assignment to Afghanistan as an Intelligence Analyst with a U.S. security clearance, the Claimant secretly applied for an Iranian passport that depended upon his status as an Iranian citizen. In applying for an Iranian passport, the Claimant would have understood given his prior experience in applying for a security clearance that he could not simultaneously hold a U.S. security clearance and be an Iranian citizen.

---

[8] Hearing Tr. at 7-8.

During his first application for a security clearance in 2003, the Claimant was advised by the Department of Defense that he was considered to be a citizen of Iran because his father was an Iranian citizen.  He was informed that he could not be granted a security clearance unless he renounced his Iranian citizenship.[9]  On August 12, 2003, the Claimant sent by certified mail a sworn formal statement to "renounce and relinquish any and all right, title and interest . . . as a citizen of Iran" to the Iranian Interest Section in the Embassy of Pakistan, and he provided a copy of this renunciation document to the Department of Defense.[10]

Despite being on notice that he was prohibited from being an Iranian citizen and possessing a U.S. security clearance, in January 2011, the Claimant sought the assistance of a company called Legal Persian to obtain an Iranian passport from the Iranian Interest Section.[11] To be eligible for an Iranian passport, a person must affirm he or she is a citizen of Iran.[12]  In February 2011, in response to Claimant's request, the Iranian Interest Section issued an Iranian passport to the Claimant.[13]  Despite having recently been issued an Iranian passport reflecting that he was an Iranian citizen, the Claimant never reported his Iranian passport to U.S. security officials as required – even though at the time he was serving in a national security position as an Intelligence Analyst with Top Secret/Sensitive Compartmented Information (TS/SCI) clearances.[14]  Notably, the Claimant was not required to obtain an Iranian passport to travel to Iran.  The Claimant could have traveled to Iran using his U.S. passport with an Iranian visa, although doing so risked alerting U.S. authorities to his travel.[15]  By traveling on an Iranian passport instead of a U.S. passport, the Claimant could minimize the risk of alerting U.S. authorities about his travel to Iran.[16]

In addition to his failure to disclose his new Iranian passport to U.S. security officials, the Claimant also failed to comply with rules requiring him to disclose his intended travel to Iran. Prior to beginning work in Afghanistan, the Claimant received three standard security briefings from his Department of Defense contractor for his assignment as an Intelligence Analyst.  Under the category of "Required Reports," the Department of Defense Initial Briefing mandated that employees with a clearance are required to report to the security officer any information pertaining to "Foreign travel to or through a country that is overtly hostile to the US."[17]  In the Defense Security Measures Briefing, a list identified "ways that an individual can protect oneself and some responsibilities the individual must assume in order to circumvent the possibility of becoming a target" of a hostile foreign government.  The list includes "Report all foreign travel

---

[9] Supplemental Record ¶ 1.

[10] *Id.*

[11] Supplemental Record ¶ 2.

[12] *Id.*

[13] *Id.*

[14] *Id.*

[15] *Id.*

[16] *Id.*  Evidence that this was an attempt to deceive is further supported by the Claimant's choice of travel itinerary. The Claimant waited until he arrived in Dubai before he purchased a ticket to Iran.  Hearing Tr. at 70.

[17] Supplemental Record ¶ 3.

and the intent to travel to criterion countries.  To avoid any repercussions, these travel plans must be reported prior to the trip."[18]  On June 22, 2011, the Claimant signed the form acknowledging that he had read and understood the security requirements.[19]  From those recently briefed requirements and warnings (and from his prior experience as a clearance holder), the Claimant would have known that he was required to report his intended travel to Iran – "a country that is overtly hostile to the US" – as a security precaution.  His failure to do so supports that the Claimant wanted to conceal his travel to Iran.

The Claimant's testimony also does not adequately account for the particularly acute risks he undertook in traveling to Iran.  During the hearing, the Claimant testified that he had been planning his trip to Iran since December 2010 to visit family.[20]  He stated that it would be a good time for him to travel to Iran because he was already in the region, and that his mother had recently been to Iran.[21]  He also stated that it was not illegal for him to travel to Iran.  Still, while the Claimant is correct that it was not *illegal* for him as a security clearance holder to travel to Iran,[22] it was highly imprudent for him to do so.  Indeed, at the time, the U.S. Department of State had issued a Travel Warning advising on the serious risks of U.S. citizens traveling to Iran.[23]

---

[18] *Id.*

[19] Supplemental Record ¶ 3, Exhibit 3 (b).

[20] Hearing Tr. at 96.  Even accepting that visiting family was *one* of the reasons he traveled to Iran, this reason does not contradict the record evidence that once he arrived, four sources reported that he met with Iranian officials and offered to sell U.S. classified information, which ultimately led to his arrest and detention.

[21] Hearing Tr. at 96.  *See also* Supplemental Record ¶ 4.

[22] As the Claimant was debriefed from access and had resigned his position, he was legally able to travel to Iran.  Still, as a clearance holder, the Claimant needed to notify authorities of any planned travel to Iran.

[23] The Claimant testified that the "threat level [for Iran] was a Level 2, which means exercise caution."  Hearing Tr. at 96.  The U.S. Department of State issued a Travel Warning for Iran on October 8, 2010, and reissued it again on October 21, 2011.  The terms of the State Department Travel Warning make clear that the warning went well beyond merely exercising caution.  In relevant part, the 2011 Travel Warning stated:

> The Department of State warns U.S. citizens to carefully consider the risks of travel to Iran.  Dual national Iranian-American citizens may encounter difficulty in departing Iran.  U.S. citizens should stay current with media coverage of local events and carefully consider nonessential travel … Some elements in Iran remain hostile to the United States.  As a result, U.S. citizens may be subject to harassment or arrest while traveling or residing in Iran.  Since 2009, Iranian authorities have prevented the departure, in some cases for several months, of a number of Iranian-American citizens, including journalists and academics, who traveled to Iran for personal or professional reasons.  Iranian authorities also have unjustly detained or imprisoned U.S. citizens on various charges, including espionage and posing a threat to national security.  U.S. citizens of Iranian origin should consider the risk of being targeted by authorities before planning travel to Iran.  Iranian authorities deny the U.S. Interests Section in Tehran access to imprisoned dual national Iranian-American citizens because Iranian authorities consider them to be solely Iranian citizens, access to U.S. citizens is often denied as well.

Supplemental Record ¶ 5, Exhibit 5 (b).

Finally, notwithstanding his stated long-standing desire to travel to Iran, the Claimant never informed or mentioned to any of his work colleagues that he was traveling to Iran.[24]  This failure to mention his travel to Iran is particularly significant with regard to Colonel Roland Tiso, Jr., a colleague with whom the Claimant had a close relationship (discussed below) during his time in Afghanistan.[25]

Overall, considering the circumstances of the Claimant's secretly obtaining an Iranian passport in violation of his security clearance, his failing to report his intent to travel to Iran as required by his security briefings, the risks of traveling to Iran, and the Claimant's failure to mention the trip to his colleagues, the evidence in the record supports the conclusion that he was attempting to conceal his trip.[26]

### III. The Claimant's Pattern of Accessing Classified Information on Iran, Especially in the Weeks Leading up to His Travel to Iran, Corroborates the Source Reporting About the Purpose of His Travel

#### A. The Claimant Accessed a Substantial Amount of Classified Information that was Outside the Scope of his Work Assignments

The FBI forensic examination of the Complainant's computer search/access logs revealed that over 90% of the hundreds of classified documents he accessed were on Iran — not on his assigned responsibility to analyze threats within Afghanistan.[27]  In his testimony, the Claimant acknowledges that he accessed highly classified information regarding Iran.[28]  He claims that he did so, however, only because he was not given any direction about the types of projects he

---

[24] The Claimant admitted during his April 2016 interview with the FBI that he had not told any of his associates or colleagues in Afghanistan about his intentions to travel to Iran.  During that same interview, the FBI asked him why it was that "everyone to include his colleagues and employer all thought [the Claimant] was traveling directly from Afghanistan to the U.S. to pursue his graduate degree."  The Claimant did not answer that question, but instead responded only by clarifying that he intended to attend the University of Michigan in Dearborn, and not in Flint. Supplemental Record ¶ 12, Exhibit 12 (c) at 2.

[25] Supplemental Record ¶ 6.  Colonel Tiso believed that the Claimant was returning home to the United States after leaving Afghanistan and transiting through Dubai.  *Id.*

[26] The Claimant's concealment of his travel plans to Iran from Colonel Tiso is especially notable.  In his testimony to the Special Master, the Claimant asserted "everyone knew" of his research on Iran and specifically recalled a conversation with Colonel Tiso to illustrate this point.  Hearing Tr. at 56, 58.  The Claimant said he told Tiso that he wanted to become an expert on Iran, like Tiso was an expert on Pakistan, and Tiso replied that it was a great idea. Hearing Tr. at 57.  Yet, even after he allegedly expressed this interest to become an expert on Iran, the Claimant never disclosed his imminent trip to Iran to the Colonel.  This is even more suspicious considering how close they were.  Colonel Tiso (as well as Captain Molnar) reported to the FBI that he and the Claimant were close friends who "spent a great deal of time" working next to each other and frequently ate meals and lifted weights together. Supplemental Record ¶¶ 6, 9. Colonel Tiso gave a plaque and a short speech before the Claimant's departure and accompanied him to the airport on his final day in Afghanistan.  Supplemental Record ¶ 6.

[27] Supplemental Record ¶ 10, Exhibits 11 (a) and (b).

[28] Hearing Tr. at 28 (testifying that he "used SIPRNet, which is a secret classified system, and [he] accessed hundreds of reports on Iran-related topics"); Hearing Tr. at 54-55 (acknowledging that he started to look into Iran-related issues); *id* at 57 (stating that his research on Iran was a "natural progression" of his work).

should be working on, and needed to fill his workdays.[29]  He also claims that he accessed the Iran-related classified information because he wanted to become a more effective employee by developing expertise on Iran.[30]  His stated reasons for accessing this information, however, are not credible because they are contradicted by the clear evidence in the record, and further, they do not explain the substantial increase in the Claimant's interest in accessing Iran information during his last weeks in Afghanistan prior to ending his employment.

First, the evidence is clear that the Claimant's designated work during his time in Afghanistan was focused on topics related to Afghanistan, not Iran.  When the Claimant arrived at Bagram Air Force Base in Afghanistan, he was assigned to work on projects related to the Afghan Taliban, the core threat to U.S. operations, and the Haqqani Network, an Afghan guerrilla insurgent group.[31]  FBI interviews with the Claimant's supervisors at the time support that the focus of his assigned work was on Afghanistan, and not Iran.

Lt. Colonel (then Major) Christopher Heatherly supervised the Claimant in his role as the Chief of the Regional Information Fusion Center where the Claimant worked.[32]  When interviewed by the FBI in 2016, Lt. Colonel Heatherly stated that he could not recall any specific assignments given to the Claimant, but stated that any specific taskings would have been related to analyzing insurgent communication methods and techniques in relation to Afghanistan and certain surrounding countries, such as Pakistan.[33]  Lt. Colonel Heatherly thought it was highly unlikely that the Claimant needed to access any information regarding Iran, because Iran's influence in Afghanistan was not a prevalent issue at the time.[34]  The Claimant's other supervisors corroborate Lt. Colonel Heatherly's information.  In an FBI interview in 2011 with another of the Claimant's supervisors, Lt. Colonel Pendall, who was the Deputy Chief of Staff for Intelligence, said that he instructed the Claimant to work on researching the inconsistencies between what the Taliban and Haqqani Network leaders were saying to their commanders and what they were saying to the public.[35]  Captain Elizabeth Molnar, who was also responsible for supervising the Claimant, stated in an FBI interview that he was tasked with analyzing communication techniques and methods used by the Taliban.[36]  The Claimant's intensive time

---

[29] Hearing Tr. at 55 (stating that he began to research Iran-related issues because he "had 12-hour days" and "had to fill his time").

[30] Hearing Tr. at 56 ("I would also try to develop expertise in Iranian influence in Afghanistan and other Iranian-related topics and being a so-called Iran expert like I had been in some way in Iraq.").

[31] In his testimony, the Claimant acknowledged that after he arrived, it was suggested that he "look at Taliban or Al-Qaeda messaging and propaganda." Hearing Tr. at 46.  *See also* Supplemental Record ¶ 12, Exhibit 12 (c) at 5.

[32] Supplemental Record ¶ 7.

[33] *Id.*

[34] *Id.*

[35] Supplemental Record ¶ 8.

[36] Supplemental Record ¶ 9.

and effort in researching classified materials on Iran thus had no correlation to his actual work assignment, which focused on communication and messaging techniques in Afghanistan.[37]

The FBI forensic analysis of the Claimant's classified information computer system audit revealed that he unilaterally accessed 540 classified documents pertaining to Iran.[38]  In fact, as noted previously, over 90% of the classified products he accessed between early July and early August 2011 were related to Iranian topics and issues, and included reports on Iranian military, nuclear, and terrorism topics that were classified at the highest levels, and had no relation to Afghanistan.[39]

Second, the Claimant's explanation that he wanted to be more productive by "fill[ing] his time" and becoming a subject matter expert on Iran also is belied by the record.[40]  As the Claimant admitted in his testimony, his supervisors were most interested in the work product that he was generating.[41]  As an Intelligence Analyst in Afghanistan, the Claimant produced five intelligence reports, all relating to the Taliban.  But, despite focusing over 90% of his classified product research on Iranian topics/issues and accessing approximately 540 separate documents on Iran, the Claimant produced *no reports* on Iran during his time in Afghanistan.[42]  The Claimant's failure to produce any work product on Iran undermines the credibility of his claim that his research was for legitimate work-related purposes.

Third, the Claimant's explanation is also contradicted by the fact that he actually increased his focus on Iran research even *after* he gave notice that he was leaving.  According to the Claimant, his original reason for wanting to access classified information on Iran was because he wanted to become a more productive employee for the company.  After the Claimant provided his two-weeks' notice in late July 2011 (after only less than two months on the job),[43] there was ostensibly no further need for the Claimant to develop an expertise on Iran as part of his effort to become a more productive employee.[44]  Despite this, the evidence confirms that not

---

[37] To support his claim that his supervisors valued initiative, the Claimant repeatedly cites to a telecommunications analysis project that he took it upon himself to start, and for which he received "praise."  Hearing Tr. at 54; *see also id.* at 55.  That project, however, was an analysis of Taliban and Al-Qaeda activities related to communications systems – exactly the focus of the work the Claimant was charged with pursuing.  The fact that the Claimant was praised for taking initiative on this project does not support his assertion that his supervisors approved of his focusing on Iran.  Indeed, as explained below, they did not know that he was focusing on Iran-related topics.

[38] Supplemental Record ¶ 10.

[39] DOJ 12/20/2019 Mem., Exhibit F ¶ 3.

[40] Hearing Tr. at 55.

[41] Hearing Tr. at 58 ("They wanted to know – what they most cared about was "What do you got? What [do] you have for us? What is the product? What is the solution you have to one of our problems?").

[42] DOJ 12/20/2019 Mem., Exhibit F ¶¶ 3, 4.

[43] DOJ 12/20/2019 Mem., Exhibit F ¶ 4.

[44] According to the Claimant, he understood that his work over these last two weeks was not even necessary or important to the company.  Hearing Tr. at 70 ("One is that I gave a two-week notice, but I know they didn't need those two weeks.  So I gave them a two-week notice because that's the right thing to do, but I asked the unit, you know, 'I'm totally okay with staying two weeks, giving you enough time, but if you don't need me, you know, I just

only did the Claimant not cease accessing classified materials on Iran, the pace of his access increased.

The FBI's forensic analysis of his search/access activity during his final two weeks confirms that over 90% of the classified documents he accessed related to Iran, and an unusually large percentage of those products were highly classified.[45]  Moreover, during these two weeks, the Claimant nearly doubled the pace at which he accessed classified documents – 301 in the last 11 days compared to 321 documents in the previous 20 days.  As a final point, the record evidence reflects that Hekmati was reading a dozen Iran-related intelligence products all the way up to and including the day of his departure, only hours before he departed Afghanistan.[46]  This pattern of behavior is not consistent with Claimant's explanation for his Iran-related research, and there simply is no credible explanation for the Claimant's pattern of accessing classified information on Iran other than that he was reviewing it for an illicit purpose.[47]

### B.    The Claimant's Access of Classified Information on Iran Was Done Secretly

In his testimony, the Claimant contends that his work on Iran was not a secret because he informed his colleagues and supervisors about what he was doing, and because everything he did was in the open for others to see.[48]  Indeed, the Claimant asserts that "everyone knew" what he was working on.[49]  In direct response to this testimony, the Department is providing additional evidence relevant to the Claimant's assertions.

First, the evidence is clear that the Claimant's supervisors and colleagues were not aware that the Claimant was focusing his work on Iranian matters.  As previously noted, the FBI interviewed three supervising officers in his chain of command (Heatherly, Pendall, and Molnar).  All three officers consistently reported that the Claimant was tasked to work on Taliban communications in Afghanistan and never mentioned any knowledge of his work on Iran matters.  In his testimony, however, the Claimant relies heavily on his interactions with a retired Colonel who sat right next to him in the intelligence center to show that he was transparent to others about his focus on Iran.  The FBI has identified this person as Colonel Roland Tiso, Jr.  According to the Claimant, he asked Colonel Tiso, "Hey, you are the Pakistan expert.  How does that work?  What do you think about me getting – sort of being like the Iran expert."[50]  The

---

-- I'll go ahead and get out of here.'").  The Claimant's pattern of continuing to access classified information on Iran is inconsistent with his assertion that he should have been transitioning out of the job during these last two weeks.

[45] DOJ 12/20/2019 Mem., Exhibit F ¶ 4.

[46] Supplemental Record ¶ 10.

[47] According to Captain Molnar, the Claimant's work production declined significantly, and he became even more quiet and reserved towards the end of his time in Afghanistan.  Supplemental Record ¶ 9.

[48] *See* Hearing Tr. at 56-57 ("Q.  Did you tell your colleagues about your research on Iran issues? A.  Everyone knew.  The colonel who was on my – we were elbow to elbow.  This is a SCIF, and we had limited space.  It is packed.  I have analysts on my right; I have analysts on my left.  I have one in front of me, one behind me, elbow to elbow, we can see each other's screen.").

[49] Hearing Tr. at 56.

[50] Hearing Tr. at 57.

Claimant testified that Colonel Tiso responded, "I think that's great." This testimony is contradicted by information provided by Colonel Tiso. In two interviews with the FBI conducted in 2011 and 2016, Colonel Tiso confirmed that he sat next to the Claimant in the SCIF (Sensitive Compartmented Information Facility, where classified information is secured).[51] Tiso understood that the Claimant's analytic assignment was to examine insurgent communication methods, although he could not remember any specific work that had been assigned to the Claimant.[52] Tiso also reported that "of all of the analysts on the JOC [Joint Operations Center] floor, what people knew the least about was what HEKMATI was doing," and that the Claimant never "opened up about what he was working on."[53]

Second, the evidence also contradicts the Claimant's testimony about the change in his work routine after he gave his two-weeks' notice.[54] According to the FBI forensic analysis of his search/access logs, the date/time record shows that from July 13, 2011, through July 31, 2011, the Claimant regularly began work between 8 a.m. to 10 a.m. and finished work between 5 p.m. to 7 p.m. local time. Shortly after providing two-weeks' notice that he was terminating his contract, however, the Claimant significantly changed his work hours. He began to work primarily at night, often after midnight.[55] And as discussed above, he doubled the pace at which he accessed classified documents in the final two weeks. Rather than a sudden personal whim to work night hours, the Claimant's decision appears to be a calculated effort to access more classified documents during hours where he might feel the risk of detection was considerably reduced.

C.     The Claimant Never Intended to Stay in Afghanistan for the Duration of His Contract

First, in January 2011, months before he began his DoD assignment to Afghanistan, the Claimant began the process of obtaining an Iranian passport for his trip to Iran.[56] The Claimant later told the passport facilitator that his plan was to travel to Iran in October.[57] The timing of his travel plans to Iran is suspicious because October was only four or five months after he began his work as an Intelligence Analyst in Afghanistan. However, in his interview with the FBI in 2016, the Claimant stated that a reasonable period of time to gain experience to obtain a full-time position as an Intelligence Analyst for the U.S. government in the future was at least one year and that he was willing to stay in Afghanistan one, two, or even three years if he was receiving a

---

[51] Supplemental Record ¶ 6.

[52] *Id.*

[53] *Id.*

[54] Hearing Tr. at 60-61 ("I never went to any night shift. . . . So there were times maybe when I wasn't feeling good in the daytime so I shifted a few hours to the night. I was never on any set night shift where I shifted to the night shift.").

[55] Supplemental Record ¶ 10.

[56] Supplemental Record ¶ 2.

[57] Supplemental Record ¶ 12, Exhibit 12 (c) at 6.

good experience as an analyst.[58]  He also testified to the Special Master that he considered this assignment a "once-in-a-lifetime opportunity."[59]  The Claimant's statements to the FBI and the Special Master are not credible as the evidence demonstrates that he had already planned to travel to Iran only four to five months into his assignment in Afghanistan – and the Claimant acknowledged to the FBI that travel to Iran could jeopardize his security clearance, which clearly could preclude his continuing to serve as an Intelligence Analyst in Afghanistan.[60]  Contrary to his claims to the FBI and the Special Master, the Claimant had no intent to serve in his Afghanistan position for an extended period.  The evidence establishes that his intent was to gain access to classified intelligence on Iran prior to his already planned trip to Iran.

Second, the Claimant requested that the signing bonus provisions in his contract be rescinded to avoid any time commitment.[61]  It was not the case that contractors in the Claimant's position did not enter into time commitments; many accepted signing bonuses, but they had to commit to stay for a minimum period of time or else the bonus would have to be repaid.  The fact that the Claimant refused a signing bonus from the outset is another indicator that he never intended to stay longer than 6 months in his contract.

In sum, the facts and circumstances surrounding the Claimant's access of classified information on Iran corroborate the source reporting that he traveled to Iran to sell U.S. classified information.

## IV.    The Claimant's False, Evasive, and Inconsistent Answers When Questioned on the Purpose of His Travel Further Undermine his Credibility and Corroborate both the Source Reporting and Evidence Developed by the FBI

The Claimant does not contest that he made the false and inconsistent explanations set forth in the FD 302 reports included in the record.  Instead, he attempts to minimize the significance of these evasive answers by suggesting the FBI was motivated by "suspicions," employed improper tactics, and exploited the shock of his detention in Iran.[62]  These arguments are contradicted by the facts in the record.

---

[58] *Id.*

[59] Hearing Tr. at 38.

[60] Supplemental Record ¶ 12, Exhibit 12 (c) at 6.

[61] Claimant Submission Ex. A ¶ 23.

[62] Claimant's counsel makes the argument that interview reports were the result of "recollections" of the FBI agents who interviewed the Claimant.  It is standard FBI policy, however, for agents to take contemporaneous notes during the interview, and then later use those contemporaneous notes to draft the report.  Hearing Tr. at 7.

A.   The Claimant Gave False, Evasive, and Inconsistent Responses to the FBI's Questions About Iran

1.   The January 2016 FBI Interviews

The Claimant was interviewed by the FBI in Germany on January 19, 2016 in the morning and afternoon after he was released from Iran.[63]  At the beginning of the both interviews, the FBI agents identified themselves.[64]  They began by asking the Claimant questions about his arrest and detention and time in Iran.  During this portion of the interview, the Claimant provided fulsome responses to the agents' questions.  For example, the Claimant provided a detailed description of the circumstances of his arrest and questioning by Iranian agents.  He also provided a detailed description of Evin Prison where he was held, including the security mechanisms that prevented escape, as well as the types of prisoners who were housed there.  The Claimant also provided a detailed description of the number of prisoners who were accused of being spies, and in particular his knowledge concerning spies supposedly working for the Central Intelligence Agency.

During the course of these interviews, the agents were not confrontational and never accused him of espionage or any other improper conduct.  Once the agents asked the Claimant about his access to classified reporting regarding Iran in the afternoon interview, however, the Claimant *refused to answer*.  Instead, he stated that the FBI could find out for itself.  The Claimant's refusal to answer this simple and direct question is revealing.  The Claimant knew that he had spent most of his time reading classified documents about Iran – over 90% of the classified documents he had accessed as an Intelligence Analyst in Afghanistan were on Iran – yet when questioned, he refused to acknowledge this to the FBI.  His refusal to answer this question is also inconsistent with his hearing testimony that his interest and "research" on Iran was known to "everyone" at the intelligence center.  Similarly, when the FBI subsequently asked the Claimant whether he had ever accessed paper copies of classified reporting on Iran, the Claimant again avoided the question, stating only that he had top secret security clearance and explaining that he did not have oversight and did not know what his mission was.[65]

Notably, the context for these questions was the circumstances of his arrest and detention in Iran, not that the Claimant had engaged in espionage or otherwise improper behavior.  The fact that the Claimant refused to answer any questions about his access of classified information on Iran while freely answering other questions is telling, and supports the Claimant's consciousness of guilt on this issue.

---

[63] Supplemental Record ¶ 12, Exhibits 12 (a) and (b).

[64] Supplemental Record ¶ 12, Exhibit 12 (a) at 1 ("After being advised of the identity of the interviewing Agents and the nature of the interview, Hekmati voluntarily provided the following information … Before the interview started, SA Anderson told Hekmati the FBI appreciated Hekmati agreeing to talk to the FBI.  Hekmati stated that he was happy to help the FBI."  *See also* Exhibit 12 (b) at 1 ("The FBI SAs identified themselves to HEKMATI during the previous 1/19/2016 interview … SA Anderson thanked HEKMATI for agreeing to speak with the FBI again …."").

[65] Supplemental Record ¶ 12, Exhibit 12 (b) at 3-4.

2.    The April 2016 FBI Interview

The Claimant was again interviewed by FBI agents on April 7, 2016.[66]  The interview took place in Michigan, almost three months after the Claimant had been released from Iran.  At the beginning of the interview, the agents provided the Claimant with a detailed summary of the FBI's investigation into his activities, and confronted the Claimant by stating that the FBI knew that he had traveled to Afghanistan to gain access to classified information regarding Iran, and that he then traveled to Iran to sell that information to the Iranian government.  Throughout this interview, the Claimant provided false, evasive, and inconsistent responses to the FBI agents' questions.

First, with respect to the secrecy of the Claimant's travel to Iran, the FBI agents asked him why it was that "everyone to include his colleagues and employer all thought [the Claimant] was traveling directly from Afghanistan to the U.S. to pursue his graduate degree."[67]  The Claimant did not address the question, but responded only by clarifying that he intended to attend the University of Michigan in Dearborn, and not in Flint.  Once again, the Claimant deflected the question.  His only answer to a serious question in the context of an espionage investigation was to make sure the agents understood the correct University of Michigan campus.  The Claimant's evasive answers to this question support that he did mislead his colleagues into believing that he was returning to the U.S. after Afghanistan.

Second, the agents showed the Claimant his June 6, 2011 email to Legal Persian, where the Claimant wrote: "So I plan on going [to Iran] in October."[68]  The agents noted that this contradicted the Claimant's prior statement that he wanted to stay up to three years depending on the quality of the experience that he was receiving, and that the email showed his clear intent to spend very little time in Afghanistan before traveling to Iran.  In response, the Claimant did not explain the inconsistency, but denied that he only planned to stay for a short time and stated that the email meant nothing because he went to Iran in August, not October.  The Claimant also acknowledged that a trip to Iran could mean he would lose his clearance.[69]  The agents asked him to explain the discrepancy between a pre-planned trip to Iran where he could lose his security clearance, and his statement that he wanted to stay in Afghanistan for up to three years to obtain later full-time employment with the U.S. government.  The Claimant could not explain the discrepancy.

Third, the Claimant asserted that he did not need to sell information to the Iranian government because he did not need any money, and because he had many bonuses coming in.  The Claimant acknowledged to the agents, however, that his assets were not liquid.[70]  Also, when he was told that he did not have any bonuses coming because he had left Afghanistan before the six-month contract term, the Claimant provided no response.

---

[66] Supplemental Record ¶ 12, Exhibit 12 (c).

[67] Id.

[68] Supplemental Record ¶ 12, Exhibit 12 (c) at 6.

[69] Id.

[70] Id.

B.    The FBI Did Not Act Improperly in Interviewing the Claimant

In his testimony, the Claimant made numerous incorrect accusations concerning the FBI agents' conduct during their interviews of him.  Because of the number of false statements the Claimant has made about the FBI's conduct, it is necessary to address them one at a time.  As the following discussion demonstrates, the FBI agents at all times acted properly.[71]

*The FBI agents identified themselves*.  The Claimant contends that when he was first questioned by FBI agents in Germany, the agents did not identify themselves.[72]  As reflected in the FD 302 reports regarding the January 2016 interviews, the agents identified themselves before speaking to the Claimant.[73]  Indeed, the Claimant himself confirmed that he knew he was speaking with the FBI when, in response to one of their questions about his access to classified information regarding Iran, he stated that the FBI could figure out that question for itself.[74]

*The FBI did not interview the Claimant under the ruse of a medical exam*.  The Claimant testified that, during the January 2016 interview, the FBI agents pretended to conduct a medical examination to speak with him.[75]  That is false.  The agents interviewed the Claimant only *after* he was medically cleared by doctors to speak with the FBI.[76]

*The FBI agents identified themselves before the April 2016 interview*.  The Claimant testified that the FBI agents showed up at his door in Michigan and asked to show him more photos.[77]  The Claimant omits, however, that the agents first identified themselves as from the FBI, and that they requested to speak to him on a voluntary basis.[78]  The agents drove the

---

[71] Claimant's counsel suggests that the FBI agent's actions were motivated in part by a "paranoia about Muslims." Hearing Tr. at 8.  Counsel provided no evidence to support this, nor could he.  The record demonstrates that the FBI agents conducted themselves professionally in each and every interaction with the Claimant, and with the others they interviewed.

[72] Hearing Tr. at 91.

[73] Supplemental Record ¶ 12, Exhibit 12 (a) at 1.  *See also* Exhibit 12 (b), ("This interview … was the second FBI interview … The FBI SAs identified themselves to HEKMATI during the previous 01/19/2016 interview … SA Anderson thanked HEKMATI for agreeing to speak with the FBI again…").

[74] Supplemental Record ¶ 12, Exhibit 12 (b) at 3 ("…HEKMATI was asked if he ever accessed classified reporting on Iran.  HEKMATI refused to answer this question; instead, HEKMATI indicated that the FBI could find out that information for itself by pulling the log information.").

[75] Hearing Tr. at 90-91.

[76] Supplemental Record ¶ 12.

[77] Hearing Tr. at 92.

[78] Supplemental Record ¶ 12, Exhibit 12 (c) at 1 ("Interviewing agents approached HEKMATI's residence … at which time they identified themselves and advised HEKMATI of the purpose of the interview.  HEKMATI voluntarily agreed to go to the Flint [Resident Agency] to speak with the agents."  At Flint RA, "HEKMATI was again informed the interview was voluntary and he could leave at anytime.").

Claimant to his mother's place of business so that he could pick up his car.  The Claimant then drove his car, following the agents to the FBI's offices.[79]

*The FBI agents never took the Claimant's cell phone or denied him an opportunity to speak to his attorney.*  As the Claimant testified, before the April 2016 interview, he called his attorney and spoke with him.[80]  The Claimant asserted, however, that he was thereafter unable to speak with his attorney before the interview.[81]  The FBI agent told the Claimant's counsel that she would speak to him at a later time from a landline and the Claimant provided the FBI with his attorney's contact information.  The agents did not take the Claimant's phone, and he was free to speak to his attorney during the car ride to the FBI's offices.  Indeed, the agents observed the Claimant on his phone during the car ride.[82]  Once they arrived at the office, both the agents and the Claimant left their phones outside the interview room because of the sensitive nature of the interview.  The agents again told the Claimant that the interview was voluntary; the Claimant elected to proceed with the interview.[83]

*The FBI told the Claimant that he was under investigation in the April 2016 interview.*  The Claimant testified that the FBI never told him he was under investigation.[84]  During the April 2016 interview, the FBI agents informed the Claimant that he was under investigation for attempted espionage.[85]  The FBI also provided the Claimant with the information that the agents had gathered during the investigation.  The Claimant did not stop the interview, nor did he ask to call his lawyer; he continued to talk to the FBI for approximately three hours.

*The FBI showed Claimant a log of his search activity in Afghanistan.*  During the hearing, the Claimant repeatedly stated that the FBI never showed him any logs reflecting his access of classified information.[86]  In their FD 302 report for this interview, however, the FBI agents recorded that they showed a log of his search activity to the Claimant.  Pursuant to FBI policy, a copy of the actual log shown to the Claimant is attached to the FD 302 report.[87]  Moreover, in the report, the agents wrote the following: "[t]he agents also explained to HEKMATI that approximately 90% of the searches he conducted were about Iran or issues of

---

[79] *Id.*

[80] Hearing Tr. at 93.

[81] *Id.* at 93-94.

[82] Supplemental Record ¶ 12.

[83] Supplemental Record ¶ 12, Exhibit 12 (c) at 1, at the Flint field office, ("HEKMATI was again informed the interview was voluntary and he could leave at anytime.").

[84] Hearing Tr. at 92-93 ("I was never told I was under investigation.").

[85] Supplemental Record ¶ 12, Exhibit 12 (c) at 1-2 (the FBI agent "confronted HEKMATI by telling him the FBI knew HEKMATI went to Afghanistan to gain access to classified information in order to travel to Iran and sell this information to the Iranian government.").

[86] Hearing Tr. at 48 ("there was some talk about logs that came up, search logs, and I never saw any logs.  No logs were ever shown to me, if they exist –").

[87] Supplemental Record ¶ 12, Exhibit 12 (c) at 4 ("Interviewing agents showed HEKMATI a 'search log'…").

interest to Iran.  HEKMATI looked at the search log and denied this was a log of his search activity."[88]

*The Claimant ended the voluntary interview*.  As soon as the Claimant stated that he wanted to end the interview, the agents stopped the questions and he was allowed to leave the office.  The FBI told the Claimant that his lawyer needs a clearance to receive information regarding this investigation.[89]

## V.   Conclusion

The Claimant has failed to rebut the record evidence that he traveled to Iran to sell U.S. classified information, and the entire record strongly supports the Special Master's decision. Taken together, the government's submission in the original and supplemental record establishes that the claimant intended to travel to Iran for the purpose of selling U.S. classified information to a hostile foreign power and state sponsor of terrorism.  Indeed, this evidence simply cannot be reconciled with the Claimant's stated reasons for accessing classified materials on Iran and traveling to Iran, and makes sense only if one accepts the source reporting that the Claimant traveled to Iran to sell U.S. classified information to Iranian officials.  The Claimant's decision to betray his country directly led to his arrest and detention by the Iranian government.

The Claimant is asking the Special Master to use millions of dollars of funds specifically designated to compensate the *victims* of terrorism to pay him for the results of his own voluntary decision to travel to Iran to sell secrets to a state sponsor of terrorism.  Such an outcome would truly be a perverse result.  Therefore, the Claimant's appeal should be denied, and the Special Master should reaffirm his reconsideration decision and issue a final written decision affirming that the Claimant is not eligible for payment from the Fund.

---

[88] *Id*.

[89] *Id*. at 7.

**DECLARATION OF BRETT M. KRAMARSIC, SPECIAL AGENT,**
**FEDERAL BUREAU OF INVESTIGATION**

I, Brett M. Kramarsic, hereby declare the following:

1.      I am submitting this declaration in support of the United States Department of Justice's (DOJ) Response to the Application of Amir Hekmati for compensation from the United States Victims of State Sponsored Terrorism Fund.

2.      Since October 10, 2000, I have been a Special Agent of the Federal Bureau of Investigation (FBI). For nineteen years, I have been assigned to conduct espionage and counterintelligence investigations at the Washington Field Office (WFO) and was assigned as the lead agent on the espionage investigation of Amir Hekmati. As a result of my involvement in espionage investigations, I am familiar with the tactics, methods, and techniques of particular United States persons who possess, or have possessed, a United States security clearance and who have disclosed or attempted to disclose classified information.

3.      The matters stated herein are based on my personal knowledge, my review and consideration of documents and information available to me in my official capacity, and information obtained from FBI and other personnel in the course of their official duties. My conclusions have been reached in accordance with these sources.

4.      I have attached to my declaration as Exhibit 1 the Record for Special Master ("Record"), which was originally submitted to the Special Master on December 20, 2019.

5.      I have also attached to my declaration as Exhibit 2 the Supplemental Record for Special Master ("Supplemental Record").

6.      To the best of my knowledge, based upon the sources listed above, the facts contained in the Record and Supplemental Record are true and correct.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

June_, 2020

Brett
Kramarsic

Digitally signed by Brett Kramarsic
DN  cn  Brett Kramarsic, o  FBI,
ou  WFO,
email ████████████ c  US
Date  2020.06.25 16 47 57 -04'00'

Brett M. Kramarsic
Special Agent, FBI

RECORD FOR SPECIAL MASTER

1.  The FBI opened an espionage investigation on AMIR NEMA HEKMATI on September 21, 2011. The FBI investigation has concluded that HEKMATI attempted to pass U.S. classified information to the Government of Iran, and this conclusion is corroborated by multiple reliable sources. HEKMATI was an Intelligence Analyst contractor for the Department of Defense (DOD) in Afghanistan from June 2011 to August 2011. In this position, HEKMATI held a security clearance that granted him access to intelligence reports classified at the highest level - Top Secret/Sensitive Compartmented Information (TS/SCI).

2.  When HEKMATI arrived in Afghanistan, he was told he was reassigned as a Human Terrain Systems (religious advisor) member instead of an Intelligence Analyst. HEKMATI became upset and indicated that, if he was not given the Intelligence Analyst position, he would immediately resign and go home. HEKMATI argued he was hired as an Intelligence Analyst, which would require routine access to TS/SCI information, while as a religious advisor he would not.

3.  While deployed to Bagram Air Force Base in Afghanistan, HEKMATI was assigned to work on projects related to the Afghan Taliban and the Haqqani network. However, forensic analysis of his classified information computer system audit revealed that he accessed hundreds of highly classified documents pertaining to Iran, which were all well outside the scope of his assigned duties. FBI analysis determined that, during the period from early July 2011 to early August 2011, over 90% of the classified products he accessed were related to Iranian topics/issues. The topics related to Iran included discussion of Iranian military issues, the Iranian nuclear program, Hezbollah, and Iranian support to terrorism. The products were classified up to and including the TS/SCI level.

4.  In late July 2011, HEKMATI unexpectedly provided two weeks' notice that he intended to terminate his employment. Although his original employment agreement was for six to twelve months, HEKMATI resigned from his Defense Intelligence Agency contract position within two months of his arrival in Afghanistan. During his final two weeks, HEKMATI began working the night shift at his request / decision. In those two weeks, FBI analysis indicates that, once again, approximately 90% of the products HEKMATI viewed appeared to be outside the scope of his assigned duties and an unusually high percentage were highly classified products.

5.  In August 2011, HEKMATI took a military charter flight from Bagram Air Force Base in Afghanistan to a third country. After he landed in the third country, he purchased an airline ticket to Tehran, Iran. HEKMATI did not tell any of his colleagues or associates in Afghanistan about his intentions to travel to Iran. HEKMATI later stated to the FBI that he had only told his mother about his plan to travel to Iran to visit his grandmother. Records indicate that HEKMATI arrived in the third country in the evening around 5 p.m. local time, spent the next day there, and flew to Iran the following day.

6. Throughout the investigation the FBI has received information from four reliable sources. Those sources confirm that HEKMATI voluntarily traveled to Iran and approached Iranian government officials offering U.S. classified information in exchange for payment.

7. In December 2011, the Iranian government publically released information indicating HEKMATI was arrested as a CIA spy for engaging in espionage against Iran. HEKMATI was sentenced to death, but open sources reported that HEKMATI had been retried in December 2013 and sentenced to ten years in prison. The FBI has confirmed that HEKMATI was never employed or tasked by the CIA.

8. On January 19, 2016, HEKMATI was released from Iranian custody. Following his release, the FBI interviewed HEKMATI at Landstuhl Regional Medical Center near Frankfurt, Germany. HEKMATI stated that he had always wanted to travel to Iran to visit his grandmother and other relatives. Regarding the time period when HEKMATI worked as an Intelligence Analyst for the U.S. government in Afghanistan, HEKMATI was asked if he ever accessed classified reporting regarding Iran. HEKMATI refused to answer this question; instead, HEKMATI indicated that the FBI could find out that information for itself by pulling the log information. When asked if he had ever read paper copies of classified reporting regarding Iran, HEKMATI avoided the question, instead saying that he had a "TS" clearance including SI, TK, and Gamma accesses [references to SCI programs].

9. Several months later, on April 7, 2016, the FBI interviewed HEKMATI in Flint, Michigan. In this interview, the FBI directly confronted HEKMATI, alleging that he went to Afghanistan to gain access to classified information in order to travel to Iran and sell it to the Government of Iran. In response, HEKMATI only inquired whether the FBI agent was asking a question. Interviewing agents showed HEKMATI a "search log" that detailed HEKMATI'S search activity on U.S. classified computer systems. The agents also explained to HEKMATI that approximately 90% of the searches he conducted were about Iran or issues of interest to Iran, unrelated to his assigned work. HEKMATI looked at the search log and denied this was a log of his search activity. When it was explained again this was a detailed search log of his searches, HEKMATI stated he did not have time to access classified reporting about Iran because he had too much work and was already working 12 to 13 hour days.

10. HEKMATI indicated his contractor and the military provided him access to U.S. classified systems and the interviewing agents should ask them why HEKMATI searched those topics on Iran. Interviewing agents explained that line of logic did not make sense and there was an expectation by the granting agency of his security clearance, in this case the U.S. military, he should only access information needed for his assignment. HEKMATI reiterated to ask his contractor or the military. HEKMATI further stated that his contractor and the military gave him access to U.S. classified computer network systems at large and did not restrict his access so he should be allowed to view whatever he viewed.

11. HEKMATI remembered being briefed into the TS/SCI clearance level.  When interviewing agents asked HEKMATI if he understood he did not have a "need to know" pertaining to classified reporting on Iran, HEKMATI deflected and reiterated his contractor and the military gave him "no direction."  HEKMATI indicated that his superiors did not know what he was actually supposed to do and because of this HEKMATI had to find things to do to fill his day.  As a result, HEKMATI felt that his Intelligence Analyst position was a waste of time.  When interviewing agents pointed out the contradiction between HEKMATI having to find things to do to fill his day with HEKMATI'S earlier claim he was too busy working 12 to 13 hours a day to search for information on Iran, HEMATI did not provide a response.

12. After alternating between not responding and deflecting when interviewing agents asked HEKMATI why he accessed classified reporting on Iran, HEKMATI finally responded he accessed classified information regarding Iran to become a subject matter expert on Iran. HEKMATI stated he is of Iranian descent, was curious, and compared his searches on U.S. classified information systems to a "Google" search.

13. When the interviewing agents explained to HEKMATI that he accessed a certain classified document regarding the Iranian government's presence in a certain country twice in August 2011, just before he left for the same third party country to continue onward to Iran, HEKMATI did not acknowledge accessing the document or doing anything in the third party country other than transiting to Iran.  HEKMATI said he never purposely met with the Iranian government prior to his imprisonment in Iran.

14. HEKMATI said he accepted the Intelligence Analyst position because he wanted to develop intelligence analysis experience to be more competitive in obtaining a full-time U.S. government job.  HEKMATI acknowledged to the interviewing agents that he could potentially lose his clearance if he travelled to Iran.  HEKMATI could not reconcile the discrepancy between his previous statement of wanting to acquire experience as an analyst to obtain a full-time U.S. government job and his pre-planned willingness to jeopardize his security clearance by travelling to Iran.

15. On May 9, 2016, HEKMATI filed a civil action against Iran in the United States District Court for the District of Columbia (USDC).  HEKMATI claimed that his treatment while in custody in Iran constituted torture and hostage taking in violation of the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. §§ 1602-1611, and he sought compensatory and punitive damages.

16. In support of his civil claim, HEKMATI signed a "Declaration of Amir Hekmati" on September 27, 2016.  At the conclusion of the 23-page document, HEMATI attested "Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct."  The declaration was filed with the USDC on February 10, 2017.

17. In his declaration to the USDC, HEKMATI asserted that "Before returning home from Afghanistan to Michigan to start school, I decided to take the opportunity to travel for a few

weeks . . . my mother had been encouraging me in particular over the last few months to visit my grandmother in Iran . . . ." (¶¶ 24, 25)  In fact, this was a false and misleading statement. The primary purpose of his trip to Iran was not to visit his grandmother - it was to approach Iranian Intelligence officials with an offer to sell U.S. classified information to the Iranian government.

18. In his declaration to the USDC, HEKMATI claimed that "Those first few days in Evin [prison] are a blur. I was shocked, confused, scared, indignant." (¶ 35)  HEKMATI asserted that, after his arrest by the Iranian government, "I had no contact with the outside world.  I was not permitted to speak to my family" (¶ 45) and that, after a period of months, "I hadn't spoken to my family since my arrest." (¶ 57).  In fact, this was another series of false statements.  HEKMATI's mother in interviews with the FBI indicated that HEKMATI made several calls to his uncle from his cellular phone over a period of seven to ten days indicating "he was bored ... had nothing to do, but read."

19. In assessing all the facts and circumstances presented above, the FBI has concluded that the purpose of HEKMATI's trip to Iran was to sell classified U.S. intelligence information to Iran and that, in fact, HEKMATI attempted to sell classified information to the Government of Iran when he travelled to Tehran in August 2011.  The forensic examination of his computer system log clearly demonstrates that HEKMATI accessed hundreds of highly classified documents pertaining to Iran that were wholly unrelated to his area of responsibility.  HEKMATI'S assignment in Afghanistan was to analyze the Taliban and Haqqani network - and he had no "need to know" regarding sensitive classified reporting on Iranian matters.  The suspicious nature of this unauthorized conduct is further underscored by HEKMATI'S unexpected two weeks' notice that he was terminating his employment months earlier than the terms of his contract.  Then HEKMATI informed only his mother that he was taking a trip to Iran.  Subsequent reporting provide from multiple sources corroborate that HEKMATI travelled to Iran to sell U.S. classified information to the Iranians in exchange for payment.

20. In addition, HEKMATI's own statements during interviews with FBI agents reveal dissembling behavior that reflects a consciousness of guilt.  In his initial interview after his release from Iran, when the FBI asked him if he had ever accessed classified documents as an Intelligence Analyst in Afghanistan, HEKMATI did not answer the question, instead he said the FBI could find out itself by pulling the log information.  In another interview months later, when the FBI directly confronted him alleging he went to Iran to sell classified U.S. intelligence information, HEKMATI again did not respond- instead replying only to ask if that was a question.

21. Moreover, in his statements to the interviewing agents, HEKMATI provided significantly inconsistent answers that show his effort to deflect and evade the FBI's questions.  When the FBI showed him the computer search log listing his accessing of numerous classified documents regarding Iran, HEKMATI initially denied that it was his log.  He further claimed he had so much work to do over his 12 to 13 hour shifts that he did not have any time to search classified documents on Iran.  However, later in the same interview, HEKMATI admitted

DA636

accessing the classified reports on Iran because he had to find things to do to fill his day.  Still later in the course of the interview, HEKMATI once again changed his answer - discarding his previous assertion that he accessed the documents because he had to fill the time, HEKMATI stated that he accessed the classified documents on Iran because he wanted  to become a subject matter expert on Iran.  Finally, when the FBI focused on the fundamental principle of "need to know" in accessing intelligence reports, HEKMATI simply remarked that his contractor and the military had given him access to the classified computer network and did not restrict his access, so he should be allowed to view whatever he viewed.

22. In reviewing the classified intelligence reports on Iran that HEKMATI accessed, the FBI found numerous reports on the Iranian government.  The Iranian government has a long established history of conducting and supporting terrorist operations around the world.

23. The Iranian Revolutionary Guard Corps (IRGC), with the support of the Iranian government, has engaged in terrorist activity since its inception 40 years ago.  The IRGC - most prominently through its Qods Force - has the greatest role among Iran's actors in directing and carrying out a global terrorist campaign.

   - In recent years, IRGC Qods Force terrorist planning has been uncovered and disrupted in many countries, including Germany, Bosnia, Bulgaria, Kenya, Bahrain, and Turkey.

   - The IRGC Qods Force in 2011 plotted a brazen terrorist attack against the Saudi Ambassador to the U.S. on American soil.  Fortunately, this plot was foiled.

   - In 2012, IRGC Qods Force operatives were arrested in Turkey for plotting an attack and in Kenya for planning a bombing.

   - In January 2018, Germany uncovered ten IRGC operatives involved in a terrorist plot in Germany, and convicted another IRGC operative for surveilling a German-Israeli group.

   - In September 2018, a U.S. federal court found Iran and the IRGC liable for the 1996 Khobar towers bombing, which killed 19 Americans.

24. The IRGC continues to provide financial and other material support, training, technology transfer, advanced conventional weapons, guidance, or direction to a broad range of terrorist organizations, including Hizballah, Palestinian terrorist groups like Hamas and Palestinian Islamic Jihad, Kata'ib Hizballah in Iraq, al-Ashtar Brigades in Bahrain, and other terrorist groups in Syria and around the Gulf.

25. The FBI assesses that the sensitive intelligence reporting accessed by HEKMATI could be exploited by the Iranian government in support of terrorist operations.

**SUPPLEMENTAL RECORD**

1. In 2003, the Department of Defense (DoD) processed HEKMATI for his initial security clearance.  HEKMATI was informed that, because his father was a citizen of Iran, he was considered to be an Iranian citizen as well.  In order for the DoD to grant him a security clearance, HEKMATI was required to renounce his Iranian citizenship.  HEKMATI subsequently provided DoD with a copy of a letter dated August 12, 2003, that was sent by certified U.S. mail to the Iranian Interest Section.  With the break of diplomatic relations between the United States and Iran after the seizure of the U.S. Embassy in Tehran in 1979, the Iranian Interest Section has provided de facto consular representation for the Islamic Republic of Iran in the United States.  It is located at the Embassy of Pakistan in Washington, D.C.  In the letter, HEKMATI stated in relevant part: "I understand that I may have additional citizenship status in the Islamic Republic of Iran (Iran) because my parents (who are both US citizens) were born in Iran.  I am sending this letter and executing it under oath today in order to inform the government of Iran that I am hereby renouncing any and all status that I may have in Iran under the laws of that country. . . . Intending to be legally bound, irrevocably and forever, I hereby absolutely and unconditionally abjure, renounce and relinquish any and all right, title and interest that I may have, whatsoever, as a citizen of Iran."

   EXHIBIT 1 Renunciation Letter

2. In January 2011, HEKMATI requested an Iranian passport through Legal Persian so he could travel to Iran in the summer.  To be eligible for a passport, a person must affirm he or she is a citizen of Iran.  Legal Persian is a company that facilitated contact with the Iranian Interest Section to procure passports and visas for members of the Iranian community in the United States.  On January 3, 2011, HEKMATI sent Legal Persian a copy of his old Iranian passport, which was issued on July 16, 1999 and expired on July 15, 2004, to assist with the application for his new passport.  In February 2011, the Iranian Interest Section issued an Iranian passport to HEKMATI.  In June 2011, HEKMATI informed Legal Persian that he planned to travel to Iran in July.  In July 2011, HEKMATI asked Legal Persian how to get his Iranian passport sent to him overseas. Although he held a Top Secret/Sensitive Compartment Information (TS/SCI) clearance, HEKMATI never reported to U.S. security officials that he had applied for and been issued an Iranian passport.  HEKMATI could have traveled to Iran using his U.S. passport with an Iranian visa, although doing so risked alerting U.S. authorities to his travel.

   EXHIBIT 2 (a) Iranian Passport Application
   EXHIBIT 2 (b) Hessam Mirzaei (Legal Persian) February 2, 2012 FD 302
   EXHIBIT 2 (c) Hessam Mirzaei (Legal Persian) February 26, 2012 FD 302

3. As an Intelligence Analyst with the DoD contractor Six3Systems, Inc., HEKMATI received three standard security briefings prior to his assignment in Afghanistan.  The

briefings were: 1) "Department of Defense Initial Briefing"; 2) "Threat Awareness"; and 3) "Defensive Security Briefing." In the "Department of Defense Initial Briefing," a section entitled "Required Reports" states "cleared employees are required to report any information pertaining to the following events directly to the FSO [Facility Security Officer]." The first event listed is "Foreign travel to or through a country that is overtly hostile to the US or attendance at international conferences at which representatives of such a country were or will be in attendance." Likewise, in the "Defensive Security Briefing" there is a listing of "ways that an individual can protect oneself and some responsibilities the individual must assume in order to circumvent the possibility of becoming a target." One of the responsibilities listed is to "Report all foreign travel and the intent to travel to criterion countries. To avoid any repercussions, these plans must be reported prior to the trip." On June 22, 2011, HEKMATI signed the form acknowledging that he had read and understood the three required security briefings. [Note: According to the DoD Contractor, the briefings attached as Exhibit 3 were created in 2010. There were no corresponding briefing documents kept with the acknowledgement form signed by HEKMATI in 2011. The DoD contractor indicated that these briefing were in sum and substance the same as the briefings provided in Exhibit 3 (a) below.] Iran was a country overtly hostile to the U.S. and a criterion country, which required reporting in advance of travel. HEKMATI never reported his intent to travel to Iran to the security office in disregard of the reporting requirements set forth in these briefings.

EXHIBIT 3 (a) Six3Systems Security Briefings
EXHIBIT 3 (b) Security Briefing Acknowledgment

4.  The FBI interviewed Behnaz M. Hekmati (HEKMATI's mother) on October 5, 2011. Behnaz traveled to Iran with her son Omeed and daughter Leila and arrived in Teharan on June 24, 2011. Behnaz cut the trip shorter than planned because she had a heated argument with her husband's side of the family over the inheritance of her husband Ali's father. Ali's sister threatened to tell the Iranian authorities lies about Behnaz and her family that would cause the Iranians to arrest them. After the threat, Behnaz moved her family into a hotel until she was able to obtain an earlier flight back to the United States. HEKMATI told his family that his contract ran out on August 14, 2011. Therefore, HEKMATI decided that he would travel to Iran since he was already in the region. Behnaz tried to talk her son out of going to Iran due to her recent troubles with her husband's family. HEKMATI promised that he would not contact his father's family. Behnaz was worried that the Iranians would cause HEKMATI problems because he served in the United States Marine Corps. HEKMATI believed that the Iranians would never know that he served in the Marines.

EXHIBIT 4 Behnaz M. Hekmati FD 302

5.  The U.S. Department of State issued a Travel Warning for Iran on October 8, 2010, and reissued it again on October 21, 2011. In relevant part, the 2011 Travel Warning stated: "The Department of State warns U.S. citizens to carefully consider the risks of travel to

Iran.  Dual national Iranian-American citizens may encounter difficulty in departing Iran.  U.S. citizens should stay current with media coverage of local events and carefully consider nonessential travel…Some elements in Iran remain hostile to the United States.  As a result, U.S. citizens may be subject to harassment or arrest while traveling or residing in Iran.  Since 2009, Iranian authorities have prevented the departure, in some cases for several months, of a number of Iranian-American citizens, including journalists and academics, who traveled to Iran for personal or professional reasons.  Iranian authorities also have unjustly detained or imprisoned U.S. citizens on various charges, including espionage and posing a threat to national security.  U.S. citizens of Iranian origin should consider the risk of being targeted by authorities before planning travel to Iran.  Iranian authorities deny the U.S. Interests Section in Tehran access to imprisoned dual national Iranian-American citizens because Iranian authorities consider them to be solely Iranian citizens; access to U.S. citizens is often denied as well."

EXHIBIT 5 (a) 2010 State Department Travel Warning
EXHIBIT 5 (b) 2011 State Department Travel Warning

6.  The FBI interviewed Colonel Roland Tiso, Jr., United States Army (ret.), on September 29, 2011, and on March 14, 2016.  In 2011, Tiso was a civilian contract employee who served as the senior Pakistan military analyst at the Regional Intelligence Fusion Center at Bagram Air Base, Afghanistan.  Tiso and HEKMATI's work stations in the Sensitive Compartmented Information Facility (SCIF) were right next to each other, they spent a great deal of time together professionally and socially, and they became good friends.  HEKMATI's analytical assignment was to examine insurgent communication methods, but Tiso did not know the specific work HEKMATI was assigned as an Intelligence Analyst.  Tiso stated "of all the analyst[s] on the JOC floor what people knew the least about was what HEKMATI was doing."  HEMATI never "opened up about what he was working on."  Prior to HEKMATI's departure, Tiso presented HEKMATI with a plaque he had purchased and gave a short speech.  Tiso accompanied HEKMATI to the airport on his last day and believed HEKMATI was traveling to the United States directly from Dubai.

EXHIBIT 6 Tiso FD 302 (September 29, 2011)
EXHIBIT 7 Tiso FD 302 (March 14, 2016)

7.  The FBI interviewed Lt. Colonel Christopher Heatherly, United States Army, on April 2, 2016.  In 2011, then-Major Heatherly served at Bagram Air Base, Afghanistan as Chief of the Regional Information Fusion Center, where HEKMATI was assigned as a contract Intelligence Analyst.  Heatherly could not recall HEKMATI's specific tasking but stated it would have been related to analyzing insurgent communication methods and techniques in relation to Afghanistan and its surrounding countries, e.g., Pakistan, and narcoterrorism.  Heatherly thought it was highly unlikely that HEKMATI needed to access any information regarding Iran, because Iran's influence in Afghanistan was not a prevalent

issue at the time.  Heatherly had no idea HEKMATI was travelling to Iran or that he had family in Iran, and only learned this information after HEKMATI was incarcerated in Iran.

EXHIBIT 8 Heatherly FD 302

8.  The FBI interviewed Lt. Colonel David W. Pendall, United States Army, on October 1, 2011.  Pendall served as Deputy Chief of Staff for Intelligence at the Joint Operations Center.  Pendall instructed HEKMATI to work on researching the inconsistencies between what the Taliban and Haqqani Network leaders are saying to their commanders and what they are saying to the public.  Pendall wanted HEKMATI to develop strategies on how to exploit those inconsistencies.

EXHIBIT 9 Pendall FD 302

9.  The FBI interviewed Captain Elizabeth Molnar, United States Army, on September 29, 2011.  Molnar served as Deputy Chief of the Regional Information Fusion Center and was in HEKMATI's direct chain of command.  HEMATI was tasked with analyzing communication techniques and methods used by the Taliban.  Molnar did notice that towards the end of his employment HEKMATI's work production declined significantly and he became even more quiet and reserved.  HEKMATI's resignation was sudden and unexpected.  When he resigned, HEKMATI complained of being tired of deployment and stated that he wanted to go back to school.  Molnar stated that HEKMATI's closest friend was fellow analyst Roland Tiso.  HEKMATI worked directly adjacent to Tiso, and frequently went to the gym and to meals with Tiso.

EXHIBIT 10 Molnar FD 302

10.  The FBI conducted a forensic audit of the logs corresponding to HEKMATI's classified information computer system.  The logs reflected search terms entered and documents accessed on the system.  Analysis revealed that between July 11 and August 12, 2011, HEKMATI accessed 540 separate documents related to Iran and only 47 of those documents had a possible nexus to his assigned intelligence duties in Afghanistan.  Further analysis revealed that from July 11 to July 31, 2011, HEKMATI accessed Iranian documents 321 times and from August 1 to August 12, 2011, HEKMATI accessed Iranian documents 301 times.  Accordingly, in the final 11 days of his assignment compared with the previous 20 days, he almost doubled the pace at which he accessed these documents.  Furthermore, examination of the date/time record on the logs showed from July 13, 2011, through July 31, 2011, HEKMATI regularly began work between 8 a.m. to 10 a.m. and finished work between 5 p.m. to 7 p.m. local time.  However, shortly after providing two-weeks' notice that he was terminating his contract, HEKMATI significantly changed his work hours.  HEKMATI began to work primarily at night, often after midnight.  HEKMATI was reading Iran-related intelligence products all the way up to and including the day of his departure, only hours before he departed Afghanistan.

EXHIBIT 11 (a) Search Term Log
EXHIBIT 11 (b) Access Document Log

11. The FBI requested from DoD all intelligence products prepared by HEKMATI after his assignment in June 2011.  DoD replied that HEKMATI produced five intelligence reports – each of them related to his assigned area of responsibility.  HEKMATI produced no intelligence reports on Iran.

12. The FBI conducted two interviews of HEKMATI on January 19, 2016 and a third interview on April 7, 2016.  At each of the three interviews, the FBI agents identified themselves to HEKMATI.  During the first interview, the FBI agents questioned HEKMATI after he was cleared by medical staff at Landstuhl Regional Medical Center in Germany.  Prior to the third interview, HEKMATI picked up his car from his mother and followed the agents to the FBI Field Office in Flint, Michigan.  HEKMATI had possession of his phone, and the FBI agents witnessed him talking on his phone.  At the FBI Field Office, the agents told HEKMATI that he had to leave his phone outside of the interview room due to the sensitive nature of the interview.  The FBI agents also left their phones outside of the interview room.  During the interview, the FBI agents continued to advise HEKMATI that the interview was voluntary.

EXHIBIT 12 (a) First Interview (morning) on January 19, 2016

EXHIBIT 12 (b) Second Interview (afternoon) on January 19, 2016 [previously provided as Exhibit H-1]

EXHIBIT 12 (c) Third Interview on April 7, 2016 [with unredacted portion of redacted FD 302 previously provided as Exhibit H-2]

DA642

**Exhibit 1**

 

**Amir Nema Hekmati**

August 12, 2003

VIA CERTIFIED MAIL
Embassy of Pakistan
ATTN: Iranian Interest Section
2209 Wisconsin Ave., NW
Washington, DC 20007

SUBJECT: Renunciation of Iranian Citizenship by Amir Nema Hekmati.

Dear Sir/ Madam:

I am a native-born citizen of the United States of America (US). I understand that I may have additional citizenship status in the Islamic Republic of Iran (Iran) because my parents (who are both US citizens) were born in Iran. I am sending this letter and executing it under oath today in order to inform the government of Iran that I am hereby renouncing any and all status that I may have in Iran under the laws of that country.

My name is Amir Nema Hekmati. I was born in [redacted] on [redacted]

I understand that under the laws of both the US and Iran I cannot be a dual citizen of both countries.

By virtue of my birth in the US I consider myself to be a citizen exclusively of the US.

Intending to be legally bound, irrevocably and forever, I hereby absolutely and unconditionally abjure, renounce and relinquish any and all right, title and interest that I may have, whatsoever, as a citizen of Iran.

I am making this renunciation of my Iranian citizenship of my own free will, without any inducement, coercion or duress.

Sincerely,

Amir Nema Hekmati

Attachment 6 (3 pages)

0131021111 : 58

DA643



U.S. Postal Service™
CERTIFIED MAIL™ RECEIPT
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com™

OFFICIAL USE

| Postage | $ 1 44 |
| Certified Fee | 4 60 |
| Return Receipt Fee (Endorsement Required) | 3 50 |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Sent To
EMBASSY OF PAKISTAN
Street, Apt No., or PO Box No.
2709 WISCONSIN AVE. NW
City, State, ZIP+4
WASHINGTON, DC 20007

PS Form 3800, June 2002                    See Reverse for Instructions

01312011:58

DA644

**Exhibit 2 (a)**

(U//FOUO)

~~SECRET NOFORN~~

### UNITED STATES DEPARTMENT OF JUSTICE
### FEDERAL BUREAU OF INVESTIGATION



Washington Field Office

File Number: ███████████

Requesting Official(s) and Office(s): ███████████████

Task Number(s) and Date Completed: ██████████

Name and Office of Linguist(s): ████████████

Name and Office of Reviewer(s): ████

Source Language(s): █████

Target Language: █████

Source File Information
  Name of Document File:



███████



(U//FOUO)

~~SECRET NOFORN~~

DA  5

(U//FOUO)

SECRET NOFORN

Form 001
First Name: Amir
Last Name: Mirza Hekmati
Father's Name: Ali
Birth certificate number: ▮▮▮▮▮
Date of Birth: ▮▮▮▮
Place of Birth: USA
Place of Issue: Washington
District Number: Consulate
Do you have National Identity Card: No
National Number: ▮▮▮▮▮
Father's Name: Ali
Father's Residence: USA
Father's Occupation: University Professor
Marital Status: Single
Military Status: Eligible
Passport Number: ▮▮▮▮
Place of Issue: Washington
Date of Issue: ▮▮▮▮
Do you have any other passport other than Iranian: Yes
From what country: USA
The most recent educational document: BA
Mailing address: ▮▮▮▮▮▮▮▮▮▮▮▮▮
Home phone number: ▮▮▮▮▮
You or your relative address in Iran: Tehran, ▮▮▮▮▮▮▮▮▮▮

City code with phone number: ▮▮▮▮▮

(U//FOUO)

SECRET NOFORN

(U//FOUO)

SECRET NOFORN

Request for national Identification Card specific for Iranian residing outside the country
Form 462

National Number: ▮▮▮▮▮
Sex: Male
Name: Amir
Last Name: Mirza Hekmati
Father's Name: Ali
Birth certificate series number: ▮▮▮▮▮
Reason for request: Initial card
*Address*
Outside the country:
*First & Last Name: Amir Hekmati*
*Street:* ▮▮▮ .
*City:* ▮▮ *State:* ▮ *Zip code:* ▮▮
*Country: USA*
*Home Tel:* ▮▮▮▮

Inside the country:
Province: Tehran
City: Tehran
Street: ▮▮▮▮▮▮▮
Alley: ▮▮▮▮▮
Number: ▮
Phone: ▮▮▮▮

(U//FOUO)

SECRET NOFORN

فرم شماره: ۰۰۱

بسمه تعالی

شماره پرونده:

دفتر حفاظت منافع جمهوری اسلامی ایران – واشنگتن

**EMBASSY OF PAKISTAN**
**INTERESTS SECTION OF THE ISLAMIC REPUBLIC OF IRAN**
2209 WISCONSIN AVENUE N.W. WASHINGTON, DC 20007, TEL.:(202)965-4990٬4 , FAX: (202)965-1073
WWW.DAFTAR.ORG    Email Address:  REQUESTS@DAFTAR.ORG

مشخصات خود را مطابق با شناسنامه در جدول زیر به فارسی و لاتین بنویسید:

نام خانوادگی: میرزای حکمت    نام: امیر

| FIRST NAME: | A | M | I | R | | | | | FATHER'S NAME: | A | l | i | | | | | |
| LAST NAME: | M | I | R | Z | A | | H | E | K | M | A | T | i | | | | |

شماره شناسنامه:

آیا کارت شناسائی ملی دارید؟  ☒ خیر  ☐ آری

نام خانوادگی قبلی:    نام پدر:    محل اقامت پدر:

وضعیت تاهل:  ☒ مجرد  ☐ متاهل  ☐ مطلقه  ☐ فوت    وضعیت نظام وظیفه:  ☐ مشمول  ☒ معاف  ☐ پایان خدمت

اطلاعات گذرنامه خود را مطابق با گذرنامه در جدول زیر بنویسید:

شماره گذرنامه:    محل صدور:    تاریخ صدور: ۱۳۷۸/۱/۲

مرز آخرین خروج از ایران: ☒ امام خمینی(ره)  ☐ مهرآباد  ☐ بازرگان  ☐ غیره    تاریخ خروج: ۱ / ۱۳    توضیح:

نوع ویزا: ☐ دانشجوئی  ☐ توریستی  ☐ غیره    توضیح:

نوع اقامت: ☐ کارت سبز    تابعیت خارجی (تکمیل و ارسال فرم ۹۸۹ الزامی است) ☐

شغل: ☐ شغل قبلی:    آیا دارای گذرنامه غیر از گذرنامه ایرانی هستید؟ بلی    شماره گذرنامه:

رشته تحصیلی:    آخرین مدرک تحصیلی: دیپلم ☐ فوق دیپلم ☐ لیسانس ☒ فوق لیسانس ☐ دکتری ☐ غیره ☐

محل الصاق عکس

در پشت هر عکس نام و نام خانوادگی را به فارسی درج نمائید.

مشخصات تحصیلی: ( نام دانشگاهها و موسسات عالی که تحصیل نموده اید را در جدول زیر به انگلیسی درج نمائید.)

| NAME OF INSTITUTE | CITY / STATE | DATE OF ATTENDANCE | FIELD OF STUDY | DEGREE | DATE OF GRADUATION |
|---|---|---|---|---|---|

مشخصات همسر: (کلیه اطلاعات ذیل مربوط به همسر میباشد.)

نام همسر:    نام خانوادگی همسر:

| FIRST NAME: | | | | | | | | | FATHER'S NAME: | | | | | | | | |
| LAST NAME: | | | | | | | | | | | | | | | | | |

شماره شناسنامه:    تاریخ تولد: روز / ماه / ۱۳    محل تولد:    محل صدور شناسنامه:    شماره حوزه:

مشخصات فرزندان زیر ۱۸ سال:

| نام | نام به انگلیسی | محل تولد | تاریخ تولد (شمسی) | (میلادی) | شماره شناسنامه | محل صدور | جنسیت |
|---|---|---|---|---|---|---|---|
| | | | / ۱۳ / | / / | | | |
| | | | / ۱۳ / | / / | | | |

نوع درخواست امور کنسولی:

**E-MAIL :**

*Mailing address :*

Street:    City:

Home Phone:

آدرس و شماره تلفن در آمریکا به انگلیسی جهت دریافت مدارک: (لطفاً از نوشتن آدرس صندوق پستی خودداری فرمائید.)

آدرس خود و یا بستگان در ایران، شهر:  تهران، خیابان:    بلاک: ۱۷    کد پستی:

شماره تلفن با کد شهری: (    )

**توجه:** علاوه بر این پرسشنامه با توجه به درخواست به درخواست های متفاوت نیاز به تکمیل فرمهای دیگر نیز میباشد.

اینجانب تعهد مینمایم که اطلاعات مندرج بالا توسط اینجانب صحیح میباشد.

امضاء متقاضی: ................    تاریخ: ................

K0/1/11-۰۴

DA648

# درخواست کارت شناسائی ملی ویژه ایرانیان مقیم خارج از کشور

**سازمان ثبت احوال کشور**

**فرم شماره: ۴۶۲**

*چنانچه از شماره ملی و کد پستی خود مطلع می‌باشید در محل مربوطه قید شود در غیر اینصورت نیاز به تکمیل آن نمی‌باشد.

## مشخصات متقاضی:

**شماره ملی :** 

**نام:** ا صبر          **نام خانوادگی:**          جنسیت: مرد ☒     زن ☐

**نام پدر:**

**شماره مسلسل و سری شناسنامه:**

**علت درخواست :** ۴۰

☒ اولین کارت | تغییر مشخصات سجلی ۴۱ | تغییر نشانی ۴۲ | مفقودی ۴۳ | مستعمل ۴۴ | پایان اعتبار ۴۵

## نشانی متقاضی:

| داخل کشور:(ایران) | خارج از کشور: | **ADDRESS** |
|---|---|---|
| | First & Last Name: Amir   Hekmati | |
| | Street: | |
| | City:            State:     Zip Code: | |
| | Country: U.S.A. | |
| | Home Tel: | |
| | Work Tel: (   )‑‑‑ ‑ ‑‑‑‑ | |

**شغل:**          **تحصیلات:**          **محل امضاء متقاضی:**

**(لطفاً در این قسمت چیزی ننویسید.)**

محل الصاق عکس

AR462BX-01

# Exhibit 2 (b)

## Filing and Security ⌄

| | | | |
|---|---|---|---|
| **Primary Case:** | ▮▮▮▮ | **Case Title:** | ▮▮▮▮ |
| **Serial Number:** | ▮ | | ▮▮ |
| **Serialized:** | ▮▮ | | |
| **Category:** | ▮▮▮ | | |
| **Initiated:** | ▮▮ | | |

## Details ⌄

| | | | |
|---|---|---|---|
| **Serial #:** | ▮ | **Type:** | FD302 |
| **From:** | WASHINGTON FIELD | **To:** | WASHINGTON FIELD |
| **Document Title:** | HESSAM MIRZAEI INTERVIEW | | |
| **Approval Date:** | 2/2/2012 | | |
| **Classification:** | S (U//FOUO) | | |

**Contents**
(U//FOUO) SECRET/NOFORN
02/02/2012

U//FOUO (S//NF) Hessam Mirzaei, born ▮▮▮▮, Social Security Account Number ▮▮▮▮, telephone number ▮▮▮-▮▮▮ and his wife, Sanaz Mirzaei were interviewed at ▮▮▮▮ located at ▮▮▮▮. After being advised of the identities of the interviewing agents and the nature of the interview, Mirzaei and his wife provided the following information:

(U//FOUO) (S//NF) Mirzaei was born in Iran. Mirzaei studied and practiced law in Iran. Mirzaei came to the United States eleven years ago. Mirzaei worked as an investigator for a United States courthouse. Mirzaei studied law in Washington, D.C. Mirzaei traveled often to Iran on business. Mirzaei still has family who live in Iran. Mirzaei's father is a lawyer in Iran. Mirzaei used to serve in his father law firm.

(U//FOUO) (S//NF) Mirzaei started his company, Legal Persian, seven years ago. Legal Persian provided legal services to the Iranian American community. These services included immigration

DA650

services, trusts and estates. Legal Persian specialized in Iranian and Islamic law. Mirzaei used to have an office in Rockville, Maryland. Mirzaei currently runs his business from ███████.

(U//FOUO)    (S//NF) Mirzaei's interaction with the Iranian Interest Section (ISEC) began while he was working on an adoption case. During his interaction with the ISEC, Mirzaei came up with the idea of starting the Legal Persian business. Former ISEC Director Ali Jazini granted Mirzaei permission to provide Iranian passport services and conduct other legal business with the ISEC.

(U//FOUO)    (S//NF) The ISEC worked like a post office when issuing passports. Mirzaei submitted clients' passport applications to the ISEC. The ISEC sent the applications to the Government of Iran which would issue the passports. Mirzaei picked up the passports from the ISEC after they were issued by Iran. Clients obtained

(U//FOUO)    (S//NF) Derived From : FBI NSISCG-20080301
Declassify On: 20370202
their passports faster by using Mirzaei's services. Passport applications mailed directly to the ISEC were stacked up with the rest of the ISEC mail.

(U//FOUO)    (S//NF) Mirzaei normally met with ISEC employees Rokhvand and Dadfarnia. On occasion, Mirzaei met with Mehribadi at the ISEC. Mostafa Rahmani is the current ISEC Director. Rahmani restricted Mirzaei's access to the ISEC. Rahmani only allowed Mirzaei to visit the ISEC four days a week and only after 3:00 PM. This restriction was placed on Mirzaei because Rahmani wanted the ISEC to have direct access with Iranian Americans rather than dealing with their attorneys and representatives. Mirzaei never met Rahmani. Mirzaei never had direct communication with Rahmani.

(U//FOUO)    (S//NF) Mirzaei canceled his passport business because no one wanted to travel to Iran anymore due to the current climate in the country. Mirzaei's business became more focused on Power of Attorney duties. Iranian Americans hired Mirzaei to obtain rights to inheritances and properties which were confiscated after the Islamic Revolution. Mirzaei's Power of Attorney rights allowed him to sell these properties on behalf of his Iranian American clients. The Office of Foreign Assets Controls provided Mirzaei with licenses to conduct these transactions.

(U//FOUO)    (S//NF) Amir Hekmati was one of Mirzaei's first clients. Hekmati read a Legal Persian advertisement in an Iranian newspaper. Hekmati called Mirzaei in June 2007 or July 2007. Hekmati needed Farsi translators for a project with the Defense Advanced Research Projects Agency (DARPA). Hekmati hired Mirzaei and his wife to work on the DARPA project. The purpose of the DARPA project was to make software for a handheld translator device used by United States soldiers. Hekmati was one of the translators on the project. Hekmati worked for a company called Mobius during the project.

(U//FOUO)    (S//NF) Hekamti and Mirzaei began a social relationship during the DARPA project. Hekmati and Mirzaei hung out together at clubs. Hekmati and Mirzaei continued email contact after the

DA651

project was finished. Hekmati visited Mirzaei and his wife on two occasions since 2007. Hekmati hired Mirzaei to work on a second small project which he paid for with a personal check.

(U//FOUO)   (S//NF) Hekmati last contacted Mirzaei in May 2011 or June 2011. Hekmati wanted to travel to Iran and visit his grandmother. Hekmati's mother, Behnaz Hekmati, filled out Hekmati's passport application and sent all of the paperwork to Mirzaei. Mirzaei prepared a military permit for Hekmati which allowed him to travel to Iran for three months without having to serve in the Iranian Army. The Iranians granted these permits in order to accommodate Iranian American tourism in Iran.

(U//FOUO)   (S//NF) Hekmati had a previous Iranian passport which expired on July 15, 2004. Mirzaei took the completed passport application to the ISEC. The passport application did not indicate that Hekmati served in the United States military. In fact the occupation field in the passport application was left blank. Mirzaei never told anyone at the ISEC that Hekmati served in the military. Mirzaei knew many Iranian Americans who served in the United States military and who traveled to Iran without any problems.

(U//FOUO)   (S//NF) Hekmati called Mirzaei and told him that he planned to travel to Iran in one month on July 27, 2011. Hekmati wanted Mirzaei to ask the ISEC to mail his passport via diplomatic package to either the Iranian Embassy in Afghanistan or the Iranian Embassy in Dubai, U.A.E. Mirzaei told Hekmati that the ISEC would not mail the passport. Behnaz Hekmati most likely mailed Hekmati his passport to Afghanistan or Dubai.

(U//FOUO)   (S//NF) Behnaz Hekmati called Mirzaei after Hekmati was arrested. Behnaz Hekmati believed that someone in her husband's family might have had Hekmati arrested. Behnaz Hekmati had a recent financial dispute with that part of the family.

(U//FOUO)   (S//NF) Hekmati's sister called the Iranian Mission to the United Nations (IMUN). The sister asked the IMUN officials if her brother was arrested because he was in the United States military. Mirzaei did not think it was wise to tell the IMUN about Hekmati's previous military service.

(U//FOUO)   (S//NF) Hekmati did not speak Farsi very well and he had an American accent. The Iranians would have easily identified him as an American.

(U//FOUO)   (S//NF) Mirzaei and his wife were in Iran when the Government of Iran televised Hekmati's confession. The Mirzaeis were frightened that they might have trouble because Mirzaei helped Hekmati obtain his passport.

(U//FOUO)   (S//NF) Mirzaei let the interviewing agents review some of the email messages between him and Hekmati. On January 3, 2011, Hekmati asked for the new passport so he could travel to Iran in the summer. On June 6, 2011, Hekmati sent Mirzaei an email message which indicated that he planned to travel to Iran in October 2011

and stay for three months. Mirzaei agreed to provide the FBI with
copies of Hekmati's passport application and his email messages if
Hekmati's family granted him permission to share this information.
Behnaz Hekmati wanted Mirzaei to provide her with this information.
However, Mirzaei could not find the documents until recently.

_____

## Indexing ⌄

No Entities to display.

## Intelligence ⌄



## Roung ⌄

**Drafted By:** ████████████

# Exhibit 2 (c)

## Filing and Security ⌄

| | | | |
|---|---|---|---|
| **Primary Case:** | ███████████ | **Case Title:** | ████████████ |
| **Serial Number:** | ██ | | |
| **Serialized:** | ██████ | | |
| **Category:** | ████████ | | |
| **Initiated:** | █████ | | |

## Details ⌄

| | | | |
|---|---|---|---|
| **Serial #:** | ██ | **Type:** | FD302 |
| **From:** | WASHINGTON FIELD | **To:** | WASHINGTON FIELD |
| **Document Title:** | HESSEM MIRZAEI INTERVIEW | | |
| **Approval Date:** | 2/24/2012 | | |
| **Classification:** | S (U//FOUO) | | |

**Contents**

(U//FOUO) SECRET/NOFORN
02/24/2012

(U//FOUO) (S//NF) Hessam Mirzaei, born ██████████, Social Security Account Number ██████████, telephone number █████ was telephonically interviewed at ██████████ located at ████████████ ████████████. After being advised of the identity of the interviewing agent and the nature of the interview, Mirzaei provided the following information:

(U//FOUO) (S//NF) Mirzaei mailed the FBI information on Amir Hekmati's Iranian passport. Mirzaei provided the FBI with email communications between him and Hekmati. A 2007 email communication contained an attachment tilted "firstTH.xls". Mirzaei did not provide the FBI with a copy of this attachment. This attachment contained a thousand lines of Farsi translations. Hekmati hired Mirzaei to work on a translation project in 2007.

(U//FOUO) (S//NF) Hekmati sent Mirzaei an email communication on June 10, 2011. Hekmati asked Mirzaei for his opinion on whether his former military service would be a problem when he traveled to Iran. Mirzaei did not reply to this email. Mirzaei and Hekmati had several telephone calls concerning the passport application.

DA654

1/3

Mirzaei told Hekmati that he never heard of anyone arrested in Iran for prior service in the United States military. It was not a crime in Iran for someone to serve in the United States military.

(U//FOUO) (S//NF) On July 26, 2011, Hekmati asked Mirzaei for advice on how to get his Iranian passport sent to him overseas. Hekmati wanted to avoid flying back to the United States to obtain his passport. Mirzaei told Hekmati that the Iranian Intersect Section (ISEC) would not send his passport to the Iranian Embassy in Kabul or Dubai. Mirzaei told Hekmati that it would be best for his family to mail his passport to Dubai because Afghanistan was so remote.

(U//FOUO) (S//NF) Mirzaei provided the FBI with a partially completed passport application. Mirzaei obtained this passport application from his email records. Mirzaei did not keep copies of

(U//FOUO) (S//NF) Derived From : FBI NSISCG-20080301
Declassify On: 20370224
his clients completed passport applications.

(U//FOUO) (S//NF) Hekmti's mother drafted the partially completed passport application. Hekmati's mother left some of the fields blank because she did not know how to answer them for Hekmati. These fields included Hekmati's occupation. The draft passport application still needed Hekmati's signature. The Iranian Interest Section (ISEC) would not accept a passport application without a signature. Mirzaei did not remember how he obtained Hekmati's signature for this application. The ISEC did not require the occupation field to be completed. Mirzaei believed that this field remained blank when the application was finalized.

(U//FOUO) (S//NF) Mirzaei did not remember seeing Hekmati's completed passport. The ISEC most likely mailed Hekmati's passport to his mother. Hekmati paid for the passport with a personal check.

## Indexing　⌄

---

## Intelligence　⌄

---

**Intelligence Value:** ████████████
**Potential IIR/SIR?** ███
**Sentinel Tags:** ████████████

**Can you identify the source of this information?** ██

## Routing　⌄

---

████████████████████

DA655

**Drafted By:** ████████████

DA656

**Exhibit 3 (a)**

**Please read:**

DoD Initial Briefing ................................................................................................................. 3

Defensive Security Measures Briefing ...................................................................... 12

Threat Awareness and Defensive Security Briefing ........................................................ 14

**Once you have read the listed briefings above, please sign and return the below documents.**

Initial Security Briefing Acknowledgement ................................................................ 22

Privacy Notice ................................................................................................................ 24

REPORTING RESPONSIBILITIES ................................................................................. 26

CLASSIFIED INFORMATION NON-DISCLOSURE AGREEMENT ................................... 28

***When completing the Classified Information Non-Disclosure Agreement (SF-312), please only sign under #11.***

DA657

# DoD Initial Briefing

**Introduction:**

It is the responsibility of every cleared employee who comes in contact with classified information to insure its security.  Our security program at Six3 Systems is only as effective as your security consciousness.  Security consciousness is nothing more than being aware of your responsibilities for protecting our nations' secrets.  Security revolves around you, the cleared employee.

The security information in this briefing is provided to you to familiarize and emphasize your responsibility to protect classified information and material, whether DoD or Special Program related.  Security is common sense business.  The procedures are not complicated, however, they do require that you be aware and abide by them.  If you have questions not addressed in this briefing, please contact your Six3 Systems Security Officer.

**PERSONNEL (Security) CLEARANCE (PCL):**
An administrative determination that an individual is eligible, from a security point of view, for access to classified information of the same or lower category as the level of the personnel clearance being granted.

**ADMINISTRATIVE REQUIREMENTS/CONSIDERATIONS:**
How did I get here?
First, your manager and/or Program Manager determined that your skills are required on a specific contract and/or project and requested the government contract representative, to give his/her permission for you to be submitted for a clearance.

Next, your Personnel Security Questionnaire was submitted to the government which resulted in either an extensive background check for Top Secret or a less extensive Secret.  Next you have excellent character and discretion, and must not be subject to influence through exploitable personal conduct.

Before you are given access to classified information, the following requirements must be met:
- Read, review, check and sign Non-Disclosure SF-312.
  The SF-312 is a legal, lifetime binding contract between you and the US Government, in which, you agree to protect US Classified information from unauthorized disclosure.  The contract has been tested in court.

**GENERAL INFORMATION:**
As a Defense Contractor, Six3 is required by the Defense Security Service (DSS), in accordance with our Security Agreement, to give a security indoctrination to all personnel before allowing them access to classified information.  In accordance with this agreement, our company has

DA659

been granted a facility security clearance at the level of Top Secret.  We are required to install and maintain comprehensive security measures for the protection of classified material developed by or furnished to us.  It is the personal responsibility of every employee who handles or otherwise comes in contact with classified information to observe at all times our written company security procedures and other instructions that may be issued by the Security Office.

## NATIONAL INDUSTRIAL SECURITY PROGRAM (NISP) OVERVIEW

The NISP is the US government – industry program designed to safeguard classified information that has been entrusted to industry in conjunction with defense contracts.  It may be viewed as the three-way partnership, in which the government customer or user agency enters into a classified contractual agreement with a cleared industrial facility and DSS oversees and validates compliance with security portions of that contract.  The government has established the DSS to provided advice, assistance, and supervision of program elements, and has developed a set of rules and requirements contained in the National Industrial Security Program Operating Manual (NISPOM).

The NISP is commonly administered within each cleared facility by the Facility Security Officer.  The Top management is ultimately responsible for administration of the program but this authority is generally delegated to the FSO.  The office of the FSO (or the individual) is responsible for all security matters relative to the safeguarding and handling of classified information.  In large facilities, the office is staffed with security professionals who are available to provide guidance and answers to questions or concerns about the NISP.

The NISPOM, established by Executive Order 12829 dated 06 January 1993, is industry's primary reference in the protection of classified information. The manual outlines the proper procedures for handling and safeguarding information classified pursuant to Executive Order 12958.  It provides uniform rules for all industrial firms under the NISP and each firm working on any government-classified contract must comply with its provisions.

Facilities with classified DoD Contracts require facility security clearances, which are granted and administered by DSS.  DSS is responsible for ensuring compliance with the NISPOM and it does this principally by conduction regular security reviews at all cleared facilities.  These reviews are normally all encompassing and tend to include a review of the company's Standard Practice and Procedures (SPP), information management systems, classified material accountability and safeguarding and handling of classified information.  The level and amount of classified material possessed at a facility normally determines the frequency and length of such inspections.

DSS has the authority to suspend or revoke a facility clearance if it finds that the company's security procedures are unsatisfactory for handling and safeguarding classified information.  DSS ratings of unsatisfactory will negatively impact the facility's ability to conduct future classified work.  Consequently, poor security practices are not only detrimental to the national

security, but they have a direct impact on all employees' jobs and company's ability to perform on classified contracts.

**CLASSIFIED INFORMATION DEFINITIONS AND DESCRIPTION**

Classified information is official government information that has been determined to require protection in the interest of national security.  All classified information is under sole ownership of the US Government, and as such employees possess no right, interest, title, or claim to such information.  (An exception to this information developed under an Independent Research & Development Program.)

Classified information exists in many forms.  It may be a piece of hardware, a photograph, a film, recording tapes, notes, a drawing, a document or spoken words. Classified material is marked as such upon origination.  It comes to industry via DD Form 254 and security classification guides.  The degree of safeguarding required information depends on its classification category.  Three levels have been established based on their criticality to national interests:

**TOP SECRET:**       Information or material whose unauthorized disclosure could be expected to cause exceptionally grave damage to the national security.

**SECRET:**       Information or material whose unauthorized disclosure could be expected to cause serious damage to the national security.

**CONFIDENTIAL:**       Information or material whose unauthorized disclosure could be expected to cause damage to the national security.

DSS has security cognizance over DoD classified material of information and their three levels of classification.  There are also other categories of classified information that required special access authorization.  The customer will provide information concerning these.  You may hear terms such as Sensitive Compartmented Information (SCI) or Special Access Program (SAP).  Information pertaining to these programs will be provided if you are assigned to work these programs.

There are other categories of information which, while not classified, also deserve mention. For Official Use Only (FOUO) is unclassified DoD Information which is exempt from general public disclosure and must not be given general circulation.

As a minimum, after the determination of the level of classification, classified material shall be marked with the date or origin, the name and address of the facility responsible for its preparation, and shall be plainly and conspicuously marked, stamped, or typed with the appropriate classification at the top and bottom of each page, front and back. Each portion, section, part, paragraph, or similar portions of a classified document shall be marked to show the level of classification.  The FSO must approve the classified markings prior to submission to a customer or other agency.

In addition to government classified information, Six3 produces a large amount of company private or proprietary information.  This information is not to be divulged to individuals outside of the company.  Examples of this information are salary and wage lists, technical and research data, trade secrets and proposals. Employees should protect this information in such a manner as to preclude unauthorized access.  This information can be marked Company Proprietary. Caution should be taken to keep this information separate from US government classified information.

## ACCESS REQUIREMENTS AND NEED-TO-KNOW

Access to classified information occurs when a person has the ability and opportunity to obtain knowledge of classified information.  Authorized access to classified information may be granted only when two conditions are met: First, the recipient must have a valid and current security clearance at a level at least as high as the information to be released.  Second, the recipient must demonstrate the need for access to the classified information.  This is referred to as Need-To-Know.

Need-To-Know is met when access to classified information by an individual is essential to the performance of his or her job duties in fulfilling a classified contract. Each individual, regardless of rank, position, or amount of clearance or accesses, only has a need-to-know for information pertinent to the performance of his or her specific task or project.  Need-to-know is not the same as want to know.  Individuals must always establish a person's need-to-know before sharing classified information.

It is the responsibility of the possessor of classified information to ensure the proper clearance and need-to-know of the recipient.  The possessor must also advise the recipient of the classification of the information disclosed.  Need-to-know confirmation should come from a security department advisor or representative.  If there is doubt as to whether or not a person has need-to-know, the employees should check with the proper authority prior to release of any classified information.  Establishment of need-to-know is essential.  It is far better to delay release to an authorized person than to disclose classified information to an unauthorized individual.

**REMEMBER:  If you are in doubt about anyone's clearance and/or need-to-know, contact your Security Officer or supervisor for assistance.**

## SAFEGUARDING CLASSIFIED INFORMATION

One of the most fundamental requirements of the NISP pertains to the proper safeguarding and storage of classified information.  It is essential that classified information be properly safeguarded or stored in accordance with the requirements of the NISPOM at all times.  A natural way of approaching the subject of safeguarding is to divide it into requirements for safeguarding when classified materials are in use and when not in use.

## WHEN IN USE

While in use, classified material must never be left unsecured or unattended.  An authorized individual who is able to exercise direct control over the classified material must keep it under constant surveillance.  The authorized individual must have the appropriate clearance and need-to-know and must take action to prevent access to the material when others who do not have the appropriate clearance and need-to-know are present.

When working with classified material in an unsecured area, any open curtains or doors should be closed.  It is prudent to also post a sign, declaring "CLASSIFIED WORK IN PROGRESS". If a visitor or unauthorized employee is present, a classified document must be protected by either covering it, turning it face down, or placing it in an approved storage container.

When working on classified material you must lock the documents in an approved storage container when you leave your desk for lunch or coffee/smoke breaks.  They must never be tucked in a desk drawer, file cabinet, credenza, key-lock file, etc., for even the briefest period. If you are working on a computer and need to take a break, you must comply with AIS procedures.  You cannot just turn off your computer and expect the classified information to be safe.  Classified information should be stored as soon as possible after is has been used.

## WHEN NOT IN USE

When not in use, classified material must be properly secured in an approved container, unless another properly cleared person with need-to-know is guarding it.  The storage of classified material is anything other than an approved container is strictly prohibited.

Approved storage containers must remain in a locked position unless they are under constant surveillance and control.  The employee should always shield the combination from the sight of others when opening a classified container.  Combination padlocks must be stored inside or locked on the container when it is open.  This prevents tampering or replacement of the padlock by an unauthorized person.

Combinations to classified storage containers and controlled areas are themselves classified and must therefore be protected at the same level of the data they are protecting. Combinations to classified containers must be committed to memory.  They cannot be written down on slips of paper to be kept in desks, wallets, notebooks, etc.  In addition, they cannot not be written down in a coded form, such as backwards, out of order, etc. Only in certain circumstances can combinations be written down and safeguarded as a piece of classified material.  In choosing a combination, employees should avoid persons, places or things that can be easily identified with them, such as a birthday, spouses name, favorite sport team, license place, etc.  At many facilities there is a restrict prohibition against sharing safe combinations, since only those authorized to have access to the container may know the combination. Combinations must be changed whenever anyone with access leaves the organization or transfers to another group.

If circumstances prevent you from storing material in the prescribed container you should inform security and hold the material until the security officer arrives and takes control of the material.  The security officer will take the material for storage.

**TRANSMITTAL OF CLASSIFIED MATERIAL**

The transmittal of classified material will generally be performed by the security office.  For questions concerning transmittal you should contact your FSO.  No employee or visitor is allowed to bring classified material in or out of a Six3 facility without first logging in the material at the security office.

Each cleared facility within Six3 is required to maintain complete records for all classified material in its possession.  All classified information will be logged on the Information management System. No Top Secret Material is authorized to be stored at the Six3 facility.

Methods for transmittal of classified information depend on the material's classification and its destination.  The FSO will insure that the material is properly packaged and transmitted in accordance with the NISPOM.

**REPRODUCTION**

Prior to reproducing and classifying information, check with the FSO.  Each copy made must be entered into the Information Management System and all waste properly disposed of.  No copying machines are authorized for reproduction of classified.

**DESTRUCTION**

When it is determined that a piece of classified information is no longer required, it should be destroyed.  Material to be destroyed will be entered on a destruction report and destroyed in a manner approved by DSS.  A witness, while not required for material classified Secret or below, should be used.  Some destruction reports attached to material received from DoD requires a witness sign the form.  The FSO should review material logged on the Information Management System on a yearly basis and destroy any material no required.

**EMPLOYEE REPORTING REQUIREMENTS**

The NISP is based to a large extent on individual trust and responsibility and employee-reporting requirements are a critical element in the program.  Employees are required to report any suspicious occurrences, know security infractions, adverse information and changes in employee status.  Employee reporting requirements are designed to protect the employee and counter any possible hostile intelligence threat.  It is your personal responsibility to understand and report these conditions to the security officer as circumstances warrant.

**SUSPICOUS OCCURENCES**

Employees are required to report any suspicious behavior or occurrences that may occur at any time.  More specifically, employees must report to the FSO any of the following events:

1.   Any efforts, by any individual, regardless of nationality, to obtain illegal or unauthorized access to classified or sensitive information.
2.  Any efforts, by any individual, regardless of nationality, to compromise a cleared employee.
3.  Any contact by a cleared employee with a known or suspected intelligence officer from any country.
4.  Any contact, which suggests the employee concerned, may be the target of any attempted exploitation by the intelligence services of another country.

If there is any question as to whether any specific situation is reportable, it too should be reported.

## SECURITY VIOLATIONS OR INFRACTIONS

Employees are required to report known or suspected security violations to the FSO.  Reporting provides employees with an opportunity to extricate them self from a compromising situation and enhances the protection of national security information.  Ideally, Six3's security posture should be enhanced as the result of a security infraction because security professionals will have an opportunity to address and correct any problems that may exist.  When an employee covers up a known security infraction, the security education process is negated because security is denied the chance to rectify deficiencies.  The relationship of mutual trust between the contractor and DSS is also jeopardized.  In addition, not reporting a known security violation may constitute a major security violation itself, regardless of the severity of the unreported incident.  Some common security violations are:

1.  Classified material left out or unattended.
2.  Unsecured, unattended security containers/unsecured combinations.
3.  Removal of material without approval.
4.  Lost classified information.
5.  Unauthorized copying or destroying classified material.
6.  Unauthorized/improper transmission of classified material.
7.  Disclosure of/permitting access of an unauthorized person.
8.  Processing classified material on a non-approved computer.

## ADVERSE INFORMATION

The NISPOM requires that cleared defense contractor employees report to their respective security officer adverse information regarding other cleared employees.  As a general rule, adverse information is that which reflects unfavorable on the trustworthiness or reliability of the employee and suggests that their ability to safeguard classified information may be

impaired.  Examples of this include: excessive indebtedness or recurring financial problems, unexplained affluence, use of drugs or excessive use of intoxicants, bizarre behavior, mental or emotional problems, and criminal behavior.  Wage garnishments are considered adverse information that needs to be reported.

Reporting adverse information on coworkers is one of the most difficult tasks you may have. Employees find it difficult to be objective in assessing the impact of personal problems on job performance or continuing clearance eligibility.  Many employees feel by reporting such behavior they are playing a policing role, a role they have no desire to perform.  Other employees may take too zealously to this reporting requirement.  Employees are cautioned against creating an atmosphere of suspicion or intrusiveness in the work place.  Employees should be more concerned with their own work than that of others, but at the same time they should be vigilant and not turn a blind eye to the questionable behavior of practices of coworkers.

Employees found to have problems with drugs or intoxicants will be processed in accordance with legal constraints and policy and procedures relating to employee support.

Adverse information should be reported to protect the individual from being placed in a position where he or she could be exploited and persuaded to commit a security violation, or even espionage.  Many espionage cases can be cited in which hostile intelligence agents exploited a human weakness.  If you are unsure if certain behavior requires reporting, you should consult the FSO for guidance.

## **REQUIRED REPORTS**

Cleared employees are required to report any information pertaining to the following events directly to the FSO.

1.  Foreign travel to or through a country that is overtly hostile to the US or attendance at international conferences at which representatives of such a country were or will be in attendance
2. Establishment of residency in an overtly hostile country by an employee's spouse or member of his/her immediate family or the acquisition of relatives, through marriage, who live in such a country.
3. Any loss, compromise, or suspected compromise of classified information in your possession or in the possession of another person.
4. Any association with or intent to represent a foreign interest (RFI).
5. Change in name, residence, or marital status.
6. Receipt of classified material not related to a classified contract, project, or program for which no safeguarding or disposition instructions have been received.
7. Any instance in which classified material is out of the control of the custodian or which cannot be readily located.

DA666

8. Any instances in which an employee desires not to perform on classified work accept security responsibility or request to terminate clearance or clearance processing.
9. Any instances in which someone approaches you and requests information pertaining to classified information when such person does not have a legitimate "need-to-know" and/or is willing to "pay" you for such information.
10. The experience of grave financial problems or lawsuits.

## OTHER REPORTING REQUIREMENTS

In addition to the above, employees are required to report any act of sabotage or possible sabotage, espionage or attempted espionage, and any subversive or suspicious activity.  Your are also encouraged to report any attempts to solicit classified information, unauthorized persons on company property, and disclosure of classified information to an unauthorized person, along with any other condition that would qualify as a security violation or which common sense would dictate as worth reporting.

## HOTLINE

The Defense Security Hotline may be used, if necessary, for reporting matters of national security significance.  Posters are located in the kitchen areas of Six3 DoD Facilities.

<div align="center">

Defense Hotline
The Pentagon
Washington DC 20301-1911
(800) 424-9098

</div>

## SECURITY VIOLATION POLICY

Six3 has established strict disciplinary action procedures for employees knowingly and willingly commit security violations.  The following is the suggested scale of disciplinary action for those individuals determined to be culpable for a security violation.
1st Violation within a 12-month consecutive period — Written reprimand
2nd violation within a 12-month consecutive period — Written reprimand and other corrective action deemed appropriate
3rd violation within a 12-month consecutive period — Written reprimand and other action deemed appropriate as applicable by the FSO and supervisor based upon the current and past violation.

## TERMINATION OF EMPLOYMENT

As a cleared employee, you have a responsibility to surrender all classified material in your possession to the Security Officer upon termination.  In addition, you must sign and date a debriefing form and return your badges prior to departure.

**Defensive Security Measures Briefing**

As a member of Six3 Systems, providing support to the DoD Community, remember that you may be targeted as a potential candidate for contact and exploitation of foreign agents during international business meetings/conferences/symposia or vacation travels.

Personnel working on DoD contracts are considered to be potential rich source of information by agents involved in both classified and industrial or economic espionage.  Many US Citizens having access to classified information have been identified by foreign intelligence through unclassified US sources.  Everyone should realize that basic personal information (i.e. name, areas of expertise/interest and other related facts) about oneself may become known to enemy agents.

Your increased awareness, when meeting foreign nationals domestically and abroad, or while vacationing outside the continental US, is essential.  Government affiliated individuals are known to the enemy and we presume ourselves to be targeted when traveling, even in countries we consider traditional allies.  Remember that industrial and economic espionage are on the increase.

The following are some ways that an individual can protect oneself and some responsibilities the individual must assume in order to circumvent the possibility of becoming a target are:
- Remain alert.
- Keep your Facility Security Officer advised on any contacts (business, social) with representatives of foreign governments.
- Report any attempts to induce you or another individuals to reveal any information (classified or not) if disclosure of that information could be harmful to the security and best interest of the United States.
- Report any attempt made by residents of criterion countries who try to cultivate friendships.
- Advice your Facility Security Officer of any attempts made to assist or harm relatives in foreign countries.
- If an indiscretion has been committed, report it immediately.  This removes you from any possibility of becoming a prime target.  Confidentiality will be exercised.
- Report any effort made to obtain US defense information through observations, collections of documents or personal contact with US personnel.
- Report offers to provide the US with services or information of intelligence value if the offer made by persons, groups, or organizations believed to be in contact with foreign intelligence operations.
- Report all foreign travel and the intent to travel to criterion countries.  To avoid any repercussions, these travel plans must be reported prior to the trip.

DA668

- Before publication of any material (i.e. books, papers, etc.), the material should be submitted to the appropriate office for approval.

## Threat Awareness and Defensive Security Briefing

### Introduction

The following information is taken from the National Counterintelligence Center report "Annual Report to Congress on Foreign Economic Collection and Industrial Espionage" and may be provided to the contractors.

### The Foreign Intelligence Threat

The gathering of information by intelligence agents, especially in wartime, is an age-old strategy for gaining superiority over enemies. Intelligence officers—those individuals working for government intelligence services—are trained to serve their country by gathering information. Spies, on the other hand, betray their country by committing espionage. Preventing this kind of betrayal is the ultimate goal of the entire U.S. personnel security system.

While espionage has existed since countries began to battle, it was the events of the last few generations (the era of the Cold War) that concern us. During that period we had only one monolithic enemy, the Soviet Union. Our knowledge of Soviet Cold War espionage began with the defection of Igor Sergeievitch Gouzenko, a cipher clerk in the Soviet Embassy in Ottawa. In September 1945, he defected to Canada with documents that eventually led to the arrest of Klaus Fuchs and, from there, to the apprehension of the Rosenbergs and their accomplices. A series of arrests and trials in the early 1950s helped set the climate for an anti-Communist campaign to root out all Communist sympathizers in government and nongovernment areas alike. Since then, motivations for espionage have changed dramatically. Ideology was supplanted by financial greed and other motives such as disgruntlement, revenge, wanting to please others, wanting to spy simply for the thrill, or a combination of all these things.

Nobody knows exactly how many spy incidents have occurred since World War II because so many have been kept secret or have never even been prosecuted. The research of the Security Research Center (SRC) (formally known as Personnel Security Research Center [PERSEREC]) has documented at least 130 cases in the open literature. This classical form of espionage—the passing of classified information—still continues, though the recipients have changed since the end of the Cold War. In a recent informal PERSEREC study of espionage cases since 1991 (found in open sources) six cases were "old" Cold War cases where the Soviet Union or Russia was the recipient, but the remaining nine involved spies who worked for a variety of countries, some of which were U.S. allies.

### The New Threat

Classical espionage cases still occur, but now we are seeing an increase in a different kind of spying—an espionage based on not only the theft of classified information but also on theft of high-technology information, classified or unclassified. This economic espionage is not a new phenomenon; its frequency has increased greatly in recent years. Estimates of current yearly U.S. loss of proprietary business information now range between $20 billion and $100 billion. This loss, and the loss of other technological information, is especially detrimental to our economic vitality and may, by extension, have deleterious effects on U.S. security interests, since economic and national security are so closely linked in our highly competitive new world.

By now everyone understands that the end of the Cold War brought massive changes in the global economic structure. An intensified struggle for international economic power has taken the place of military superiority. Currently, a host of foreign governments and individuals (present adversaries, former foes and traditional friends) are expending considerable resources in attempting to acquire our technological know-how through economic espionage.  Economic espionage is the acquisition by foreign governments or corporations of U.S. high-technology information in order to enhance their countries' economic competitiveness. (Please note that this discussion is limited to espionage conducted by foreign governments against the U.S. government or U.S. companies, defense-related or otherwise. We are not discussing intercorporate or industrial espionage within the United States [i.e., American companies spying against each other] although sometimes the methods used are similar.)

The FBI believes that nearly 100 countries are now running economic espionage operations against the United States. Targets are shifting away from the classified military information sought in the old Cold War days toward basic research and development processes. Such targets also include the technology and trade secrets of U.S. high-tech companies—everything from cost analyses, marketing plans, contract bids and proprietary software to the high-tech data itself. Any information or process—whether classified, unclassified or proprietary—that leads to cutting-edge technology is plainly in demand. Some products are bought (or stolen) in this country and then physically smuggled abroad. Often the technology is not a physical product; it may be a plan, formula or idea that can be transported on computer or fax machine, or simply carried away inside the minds of scientists.

As suggested above, the economic espionage threat is not confined to America's traditional adversaries. Allies can be just as interested in U.S. technological know-how as our traditional foes from the Cold War. Countries are aggressively targeting American firms at home and abroad for industrial secrets that are critical to U.S. economic security. American corporations are now facing several foreign competitors who, backed by their intelligence services, are trying to steal trade secrets and technical data on a massive scale.

Who are these new spies?  How do they present themselves?  They may be informal representatives of their countries or people paid by their countries to spy. They may be visiting the United States on scientific exchanges, business tours, or with on-site inspection teams. They may be trade representatives or liaison officers at their embassies here. Some may be foreign moles placed in American companies by their country's government, or students doing research

DA671

in the United States who serve as informal conduits to their home governments. They may be foreign business people who can manipulate the communications systems of U.S. high-tech companies. They may also be Americans, disgruntled or greedy employees of U.S. companies, who, having volunteered or been recruited, are willing to sell classified, proprietary or high-tech information to other countries. (Fifty percent of attempts to misappropriate proprietary information involve U.S. employees or ex-employees.) Whoever they are, foreign or homegrown, they are generally well educated and technologically sophisticated, and certainly well able to navigate in high-tech waters.

Many U.S. high-tech industries have been targeted but, according to a recent government report, the following areas are the most vulnerable: biotechnology, aerospace, telecommunications, computer software and hardware, advanced transportation and engine technology, advanced materials and coatings (including stealth technologies), energy research, defense and armaments technology, manufacturing processes, and semiconductors. Not yet classified proprietary business information is aggressively targeted. The industries listed above are of strategic interest to the United States because they contribute so greatly to leading edge, critical technologies. A 1995 report by the National Counterintelligence Center adds that foreign collectors have also exhibited an interest in government and corporate financial and trade data. Clearly, this list does not cover every high-tech area that is being targeted, but it provides a sense of some of the areas that are vulnerable.

For more threat information pertinent to the defense industry, refer to the Defense Security Service's Web site at (www.dss.mil). The Counterintelligence (CI) office annually publishes its own list based on an industry survey. Of particular interest to FSOs is the CI office's "Recognition of Potential Counterintelligence Issues," published in 1996. This "For Official Use Only" report is highly recommended to all Facility Security Officers (FSOs). It discusses awareness of the foreign threat, recognition of potential CI issues and reporting CI issues.

**The Methods of Espionage**

Economic espionage is often conducted by using basic business intelligence-gathering methods. The Internet and dozens of commercial databases are widely available, along with such sources as trade journals and company newsletters and annual reports. So much technical information is available in the United States in open sources that it hardly would seem necessary to resort to illegal means; in effect, much of science and technology in this country is here for the taking. There are vast repositories of technical information with the National Technical Information Service (NTIS) and the Defense Technical Information Center (DTIC). Foreigners can make direct requests to the Department of Defense and, of course, a great deal of information is published in academic and technical journals and in newspapers and trade publications, and thus available to anyone.
However, employees need to be alert when such activities as extracting information from executives of competing companies under the guise of job interviews, or hiring away an employee from a competitor just to acquire that person's knowledge occur.  In a world becoming more and more interconnected, systems for exchanging information are clearly

necessary for research and commerce to thrive. The United States invites foreign scientists to its research institutes and laboratories in programs designed to enhance knowledge through the cross-fertilization of ideas. And we enter into exchange agreements with other countries to foster research and development, provide security or technical assistance, and so forth. Less economically developed countries—both allies and foes—do take advantage of the openness of our system. Some caution and wariness are thus suggested in order to prevent the disclosure of too much information.

A major means for foreign governments to obtain information is by sending their representatives to the United States on fact-finding visits or for training.  Participants in scientific meetings, trade delegations and trade shows can easily obtain useful information during their stays here. Other arrangements, such as visitor programs, cultural exchanges and military exchanges, are also used. One fruitful method is sending students and scholars to U.S. universities or government research laboratories where they are trained and also participate in research as guests of the U.S. Government. High-tech data, acquired by scientists participating in such programs, is easily transferred back to home countries through fax, telephone, the written word, and by memory.

Foreign governments or their representatives often attempt to acquire high-tech information by establishing joint venture companies with Americans. This allows them direct access to U.S. know-how not always available in the public domain, especially if the companies conduct classified work. Other standard business practices in this general category include mergers, strategic alliances, licensing agreements, and corporate technology agreements. It must be noted, however, that joint ventures are often encouraged by the United States. For example, the Bureau of Export Administration in the U.S. Department of Commerce has programs to encourage such ventures with the newly independent states of the former Soviet Union, as a way to expand U.S. trade in those areas.

Another way of acquiring high-tech information is to purchase U.S. high-tech companies, preferably those with government contracts, or for foreigners to set up their own companies in the U.S. to collect information on certain technologies and to train their own personnel. Related to establishing companies in the U.S. is the commonly used device of creating front companies. These are companies set up to undertake "legitimate" business but used by the foreign government to further its own economic espionage purposes.

Often foreigners acquire proprietary information under the guise of market research, sending surveys from abroad to ferret out product information. Even personal telephone calls, letters and fax inquiries from abroad can elicit useful information. Callers may pretend to be someone other than who they are; in the parlance of the business intelligence fraternity this is known as pretext calling.

Some economic espionage cases resemble typical old-style espionage operations conducted with the full panoply of tradecraft. Indeed, the very words used to describe the roles of

participants in an economic espionage crime are borrowed directly from the classic espionage lexicon: spies, moles, recruiters, defectors.

The "best" way to acquire information from an organization or company is—in classic spy style—to recruit a mole on the inside or to send one of your own people in on a ruse, posing as someone else. Another method is to blackmail vulnerable employees of U.S. companies or to recruit foreign nationals working in U.S. subsidiaries abroad. Not all spies have been recruited. Some, perhaps disgruntled or troubled, employees, past or present, of U.S. companies have stolen materials and then sold them to foreign companies—the volunteer of classic espionage.

Equally as unscrupulous, and also patently illegal, is the outright bribing of employees to steal plans, reports and other proprietary documents, or hiring so-called consultants to spy on competitors, a practice that can include bugging competitors' offices. Other methods include theft and smuggling of goods, theft of intellectual property, tampering with companies' electronics, bribery, and so forth.

## The Damage

At the industry and company level, the compromise of industrial technology often translates into lost contracts, loss of trade secrets and loss of technology (in the billions) and loss of technological edge over our competitors. In this age of shrinking budgets and tighter control over expenses, economic espionage can be very profitable; the less money a company has to spend on research, the greater its profit margin.

## The Old Threat Still Lingers

All this discussion of economic espionage does not mean that traditional, classical espionage has ceased. It only means that espionage has shifted to some degree, away from stealing classified information to a new interest in acquiring high-tech information that might be advantageous to a foreign country.  Classical spy cases continue, the most famous case being Aldrich Ames, a veteran CIA intelligence officer who volunteered highly secret and sensitive CIA information to Soviet and Russian intelligence from 1985 to 1994. It is known that at least 11 agents lost their lives and that Ames gave the KGB tens of thousand of classified documents, in what will surely be the spy case of the century. On the heels of Ames came a second CIA case, Harold Nicholson, arrested at the end of 1996 on espionage charges that he had sold secrets to Moscow for 29 months. Nicholson was a CIA operations officer.

There have been several other cases recently; involving individuals who were caught before they could do any real harm. For example, John Charlton, a retired engineer, was arrested in May 1995 for trying to sell secret documents stolen from his company at the time of his retirement. Between July and September 1993 he tried to sell the information for $100,000 to an FBI agent posing as a representative of a foreign government. In April 1996 he was sentenced to two years in prison and fined $50,000.

Another case in 1996 concerns a Navy machinist mate who sold an undercover FBI agent top secret information on nuclear submarines. The Petty Officer 1st Class, an instructor at the Naval Nuclear Power School in Orlando, Florida, was charged after he was video taped turning over documents to an FBI agent posing as a Russian. The young instructor, unbeknownst to him, was dealing all the time with an FBI agent, not a foreigner. His trial is still pending.

In another recent and aborted attempt, a civilian Navy intelligence official, a naturalized American was accused of spying for his native country in Asia after he was arrested by the FBI. This individual is charged with transferring classified information to an agent of a foreign government.

For materials on new espionage cases for inclusion in security awareness briefings, the DSS Academy (formally known as the Department of Defense Security Institute [DoDSI]) publishes the quarterly Recent Espionage Cases, Summaries & Sources, in which articles in the press on recent espionage cases are abstracted.  Losses caused by theft of U.S. military secrets can be massive.  In times of crisis such losses can weaken and even destroy the country's national defense by alerting enemies of our military plans and new weaponry. Often the damage that results from the compromise of military secrets is impossible to repair.  The information supplied to the Russians by John Walker, for example, enabled them to gain access to our weapons and sensory data, naval tactics, submarine and airborne training, military operations, and intelligence activities.

In short, it permitted the Russians to measure the true capability and vulnerability of the U.S. Navy and to improve their own military positions dramatically.

## Indicators of Espionage

Studies of traditional espionage cases have revealed a pattern of warning signs displayed by several of the spies in varying degrees. The most common indicators of an individual's espionage activity or potential vulnerability to espionage are mentioned below and should be a matter of concern to security and supervisory personnel.

Signs that an individual might be involved in espionage include attempts to gain access to classified information without a valid need-to-know or without the required security clearance. Other indicators might be unauthorized reproduction or removal of classified material from the work area and secret destruction of documents. Unexplained affluence can be a possible sign of ongoing espionage if a legitimate source of increase income cannot be found. Sudden prosperity might be of particular concern when it follows a period of financial difficulties.

Foreign travel, on a regular basis and without sufficient explanation, might be another sign of espionage when individuals with access to classified information are involved. Job and career dissatisfaction or deep grudges against the company or the U.S. Government have also figured as predisposing elements in some cases.

**Facing the Challenge**

In summary, espionage against the United States, both economic and classical, continues to occur, and the threat it poses to U.S. national security and economic well being is immense. Increasingly, economic espionage efforts directed against the United States come not only from present foes but also from friends and allies, all in search of U.S. high-tech and commercial secrets. With billions of dollars invested in research and development, the United States is a tempting target for friendly nations, former foes, and traditional adversaries alike.

The current challenge for security professionals is to make employees understand that, despite the vast political changes around the globe, foreign intelligence activities really do continue to be directed against the United States. Many people believe that there is no longer the danger of espionage. Many believe, for example, that it is no longer necessary to restrict the flow of scientific and technical information to our highly industrialized allies or to newly emerging democracies. However, experience has shown that the United States often gives away far more than it gets and that scientific "exchange" is more likely than not to be a one-way street. The cheapest way to gain access to economic and scientific information is to take what is freely given (by the U.S.) or to steal it. Employees of the U.S. Government and U.S. industry must be aware of this still-present danger and be able to recognize all warning signals. Moreover, they must understand their responsibilities to report any suspicions they may have of workmates or visitors so that the appropriate authorities can investigate the situation.

**Initial Security Briefing Acknowledgement**

I have read and understand the HSA, A Six3 Systems Company Initial Security Briefing that includes the following:

- o **Department of Defense Initial Briefing**

- o **Threat Awareness**

- o **Defensive Security Briefing**

_____

Employee Printed Name

_____    <u>June 19, 2020</u>

Employee Signature                                 Date

_____    <u>June 19, 2020</u>

Security Representative Signature          Date

DA678

# Privacy Notice

NOTICE TO INDIVIDUAL OF NISPOM PARA 2-202 SF 86 REVIEW REQUIREMENTS FOR FACILITY SECURITY OFFICER

Para 2-202a in the National Industrial Security Program Operating Manual (NISPOM) outlines the following guidance for notifying individuals about review of the SF 86 by the Facility Security Officer or designee.

**"The FSO or designee shall inform the employee that the SF 86 is subject to review and shall review the application solely to determine it adequacy and to ensure the necessary information has not been omitted.  The FSO or designee shall provide the employee with written notification that review of the information will be used for no other purpose within the company, and that the information provided by the employee is protected by Privacy Act of 1974 US Code 5 U.S.C. § 552a."  <u>It states in part: (b) Conditions of disclosure:  No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains.</u>**

### *STATEMENT OF ACKNOWLEDGEMENT*

I acknowledge I have received written notification of the requirements as outlined above and in Para 2-202a of the NISPOM.


_____                                     <u>June 19, 2020</u>
Printed Name                                                          Date


_____
Signature

DA680

DA681

# REPORTING RESPONSIBILITIES

**AS A CLEARED HSA EMPLOYEE, YOU ARE RESPONSIBLE TO REPORT THE FOLLOWING TO SECURITY:**

- Any attempt to solicit information:   1) Classified    2) Proprietary
- Efforts by an individual, regardless of nationality, to obtain illegal or unauthorized access to classified or sensitive unclassified information or to compromise a cleared employee
- Contacts with known or suspected intelligence officers
- Contact which suggests target of an attempted exploitation by the intelligence services of another country
- Suspected or actual incidents of espionage, sabotage, or subversive activities
- Loss, compromise, or suspected compromise of classified information
- Any adverse (derogatory) information
- Change of name, marital status, or citizenship
- Change in employment status such as termination, layoff, leave of absence, or transfer to another HSA location
- Change in work location
- If you no longer desire to work on classified projects, or access is required at a lower level
- Loss of company issued badge and/or keycard
- Intention to reside or accept assignment outside the U.S. for a period in excess of 90 consecutive days
- If you become representative of a foreign interest or government
- Any incident which demonstrates willful disregard of security procedures or need for attention by the Security Office

_____

Printed Name of Person Briefed


_____        June 19, 2020

Signature of Person Briefed               Date


_____        June 19, 2020

Security Representative                  Date

DA682

DA683

## CLASSIFIED INFORMATION NON-DISCLOSURE AGREEMENT

AN AGREEMENT BETWEEN _____ AND THE UNITED STATES

(Name of Individual - Printed or Typed)

1.    Intending to be legally bound, I hereby accept the obligations contained in this Agreement in consideration of my being granted access to classified information.  As used in this Agreement, classified information is marked or unmarked classified information, including oral communications, that is classified under the standards of Executive Order 12958, or under any other Executive order or statute that prohibits the unauthorized disclosure of information in the interest of national security; and unclassified information that meets the standards for classification and is in the process of a classification determination as provided in Sections 1.1, 1.2, 1.3 and 1.4(e) of Executive Order 12958, or under any other Executive order or statute that requires protection for such information in the interest of national security.  I understand and accept that by being granted access to classified information, special confidence and trust shall be placed in me by the United States Government.

2.    I hereby acknowledge that I have received a security indoctrination concerning the nature and protection of classified information, including the procedures to be followed in ascertaining whether other persons to whom I contemplate disclosing this information have been approved for access to it, and that I understand these procedures.

3.    I have been advised that the unauthorized disclosure, unauthorized retention, or negligent handling of classified information by me could cause damage or irreparable injury to the United States or could be used to advantage by a foreign nation.  I hereby agree that I will never divulge classified information to anyone unless:  (a)  I have officially verified that the recipient has been properly authorized by the United States Government to receive it; or (b) I have been given prior written notice of authorization from the United States Government Department or Agency (hereinafter Department or Agency) responsible for the classification of the information or last granting me a security clearance that such disclosure is permitted.  I understand that if I am uncertain about the classification status of information, I am required to confirm from an authorized official that the information is unclassified before I may disclose it, except to a person as provided in (a) or (b), above.  I further understand that I am obligated to comply with laws and regulations that prohibit the unauthorized disclosure of classified information.

4.    I have been advised that any breach of this Agreement may result in the termination of any security clearances I hold; removal from any position of special confidence and trust requiring such clearances; or the termination of my employment or other relationships with the Departments or Agencies that granted my security clearance or clearances.  In addition, I have been advised that any unauthorized disclosure of classified information by me may constitute a violation, or violations, of United States criminal laws, including the provisions of Sections 641, 793, 794, 798, *952 and 1924, Title 18, United States Code, *the provisions of Section 783(b), Title 50, United States Code, and the provisions of the Intelligence Identities Protection Act of 1982.  I recognize that nothing in this Agreement constitutes a waiver by the United States of the right to prosecute me for any security violation.

5.    I hereby assign to the United States Government all royalties, remunerations, and emoluments that have resulted, will result or may result from any disclosure, publication, or revelation of classified information not consistent with the terms of this Agreement.

6.    I understand that the United States Government may seek any remedy available to it to enforce this Agreement including, but not limited to, application for a court order prohibiting disclosure of information in breach of this Agreement.

7.    I understand that all classified information to which I have access or may obtain access by signing this Agreement is now and will remain the property of, or under the control of the United States Government unless and until otherwise determined by an authorized official or final ruling of a court of law.  I agree that I shall return all classified materials which have, or may come into my possession or for which I am responsible because of such access:  (a) upon demand by an authorized representative of the United States Government; (b) upon the conclusion of my employment or other relationship with the Department or Agency that last granted me a security clearance or that provided me access to classified information; or (c) upon the conclusion of my employment or other relationship that requires access to classified information.  If I do not return such materials upon request, I understand that this may be a violation of Section 793 and /or 1924, Title 18, United States Code, a United States criminal law.

8.    Unless and until I am released in writing by an authorized representative of the United States Government, I understand that all conditions and obligations imposed upon me by this Agreement apply during the time I am granted access to classified information, and at all times thereafter.

9.    Each provision of this Agreement is severable.  If a court should find any provision of this Agreement to be unenforceable, all other provisions of this Agreement shall remain in full force and effect.

10.    These restrictions are consistent with and do not supercede, conflict with or otherwise alter the employee obligations, rights or liabilities created by Executive Order 12958; Section 7211 of Title 5, United States Code (governing disclosures to Congress);  Section 1034 of Title 10, United States Code, as amended by the Military Whistleblower Protection Act (governing disclosure to Congress by members of the Military); Section 2302(b)(8) of Title 5, United States Code, as amended by the Whistleblower Protection Act of 1982 (50 U.S.C. 421 et seq.) (governing disclosures that expose confidential Government agents), and the statutes which protect against disclosure that may compromise the national security, including Sections 641, 793, 794, 798, 952 and 1924 Title 18, United States Code, and Section 4(b) of the Subversive Activities Act of 1950 (50 U.S.C. , Section 783(b)).  The definitions, requirements, obligations, rights, sanctions and liabilities created by said Executive Order and listed statutes are incorporated into this Agreement and are controlling.

**(Continue on reverse.)**

DA684

11.    I have read this Agreement carefully and my questions, if any, have been answered.  I acknowledge that the briefing officer has made available to me the Executive Order and statutes referenced in this Agreement and its implementing regulation (32 CFR Section 2003.20) so that I may read them at this time, if I so choose.

| Signature | Date | SOCIAL SECURITY NUMBER (See Notice Below) |
|---|---|---|
| | 19-Jun-20 | |

Organization (If Contractor, Licensee, Grantee or Agent, Provide:  Name, Address, and if applicable, Federal Supply Code Number)
     (Type or Print)

Harding Security Associates, a Six3 Systems Company
1430 Spring Hill Road, Suite 525
McLean, VA 22102

| WITNESS | | ACCEPTANCE | |
|---|---|---|---|
| THE EXECUTION OF THIS AGREEMENT WAS WITNESSED BY THE UNDERSIGNED | | THE UNDERSIGNED ACCEPTED THIS AGREEMENT ON BEHALF OF THE UNITED STATES GOVERNMENT. | |
| SIGNATURE | DATE | SIGNATURE | DATE |
| | 19-Jun-20 | | 19-Jun-20 |
| Name and Address (Type or print) Michael Saul Harding Security Associates, a Six3 Systems Company 1430 Spring Hill Road, Suite 525 McLean, VA 22102 | | Name and Address (Type or print) Michael Saul Harding Security Associates, a Six3 Systems Company 1430 Spring Hill Road, Suite 525 McLean, VA 22102 | |

## SECURITY DEBRIEFING ACKNOWLEDGMENT

I reaffirm that the provisions of the espionage laws, other federal criminal laws and executive orders applicable to the safeguarding of classified information have been made available to me; that I have returned all classified information in my custody; that I will not communicate or transmit classified information to any unauthorized person or organization; that I will promptly report to the Federal Bureau of Investigation any attempt by an unauthorized person to solicit classified information, and that I (have) (have not) (strike out inappropriate word or words) received a security debriefing.

| Signature of Employee | | Date |
|---|---|---|
| Name of Witness (Type or Printed) | Signature of Witness | |

The Privacy Act, 5 U.S.C. 552a, requires that federal agencies inform individuals, at the time information is solicited from them, whether the disclosure is mandatory or voluntary, by what authority such information is solicited, and what uses will be made of the information.  You are hereby advised that authority for soliciting your Social Security Account Number (SSN) is Executive Order 9397.  Your SSN will be used to identify you precisely when it is necessary to 1) certify that you have access to the information indicated above or 2) determine that your access to the information indicated has terminated.  Although disclosure of your SSN is not mandatory, you failure to do so may impede the processing of such certifications or determinations, or possibly result in the denial of your being granted access to classified information.

NOT APPLICABLE TO NON-GOVERNMENT PERSONNEL SIGNING THIS AGREEMENT

DA685

**Exhibit 3 (b)**



## Initial Security Briefing Acknowledgement

I have read and understand the HSA, A Six3 Systems Company Initial Security Briefing that includes the following:

- o **Department of Defense Initial Briefing**

- o **Threat Awareness**

- o **Defensive Security Briefing**

Amir N. Hekmati
Employee Printed Name

Employee Signature                    June 22, 2011
                                      Date

Security Representative Signature     June 22, 2011
                                      Date

DA687



# Privacy Notice

NOTICE TO INDIVIDUAL OF NISPOM PARA 2-202 SF 86 REVIEW REQUIREMENTS FOR FACILITY SECURITY OFFICER

Para 2-202a in the National Industrial Security Program Operating Manual (NISPOM) outlines the following guidance for notifying individuals about review of the SF 86 by the Facility Security Officer or designee.

**"The FSO or designee shall inform the employee that the SF 86 is subject to review and shall review the application solely to determine it adequacy and to ensure the necessary information has not been omitted.  The FSO or designee shall provide the employee with written notification that review of the information will be used for no other purpose within the company, and that the information provided by the employee is protected by Privacy Act of 1974 US Code 5 U.S.C. § 552a."  It states in part: (b) Conditions of disclosure:  No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains.**

### STATEMENT OF ACKNOWLEDGEMENT

I acknowledge I have received written notification of the requirements as outlined above and in Para 2-202a of the NISPOM.


Amir N. Hekmati                                                June 22, 2011
Printed Name                                      Date


Signature

DA688



# REPORTING RESPONSIBILITIES

## AS A CLEARED HSA EMPLOYEE, YOU ARE RESPONSIBLE TO REPORT THE FOLLOWING TO SECURITY:

- Any attempt to solicit information:  1) Classified    2) Proprietary
- Efforts by an individual, regardless of nationality, to obtain illegal or unauthorized access to classified or sensitive unclassified information or to compromise a cleared employee
- Contacts with known or suspected intelligence officers
- Contact which suggests target of an attempted exploitation by the intelligence services of another country
- Suspected or actual incidents of espionage, sabotage, or subversive activities
- Loss, compromise, or suspected compromise of classified information
- Any adverse (derogatory) information
- Change of name, marital status, or citizenship
- Change in employment status such as termination, layoff, leave of absence, or transfer to another HSA location
- Change in work location
- If you no longer desire to work on classified projects, or access is required at a lower level
- Loss of company issued badge and/or keycard
- Intention to reside or accept assignment outside the U.S. for a period in excess of 90 consecutive days
- If you become representative of a foreign interest or government
- Any incident which demonstrates willful disregard of security procedures or need for attention by the Security Office

Amir N. Hekmati
_____
Printed Name of Person Briefed

_____
Signature of Person Briefed

June 22, 2011
Date

_____
Security Representative

June 22, 2011
Date

DA689

**Exhibit 4**

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    10/07/2011

Behnaz M. Hekmati, born ▇▇▇▇▇▇▇ Social Security Account Number ▇▇▇▇▇▇▇, telephone number ▇▇▇▇▇▇▇, and her daughter, Sarah Hekmati, born ▇▇▇▇▇▇▇ and Social Security Account Number ▇▇▇▇▇▇▇ were interviewed at Sarah Hekmati's residence located at ▇▇▇▇▇▇▇ After being advised of the identities of the interviewing agents and the nature of the interview, Behnaz and Sarah Hekmati provided the following information:

Behnaz traveled to Iran with her son, Omeed Hekmati, and her daughter, Leila Hekmati. Behnaz and her family arrived in Tehran, Iran on June 24, 2011. Behnaz cut the trip shorter than planned because she had a heated argument with her husband's side of the family. Another reason for coming home early was that Behanz's husband, Ali Hekmati, became ill in the United States.

The heated argument was over the inheritance from her husband's father. Ali Hekmati's sister claimed the whole inheritance in Iran. Behnaz brought up the issue to Ali Hekmati's sister. Ali Hekmati's sister threatened to tell the Iranian authorities lies about Behnaz and her family. These lies would cause the Iranians to arrest Behnaz and her family. After the threat, Behnaz moved her family into a hotel until she was able to obtain earlier flights back to the United States.

Behnaz's older son and Leila's twin brother, Amir Hekmati, had originally planned to travel with his other family members on this trip to Iran. However, Hekmati had changed his mind about coming on the trip. Instead, Hekmati left Michigan on June 20, 2011 to travel to Doha, Qatar. Hekmati was performing contract work for the United States Government in Doha. Hekmati never told his family that he was working in Afghanistan.

Hekmati told his family that he was going to ▇▇▇▇▇▇▇

▇▇▇▇▇▇▇

| | | |
|---|---|---|
| Investigation on | 10/05/2011 | at Lathrup Village, Michigan |

File # ▇▇▇ WF-244323-302                          Date dictated    not dictated

by   SA Brett M. Kramarsic
     SA James J. Dougherty

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

DA690

FD-302a (Rev. 10-6-95)

WF-244323-302

Continuation of FD-302 of ____Behnaz and Sarah Hekmati____ , On __10/05/2011__ , Page ___2___

attend graduate school after he finished his overseas contract
assignment.  Hekmati applied and got accepted at the University of
Michigan-Dearborn for the semester starting in January 2012.

Hekmati told his family that his contract ran
out on August 14, 2011.  Therefore, Hekmati decided that he would
travel to Iran since he was already in the region.  Hekmati
originally  planned to stay in Iran for two weeks to three months
to learn about his heritage.  Hekmati traveled from Doha to Iran
through Dubai, United Arab Emirates.  This was the first time that
Hekmati traveled to Iran.  Hekmati wanted to meet his grandmother
and his six uncles from his mother's side.

Behnaz tried to talk her son out of going to
Iran due to her recent troubles with her husband's family.  Hekmati
promised that he would not contact his father's family.  Behnaz was
worried that the Iranians would cause Hekmati problems because he
served in the United States Marine Corps.  Hekmati believed that
the Iranians would never know that he served in the Marines.
Hekmati was reassured because he had many Iranian American friends
who served in the Marines and traveled to Iran without any
problems.

Hekmati traveled to Iran with an Iranian
passport.  Hekmati received the passport through the mail from an
attorney who worked at Legal Persian Law Firm in Maryland.  The
attorney obtained the passport from the Iranian Interest Section
(ISEC) in April or May 2011.

Hekmati checked into a hotel when he first
arrived in Iran.  Hekmati visited Behnaz's family and he attended
several family reunions.  Hekmati eventually moved into an
apartment owned by one of his uncles.  Hekamti told his mother that
his first two weeks in Iran were great.  Hekmati registered for a
Farsi language class which catered to foreigners at the Tehran
Institute of Language.  Hekmati intended to stay in Iran for the
whole month of September 2011 so that he could finish the language
class.

Hekmati purchased a SIM card so that he could
use his American cellular telephone in Iran.  Hekmati talked with
his mother from this telephone which had telephone number
09361821054.  Hekmati told his mother that he did not know whether

DA691

FD-302a (Rev. 10-6-95)

███████████████████

███ WF-244323-302

Continuation of FD-302 of ____Behnaz and Sarah Hekmati_____ , On __10/05/2011__ , Page ___3___

it was safe to talk on this telephone.  Hekmati warned his mother
not to discuss anti-Iranian matters over the telephone or by email.

███████   Hekmati brought his laptop to Iran against his
mother's wishes.  Hekmati claimed that there was nothing on his
laptop which would be of interest to the Iranians.  Hekmati sent
emails messages to his mother from his email address
████████████████   Behnaz believed that Hekmati used a second
email account, but she could not remember the email address.
Hekmati carried his laptop through the security check points at the
airport in Iran without any problems.

███████   On August 29, 2011, Hekamti had a telephone
conversation with his mother at 5:00 AM (in Michigan).  Hekmati was
planning to attend a party in a couple of hours.  The party was
hosted by one of Behnaz's friends who was very close to the Iranian
Government.  Hekmati finished the telephone conversation at about
12:00 PM (in Iran).  Hekmati did not show up for the taxi cab which
arrived at 3:00 PM to take him to the party.

███████   Behnaz's brother emailed Behnaz to tell her that
Hekmati did not come to the party even though he told his cousin
that he would be at the party.  Behnaz's brother went to Hekmati's
apartment to check on him.  Hekmati was not present in the
apartment.  Hekmati's laptop, passports, and money were missing
from the apartment.  Hekmati's ring, watch, clothes, laptop bag,
and suitcase were still in the apartment.  Muddy footprints were
all over the apartment floor.  The apartment door and lock were
still functioning and there was no sign of struggle.

███████   Hekmati was still missing on August 31, 2011.
Hekmati called his uncle two or three days latter from his cellular
telephone.  Hekmati claimed that he was in Evin prison and he
wanted to know why his uncle was not coming to pick him up.  The
uncle called Behnaz and told her about his telephone conversation
with Hekmati.  Behnaz tried to call Hekmati's cellular telephone on
numerous times, but she could not make a connection because
Hekmati's telephone was turned off.

███████   Hekmati made a couple of other telephone calls
to his uncle.  Hekmati told his uncle that he was alright, but he
was bored.  Hekmati had nothing to do, but read.  The Hekmati
family has not heard anything from Hekmati since the first week in

███████████████████

FD-302a (Rev. 10-6-95)

WF-244323-302

Continuation of FD-302 of ___Behnaz and Sarah Hekmati___ , On _10/05/2011_ , Page ___4___

September 2011.  Hekamti's Visa expires November 15, 2011 and the family is worried that the Iranians might make him serve in the Iranian Military if he overstays his Visa.

Hekmati's uncle tried to get him from Evin prison, but the Iranians claimed he was not in the prison. Hekmati's uncle went to the local Iranian police station to check on Hekmati's status.  The police station had no report for Hekmati.

Leila contacted her friend who is the son of Mustafa Rahmani.  Rahmani is in charge of the ISEC.  Rahmani's son used his Iranian contacts to obtain verbal confirmation that Hekmati was being held in Evin prison.  However, the ISEC would not provide the family with a written response.  The Iranian Government needed to officially provide information on Hekmati to the ISEC before they could provide anything in writing to the family.

Behnaz's brother went to the Foreign Ministry in Tehran to obtain information on Hekmati.  The Foreign Ministry had no information on Hekmati.  Behnaz's brother contacted the Iranian International Ministry of Justice.  The Ministry of Justice could not provide any information on Hekmati before they finished their investigation and Hekmati was charged.  Behnaz wrote a letter to inquire about her son.  The Iranians won't even let an attorney or the Iranian President to visit Hekmati until the investigation was finished.  Behnaz was told that the investigation would be finished in forty days from when he was arrested.  Therefore, Behnaz assumed the investigation would be finished by October 12, 2011.

Leila called the Iranian Mission to the United Nations (IMUN) to obtain information on Hekmati.  Leila visited the IMUN when Iranian President Ahmadinejad was in New York.  Behnaz and Sarah did not know the name of the IMUN official who met with Leila.  The IMUN Ambassador Mohammed Khazaee was not the person who met with Leila.  The IMUN official asked Leila questions about Hekmati.  The Iranians wanted to know what rank he served in the United States military.  They wanted to know whether he was in the special forces.  They wanted to know what Hekmati did for work. The ISEC asked the Hekmatis similar questions.  The IMUN and ISEC never answered the questions posed by the Hekmati family concerning their son's status.

DA693

FD-302a (Rev. 10-6-95)

█████████

███ WF-244323-302

Continuation of FD-302 of ___Behnaz and Sarah Hekmati___ , On __10/05/2011__ , Page __5__

████ The family notified the United States Department of State (USDS) of their son's imprisonment. The USDS Iranian Desk officer was notified about Hekmati. USDS promised to keep Hekmati's case quiet to allow the family in Iran to try and get his release. The Hekmatis did not want their son's case to turn into to a political issue like what happened with the hikers.

████ Behnaz and Sarah did not have any information on the type of work Hekmati did for the United States Government. Sarah knew that Hekmati had a security clearance because her husband was interviewed during Hekmati's background investigation. Leila moved back from New York and she currently lives with her mother and father.

# Exhibit 5 (a)

---

**From:** svcsmartmfi
**Sent:** 10/8/2010 8:20:26 PM
**To:** SMART Core
**Subject:** TRAVEL WARNING - IRAN 1. The Department of State warns U.S. citizens to carefully consider the risks of travel to Iran. Dual national Iranian-American citizens may encounter difficulty in departing Iran. U.S. citizens should stay

## UNCLASSIFIED



---

| | |
|---|---|
| **MRN:** | 10 STATE 105552 |
| **Date/DTG:** | Oct 09, 2010 / 082336Z OCT 10 |
| **From:** | SECSTATE WASHDC |
| **Action:** | PORT AU PRINCE, AMEMBASSY*IMMEDIATE* ;<br>ALL DIPLOMATIC AND CONSULAR POSTS COLLECTIVE*IMMEDIATE* |
| **E.O.:** | 13526 |
| **TAGS:** | CASC, ASEC, OTRA, PREL, IR |
| **Captions:** | SIPDIS |
| **Subject:** | TRAVEL WARNING - IRAN 1. The Department of State warns U.S. citizens to carefully consider the risks of travel to Iran. Dual national Iranian-American citizens may encounter difficulty in departing Iran. U.S. citizens should stay |

UNCLAS STATE 105552

SIPDIS

E.O. 13526: N/A
TAGS: CASC, ASEC, OTRA, PETER, PREL, IR
SUBJECT: TRAVEL WARNING - IRAN
1.  The Department of State warns U.S. citizens to carefully consider the risks of travel to Iran.  Dual national Iranian-American citizens may encounter difficulty in departing Iran.  U.S. citizens should stay current with media coverage of local events and carefully consider nonessential travel.  This supersedes the Travel Warning for Iran issued March 23, 2010, to update information on security concerns.

2.  Some elements in Iran remain hostile to the United States.  As a result, U.S. citizens may be subject to harassment or arrest while traveling or residing in Iran.  Since 2009, Iranian authorities have prevented the departure of a number of Iranian-American citizens, including journalists and academics, who traveled to Iran for personal or professional reasons, in some cases for several months.  Iranian authorities also have unjustly detained or imprisoned U.S. citizens on various charges, including espionage and posing a threat to national security.  U.S. citizens of Iranian origin should consider the risk of being targeted by authorities before planning travel to Iran.  Iranian authorities deny the U.S. Interests Section in Tehran

DA695

access to imprisoned dual nationals because Iranian authorities consider them to be solely Iranian citizens; access to U.S. citizens is often denied as well.

3. The Iranian government continues to repress some minority religious and ethnic groups, including Baha'i, Arabs, Kurds, Azeris, and others. Consequently, some areas within the country where these minorities reside, including the Baluchistan border area near Pakistan and Afghanistan, the Kurdish northwest of the country, and areas near the Iraqi border, remain unsafe. U.S. citizens who travel to Iran should exercise caution.

4. The U.S. government does not have diplomatic or consular relations with the Islamic Republic of Iran and therefore cannot provide protection or routine consular services to U.S. citizens in Iran. The Swiss government, acting through its Embassy in Tehran, serves as protecting power for U.S. interests in Iran. Neither U.S. passports nor visas to the United States are issued in Tehran. The Iranian government does not recognize dual citizenship and will not allow the Swiss to provide protective services for U.S. citizens who are also Iranian nationals. Iranian authorities have detained and harassed U.S. citizens of Iranian origin. Former Muslims who have converted to other religions, as well as persons who encourage Muslims to convert, are subject to arrest and prosecution.

5. U.S. citizens who travel or reside in Iran are strongly encouraged to register through the State Department's travel registration website at http://www.travel.state.gov. U.S. citizens may also register in person at the U.S. Interests Section at the Swiss Embassy, located at No. 39, Shahid Mousavi (Golestan 5th), Pasdaran, Tehran. The telephone numbers for the U.S. Interests Section are (+98)(21) 2254-2178 and (+98)(21) 2256-5273, fax (+98)(21) 2258-0432, email: tie.vertretung@eda.admin.ch, website: http://www.eda.admin.ch/tehran.

6. U.S. citizens should also consult the Department of State's Country Specific Information for Iran, and the current Worldwide Caution, which are located on the Department's Internet website at http://travel.state.gov. U.S. citizens may also obtain updated information on travel and security conditions by calling 1-888-407-4747 toll-free in the United States and Canada or, from other countries, 1-202-501-4444.

7. Minimize considered.
CLINTON

| | |
|---|---|
| **Signature:** | CLINTON |
| **Drafted By:** | CA/OCS/ACS/NESCA:BMARWAHA – 10/08/2010 X76135 |
| **Cleared By:** | CA/OCS/ACS/NESCA:CWALKER, DS/TIA/ITA:JHADDOCK, EEB/TRA/OTP:JWEBSTER, NEA/IR: MSPRING, CA/P:RDODDS, /CT:ERYE, P:DSCHNIER, M:TBURL D (L):NSHEPHERD, D(S):VREIDHEAD, PA:JRESIDE, DRL: JHUTCHINGS S/ES-O CTCROSBY |
| **Approved By:** | CA/OCS: MBERNIER-TOTH |
| **Info:** | ATLANTA, CDC |

*IMMEDIATE* ; CDR USCENTCOM MACDILL AFB FL//CCJ2-JIT//*IMMEDIATE* ;
CDR USPACOM HONOLULU HI*IMMEDIATE* ; CDR USSOUTHCOM MIAMI FL*IMMEDIATE* ;
CDRAMC FT BELVOIR VA//AMCMI-SS//*IMMEDIATE* ; CIM NTDB WASHINGTON DC
*IMMEDIATE* ; COGARD INTELCOORDCEN WASHINGTON DC*IMMEDIATE* ;
COMNAVAIRSYSCOM PATUXENT RIVER MD//AIR1031B//*IMMEDIATE* ;
DEPT OF TREASURY WASHINGTON DC*IMMEDIATE* ; FSINFATC, DIR*IMMEDIATE* ;
FAA NATIONAL HQ WASHINGTON DC//ACI-400//*IMMEDIATE* ;
HQ AFOSI DOQ ANDREWS AFB MD//IVOA//*IMMEDIATE* ;
HQ USAF WASHINGTON DC//XOXXI//*IMMEDIATE* ; NRC WASHINGTON DC//INFOSEC//
*IMMEDIATE* ; WHITE HOUSE NATIONAL SECURITY COUNCIL WASHINGTON DC
*IMMEDIATE*

**Action Post:**

**Dissemination Rule:**          Archive Copy

**UNCLASSIFIED**

DA697

**From:** svcsmartmfi
**Sent:** 10/21/2011 2:31:17 PM
**To:** SMART Core
**Subject:** TRAVEL WARNING - IRAN

**UNCLASSIFIED**



# Exhibit 5 (b)

| | |
|---|---|
| **MRN:** | 11 STATE 105785 |
| **Date/DTG:** | Oct 21, 2011 / 211808Z OCT 11 |
| **From:** | SECSTATE WASHDC |
| **Action:** | ALL USDOC DISTDIR COLLECTIVE WASHINGTON DC*IMMEDIATE* ; DAMASCUS, AMEMBASSY*ROUTINE* ; ASIA, ATO*PRIORITY* ; ATLANTA, CDC*IMMEDIATE* ; CDR USPACOM HONOLULU HI*IMMEDIATE* ; CDR USSOUTHCOM MIAMI FL*IMMEDIATE* ; CDRAMC FT BELVOIR VA*IMMEDIATE* ; CIM NTDB WASHINGTON DC*IMMEDIATE* ; COGARD INTELCOORDCEN WASHINGTON DC*IMMEDIATE* ; COMNAVAIRSYSCOM PATUXENT RIVER MD*IMMEDIATE* ; DEPT OF TREASURY WASHINGTON DC*IMMEDIATE* ; FSINFATC, DIR*IMMEDIATE* ; FAA NATIONAL HQ WASHINGTON DC*IMMEDIATE* ; HQ AFOSI DOQ ANDREWS AFB MD *IMMEDIATE* ; HQ USAF WASHINGTON DC*IMMEDIATE* ; NRC WASHINGTON DC*IMMEDIATE* ; WHITE HOUSE NATIONAL SECURITY COUNCIL WASHINGTON DC*IMMEDIATE* ; ALL DIPLOMATIC AND CONSULAR POSTS COLLECTIVE*IMMEDIATE* |
| **E.O.:** | 13526 |
| **TAGS:** | CASC, ASEC, OTRA, PTER, PREL, IR |
| **Captions:** | SIPDIS |
| **Subject:** | TRAVEL WARNING - IRAN |

UNCLAS STATE 105785

SIPDIS

E.O. 13526: N/A
TAGS: CASC, ASEC, OTRA, PTER, PREL, IR
SUBJECT: TRAVEL WARNING - IRAN

1. The Department of State warns U.S. citizens to carefully consider the risks of travel to Iran. Dual national Iranian-American citizens may encounter difficulty in departing Iran. U.S. citizens should stay current with media coverage of local events and carefully consider nonessential travel. The Travel Warning for Iran issued October 8, 2010 has been reviewed and reissued without change.

2. Some elements in Iran remain hostile to the United States. As a result, U.S. citizens may be subject to harassment or arrest while traveling or residing in Iran. Since 2009, Iranian authorities have prevented the departure, in some cases for several months, of a

number of Iranian-American citizens, including journalists and academics, who traveled to Iran for personal or professional reasons. Iranian authorities also have unjustly detained or imprisoned U.S. citizens on various charges, including espionage and posing a threat to national security.  U.S. citizens of Iranian origin should consider the risk of being targeted by authorities before planning travel to Iran.  Iranian authorities deny the U.S. Interests Section in Tehran access to imprisoned dual national Iranian-American citizens because Iranian authorities consider them to be solely Iranian citizens; access to U.S. citizens is often denied as well.

3.  The Iranian government continues to repress some minority religious and ethnic groups, including Baha'i, Arabs, Kurds, Azeris, and others.  Consequently, some areas within the country where these minorities reside, including the Baluchistan border area near Pakistan and Afghanistan, the Kurdish northwest of the country, and areas near the Iraqi border, remain unsafe.  U.S. citizens who travel to Iran should exercise caution.

4.  The U.S. government does not have diplomatic or consular relations with the Islamic Republic of Iran and therefore cannot provide protection or routine consular services to U.S. citizens in Iran.  The Swiss government, acting through its Embassy in Tehran, serves as protecting power for U.S. interests in Iran. Neither U.S. passports nor visas to the United States are issued in Tehran.  The Iranian government does not recognize dual citizenship and will not allow the Swiss to provide protective services for U.S. citizens who are also Iranian nationals.  Iranian authorities have detained and harassed U.S. citizens of Iranian origin.  Former Muslims who have converted to other religions, as well as persons who encourage Muslims to convert, are subject to arrest and prosecution.

5.  U.S. citizens who travel or reside in Iran are strongly encouraged to enroll in the State Department's Smart Traveler Enrollement Program.  U.S. citizens may also enroll in person at the U.S. Interests Section at the Swiss Embassy, located at No. 39, Shahid Mousavi (Golestan 5th), Pasdaran, Tehran.  The telephone numbers for the U.S. Interests Section are (+98)(21) 2254-2178 and (+98)(21) 2256-5273, fax (+98)(21) 2258-0432, email: tie.vertretung@eda.admin.ch, website: http://www.eda.admin.ch/tehran.

6.  U.S. citizens should also review the Department of State's Country Specific Information for Iran and stay up to date by bookmarking the Bureau of Consular Affairs website, which contains the current Travel Warnings and Travel Alerts as well as the Worldwide Caution. Follow us on Twitter and the Bureau of Consular Affairs page on Facebook as well. If you don't have internet access, current information on safety and security can also be obtained by calling 1-888-407-4747 toll-free in the United States, or for callers from other countries, a regular toll line at 1-202-501-4444. These numbers are available from 8:00 a.m. to 8:00 p.m. Eastern Time, Monday through Friday (except U.S. federal holidays).

7.  Minimize considered.
CLINTON

| | |
|---|---|
| **Signature:** | CLINTON |
| **Drafted By:** | CA/OCS/ACS/NESCA:CGRAHAM -- 10/21/2011 X76135 |
| **Cleared By:** | CA/OCS/ACS/NESCA:KRICHTER, DS/TIA/ITA:JJURASKA, EEB/TRA/OTP:JKIM, NEA/IR: CBROWN, CA/P:JECHARD, S/CT:TSTASBURY, P:MSIMPSON, M:PPETROVICH D (N):LPETRUSH, D(B):KMOORE, PA:JRESIDE, DRL: GKASSEM, CA/OCS/ACS:HFRORDRIGUEZ CA/OCS:BAPAYNE S/ES-O: CTHORNBERRY |
| **Approved By:** | CA/OCS: JDPETTIT |
| **Info:** | |
| **XMT:** | AMEMBASSY TRIPOLI; TASK FORCE EAGLE TUZLA BOSNIA UTA |
| **Action Post:** | |
| **Dissemination Rule:** | Archive Copy |

**UNCLASSIFIED**

# Exhibit 6

## Filing and Security                                                    ⌄

| | | | |
|---|---|---|---|
| **Primary Case:** | ██████████ | **Case Title:** | ██████████ |
| **Serial Number:** | ██ | | ██████ |
| **Serialized:** | 09/30/2011 | | |
| **Category:** | ████████ | | |
| **Initiated:** | ██████ | | |

## Details                                                               ⌄

| | | | |
|---|---|---|---|
| **Serial #:** | ██ | **Type:** | FD302 |
| **From:** | NEW YORK | **To:** | WASHINGTON FIELD |
| **Document Title:** | TISO ROLAND JOHN JR INTERVIEW | | |
| **Approval Date:** | 9/30/2011 | | |
| **Classification:** | U. (U//FOUO) | | |
| **Contents** | 09/30/2011 | | |

(U//FOUO)  On September 29, 2011, Roland John Tiso Jr, born ██████
██████ social security number ████████, was interviewed at his
place of employment, located on Bagram Airfield, Afghanistan.
After being advised of the identity of the interviewing agents and
the nature of the interview, Tiso provided the following
information:

(U//FOUO)  Tiso is a civilian contract employee working for OG
Systems. Tiso is temporarily assigned to the Regional Intelligence
Fusion Center (RIFC), at Bagram Airfield, as the Senior Pakistan
Military Analyst. Tiso is permanently assigned to the U.S. Central
Command (Centcom) Afghan/Pakistan Center (Af/Pak Center). Prior to
becoming an intelligence analyst, Tiso was a career Army officer
and retired at the rank of Colonel (O6).

(U//FOUO)  Tiso spent a great deal of time with AMIR HEKMATI during
HEKMATI'S brief time working as an analyst at RIFC. HEKMATI worked
at RIFC for less then two months, but Tiso and HEKMATI'S work
stations were right next to each other. Both Tiso and HEKMATI both
enjoyed training at the gym, and both were infantrymen during their
time in uniformed service. These commonalities led to them quickly
becoming good friends. Tiso and HEKMATI would often work out

████████████████████

5/6/2020

Serials

together, and frequently went to lunch and dinner together.

(U//FOUO)   While working at RIFC, HEKMATI'S analytical assignment was to examine insurgent communication methods. As a result of sitting right next to HEKMATI, Tiso always had a view of HEKMATI'S work station screen. Tiso has never noticed any content on HEKMATI'S screen that was inconsistent with his assigned area of focus.

(U//FOUO)   HEKMATI was an extremely smart and serious minded individual. HEKMATI was very focused on his analytical tasks, and had a strong work ethic. HEKMATI was also reserved but very polite and friendly. Tiso has never observed any suspicious or unusual activity by HEKMATI. Tiso does not know HEKMATI to have violate any security procedures. Tiso has no reason to question HEKMATI'S loyalty to the United States.

(U//FOUO)   Tiso and HEKMATI frequently talked about their respective military service. HEKMATI was extremely proud to have been a United States Marine. Although he was mainly assigned to intelligence in the Marine Corps, he insisted on attending infantry school. After graduating infantry school, he was assigned to the 4th Marine Infantry Division and served in Iraq. HEKMATI told Tiso that because of his Arabic appearance, coupled with his fluency in Arabic and Farsi, HEKMATI was often tasked by his Sergeant Major to perform undercover operations. On many occasions during his service in Iraq, HEKMATI would be directed to dress in traditional Arabic garb and attempt to gain intelligence by blending in with the local population. HEKMATI showed Tiso a picture of himself in Arabic garb next to his Sergeant Major.

(U//FOUO)   HEKMATI lived in the temporary quarters, located on the Joint Operations Center (JOC) compound, the entire time he was working at RIFC. The temporary quarters consists of a large room filled with bunks. HEKMATI was finally assigned permanent quarters approximately one week prior to his resignation, but HEKMATI never bothered to make the move. HEKMATI hung a poncho/sheet around his bunk for privacy, a practice that his very common among military personnel living in large common areas.

(U//FOUO)   HEKMATI worked twelve to fourteen hours a days, and typically worked from 8:30 am to 10:00 pm. Towards the end of HEKMATI'S employment, Tiso noticed that he began keeping later hours. He was going to the gym sometimes between 12:00 am and 1:00 am. Once he announced his resignation, Tiso noticed that HEKMATI was spending more time on the phone, however, the conversations appeared to be with his company management, and seemed pertinent to his travel arrangements for leaving Afghanistan.

(U//FOUO)   HEKMATI advised Tiso of his decision to resign approximately two weeks prior to his departure, about the same time he announced it to everyone else. HEKMATI told Tiso he was tired of being deployed and wanted to do something else. HEKMATI also advised Tiso that he had been accepted to a graduate program in economics at the University of Michigan and was planning an attending the school in early September.

5/6/2020

Serials

(U//FOUO)  On the day HEKMATI departed Bagram Airfield, Tiso accompanied him to the DFS terminal where he boarded a flight to Dubai. Gabriel Serrano was driving the car that took HEKMATI and Tiso to the DFS terminal. Tiso believed that HEKMATI was traveling to the United States directly from Dubai. Tiso and HEKMATI agreed to maintain contact via email. HEKMATI provided Tiso with email address ███████████

(U//FOUO)  Soon after HEKMATI'S departure, Tiso sent HEKMATI two or three emails but never received a response.

(U//FOUO)  Tiso does not recall ever seeing HEKMATI with a personal cellular telephone, or a personal laptop computer.



**Exhibit 7**

FD-302 (Rev. 5-8-10)

-1 of 4-
UNCLASSIFIED//FOUO
**FEDERAL BUREAU OF INVESTIGATION**



Date of entry ___05/04/2016___

**DOCUMENT RESTRICTED TO CASE PARTICIPANTS**
This document contains information that is restricted to case participants.

(U//FOUO) ROLAND JOHN TISO JR., date of birth: █████████, social security
number: ████████, was interviewed from the Washington Field Office (WFO)
of the Federal Bureau of Investigation (FBI) on March 14, 2016 by Special
Agents ████████ and ████████ via a secure video
teleconferencing (SVTC) with the assistance of the FBI Legal Attache
(LEGAT) Office at the U.S. Embassy in Baghdad, Iraq. After being advised
of the identity of the interviewing Agents, the nature of the interview,
the fact that TISO's prior Non-Disclosure Agreement was still in effect,
TISO provided the following information:

(U//FOUO) From 2010 to June 2014, TISO was a civilian contractor employed by OG
Systems, a subcontractor of SAIC assigned to the Regional Intelligence
Fusion Center (RIFC), Special Operations Joint Task Force- Afghanistan
(SOJFT-A) at Bagram, Afghanistan. TISO had never heard of Camp Vance, but
stated the SOJFT-A was located in the Joint Operations Command Center
referred to as the "JOC." TISO was the Senior Pakistan Military Analyst
for "RC East." Prior to becoming an intelligence analyst (IA) for OG
Systems, Tiso was a career Army Infantry Officer and retired at the rank of
Colonel.

(U//FOUO) TISO sat next to AMIR HEKMATI in the SOJFT-A JOC Sensitive Compartmented
Information Facility (SCIF) from approximately June 2011 to August 2011.
TISO did not know what specific work HEKMATI was assigned to as an IA in
support of SOJFT-A. TISO stated "of all the analyst on JOC floor what
people knew the least about was what HEKMATI was doing." TISO opined
HEKMATI's work was compartmented. HEKMATI never "opened up about what he
was working on." HEKMATI did not have the same requirements as other IA's
at SOJFT-A to coordinate with others. TISO opined "HEKMATI knew how to
play the intel [SIC] business," was "all business," and was "very
professional."

(U//FOUO) When HEKMATI first arrived in Afghanistan he was asked by Six3 Systems
to work a non-IA position, to which HEKMATI refused. TISO opined HEKMATI's

UNCLASSIFIED//FOUO

| | | |
|---|---|---|
| Investigation on | 03/14/2016 | at Washington, District Of Columbia, United States (, Other (Secure Video Teleconferencing )) |
| File # | ███████ | Date drafted 03/16/2016 |
| by | ████████████ | |

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

DA704

FD-302a (Rev. 05-08-10)                    UNCLASSIFIED//FOUO

Continuation of FD-302 of (U) ROLAND JOHN TISO JR              ,On  03/14/2016 ,Page  2 of 4

attitude was he had agreed to work for Six3 Systems in in Afghanistan as an
IA and therefore did not want to work any other position. Additionally,
TISO opined HEKMATI wanted to try a different position then the one he held
in Iraq.

(U//FOUO) TISO did not know if HEKMATI had taken a pay cut from his job in Iraq
for the Six3 Systems position in Afghanistan. TISO did not believe
contractors had started to take any pay cuts in 2011 due to the Department
of Defense's (DOD) budget. HEKMATI never spoke of any financial issues or
business ventures with TISO.

(U//FOUO) HEKMATI did not conduct a "left seat right seat" with anyone when he
arrived at the JOC. HEKMATI worked primarily with Major FNU Heatherly.

(U//FOUO) TISO noticed HEKMATI had personal headphones on the majority of the time
and could have been in "the listening business." HEKMATI was always
focused on his computer while at work. TISO never observed HEKMATI writing
any notes on a paper while working on his computer. TISO did not "remember
him [HEKMATI] getting up to go to the printer." HEKMATI and TISO both did
not have any desk drawers to store work or personal items in the SCIF.
HEKMATI had a backpack which he brought into the SCIF.

(U//FOUO) TISO believed HEKMATI's normal work hours were from 8:00a.m. to
10:00p.m., however there were no set schedules. HEKMATI was allowed to
work whatever hours he wished as long as he completed his assignments.
HEKMATI worked long hours like TISO.

(U//FOUO) When HEKMATI first arrived at Bagram, he was lodged in temporary
quarters on the second floor of a building located near the JOC. The
security office where individuals received their JOC base identification
badge and the First Sergeants office were located on the first floor of the
building. HEKMATI had the bunk bed located closest to the main door of the
temporary quarters. HEKMATI kept his personal bags on the top bunk bed and
slept on the bottom bunk bed. HEKMATI like most individuals in the
temporary quarters hung a blanket from the top bunk bed to provide some
personal privacy. TISO did not observe HEKMATI using a personal laptop
computer, however saw him reading books and magazines. TISO resided in the
same temporary quarters as HEKMATI for an unknown period of time prior to
TISO receiving his permanent housing assignment. TISO did not know when or
if HEKMATI received a permanent housing assignment. The permanent housing
quarters were either a two person container located near the JOC or single
occupant rooms located in wood buildings in "Infantry Village."

(U//FOUO) TISO stated it was possible for an individual to place a thumb drive
into a classified computer. TISO did not observe HEKMATI ever placing a
thumb drive into a classified computer.

UNCLASSIFIED//FOUO

FD-302a (Rev. 05-08-10)

UNCLASSIFIED//FOUO

████████████

Continuation of FD-302 of  (U)  ROLAND JOHN TISO JR _____ , On  03/14/2016 , Page  3 of 4

(U//FOUO) TISO did not know if HEKMATI had access to any Special Access Programs (SAP), ████████████████████████, or any National Security Agency (NSA) programs.

(U//FOUO) The JOC had U.S. Army soldiers who sat at the JOC security desk and would check backpacks as individuals entered or exited the JOC SCIF. Individuals would also have to check their cell phones at the JOC security desk prior to entering the SCIF. TISO never observed HEKMATI with a cell phone.

(U//FOUO) HEKMATI did not have a NIPR computer at his desk. There were two NIPR computers located at a desk near HEKMATI and TISO's desk. The NIPR computers were communal computers. HEKMATI was "not a NIPR Queen." Approximately a week prior to HEKMATI's departure, TISO observed HEKMATI using the NIPR computer and telephone located at the desk frequently. TISO opined HEKMATI was using the telephone to speak with individuals from Six3 Systems.

(U//FOUO) TISO and HEKMATI shared a common interest in weight lifting and prior U.S. military combat experiences. TISO "always thought he was a good guy, a good friend." TISO is a competitive bodybuilder and was training his roommate GABE SERRANO every night until approximately 11:00p.m. at the gym located near the JOC. TISO did not workout with HEKMATI. TISO opined that HEKMATI went to the gym between 8:00p.m. and midnight.

(U//FOUO) HEKMATI informed TISO he was "tired of this" referring to the contractor position and wished to "move onto something else." HEKMATI informed TISO he was going to return to school to obtain his Master of Business Administration (MBA). TISO did not believe HEKMATI had applied to an university prior to departing Afghanistan. For this reason TISO believed the earliest HEKMATI would be starting his MBA was in January 2012. TISO opined HEKMATI was the "black sheep of family since he went into Marines instead of going on to school." HEKMATI's parents and sister were all highly educated. TISO opined HEKMATI's desire to return to the United States to start his MBA was a logical decision.

TISO did not observe HEKMATI's work hours decrease or increase after he notified Six3 Systems of his intentions to leave the contract. The night prior to HEKMATI's departure at shift change, TISO presented HEKMATI with a plaque he had purchased. TISO gave a short speech and the "G2" said "something."

TISO and SERRANO drove HEKMATI to the Bagram airport on his last day. HEKMATI boarded a flight to Dubai and was scheduled to continue on to the United States. TISO did not know why HEKMATI decided to visit his

UNCLASSIFIED//FOUO

FD-302a (Rev. 05-08-10)

UNCLASSIFIED//FOUO

Continuation of FD-302 of  (U) ROLAND JOHN TISO JR _____ , On  03/14/2016 , Page  4 of 4

grandparents in Iran prior to returning to the United States. HEKMATI left Afghanistan with a backpack and one checked bag. TISO opined that HEKMATI had mailed some of his personal items home from the base U.S. Post Office.

TISO did not know what identification HEKMATI used to board his flight to Dubai. TISO knew HEKMATI had a DOD CAC identification card and his JOC base identification card. TISO believed HEKMATI had to return his JOC base identification card prior to his departure.

TISO opined SERRANO, NICK STEPHANADIS, Major FNU Lewis, Chief FNU Janney, Chief FNU Howell, were all good friends with HEKMATI.

TISO's notes are maintained in the 1A.

UNCLASSIFIED//FOUO

**Exhibit 8**

FD-302 (Rev. 5-8-10)

- 1 of 3 -


OFFICIAL RECORD

(U//FOUO) ~~SECRET//NOFORN~~

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry     05/09/2016

**DOCUMENT RESTRICTED TO CASE PARTICIPANTS**
This document contains information that is restricted to case participants.

(U//FOUO) On 2 April 2016, CHRISTOPHER HEATHERLY, Professor of Military
Science Department of Military Science at Washington State University
(WSU), Avery Hall, Room 405 F, Pullman, Washington 99163, telephone numbers
████████ and ████████, born ████████, social security
number ████████ was interviewed at his office at WSU. HEATHERLY was
advised of the identity of the interviewing agents, the nature of the
interview and was provided a Classified Non-Disclosure Agreement (NDA).
HEATHERLY acknowledged he understood the NDA and signed it. HEATHERLY then
voluntarily provided the following information:

(U//FOUO) HEATHERLY is a Lieutenant Colonel in the United States Army
assigned to WSU. HEATHERLY has had many overseas assignments, to include,
an assigned as the Chief of the Regional Information Fusion Center (RIFC)
in Bagram, Afghanistan. This is when HEATHERLY first met AMIR HEKMATI.

(U//FOUO) In circa 2011, for a short time, HEKMATI was a civilian contract
analyst assigned to the RIFC. Everyone in the RIFC, to include, HEKMATI
worked long days fourteen to sixteen hours. HEATHERLY could not recall
HEKMATI's specific tasking, but stated it would have been related to
analyzing insurgent communication methods and techniques in relation
toAfghanistan and its surrounding countries, i.e. Pakistan, and
narcoterrorism. HEATHERLY thought it was highly unlikely HEKMATI needed to
access any information regarding Iran, since Iran's influence to
Afghanistan was not a prevalent issue at the time.

(U//FOUO) HEATHERLY described HEKMATI's day-to-day tasking of how he
received intelligence. Daily raw human intelligence (HUMINT) from the
"field" would be received via email. From the raw HUMINT, HEKMATI was
supposed to compose an analytical work product, which was either

          Reason: ~~1.4(c)~~
          Derived From: ~~FBI~~
          ~~NSISC-20090615~~
          Declassify On: ~~20411231~~

          (U//FOUO) ~~SECRET//NOFORN~~

Investigation on   04/02/2016   at   Pullman, Washington, United States (In Person)

File #   ████████                                                     Date drafted   04/19/2016

by   ████████  ████████

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

FD-302a (Rev. 05-08-10)

(U//FOUO) SECRET//NOFORN

(U//FOUO) Interview of Christopher
Heatherly

Continuation of FD-302 of  ~~unclassified or up to the Secret level. HEKMATI may have saved his work~~  On  04/02/2016  Page  2 of 3

products on their shared drive. All analytical work products, to include HEKMATI's work, went through a peer review before HEATHERLY or ELIZABETH ROBERTSON, maiden name MOLNAR, reviewed it. HEATHERLY opined CHRIS MYERS, with Defense Intelligence Agency (DIA), or a Warrant Officer would have done the peer review for HEKMATI. HEATHERLY had weekly intelligence team meetings, on Fridays at 1900 hours, which HEKMATI attended. Once a final analytical product was reviewed it could have been distributed to Central Command, to the White House or to other intelligence agencies.

(U//FOUO) Interviewing agents provided a copy of the RIFC SCIF's schematics to HEATHERLY. HEATHERLY identified it as the RIFC SICF they were assigned. The RIFC SCIF is operational 24 hours a day, having at least 15 to 20 personnel in it at any time. THE RIFC SCIF had a 5 digit code and cipher lock to enter and it would change every 30 to 60 days. There was ingress and egress to the RIFC SCIF and personnel had to sign a sign-in-sheet if entering and leaving. It was based on the honor system. Those sign-in-sheets were viewed weekly by HEATHERLY and would be destroyed if nothing looked out of the norm. No cell phones or electronics were allowed and bag checks were mostly for visitors.

(U//FOUO) HEATHERLY wrote on the RIFC SCIF schematics identifying his desk, HEKMATI's desk and where other personnel were located. HEATHERLY identified the desk labeled "CHRIS SMITH" as HEKMATI's desk. No one except HEKMATI sat at that desk. Everyone had access to SIPR and JWICS laptops at their desks and the NIPR laptops were located away from their desk in the corner of the SCIF. HEKMATI probably used the NIPR laptops, but could not say for certain. The laptops were stationary and could not physically be removed from their designated areas. The thumb drives were disabled, but HEATHERLY could not recall whether or not you could download information to a compact disc. Each desk had individual cubicles to store personal items and documents. HEATHERLY was not aware if HEKMATI stored anything at his desk. HEATHERLY does not recall any excessive printing of HEKMATI and would have noticed since HEATHERLY kept a strict inventory of the paper due to paper shortages. Since HEKMATI's analytical work products were based on RAW HUMINT received by email, HEATHERLY was not aware of the specific databases HEKMATI had access to or needed access to perform his duties. HEATHERLY did not notice anything unusual or nefarious by HEKMATI's activities in the RIFC SCIF.

(U//FOUO) HEATHERLY was aware HEKMATI was a former member of the United States Marine Corp and linguist. HEKMATI's friend and co-worker was ROLAND TISO. TISO worked out in the gym three times a day. HEKMATI and TISO worked out during the same time together. HEATHERLY provided HEKMATI, TISO, and

(U//FOUO)  SECRET//NOFORN

FD-302a (Rev. 05-08-10)

(U//FOUO)  SECRET//NOFORN

(U//FOUO)  Interview of Christopher
Continuation of FD-302 of  Heatherly                    On  04/02/2016  Page  3 of 3
other contractors leeway to workout sporadically through the day as long as
they worked their hours assigned.

(U//FOUO) HEKMATI's living quarters were located off Disney Drive.
HEATHERLY was not aware if HEKMATI had a roommate. HEATHERLY opined
HEKMATI's living quarters were pre-wired for internet. Internet had to be
purchased individually.

(U//FOUO) HEATHERLY had never seen HEKMATI practicing any type of religion.
HEKMATI has never made any political statements or done anything for
HEATHERLY to question his loyalty to the United States when he was assigned
to the RIFC.

(U//FOUO) One day, HEATHERLY was entering the RIFC and saw HEKMATI outside
the entry way visibly upset. HEATHERLY asked HEKMATI if everything was
okay. HEATHERLY stated HEKMATI was tired of being overseas and wanted to go
home to attend graduate school. This did not surprise HEATHERLY because he
knew HEKMATI was previously in Iraq for a period of time before being
assigned in Bagram. HEATHERLY opined it was not uncommon to have turn-over
of government contractors because of the long hours and time away from
their families. HEATHERLY asked HEKMATI if he was ever unjustly treated due
to his Persian appearance and he had not. HEATHERLY was relieved because
there had been a number of insider shootings involving their coalition
partners, who are Middle Eastern, on base which brought concern to the U.S.
military and their personnel.

(U//FOUO) HEATHERLY had no idea HEKMATI was traveling to Iran or that he
had family in Iran, and only learned of it after HEKMATI was incarcerated
in Iran.

(U//FOUO) Interview notes of HEATHERLY's interview, the signed NDA, copy of
the RIFC SCIF floor plan and HEATHERLY's hand written notes are maintained
in the 1A.

(U//FOUO) SECRET//NOFORN

4/23/2020

Serials

# Exhibit 9

## Filing and Security ⌄

| | | | |
|---|---|---|---|
| **Primary Case:** | ████████ | **Case Title:** | ████████ |
| **Serial Number:** | ██ | | |
| **Serialized:** | 10/02/2011 | | |
| **Category:** | ████████ | | |
| **Initiated:** | ████████ | | |

## Details ⌄

| | | | |
|---|---|---|---|
| **Serial #:** | ██ | **Type:** | FD302 |
| **From:** | NEW YORK | **To:** | WASHINGTON FIELD |
| **Document Title:** | LIEUTENANT COLONEL DAVID W PENDALL INTERVIEW | | |
| **Approval Date:** | 10/2/2011 | | |
| **Classification:** | U | | |
| **Contents** | 10/02/2011 | | |

On October 1, 2011, Lieutenant Colonel (LTC) David W. Pendall, United States Army, born ████████, social security number ████████, was interviewed at his place of employment, located on Bagram Airfield, Afghanistan. After being advised of the identity of the interviewing agents and the nature of the interview, LTC Pendall provided the following information:

LTC Pendall is the Deputy Chief of Staff of Intelligence for the Joint Operations Center (JOC). LTC Pendall's interactions with AMIR HEKMATI were limited to approximately three or four direct meetings with HEKMATI, each of which were a few minutes in length, and four to five larger group meetings where HEKMATI was present. LTC Pendall instructed HEKMATI to work on researching the inconsistencies between what the Taliban and Haqqani Network leaders are saying to their commanders and what they are saying to the public. LTC Pendall also wanted HEKMATI to help in developing strategies on how to exploit those inconsistences.

HEKMATI appeared to be motivated and hard working. His work product was decent, and LTC Pendall appreciated HEKMATI'S willingness to freely offer his opinions and thoughts.

████████████████████████████████     DA711     1/2

4/23/2020

Serials

LTC Pendall has never noticed any unusual or suspicious
behavior by HEKMATI, nor is he aware of HEKMATI violating any
security procedures.

LTC Pendall does not know if HEKMATI had access to the
database ████████ , however, he would be surprised if he didn't.
████████ would be a logical source of intelligence for HEKMATI to
have used in doing his analysis on insurgency communications.



DA712

2/2

# Exhibit 10

## Filing and Security                                                    ⌄

| | | |
|---|---|---|
| **Primary Case:** | ███████████ | **Case Title:** ████████████ |
| **Serial Number:** | ██ | ██████ |
| **Serialized:** | ███████ | |
| **Category:** | █████████ | |
| **Initiated:** | ██████ | |

## Details                                                               ⌄

**Serial #:** ██                                **Type:** FD302

**From:** NEW YORK                              **To:** WASHINGTON FIELD

**Document Title:** ELIZABETH **MOLNAR** INTERVIEW

**Approval Date:** 9/30/2011

**Classification:** U̶ (U//FOUO)

**Contents** 09/30/2011

(U//FOUO)   On September 29, 2011, Captain (CPT) Elizabeth Molnar, United States Army, born ████████████, social security number ████████, was interviewed at her place of employment, located on Bagram Airfield, Afghanistan. After being advised of the identity of the interviewing agents and the nature of the interview, CPT **Molnar** provided the following information:

(U//FOUO)   CPT **Molnar** has been assigned to her current unit since October of 2010, and has been in Afghanistan since May 2011. Captain **Molnar** is currently assigned as the Deputy Chief of the Regional Information Fusion Center (RIFC), also known as the Analysis Control Element (ACE).

(U//FOUO)   CPT **Molnar** has a clear recollection of AMIR HEKMATI. HEKMATI worked as a contract analyst at RIFC from approximately June 2011 to August 2011. While working at RIFC, HEKMATI was tasked with analyzing communication techniques and methods used by the Taliban. He typically worked from 9:00 am to 10:00 pm.

(U//FOUO)   CPT **Molnar** was in HEKMATI'S direct chain of command, but she did not interact with him too often. Most of HEKMATI'S tasking came directly from Lieutenant Colonel Bakavage or Lieutenant

████████████████████████████████████████

DA713                                                         1/3

4/23/2020

Colonel Pendall, who assigned tasks for HEKMATI based on requests and inquiries from the Command General.

(U//FOUO)   The few casual conversations that CPT **Molnar** had with HEKMATI were about their mutual home state of Michigan. HEKMATI'S demeanor was polite, confident and reserved. He was quiet and serious, and generally worked hard. His analytical skills were strong, however, his writing skills were marginal.

(U//FOUO)   CPT **Molnar** did notice that towards the end of his employment, HEKMATI's work production declined significantly and he became even more quiet and reserved. CPT **Molnar** also recalls a period of time when HEKMATI was sick and needed to be retrieved from his bunk.

(U//FOUO)   While working at RIFC, HEKMATI'S work station was equipt with SIPRNET, CENTRIX and JWICS computer terminals. None of these terminals were capable of downloading data to a removable media device. If HEKMATI wished to remove data from his work station he would have had to solicit the help of CW2 Janney or CW3 Howell. HEKMATI also had access to the community NIPR computer terminal located in the corner of the RIFC room. CPT **Molnar** did not notice HEKMATI'S use of the NIPR terminal, or the telephones, to be excessive. CPT **Molnar** has never seen HEKMATI use the DSN telephone line.

(U//FOUO)   HEKMATI'S closest friend at RIFC was fellow analyst Roland Tiso. HEKMATI worked directly adjacent to Tiso, and frequently went to the gym and to meals with Tiso. HELKMANI was also friendly with co-workers Chris Myers, Nick Stephanadis and Hanhah Gleiter.

(U//FOUO)   CPT **Molnar** never noticed any unusual or suspicious behavior by HEKMATI. CPT **Molnar** is not aware of any security violations by HEKMATI, nor did she ever notice him searching or inquiring about intelligence outside the purview of his duties and assignments.

(U//FOUO)   HEKMATI'S resignation was sudden and unexpected. When he resigned, he complained of being tired of deployment and stated that he wanted to go back to school.

(U//FOUO)   At the conclusion of the interview, CPT **Molnar** provided the interviewing agents with a sketch of the RIFC work area.

UNCLASSIFIED//FOR OFFICIAL USE ONLY        Attachment A

# Exhibit 11 (a)

search_log

| TIMESTAMP | SEARCH TERMS |
|---|---|
| 5/4/2011 02:35:56 AM | iran |
| 5/4/2011 02:37:58 AM | iran |
| 7/9/2011 06:52:55 AM | Afghanistan |
| 7/10/2011 06:59:48 AM | jundollah |
| 7/10/2011 07:15:30 AM | iran |
| 7/13/2011 12:45:54 AM | Taliban moving south |
| 7/13/2011 12:52:53 AM | future attack on Kabul indicators |
| 7/13/2011 12:54:44 AM | IRan |
| 7/13/2011 06:23:34 AM | IRan |
| 7/13/2011 06:24:42 AM | IRan |
| 7/13/2011 06:29:23 AM | IRan |
| 7/13/2011 06:40:16 AM | IRan |
| 7/13/2011 06:43:56 AM | IRan |
| 7/13/2011 06:47:44 AM | IRan |
| 7/13/2011 06:48:35 AM | IRan |
| 7/13/2011 06:52:14 AM | IRan |
| 7/13/2011 07:17:23 AM | IRan |
| 7/13/2011 07:51:44 AM | IRan |
| 7/13/2011 11:59:36 PM | iran |
| 7/14/2011 12:01:18 AM | iran |
| 7/14/2011 01:51:52 AM | iran |
| 7/14/2011 01:54:45 AM | iran |
| 7/14/2011 02:08:48 AM | iran |
| 7/14/2011 05:39:35 AM | iran |
| 7/14/2011 06:03:01 AM | iran |
| 7/14/2011 06:03:51 AM | iran |
| 7/14/2011 06:54:00 AM | iran |
| 7/14/2011 07:09:16 AM | iran |
| 7/14/2011 07:12:28 AM | iran |
| 7/14/2011 07:15:31 AM | iran |
| 7/14/2011 07:16:26 AM | iran |
| 7/14/2011 07:30:25 AM | iran |
| 7/14/2011 07:32:22 AM | iran |
| 7/14/2011 07:33:23 AM | iran |
| 7/14/2011 07:34:59 AM | iran |
| 7/14/2011 07:38:41 AM | iran |
| 7/15/2011 08:41:04 AM | Afghanistan |
| 7/16/2011 05:41:00 AM | MEK |
| 7/16/2011 05:47:56 AM | MEK |
| 7/16/2011 05:57:48 AM | Jundollah |
| 7/16/2011 06:30:29 AM | Jundollah |
| 7/16/2011 06:43:43 AM | Khalq-E-Arab |
| 7/17/2011 12:09:59 AM | iran |
| 7/17/2011 12:39:48 AM | iran |
| 7/17/2011 12:56:16 AM | iran |
| 7/17/2011 01:11:32 AM | iran |
| 7/17/2011 01:13:46 AM | iran |
| 7/17/2011 01:29:36 AM | iran |
| 7/17/2011 01:32:43 AM | iran |
| 7/17/2011 02:12:36 AM | iran |
| 7/17/2011 02:13:05 AM | iran |
| 7/17/2011 02:13:17 AM | iran |
| 7/17/2011 02:16:04 AM | iran |
| 7/17/2011 02:46:32 AM | iran |
| 7/17/2011 03:11:58 AM | iran |
| 7/17/2011 03:13:18 AM | iran |
| 7/17/2011 03:20:39 AM | iran |
| 7/17/2011 03:21:07 AM | iran |
| 7/17/2011 03:29:12 AM | iran |
| 7/17/2011 03:29:36 AM | iran |
| 7/17/2011 03:33:27 AM | iran |
| 7/17/2011 03:35:56 AM | iran |

Page 1

UNCLASSIFIED//FOR OFFICIAL USE ONLY

```
                              search_log
7/17/2011 03:36:40 AM        iran
7/17/2011 03:38:05 AM        iran
7/17/2011 03:38:48 AM        iran
7/17/2011 03:39:44 AM        iran
7/17/2011 03:40:27 AM        iran
7/17/2011 03:42:04 AM        Lebanon
7/17/2011 03:42:11 AM        Syria
7/17/2011 03:42:23 AM        iran
7/17/2011 03:43:47 AM        Syria
7/17/2011 03:44:06 AM        iran
7/17/2011 03:49:42 AM        iran
7/17/2011 03:54:18 AM        iran
7/17/2011 03:54:36 AM        Syria
7/17/2011 03:58:15 AM        Syria
7/17/2011 03:59:32 AM        Syria
7/17/2011 03:59:41 AM        iran
7/17/2011 04:00:12 AM        Syria
7/17/2011 04:03:17 AM        Syria
7/17/2011 04:03:25 AM        iran
7/17/2011 04:04:37 AM        Syria
7/18/2011 08:35:17 AM        Iran
7/18/2011 08:39:22 AM        Iran
7/18/2011 08:44:51 AM        Iran
7/18/2011 08:48:00 AM        Iran
7/18/2011 08:50:19 AM        Iran
7/18/2011 08:51:10 AM        Iran
7/18/2011 08:57:57 AM        Iran
7/18/2011 09:01:32 AM        Iran
7/18/2011 09:04:33 AM        Iran
7/18/2011 09:05:25 AM        Iran
7/18/2011 09:09:24 AM        Iran
7/18/2011 11:08:57 AM        Lebanon
7/18/2011 11:15:35 AM        Syria
7/19/2011 02:56:10 AM        Afghanistan
7/19/2011 02:57:14 AM        Iran
7/19/2011 03:05:16 AM        Iran
7/19/2011 03:10:38 AM        Iran
7/19/2011 03:18:08 AM        Iran
7/19/2011 03:18:51 AM        Afghanistan
7/19/2011 03:20:01 AM        Lebanon
7/19/2011 06:40:06 AM        PEJAK
7/20/2011 12:34:30 AM        Afghanistan
7/20/2011 02:56:14 AM        Iran
7/20/2011 03:03:34 AM        Iran
7/20/2011 03:05:47 AM        Iran
7/20/2011 08:16:07 AM        iran
7/20/2011 08:18:46 AM        iran
7/20/2011 08:19:46 AM        iran
7/20/2011 08:26:17 AM        iran
7/20/2011 08:31:31 AM        iran
7/20/2011 08:32:46 AM        iran
7/20/2011 08:37:35 AM        iran
7/20/2011 08:54:41 AM        iran
7/20/2011 08:57:08 AM        iran
7/20/2011 08:57:30 AM        iran
7/20/2011 09:00:55 AM        iran
7/20/2011 09:02:33 AM        iran
7/20/2011 09:06:41 AM        iran
7/20/2011 10:34:22 AM        iran
7/20/2011 10:48:13 AM        iran
7/20/2011 11:00:34 AM        iran
7/21/2011 01:50:19 AM        Iran
7/21/2011 02:21:32 AM        Iran
```

Page 2

UNCLASSIFIED//FOR OFFICIAL USE ONLY

UNCLASSIFIED//FOR OFFICIAL USE ONLY

search_log

| | | |
|---|---|---|
| 7/21/2011 | 02:34:05 AM | Iran |
| 7/21/2011 | 02:44:20 AM | Iran |
| 7/21/2011 | 02:49:57 AM | Iran |
| 7/21/2011 | 02:53:51 AM | Iran |
| 7/21/2011 | 03:13:18 AM | Iran |
| 7/21/2011 | 03:20:02 AM | Iran |
| 7/21/2011 | 03:34:48 AM | Iran |
| 7/21/2011 | 03:39:29 AM | Iran |
| 7/21/2011 | 03:39:57 AM | Iran |
| 7/21/2011 | 03:41:27 AM | Iran |
| 7/21/2011 | 03:42:01 AM | Iran |
| 7/21/2011 | 03:57:25 AM | Iran |
| 7/21/2011 | 03:58:54 AM | Iran |
| 7/21/2011 | 04:03:12 AM | Iran |
| 7/21/2011 | 04:04:37 AM | Iran |
| 7/21/2011 | 04:05:08 AM | Iran |
| 7/21/2011 | 05:17:43 AM | Iran |
| 7/21/2011 | 05:20:55 AM | Iran |
| 7/21/2011 | 05:32:08 AM | Iran |
| 7/21/2011 | 05:33:34 AM | Iran |
| 7/21/2011 | 05:38:08 AM | Iran |
| 7/21/2011 | 05:45:08 AM | Iran |
| 7/21/2011 | 05:49:11 AM | Iran |
| 7/21/2011 | 06:10:46 AM | Iran |
| 7/21/2011 | 06:43:37 AM | Iran |
| 7/21/2011 | 06:44:27 AM | Iran |
| 7/21/2011 | 06:45:04 AM | Iran |
| 7/21/2011 | 06:47:40 AM | Iran |
| 7/21/2011 | 06:50:27 AM | Iran |
| 7/21/2011 | 06:52:13 AM | Iran |
| 7/21/2011 | 06:52:49 AM | Iran |
| 7/21/2011 | 06:54:25 AM | Iran |
| 7/21/2011 | 07:05:05 AM | Iran |
| 7/21/2011 | 07:05:37 AM | Iran |
| 7/21/2011 | 07:11:37 AM | Iran |
| 7/21/2011 | 08:11:04 AM | iran |
| 7/21/2011 | 08:14:30 AM | iran |
| 7/21/2011 | 08:18:08 AM | iran |
| 7/21/2011 | 08:18:35 AM | iran |
| 7/21/2011 | 08:21:28 AM | iran |
| 7/21/2011 | 08:23:46 AM | iran |
| 7/21/2011 | 08:24:56 AM | iran |
| 7/21/2011 | 08:26:51 AM | iran |
| 7/21/2011 | 08:27:39 AM | iran |
| 7/21/2011 | 08:28:49 AM | iran |
| 7/21/2011 | 08:29:45 AM | iran |
| 7/21/2011 | 08:30:36 AM | iran |
| 7/21/2011 | 08:45:51 AM | iran |
| 7/21/2011 | 08:46:37 AM | iran |
| 7/21/2011 | 08:49:27 AM | iran |
| 7/22/2011 | 01:17:47 AM | Iran |
| 7/22/2011 | 01:20:12 AM | Iran |
| 7/22/2011 | 01:23:13 AM | Iran |
| 7/22/2011 | 01:24:21 AM | Iran |
| 7/22/2011 | 01:25:52 AM | Iran |
| 7/22/2011 | 01:38:37 AM | Iran |
| 7/22/2011 | 01:39:44 AM | Iran |
| 7/22/2011 | 01:40:59 AM | Iran |
| 7/22/2011 | 01:41:44 AM | Iran |
| 7/22/2011 | 01:42:52 AM | Iran |
| 7/22/2011 | 01:43:32 AM | Iran |
| 7/22/2011 | 02:55:38 AM | Iran |
| 7/22/2011 | 02:56:24 AM | Iran |

Page 3

UNCLASSIFIED//FOR OFFICIAL USE ONLY

UNCLASSIFIED//FOR OFFICIAL USE ONLY

search_log

| | |
|---|---|
| 7/22/2011 03:04:03 AM | Iran |
| 7/22/2011 03:08:51 AM | Iran |
| 7/22/2011 03:12:04 AM | Iran |
| 7/22/2011 03:12:46 AM | Iran |
| 7/22/2011 03:21:40 AM | Iran |
| 7/22/2011 03:25:04 AM | Iran |
| 7/22/2011 03:27:21 AM | Iran |
| 7/22/2011 03:33:00 AM | Iran |
| 7/22/2011 03:34:57 AM | Iran |
| 7/22/2011 03:35:19 AM | Iran |
| 7/22/2011 05:42:45 AM | Iran |
| 7/22/2011 05:43:10 AM | Iran |
| 7/22/2011 05:47:58 AM | Iran |
| 7/22/2011 06:17:44 AM | Iran |
| 7/22/2011 06:22:20 AM | Iran |
| 7/22/2011 06:23:11 AM | Iran |
| 7/22/2011 06:33:12 AM | Iran |
| 7/22/2011 06:33:39 AM | Iran |
| 7/22/2011 06:35:02 AM | Iran |
| 7/22/2011 06:58:41 AM | Iran |
| 7/22/2011 07:02:20 AM | Iran |
| 7/22/2011 07:02:36 AM | Iran |
| 7/22/2011 07:05:16 AM | Iran |
| 7/22/2011 07:12:54 AM | Iran |
| 7/22/2011 07:13:35 AM | Iran |
| 7/22/2011 07:15:21 AM | Iran |
| 7/22/2011 07:20:01 AM | Iran |
| 7/22/2011 07:28:43 AM | Iran |
| 7/22/2011 07:36:45 AM | Iran |
| 7/22/2011 07:48:42 AM | Iran |
| 7/22/2011 08:21:14 AM | Iran |
| 7/22/2011 08:30:38 AM | Iran |
| 7/22/2011 09:14:46 AM | Iran |
| 7/22/2011 09:18:01 AM | Iran |
| 7/22/2011 09:18:48 AM | Iran |
| 7/22/2011 09:20:04 AM | Iran |
| 7/22/2011 09:22:53 AM | Iran |
| 7/22/2011 09:23:54 AM | Iran |
| 7/22/2011 09:32:35 AM | Iran |
| 7/22/2011 09:33:57 AM | Iran |
| 7/23/2011 12:40:26 AM | iran |
| 7/23/2011 01:28:32 AM | iran |
| 7/23/2011 01:31:15 AM | iran |
| 7/23/2011 02:37:39 AM | iran |
| 7/23/2011 02:39:26 AM | iran |
| 7/23/2011 02:54:13 AM | iran |
| 7/23/2011 03:20:48 AM | iran |
| 7/23/2011 03:29:51 AM | iran |
| 7/23/2011 03:37:09 AM | iran |
| 7/23/2011 03:37:51 AM | iran |
| 7/23/2011 03:42:12 AM | iran |
| 7/23/2011 03:42:53 AM | iran |
| 7/23/2011 04:00:52 AM | iran |
| 7/23/2011 04:01:39 AM | iran |
| 7/23/2011 04:03:24 AM | iran |
| 7/23/2011 04:04:15 AM | iran |
| 7/23/2011 04:05:21 AM | iran |
| 7/23/2011 04:07:21 AM | iran |
| 7/23/2011 04:08:05 AM | iran |
| 7/23/2011 04:09:07 AM | iran |
| 7/23/2011 04:10:44 AM | iran |
| 7/23/2011 05:19:24 AM | iran |
| 7/23/2011 05:22:27 AM | iran |

Page 4

UNCLASSIFIED//FOR OFFICIAL USE ONLY

DA719

UNCLASSIFIED//FOR OFFICIAL USE ONLY

search_log
```
7/23/2011 05:23:12 AM    iran
7/23/2011 05:23:52 AM    iran
7/23/2011 05:24:27 AM    iran
7/23/2011 05:25:28 AM    iran
7/23/2011 05:27:23 AM    iran
7/23/2011 05:30:11 AM    iran
7/23/2011 05:37:49 AM    iran
7/23/2011 05:38:49 AM    iran
7/23/2011 05:39:28 AM    iran
7/23/2011 07:15:37 AM    PJAK
7/23/2011 01:31:13 PM    Rahman Hajj Ahmadi
7/24/2011 01:09:30 AM    iran
7/24/2011 01:09:35 AM    iran
7/24/2011 01:20:30 AM    iran
7/24/2011 05:48:20 AM    venezuela
7/24/2011 05:55:55 AM    venezuela
7/24/2011 08:30:41 AM    venezuela
7/24/2011 08:35:49 AM    venezuela
7/24/2011 08:38:17 AM    venezuela
7/24/2011 08:40:06 AM    venezuela
7/24/2011 08:40:51 AM    venezuela
7/24/2011 08:49:48 AM    venezuela
7/24/2011 08:50:29 AM    venezuela
7/24/2011 08:54:27 AM    venezuela
7/24/2011 08:54:52 AM    venezuela
7/24/2011 08:58:24 AM    venezuela
7/24/2011 08:59:19 AM    venezuela
7/24/2011 09:05:56 AM    venezuela
7/24/2011 09:10:13 AM    venezuela
7/24/2011 09:12:25 AM    venezuela
7/24/2011 09:16:05 AM    venezuela
7/24/2011 09:18:39 AM    venezuela
7/25/2011 01:38:53 AM    iran
7/25/2011 01:44:29 AM    iran
7/25/2011 01:49:01 AM    iran
7/25/2011 01:53:01 AM    iran
7/25/2011 01:55:11 AM    venezuela
7/25/2011 07:56:29 AM    PEJAK
7/25/2011 07:58:12 AM    PJAK
7/25/2011 08:23:59 AM    ████████████████
7/25/2011 08:27:51 AM    ████████████████
7/26/2011 01:03:57 AM    iran
7/26/2011 01:58:54 AM    iran
7/26/2011 02:01:37 AM    iran
7/26/2011 02:06:58 AM    iran
7/26/2011 02:08:54 AM    iran
7/26/2011 02:13:30 AM    iran
7/26/2011 02:38:03 AM    iran
7/26/2011 05:15:03 AM    venezuela
7/27/2011 01:03:45 AM    iran
7/27/2011 01:06:49 AM    Iran
7/27/2011 01:07:00 AM    iran
7/27/2011 01:07:00 AM    venezuela
7/27/2011 01:09:05 AM    iran
7/27/2011 01:11:07 AM    Iran
7/27/2011 01:13:12 AM    iran
7/27/2011 09:13:34 AM    Lebanon
7/27/2011 09:18:42 AM    Lebanon
7/27/2011 09:22:17 AM    Lebanon
7/27/2011 09:22:26 AM    Afghanistan
7/27/2011 11:06:23 AM    Lebanon
7/27/2011 11:09:22 AM    Lebanon
7/27/2011 11:16:08 AM    Lebanon
```
Page 5

UNCLASSIFIED//FOR OFFICIAL USE ONLY

UNCLASSIFIED//FOR OFFICIAL USE ONLY

```
                                      search_log
7/27/2011 11:16:46 AM          Lebanon
7/27/2011 11:22:47 AM          Lebanon
7/28/2011 01:20:09 AM          Afghanistan
7/28/2011 01:23:02 AM          Iran
7/28/2011 01:35:25 AM          Iran
7/28/2011 02:00:52 AM          Iran
7/28/2011 02:01:53 AM          Iran
7/28/2011 02:05:30 AM          Iran
7/28/2011 02:17:53 AM          Iran
7/28/2011 02:20:51 AM          Iran
7/28/2011 05:37:28 AM          Lebanon
7/28/2011 05:38:59 AM          syria
7/28/2011 11:11:42 PM          iran
7/28/2011 11:13:33 PM          iran
7/28/2011 11:21:17 PM          iran
7/28/2011 11:31:27 PM          iran
7/29/2011 05:47:57 AM          Lebanon
7/29/2011 05:51:23 AM          Lebabon
7/29/2011 05:51:28 AM          Lebanon
7/29/2011 05:51:34 AM          Lebanon
7/29/2011 05:58:27 AM          Lebanon
7/29/2011 09:25:16 AM          syria
7/29/2011 09:26:57 AM          Iraq
7/29/2011 09:29:48 AM          Iraq
7/29/2011 09:30:49 AM          MEK
7/29/2011 09:38:32 AM          MEK
7/29/2011 11:44:09 PM          Iran
7/29/2011 11:55:37 PM          Iran
7/29/2011 11:58:27 PM          Iran
7/30/2011 12:02:15 AM          Iran
7/30/2011 12:02:38 AM          Lebanon
7/30/2011 12:59:24 AM          Iran
7/30/2011 01:00:15 AM          Lebanon
7/30/2011 01:00:22 AM          Iran
7/30/2011 01:01:13 AM          Iran
7/30/2011 01:05:06 AM          Lebanon
7/30/2011 02:24:29 AM          sayyad-2
7/30/2011 02:38:20 AM          sadra
7/30/2011 03:20:24 AM          syria
7/30/2011 03:25:04 AM          syria
7/31/2011 12:00:25 AM          iran
7/31/2011 12:05:43 AM          iran
7/31/2011 12:06:40 AM          lebanon
7/31/2011 03:14:34 AM          Iraq
7/31/2011 03:17:10 AM          Afghanistan
7/31/2011 03:18:38 AM          Afghanistan
7/31/2011 10:18:35 AM          Syria
8/1/2011 04:01:19 AM           iran
8/1/2011 04:10:21 AM           iran
8/1/2011 04:12:16 AM           iran
8/1/2011 04:14:57 AM           iran
8/1/2011 04:17:12 AM           iran
8/1/2011 04:18:14 AM           iran
8/1/2011 04:21:23 AM           iran
8/1/2011 04:23:03 AM           iran
8/1/2011 04:25:22 AM           iran
8/1/2011 04:25:44 AM           iran
8/1/2011 04:26:41 AM           Lebanon
8/1/2011 04:34:29 AM           iran
8/1/2011 11:25:50 AM           iran
8/1/2011 11:33:44 AM           iran
8/1/2011 11:48:43 AM           iran
8/1/2011 11:51:02 AM           iran
```

Page 6

UNCLASSIFIED//FOR OFFICIAL USE ONLY

UNCLASSIFIED//FOR OFFICIAL USE ONLY

```
                                     search_log
8/1/2011 11:54:28 AM             iran
8/1/2011 12:29:41 PM             iran
8/1/2011 12:32:58 PM             iran
8/1/2011 01:43:17 PM             iran
8/1/2011 02:31:20 PM             iran
8/1/2011 02:37:33 PM             iran
8/1/2011 02:38:40 PM             iran
8/1/2011 03:12:39 PM             iran
8/1/2011 03:13:39 PM             iran
8/1/2011 03:26:17 PM             iran
8/1/2011 03:30:04 PM             iran
8/1/2011 03:41:50 PM             iran
8/1/2011 04:36:33 PM             jondollah
8/1/2011 04:37:14 PM             jondollah
8/1/2011 04:41:03 PM             saudi arabia, jondollah
8/1/2011 04:41:11 PM             lebanon
8/1/2011 04:41:37 PM             iran
8/1/2011 04:41:55 PM             saudi arabia, jondollah
8/1/2011 04:43:19 PM             saudi arabia, jondollah
8/1/2011 04:47:36 PM             iran
8/1/2011 04:48:07 PM             lebanon
8/1/2011 04:49:46 PM             iran
8/2/2011 06:57:39 AM             jondollah
8/2/2011 07:01:15 AM             jondollah, saudi arabia
8/2/2011 07:08:40 AM             jondollah
8/2/2011 07:19:59 AM             jundollah
8/2/2011 07:24:43 AM             MEK
8/2/2011 07:25:36 AM             Iran
8/2/2011 07:28:42 AM             Lebanon
8/2/2011 07:30:21 AM             Iran
8/2/2011 08:10:39 AM             Iran
8/2/2011 08:21:18 AM             Iran
8/2/2011 09:30:29 AM             Iran
8/2/2011 09:35:17 AM             saudi support to jondollah
8/2/2011 11:05:42 AM             venezuela
8/2/2011 05:39:07 PM             shahram amiri
8/2/2011 05:40:15 PM             iran
8/2/2011 05:51:55 PM             iran
8/2/2011 06:03:09 PM             iran
8/2/2011 06:04:43 PM             iran
8/2/2011 06:15:35 PM             iran
8/2/2011 06:19:33 PM             iran
8/2/2011 06:20:00 PM             iran
8/3/2011 06:58:47 AM             TTP
8/3/2011 07:29:17 AM             iran
8/3/2011 07:42:30 AM             Lebanon
8/3/2011 07:42:57 AM             iran
8/3/2011 07:47:48 AM             iran
8/3/2011 07:55:12 AM             Lebanon
8/3/2011 08:02:56 AM             iran
8/3/2011 08:52:30 AM             Lebanon
8/3/2011 09:55:21 AM             iran
8/3/2011 11:58:38 AM             Lebanon
8/3/2011 12:01:29 PM             Lebanon
8/3/2011 12:03:03 PM             iran
8/3/2011 12:03:09 PM             Lebanon
8/3/2011 12:07:06 PM             iran
8/3/2011 12:07:17 PM             iran
8/3/2011 12:07:31 PM             venezuela
8/3/2011 12:12:05 PM             iran
8/3/2011 12:13:24 PM             iran
8/3/2011 12:16:07 PM             venezuela
8/3/2011 12:23:18 PM             iran
```

Page 7

UNCLASSIFIED//FOR OFFICIAL USE ONLY

UNCLASSIFIED//FOR OFFICIAL USE ONLY

```
                                    search_log
8/3/2011 12:43:22 PM                iran
8/3/2011 02:55:17 PM                iran
8/3/2011 02:58:29 PM                iran
8/4/2011 02:15:02 AM                iran
8/4/2011 02:38:54 AM                iran
8/4/2011 02:39:56 AM                iran
8/4/2011 02:57:38 AM                iran
8/4/2011 03:00:32 AM                iran
8/4/2011 09:05:07 AM                venezuela
8/4/2011 09:05:16 AM                lebanon
8/4/2011 09:10:49 AM                lebanon
8/4/2011 12:29:05 PM                lebanon
8/4/2011 12:33:10 PM                iran
8/4/2011 12:57:59 PM                iran
8/5/2011 03:07:02 AM                Pakistan: Militant Tensions Risk Threatening
Al-Qa\xE2\x80\x98ida Safehaven
8/5/2011 03:17:56 AM                iran
8/5/2011 03:30:04 AM                iran
8/5/2011 04:05:23 AM                iran
8/5/2011 04:08:46 AM                iran
8/5/2011 04:22:20 AM                Lebanon
8/5/2011 04:24:17 AM                iran
8/5/2011 04:26:58 AM                Lebanon
8/5/2011 04:30:43 AM                iran
8/5/2011 06:06:28 AM                iran
8/5/2011 06:11:37 AM                iran
8/5/2011 04:06:58 PM                iran
8/5/2011 04:12:16 PM                iran
8/5/2011 04:18:59 PM                iran
8/5/2011 04:21:05 PM                iraq
8/5/2011 04:36:22 PM                iraq
8/5/2011 04:38:00 PM                china
8/5/2011 04:40:06 PM                lebanon
8/5/2011 04:42:41 PM                China
8/5/2011 04:49:32 PM                China
8/6/2011 01:28:41 AM                iran
8/6/2011 01:49:11 AM                syria
8/6/2011 03:53:55 AM                afghanistan
8/6/2011 08:52:34 AM                iran
8/6/2011 08:57:34 AM                lebanon
8/6/2011 03:50:15 PM                iran
8/6/2011 03:56:52 PM                iran
8/6/2011 04:02:44 PM                iran
8/6/2011 04:09:07 PM                iran
8/6/2011 04:10:46 PM                iran
8/6/2011 04:11:27 PM                lebanon
8/6/2011 04:19:07 PM                lebanon
8/6/2011 04:23:50 PM                syria
8/7/2011 01:05:57 AM                iran
8/7/2011 04:07:38 AM                Lebanon
8/7/2011 05:46:00 AM                jondollah
8/7/2011 05:46:33 AM                jondollah
8/7/2011 02:01:01 PM                IRAN
8/7/2011 02:01:09 PM                LEBANON
8/7/2011 02:07:36 PM                IRAN
8/7/2011 06:51:55 PM                venezuela
8/7/2011 06:53:56 PM                venezuela
8/7/2011 06:57:40 PM                venezuela
8/8/2011 01:30:44 AM                iran
8/8/2011 01:38:47 AM                iran
8/8/2011 02:10:32 AM                iran
8/8/2011 02:13:20 AM                lebanon
8/8/2011 06:14:42 AM                venezuela
```

Page 8

UNCLASSIFIED//FOR OFFICIAL USE ONLY

UNCLASSIFIED//FOR OFFICIAL USE ONLY

```
                              search_log
8/8/2011 11:10:25 AM          iran
8/8/2011 11:37:30 AM          iran
8/8/2011 11:37:38 AM          Lebanon
8/8/2011 11:57:46 AM          Lebanon
8/8/2011 12:00:19 PM          iran
8/8/2011 12:00:44 PM          venezuela
8/8/2011 12:03:38 PM          venezuela
8/8/2011 12:05:41 PM          iran
8/8/2011 04:49:50 PM          Iran
8/8/2011 05:01:33 PM          iran
8/8/2011 05:03:04 PM          Iran
8/8/2011 05:17:15 PM          Iran
8/9/2011 05:19:19 AM          iran
8/9/2011 06:11:44 AM          iran
8/9/2011 06:15:56 AM          iran
8/9/2011 06:20:47 AM          iran
8/9/2011 06:32:18 AM          iran
8/9/2011 10:12:59 AM          lebanon
8/9/2011 10:15:25 AM          syria
8/9/2011 10:17:11 AM          lebanon
8/9/2011 02:15:19 PM          Iran
8/9/2011 02:18:20 PM          Iran
8/9/2011 02:28:01 PM          lebanon
8/9/2011 02:30:38 PM          Iran
8/9/2011 02:31:15 PM          syria
8/9/2011 02:36:09 PM          syria
8/9/2011 02:59:57 PM          Iran
8/9/2011 04:01:42 PM          Iran
8/9/2011 04:06:28 PM          Iran
8/9/2011 04:07:23 PM          Iran
8/9/2011 04:11:10 PM          Iran
8/10/2011 01:39:40 AM         china
8/10/2011 01:40:54 AM         iran
8/10/2011 01:41:00 AM         syria
8/10/2011 01:51:49 AM         Lebanon
8/10/2011 05:41:43 AM         iran
8/10/2011 09:00:19 AM         Lebanon
8/10/2011 09:05:03 AM         Lebanon
8/10/2011 09:06:54 AM         afghanistan
8/10/2011 09:09:41 AM         yas air
8/10/2011 09:55:18 AM         iraq
8/10/2011 09:57:03 AM         iran
8/10/2011 02:28:59 PM         syria
8/10/2011 02:34:45 PM         bahrain
8/10/2011 02:36:26 PM         syria
8/10/2011 02:48:37 PM         syria
8/10/2011 02:51:28 PM         iran
8/10/2011 02:55:17 PM         syria
8/11/2011 01:13:07 AM         syria
8/11/2011 01:20:18 AM         lebanon
8/11/2011 01:25:20 AM         lebanon
8/11/2011 01:27:44 AM         lebanon
8/11/2011 01:37:39 AM         iran
8/11/2011 06:29:27 AM         Iran
8/11/2011 06:50:05 AM         syria
8/11/2011 06:53:28 AM         Iran
8/11/2011 08:18:58 AM         iran
8/11/2011 11:46:18 AM         iran
8/11/2011 11:49:32 AM         iran
8/11/2011 11:54:34 AM         lebanon
8/11/2011 03:56:56 PM         IRAN
8/11/2011 03:58:49 PM         IRAN
8/11/2011 03:58:55 PM         lebanon
```

UNCLASSIFIED//FOR OFFICIAL USE ONLY

DA724

UNCLASSIFIED//FOR OFFICIAL USE ONLY

**search_log**

| | |
|---|---|
| 8/11/2011 04:04:07 PM | IRAN |
| 8/11/2011 04:06:07 PM | lebanon |
| 8/11/2011 04:08:07 PM | syria |
| 8/11/2011 04:57:33 PM | iran |
| 8/11/2011 05:01:11 PM | iran |
| 8/11/2011 05:05:07 PM | iran |
| 8/12/2011 01:21:35 AM | iran |
| 8/12/2011 01:21:48 AM | iran |

**Page 10**

UNCLASSIFIED//FOR OFFICIAL USE ONLY

DA725

UNCLASSIFIED//FOR OFFICIAL USE ONLY



log txt

| TIMESTAMP (EST) | DOCUMENT ID |
|---|---|
| 7/5/2011 6:10 | |
| 7/5/2011 6:13 | |
| 7/9/2011 6:18 | |
| 7/9/2011 6:18 | |
| 7/9/2011 6:18 | |
| 7/9/2011 6:18 | |
| 7/10/2011 7:58 | |
| 7/11/2011 10:11 | |
| 7/11/2011 10:12 | |
| 7/11/2011 10:13 | |
| 7/11/2011 10:19 | |
| 7/11/2011 10:25 | |
| 7/13/2011 0:20 | |
| 7/13/2011 0:55 | |
| 7/13/2011 6:25 | |
| 7/13/2011 6:29 | |
| 7/13/2011 6:32 | |
| 7/13/2011 6:41 | |
| 7/13/2011 6:49 | |
| 7/13/2011 6:54 | |
| 7/13/2011 23:52 | |
| 7/14/2011 1:46 | |
| 7/14/2011 1:53 | |
| 7/14/2011 1:55 | |
| 7/14/2011 2:04 | |
| 7/14/2011 4:03 | |
| 7/14/2011 6:49 | |
| 7/14/2011 7:02 | |
| 7/14/2011 7:13 | |
| 7/14/2011 7:17 | |
| 7/14/2011 7:21 | |
| 7/14/2011 7:24 | |
| 7/14/2011 7:25 | |
| 7/14/2011 7:27 | |
| 7/14/2011 7:29 | |
| 7/14/2011 7:35 | |
| 7/14/2011 23:53 | |
| 7/15/2011 0:00 | |
| 7/15/2011 6:37 | |
| 7/15/2011 23:53 | |
| 7/16/2011 0:18 | |
| 7/16/2011 2:40 | |
| 7/16/2011 5:42 | |
| 7/16/2011 5:48 | |
| 7/16/2011 5:58 | |
| 7/17/2011 0:13 | |
| 7/17/2011 0:41 | |
| 7/17/2011 1:09 | |
| 7/17/2011 1:14 | |
| 7/17/2011 1:16 | |
| 7/17/2011 1:29 | |
| 7/17/2011 2:10 | |
| 7/17/2011 2:14 | |
| 7/17/2011 2:16 | |
| 7/17/2011 2:43 | |
| 7/17/2011 3:14 | |
| 7/17/2011 3:25 | |
| 7/17/2011 3:30 | |
| 7/17/2011 3:33 | |
| 7/17/2011 3:41 | |
| 7/17/2011 3:41 | |
| 7/17/2011 3:43 | |

**Exhibit 11 (b)**

Page 1

UNCLASSIFIED//FOR OFFICIAL USE ONLY

UNCLASSIFIED//FOR OFFICIAL USE ONLY



log.txt

```
7/17/2011  3:44
7/17/2011  3:45
7/17/2011  3:47
7/17/2011  3:52
7/17/2011  3:54
7/17/2011  3:55
7/17/2011  3:57
7/17/2011  4:00
7/17/2011  4:00
7/17/2011  4:04
7/17/2011  8:51
7/18/2011  1:48
7/18/2011  1:52
7/18/2011  2:07
7/18/2011  2:18
7/18/2011  5:15
7/18/2011  7:33
7/18/2011  8:19
7/18/2011  8:36
7/18/2011  8:39
7/18/2011  8:45
7/18/2011  8:48
7/18/2011  8:52
7/18/2011  8:58
7/18/2011  9:01
7/18/2011  9:07
7/18/2011  11:10
7/19/2011  2:57
7/19/2011  3:02
7/19/2011  3:08
7/19/2011  3:11
7/20/2011  3:00
7/20/2011  3:02
7/20/2011  3:04
7/20/2011  6:55
7/20/2011  8:17
7/20/2011  8:20
7/20/2011  8:21
7/20/2011  8:27
7/20/2011  8:28
7/20/2011  8:34
7/20/2011  8:53
7/20/2011  8:55
7/20/2011  8:58
7/20/2011  9:01
7/20/2011  9:03
7/20/2011  9:05
7/20/2011  9:07
7/20/2011  9:09
7/20/2011  10:49
7/20/2011  10:51
7/20/2011  10:58
7/20/2011  11:01
7/21/2011  0:53
7/21/2011  2:48
7/21/2011  2:50
7/21/2011  3:17
7/21/2011  3:35
7/21/2011  3:55
7/21/2011  3:59
7/21/2011  4:03
7/21/2011  4:07
7/21/2011  5:14
```

Page 2

UNCLASSIFIED//FOR OFFICIAL USE ONLY

UNCLASSIFIED//FOR OFFICIAL USE ONLY

log txt



```
7/21/2011 5:18
7/21/2011 5:22
7/21/2011 5:24
7/21/2011 5:34
7/21/2011 5:38
7/21/2011 5:42
7/21/2011 5:46
7/21/2011 6:13
7/21/2011 6:15
7/21/2011 6:23
7/21/2011 6:38
7/21/2011 6:45
7/21/2011 6:48
7/21/2011 6:50
7/21/2011 6:56
7/21/2011 6:57
7/21/2011 7:00
7/21/2011 7:02
7/21/2011 7:06
7/21/2011 7:08
7/21/2011 7:12
7/21/2011 8:12
7/21/2011 8:15
7/21/2011 8:19
7/21/2011 8:21
7/21/2011 8:23
7/21/2011 8:26
7/21/2011 8:31
7/21/2011 8:47
7/21/2011 9:04
7/22/2011 1:18
7/22/2011 2:52
7/22/2011 2:53
7/22/2011 3:05
7/22/2011 3:09
7/22/2011 3:13
7/22/2011 3:16
7/22/2011 3:18
7/22/2011 3:19
7/22/2011 3:22
7/22/2011 3:24
7/22/2011 3:25
7/22/2011 3:27
7/22/2011 3:31
7/22/2011 3:33
7/22/2011 3:35
7/22/2011 5:32
7/22/2011 5:43
7/22/2011 5:51
7/22/2011 6:13
7/22/2011 6:15
7/22/2011 6:19
7/22/2011 6:28
7/22/2011 6:32
7/22/2011 7:03
7/22/2011 7:05
7/22/2011 7:15
7/22/2011 7:17
7/22/2011 7:18
7/22/2011 7:26
7/22/2011 7:31
7/22/2011 7:32
7/22/2011 7:39
```

UNCLASSIFIED//FOR OFFICIAL USE ONLY

DA728

UNCLASSIFIED//FOR OFFICIAL USE ONLY

log txt

```
7/22/2011 8:14
7/22/2011 8:24
7/22/2011 8:28
7/22/2011 8:28
7/22/2011 9:15
7/22/2011 9:20
7/22/2011 9:26
7/22/2011 9:28
7/22/2011 9:29
7/22/2011 9:39
7/22/2011 9:42
7/22/2011 9:51
7/23/2011 1:25
7/23/2011 1:29
7/23/2011 2:37
7/23/2011 2:41
7/23/2011 2:52
7/23/2011 2:58
7/23/2011 3:22
7/23/2011 3:39
7/23/2011 3:59
7/23/2011 4:02
7/23/2011 4:06
7/23/2011 5:30
7/23/2011 7:16
7/24/2011 0:38
7/24/2011 1:13
7/24/2011 1:21
7/24/2011 8:47
7/24/2011 8:51
7/24/2011 8:55
7/24/2011 9:01
7/24/2011 9:03
7/24/2011 9:11
7/24/2011 9:12
7/24/2011 9:17
7/25/2011 1:03
7/25/2011 1:21
7/25/2011 1:40
7/25/2011 1:50
7/25/2011 1:56
7/25/2011 3:15
7/25/2011 6:33
7/25/2011 8:01
7/26/2011 0:46
7/26/2011 1:05
7/26/2011 1:18
7/26/2011 1:19
7/26/2011 1:54
7/26/2011 2:00
7/26/2011 2:02
7/26/2011 2:10
7/26/2011 2:14
7/26/2011 2:18
7/26/2011 2:26
7/26/2011 2:36
7/26/2011 2:38
7/26/2011 5:15
7/27/2011 1:05
7/27/2011 1:09
7/27/2011 1:09
7/27/2011 1:13
7/27/2011 1:14
```



Page 4

UNCLASSIFIED//FOR OFFICIAL USE ONLY

UNCLASSIFIED//FOR OFFICIAL USE ONLY

```
7/27/2011 8:28
7/27/2011 8:37
7/27/2011 9:15
7/27/2011 9:19
7/27/2011 9:24
7/27/2011 11:14
7/27/2011 11:17
7/28/2011 0:58
7/28/2011 1:21
7/28/2011 1:24
7/28/2011 1:40
7/28/2011 1:43
7/28/2011 2:02
7/28/2011 2:12
7/28/2011 2:13
7/28/2011 2:15
7/28/2011 2:18
7/28/2011 2:19
7/28/2011 5:30
7/28/2011 5:32
7/28/2011 5:38
7/28/2011 9:09
7/28/2011 12:50
7/28/2011 23:06
7/28/2011 23:10
7/28/2011 23:12
7/28/2011 23:18
7/28/2011 23:22
7/28/2011 23:24
7/28/2011 23:27
7/28/2011 23:29
7/29/2011 3:00
7/29/2011 3:03
7/29/2011 5:48
7/29/2011 5:51
7/29/2011 5:55
7/29/2011 5:59
7/29/2011 7:31
7/29/2011 9:27
7/29/2011 23:45
7/29/2011 23:47
7/29/2011 23:48
7/29/2011 23:50
7/29/2011 23:54
7/29/2011 23:56
7/29/2011 23:59
7/30/2011 0:00
7/30/2011 0:03
7/30/2011 1:01
7/30/2011 2:23
7/30/2011 2:24
7/30/2011 2:25
7/30/2011 2:38
7/30/2011 2:39
7/30/2011 3:22
7/30/2011 3:25
7/31/2011 0:07
7/31/2011 3:27
7/31/2011 3:28
7/31/2011 3:29
7/31/2011 3:29
7/31/2011 3:29
7/31/2011 3:29
```



log.txt

Page 5

UNCLASSIFIED//FOR OFFICIAL USE ONLY

UNCLASSIFIED//FOR OFFICIAL USE ONLY

```
                                       log.txt
7/31/2011 3:29
7/31/2011 10:21
8/1/2011 4:03
8/1/2011 4:10
8/1/2011 4:15
8/1/2011 4:15
8/1/2011 4:18
8/1/2011 4:18
8/1/2011 4:20
8/1/2011 4:20
8/1/2011 4:22
8/1/2011 4:23
8/1/2011 4:26
8/1/2011 4:35
8/1/2011 10:39
8/1/2011 10:52
8/1/2011 10:58
8/1/2011 11:28
8/1/2011 11:49
8/1/2011 11:55
8/1/2011 11:56
8/1/2011 12:31
8/1/2011 12:33
8/1/2011 12:33
8/1/2011 14:31
8/1/2011 14:32
8/1/2011 14:38
8/1/2011 14:45
8/1/2011 14:45
8/1/2011 15:09
8/1/2011 15:09
8/1/2011 15:13
8/1/2011 15:18
8/1/2011 15:18
8/1/2011 15:29
8/1/2011 15:30
8/1/2011 15:40
8/1/2011 16:34
8/1/2011 16:36
8/1/2011 16:43
8/1/2011 16:43
8/1/2011 16:49
8/1/2011 16:50
8/1/2011 16:51
8/1/2011 16:54
8/1/2011 16:58
8/1/2011 16:59
8/1/2011 16:59
8/1/2011 16:59
8/1/2011 16:59
8/1/2011 17:00
8/1/2011 17:02
8/1/2011 17:33
8/2/2011 6:17
8/2/2011 6:40
8/2/2011 7:28
8/2/2011 7:29
8/2/2011 7:30
8/2/2011 7:30
8/2/2011 7:33
8/2/2011 7:36
8/2/2011 8:22
8/2/2011 9:32
```



Page 6

UNCLASSIFIED//FOR OFFICIAL USE ONLY

DA731

UNCLASSIFIED//FOR OFFICIAL USE ONLY

log.txt

8/2/2011 9:32
8/2/2011 11:08
8/2/2011 12:59
8/2/2011 17:25
8/2/2011 17:29
8/2/2011 17:49
8/2/2011 17:53
8/2/2011 18:04
8/2/2011 18:05
8/2/2011 18:08
8/2/2011 18:09
8/2/2011 18:09
8/2/2011 18:13
8/2/2011 18:13
8/2/2011 18:19
8/2/2011 18:21
8/3/2011 6:14
8/3/2011 7:31
8/3/2011 7:43
8/3/2011 7:48
8/3/2011 7:48
8/3/2011 7:56
8/3/2011 8:51
8/3/2011 8:53
8/3/2011 9:23
8/3/2011 11:59
8/3/2011 11:59
8/3/2011 12:04
8/3/2011 12:07
8/3/2011 12:08
8/3/2011 12:08
8/3/2011 12:10
8/3/2011 12:10
8/3/2011 12:10
8/3/2011 12:16
8/3/2011 12:16
8/3/2011 12:19
8/3/2011 12:19
8/3/2011 14:54
8/3/2011 14:57
8/4/2011 1:25
8/4/2011 1:56
8/4/2011 2:18
8/4/2011 2:20
8/4/2011 2:23
8/4/2011 2:32
8/4/2011 2:39
8/4/2011 2:40
8/4/2011 2:41
8/4/2011 2:47
8/4/2011 2:47
8/4/2011 2:57
8/4/2011 2:58
8/4/2011 3:00
8/4/2011 9:13
8/4/2011 9:15
8/4/2011 12:30
8/4/2011 12:35
8/4/2011 12:53
8/4/2011 12:56
8/4/2011 12:58
8/5/2011 2:08
8/5/2011 2:10



Page 7

UNCLASSIFIED//FOR OFFICIAL USE ONLY

DA732

UNCLASSIFIED//FOR OFFICIAL USE ONLY

log.txt

8/5/2011 2:10
8/5/2011 3:20
8/5/2011 3:20
8/5/2011 3:27
8/5/2011 3:48
8/5/2011 3:49
8/5/2011 4:02
8/5/2011 4:07
8/5/2011 4:09
8/5/2011 4:20
8/5/2011 4:24
8/5/2011 4:25
8/5/2011 5:52
8/5/2011 6:08
8/5/2011 6:29
8/5/2011 6:31
8/5/2011 6:32
8/5/2011 6:33
8/5/2011 16:05
8/5/2011 16:09
8/5/2011 16:12
8/5/2011 16:12
8/5/2011 16:16
8/5/2011 16:31
8/5/2011 16:43
8/6/2011 1:00
8/6/2011 1:12
8/6/2011 1:29
8/6/2011 1:48
8/6/2011 1:50
8/6/2011 1:50
8/6/2011 2:11
8/6/2011 2:11
8/6/2011 8:54
8/6/2011 8:58
8/6/2011 15:52
8/6/2011 15:57
8/6/2011 16:03
8/6/2011 16:12
8/7/2011 1:06
8/7/2011 4:12
8/7/2011 5:24
8/7/2011 5:26
8/7/2011 5:29
8/7/2011 5:31
8/7/2011 5:39
8/7/2011 5:43
8/7/2011 6:27
8/7/2011 14:03
8/7/2011 14:03
8/7/2011 14:08
8/7/2011 14:09
8/7/2011 14:10
8/7/2011 18:55
8/8/2011 1:17
8/8/2011 1:20
8/8/2011 1:32
8/8/2011 1:50
8/8/2011 1:52
8/8/2011 2:01
8/8/2011 2:11
8/8/2011 5:05
8/8/2011 11:11



Page 8

UNCLASSIFIED//FOR OFFICIAL USE ONLY

DA733

UNCLASSIFIED//FOR OFFICIAL USE ONLY



log.txt

8/8/2011 11:21
8/8/2011 11:31
8/8/2011 11:34
8/8/2011 11:38
8/8/2011 11:38
8/8/2011 11:38
8/8/2011 11:55
8/8/2011 12:00
8/8/2011 12:01
8/8/2011 12:03
8/8/2011 12:06
8/8/2011 12:16
8/8/2011 16:21
8/8/2011 16:29
8/8/2011 16:33
8/8/2011 16:35
8/8/2011 16:37
8/8/2011 16:39
8/8/2011 16:52
8/8/2011 17:01
8/8/2011 17:03
8/8/2011 17:03
8/8/2011 17:06
8/8/2011 17:06
8/8/2011 17:11
8/8/2011 17:11
8/8/2011 17:13
8/8/2011 17:17
8/9/2011 4:52
8/9/2011 5:16
8/9/2011 5:28
8/9/2011 6:12
8/9/2011 6:15
8/9/2011 6:18
8/9/2011 6:22
8/9/2011 6:24
8/9/2011 6:27
8/9/2011 10:15
8/9/2011 10:18
8/9/2011 10:19
8/9/2011 14:16
8/9/2011 14:19
8/9/2011 14:25
8/9/2011 14:31
8/9/2011 14:34
8/9/2011 14:36
8/9/2011 14:42
8/9/2011 15:58
8/9/2011 16:02
8/9/2011 16:04
8/9/2011 16:08
8/10/2011 1:18
8/10/2011 1:24
8/10/2011 1:27
8/10/2011 1:42
8/10/2011 1:43
8/10/2011 1:47
8/10/2011 1:47
8/10/2011 1:52
8/10/2011 5:29
8/10/2011 9:01
8/10/2011 9:11
8/10/2011 9:12

UNCLASSIFIED//FOR OFFICIAL USE ONLY

DA734

UNCLASSIFIED//FOR OFFICIAL USE ONLY

log.txt



```
8/10/2011 9:13
8/10/2011 9:23
8/10/2011 14:30
8/10/2011 14:34
8/10/2011 14:44
8/10/2011 14:49
8/10/2011 14:58
8/10/2011 14:59
8/10/2011 16:21
8/10/2011 16:25
8/10/2011 16:26
8/11/2011 0:38
8/11/2011 0:53
8/11/2011 0:56
8/11/2011 0:59
8/11/2011 1:01
8/11/2011 1:14
8/11/2011 1:21
8/11/2011 1:26
8/11/2011 1:30
8/11/2011 1:31
8/11/2011 6:26
8/11/2011 6:49
8/11/2011 11:47
8/11/2011 11:51
8/11/2011 11:54
8/11/2011 11:56
8/11/2011 15:57
8/11/2011 15:59
8/11/2011 16:05
8/11/2011 16:08
8/11/2011 16:11
8/11/2011 16:58
8/11/2011 17:01
8/11/2011 17:03
8/11/2011 17:04
8/11/2011 17:05
8/11/2011 17:07
8/11/2011 17:11
8/12/2011 1:03
```

UNCLASSIFIED//FOR OFFICIAL USE ONLY

DA735

FD-302 (Rev. 5-8-10)

-1 of 7-



**OFFICIAL RECORD**

**UNCLASSIFIED//FOUO**

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry   02/03/2016

(U//FOUO)  Amir Hekmati, date of birth ⬛⬛⬛⬛⬛, Social Security Account Number ⬛⬛⬛⬛⬛, was interviewed at Landstuhl Medical Center in Landstuhl, Germany from approximately 10:55 AM to 11:40 AM local time.  Maj or Neysa M. Etienne, SERE [Survival, Evasion, Resistance and Escape] Psychologist, telephone number ⬛⬛⬛⬛⬛ official e-mail address ⬛⬛⬛⬛⬛ personal e-mail address ⬛⬛⬛⬛⬛, and Master Sergeant Toby A. Stolz, US Air Force SERE Specialist, telephone number ⬛⬛⬛⬛⬛, official e-mail address ⬛⬛⬛⬛⬛mil, personal e-mail address ⬛⬛⬛⬛⬛, were present during the interview.  After being advised of the identity of the interviewing Agents and the nature of the interview, Hekmati voluntarily provided the following information:

(U//FOUO)  Before the interview started, SA Anderson told Hekmati the FBI appreciated Hekmati agreeing to talk to the FBI.  Hekmati stated that he was happy to help the FBI.

(U//FOUO)  Hekmati resigned as an Intelligence Analyst at Bagram Air Force Base in Afghanistan to pursue his Masters Degree.  The starting date for the Masters Degree program did not start for two months after Hekmati offered his resignation.  Hekmati needed two months to relax before starting the Masters Program.  Hekmati had always wanted to travel to Iran, but he never had a chance to visit Iran.  Therefore, since he was already in the region, Hekmati traveled to Iran to visit his grandmother and other relatives.

(U//FOUO)  Hekmati took a commercial flight from Bagram to Dubai, United Arab Emirates.  After he landed in Dubai, Hekmati purchased an airplane ticket to Tehran, Iran.  Hekmati's Iranian family was very happy that he visited them in Iran.  Hekmati's Iranian family took him around to see the sites in Tehran.

(U//FOUO)  Hekmati was subjected to a random check at the Tehran airport.  The Iranian official who conducted the random check went through Hekmati's belongings.  The official questioned Hekmati for approximately thirty minutes.  The official asked Hekmati why it took so many years for him to make his first trip to Iran.

**UNCLASSIFIED//FOUO**

| | | | |
|---|---|---|---|
| Investigation on | 01/19/2016 | at | Landstuhl Medical Center, Armed Forces Africa, Canada, Europe Or Middle East, United States (In Person) |

| | | |
|---|---|---|
| File # | -WF-244323-302 | Date drafted   01/20/2016 |

by  Brett M. Kramarsic, ANDERSON RICHARD A

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 05-08-10)

**UNCLASSIFIED//FOUO**

WF-244323-302

Continuation of FD-302 of Amir Hekmati                                    , On   01/19/2016  , Page   2 of 7

(U//FOUO)  While in Tehran, Hekmati stayed at an apartment which was owned by his uncle's daughter.  After staying approximately three weeks in Iran, Hekmati was visited by two Iranian men.  The men told Hekmati that they were with passport control.  The men told Hekmati that there were issues with his Iranian passport.  One of the men was armed with a gun. The two men told Hekmati that he had to come to their office to resolve the issue.

(U//FOUO)  The men drove Hekmati to an administrative office.  One armed guard was present in the administrative office.  Hekmati was placed into a room about the size of the room were this FBI interview was being conducted.  Hekmati was left alone in the room for approximately thirty minutes.  One man entered the room and forced Hekmati to sit in a chair in a way that made him face a wall in the room.

(U//FOUO)  Two men entered the room and began questioning Hekmati.  They asked Hekmati why it took so long for him to travel to Iran for the first time.  They asked Hekmati for the names of his father, mother, and other family members.  The men claimed that Iranian intelligence had a global reach.  The men claimed that Hekmati was lying to them because he did not tell them the real reason why he traveled to Iran.  They kept saying, "You know, you are lying to me."  The men told Hekmati to write a simple resume which detailed his past employment.  Hekmati was forced to write and sign this resume in Farsi.

(U//FOUO)  At this point in the interview, Major Etienne asked Hekmati whether he needed a bigger room for the rest of the interview, given his statement that he had been questioned by the Iranians in a room the size of the present interview room.  Hekmati said that he was comfortable in this room and that he did not need a bigger room.

(U//FOUO)  The men started interviewing Hekmati with an argumentative stance.  They told Hekmati it was going to be bad for him if he did not cooperate.  They told Hekmati that he messed up.  The two men took Hekmati's resume and left the room.

(U//FOUO)  Two men came back to the room and blindfolded Hekmati and drove him to Evin prison.  Hekmati was placed in a room inside Section 209 of Evin prison.  This part of the prison was controlled by Iranian intelligence.  Hekmati was forced to strip down to his underwear.  Hekmati was forced to pull down his underwear so the Iranians could check to see if he was hiding anything in his underwear.  The Iranians took away Hekmati's clothes and he was ordered to dress in blue clothes which were used for prisoners in Section 209.

(U//FOUO)  Hekmati sat in the room for approximately forty-five minutes

**UNCLASSIFIED//FOUO**

**UNCLASSIFIED//FOUO**

■-WF-244323-302

until he was taken to the interrogation facility in Section 240 of Evin
prison. Hekmati was placed into a one by one and a half meter sized cell.
The cell had on hole in the floor which served as Hekmati's bathroom. The
cell had a sink and a window which could only be opened from the outside of
the cell. The corner of the cell was curved which made the room feel
smaller. The cell was painted green and it had a light on top of the door
which was turned on twenty-four hours a day. Hekmati could hear something
which sounded like other prisoners screaming outside his door. Hekmati
drew little lines on the cell's wall to track time.

(U//FOUO) Hekmati began banging on the door and yelling at the guards.
Hekmati's Farsi was a little weak at this point of time. Hekmati was very
nervous because he was in a new country and he never had been in this
situation before. Hekmati felt like he was struggling for his breath. The
guards were insulting Hekmati from outside his cell door. Some of these
insults had to do with Hekmati being a Marine.

(U//FOUO) The Iranians did not tell Hekmati anything about his
situation until his second day in Evin when they opened his cell door.
Hekmati was blindfolded and brought to an interrogation room. The same man
who interrogated Hekmati before was present at this interrogation. The
Iranians still would not say why they arrested Hekmati. The man told
Hekmati that he was lying. Hekmati told the man that he did not know what
he was talking about. The man told Hekmati that he would be back in six
months to let Hekmati think about what he did.

(U//FOUO) Five days later, the Iranian man told Hekmati to write his
biography in Farsi. Hekmati was to included everything from his birth to
the present. It took two weeks for Hekmati to write the biography because
he had trouble writing in Farsi. The man came back when Hekmati was
finished with the biography. The man looked at the biography and told
Hekmati to write it again.

(U//FOUO) Hekmati had no contact with his family and he could not make
telephone calls. The Iranians told Hekmati he had to cooperate in order to
make telephone calls. The Iranians told Hekmati that one of his relatives
was not feeling well and he had to cooperate to call his relative.

(U//FOUO) Hekmati had several altercations with the guards. The guards
hit Hekmati with a baton on his arm. Hekmati told the guards that he had
barely enough room to keep his legs in the cell. The guards told Hekmati
that he could put the rest of his legs into his mother.

(U//FOUO) After one month in Evin, the Iranians tried to make Hekmati
confess that the Americans sent him to spy on Iran. Hekmati and the
Iranians would argue back and forth on this issue. The Iranians told

**UNCLASSIFIED//FOUO**

DA738

FD-302a (Rev. 05-08-10)

**UNCLASSIFIED//FOUO**

■-WF-244323-302

Continuation of FD-302 of  Amir Hekmati                                    , On   01/19/2016 , Page   4 of 7

Hekmati that he would stay in Evin until he was an old man unless he
cooperated. Hekmati was not sure if the Iranians were bluffing. Hekmati
remarked that in America, to arrest someone, you need enough evidence.
Hekmati could get a lawyer if he was in America.

(U//FOUO) The Iranian interrogator told Hekmati that he was God and he
had total control of Hekmati. Five months went by, while the interrogator
kept telling Hekmati that he had to confess to being a Central Intelligence
Agency (CIA) agent who was tasked to infiltrate Iran and travel back to
America to say Iran was supporting terrorists.

(U//FOUO) Once a week for ten minutes, Hekmati was allowed to leave his
jail cell for a room that had no roof. Hekmati was hit with a taser once
in the kidney area as punishment. During month four, Hekmati was placed on
a table when he was not playing along with the script. The Iranian whipped
the bottom of Hekmati's feet with a cable. The Iranian told Hekmati that
he must cry for them to stop hitting his feet.

(U//FOUO) After five months, Hekmati broke down. Hekmati no longer saw
a reason why he should continue to argue with the Iranians. Hekmati wrote
a statement on an Iranian Government paper pad. The statement indicated
that Hekmati was a CIA agent who came to Iran to commit an act of
espionage. After writing the statement, the Iranians allowed Hekmati to
place a telephone call to his uncle. Hekmati told his uncle that he was in
Evin prison. The uncle told Hekmati he had previously tried to locate
Hekmati at Evin prison, but the prison guards told him that Hekmati was not
at the prison.

(U//FOUO) After writing his confession, the Iranians moved Hekmati from
Evin Section 240 to Section 209. The new section had bigger cells and the
guards left the door latch open. This allowed Hekmati to see guards as
they passed directly in front of his cell. Hekmati was still being held in
solitary, but it helped to see the guards. At this point, Hekmati did not
know how long he was held in Evin. Hekmati was assigned to a Karshinas who
was the one guy who could get Hekmati things such as extra soap, telephone
access, and to get time outside.

(U//FOUO) The Karshinas thanked Hekmati for cooperating and told him he
would soon be released. Hekmati was taken to a locker where his old
clothes were stored. Hekmati was allowed to change into his clothes.
Hekmati was blindfolded and he was driven by a van to a house. At the
house, the Iranians brought Hekmati take out food. Hekmati stayed in the
basement of the house which was 20 meters by 15 meters. The basement room
had a television, DVD, bed, and a bathroom that had a shower. The windows
of the basement were blocked by cinder blocks. Pin hole cameras were used
in the walls of the room to monitor Hekmati in the basement.

**UNCLASSIFIED//FOUO**

FD-302a (Rev. 05-08-10)

**UNCLASSIFIED//FOUO**

■■■-WF-244323-302

Continuation of FD-302 of <u>Amir Hekmati</u>                    , On   <u>01/19/2016</u>  , Page   <u>5</u> of <u>7</u>

(U//FOUO)  The Iranians told Hekmati that he had to participate in a
training video to be used by Iran.  The Iranians promised to let Hekmati go
if he cooperated in the video.  Hekmati was initially resistant to
participate in the video.  Due to his resistance, Hekmati was taken back to
Evin.  Hekmati immediately regretted his decision.  He requested the
opportunity to do the video.  In a couple of days, Hekmati was driven to
the Independence Hotel in Tehran.  The Iranians used the penthouse suite to
film the video.  The Iranians supplied Hekmati with fruit, tea, and a
cigarette.  Hekmati sat in a chair facing a wall.  The view from the hotel
room offered Hekmati a glimpse of freedom out of prison.  The view made
Hekmati want to get the video done.  During the video tape interview, the
Iranians asked Hekmati about his background as a Marine.  Hekmati talked
about his role as a CIA agent even though this was a fabricated statement.

(U//FOUO)  After an hour or two, Hekmati was driven back to the house.
Hekmati stayed at the house for three to four days until a guard came down
to the basement.  The guard told Hekmati that there was a problem and he
had to take him back to Evin.  Hekmati was informed that his Karshinas
would tell Hekmati why he was taken back to Evin.  Hekmati was taken to a
bigger prison cell which had a television and a refrigerator.  The
television only had four channels which were run by the Iranian
Government.  Hekmati was not allowed to receive newspapers in this cell.

(U//FOUO)  Hekmati stayed in this prison cell for approximately thirteen
months.  During month six, Hekmati watched Iran news which showed an
Unmanned Aerial Vehicle (UAV) which the IRGC claimed it shot down.  Hemati
later saw a news story that the Iranian intelligence had a great
achievement from Afghanistan.  The news program showed Hekmati's video and
a picture of Hekmati's military card.  Hekmati believed the Iranians
obtained the picture of his military card from his laptop because he
claimed he destroyed his military card before he arrived in Iran.  The news
program revealed that the Iranian intelligence just had their greatest
achievement by capturing one of the greatest trained American agents.

(U//FOUO)  Hekmati was taken to court before Iranian Judge Salavati who
represented the Branch 15 of the Iranian Revolutionary Court.  Hekmati was
brought to the Judge's office.  The Judge was very nice and he offered
Hekmati tea.  Hekmati's court appearance lasted about ten minutes and
Hekmati was not offered legal guidance by a lawyer.  A small camera
recorded the hearing.  The Judge asked Hekmati questions about the CIA and
if it was proven that Hekmati was tricked by the CIA, then he would be let
free.

(U//FOUO)  After the trial, Iranian television reported that Hekmati was

**UNCLASSIFIED//FOUO**

DA740

FD-302a (Rev. 05-08-10)

**UNCLASSIFIED//FOUO**

-WF-244323-302

Continuation of FD-302 of Amir Hekmati _____ , On __01/19/2016__ , Page __6 of 7__

found guilty and he was sentenced to death by hanging. The Iranian intelligence interrogator told Hekmati not to take the death sentence seriously.

(U//FOUO)  Hekmati spent another two months in his cell when he was allowed one telephone call with his uncle. Hekmati told his uncle that the story told during his trial was not true. One Iranian prison guard was present during the telephone conversation and he hung up the telephone call after Hekmati claimed his innocence.

(U//FOUO)  Within two months, the Iranians reported on television that Hekmati's death sentence was annulled and his case was sent to a higher Iranian court. Hekmati was told that he was originally sentenced to death because he was a United States Marine who killed Muslims during the Iraq war.

(U//FOUO)  During the retrial, Hekmati told the judge that everything about his case was a lie. The judge never listened to Hekmati's testimony during the twenty minute hearing. The judge lessened Hekmati's sentence to ten years in jail for cooperating with a hostile government. Hekmati believed there was no basis for this sentence. After this trial, Hekmati had no more contact with Iranian intelligence or the Iranian legal system.

(U//FOUO)  After the retrial, Hekmati remained in Section 209 for about twelve or eighteen months until he passed out and hit his head in his cell. Due to his injury, the Iranians transferred Hekmati to Section 350 which was where the Iranian political prisoners were held. Prisoners in Section 350 included individuals from the Green Party, MEK, and individuals accused of spying for Israel. Saeed Abedini and two other Christian prisoners were held in Section 350 for about a year while Hekmati was in Section 350.

(U//FOUO)  Hekmati was transferred to the Unit 12 financial crimes prison after a riot occurred in Section 350. Hekmati remained in Unit 12 until the Iranians released him to the United States.

(U//FOUO)  The Iranians gave Hekmati antidepressant pills while he was in prison. These pills were possibly Lithium. The Iranians would periodically take Hekmati off these pills for long periods so that he would suffer from withdrawal. Hekmati believed that Iranians used the withdrawal symptoms to control Hekmati and force him to cooperate with the interrogations.

(U//FOUO)  Hekmati was notified about his pending release by Iranian Judicial Officials. The officials told Hekmati that he could be released because he had served one third of his ten years sentence. In actuality

**UNCLASSIFIED//FOUO**

DA741

FD-302a (Rev. 05-08-10)

**UNCLASSIFIED//FOUO**

▊-WF-244323-302

Continuation of FD-302 of Amir Hekmati _____, On 01/19/2016 , Page 7 of 7

Hekmati had already served about one half of his sentence. The Iranians
tried to video tape Hekmati's reaction to the announcement, however, since
Hekmati did not show any reaction, the Iranians turned off the video
camera.

(U//FOUO)  After the announcement, Hekmati was taken back to solitary
confinement.  Hekmati was instructed to pack his clothes and his
belongings.  Hekmati briefly saw Matthew Trevithick before he was
released.  Hekmati, Abedini and, Jason Rezaian were taken to a room at
airport in Tehran.  They waited in this room for two and a half days before
they boarded the plane for Switzerland.  The Swiss Ambassador told them the
wait was due to an issue with Rezaian's wife and mother.

(U//FOUO)  Hekmati heard a story about Robert Levinson from another
Iranian prisoner in Section 350 named Qudri Siamak.  Siamak knew an Islamic
Revolutionary Guard Corps (IRGC) official named Ali Niko Bandari.  Bandari
told Siamak that he was there when Levinson was arrested.  Levinson's
captors used chloroform (or similar) to make Levinson pass out before he
was placed in a car and driven away.  Bandari heard that Levinson died from
a heart attack.  Hekmati head another story that Levinson was sold to
Pakistani militants.  Hekmati believed the Iranians would have released
Levinson if they still had him.  Siamak now lives in Virginia.

(U//FOUO)  Hekmati became ninety percent fluent in Farsi by the time he
was eventually released by the Iranians.  Hekmati agreed to talk to the FBI
further once he returns to Michigan.  Hekmati will be living at his
mother's residence.

FD-302 (Rev. 5-8-10)

- 1 of 5 -

**OFFICIAL RECORD**

UNCLASSIFIED//FOUO

**FEDERAL BUREAU OF INVESTIGATION**

**Exhibit 12 (b)**

Date of entry _____02/02/2016_____

(U//FOUO) On Tuesday, 01/19/2016, AMIR NEMA HEKMATI, date of birth (DOB) ████████, was interviewed by Special Agent (SA) Brett Kramarsic and SA Richard A. Anderson at the Landstuhl Regional Medical Center (LRMC) in Landstuhl, Germany. Major Neysa M. Etienne, SERE [Survival, Evasion, Resistance and Escape] Psychologist, telephone number ████████, official e-mail address ████████, personal e-mail address ████████, and Master Sergeant (MSgt) Toby A. Stolz, US Air Force SERE Specialist, telephone number ████████, official e-mail address ████████ personal e-mail address ████████ also participated in the interview. This interview, which took place at approximately 2:30 PM local time, was the second FBI interview of HEKMATI conducted on 01/19/2016 at the LRMC. The FBI SAs identified themselves to HEKMATI during the previous 01/19/2016 interview, which will be documented separately. After SA Anderson thanked HEKMATI for agreeing to speak with the FBI again, HEKMATI provided the following information, some of which was requested by SERE personnel to clarify or expand upon matters discussed during the previous interview:

(U//FOUO) HEKMATI indicated that he was initially arrested in Iran by two (2) older males in their 40s or 50s who identified themselves as being from the Office of Passport Control or the Passport Authority. The arrest took place at approximately 2:00 PM local time. The men effecting the arrest searched HEKMATI's luggage and instructed HEKMATI to come with them for questioning about matters related to his passport. HEKMATI was transported in a vehicle to an office, where he was instructed to list out his family members and write a resume for himself. HEKMATI's electronics, including a laptop computer and a cellphone, as well as his books, were seized by the Iranian officials. HEKMATI's clothes were not seized at that time. HEKMATI stated that his cellphone, but not his laptop, was ultimately returned to him upon his 2016 release from Iranian prison.

(U//FOUO) HEKMATI indicated that the arresting officials conducted a casual search but did not pat down HEKMATI. Once HEKMATI was transported to Evin Prison, he was subjected to a full search, including a pat down when he changed clothes and was stripped down to his underwear.

(U//FOUO) Regarding the Iranian's use of physical restraints, HEKMATI

UNCLASSIFIED//FOUO

Investigation on ___01/19/2016___ at ___Landstuhl, Germany (In Person)___

File # ███ WF-244323                                     Date drafted ___01/20/2016___

by ___ANDERSON RICHARD A, Brett M. Kramarsic___

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 05-08-10)

**UNCLASSIFIED//FOUO**

 WF-244323

01/19/2016 Interview of AMIR HEKMATI
(Interview #2)

Continuation of FD-302 of _____ , On  01/19/2016 , Page  2 of 5

stated that during his initial arrest, there were two men on either side of
him in the vehicle used to transport him, plus a driver. He noted that they
did not restrain HEKMATI with handcuffs during the initial transport.
HEKMATI also noted that later during his imprisonment, Iranian officials
used set of cuffs that only attached to two fingers, one on each hand.

(U//FOUO) Regarding whether or not he had ever contemplated escape, HEKMATI
indicated that he thought about it all the time, but that it was more of a
dream than a realistic proposition, as he believed that no one had ever
escaped from Evin Prison. HEKMATI stated that Evin Prison was bounded by
mountains on one side, with a highway on the other side. Evin Prison was
surrounded by a twenty (20) meter tall wall that had a ten (10) meter
trench surrounding it, requiring one to climb 20 meters over the wall and
then descend 30 meters. At some point during his captivity, HEKMATI
reported that he was taken to a hospital [in context, understood to mean a
hospital in Tehran]. He indicated that Tehran was so saturated with cameras
and security that even if he managed to briefly escape, there would be
nowhere to go. During his trip to the hospital, HEKMATI purchased snacks
for Iranian soldiers he interacted with, who reportedly are not paid and
have little food. He indicated that the soldiers were extremely grateful
for this.

(U//FOUO) HEKMATI indicated that there was a ward of Evin Prison dedicated
to Al Qaeda prisoners. He stated that three (3) prisoners from this ward
were brought to Ward 350. These individuals were all Kurds.

(U//FOUO) According to HEKMATI, Evin Prison was mostly run by the prisoners
themselves. He stated that there were only about twenty (20) actual staff
members at Evin Prison, with fellow prisoners doing most of the work. He
stated that there were about 8000 prisoners in Evin Prison.

(U//FOUO) HEKMATI stated that prisoners had access to prison phones, which
were believed to be monitored. Some prisoners had cell phones smuggled in
to the prison, sometimes by individuals coming to the prison for conjugal
visits. HEKMATI indicated that many or all prisoners could have conjugal
visits, and that additional conjugal visits could be earned by working jobs
within the prison.

(U//FOUO) Regarding interrogations, HEKMATI estimated that he was
interrogated approximately twenty (20) times during his imprisonment. He
did not know if the interrogations were recorded, as he was blind folded
and/or facing a wall when the interrogations were conducted. The
interrogations took place in a sound proof room that HEKMATI compared to a
recording room about the size of the room in which the instant interview

FD-302a (Rev. 05-08-10)

UNCLASSIFIED//FOUO



WF-244323

01/19/2016 Interview of AMIR HEKMATI
(Interview #2)

Continuation of FD-302 of                                          , On  01/19/2016 , Page  3 of 5

was being conducted. [AGENT NOTE: The instant interview was conducted in a room roughly estimated to be 14' x 10'.] As part of the interrogation process, HEKMATI was forced to write out his biography two separate times.

(U//FOUO) At approximately 2:50 PM during the instant interview, HEKMATI was offered and accepted a bottle of water.

(U//FOUO) HEKMATI described one of his cells at Evin Prison as having very thick walls, a low roof, no window, and a little opening covered by a perforated metal cover to allow for ventilation. The door to the cell was very heavy with a tiny latch. The door only had a mechanical handle on the outside, which was operated by turning counter clockwise. The door reportedly opened outwards from the cell.

(U//FOUO) HEKMATI relayed information he had acquired alleging that a sandwich seller who worked outside of the Israeli Embassy in Turkey was actually a spotter for the IRGC [Islamic Revolutionary Guard Corps]. He also indicated that of about 100 prisoners in Ward 350 who were imprisoned for working for a foreign government [in context, understood to mean as a spy], 30 were accused of working for the United States, and 70 were accused of working for Israel. Some of these prisoners told HEKMATI that they had contacted the CIA through the CIA website. The CIA would then arrange for them to travel to a third country in the Middle East or elsewhere, presumably for a meeting. HEKMATI indicated that the prisoners told him that when they were arrested by Iranian officials, they were confronted with the names of their CIA handling officers and with e-mails between themselves and the handling officers. Some of these prisoners indicated that three years had passed between when they had last contacted the CIA and when they were arrested.

(U//FOUO) Regarding the time period when HEKMATI worked as an intelligence analyst for the US Government in Afghanistan, HEKMATI was asked if he ever accessed classified reporting regarding Iran. HEKMATI refused to answer this question; instead, HEKMATI indicated that the FBI could find out that information for itself by pulling the log information. When asked if he had ever read paper copies of classified reporting on Iran, HEKMATI avoided the question, instead saying that he had a "TS" [Top Secret] clearance including SI, TK, and Gamma accesses. He stated that he had been tasked as an intelligence analyst to study "messaging." HEKMATI indicated that his superiors did not know what he was actually supposed to do and that it felt like they were wasting his time, which was part of why he quit the job after just a few months. He indicated that he had worked on one or more projects related to cell towers in Afghanistan and Taliban targeting. He

UNCLASSIFIED//FOUO

DA745

FD-302a (Rev. 05-08-10)



WF-244323

Continuation of FD-302 of  01/19/2016 Interview of AMIR HEKMATI
(Interview #2)  , On  01/19/2016  , Page  4 of 5

stated that there was no oversight over what he was supposed to do and that he did not understand what the mission was.

(U//FOUO) HEKMATI rejected the proposition that he might have been targeted because he had access to classified information on Iran. He stated that he had been targeted because he was a Marine. He believed that his arrest was connected to or in response to the US arrest of an Iranian who had attempted to assassinate a Saudi Arabian ambassador.

(U//FOUO) Regarding whether or not HEKMATI's Iranian interrogators had attempted to extract classified information from him, HEKMATI indicated that although the interrogators knew what his job was in Afghanistan, they did not spend much time exploring that topic. He indicated that he would have thought they would have asked for more information. He stated that the interrogators spent as much time talking about his time in high school as they did on his time as an intelligence analyst in Afghanistan.

(U//FOUO) Regarding how widely it was known that HEKMATI had a Top Secret security clearance, HEKMATI stated that his family in Iran did not know that he had held a TS clearance. He stated that only his co-workers knew about the TS clearance, as he only had it for about two months. However, HEKMATI indicated that internet searches on his name would reveal that he had worked for DARPA. He also referenced his Linked In account. HEKMATI noted that he had previously only held a Secret security clearance.

(U//FOUO) HEKMATI stated that he was not aware of anything that would make him suspicious that he had been under surveillance while in Afghanistan, nor did he recall any suspicious individuals contacting him. He indicated that he had worked long hours for the brief two months he was there, and spent all his time on the compound [other than work time] either at the mess hall, the gym, or his lodging.

(U//FOUO) HEKMATI similarly denied any suspicious events such as surveillance or unusual contact by individuals after he left Afghanistan and traveled to Dubai. He stated that he was in Dubai only for about 48 hours and that he spoke to no one while he was there. He did make two calls back to the US, one of which was a call to the company he had just resigned from to discuss issues related to his resignation.

(U//FOUO) Once HEKMATI arrived in Iran, his only contact with Iranian government officials prior to his arrest was an interview that was conducted immediately upon his arrival in Tehran. He denied any other contact with Iranian government officials after this interview until he was arrested several weeks later.

DA746



FD-302a (Rev. 05-08-10)

**UNCLASSIFIED//FOUO**

WF-244323

01/19/2016 Interview of AMIR HEKMATI
(Interview #2)

Continuation of FD-302 of _____ , On  01/19/2016 , Page  5 of 5

(U//FOUO) HEKMATI was shown a series of photographs and asked if he
recognized any of the individuals from his time in Iran or in Evin Prison.
HEKMATI correctly identified several photographs of ROBERT LEVINSON, but
explained that this was only because LEVINSON's likeness was publicly
known. He indicated that he had not seen LEVINSON at any time while in
Iran. For all other photographs shown during the interview, HEKMATI
indicated that he did not recognize the individuals and had not seen them
while in Iran. For one photograph, HEKMATI did indicate that the man in the
photograph looked similar to many Iranian men, but ultimately answered that
he could not identify or recognize the individual.

(U//FOUO) With regards to ROBERT LEVINSON, HEKMATI discussed another
individual who had been a part of the prisoner release that freed HEKMATI.
This individual, named Fred [in context, understood to be a reference to
NOSRATOLLAH KHOSRAVI], claimed that the reason he had been arrested by the
Iranians was that he had sent a text message to LEVINSON. Fred/KHOSRAVI
reportedly elected not to leave Iran with HEKMATI and the other freed
individuals because there were pending charges against him in the US and
because he claimed to have a girlfriend in northern Iran.

(U//FOUO) The instant interview of HEKMATI ended at approximately 3:30 PM,
local time. HEKMATI was offered and accepted a cup of coffee during the
last approximately 30 minutes of the interview.



FD-302 (Rev. 5-8-10)

-1 of 7-
UNCLASSIFIED//FOUO
SECRET//ORCON/NOFORN



## FEDERAL BUREAU OF INVESTIGATION

Date of entry     05/09/2016

### DOCUMENT RESTRICTED TO CASE PARTICIPANTS
This document contains information that is restricted to case participants.

(U//FOUO) AMIR NEMA HEKMATI, date of birth ▮▮▮▮▮▮ social security account number ▮▮▮▮▮▮, home address ▮▮▮▮▮▮ ▮▮▮▮▮▮, was interviewed at the Detroit Field Office - Flint Resident Agency (RA), on 4/7/2016 by Special Agents (SA) ▮▮▮▮▮▮ and ▮▮▮▮▮▮. Interviewing agents approached HEKMATI's residence at approximately 0945 hours, at which time they identified themselves and advised HEKMATI of the purpose of the interview. HEKMATI voluntarily agreed to go to the Flint RA to speak with the agents. Due to the fact HEKMATI had no vehicle available to him, HEKMATI requested the agents drive him to his mother's work location at H&R Block to get his vehicle. SA ▮▮▮▮▮▮ drove the interviewing agents and HEKMATI to H&R Block. While at H&R Block, HEKMATI asked interviewing agents if they would speak to his attorney. SA ▮▮▮▮▮▮ stated she would speak to his attorney at a later time from a landline. HEKMATI provided his attorney's name as Scott Gilbert, telephone number (202)669-2966. HEKMATI subsequently followed the interviewing agents in his own vehicle to the Flint RA, where HEKMATI was again informed the interview was voluntary and he could leave at any time. Interviewing agents offered HEKMATI a bottle of water, which he accepted and drank throughout the interview. Also, at this point, HEKMATI knew interviewing agents had not yet spoken with his attorney and continued to speak with interviewing agents. HEKMATI provided the following information:

(U//FOUO) SA ▮▮▮▮▮▮ provided HEKMATI a detailed summary of the FBI's investigation into him and his activities beginning in January 2011 in Iraq, continuing through his deployment to Afghanistan and on through his arrest and detainment in Iran. HEKMATI sat still through the presentation, appeared to have listened attentively and at no time interrupted SA ▮▮▮▮▮▮. During this presentation, SA ▮▮▮▮▮▮ confronted HEKMATI by telling him the FBI knew HEKMATI went to Afghanistan to gain access to classified

Reason: ~~1.4(b)~~
Derived From: FBI
NSISC-20090615
Declassify On: 20411231

SECRET//ORCON/NOFORN
UNCLASSIFIED//FOUO

Investigation on   04/07/2016   at   Flint, Michigan, United States (In Person)

File #   ▮▮▮▮▮▮

Date drafted   04/11/2016

by   ▮▮▮▮▮▮

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 05-08-10)

UNCLASSIFIED//FOUO
**SECRET//ORCON/NOFORN**

████████████

(U//FOUO) 7 April 2016 interview of Amir

Continuation of FD-302 of ~~Hekmati~~ _____ On ~~04/07/2016~~ Page ~~2 of 7~~

~~information in order to travel to Iran and sell this information to the~~
Iranian government. In response, HEKMATI inquired whether SA ████ was
asking a question.

### Reason for leaving Afghanistan / returning home early

(U//FOUO) HEKMATI stated he resigned from his position as an Intelligence
Analyst (IA) with Six3 Systems at Bagram Air Force Base (BAFB) in
Afghanistan in 2011 to return to Michigan to pursue his Master's degree.
HEKMATI was shown by interviewing agents an email he sent to the University
of Michigan (UM) - Flint Admission on 6/2/2011, before he deployed to
Afghanistan, indicating he needed to defer his admission to January of 2012
because he was leaving for a military deployment overseas. When
interviewing agents asked HEKMATI why everyone to include his colleagues
and employer all thought HEKMATI was traveling directly from Afghanistan to
the U.S. to pursue his graduate degree, HEKMATI indicated he was returning
to the U.S. to attend UM - Dearborn, not UM - Flint.

(U//FOUO) In August 2011, after HEKMATI resigned from Six3 Systems at BAFB,
HEKMATI traveled to Iran to visit his grandmother, who he had never
visited. HEKMATI only told his mother of his plan to travel to Iran.
HEKMATI did not tell any of his associates or colleagues in Afghanistan
about his intentions to travel to Iran. HEKMATI did not understand why he
would tell anyone he was going to Iran. Interviewing agents brought up
ROLAND TISO and GABRIEL SERRANO and HEKMATI responded they are merely
associates he met in Afghanistan and nothing more.

████████

(U//FOUO) HEKMATI advised he took a commercial flight from BAFB to ████████
████████████████████ After he landed in ██████ HEKMATI purchased an
airline ticket to Tehran, Iran. Interviewing agents reminded HEKMATI he
previously informed FBI agents in Germany, he only spent one night in ████
and flew out the next day and that he did not have time to do anything else
before departing. HEKMATI stated it was true he did not have time to do
anything else. When challenged by the interviewing agents that records
indicated HEKMATI arrived in ████ in the evening around 5:00 pm local
time, spent the next day ████ and then flew to Iran the following day,
HEKMATI did not deny the timeline and commented he never met with anyone.

### Iran

(U//FOUO) HEKMATI advised he was incarcerated in Iran because he was a U.S.
Marine. Interviewing agents proposed to HEKMATI he only had contact with
Iranian officials because he approached them and made them aware he had
access to classified information. HEKMATI reiterated his interaction with

**SECRET//ORCON/NOFORN**
UNCLASSIFIED//FOUO

DA749

FD-302a (Rev. 05-08-10)

UNCLASSIFIED//FOUO
**SECRET//ORCON/NOFORN**

(U//FOUO) 7 April 2016 interview of Amir
Hekmati

~~the Iranian government was solely because he was a U.S. Marine.~~ HEKMATI
opined Iranian officials learned he was a U.S. Marine when they "Googled"
him and looked at his Facebook page which showed HEKMATI's affiliation as a
U.S. Marine. HEKMATI did not provide any classified information to Iranian
officials.

**Iranian Passport**

(U//FOUO) Interviewing agents showed HEKMATI a copy of his expired Iranian
passport. HEKMATI was not aware he had an Iranian passport until his mother
provided it to HEKMATI for the purpose of providing it to Legal Persian.
HEKMATI stated he was about 14 years old in the photo. HEKMATI's mother
still maintains HEKMATI's Iranian passport. HEKMATI has never indicated on
any U.S. government forms or applications that he had the Iranian passport
because he was not aware of it when he completed those forms.

**Common Access Card (CAC)**

(U//FOUO) Interviewing agents showed HEKMATI a photo copy of his Department
of Defense (DoD) civilian employee Common Access Card (CAC) [Agent's note:
The picture of the CAC shown to HEKMATI was pulled from an online Internet
video which appeared to have been produced in concert with the Iranian
government. In the video, HEKMATI confessed to being a CIA spy. It appeared
from the video the Iranian government was in possession of HEKMATI's actual
CAC, or a picture of it.] HEKMATI admitted he took a picture of his CAC
with his cell phone. HEKMATI pointed to the thumb and fingers in the photo
and stated he was holding the CAC when the photo was taken. HEKMATI
explained he took a photo of his CAC, so he would have a photo of it in the
event he lost the actual card. HEKMATI stated he turned in his CAC to BAFB
before departing for ▆▆▆▆▆ When interviewing agents reminded HEKMATI that
Six3 Systems instructed him to turn his CAC to a U.S. base upon his return
to the U.S. and then mail Six3 Systems a receipt of the return, HEKMATI
remained silent. Interviewing agents also reminded HEKMATI he had told FBI
agents in Germany he destroyed his CAC before traveling to Iran. In
response, HEKMATI indicated he could not remember, and that "maybe" this
occurred. HEKMATI denied using his CAC as "bona fides" in any approach to
the Iranians.

(U//FOUO) Interviewing agents showed HEKMATI a copy of his Armed Forces
U.S. military identification card. HEKMATI stated this card was currently
at his home in Flint and he did not take it with him when he went to
Afghanistan and Iran. HEKMATI pointed to the expiration date on the card,
which was shown as 2009, and stated it was expired. [Agent's note:  The
picture of the Armed Forces U.S. military identification card shown to
HEKMATI was pulled from an online Internet video which appeared to have

FD-302a (Rev. 05-08-10)

UNCLASSIFIED//FOUO
**SECRET//ORCON/NOFORN**

████████████

(U//FOUO) 7 April 2016 interview of Amir

Continuation of FD-302 of Hekmati On 04/07/2016 , Page 4 of 7

~~been produced in concert with the Iranian government. In the video,~~ ~~HEKMATI~~
confessed to being a CIA spy.]

████████ **/ JWICS access / work assignment**

(U//FOUO) ~~(S//NF)~~ Interviewing agents showed HEKMATI a "search log" which detailed
HEKMATI's search activity on ████████. The agents also explained to HEKMATI
that 91% of the searches he conducted on ████████ were about ████ or issues
of interest to ████. HEKMATI looked at the search log and denied this was a
log of his search activity. When it was explained again this was a detailed
search log of HEKMATI's searches, HEKMATI stated he did not have time to
access classified reporting about ████ because he had too much work and was
already working 12 to 13 hour days.

(U//FOUO) ~~(S//NF)~~ HEKMATI indicated Six3 Systems and the military provided him access
to ████ ████ and the interviewing agents should ask them why HEKMATI
searched those topics on Iran. Interviewing agents explained that line of
logic did not make sense and there was an expectation by the granting
agency for his security clearance, in this case the U.S. military, he
should only access information needed for his assignment. HEKMATI
reiterated to ask Six3 Systems or the military. HEKMATI further stated Six3
Systems and the military gave him access to ████████ and JWICS at large and
did not restrict his access so he should be allowed to view whatever he
viewed.

(U//FOUO) ~~(S//NF)~~ HEKMATI remembered being briefed into the Top Secret/Sensitive
Compartmented Information (TS/SCI) clearance level including SI, TK, and
Gamma compartments. When interviewing agents asked HEKMATI if he understood
he did not have a "need to know" pertaining to classified reporting on
Iran, HEKMATI deflected and reiterated Six3 Systems and the military gave
him "no direction." HEKMATI indicated his superiors did not know what he
was actually supposed to do and because of this HEKMATI had to find things
to do to fill his day. As a result, HEKMATI felt his IA position was a
waste of time. When interviewing agents pointed out the contradiction
between HEKMATI having to find things to do to fill his day with HEKMATI's
earlier claim he was too busy working 12 to 13 hours a day to search for
information on Iran, HEKMATI did not provide a response.

(U//FOUO) ~~(S//NF)~~ After alternating between not responding and deflecting when
interviewing agents asked HEKMATI why he accessed classified reporting on
Iran, HEKMATI finally responded he accessed classified information
regarding Iran to become a subject matter expert on Iran. HEKMATI stated he
is of Iranian descent, was curious and compared his searches in ████████ to
a "Google" search. HEKMATI stated anyone could "Google" Iran and suggested
the FBI review his personal "Google" searches.

UNCLASSIFIED//FOUO
**SECRET//ORCON/NOFORN**

FD-302a (Rev. 05-08-10)

UNCLASSIFIED//FOUO
SECRET//ORCON/NOFORN

(U//FOUO) 7 April 2016 interview of Amir

Continuation of FD-302 of  Hekmati                                On  04/07/2016  Page  5 of 7

(U//FOUO) (S//NF) When it was explained to HEKMATI his job responsibilities revolved around insurgent messaging related to the Taliban and Haqqani Network, HEKMATI did not deny this was accurate. HEKMATI asked interviewing agents why then was he allowed to compose a work product on cell tower targeting by the Taliban in Afghanistan, which he attributed as his own idea and outside of the "messaging" category, if he was not given freedom to conduct open searches. Interviewing agents explained working on issues related to the Taliban, even if those issues were somewhat outside of the "insurgent messaging" category, would still be reasonable, but conducting searches on Iran were not. HEKMATI had no response.

(U//FOUO) (S//NF) HEKMATI felt he had no oversight over what he was supposed to do and stated his work products were based on his own initiative. Interviewing agents asked HEKMATI if he ever spoke to anyone about not having any direction on what he was supposed to do, to include Six3 Systems or his military supervisors. HEKMATI did not respond. Interviewing agents asked HEKMATI if he ever told Major Heatherly, his direct military supervisor, who was physically co-located with him; to which HEKMATI indicated Major Heatherly was aware and that there was mismanagement.

(U//FOUO) (S//NF) When interviewing agents explained to HEKMATI he accessed a document on ▮▮▮▮▮▮ pertaining to the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ before he left for ▮▮▮, HEKMATI did not acknowledge accessing the document or doing anything in ▮▮▮ other than transiting to Iran. HEKMATI never purposely met with ▮▮▮ prior to his imprisonment in Iran.

**BAFB - Analyst experience**

(U//FOUO) HEKMATI's Secret level clearance was upgraded to TS/SCI when he was still in Iraq working for Human Terrain Systems (HTS). HEKMATI used the TS/SCI clearance to obtain the IA position at BAFB for Six3 Systems. Interviewing agents confronted HEKMATI with reporting that when he arrived in Kabul, Six3 Systems management attempted to move him to another position other than the IA position, which he refused to accept because he came to Afghanistan to work with TS information. HEKMATI denied he took the IA position to gain access to classified information.

(U//FOUO) HEKMATI accepted the IA position because he wanted to develop IA experience to be more competitive in obtaining a full-time U.S. government job. When interviewing agents discussed with HEKMATI what a reasonable period of time would be for him to gain that experience, HEKMATI acknowledged at least one year. HEKMATI further stated he was willing to

SECRET//ORCON/NOFORN
UNCLASSIFIED//FOUO

FD-302a (Rev. 05-08-10)

UNCLASSIFIED//FOUO
**SECRET//ORCON/NOFORN**



(U//FOUO) 7 April 2016 interview of Amir
Continuation of FD-302 of Hekmati                                    On     04/07/2016    Page    6 of 7
~~stay in Afghanistan one, two, or even three years~~ if he was receiving good
job experience as an analyst. Since the IA position was not what HEKMATI
thought it would be and he was not getting good experience, HEKMATI left
the position after a short period of time.

(U//FOUO) Interviewing agents showed HEKMATI emails between him using email
address [redacted] and Hessam Mirzaei using email address
[redacted] Specifically, HEKMATI was shown an email dated
6/6/2011, in which HEKMATI wrote, "So I plan on going in October and just
want to be sure that my Visa is good for 1 year and that I can stay for up
to 3 months without having any problems." Interviewing agents informed
HEKMATI this email indicated he had no intention to stay in Afghanistan
beyond four months, not to mention one, two, or three years as he
previously stated to interviewing agents. HEKMATI stated since the email
indicated he planned to go in October and he actually went in August, the
email meant nothing. Interviewing agents pointed out to HEKMATI his email
showed clear intent by him to spend a very limited period of time in
Afghanistan before he even arrived there and realized the IA position was
not what he thought it would be. HEKMATI denied this was his intent.

(U//FOUO) HEKMATI acknowledged he could potentially lose his clearance if
he traveled to Iran. HEKMATI could not reconcile the discrepancy between
his previous statement of wanting to acquire experience as an analyst to
obtain a full-time U.S. government job and a pre-planned willingness to
jeopardize his security clearance by traveling to Iran.

**Bonuses / Financial situation**

(U//FOUO) Interviewing agents showed HEKMATI an email he sent Gretchen
Klugh at Six3 Systems on 6/28/2011. In this email, HEKMATI indicated he
did not want to receive his six or twelve month bonuses up front because he
did not want to pay them back or have a tax liability if he did not stay in
Afghanistan for those periods of time. Interviewing agents pointed out to
HEKMATI the email was sent before he entered Afghanistan, before he would
have realized the analyst position did not meet his expectations; further,
it showed HEKMATI did not intend to stay in Afghanistan even six months.
HEKMATI denied this being the case.

(U//FOUO) HEKMATI indicated he did not need to "sell" information to the
Iranians because he did not need money. When the interviewing agents
suggested HEKMATI wanted money and referenced $500,000, HEKMATI stated he
had $500,000. HEKMATI did not need money and the FBI should know that. When
interviewing agents indicated the FBI did know and HEKMATI did not have
$500,000 in the bank, HEKMATI stated he had it but it was not "liquid."
When interviewing agents opined that HEKMATI took advantage of the

UNCLASSIFIED//FOUO
**SECRET//ORCON/NOFORN**

FD-302a (Rev. 05-08-10)

UNCLASSIFIED//FOUO
SECRET//ORCON/NOFORN

(U//FOUO) 7 April 2016 interview of Amir

~~opportunity to make a quick buck regardless of his net worth at the time,~~
HEKMATI queried as to why he would do that when he had all of these bonuses
coming in. When interviewing agents responded that HEKMATI did not have any
bonuses coming in because of the aforementioned email where HEKMATI
specifically asked not to receive them up front with the knowledge he was
not going to stay in Afghanistan for six months, HEKMATI provided no
response.

## Polygraph

(U//FOUO) HEKMATI has taken a polygraph before and passed it. When
interviewing agents explained to HEKMATI he took the aforementioned
polygraph prior to his activities in Afghanistan and Iran, and inquired as
to whether or not he would take a polygraph now, HEKMATI agreed to take an
FBI polygraph. At the end of the interview, HEKMATI stated he would only
take an FBI polygraph if he was charged, went to court and then was made to
take a polygraph. HEKMATI asked if he was being charged with a crime.
Interviewing agents informed HEKMATI he was not charged, but they would
present the findings of the investigation to the United States Attorney's
Office.

(U//FOUO) HEKMATI did not know if his attorney possessed a U.S. government
security clearance. HEKMATI was informed by interviewing Agents that if his
attorney did not have a clearance, the interviewing agents would not be
able to provide him/her any of the information they provided to HEKMATI.

(U//FOUO) The interview of HEKMATI ended at approximately 1330 hours.

UNCLASSIFIED//FOUO
SECRET//ORCON/NOFORN

# Amir Hekmati's Response to the Government's June 26, 2020 Submission

## INTRODUCTION

Mr. Hekmati has been awaiting the payment to which he is entitled from the U.S. Victims of State Sponsored Terrorism Fund (the "Fund") for nearly two years.  He has now spent over nine months challenging the Government's unlawful "reconsideration" of his claim.  As Mr. Hekmati has shown, the Government has made unfounded accusations that Mr. Hekmati falsely represented that he traveled to Iran to visit his grandmother, when (according to the Government) the primary purpose of his trip was to sell classified information.

In March and April of 2020, Mr. Hekmati provided 379 pages of written evidence and testimony contradicting the Government's outrageous accusations that he sought a position as an intelligence analyst with Six Systems ("Six3") in Afghanistan, secretly accessed classified information on Iran, and abruptly quit his job to travel to Iran, all to sell information to the Iranian regime.  Specifically, Mr. Hekmati has demonstrated the following:

- He had plans to travel to Iran to visit his grandmother long before he learned of the Six3 opportunity.[1]

- He did not seek the Six3 position; it was recommended to him by a co-worker. Six3 recruiters affirmatively pursued him for the job based on his previous experience.[2]

- His supervisors at Six3 provided him with access to a wide range of intelligence programs in order to support the unit.  All Iran-related materials he reviewed were

---

[1] Decl. of Amir Hekmati ¶ 20 (Mar. 23, 2020) (Ex. A to Opening Br.) ("A. Hekmati Decl."); Decl. of Behnaz Hekamti ¶ 9–10 (Mar. 23, 2020) (Ex. B to Opening Br.) ("B. Hekmati Decl."); E-mail from Amir Hekmati to Behnaz Hekmati (Dec. 29, 2010, 11:31 AM) (Ex. 9 to A. Hekmati Decl.).
[2] A. Hekmati Decl. ¶ 21; E-mail from Gretchen Klugh to Amir Hekmati (May 19, 2011, 10:12 AM) (Ex. 11 to A. Hekmati Decl.) (noting that they "would love to get [Mr. Hekmati] on the team").

well within his access credentials.  He did not request access to these intelligence programs or know beforehand that he would be provided with such access.[3]

- His access to materials regarding Iran was for a legitimate purpose.  His formal work assignment did not fill the 12 hours he was required by contract to work each day, so he sought to add value to the unit by building a specialty in Iran-related issues based on his prior work experience.[4]

- He did not seek to conceal his Iran-related work from his colleagues and supervisors.  His work at night was typical of contractors looking to split up their long shifts.  His office was busy 24 hours a day, meaning that night work provided no additional opportunity to access information without supervision.[5] His computer screen always was in full view of others.[6]

- He took, and passed, two full-scale polygraphs in the years immediately preceding his trip to Iran.[7]  He had a steady income from his contracting work, a loving family and girlfriend, and no motive to put his life at risk by selling secrets to a hostile government.[8]

- He had reservations about the Six3 job at the outset for personal reasons.  He was unhappy in the position from the start and left accordingly.[9]

- He was no longer employed by Six3 at the time he traveled to Iran and thus was under no duty to inform his former colleagues about his trip to Iran.[10]

---

[3] Opening Br. at 8; USVSST Fund Hearing Tr. at 49: 6–10, April 7, 2020.
[4] *See, e.g.*, A. Hekmati Decl. ¶  28; USVSST Fund Hearing Tr. at 55:2–56:19; Opening Br. 9–10.
[5] *See, e.g.*, A. Hekmati Decl. ¶ 30; USVSST Fund Hearing Tr. at 60:13–22.
[6] Opening Br. at 10; USVSST Fund Hearing Tr. at 56:22–57:2.
[7] *See, e.g.*, A. Hekmati Decl.  ¶  ¶ 18, 99; USVSST Fund Hearing Tr. at 49:10–11.
[8] Opening Br. at 30; A. Hekmati Decl. ¶ 23; USVSST Fund Hearing Tr. at 38:4–7
[9] *See, e.g.*, A. Hekmati Decl. ¶¶ 23, 32; *see, e.g.* Opening Br. at 30.
[10] A. Hekmati Decl. ¶ 32; USVSST Fund Hearing Tr. at 70:3–12.

- He stayed with family during the entirety of his trip to Iran and did not approach any Iranian government officials about selling information, much less sell them any such information.[11]

- He was imprisoned, tortured, and sentenced to death by the government to which he is alleged to have tried to sell information.[12]  Academic experts, international human rights organizations, and our own government have confirmed repeatedly that his imprisonment was politically motivated.[13]  The Iranian government held him for more than four years and released him only as part of a broader hostage deal.[14]

- His purportedly evasive or inconsistent answers when the FBI interrogated him without his lawyer present—twice—shortly after his release from prison were the result of the severe PTSD he was suffering at the time and the shock of being accused of treason and espionage after enduring over four years of imprisonment and torture at the hands of the government to which he supposedly sought to sell information.[15]

Mr. Hekmati also provided substantial legal precedent demonstrating that the Government's purported "evidence" was misleading, conclusory, unreliable, and constitutionally infirm and that reconsideration of Mr. Hekmati's claim was not permitted under the statute establishing the Fund.[16]

---

[11] A. Hekmati Decl. ¶ 38; USVSST Fund Hearing Tr. at 73: 3–14; Decl. of M. Maleki ¶¶ 2, 4 (March 23, 2020) (Ex. C to Opening Br.).

[12] *See generally* Opening Br. at 12–21.

[13] *See* Letter from Victoria M. Lopakiewicz, Division Chief, Office of American Citizen Services and Crisis Management, to Consulate of Spain, Chicago (May 23, 2017) (Ex. H to Opening Br.) (noting injustice of Mr. Hekmati's detention and confirming that Mr. Hekmati's contact with the outside world was "extremely limited").

[14] A. Hekmati Decl. ¶ 84.

[15] *Id.* ¶¶ ¶ 93, 94, 96.

[16] Opening Br. at 36, 39.

After three months of virtual silence, the Government has submitted a supplemental memorandum (the "Reply") containing what it deems to be new and conclusive evidence of Mr. Hekmati's alleged misrepresentations.  This "evidence," however, is neither new nor persuasive.  The Government merely re-hashes the same arguments from its first submission to the Special Master.  The Government does not undercut, or in some cases even address, the evidence Mr. Hekmati provided in support of his case.  Nor does the Government even bother to contest the legal infirmities of the evidence, the reconsideration decision, or the reconsideration process writ large.

Stating unsupported, and indeed unsupportable, accusations twice does not make them true.  Mr. Hekmati will address each of the Government's arguments for purposes of creating a comprehensive record on this matter, but Mr. Hekmati respectfully requests that the Special Master put an end to this matter and reinstate the award to Mr. Hekmati.

## **ARGUMENT**

The Government argues that the following "facts" contradict Mr. Hekmati's testimony regarding the circumstances of his trip to Iran, his access of classified information as an intelligence analyst in Afghanistan, and his conduct during the FBI interviews:

- Four unidentified "sources" (presumably the same sources referenced in the Government's initial submission to the Special Master) allegedly can corroborate that Mr. Hekmati sought to sell information to the Iranian government.[17]

- An uncompleted Iranian passport application and an FD-302 from the FBI's interview with a U.S.-based law firm specializing in travel to Iran that assisted

---

[17] Reply at 1, 3, 4.

Mr. Hekmati with procuring the necessary travel documents for his trip to Iran

show that Mr. Hekmati sought to travel to Iran in "secret."[18]

- Department of Defense briefing documents from Six3 demonstrate that

  Mr. Hekmati was required to disclose his Iran trip to his former employers.[19]

- Iran travel advisories by the U.S. Department of State from 2010 and 2011

  demonstrate that Mr. Hekmati undertook "acute risk" in traveling to Iran, and thus

  could only have been traveling there to sell information to the Iranian

  government.[20]

- FD-302s from FBI interviews with Mr. Hekmati's supervisors and colleague

  show that Mr. Hekmati's accessing of Iran-related materials was covert and

  outside the scope of his formal work assignment, and that he sought to conceal his

  trip from his colleagues.[21]

- Previously-cited search logs show that Mr. Hekmati worked more at night and

  increased his accessing of Iran-related materials during the last two weeks of his

  employment.[22]

- Correspondence between Mr. Hekmati and his U.S.-based travel consultant and

  evidence that Mr. Hekmati declined a signing bonus (both also cited in the

  Government's first submission) show that Mr. Hekmati did not intend to stay in

  the Afghanistan position long-term.[23]

---

[18] *Id.* at 4–5; Iranian Passport Application (Ex. 2(a) to Gov't Suppl. R.).
[19] Reply at 4; (citing Gov't Suppl. R. ¶ 3).
[20] Reply at 6; Travel Warning – Iran (Oct. 9, 2010) (Ex. 5(a) to Gov't Suppl. R.); Travel Warning – Iran (Oct. 21, 2011) (Ex. 5(b) to Gov't Suppl. R.).
[21] Reply at 7.
[22] *Id.* at 4.
[23] *Id.* at 12.

- The same FD-302s from the FBI's interrogations of Mr. Hekmati cited in the Government's original submission, this time with a declaration from the author of the 302s stating that they are accurate, demonstrate that Mr. Hekmati displayed a "consciousness of guilt" during these interviews.[24]

Mr. Hekmati will address each argument in turn.

## I.   THE GOVERNMENT HAS FAILED TO SET FORTH A LEGAL BASIS FOR THE SPECIAL MASTER'S DECISION OR ITS RECONSIDERATION OF MR. HEKMATI'S CLAIM.

At the outset, it bears emphasis that the Government has not responded to any of Mr. Hekmati's legal arguments regarding the Special Master's decision or the reconsideration process. As noted in Mr. Hekmati's opening brief, "reconsideration" of a claimant's prior eligibility determination is expressly prohibited by the authorizing statute for the USVSST Fund.[25] Even if such reconsideration were permitted, neither the Special Master nor the Government has legal or constitutional authority to rescind Mr. Hekmati's payment rights based on statements he made in a submission to a federal district court, outside the context of his application to the Fund.[26] And, even if the Special Master did have such authority, Mr. Hekmati's statement regarding his intent to visit family cannot serve as a basis to terminate his payment rights.[27] Mr. Hekmati's statement in his declaration to the court that he visited Iran to see his grandmother is unquestionably true. Indeed, the Government does not contend otherwise. Even assuming he failed to disclose some other intent (a proposition that we refute below), that does not make his statement false.[28]

---

[24] *Id.* at 13.
[25] Opening Br. at 36 (citing 81 Fed. Reg. 45,535).
[26] Opening Br. at 3.
[27] *Id.*
[28] *See id.* at 41 (citing *Bronston v. U.S.*, 409 U.S. 352, 354–58 (1973) (holding that, although witness's omission was purposefully misleading, it did not constitute an actionable falsehood because witness's statement was literally true)).

The Government offers no response to any of these arguments, and thus has failed to establish any legal basis on which the Special Master may rescind Mr. Hekmati's right to payment. Mr. Hekmati is entitled to reinstatement of his award on these grounds alone.

## II.   THE REPLY PROVIDES NO NEW EVIDENCE OF MR. HEKMATI'S ACTIVITIES IN IRAN.

Even if the Government could establish a legal basis for rescinding Mr. Hekmati's right to payment from the Fund, it has yet to provide a sufficient factual basis for doing so. The centerpiece of the Government's Reply—and indeed the only direct evidence of Mr. Hekmati's activities in Iran that the Government has provided to date—is another reference to four unidentified "sources" that the Government cited in its original submission to the Special Master.[29] The Government contends (again) that these "sources" corroborate that Mr. Hekmati sought to sell information to the Iranian government while in Iran.[30]

Mr. Hekmati already has demonstrated that these "sources," without more, do not constitute credible evidence of his alleged activities in Iran and cannot provide a legal basis for termination of his payment rights.[31] The Government does not address these arguments in its Reply. The Government provides no new information regarding the identity of these "sources" or the basis for their accusations. The Government merely states that the Special Master should accept these sources as conclusive evidence of Mr. Hekmati's alleged crimes, because they were "deemed reliable by the FBI."[32]

---

[29] *See* Reply at 1, 3, 5.
[30] *Id.* at 1, 3, 4.
[31] *See* Opening Br. at 37–38
[32] *Id.* at 3.

"Because I said so" is not enough.  The Government cannot lawfully terminate Mr. Hekmati's payment rights without providing him with an opportunity to confront and challenge the credibility of these sources and any information they purportedly have provided.

### III.   THE REPLY PROVIDES NO EVIDENCE SUPPORTING EVEN AN INFERENCE THAT MR. HEKMATI TRAVELED TO IRAN TO SELL INFORMATION.

#### A.   The Record Shows That Mr. Hekmati Traveled to Iran Openly and Legally.

##### 1.   Mr. Hekmati Did Not "Secretly" Apply for an Iranian Passport in Order to Conceal His Trip From U.S. Authorities.

The Government argues that Mr. Hekmati "secretly" procured an Iranian passport, purportedly in violation of his security clearance, so that he could "minimize the risk of alerting U.S. authorities to his travel."[33]  According to the Government, Mr. Hekmati could have, and should have, traveled to Iran on his U.S. passport with an Iranian visa.[34]  The Government's own evidence contradicts these allegations.

First, the record shows that Mr. Hekmati contacted Legal Persian, a U.S.-based law firm specializing in Iranian travel, about procuring the necessary travel documents for a trip to Iran with his family in January 2011—five months before he even became aware of the job opening with Six3.[35]  The Government admits to the timing of these events in its Reply but fails to explain how Mr. Hekmati could have sought to plan a secret trip to Iran to sell classified information months before learning he would have access to such information.[36]

Second, the record shows that Mr. Hekmati's procurement of an Iranian passport was not "secret," as the Government contends.  The Government acknowledges that Mr. Hekmati

---

[33] *Id.* at 5.
[34] *Id.*
[35] Opening Br. at 6; A. Hekmati Decl. ¶ 20; E-mail from Legal Persian to Amir Hekmati (Jan. 3, 2011, 8:58 AM) (Ex. 10 to A. Hekmati Decl.).
[36] Reply at 4.

procured the passport, along with all other necessary documentation for his trip to Iran, via official government channels with the assistance of U.S.-based Legal Persian.[37]  Indeed, the record shows that Mr. Hekmati's mother handled much of the paperwork for the passport— hardly a covert action by Mr. Hekmati.[38]

Third, the Government's assertion that Mr. Hekmati "could have traveled to Iran using his U.S. passport" is false.[39]  It is well-established that individuals born to Iranian fathers are required to use an Iranian passport to enter and exit Iran.[40]  This is true regardless of the fact that Mr. Hekmati renounced his Iranian citizenship in 2003, as Iran does not recognize such renunciations.[41]  The notion that Mr. Hekmati somehow rescinded his renunciation of his Iranian citizenship by applying for a passport is meritless—and in any event, does not support a logical leap that he intended to travel to Iran in secret to sell information.

---

[37] *Id.* at 5.

[38] H. Mirzaei Interview at 3 (Feb. 2, 2012) (Ex. 2(b) to Gov't Suppl. R.) (noting "Behnaz Hekmati, filled out Hekmati's passport application and sent all of the paperwork to Mirzaei").

[39] *Id.*

[40] *See, e.g., Entry Requirements for Iran*, GOV.UK, https://www.gov.uk/foreign-travel-advice/iran/entry-requirements (last visited July 24, 2020) ("Under Iranian law, all Iranian nationals must travel to and from Iran using an Iranian passport.  Even if you don't consider yourself to be Iranian, you may be regarded as an Iranian national by the Iranian authorities—e.g., if your father is Iranian, or if you're married to an Iranian man."); Decision, Dep't of Defense, Defense Office of Hearings and Appeals, ISCR No. 08-06559 (Aug. 25, 2010) https://ogc.osd mil/doha/industrial/08-06559.h1.pdf (noting that Iranian law does not recognize dual citizenship and requires the use of an Iranian passport); *Esphahanian v. Bank Tejarat*, AWD 31-157-2, 2 IRAN U.S. C.T.R. at 166-67 (Mar. 29, 1983) ("Once Esphahanian had emigrated to the United States and become an American citizen, the only way he could return lawfully to Iran was as an Iranian national, using an Iranian passport."); *Travelers with Dual Nationality*, U.S. Dep't of State, https://travel.state.gov/content/travel/en/international-travel/before-you-go/travelers-with-special-considerations/Dual-Nationality-Travelers.html (last updated Dec. 4, 2019) (noting that, when traveling to a country where a U.S. citizen has a second nationality, "you may be required to enter and depart on a passport from that country or present a valid identity document from that country," and that individuals may be a national of another country unknowingly, simply by virtue of being born to a parent that is a national of that country).

[41] *See id.*; *see also Iran: Requirements and procedures for a former Iranian citizen by birth, who renounced their citizenship, to reacquire Iranian citizenship, including circumstances that may bar someone from re-acquiring Iranian citizenship (2015-August 2017)*, Immigration and Refugee Board of Canada (Aug. 22, 2017) https://www.refworld.org/docid/5a840b5c4 html (noting that Iran's Council of Ministers has full discretion over requests to abandon citizenship, and that "practically speaking," such renunciations are never effective).

DA764

Finally, the record shows that Mr. Hekmati did, in fact, seek to travel to Iran using his U.S. passport with a visa, as the Government suggests he could and should have done if he were not planning to commit espionage.  In correspondence with Legal Persian in January 2011 regarding his trip, Mr. Hekmati requested assistance with procuring a visa to travel to Iran with his U.S. passport.[42]  As noted above, however, this is not the approach recommended by legal professionals.

### 2. Mr. Hekmati Was Not Required to Disclose His Iran Trip to His Former Employer.

The Government contends that Department of Defense briefing documents from Six3 demonstrate that Mr. Hekmati was required to disclose his Iran trip to his supervisors, and that his failure to do so proves that he sought to travel to Iran in secret.[43]

The Government mischaracterizes the evidence on this point.  The briefing documents state expressly that any travel reporting requirements (and indeed, any of the rules, requirements, or restrictions set forth therein) apply only to current employees of Six3.  Mr. Hekmati was not a Six3 employee or a government employee of any kind when he traveled to Iran.[44]  He had no obligation to report his travel to his former employer.  The Government has yet to identify any other reason why an individual would find it necessary or appropriate to inform a former employer of plans for personal travel.

### 3. Mr. Hekmati Was Not Required to Disclose His Iran Trip to a Co-Worker.

Similarly, the Government argues that the fact that Mr. Hekmati did not disclose his Iran trip to his colleague in Afghanistan, Mr. Roland Tiso, renders the purpose of the trip suspect.[45]

---

[42] A. Hekmati Decl. ¶ 20; E-mail from Legal Persian to Amir Hekmati (Jan. 3, 2011, 8:58 AM) (Ex. 10 to A. Hekmati Decl.).
[43] Reply at 5.
[44] A. Hekmati Decl. ¶ 32; USVSST Fund Hearing Tr. at 70:3–12.
[45] Reply at 7.

However, the Government provides no basis as to why Mr. Hekmati would discuss the details of a personal trip with Mr. Tiso.  Mr. Hekmati and Mr. Tiso were co-workers for less than two months.[46]  Mr. Tiso was 60 years old at the time; Mr. Hekmati was 28.  While Mr. Hekmati and Mr. Tiso were friendly, they did not typically discuss their personal lives.  In the 302s summarizing the FBI's interviews with Mr. Tiso, Mr. Tiso himself notes that Mr. Hekmati was reserved.[47]  The fact that Mr. Hekmati did not mention his post-employment travel plans to Mr. Tiso does not support a conclusion that he traveled to Iran to sell information.

### 4.   Iran Travel Advisories From the U.S. Department of State Corroborate Mr. Hekmati's Testimony.

The Government cites Iran travel advisories by the U.S. Department of State from 2010 and 2011 as evidence that Mr. Hekmati undertook "acute risk" in traveling to Iran, and thus could only have been traveling there to sell information to the Iranian government.

The Government is correct that these travel advisories noted that Americans may face risks in traveling to Iran.  However, they also note, consistent with Mr. Hekmati's testimony on this issue, that the threat level for traveling to Iran at the time of his trip was Level 2 (travelers should "consider the risks of travel to Iran"), whereas today it is Level 4 ("do not travel").[48]  Travel to a country with a Level 2 threat advisory is hardly evidence of an intent to sell classified information.  Countries that currently have Level 2 travel advisories (which do not take into account any risks relating to the COVID-19 pandemic) include Denmark, Belgium, Germany, and France.[49]

---

[46] *See* Reply at 2, 3, 9.
[47] R. Tiso FBI Interview at 2 (May 4, 2016) (Ex. 7 to Gov't Suppl. R.) ("R. Tiso Interview")
[48] Reply at 6; USVSST Fund Hearing Tr. at 96: 15–16.
[49] *Denmark Travel Advisory*, U.S. Dep't of State, https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/denmark-travel-advisory html#. (last visited July 27, 2020); *Belgium Travel Advisory*, U.S. Dep't of State, https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/belgium-travel-advisory.html (last visited July 27, 2020); *Germany Travel Advisory*, U.S. Dep't of State,

Mr. Hekmati was not ignorant of the risks of traveling to Iran.  His testimony demonstrates that he made a reasoned judgment about those risks based on the fact that his family had been traveling there for his entire life without incident.[50]  The Government fails to show how a Level 2 travel advisory supports a logical leap that Mr. Hekmati traveled to Iran to sell information.

### B.      The Record Shows That Mr. Hekmati's Access of Iran-Related Materials Was Authorized.

#### 1.      FD-302s from the FBI's Interviews with Mr. Hekmati's Supervisors and Colleague Corroborate His Testimony.

The Government contends that Mr. Hekmati's accessing of classified information on Iran was improper because FD-302s from FBI interviews with Mr. Hekmati's supervisors and Mr. Tiso demonstrate that "the focus of his assigned work was on Afghanistan, and not Iran."[51]

Mr. Hekmati does not disagree that the "focus of his assigned work" was not Iran. Indeed, as the Government acknowledges, Mr. Hekmati provided the same description of his formal work assignment as his supervisors in his opening brief and testimony.[52]  As Mr. Hekmati has explained, however, he began researching Iran-related materials because that formal work assignment was insufficient to fill his 12-hour shifts, and he felt pressure to add value to the unit.[53]  Nothing in the 302s contradicts these assertions or otherwise indicates that the documents he accessed were outside the bounds of his security authorizations.

---

https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/germany-travel-advisory.html (last visited July 27, 2020); *France Travel Advisory*, U.S. Dep't of State, https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/france-travel-advisory.html (last visited July 27, 2020).

[50] A. Hekmati Decl. ¶ 33; Opening Br. at 11; USVSST Fund Hearing Tr. at 100:9–13.

[51] Reply at 8.

[52] *Compare id.* at 8 n.31 ("In his testimony, the Claimant acknowledged that after he arrived, it was suggested that he 'look at Taliban or Al-Qaeda messaging and propaganda.'") *with* Opening Br. at 9 (describing formal work assignment to "monitor and interpret anti-U.S. propaganda by the Taliban, Haqqani network, and Al-Qaeda, and to devise strategies for countering those propaganda efforts."); USVSST Fund Hearing Tr. at 46:15–18.

[53] A. Hekmati Decl. ¶ 28; USVSST Fund Hearing Tr. at 55:2–56:19; Opening Br. 9–10.

### 2. Mr. Hekmati's Lack of Work Product on Iran-Related Issues Corroborates His Testimony.

The Government argues that Mr. Hekmati's lack of work product on Iran-related issues also undermines his claim that his research was legitimate.  However, Mr. Hekmati has never claimed that he was able to generate substantive work product on Iran-related issues.  Indeed, his lack of success in generating work product on these issues corroborates his statement that he chose to leave the position in part because he felt he was not adding value to the unit.[54]  The fact that he was unable to educate himself, identify leads, develop analysis, and generate formal work product on Iran-related threats from scratch in less than two months is hardly evidence of an intent to commit espionage.

### 3. Search Logs From Mr. Hekmati's Work Computer Corroborate His Testimony.

The Government argues that redacted search logs purportedly showing that Mr. Hekmati increased his accessing of Iran-related materials during the last two weeks of his employment undermine his claims that he was researching Iran in order to be a productive employee.[55]

The record does not support this assertion.  The search logs the Government has provided show no increase in Iran-related searches during the last two weeks of Mr. Hekmati's employment.  Regardless, any such increase would corroborate Mr. Hekmati's testimony, as it would demonstrate that Mr. Hekmati was trying to remain productive while his formal assignments were winding down.

---

[54] USVSST Fund Hearing Tr. at 65:11–66:2.
[55] Reply at 9.

### C.   The Record Shows That Mr. Hekmati's Accessing of Iran-Related Materials Was Not Secret.

#### 1.   FD-302s from the FBI's Interviews with Mr. Hekmati's Supervisors and Colleague Corroborate His Testimony.

The Government argues that the same 302s cited above from interviews with Mr. Hekmati's supervisors and colleague provide conclusive evidence that they were not aware of his focus on Iran.[56]  The Government also contends (as it did in its first submission) that Mr. Hekmati worked more at night during the last two weeks of his employment in order to conceal his searches.[57]

As an initial matter, Mr. Hekmati already has demonstrated that courts consistently reject FD-302s as non-credible and inadmissible hearsay, as they consist solely of the impressions and conclusions of the FBI agents who authored the reports.[58]  The Government fails to address this precedent or explain why these particular 302s should be viewed as any more credible than the others it has submitted in support of its case.

Putting credibility issues aside, the 302s do not contradict Mr. Hekmati's testimony. With respect to the 302s from interviews with Mr. Hekmati's supervisors, they address only Mr. Hekmati's formal work assignment while in Afghanistan.  They provide no indication that the FBI ever asked whether Mr. Hekmati had mentioned an interest in building an Iran-related expertise.

The 302s from the FBI's interview with Mr. Tiso are similarly insufficient to support the Government's narrative.  According to the FBI, Mr. Tiso purportedly stated (in a 2016 interview—five years after he worked with Mr. Hekmati) that "people knew the least about []

---

[56] Reply at 10.
[57] *Id.* at 11.
[58] Hon. Katherine B. Forrest, *Guidelines Regarding Appropriate Use of 302 Forms in Criminal Trials*, at 5 (June 11, 2018), https://blog.federaldefendersny.org/wp-content/uploads/2018/06/Forrest-on-302s.pdf ("Judicial Guidelines").

what H[ekmati] was doing" and that he never "opened up about what he was working on."[59]

Again, there is no indication in these 302s that the FBI asked Mr. Tiso whether Mr. Hekmati had

expressed an interest in building an Iran-related expertise.  Moreover, the remainder of the

paragraph cited by the Government reflects that any lack of knowledge by others of

Mr. Hekmati's work was attributable to the fact that, as Mr. Hekmati testified, he had no team

and largely was on his own—not because he was seeking to conceal a conspiracy to commit

espionage against the United States.[60]

      Various other aspects of each of these 302s provide additional support for Mr. Hekmati's

testimony:

- Nowhere do they reference any subject matter restrictions on Mr. Hekmati's access
  credentials.

- Consistent with Mr. Hekmati's statement that he had little day-to-day direction from
  his supervisors regarding work assignments, nearly all of his supervisors admitted
  that they could not recall what, exactly, they had tasked Mr. Hekmati with
  researching.[61]

- Mr. Hekmati's supervisors and colleagues note that Mr. Hekmati was required to
  work long days (14–16 hours), and that he, along with many others, often worked at
  night to split up those hours.[62]

---

[59] Reply at 11 (citing to R. Tiso Interview at 1).
[60] R. Tiso Interview at 1 (noting that "HEKMATI did not have the same requirements as other IA's at SOJFT-A to coordinate with others.").
[61] See, e.g., C. Heatherly FBI Interview at 1 (April 19, 2016) (Ex. 8 to Gov't Supp. R.) ("HEATHERLY could not recall HEKMATI's specific tasking . . .") ("C. Heatherly Interview"); see also R. Tiso Interview at 1 ("TISO did not know what specific work HEKMATI was assigned to as an IA in support of SOJFT-A.").
[62] See C. Heatherly Interview at 3 (describing how Lieutenant Colonel Heatherly provided leeway for employees to go to the gym during the day, as long as they worked the required number of hours overall); R. Tiso Interview at 2.

- Mr. Hekmati's supervisors note that there were always at least 15 people in the SCIF at any time, meaning that night work provided no additional opportunity to engage in any illicit behavior.[63]

- No one observed Mr. Hekmati copying, writing, saving, or printing any information.[64]

- Mr. Hekmati was not permitted to bring a cell phone into the SCIF, and his colleagues never recalled seeing Mr. Hekmati with a personal cell phone or laptop computer.[65]

- Mr. Tiso "always had a view of" Mr. Hekmati's computer screen, and never observed Mr. Hekmati viewing anything unusual or inappropriate.[66]

- No one observed Mr. Hekmati engaging in behavior that was suspicious or otherwise caused them to question his loyalty to the United States.[67]

### 2.    Other Evidence From Mr. Hekmati's Colleagues Corroborates His Testimony.

Attached is a letter of recommendation from Gabriel Serrano, an individual identified by Mr. Tiso in the 302s as a colleague and friend of Mr. Hekmati's while in Afghanistan. In the letter, Mr. Serrano notes expressly that Mr. Hekmati researched Iran-related matters as part of his

---

[63] C. Heatherly Interview at 2.

[64] R. Tiso Interview at 2.

[65] *Id.* at 3.

[66] *Id.* at 1.

[67] *See, e.g.*, D. Pendall FBI Interview at 2 (Oct. 2, 2011) (Ex. 9 to Gov't Supp. R.) ("LTC Pendall [] never noticed any unusual or suspicious behavior by HEKMATI, nor is he aware of HEKMATI violating any security procedures."); E. Molnar FBI Interview at 2 (Sept. 30, 2011) (Ex. 10 to Gov't Reply) ("CPT Molnar never noticed any unusual or suspicious behavior by HEKMATI.  CPT Molnar is not aware of any security violations by HEKMATI, nor did she ever notice him searching or inquiring about intelligence outside the purview of his duties and assignments."); R. Tiso Interview at 2 ("Tiso has never observed any suspicious or unusual activity by HEKMATI.").

work in Afghanistan.[68]  Such evidence demonstrates that Mr. Hekmati's colleagues were aware of his Iran-related research and far outweighs any hearsay from the FBI.

> ### D.   The Record Shows That Mr. Hekmati Left the Six3 Job Early for Personal Reasons.

The Government argues that Mr. Hekmati's correspondence with Legal Persian and refusal to accept a signing bonus with a corresponding time commitment proves that he did not intend to stay in the Six3 position for the long term, and therefore that he must have taken the job only to obtain information that he could later sell to the Iranian government.[69]

The Government made this exact same argument in its first submission.  Mr. Hekmati already has explained that he had reservations about the Six3 job at the outset for personal reasons and was not certain he would stay long-term.[70]  Given these reservations, he declined a signing bonus to avoid any time commitment or tax obligations if he determined once he arrived that the position was not worth the toll that another deployment would put on his family and relationship with his girlfriend.[71]  He was unhappy in the position from the start, tired of being deployed, and left accordingly.[72]  His mother has attested to this under penalty of perjury.[73]

The Government's evidence corroborates these points.  According to the 302s provided by the Government, one of Mr. Hekmati's supervisors told the FBI that he observed Mr. Hekmati looking upset shortly before he gave his notice, and that Mr. Hekmati said it was due to the fact that he was tired of the challenges of being deployed.[74]  The Government fails to reconcile this evidence with its narrative regarding Mr. Hekmati's reasons for leaving the Six3 position.

---

[68] *See* Letter of Recommendation from Gabriel A. Serrano, Staff Officer, Dep't of Def., U.S. Transportation Command (June 26, 2020) (attached as Ex. A to Decl. of E. Grim).
[69] Reply at 11–12.
[70] Opening Br. at 30.
[71] A. Hekmati Decl. ¶ 23.
[72] B. Hekmati Decl. ¶ 12.
[73] *Id.* at 4.
[74] C. Heatherly Interview at 3.

**E.      Mr. Hekmati's Conduct During FBI Interviews Is Not Evidence of a "Consciousness of Guilt."**

Finally, the Government cites the same FD-302s memorializing the FBI's interviews with Mr. Hekmati from its first submission to the Special Master, this time with a declaration from their author stating that they are accurate.  According to the Government, Mr. Hekmati's purportedly "inconsistent" and "evasive" behavior during these interviews demonstrates a "consciousness of guilt."  *See* R. for Special Master ¶¶ 20, 21 ; Reply at 13.

In his opening brief and testimony, Mr. Hekmati demonstrated that any purported inconsistencies or defensiveness he exhibited during the two interviews were attributable to the severe PTSD he was suffering at the time and the shock of being accused of seeking to sell information to a government that had just imprisoned and tortured him for four-and-a-half years.[75]  In addition, Mr. Hekmati already has provided substantial legal authority rejecting the credibility not just of 302s generally, but also of information derived from interrogations of those suffering from PTSD.[76]

The Government addresses none of this evidence or legal precedent.  The Government does not deny that Mr. Hekmati was suffering from PTSD at the time of the interviews or that Mr. Hekmati's lawyer was not present during either interrogation.  The Government does not provide legal support for its assertion that such 302s are credible evidence of any kind.  Rather, the Government quibbles with what was or wasn't said during the interviews, and whether the FBI followed proper procedures during the interview process.  Such quibbles do not change the key facts on record or the law on this issue.

---

[75] A. Hekmati Decl. ¶ 40.
[76] Opening Br. 32–35.

## **CONCLUSION**

Mr. Hekmati has endured over four years of torture and wrongful imprisonment in Iran. He now has had to endure over four years of abuse and intimidation by his own Government. The Government has trampled Mr. Hekmati's constitutional and administrative rights, falsely and recklessly accused him of treason and espionage, and put Mr. Hekmati and his family through hell.  It is past time to close, once and for all, this disgraceful chapter.  Mr. Hekmati respectfully requests that the Special Master reinstate his claim and award him the payments to which he is entitled.

## <u>DECLARATION OF EMILY P. GRIM</u>

I, Emily P. Grim, do hereby state the following facts based on my personal knowledge:

1. Along with my colleagues, I represent Amir Hekmati in these proceedings before Special Master Kenneth R. Feinberg regarding the reconsideration of Mr. Hekmati's award from the United States Victims of State Sponsored Terrorism Fund.

2. I practice law in Washington, D.C.  I am an associate at the law firm Gilbert LLP. I am a member of the Bars of the District of Columbia, Pennsylvania, and Illinois.

3. Attached hereto as Exhibit A is a true and correct copy of a letter from Gabriel A. Serrano, Staff Officer at DoD, USTRANSCOM, J2X, FEV, to Amir Hekmati, dated June 26, 2020, as produced to me by Mr. Hekmati on June 26, 2020.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.


Executed On:  July 27, 2020


*/s/ Emily P. Grim*    
Emily P. Grim

# EXHIBIT A

June 26, 2020

Gabriel A. Serrano
Staff Officer
Department of Defense
U.S. Transportation Command
Scott AFB, IL 62225

Re: Reference Letter for Amir Hekmati

To Whom It May Concern:

I had the pleasure of working with Amir Hekmati at Bagram Air Base in Afghanistan between June 2011 and August 2011 in support of Regional Command-East where Amir supported the unit as an All-Source Intelligence Analyst.  During Amir's time with the unit he conducted research in support of the unit, and with little direction provided valuable insight into the following topics:

-Attacks on Cellphone towers inside Afghanistan by the Taliban, and made recommendations on addressing those attacks to Afghan infrastructure.
-Amir would monitor Extremist media propaganda, and deliver written suggestions for countering said propaganda.
-Geo-spatial analysis of attack patterns on US Army ground forces by extremist entities operating in the RC-East AO.
-Iranian influence in Afghanistan, and aid to Taliban forces against US Troops.
-A written plan to engage with Afghan Radio, and TV outlets such as Ariana TV to fund, and develop Afghan media content that would promote democracy, peace, and stability to the Afghan people.

During the period I worked with Amir I considered him effective, professional, dependable, and motivated about his role, and contributions to the organization.  He continuously provided expedient, accurate, and reliable results to the Command.  His outstanding work ethic made him one of the most trusted and reliable team members.   I would recommend Amir as a capable member of any team/organization.


Respectfully,

Gabriel A. Serrano
Staff Officer, DoD, USTRANSCOM, J2X, FEV
███████████████
███████████
████████████████

| | |
|---|---|
| **From:** | Ken Feinberg |
| **To:** | Grim, Emily P. |
| **Cc:** | Gilbert, Scott D; Connor, Deborah (CRM); Lee, Jane (CRM); Dery, Alice (CRM); Tsao, Leo (CRM); Campbell, Stephen (CRM); Dorsey, Sarah (CRM) |
| **Subject:** | RE: USVSST Fund Claim No. 1226 |
| **Date:** | Tuesday, July 28, 2020 11:09:57 AM |
| **Attachments:** | image001.png |

Emily,

Receipt confirmed. I will review the attached and render an Opinion.

Ken

---

**From:** Grim, Emily P. <grime@gilbertlegal.com>
**Sent:** Monday, July 27, 2020 9:48 PM
**To:** Ken Feinberg <KFeinberg@feinberglawoffices.com>
**Cc:** Gilbert, Scott D <gilberts@gilbertlegal.com>; deborah.connor@usdoj.gov; Jane.Lee3@usdoj.gov; Dery, Alice (CRM) <Alice.Dery@usdoj.gov>; Leo.Tsao@usdoj.gov; Stephen.Campbell@usdoj.gov; Dorsey, Sarah (CRM) <Sarah.Dorsey2@usdoj.gov>
**Subject:** RE: USVSST Fund Claim No. 1226

Ken,

Please find attached Amir Hekmati's response to the Government's June 26th submission.

Thank you,
Emily

**GILBERT** LLP

**Emily P. Grim**
grime@gilbertlegal.com
O 202.772.3926
C 610.737.3191

**Please Note My New Address:**

700 Pennsylvania Ave, SE
Suite 400
Washington, DC 20003
**GilbertLegal.com**

This email and any attachments may contain confidential information that is privileged at law. If you are not a named recipient or have received this communication by error, please notify the sender immediately and destroy this email and its attachments, and all copies thereof, without further distributing or copying them.

**From:** "Lee, Jane (CRM)" <Jane.Lee3@usdoj.gov>

**Date:** Friday, June 26, 2020 at 11:55 AM
**To:** Kenneth Feinberg <KFeinberg@feinberglawoffices.com>
**Cc:** "Connor, Deborah (CRM)" <Deborah.Connor@usdoj.gov>, "Tsao, Leo (CRM)"
<Leo.Tsao@usdoj.gov>, "Campbell, Stephen (CRM)" <Stephen.Campbell@usdoj.gov>,
"Dorsey, Sarah (CRM)" <Sarah.Dorsey2@usdoj.gov>, "Dery, Alice (CRM)"
<Alice.Dery@usdoj.gov>, Scott Gilbert <gilberts@gilbertlegal.com>
**Subject:** USVSST Fund Claim No. 1226

Dear Ken:

Pursuant to your April 24, 2020 Hearing Continuation Procedures, please find attached the
Department's written response to Mr. Hekmati's testimony.  Specifically, please find attached: (1)
the Department's Memorandum; (2) Declaration of FBI Special Agent Kramarsic, with the original
Record and Supplemental Record as Exhibits 1 and 2, respectively; and (3) Exhibits to the
Supplemental Record.

Mr. Gilbert is being provided the Department's submission via this email.

Thank you,

*Jane K Lee*
Attorney Advisor
Money Laundering & Asset Recovery Section
U.S. Department of Justice
1400 New York Avenue, NW
Washington, DC 20005
202-305-4232 (Direct)
202-603-9742 (Cell)
jane.lee3@usdoj.gov

September 15, 2020

VIA U.S. MAIL & ELECTRONIC MAIL

Scott D. Gilbert, Esq.
Gilbert LLP
700 Pennsylvania SE Suite 400
Washington, DC 20003


      Re:    <u>Amir Hekmati, Claim No. 1226</u>


Dear Mr. Gilbert:

      Pursuant to 34 U.S.C. § 20144(b)(4) (hearings), (b)(2)(A) (Federal Register publication of procedures), and 81 Fed. Reg. 45535, Part X.2 (July 14, 2016) (Special Master determines hearing procedures), on April 24, 2020 I provided hearing continuation procedures to both you and the Department of Justice allowing for further submissions in the above-captioned matter. Pursuant to these procedures, both you and the Department provided additional responses and submissions. On July 28, 2020, I communicated to you and the Department that I would review these additional submissions. I have done so.

      According to these procedures, I have the authority to request additional information or written submissions from the Department or the Claimant. Before I render a final decision in this matter, I request that you provide – no later than Friday, October 16, 2020 - additional information addressing the following five questions:

1) The Claimant obtained an Iranian passport relying upon his Iranian citizenship. Did this decision to obtain Iranian citizenship violate the terms and conditions of his US security clearance?

2) Did the Claimant ever disclose to United States officials at any time his intention to travel to Iran as required as a DOD contractor?

3) Can the Claimant credibly refute the fact that, while employed as a United States intelligence analyst in Afghanistan – and possessing a Top Secret government security clearance - over 90% of hundreds of highly classified documents he accessed focused on the subject of Iran rather than on his assigned responsibility to analyze terrorist threats in Afghanistan? Did the Claimant prepare any written reports or oral summaries of his examination of such Iranian topics?

4) How does the Claimant respond to the Department of Justice assertion that four reliable individual confidential sources independently maintain that the Claimant traveled to Iran primarily for reasons unrelated to a family visit?

5) Finally, how does the Claimant respond to the Department of Justice assertion that he provided evasive, false and inconsistent statements to the FBI when interviewed on three separate occasions by FBI agents concerning his trip to Iran and the circumstances surrounding that trip?

Barring any need for additional DOJ information, once you respond to this letter, I will declare the hearing closed and will promptly issue a final written decision.

Sincerely,

Kenneth R. Feinberg
Special Master
U.S. Victims of State Sponsored Terrorism Fund

CC:    Department of Justice:
Sarah B. Dorsey
Jane K. Lee
Joshua L. Shon

DA781

| | |
|---|---|
| **From:** | Ken Feinberg |
| **To:** | Gilbert, Scott D |
| **Cc:** | Lee, Jane (CRM); Dorsey, Sarah (CRM); Connor, Deborah (CRM) |
| **Subject:** | RE: Amir Hekmati |
| **Date:** | Tuesday, October 13, 2020 2:02:08 PM |
| **Attachments:** | image001.png |

Scott,

I am in receipt of your email detailing a request for a 30 day extension in the above captioned matter. In light of the circumstances referenced in your email I will grant you and your client a 30 day extension until the close of business on Friday, November 20, 2020.

Ken

---

**From:** Gilbert, Scott D <gilberts@gilbertlegal.com>
**Sent:** Tuesday, October 13, 2020 12:28 PM
**To:** Ken Feinberg <KFeinberg@feinberglawoffices.com>
**Subject:** Amir Hekmati

Ken,

Although, as you well know, I believe all of the questions you have posed have been amply answered in our pleadings and attached factual exhibits, and during the April hearing, I do want to ensure that we have the opportunity to address your most recent questions as you have posed them. In this regard, I am requesting a 30-day extension to provide our answers for the following reason.

Amir's father has been in an acute state for most of the last month. Amir and his family have been with his father throughout this period, and last week Amir and his family had to make the wrenching decision to take him off the ventilator. His father passed away this morning.

As a result of the foregoing, our ability to work with Amir and get him to focus on this has been, and at least in the near term will continue to be, limited, to say the least. This is exacerbated by the fact that the family, including Amir, believes that Amir's father's serious health issues were brought on by Iran's imprisonment and torture of Amir for nearly five years. By the time Amir was released and returned to the US, his father was on a one-way road. Having had to confront DOJ's conduct over the last year has certainly increased the stress and pain not only for Amir but for his mother and the rest of the family.

In view of the repeated DOJ-related extensions and delays since our hearing nearly six months ago, another 30 days should not cause you or they any concern. Please confirm that a 30-day extension is acceptable. Thanks.

sdg

# GILBERT LLP

**Scott D. Gilbert**
gilberts@gilbertlegal.com
O 202.772.2277
C 202.669.2966

**Please Note My New Address:**

700 Pennsylvania Ave, SE
Suite 400
Washington, DC 20003
**GilbertLegal.com**

This email and any attachments may contain confidential information that is privileged at law. If you are not a named recipient or have received this communication by error, please notify the sender immediately and destroy this email and its attachments, and all copies thereof, without further distributing or copying them.



700 Pennsylvania Avenue, SE
Suite 400
Washington, DC 20003
O 202.772.2200
F 202.772.3333

GilbertLegal.com

**Scott D. Gilbert**
202.772.2277
gilberts@gilbertlegal.com

November 20, 2020

**<u>VIA ELECTRONIC MAIL</u>**

Kenneth R. Feinberg
Special Master
U.S. Victims of State Sponsored Terrorism Fund
P.O. Box 10299
Dublin, OH 43017
kfeinberg@feinberglawoffices.com

Re:    Amir Hekmati, Claim No. 1226

Ken:

We write in response to the five questions posed in your letter of September 15, 2020, regarding assertions by the Department of Justice ("DOJ") that our client, Amir Hekmati, misrepresented the purpose of his trip to Iran on his application to the U.S. Victims of State Sponsored Terrorism Fund ("USVSST Fund" or "the Fund"), and that his entitlement to payment from the Fund therefore should be rescinded.

At the outset, the legal implications of your January 12, 2020, decision to rescind Mr. Hekmati's prior eligibility determination bear repeating:

1)    **Reconsideration of Mr. Hekmati's prior eligibility determination is expressly prohibited by the authorizing statute for the USVSST.** Your decision to do so is in violation of federal law.[1]

2)    **Even if such reconsideration were permitted, it would not be justified here, as Mr. Hekmati made no representations in his application or supporting materials regarding the purpose of his trip to Iran.** Pursuant to USVSST regulations, Mr. Hekmati's eligibility for payment from the Fund is determined *solely* by whether he holds a final judgment issued by a United

---

[1] 34 U.S.C. 20144(b)(3) (decisions by the Special Master are "final and, except as provided in paragraph (4) [concerning denials], not subject to administrative or judicial review"); *see, e.g.*, Opening Br. at 28–29; 35–36.

DA784

Special Master Kenneth R. Feinberg
November 20, 2020
Page 2



States district court against a state sponsor of terrorism arising from an act of international terrorism.[2]  It is uncontroverted that Mr. Hekmati holds such a judgment.

3)  **Neither you nor DOJ has legal authority to challenge the validity Mr. Hekmati's judgment against Iran.**  Your January 15, 2020 reconsideration decision rescinded Mr. Hekmati's right to payment on the basis that the judgment he submitted from the District Court contained "material omissions and false statements," and therefore was not "true and accurate."  However, the judgment is final and non-appealable—it cannot, by definition, be deemed "inaccurate."  The District Court reviewed the evidence before it, made credibility determinations, and issued factual findings regarding the nature and circumstances of Mr. Hekmati's trip to Iran.  If DOJ had grounds to challenge the evidence submitted to the District Court, it had every opportunity to participate in those proceedings—the case was highly publicized, and the government already had the information it has proffered to you in its possession.  DOJ chose to do nothing.  Neither you nor DOJ may now simply deem the District Court's judgment inaccurate or invalid.  Such encroachment is a clear violation of the separation of powers doctrine.[3]

4)  **Even if you did have such authority over the judicial branch, Mr. Hekmati's statement in his declaration that he traveled to Iran to see his grandmother is unquestionably true.**  DOJ has never asserted that Mr. Hekmati did not intend to visit his grandmother in Iran.  Even assuming he failed to disclose some *other* intent (which, as demonstrated by the evidentiary record, he did not), any omission of that intent from his declaration would not constitute a misrepresentation under federal law and thus cannot constitute grounds for rescinding his right to payment.[4]

5)  **The government cannot legally deprive Mr. Hekmati of his right to payment based on the current record.**  As discussed herein, DOJ's case rests entirely on hearsay and unsubstantiated suspicions, primarily in the form of unexplained "corroboration" by unidentified "sources" that Mr. Hekmati sought to sell information to the Iranian government, and conclusions by FBI agents that Mr. Hekmati acted suspiciously when he was interrogated without his lawyer present (twice) shortly after his release from years of imprisonment and torture in Iran.  Courts have held uniformly that such undisclosed "sources" and one-sided FBI conclusions cannot be used to prove the truth of any matter asserted, and certainly cannot provide a sufficient factual basis to deprive an individual of a right to payment.  The very purpose of our Constitution is to protect citizens from such lack of due process.[5]

---

[2] *See* USVSST Fund, *USVSST Fund Frequently Asked Questions* § 2 (2017),
http://www.usvsst.com/docs/USVSST%20Website%20FAQS%205.19.17%20FINAL%20130pm.pdf.
[3] *See* Opening Br. at 39–40.
[4] *See id.* at 41–42, Reply Br. at 6 (citing *Bronston v. U.S.*, 409 U.S. 352, 354–58 (1973) (holding that, although witness's omission was purposefully misleading, it did not constitute an actionable falsehood because witness's statement was literally true)).
[5] *Infra* at 10–13.

Special Master Kenneth R. Feinberg
November 20, 2020
Page 3



You have stated throughout these proceedings that you are not making a judgment as to whether Mr. Hekmati sought to sell information in Iran; you are simply determining whether he misrepresented the primary purpose of his trip on his application.  However, in order to conclude that Mr. Hekmati misrepresented the purpose of his trip to Iran, you are, by definition, concluding that Mr. Hekmati sought to sell information to the Iranian government—a charge tantamount to treason.  You, who are not a judge, would be ruling on Mr. Hekmati's alleged guilt without providing to Mr. Hekmati *any* of the protections of a criminal proceeding, including, but not limited to, Mr. Hekmati's right to confront witnesses and address the basis for their accusations against him, the prohibition on use of FD-302s to prove the fact of any matter asserted, and a standard of proof requiring DOJ to show "beyond a reasonable doubt" that Mr. Hekmati—a young man born and raised in the U.S. by a tight-knit and loving family, who served his country honorably as a U.S. Marine—sought to commit espionage.  Such a decision would constitute a gross violation Mr. Hekmati's most basic administrative and constitutional rights.

The USVSST Fund is intended to compensate individuals who, like Mr. Hekmati, have been tortured by terrorist nations.  It is not a tool for DOJ to harass victims of terrorism via back-door criminal proceedings, when DOJ otherwise has insufficient evidence to charge such individuals with a crime.  If you were to rescind Mr. Hekmati's right to payment based on the record provided to date, you would be perpetuating the abuse and manipulation of an administrative process whose integrity you were appointed to protect.

Answers to your questions are provided below.

\*       \*       \*

Special Master Kenneth R. Feinberg
November 20, 2020
Page 4



---

**QUESTION ONE:  The Claimant obtained an Iranian passport relying upon his Iranian citizenship.  Did this decision to obtain Iranian citizenship violate the terms and conditions of his US security clearance?**

---

**ANSWER:**  No.  Mr Hekmati did not "decide to obtain Iranian citizenship."  Even if he did, such conduct does not constitute a violation of the terms and conditions of his U.S. security clearance.

**I.      Mr. Hekmati Did Not "Decide to Obtain Iranian Citizenship."**

    A.    Mr. Hekmati did not "decide to obtain Iranian citizenship."  Under Iranian law, he was, and is, a citizen of Iran by virtue of his father's birth.[6]  Being born to an Iranian father does not violate the terms and conditions of a U.S. security clearance.[7]

    B.    Moreover, Mr. Hekmati willingly renounced his Iranian citizenship in 2003.[8]  To the extent the Special Master is suggesting that Mr. Hekmati's application for a passport somehow demonstrated an intent to rescind his renunciation of Iranian citizenship, that conclusion is unsupported by the record.  It is well-established that Iran does not recognize such renunciations and requires all individuals born to Iranian fathers to use an Iranian passport to enter and exit Iran.[9]  Mr. Hekmati sought to use his U.S. passport with an Iranian visa to travel to Iran but was advised by U.S. counsel that this would be illegal under Iranian law.[10]  Procuring an Iranian passport solely to avoid penalty under Iranian law and unnecessary scrutiny by Iranian government officials does not demonstrate an intent to reclaim citizenship.[11]

---

[6] Reply Br. at 9 (citing *Entry Requirements for Iran*, GOV.UK, https://www.gov.uk/foreign-travel-advice/iran/entry-requirements (last visited Nov. 17, 2020) ("Under Iranian law, all Iranian nationals must travel to and from Iran using an Iranian passport.  Even if you don't consider yourself to be Iranian, you may be regarded as an Iranian national by the Iranian authorities—e.g., if your father is Iranian, or if you're married to an Iranian man.")).
[7] *See generally National Security Adjudicative Guidelines*, Office of the Dir. of Nat'l Intel. (2017), https://www.dni.gov/files/NCSC/documents/Regulations/SEAD-4-Adjudicative-Guidelines-U.pdf.
[8] Gov't Suppl. R. ¶ 1; Letter from Amir Hekmati to Embassy of Pakistan (Aug. 12, 2003) (Ex. 1 to Gov't Suppl. R).
[9] Reply Br. at 9; *see also Iran: Requirements and procedures for a former Iranian citizen by birth, who renounced their citizenship, to reacquire Iranian citizenship, including circumstances that may bar someone from re-acquiring Iranian citizenship (2015-August 2017)*, Immigration and Refugee Board of Canada (Aug. 22, 2017), https://www.refworld.org/docid/5a840b5c4.html (noting that Iran's Council of Ministers has full discretion over requests to abandon citizenship, and that "practically speaking," such renunciations are never effective).
[10] Reply Br. at 10 (citing Decl. of Amir Hekmati ¶ 20 (Mar. 23, 2020) (Ex. A to Opening Br.) ("A. Hekmati Decl."); E-mail from Legal Persian to Amir Hekmati (Jan. 3, 2011, 8:58 AM) (Ex. 10 to A. Hekmati Decl.).
[11] Reply Br. at 9.

Special Master Kenneth R. Feinberg
November 20, 2020
Page 5



**II.    Even if Mr. Hekmati Could Be Said to Have "Obtained" Iranian Citizenship by Applying for an Iranian Passport, This Would Not Constitute a Violation of the Terms and Conditions of His U.S. Security Clearance.**

    A.    The National Security Adjudicative Guidelines for Determining Eligibility for Access to Classified Information or Eligibility to Hold a Sensitive Position (the "Guidelines") set forth the standards for evaluating whether an individual's conduct constitutes an actionable violation of clearance rules.[12]  The Guidelines state expressly that obtaining foreign citizenship does not constitute a violation of security clearance standards:

> *By itself*, the fact that a U.S. [citizen] is also a citizen of another country is not disqualifying without an objective showing of such conflict [with national security interests] or attempt at concealment.  The same is true for a U.S. citizen's exercise of any right or privilege of foreign citizenship and any action to acquire or obtain recognition of a foreign citizenship.[13]

    B.    Here, no such attempt at concealment occurred, and the timing and circumstances of Mr. Hekmati's procurement of the passport, as well as his personal and professional background, mitigate any concerns of an allegiance to Iran that could conflict with national security interests.

        1.    The record shows that Mr. Hekmati did not seek to conceal his procurement of an Iranian passport.  DOJ does not dispute that Mr. Hekmati procured the passport, along with all other necessary documentation for his trip to Iran, via official channels with the assistance of U.S.-based law firm Legal Persian (and his mother—hardly a covert action).[14]

        2.    Mr. Hekmati contacted Legal Persian about procuring the necessary travel documents for a trip to Iran with his family to see his ailing grandmother in January 2011—five months before he even became aware of the job opening with Six3.[15]  DOJ has yet to explain how Mr. Hekmati could have sought to plan a secret trip to Iran to sell classified information months before learning he would have access to such information.

---

[12] *National Security Adjudicative Guidelines* at 5, Office of the Dir. of Nat'l Intel. (2017), https://www.dni.gov/files/NCSC/documents/Regulations/SEAD-4-Adjudicative-Guidelines-U.pdf. ("The [] Guidelines [] are established as the single common criteria for all U.S. Government civilian and military personnel, consultants, contractors, licensees, certificate holders or grantees and their employees, and other individuals who require initial or continued eligibility for access to classified information or eligibility to hold a sensitive position.").

[13] *Id.* at 10.

[14] Reply Br. at 8–9 (citing H. Mirzaei Interview at 3 (Feb. 2, 2012) (Ex. 2(b) to Gov't Suppl. R.) (noting "Behnaz Hekmati, filled out Hekmati's passport application and sent all of the paperwork to Mirzaei")); Gov't Br. at 5.

[15] Opening Br. at 6; Reply Br. at 8; A. Hekmati Decl. ¶ 20; E-mail from Legal Persian to Amir Hekmati (Jan. 3, 2011, 8:58 AM) (Ex. 10 to A. Hekmati Decl.).

Special Master Kenneth R. Feinberg
November 20, 2020
Page 6



3.  Mr. Hekmati was born and raised in the U.S.[16] He had never visited Iran prior to his trip in 2011.[17] He holds dual citizenship only because his father was born in Iran.

4.  His family lived, and continues to live, in the U.S., and he was in a serious relationship with a woman in the U.S. at the time of his trip to Iran.[18]

5.  He had a steady income from his contracting work and was about to embark on an advanced degree in economics from the University of Michigan.[19]

6.  He took, and passed, two full-scale polygraphs in the years immediately preceding his trip to Iran.[20]

7.  He is a decorated veteran who served his country in the U.S. Marines.[21] He continued to serve his country as a defense contractor following his honorable discharge from the military.[22] He has provided numerous recommendation letters from his commanding officers and supervisors attesting to his character, work ethic, and devotion to his country.[23]

C.  DOJ has yet to explain why a young man of such background and means would have any reason whatsoever to put his life at risk by selling information to the Iranian Government.

---

**QUESTION TWO:** **Did the Claimant ever disclose to United States officials at any time his intention to travel to Iran as required as a DOD contractor?**

---

**ANSWER:** Mr. Hekmati did not disclose his intention to travel to Iran to his employer. He was not required to do so because he was not a DOD contractor when the travel occurred.[24] He planned a personal trip to visit a sick family member when he was not working for the U.S. government in any capacity. Even if DOJ could show that he was required to disclose his post-employment travel plans, Mr. Hekmati's belief that no such reporting was required was not unreasonable under the circumstances, and certainly does not support a conclusion that he was conspiring to commit espionage.

---

[16] Opening Br. at 4.
[17] Mem. Op. at 2, *Hekmati v. Islamic Republic of Iran*, No. 16-0875 (ESH) (D.D.C. Sept. 29, 2017), ECF No. 16.
[18] Opening Br. at 30; A. Hekmati Decl. ¶ 23; USVSST Fund Hr'g Tr. 38:4–7.
[19] Opening Br. at 5–6; USVSST Fund Hr'g Tr. 67:17–19.
[20] *See, e.g.*, A. Hekmati Decl. ¶¶ 18, 99; USVSST Fund Hr'g Tr. 49:10–11.
[21] Opening Br. at 4.
[22] *See, e.g.*, *id.* at 5; A. Hekmati Decl. ¶ 12.
[23] Letters of Recommendation from Military Commanders (Ex. 4 to A. Hekmati Decl.).
[24] Reply Br. at 10.

Special Master Kenneth R. Feinberg
November 20, 2020
Page 7



**I.     Mr. Hekmati Was Not Required to Disclose His Intent to Travel to Iran Post-Employment.**

    A.    Mr. Hekmati was not required to disclose his intent to travel to Iran to his employer because he was not a DOD contractor when the travel occurred.[25]

    B.    Nowhere do the DOD briefing materials provided by DOJ state that employees must report travel that they undertake (or intend to undertake) post-employment.[26]  Indeed, the materials state expressly that any travel reporting requirements—and indeed, any of the rules, requirements, or restrictions set forth therein—apply only to cleared employees of Six3.[27]  DOJ again has yet to identify any reason why an individual would find it necessary or appropriate to inform a former employer of plans for personal travel.

**II.    Even if Mr. Hekmati Were Required to Disclose His Travel Plans, Such Failure to Report Would Not Support a Conclusion That He Intended to Commit Espionage.**

    A.    Even if DOJ could show that Mr. Hekmati was required to disclose his post-employment travel plans, Mr. Hekmati's belief that no such reporting was required was not unreasonable under the circumstances, and certainly does not support a conclusion that he was conspiring to commit espionage.  Mr. Hekmati was traveling to Iran to visit his ailing grandmother, when he was no longer working in any capacity for the U.S. government.[28] After ten years of deployments, he had no plans to return to defense contracting in the near term, if ever, and was looking forward to starting a new chapter in his life—graduate school, marriage, and starting a family.[29]  He followed what he believed (and continues to believe) to be all appropriate security protocols:  he had resigned from his position before traveling[30]; he had received all standard security briefings about safeguarding classified information as part of his separation from Six3; and he consulted a U.S.-based law firm to avoid violating any Iranian travel requirements and unnecessary attention by Iranian government officials.[31]

    B.    Mr. Hekmati determined that any potential risks of traveling to Iran were far outweighed by the regret he would feel by not visiting his grandmother before she died—particularly given that he already was in a country neighboring Iran and likely would never be in such close proximity again in his grandmother's lifetime.[32]  Regardless of whether the Special

---

[25] *Id.*

[26] Six3Systems Security Briefing at 26 (Ex. 3(a) to Gov't Suppl. R.); Reply Br. at 10.

[27] Six3Systems Security Briefing at 26 (Ex. 3(a) to Gov't Suppl. R.) (noting that "[c]leared employees are required to report . . . [f]oreign travel"); *id.* at 12 (encouraging "[p]ersonnel working on DoD contracts" to undertake defensive security measures, including "[r]eport[ing] all foreign travel and the intent to travel to criterion countries.").

[28] *See, e.g.*, USVSST Fund Hr'g Tr. 66:15–17, 68:1–6.

[29] *E.g.*, Opening Br. at 5–6; USVSST Fund Hr'g Tr. 97:2–5.

[30] Opening Br. at 31.

[31] *See* Opening Br. at 6; E-mail from Legal Persian to Amir Hekmati (Jan. 3, 2011, 8:58 AM) (Ex. 10 to A. Hekmati Decl.); Reply Br. at 8–10.

[32] Opening Br. at 11, 25; USVSST Fund Hr'g Tr. 69:1–10.



Master agrees with this judgment, it certainly is not sufficient to support an inference that Mr. Hekmati sought to sell information to the Iranian government.

---

**QUESTION THREE:  Can the Claimant credibly refute the fact that while employed as a United States intelligence analyst in Afghanistan – and possessing a Top Secret government security clearance – over 90% of hundreds of highly classified documents he accessed focused on the subject of Iran rather than on his assigned responsibility to analyze terrorist threats in Afghanistan?  Did the Claimant prepare any written reports or oral summaries of his examination of such Iranian topics?**

---

**ANSWER:**  Mr. Hekmati's access of Iran-related documents fell well within the scope of "analyz[ing] terrorist threats in Afghanistan."  Though he did not author any written reports during his brief time at Six3, he referenced his research of Iranian influence in Afghanistan orally to colleagues and supervisors.

I.   **Mr. Hekmati's Access of Iran-Related Documents Fell Well Within the Scope of His Responsibility to Analyze Terrorist Threats in Afghanistan.**

    A.   Mr. Hekmati does not dispute that he accessed classified documents regarding Iran in the course of his work as an all-source intelligence analyst (though based on the search logs DOJ has provided, DOJ appears to have inflated the percentage of Iran-related documents that Mr. Hekmati viewed by nearly 20%[33]).

    B.   Regardless of whether the percentage was 1% or 100%, Mr. Hekmati's research into Iranian influence in Afghanistan falls well within the scope of "analyz[ing] terrorist threats in Afghanistan."  Numerous reports by defense analysts and think tanks at the time demonstrate that Iran's funding of the Taliban and influence over local Afghan politicians posed an increasing threat in the region, particularly as the drawdown of U.S. troops in Afghanistan commenced in the summer of 2011 (when Mr. Hekmati was working for Six3).[34]

    C.   DOJ contends that Mr. Hekmati's research into Iranian influence in Afghanistan is suspect because his only specific assignment within this realm was to deliver a weekly

---

[33] The Government contends that "over 90% of the hundreds of classified documents [Mr. Hekmati] accessed were on Iran." Gov't Br. at 7.  It is unclear how the Government came to this conclusion, as the unredacted portions of the search log it provided, apparently as support for this assertion, shows roughly 400 searches for "Iran" and Iran-related subjects out of nearly 600 total searches (approximately 70%).  Search Term Log (Ex. 11(a) to Gov't Suppl. R.).

[34] *E.g.*, Alireza Nader & Joya Laha, *Iran's Balancing Act in Afghanistan*, RAND (2011), https://www.rand.org/content/dam/rand/pubs/occasional_papers/2011/RAND_OP322.pdf; Alireza Nader et al., *Iran's Influence in Afghanistan: Implications for the U.S. Drawdown*, RAND (2014), https://www.rand.org/content/dam/rand/pubs/research_reports/RR600/RR616/RAND_RR616.pdf.



report regarding propaganda by the Taliban, Haqqani network, and Al-Qaeda.[35]  Mr. Hekmati has addressed these baseless suspicions repeatedly.[36]  His supervisors encouraged him to be proactive in pursuing any leads that might help the unit.  Because his formal assignment was insufficient to fill the 12-hour shifts required by his contract, he sought to add value to the unit by building a specialty in Iran-related issues based on his prior work experience.[37]

D.   All Iran-related materials that Mr. Hekmati reviewed were well within his access credentials.  Mr. Hekmati conducted his searches via Intelink, which is akin to Google for classified information.[38]  Search results would include a mix of classified and unclassified information and would display only documents to which he had access rights.[39]  He also clicked on links that were emailed to him as part of a daily digest.  He had no way of accessing information that was not previously authorized by his supervisors.[40]

E.   Mr. Hekmati did not (and could not, given the layout of his work station) conceal this research from others.[41]  As proof, Mr. Hekmati has provided a letter of recommendation from Gabriel Serrano, a former colleague, which notes expressly that Mr. Hekmati researched Iran-related matters as part of his work for Six3.[42]

## II.   Mr. Hekmati's Lack of Work Product on Iran-Related Matters Corroborates His Testimony.

A.   Mr. Hekmati has stated from the beginning of these proceedings that he was unable to generate useful work product on Iran-related issues during his brief tenure at Six3.[43]  His inability to do so corroborates his statement that he ultimately left the position in part because, despite his best efforts, he was struggling to find his place and add value to the unit.[44]

B.   In any event, the fact that he was unable to become an expert in Iranian influence in Afghanistan, identify leads, develop analysis, and generate formal work product on Iran-

---

[35] Gov't Br. at 8.
[36] *E.g.*, Opening Br. at 30; USVSST Fund Hr'g Tr. 47:17–22.
[37] A. Hekmati Decl. ¶ 28; USVSST Fund Hr'g Tr. 55:2–56:19; Opening Br. at 9–10; Reply Br. at 12.
[38] Opening Br. at 8.
[39] A. Hekmati Decl. ¶ 28; Opening Br. at 8.
[40] A. Hekmati Decl. ¶ 25; USVSST Fund Hr'g Tr. 49:4–18, 50:10–12, 52:6–10; Opening Br. at 8, 30.
[41] A. Hekmati Decl. ¶ 29; USVSST Fund Hr'g Tr. 56:22–57:2; Opening Br. at 10.
[42] Letter of Recommendation from Gabriel A. Serrano , Staff Officer, Dep't of Def., U.S. Transportation Command (June 26, 2020) (Ex. A to Decl. of E. Grim, July 27, 2020).
[43] *E.g.* A. Hekmati Decl. ¶ 27; Opening Br. at 9.
[44] *See* A. Hekmati Decl. ¶ 32; USVSST Fund Hr'g Tr. 65:11–66:2; Opening Br. at 10, 30; Reply Br. at 13.

Special Master Kenneth R. Feinberg
November 20, 2020
Page 10



related threats from scratch in the space of a few weeks is hardly evidence of an intent to commit espionage.

> **QUESTION FOUR:  How does the Claimant respond to the Department of Justice assertion that four reliable individual confidential sources independently maintain that the Claimant traveled to Iran primarily for reasons unrelated to a family visit?**

**ANSWER:**  Mr. Hekmati is unable to respond to DOJ's assertions because the nature and identity of the sources, and the factual basis for their accusations, have not been disclosed.  Are they drones that registered Mr. Hekmati walking within five feet of a government official?  Are they human operatives who observed Mr. Hekmati unknowingly speaking to an individual affiliated with the government at a family party?  Without such information, Mr. Hekmati cannot effectively defend himself from these accusations, and the Special Master cannot properly weigh their credibility or relevance.  This is the very reason why the Constitution provides individuals with the right to confront witnesses and evidence against them in administrative and legal proceedings.

I.   **The Constitution Forbids the Special Master from Terminating Mr. Hekmati's Payment Rights on the Basis of Information That Has Not Been Provided Either to the Special Master or to Mr. Hekmati.**

   A.   As detailed in prior briefing, when the government seeks to deprive an individual of a right or interest via an administrative proceeding, the individual is entitled to notice and an opportunity to confront evidence against him, including cross-examination of any adverse witnesses.[45]  The Supreme Court has recognized that such rights are of particular importance where, as here, claimants "have challenged proposed terminations [of rights to payment] as resting on incorrect or misleading factual premises or on misapplication of rules or policies to the facts of particular cases."  *Goldberg*, 397 U.S. at 268.  Mr. Hekmati has had no opportunity to discover the identity of these "sources" or to see the basis for their accusation, nor has he had the opportunity to confront them and challenge

---

[45] *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 171–72 (1951) (Frankfurter, J., concurring) (prior to depriving someone of a right, he must be given "notice of the case against him and opportunity to meet it"); *Goldberg v. Kelly*, 397 U.S. 254, 267–68 (1970) (noting, in context of welfare benefits termination hearing, that due process required "timely and adequate notice detailing the reasons for a proposed termination, and an effective opportunity to defend by confronting any adverse witnesses and by presenting his own arguments and evidence orally"); *Willner v. Comm. on Character & Fitness*, 373 U.S. 96 (1963) (holding same prior to denial of admission to the bar); *Goss v. Lopez*, 419 U.S. 565 (1975) (finding that substantive hearing was required prior to a ten-day suspension from a public high school and that the possible damage to a student's reputation that could flow from charges of misconduct implicated fourteenth amendment protection of liberty interests); *Greene v. McElroy*, 360 U.S. 474, 496 (1959) ("Certain principles have remained relatively immutable in our jurisprudence.  One of these is that where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue.").

Special Master Kenneth R. Feinberg
November 20, 2020
Page 11



their credibility.[46]  Therefore, the Special Master may not legally consider these alleged sources or their accusations in determining whether to terminate Mr. Hekmati's payment rights.

B.      As also demonstrated in prior briefing, Mr. Hekmati is entitled to these protections even if such information is classified or confidential.[47]  It is well-established both in the criminal and administrative context that the government cannot rely on the use of classified or confidential materials as a basis for depriving a claimant of a right unless the government discloses such materials to the claimant or produces a substitute of those materials that "provide[s] the defendant with substantially the same ability to present a defense and do[es] not otherwise violate his constitutional rights," including the right "to be confronted with the witnesses against him."[48]  DOJ has provided no such materials or a remotely permissible substitute here.

## II.    Mr. Hekmati Has Provided Credible Evidence That He Traveled to Iran to Visit His Grandmother.

A.      In contrast to DOJ's failure to provide any evidence whatsoever of Mr. Hekmati's activities in Iran, Mr. Hekmati has submitted substantial evidence supporting a conclusion that he traveled to Iran to visit his grandmother.

B.      Mr. Hekmati has explained, in detail and under oath, his activities during the trip and the purpose of the trip: to visit his ailing grandmother for a final time.[49]  He has submitted signed declarations, under penalty of perjury, from two identified individuals corroborating his testimony, as well as email correspondence with his mother from months before he ever learned of the Six3 job, in which they discuss such a trip.[50]

---

[46] Opening Br. at 38.

[47] *Id.* at 38–39.

[48] Edward C. Liu & Todd Garvey, Cong. Rsch. Serv., RL41742, *Protecting Classified Information and the Rights of Criminal Defendants:  The Classified Information Procedures Act* (2012), https://fas.org/sgp/crs/secrecy/R41742.pdf.  *See also, e.g., Kwong Hai Chew v. Colding*, 344 U.S. 590 (1953) (finding that procedural due process barred the use of undisclosed classified evidence against a resident alien in deportation proceedings); *Joint Anti-Fascist Refugee Comm.*, 341 U.S. at 170 (Frankfurter, J., concurring) ("democracy implies respect for the elementary rights of men . . . [and] must therefore practice fairness; and fairness can rarely be obtained by secret, one-sided determination of the facts decisive of rights.").

[49] *See* Opening Br. at 11–12.

[50] Decl. of Behnaz Hekmati ¶¶ 9–10, 14 (Ex. B to Opening Br.) (detailing how Mr. Hekmati's grandmother's health was "steadily declining" and "it was especially important to me [Mr. Hekmati's Mother] that Amir make the trip [to Iran]," how Mr. Hekmati was "excited to go to Iran, see his grandmother and other family, experience that place where I was born, and visit the cemetery where his grandfather was buried . . . I was grateful to hear that he was enjoying himself and spending time with my mother."); Decl. of Mohamed Reza Maleki ¶¶ 3–4 (Ex. C to Opening Br.) ("I, along with Amir's grandmother and cousins, spent every day with Amir . . . [i]n all our time together, I did not see Amir meet with anyone I knew who worked for the Iranian Government.  Indeed, I did not see him meet with anyone that wasn't a family member or close friend.  I never noticed him disappearing for long stretches of time.").

Special Master Kenneth R. Feinberg
November 20, 2020
Page 12



---

**QUESTION FIVE:  Finally, how does the Claimant respond to the Department of Justice assertion that he provided evasive false and inconsistent statements to the FBI when interviewed on three separate occasions by FBI agents concerning his trip to Iran and the circumstances surrounding that trip?**

---

**ANSWER:**  Mr. Hekmati did not make false statements or any intentionally evasive or inconsistent statements to the FBI.  As detailed in previous briefing, any perceived "defensiveness" would stem from the PTSD that he was experiencing at the time of the interviews and the shock of being accused of conspiring to sell information to a government that had just imprisoned and tortured him for four-and-a-half years.[51]  DOJ has provided no response to these points.

I.     **DOJ Has Provided No Credible Evidence of Mr. Hekmati's Purported Behavior During the Interviews.**

A.     The only "evidence" provided by DOJ of Mr. Hekmati's purportedly "evasive, false, and inconsistent statements" to the FBI consists of partially redacted FD-302s.  As detailed in Mr. Hekmati's Opening Brief, FD-302s are nothing more than a collection of impressions and conclusions of the FBI agent who authored them.[52]  Courts have ruled uniformly that FD-302s are inherently subjective and unreliable, and thus cannot be used to prove the truth of any matter asserted.[53]  DOJ has failed to argue otherwise.

B.     The circumstances of the FBI's interviews of Mr. Hekmati make DOJ's attempted use of FD-302s particularly suspect here.  Both interviews were conducted without Mr. Hekmati's lawyer present (in express disregard of his lawyer's instructions to the FBI),[54] and the FBI has provided no recording or transcript from these interviews to corroborate its statements.

---

[51] *E.g.,* Opening Br. at 34; Reply Br. at 18.

[52] Opening Br. at 32–33 ("Unless demonstrated otherwise, a 302 is not presumed to be a verbatim transcript of the questions asked or the answers given.  The witness is not placed under oath, and the purported witness statements are not sworn.  Different agents have different practices regarding how much detail they choose to include in a 302, and whether to include facts learned elsewhere as part of the investigation or editorial content that were not actually stated during the interview.  Agents with less background in an investigation may make errors in their note taking—for instance, by making references unsupported by the facts of the investigation.  Time lapses between the interview itself and the drafting of the memo also may give rise to inaccuracies.") (internal citations omitted).

[53] *Id.* at 33 (citing Hon. Katherine B. Forrest, "Guidelines Regarding Appropriate Use of 302 Forms in Criminal Trials," at 5 (June 11, 2018), *available at* https://blog.federaldefendersny.org/wp-content/uploads/2018/06/Forrest-on-302s.pdf; *Carpenters Health & Welfare Fund v. Coca-Cola Co.*, No. 1:00-CV-2838-WBH, 2008 WL 11335088, at *2 (N.D. Ga. Apr. 29, 2008) (finding 302s inadmissible because they contain "two levels of hearsay, were prepared in a criminal investigation unrelated to the instant action, and were not signed or otherwise adopted by the witnesses who were the subjects of the report," and because "302 Reports do not contain factual findings—they simply rehash what an interviewee said during an interview.").

[54] *E.g.* Opening Br. at 24.

Special Master Kenneth R. Feinberg
November 20, 2020
Page 13



## II. Any Perceived Defensiveness or Inconsistent Answers on Mr. Hekmati's Do Not Support an Inference of Guilt.

A.   Even if the FBI could provide credible evidence of any evasiveness or confusion on Mr. Hekmati's part during the interviews, the circumstances of the interviews would have justified such conduct.  The interviews were conducted shortly after Mr. Hekmati was released from years of torture, interrogations, and solitary confinement in a brutal Iranian prison.  Mr. Hekmati was understandably shocked, confused, and upset when agents began hurling accusations at him.[55]  Even under the best of circumstances, suggestions that Mr. Hekmati attempted to sell secrets to a government that had sentenced him to death and tortured him for four-and-a-half years would be incomprehensible and utterly non-sensical to any reasonable person, much less a decorated U.S. Marine.

B.   Further, it is well-established that individuals suffering from PTSD and similar mental illnesses are more  susceptible to giving cues that interrogators may perceive as indicating guilt or deception.[56]  As a result, they are more likely to make inaccurate but potentially damaging statements under questioning.[57]  For this reason, courts treat information gleaned from interviews with those suffering from mental illness as suspect.[58]

C.   The fact that Mr. Hekmati was suffering from severe PTSD upon his return from Iran is well-documented.  At the time of the interviews, he was dealing with constant insomnia, flashbacks, and panic attacks.[59]  He could barely leave his childhood room or keep track of the days, let alone withstand yet another interrogation.[60]  Dr. Stuart Grassian, an expert on the effects of PTSD on prisoners who have suffered protracted trauma, confirmed as part of his report to the District Court that, in the months following Mr. Hekmati's release from prison, he was experiencing, among other symptoms, "physiologic reactions (heart pounding, sweating, dizziness, etc.) to stimuli reminiscent of the event [his time in Evin]; increased arousal (a constant state of vigilance, anxiety and tension, irritability, jumpiness)"; and "difficulty with concentration and memory."[61]  The fact that he was

---

[55] *See id.* at 34.

[56] *See generally* Allison D. Redlich, *Mental Illness, Police Interrogations, and the Potential for False Confession*, 55 Psychiatric Servs. 19, 19–21 (2004), https://ps.psychiatryonline.org/doi/pdf/10.1176/appi.ps.55.1.19.

[57] Saul M. Kassin et al., *Police-Induced Confessions: Risk Factors and Recommendations*, 34 Law Human Behavior 3, 20–22 (2009), https://web.williams.edu/Psychology/Faculty/Kassin/files/White%20Paper%20-%20LHB%20(2010).pdf.

[58] *See, e.g., United States v. Hallford*, 756 F. App'x 1 (D.C. Cir. 2018) (upholding a motion to suppress evidence, finding it relevant that the defendant was suffering from mental illness in determining that the interview took place in a "coercive environment").

[59] Opening Br. at 34.

[60] *Id.*

[61] Expert Rep. of Dr. Stuart Grassian at 10, 15, *Hekmati v. Islamic Republic of Iran*, No. 16-0875 (ESH) (D.D.C. Feb. 6, 2017) (FILED UNDER SEAL) (Ex. D to Opening Br.).

Special Master Kenneth R. Feinberg
November 20, 2020
Page 14



suffering from such symptoms at the time he was interrogated by the FBI renders any conclusions based on those interviews inherently suspect.

\*       \*       \*

As a citizen of this country, Mr. Hekmati is entitled to certain fundamental rights of due process.  We urge you to safeguard those rights and the integrity of these proceedings by ruling based solely on the evidence before you—not on vague accusations, unsupported suspicions, and hearsay.  Thank you for your consideration in this matter.

Sincerely,

Scott D. Gilbert

December 7, 2020

VIA U.S. MAIL & ELECTRONIC MAIL

Scott Gilbert, Esq.
Gilbert LLP
700 Pennsylvania SE Suite 400
Washington, DC 20003

  Re: <u>Final Decision re: Amir Hekmati, Claim No. 1226</u>

Dear Mr. Gilbert:

  Pursuant to 34 U.S.C. § 20144(b)(4)(B), this letter provides you my final written decision regarding the claim of Mr. Amir Hekmati ("the Claimant") to the United States Victims of State Sponsored Terrorism Fund ("USVSST Fund"). For the reasons set forth below, I have determined that the Claimant is not eligible to receive payment from the USVSST Fund, and therefore affirm my prior reconsideration decision denying the Claimant's application for payment.

  I. <u>Claim Review Procedure</u>

  On December 6, 2017, the Claimant filed a timely application with the USVSST Fund, in accordance with the USVSST Fund's governing statute, 34 U.S.C. § 20144, and the procedures set forth in the USVSST Fund's Federal Register Notice, which provide that, "any payment made by the [USVSST] Fund is expressly conditioned upon the truthfulness and accuracy of the information and documentation submitted in support of the claim." *Justice for United States Victims of State Sponsored Terrorism,* 81 Fed. Reg. 45,535, 45,539 (July 14, 2016). The USVSST Fund's procedures and the Application Form require every claimant to certify, under oath and subject to penalty of perjury, the truth and accuracy of the application. The Claimant certified that his application, including the accompanying documents such as the judgment he obtained in *Hekmati v. Islamic Republic of Iran*, Case No. 1:16-cv-00875-ESH (D.D.C.), was true and accurate to the best of his knowledge.

  Based on the application, I determined that the Claimant had secured a judgment from a federal district court that met the USVSST Fund's statutory requirements. *See* 34 U.S.C. § 20144(c). On December 28, 2017, the USVSST Fund issued an eligibility letter informing the Claimant that he was eligible to receive distributions from the USVSST Fund based on his compensatory damages amount. On December 13, 2018, the Claimant was informed of his allocated payment amount. However, he has not received any payment from the USVSST Fund.

  On October 24, 2019, the Department of Justice ("Department") informed you that the Department intended to seek reconsideration of my prior eligibility and compensation decisions. On January 15, 2020, I informed you that I had determined that the Claimant was not eligible for compensation based upon all the information the Claimant submitted in his application and additional information the Department provided, which was not before me at the time of my original decision. Copies of the

Department's materials were provided to you on the same day. This reconsideration decision was based upon a preponderance of the evidence standard.

On February 12, 2020, you requested a hearing pursuant to the USVSST Fund's governing statute, 34 U.S.C. § 20144(b)(4). On March 19, 2020, I confirmed a hearing date of April 7, 2020. On March 23, 2020, you submitted a brief along with exhibits in advance of the hearing.

On April 7, 2020, I conducted a hearing during which the Claimant provided sworn testimony. On April 24, 2020, I provided hearing continuation procedures to you and the Department allowing for further submissions. Pursuant to these procedures, on June 26, 2020, the Department provided a written response, with exhibits, to the Claimant's testimony. On July 27, 2020, the Claimant submitted through counsel a reply to the Department's response. On July 28, 2020, I communicated to you and to the Department that I would review the submissions and render an opinion. On September 15, 2020, I requested additional information from you and your client addressing five questions posed in my letter. You responded by letter dated November 20, 2020 thus closing the record of the hearing.

This letter is my final written decision, in accordance with 34 U.S.C. § 20144(b)(4)(B). I have considered the Claimant's application and supporting documentation, testimony he provided, and arguments his distinguished and able counsel offered at the hearing, and the additional materials referenced above provided to me by both the Department and the Claimant. For the reasons set forth below, based upon a preponderance of the evidence, I find that the Claimant is not eligible to receive payments from the USVSST Fund because his USVSST Fund application contained material omissions and false statements.

II.    Decision

In its written submissions to the Special Master, the United States Department of Justice focuses on various reasons why the Claimant was not truthful in submitting his application for payment from the Fund. In his USVSST Fund application, the Claimant maintained that he traveled to Iran to visit family for personal reasons. But the circumstantial evidence, when viewed in its totality, indicates that this statement was false, that the Claimant traveled to Iran for primary purposes other than to visit his family. There is substantial evidence in the hearing record to corroborate this assertion by the Department of Justice.

Based upon the cumulative evidence submitted by the Department of Justice, and the rebuttal testimony and evidence submitted by the Claimant, including his oral Hearing testimony, I reaffirm my finding denying the Claimant payment based upon the following:

1) The Claimant obtained an Iranian passport relying upon his Iranian citizenship. But this decision to obtain Iranian citizenship violated the terms and conditions of his US security clearance. The Claimant had previously renounced such citizenship in order to receive the required US security clearance and failed to disclose to US authorities, as required, that he had obtained an Iranian passport. Claimant was on notice that he was prohibited from maintaining Iranian citizenship while possessing a US security clearance.

2) The Claimant never disclosed to United States officials at any time his intention to travel to Iran as required as a DOD contractor.

3) The Claimant is unable to credibly refute the fact that, while employed as a United States intelligence analyst in Afghanistan – and possessing a Top Secret government security clearance - FBI forensic examination of his computer/search access logs reveals that over 90% of hundreds of highly classified documents he accessed focused on the subject of Iran rather than on his assigned responsibility to analyze terrorist threats in Afghanistan. FBI forensic examination corroborates that the Claimant accessed highly classified information pertaining to Iranian military, nuclear and terrorism topics. This was accomplished without the knowledge or permission of the Claimant's supervisors. Nor did the Claimant prepare any written reports or oral summaries of his examination of such Iranian topics.

4) In support of its position, the Department of Justice asserts that four reliable individual confidential sources independently maintain that the Claimant traveled to Iran primarily for reasons unrelated to a family visit. The Department of Justice asserts that these four different, independent and reliable sources each arrived at this same conclusion, reinforcing each other.

5) Finally, the Hearing record details evasive, false and inconsistent statements that the Claimant provided the FBI when interviewed on three separate occasions by FBI agents concerning his trip to Iran and the circumstances surrounding that trip.

The Claimant attempts to refute the conclusions reached by the Department of Justice. The Claimant offers explanations as to each of the arguments advanced by the Department of Justice. But each of these separate circumstances – when reviewed cumulatively and in a comprehensive fashion based upon a review of the entire Hearing record – results in my conclusion that the Department has met the required preponderance of the evidence standard in asserting that the Claimant's application was untruthful. The Claimant has been unable to come forward with sufficient evidence to rebut the totality of the evidence and arguments advanced by the Department of Justice.

In sum, I conclude that the Claimant's appeal should be denied and that my prior reconsideration decision denying the Claimant's application for payment under the USVSST Fund is affirmed.

Sincerely,

Kenneth R. Feinberg
Special Master
U.S. Victims of State Sponsored Terrorism Fund

Department Of Justice:
    Sarah B. Dorsey
    Jane K. Lee
    Joshua L. Shon
    Deborah Connor